# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| REMINGTYN A. WILLIAMS, LAUREN E. CHUSTZ, and BILAL ALI-BEY, on behalf of themselves and all other persons similarly situated, | Civil Action No. |
| | Judge |
| | Section |
| Plaintiffs | Magistrate |
| v. | |
| SHAUN FERGUSON IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE NEW ORLEANS POLICE DEPARTMENT; LAMAR A. DAVIS IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE LOUISIANA STATE POLICE; JOSEPH P. LOPINTO IN HIS OFFICIAL CAPACITY AS SHERIFF OF JEFFERSON PARISH; | **JURY TRIAL DEMANDED** |

OFFICER TRAVIS JOHNSON;
OFFICER JASON JORGENSON;
OFFICER DEVIN JOSEPH;
OFFICER MICHAEL PIERCE;
SERGEANT TRAVIS WARD;
OFFICER DAVID DESALVO;
OFFICER WESLEY HUMBLES;
OFFICER ARDEN TAYLOR, JR.;
OFFICER FRANK VITRANO;
SERGEANT EVAN COX;
LIEUTENANT MERLIN BUSH;
OFFICER MICHAEL DEVEZIN;
OFFICER BRYAN BISSELL;
OFFICER DANIEL GRIJALVA;
OFFICER BRANDON ABADIE;
OFFICER DEVIN JOHNSON;
OFFICER DOUGLAS BOUDREAU;
OFFICER MATTHEW CONNOLLY;
SERGEANT TERRENCE HILLIARD;
OFFICER JONATHAN BURNETTE;
OFFICER JUSTIN MCCUBBINS;
OFFICER KENNETH KUYKINDALL;
OFFICER ZACHARY VOGEL;
SERGEANT LAMONT WALKER;
OFFICER DENZEL MILLON;
OFFICER RAPHAEL RICO;

OFFICER JAMAL KENDRICK;
SERGEANT DANIEL HIATT;
OFFICER JEFFREY CROUCH;
OFFICER JOHN CABRAL;
OFFICER MATTHEW EZELL;
OFFICER JAMES CUNNINGHAM;
OFFICER DEMOND DAVIS;
OFFICER JOSHUA DIAZ;
SERGEANT STEPHEN NGUYEN;
OFFICER VINH NGUYEN;
OFFICER MATTHEW MCKOAN;
CAPTAIN BRIAN LAMPARD;
CAPTAIN LEJON ROBERTS;
DEPUTY CHIEF JOHN THOMAS;

JOHN DOES 1-100;
JOHN POES 1-50;
JOHN ROES 1-50,

Defendants

## CLASS ACTION COMPLAINT

## INTRODUCTION

1.      This case is about Defendants' discriminatory and excessive use of force against Black people and those who, on June 3, 2020, voiced these very concerns on the Crescent City Connection ("CCC").   On that day, law enforcement officers violently attacked hundreds of peaceful demonstrators standing up for racial justice and against the tragic death of George Floyd and so many others.   The protest resulted in what was described as "the most high-profile local confrontation between demonstrators and police amid protests across the U.S."[1]   The officers' use of excessive force on the CCC was later endorsed by NOPD's Superintendent,[2] the Mayor of New Orleans,[3] and the Governor of Louisiana.[4]

2.      Officers of the New Orleans Police Department ("NOPD"), the Louisiana State Police ("LSP"), and the Jefferson Parish Sheriff's Office ("JPSO") were present on and/or near the CCC during the protest.



3. On May 25, 2020, the country was shocked by the death of George Floyd. Mr. Floyd died at the hands of Derek Chauvin, a Minneapolis police officer who knelt on Mr. Floyd's neck for nine minutes and twenty-nine excruciating seconds. Unarmed and already restrained in handcuffs, Mr. Floyd, a Black man, was recorded on video audibly pleading for his life, repeatedly stating that he could not breathe. All the while, other police officers stood idly by watching his murder. The final moments and death of Mr. Floyd, similar to far too many other killings of Black people by police, led to a nationwide outcry for justice.

4. Plaintiffs and Class Members were part of that national outcry for justice. They gathered in New Orleans, Louisiana to exercise their right to peacefully assemble and demand long-overdue change. From May 29, 2020 through June 6, 2020, thousands of Louisianans took to the streets in New Orleans to protest Mr. Floyd's death and to demand an end to discriminatory policing practices. Unfortunately, these pleas for justice—in New Orleans and around the country—were met with further police violence.[5]

5. The discriminatory nature of this excessive crackdown on peaceful protests aimed at police misconduct was made painfully clear when these events were juxtaposed with the gentler police response to a domestic terror attack in Washington D.C. on January 6, 2021. On that day, droves of mostly White rioters stormed the Nation's Capitol, openly declaring their intentions to

---

[1] Matt Sledge, *NOPD Finds 'Failures' in Crescent City Connection Bridge Tear Gas Confrontation in June*, The New Orleans Advocate, December 21, 2020, https://www.nola.com/news/crime_police/article_d797ee9a-43ae-11eb-b3c2-e7f107470440.html.

[2] *Id.*

[3] Hailey Auglair, *NOPD fires tear gas into crowd of protesters after it 'refused to comply'*, The New Orleans Advocate, June 3, 2020, https://www.nola.com/news/crime_police/article_6e38424e-a613-11ea-aaf2-578c5aaccf72.html.

[4] Sam Karlin, *John Bel Edwards: Police use of tear gas in New Orleans was reasonable*, The New Orleans Advocate, June 5, 2020, https://www.nola.com/news/politics/article_95b20ae0-a76b-11ea-a717-77912e338f23.html.

[5] Kim Barker, Matt Baker, and Ali Watkins, *Reports Hammer Police Responses To 2020 Protests*, The New York Times, Mar. 21, 2021, at A1.

harm elected officials.  They killed one police officer and injured at least 140 others.[6]  Nationwide press and social media coverage took notice of the restraint exhibited by officers in largely avoiding aggressive policing tactics—behavior rarely afforded to demonstrators protesting racial injustice and police misconduct towards Black people.  Journalists, elected officials, community members and leaders, and commentators alike echoed the same sentiment throughout the day: "*imagine if the rioters were Black.*"

 

"Members of the D.C. National Guard stand on the steps of the Lincoln Memorial as demonstrators participate in a peaceful protest against police brutality and the death of George Floyd, on June 2, 2020, in Washington, D.C." Win McNamee/Getty Images

"Police hold back supporters of U.S. President Donald Trump as they gather outside the US Capitol's Rotunda on Jan. 6, 2021, in Washington, D.C." OLIVIER DOULIERY/AFP via Getty Images

6.	The systemic discrimination against demonstrators exercising their First Amendment right to protest police misconduct is further underscored by the decision of the Federal Bureau of Investigation ("FBI") and the Department of Homeland Security ("DHS") to not issue a

---

[6]	Tom Jackman, *Police Union Says 140 Officers Injured in Capitol Riot*, The Washington Post, Jan. 27, 2021, https://www.washingtonpost.com/local/public-safety/police-union-says-140-officers-injured-in-capitol-riot/2021/01/27/60743642-60e2-11eb-9430-e7c77b5b0297_story.html.

joint intelligence bulletin or threat assessment (*i.e.*, advance warning to law enforcement agencies) on the credible reports of anticipated violence by White extremists on January 6, 2021. The decision was purportedly made "out of concern" that a bulletin may "run afoul of First Amendment free speech protections[.]" By contrast, no such trepidation was shown regarding the racial justice protests of last summer. Indeed, the FBI and DHS did issue such a bulletin in June 2020 when demonstrations were anticipated in response to the police killing of George Floyd.[7]

7.      The significantly lax police response to the violent attack on the Capitol is not an anomaly. Rather, it is yet another instance of a concerning trend tracked by the Armed Conflict Location & Event Data Project ("ACLED"), a non-profit data-reporting organization. ACLED's research found that, between May 1, 2020 and November 28, 2020, police were ***more than twice as likely*** to attempt to break up and disperse protests associated with racial injustice and police misconduct towards Black people than protests associated with (i) anti-mask demonstrators and (ii) White supremacists and other extremists, such as QAnon and militia groups—both categories of which were attended by mostly White demonstrators.[8] ACLED further found that, when officers did choose to intervene, they used heavy-handed force 51% of the time during protests associated with racial injustice and police misconduct, as opposed to only 34% of the time during anti-mask or other White supremacist protests.[9]

8.      This data—particularly in light of ACLED's finding that over 90% of racial injustice and police misconduct-associated protests were "entirely peaceful"—shows that too many

---

[7]    Dina Temple-Raston, *Why Didn't the FBI and DHS Produce a Threat Report Ahead of The Capitol Insurrection?* National Public Radio: Morning Edition, Jan. 13, 2021, https://www.npr.org/2021/01/13/956359496/why-didnt-the-fbi-and-dhs-produce-a-threat-report-ahead-of-the-capitol-insurrect.

[8]    Armed Conflict Location and Event Data Center, *The Future of 'Stop the Steal': Post-Election Trajectories for Right-Wig Mobilization in the US*, (Accessed Apr. 26, 2021) https://acleddata.com/2020/12/10/the-future-of-stop-the-steal-post-election-trajectories-for-right-wing-mobilization-in-the-us/.

[9]    *Id.*

officers' responses to protests, including whether to escalate through use of violent force, largely depends on the demonstration's subject matter and/or the race of its attendees.[10]

9.      New Orleans has seen these national trends—excessive force against racial injustice and police misconduct protests, underscored by comparatively lax response to protests regarding other matters—reflected on a local scale.

10.      While peacefully protesting on the CCC during the June 3, 2020 racial justice protest ("the Incident"), Plaintiffs Remingtyn ("Remy") A. Williams, Lauren E. Chustz, and Bilal Ali-Bey (collectively, "Plaintiffs") were tear-gassed and shot at with unauthorized projectiles, sustaining physical and severe emotional injuries.  This violent response stands in dramatic contrast to the lax responses of NOPD, LSP, and JPSO to protests dealing with issues other than racial justice and police brutality.

11.      Defendants had no legitimate basis to disperse the peaceful gathering on the night of June 3, 2020 with such extreme use of force.  Their violent response reflects how NOPD, LSP, and JPSO have historically enabled their officers as a standard policy, practice, and/or custom, to use punitive excessive force.  Moreover, failure to discipline those officers—already primed to both unconsciously and consciously mistreat communities of color—in response to their conduct during the Incident only serves to embolden police to routinely use such excessive force, particularly against the Black community (and those advocating for them).

12.      Violent and illegal conduct, *e.g.*, rioting, is not constitutionally protected and is not something Plaintiffs and their counsel defend.  Plaintiffs and Class Members, however, are entitled to exercise their constitutional rights of speech and peaceful assembly without being subjected to excessive force.

---

[10]    Armed Conflict Location and Event Data Center, *supra* note 8.

13.     Defendants' violent response to the June 3, 2020 demonstration is an example of the type of oppressive conduct against which the First Amendment was intended to protect.  On behalf of themselves and all others similarly situated, Plaintiffs seek to uphold, against uncivil, unwarranted, unjust, and unlawful attacks, their First, Fourth, and Fourteenth Amendment constitutional rights to peaceful assembly, petition for redress of grievances, equal protection under the law, freedom of speech, and freedom from excessive force and unwarranted seizures by the government.

## JURISDICTION AND VENUE

14.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1985(3) to vindicate their rights guaranteed by the First, Fourth, and Fourteenth Amendments to the United States Constitution.  Plaintiffs also bring supplemental state-law claims.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

15.     This case seeks remedies under 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. §§ 1983, 1985(3), and 1988.

16.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to Plaintiffs' claims arose in the Eastern District of Louisiana.

## PARTIES

17.     Plaintiff and proposed Class representative REMINGTYN WILLIAMS is a person of full age of majority and a resident of New Orleans, Louisiana.  Mr. Williams was demonstrating peaceably on and/or near the CCC on June 3, 2020.

18.     Plaintiff and proposed Class representative LAUREN CHUSTZ is a person of full age of majority and a resident of New Orleans, Louisiana.  Ms. Chustz was demonstrating peaceably on and/or near the CCC on June 3, 2020.

8

19.     Plaintiff and proposed Class representative BILAL ALI-BEY is a person of full age of majority and a resident of New Orleans, Louisiana.  Mr. Ali-Bey was demonstrating peaceably on and/or near the CCC on June 3, 2020.

20.     Defendant SUPERINTENDENT SHAUN D. FERGUSON ("Superintendent Ferguson") is a person of full age of majority and a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was the Superintendent of NOPD.  Upon information and belief, Superintendent Ferguson's responsibilities include, but are not limited to, the hiring, screening, training, retention, supervision, discipline, counseling, and control of the officers under his command who are or were employed by NOPD; and creating, determining, and implementing department-wide policies, practices, protocols, and customs.  He is sued in his official capacity.

21.     Defendant SUPERINTENDENT LAMAR A. DAVIS ("Superintendent Davis") is a person of full age of majority and a resident of the Parish of East Baton Rouge, State of Louisiana, who at all times pertinent herein was the Superintendent of LSP.  Upon information and belief, Superintendent Davis' responsibilities include, but are not limited to, the hiring, screening, training, retention, supervision, discipline, counseling, and control of the officers under his command who are or were employed by LSP; and creating, determining, and implementing department-wide policies, practices, protocols, and customs.  He is sued in his official capacity.

22.     Defendant SHERIFF JOSEPH P. LOPINTO, III ("Sheriff Lopinto") is a person of full age of majority and a resident of Jefferson Parish, State of Louisiana, who at all times pertinent herein was the Sheriff of Jefferson Parish.  Upon information and belief, Sheriff Lopinto's responsibilities include, but are not limited to, the hiring, screening, training, retention, supervision, discipline, counseling, and control of the officers under his command who are or were employed by JPSO; and creating, determining, and implementing department-wide policies, practices, protocols, and customs.  He is sued in his official capacity.

23.     Collectively, Defendants Ferguson, L. Davis, and Lopinto will hereinafter be referred to as "Defendant Supervisors," where appropriate.

24.     Defendant OFFICER TRAVIS JOHNSON is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  T. Johnson deployed tear gas on the protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

25.     Defendant OFFICER JASON JORGENSON is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Jorgenson deployed tear gas on the protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

26.     Defendant OFFICER DEVIN JOSEPH is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Joseph fired impact munitions at protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

27.     Defendant OFFICER MICHAEL PIERCE is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Pierce fired impact munitions at protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

28.     Defendant SERGEANT TRAVIS WARD is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Ward participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

29.     Defendant OFFICER DAVID DESALVO is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times

pertinent herein was employed by NOPD.  Desalvo participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

30.     Defendant OFFICER WESLEY HUMBLES is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Humbles participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

31.     Defendant OFFICER ARDEN TAYLOR, JR. is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Taylor participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

32.     Defendant OFFICER FRANK VITRANO is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Vitrano attacked protesters with a baton on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

33.     Defendant SERGEANT EVAN COX is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Cox participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

34.     Defendant LIEUTENANT MERLIN BUSH is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Bush participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

35.     Defendant OFFICER MICHAEL DEVEZIN is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times

pertinent herein was employed by NOPD.  Devezin attacked protesters with a baton on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

36.    Defendant OFFICER BRYAN BISSELL is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Bissell attacked protesters with a baton on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

37.    Defendant OFFICER DANIEL GRIJALVA is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Grijalva attacked protesters with a baton on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

38.    Defendant OFFICER BRANDON ABADIE is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Abadie participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

39.    Defendant OFFICER DEVIN JOHNSON is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  D. Johnson participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

40.    Defendant OFFICER DOUGLAS BOUDREAU is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Boudreau participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

41.    Defendant OFFICER MATTHEW CONNOLLY is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all

times pertinent herein was employed by NOPD.  Connolly attacked protesters with a baton on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

42.     Defendant SERGEANT TERRENCE HILLIARD is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Hilliard participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

43.     Defendant OFFICER JONATHAN BURNETTE is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Burnette participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

44.     Defendant OFFICER JUSTIN MCCUBBINS is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  McCubbins attacked protesters with a baton on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

45.     Defendant OFFICER KENNETH KUYKINDALL is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Kuykindall participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

46.     Defendant OFFICER ZACHARY VOGEL is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Vogel attacked protesters with a baton on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

47.     Defendant SERGEANT LAMONT WALKER is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all

times pertinent herein was employed by NOPD.  Walker participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

48.     Defendant OFFICER DENZEL MILLON is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Millon participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

49.     Defendant OFFICER RAPHAEL RICO is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Rico attacked protesters with a baton on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

50.     Defendant OFFICER JAMAL KENDRICK is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Kendrick participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

51.     Defendant SERGEANT DANIEL HIATT is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Hiatt participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

52.     Defendant OFFICER JEFFREY CROUCH is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Crouch attacked protesters with a baton on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

53.     Defendant OFFICER JOHN CABRAL is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times

pertinent herein was employed by NOPD. Cabral participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020. He is sued in his individual capacity.

54.     Defendant OFFICER MATTHEW EZELL is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD. Ezell participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020. He is sued in his individual capacity.

55.     Defendant OFFICER JAMES CUNNINGHAM is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD. Cunningham participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020. He is sued in his individual capacity.

56.     Defendant OFFICER DEMOND DAVIS is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD. D. Davis participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020. He is sued in his individual capacity.

57.     Defendant OFFICER JOSHUA DIAZ is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD. Diaz participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020. He is sued in his individual capacity.

58.     Defendant SERGEANT STEPHEN NGUYEN is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD. S. Nguyen attacked protesters with a baton on and/or near the CCC on June 3, 2020. He is sued in his individual capacity.

59.     Defendant OFFICER VINH NGUYEN is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times

pertinent herein was employed by NOPD.  V. Nguyen participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

60.     Defendant OFFICER MATTHEW MCKOAN is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  McKoan participated in the attack on peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

61.     Defendant CAPTAIN BRIAN LAMPARD is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Lampard gave the order for his fellow officers to use tear gas on the peaceful protesters on and/or near the CCC on June 3, 2020.  He is sued in his individual capacity.

62.     Defendant CAPTAIN LEJON ROBERTS is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Roberts witnessed the excessive force being executed by his fellow officers on and/or near the CCC on June 3, 2020 but failed to intervene to protect the peaceful protesters.  He is sued in his individual capacity.

63.     Defendant DEPUTY CHIEF JOHN THOMAS is a person of full age of majority and, on information and belief, a resident of the Parish of Orleans, State of Louisiana, who at all times pertinent herein was employed by NOPD.  Thomas witnessed the excessive force being executed by his fellow officers on and/or near the CCC on June 3, 2020 but failed to intervene to protect the peaceful protesters.  He is sued in his individual capacity.

64.     Defendants JOHN DOES 1-100 ("NOPD BYSTANDER OFFICERS") are officers of NOPD who witnessed the excessive force being executed by their fellow officers on and/or near

the CCC on June 3, 2020 but failed to intervene to protect the peaceful protesters.  They are sued in their individual capacities.

65.     Defendants JOHN POES 1-50 ("LSP BYSTANDER OFFICERS") are officers of LSP's Troop N who, upon information and belief, witnessed the excessive force being executed by other law enforcement officers on and/or near the CCC on June 3, 2020 but failed to intervene to protect the peaceful protesters.  They are sued in their individual capacities.

66.     Defendants JOHN ROES 1-50 ("JPSO BYSTANDER OFFICERS") are officers of JPSO who, upon information and belief, witnessed the excessive force being executed by other law enforcement officers on and/or near the CCC on June 3, 2020 but failed to intervene to protect the peaceful protesters.  They are sued in their individual capacities.

67.     Collectively, Defendants T. Johnson, Jorgenson, Joseph, Pierce, Ward, Desalvo, Humbles, Taylor, Vitrano, Cox, Bush, Devezin, Bissell, Grijalva, Abadie, D. Johnson, Boudreau, Connolly, Hilliard, Burnette, McCubbins, Kuykindall, Vogel, Walker, Millon, Rico, Kendrick, Hiatt, Crouch, Cabral, Ezell, Cunningham, D. Davis, Diaz, S. Nguyen, V. Nguyen, McKoan, Lampard, Roberts, Thomas, NOPD Bystander Officers, LSP Bystander Officers, and JPSO Bystander Officers will hereinafter be referred to as "Defendant Officers," where appropriate.

68.     All Defendants are jointly and severally liable for the illegal conduct set forth below.

## FACTUAL BACKGROUND

### A "Frightening Stampede" and "Chemical Warfare"—The June 3rd Protest

69.     After five days of peaceful protests against police brutality and racial injustice in and around New Orleans, peaceful demonstrators, including Plaintiffs Chustz and Ali-Bey, gathered on the afternoon of June 3, 2020 at Duncan Plaza, a park on Loyola Avenue between

Gravier and Perdido Streets in New Orleans. Activists spoke to the crowd about police brutality and racial injustice in New Orleans and around the country.

70.    In the evening, they started marching from Duncan Plaza towards the CCC.

71.    At approximately 9:30 p.m., several hundred demonstrators began walking up a ramp at Camp Street onto the westbound lanes towards the CCC. Plaintiff Williams joined the protest around this time. This was not the first night that demonstrators had marched onto an elevated roadway—they had done so on the previous night.

72.    On the night of June 3, however, peaceful protesters were met with a barricade of officers in full riot gear, holding batons and shields. Upon information and belief, Defendant Officers were in or near this police barricade. Some Defendant Officers on the front line had their only and first "riot control" training that day.[11]

73.    Defendants T. Johnson, Jorgenson, Joseph, Pierce, Ward, Desalvo, Humbles, Taylor, Cox, and Vitrano are members of NOPD's Special Operations Division tactical team ("SWAT team"). The SWAT team was on and/or near the CCC on the night of June 3, accompanied by their captain, Defendant Brian Lampard.

74.    The police barricade was "backed by a convoy of police vehicles, including at least one large military style armored truck"[12] and a helicopter from JPSO (present at NOPD's request[13]) that hovered above demonstrators "repeatedly overhead."[14]  Upon information and belief, JPSO

---

[11]   Matt Sledge, *Internal Report Details Chaotic June 3 Standoff, Teargassing on Crescent City Connection Bridge*, The New Orleans Advocate, Feb. 7, 2021, https://www.nola.com/news/crime_police/article_0541163a-6995-11eb-b918-37d0f10d4f64.html.

[12]   Bryn Stole, Ramon Antonio Vargas, and Matt Sledge, *Video from Protester Clash Appears to Show NOPD Fire Projectiles, Despite Chief's Denial*, The New Orleans Advocate, Jun 4, 2020, https://www.nola.com/news/crime_police/article_5eb37f9e-a6b0-11ea-aeb6-1775455fe0a0.html.

[13]   Ramon Antonio Vargas, *JPSO, Gretna Police Were Staged at Parish Line in Case CCC Protest Made It That Far*, The New Orleans Advocate, Jun 5, 2020, https://www.nola.com/news/crime_police/article_ebf711c4-a776-11ea-88b4-cf7e3457d375.html.

[14]   Bryn Stole, Matt Sledge, and Katelyn Umholtz, *New Orleans Protests Escalate and 'Stampede' Erupts as NOPD Fires Tear Gas Into Crowd*, The New Orleans Advocate, Jun 3, 2020, https://www.nola.com/news/crime_police/article_fea3d5ce-a5e0-11ea-85ad-9bc9881bf65e.html.

Bystander Officers were in and/or near the police barricade.  The exact locations, actions, and identities of JPSO Bystander Officers are yet unknown to Plaintiffs, despite Plaintiffs' best efforts to procure this information through public records requests issued to JPSO.[15]

75.     Upon information and belief, LSP Bystander Officers were also in and/or near the police barricade on the CCC on the night of June 3.  LSP's "Troop N units responded to [the CCC] providing assistance to the NOPD units until the protest peacefully disbursed from the location."[16] Despite Plaintiffs' best efforts, LSP has failed to provide additional details about the actions or identities of LSP Bystander Officers.[17]



76.     Upon information and belief, demonstrators asked some Defendant Officers to put down their shields, batons, and riot gear, and walk across the CCC bridge with the group in

---

[15]   Correspondence with JPSO with respect to public records request, attached hereto as Exhibit A.
[16]   Louisiana State Police's response to public records request, attached hereto as Exhibit B; p. 8.
[17]   Correspondence with LSP with respect to public records request, attached hereto as Exhibit B.

solidarity.  Defendant Officers declined.  It was later revealed that Defendant First District Captain LeJon Roberts, a commander on duty that night from NOPD, was "worried about letting a 'hostile' crowd cross the bridge,"[18] despite the fact that, prior to the firing of tear gas, "nearly all [demonstrators] were acting peacefully."[19]  Captain Roberts' description of the peaceful protesters as "hostile" demonstrates how Defendant Officers viewed protesters against police brutality and racial injustice—many of whom were people of color—through the lens of the officers' own prejudices, leading to Defendant Officers' brutal and unnecessary violence against peaceful protesters.  Roberts' characterization of the protesters is also belied by eyewitness accounts, including those of Plaintiffs and Class members, which support that Defendants, not the protesters, were by in large the "hostile" individuals that night.

77.     Upon information and belief, demonstrators attempted to negotiate with Defendant Officers that protesters should be allowed to pass through the bridge.  After a lengthy standoff that involved singing, chanting, and heckling from a few restless or otherwise frustrated demonstrators, a small group of agitated demonstrators passed through an opening in the police line while others raised their hands chanting "Hands up, don't shoot!"[20]

78.     Upon information and belief, Defendant Lampard of the SWAT team did not consult with Defendant Deputy Chief John Thomas, the highest-ranking officer on duty coordinating the protest response for NOPD that night, before ordering his team to deploy tear gas around approximately 10:25 p.m.[21]  Lampard shouted, "gas, gas, gas!"[22] at which point, without any warning, Defendants T. Johnson and Jorgenson immediately began firing canisters of tear gas

---

[18]   Matt Sledge, *Internal Report Details Chaotic June 3 Standoff, Teargassing on Crescent City Connection Bridge,* The New Orleans Advocate, Feb 7, 2021, https://www.nola.com/news/crime_police/article_0541163a-6995-11eb-b918-37d0f10d4f64.html.

[19]   Stole, *supra* note 14.

[20]   Sledge, *supra* note 1 ("Ferguson cast blame on the *small group* who tried to force their way over the bridge").

[21]   Sledge, *supra* note 11.

[22]   *Id.*

into a crowd of several hundred peaceful demonstrators[23]—many of whom were unprepared and unaware of the growing tensions in the front lines.[24]  Sergeant David A. Barnes from NOPD's Force Investigations Team has since admitted that "no indication warnings were given by police prior to the first deployment of gas" that night.[25]

79.     What transpired next has been described as a "stampede."[26]  Organizers were heard shouting "fall back, fall back" and to "walk," out of fear that demonstrators might be trampled or pushed off the elevated onramp.

80.     In response to the tear gas, demonstrators largely dispersed and retreated towards the side of the bridge for fresh air—or towards the volunteer medics on the other side of the bridge, where demonstrators poured milk onto one another's eyes to stop the burning.

 

---

[23]     New Orleans Police Department, Bureau of Integrity, *CCC Investigation Summary*, NOPD Item: F-03385-20, (December 7, 2020), attached hereto as Exhibit C.
[24]     Sledge, *supra* note 1, (". . . people were caught off guard by all of a sudden getting gassed").
[25]     Sledge, *supra* note 11.
[26]     Stole, *supra* note 14.



81.     Despite the dispersal of protesters in response to the first barrage of tear gas, supervisors in the SWAT team gave permission to fire several more canisters of tear gas and to begin shooting impact munitions at the crowd of retreating demonstrators.  Video footage of the Incident shows that Defendants Joseph and Pierce continued shooting projectiles into the crowd of demonstrators after they were a significant distance away and not an immediate threat.[27]  Numerous demonstrators, including Plaintiffs, were injured and continue to suffer severe emotional distress from Defendant Officers' coordinated and largely unprovoked attack.

82.     Evidence of Defendant Officers' improper use of unauthorized projectiles and excessive force has been collected by notable civil rights organizations and journalists.  Defendant Officers' attack was also captured in numerous photographs and videos from Class Member

---

[27]     Nola.com, *New Orleans Police Accused of Shooting Protesters on Crescent City Connection with Rubber Bullets*, Youtube, (Jun. 4, 2020), https://www.youtube.com/watch?v=3oRJgfn33eQ.

demonstrators, including Plaintiff Remy Williams.  Upon information and belief, Defendants also have custody and control of surveillance videos and body camera recordings, which contain further evidence of Defendant Officers' conduct.

*The Dangers of Tear Gas*

83.     Tear gas is an umbrella term for aerosolized chemical compounds that temporarily incapacitate those subjected to it by causing irritation to the eyes, mouth, throat, lungs, and skin.[28]

84.     It has been banned for use in warfare,[29] but it is routinely used by police in the United States, amounting to "cruel, inhuman and degrading treatment directed towards protestors primarily representing racial minorities."[30]

85.     Tear gas is indiscriminate in nature—"the risk of exposing bystanders and individuals other than the intended targets, including vulnerable people, is high."[31]

86.     The active component of tear gas deployed by Defendants T. Johnson and Jorgenson on June 3, 2020 is chlorobenzylidenemalononitrile ("CS"), a nerve gas designed to inflict pain and degrade the mucous membranes in a person's eyes, nose, mouth, and lungs.  It causes irritation to the area of contact within seconds of exposure, including, but not limited to, eye burning, excessive tearing, blurred vision, swelling and irritation of the sinuses and mouth, difficulty swallowing, chest tightness, choking sensations, wheezing, shortness of breath, burns and rashes to the skin, and vomiting.[32]

---

[28]   Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/healthshots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

[29]   *Id.*

[30]   Justin Hannsford and Meena Jagannath, *Ferguson to Geneva: Using the Human Rights Framework to Push Forward a Vision for Racial Justice in the United States After Ferguson*, 12 Hastings Race & Poverty L. J. 121, 133-34 (2015).

[31]   Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.

[32]   National Center for Environmental Health, *Facts about Riot Control Agents*, Centers for Disease Control, Apr. 4, 2018, https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp.

87.     The Centers for Disease Control classify exposure to tear gas as a "chemical emergency" and recommend seeking immediate medical attention.[33]  People with preexisting conditions, including asthma or chronic obstructive pulmonary disease (COPD), are "at risk for severe complications as a result of tear gas . . . that could lead to asphyxiation and even death."[34] Children are also at a heightened risk for experiencing severe complications.

88.     Defendants T. Johnson and Jorgenson nonetheless launched tear gas from canisters that release CS in gaseous form.  Tear gas canisters themselves are dangerous as they can explode, often causing severe burns and injuries in addition to exposure to propellants, solvents, and the tear gas itself.[35]

89.     Tear gas can also cause long-lasting lung damage, leaving people at a higher risk for contracting respiratory illnesses.  This was especially problematic at the height of the global coronavirus pandemic (COVID-19), a respiratory illness that, to date, has reportedly infected over 148 million people and taken the lives of over 3 million people worldwide.[36]  Coronavirus is spread primarily through droplets when an infected person coughs or sneezes, or through droplets of saliva or discharge from the nose.[37]  Tear gas causes people to cough and produce excess saliva and nasal mucus, increasing the likelihood that infected individuals spread the virus to other people nearby.[38]

90.     For these reasons, nearly 1,300 medical and public health professionals signed an open letter on June 2, 2020 urging police across the country to stop using tear gas, which could

---

[33]  *Id.*

[34]  Adriana Rodriguez & Janet Loehrke, *Protesters Should Know How to Protect Themselves from Tear Gas, Pepper Spray,* USA Today, Jun. 2, 2020,  https://www.usatoday.com/in-depth/news/nation/2020/06/02/george-floyd-protests-everything-know-tear-gas-pepper-spray/5307500002/.

[35]  *Id.*

[36]  Johns Hopkins University Center for Systems Science and Engineering, *Covid-19 Dashboard,* Coronavirus Resource Center, (Accessed April 28, 2021), https://coronavirus.jhu.edu/map.html.

[37]  World Health Organization, *Coronavirus,* (Accessed Apr. 25, 2021)  https://www.who.int/health-topics/coronavirus#tab=tab.

[38]  Will Stone, *Tear-Gassing Protesters During An Infectious Outbreak Called 'A Recipe For Disaster',* June 5, 2020,https://www.npr.org/sections/health-shots/2020/06/05/870144402/tear-gassing-protesters-during-an-infectious-outbreak-called-a-recipe-for-disast.

"increase risk for COVID-19 by making the respiratory tract more susceptible to infection, exacerbating existing inflammation, and inducing coughing."[39]  The very next day, Defendant Officers unleashed tear gas on the peaceful demonstrators at the CCC, in reckless and callous disregard for the health and safety of the protesters.

91.     Separate and apart from the effects of tear gas on the transmission of the coronavirus, tear gas can cause irreparable harm to the reproductive health of women.  Exposure to tear gas has been linked to miscarriages and abnormal menstrual periods, indicating that tear gas affects the menstrual cycle of women and may affect ovulation and fertility.[40]  While studies are ongoing to determine the extent and longevity of the effects,[41] it is clear that tear gas disrupts the reproductive health of women, and other countries have accordingly taken steps to protect women from these harms.  For instance, Chile has temporarily banned the use of tear gas out of concern for women's reproductive health.[42]

***Impact Munitions***

92.     In addition to chemical weapons, Defendant Officers used a variety of so-called "riot control" impact munitions on the retreating crowd of peaceful demonstrators.

---

[39]  Lisa Song, *Tear Gas is Way More Dangerous than Police Let on—Especially During the Coronavirus Pandemic*, Pro Publica, Jun 4, 2020, https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic.

[40]  *See,* e.g., Vanessa Taylor, *How Tear Gas May Be Wreaking Havoc on Protesters' Reproductive Health,* Mic, Sep. 10, 2020, https://www.mic.com/p/how-tear-gas-may-be-wreaking-havoc-on-protesters-reproductive-health-33412444; Ahmad Fathi Al-Masri, *Report prepared by the Social Affairs Department of the Palestine Liberation Organization on the brutal measures being taken against children and women in the occupied Palestinian territories*, United Nations, May 2, 1988, https://www.un.org/unispal/document/auto-insert-186729/; Physicians for Human Rights, *Weaponizing Tear Gas: Bahrain's Unprecedented Use of Toxic Chemical Agents Against Civilians,* The Nation, August 2012, https://www.thenation.com/wp-content/uploads/2015/04/Bahrain-TearGas-Aug2012-small.pdf; Beth Adams, *Protesters Report Menstrual Changes after Tear Gas Exposure*, WXXI News, Sep. 23, 2020, https://www.wxxinews.org/post/protesters-report-menstrual-changes-after-tear-gas-exposure; Yara Mahfud, Alexander Samuel, Elif Çelebi, and Jais Adam-Troian, *The Link Between CS Exposure and Menstrual Cycle Issues Among Female Yellow Vest Protesters in France,* MedRxiv, Oct. 14, 2020, https://www.medrxiv.org/content/10.1101/2020.10.11.20210955v1.full.

[41]  Planned Parenthood North Central States, *Tear Gas and Reproductive Health Study,* https://www.plannedparenthood.org/planned-parenthood-north-central-states/about-ppncs/research/tear-gas-and-reproductive-health-study.

[42]  Mari Hayman, *Chile Suspends Use of Tear Gas Amid Concerns over Miscarriages,* Land Latin Dispatch, May 19, 2011, https://latindispatch.com/2011/05/19/chile-suspends-use-of-tear-gas-amid-concerns-over-miscarriages/.

93.     Impact munitions have a larger surface area than other ammunition, and thus they take unpredictable flight paths—reduced accuracy is inevitable.[43]

94.     Defendants Joseph and Pierce fired "Direct Impact LE Extended Range CS Crushable Foam rounds."  In sum, they shot foam bullets that contain the CS irritant found in tear gas at the crowd.  These bullets are designed to "combine blunt trauma with the effects of an irritant powder, maximizing the potential for incapacitation."[44]

95.     Defendant Joseph also fired "Direct Impact Marking Crushable Foam rounds," *i.e.*, sponge grenades with paint markers.

96.     Defendant Pierce additionally fired "60 caliber rubber ball 'Stinger' rounds"[45]— projectiles that scatter 18 hard rubber bullets per round when fired.

97.     On information and belief, Defendants Joseph and Pierce acted in concert with JPSO Bystander Officers and LSP Bystander Officers in the use of these munitions.

98.     All three of these weapons—the foam bullets, the sponge grenades, and the Stinger rounds—come with a disclaimer: "This product can expose you to chemicals including Lead Salts, Methylene Chloride and Hexavalent Chromium, which are known to the State of California to cause *cancer*, and Lead Salts, which are known to the State of California to cause *birth defects or other reproductive harm*."[46]

---

[43]   Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.; Kinetic Impact Projectiles, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.

[44]   Defense Technology, *Direct Impact LE 40mm Extended Range CS Crushable Foam Round,* (Accessed Apr. 1, 2021),    https://www.defense-technology.com/product/direct-impact-le-40-mm-extended-range-cs-crushable-foam-round/.

[45]   *CCC Protest Investigation Summary*, *supra* note 23.

[46]   Defense Technology, *Direct Impact LE 40mm Extended Range CS Crushable Foam Round,* (Accessed Apr. 1, 2021),   https://www.defense-technology.com/product/direct-impact-le-40-mm-extended-range-cs-crushable-foam-round/ (emphasis added); Defense Technology, *Stinger 40mm 60 Caliber Rubber Balls Round,* (Accessed Apr. 1, 2021) https://www.defense-technology.com/product/stinger-40-mm-60-caliber-rubber-balls-round/.

99.     It is extremely common for impact munitions to cause contusions, abrasions, and bruising.[47]  Blunt impact may also cause internal injuries.[48]

100.     Fatalities may occur when impact is at the head, neck, or chest.[49]  According to a systematic review of available literature, three percent of those injured by impact munitions died from their injuries.[50]  Fifteen percent of 1,984 people studied were permanently injured by them.[51]

101.     In light of all of these dangers, the use of less-lethal weapons, including tear gas and projectiles, on lawful protesters is "a radically disproportional and needlessly aggressive overreaction," and the result is to "chill[] the speech of unarmed and nonviolent protestors and those who might otherwise be inclined to join them."[52]

*Plaintiff Remy Williams*

102.     Plaintiff and proposed Class representative REMY WILLIAMS is a poet, artist, photographer, and budding filmmaker with a degree in film.  Mr. Williams, a Black man, was one of many demonstrators peacefully expressing outrage at the mistreatment of people of color at the hands of police.

103.     Mr. Williams joined the protest on June 3, 2020 at approximately the time the crowd reached the CCC, both to peacefully protest and to document the events of that night.

104.     When the crowd reached the bridge, Mr. Williams was in the front, near the edge of the bridge with other reporters.

---

[47]   W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.
[48]   *Id.*
[49]   *Id.*
[50]   Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.
[51]   *Id.*
[52]   Crystal N. Abbey, *Agents of Change: How Police and the Courts Misuse the Law to Silence Mass Protests,* 72 Nat'l Law. Guild Rev. 81 (2015).

105.     As protesters reached the police line, Mr. Williams recalls that the crowd was loud but controlled.  Some officers spoke to individual protesters, but most ignored attempts to talk.

106.     As the protesters continued to walk forward, pushed by the crowd behind them, some officers allowed them to pass through the police line.  Once protesters started moving through these gaps, however, other officers quickly reacted, striking those individuals with their batons and shields.

107.     Mr. Williams, pushed by the crowd behind him, walked through the police line and was struck multiple times with batons and/or shields.  He recalls that he did not have time to feel the pain because immediately thereafter, police released tear gas into the crowd.

108.     Mr. Williams did not hear any warnings from Defendant Officers before tear gas was released.

109.      When the tear gas was released, Mr. Williams recalls that his skin began to itch and his eyes burned.  He tried to get away from the gas, but was unable to walk quickly because he could not open his eyes and was afraid he would fall off the bridge, especially in light of the stampede occurring around him.

110.     Mr. Williams recalls feeling fearful that others might fall or be pushed off the edge of the bridge onto the highway.

111.     Mr. Williams reached medics further back on the bridge, but was still unable to open his eyes for approximately five minutes.

112.     Around the same time protesters began to regroup and seek medical attention, officers began firing projectiles into the crowd.  Mr. Williams was struck by one such projectile.

113.     Mr. Williams experienced physical pain, swelling, and bruising in his leg for several weeks.  The Incident also took a severe emotional toll on Mr. Williams; he withdrew from his summer school program a week afterwards and continues to suffer emotional distress from the

events of that night, including nightmares.  Like many demonstrators that night, Mr. Williams is concerned about being subjected to further harm by Defendant Officers, or other law enforcement officers, at future demonstrations and does not believe he has "truly recovered."  He feels as though he is "still living it from inside out."

 *Plaintiff Lauren Chustz*

114.    Plaintiff and proposed Class representative LAUREN CHUSTZ, a White woman, is a private chef and an actress.

115.    Ms. Chustz joined the protest on June 3, 2020 at Duncan Plaza at approximately 4:00 p.m.  There, she listened to speeches about racial injustice nationally and in New Orleans.

116.    When demonstrators began marching, Ms. Chustz was in the middle of the crowd, surrounded by other peaceful demonstrators who had come out to protest police brutality against people of color.

117.    Once the crowd made it to the CCC, it suddenly stopped, confronted by the barricade of Defendant Officers.

118.    Ms. Chustz heard a call for White allies to come to the front line and stand between police and Black demonstrators, knowing the former's propensity for excessive force against Black people.  Ms. Chustz answered the call and joined demonstrators in the front.  There were approximately two people between her and the police line.

119.    Ms. Chustz recalls that the march was organized by youth, and the teenage leaders spent a significant amount of time trying to talk with the police and ask them to walk in solidarity with protesters.

120.    Ms. Chustz recalls that a select few individuals became restless and agitated with the officers' unwillingness to engage with the protest leaders.  At the same time, the crowd behind the front line continued walking forward, unaware that Defendant Officers had barricaded the

onramp.  Ms. Chustz was among the demonstrators near the front chanting, praying, and asking that Defendant Officers march with the demonstrators in solidarity, as officers had done on nights before.

121.    But Defendant Officers did not attempt to communicate with the crowd.   The protest leaders who were speaking with police had a megaphone, but police neither sought to make an announcement regarding the situation, nor attempted to speak to individuals at the front of the crowd.

122.    Instead, as the crowd behind the front line pushed the protesters at the front towards police, Defendant Officers fired tear gas into the crowd.  Ms. Chustz did not hear any warning from Defendant Officers that gas would be deployed.



123.    Ms. Chustz recalls Defendant Officers firing tear gas canisters into the crowd, causing "total chaos" and a stampede of demonstrators.  Recognizing the likelihood of such a stampede, several demonstrators yelled "don't run!" but could not stop the crowd.

124.     Ms. Chustz observed that officers began to fire projectiles into the crowd after demonstrators had already started retreating.  She did not hear any officers make announcements or warn that projectiles would be fired.

125.     Ms. Chustz, who was directly affected by the tear gas, ran to the side of the CCC for air, doused herself with milk to lessen the pain in her eyes, and helped treat other demonstrators who were injured.  She sustained physical injuries from the tear gas, including pain and redness in her eyes, and additional injuries that resulted from climbing over bicycles and other objects to avoid the gas and the hundreds of demonstrators similarly running away from the barrage of tear gas and projectiles.  Ms. Chustz recalls that tear gas particles settled into her facemask, making it difficult to breathe and compounding the terror of the Incident.

126.     Further, Ms. Chustz continues to suffer emotional distress from the events of that night, including panic attacks.  While on set for a movie during work, she suffered from a panic attack when she saw fog emerge from fog machines.  Ms. Chustz's heart was pounding, she could not breathe, and she sobbed, as it was reminiscent of the tear gas from the Incident.  Ms. Chustz is concerned about being subjected to further harm by Defendant Officers and other law enforcement officers at future demonstrations and, for this reason, chose not to go to several protests which she had originally intended to attend in the weeks following the Incident.

127.     Following her exposure to tear gas, Ms. Chustz experienced changes to her menstrual cycle that caused her to seek medical attention.  She then learned that such symptoms were a common effect of tear gas.  Nearly a year later, she is still experiencing menstrual irregularities.  Ms. Chustz wishes to have children in the near future and worries that the tear gas may have caused permanent damage to her reproductive health.  She is also concerned about being further exposed to harmful chemicals at future demonstrations.

*Plaintiff Bilal Ali-Bey*

128.     Plaintiff and proposed Class representative BILAL ALI-BEY, a Black man, is an activist, artist, poet, musician, and entrepreneur, who was protesting peacefully near the CCC on June 3, 2020 when he was tear-gassed by Defendants T. Johnson and Jorgenson.

129.     Mr. Ali-Bey joined the protest at approximately 3:00 p.m., at which point demonstrators were standing in the park, listening to speeches by activists.  He recalls that, after dark, the crowd began walking towards the CCC.

130.     Mr. Ali-Bey recalls approaching the line of police on the CCC and was among the demonstrators asking Defendant Officers for permission to march peacefully to the other side of the bridge.  He recalls Defendant Officers responding with aggression—hitting demonstrators with batons and shields—before firing canisters of tear gas into the crowd.

131.     Once the tear gas was deployed, Mr. Ali-Bey ran away from Defendant Officers to help other demonstrators who were injured, recognizing the need for immediate medical attention to prevent permanent injury.

132.     Mr. Ali-Bey recalls that "as soon as people started to regroup, they started shooting."  He heard "thumps" and screams from demonstrators next to him.  He was shot in the leg with projectiles and made eye contact with an officer who aimed directly at him when firing the projectiles.  Demonstrators rushed to help treat his injuries.  Mr. Ali-Bey bled, experienced physical pain, and had bruising in his leg for several months.  He also continues to suffer emotional distress from the events of that night.  He has had nightmares and, when an officer knocked on his neighbor's door recently, he closed his own door immediately and felt his chest tighten.  Mr. Ali-Bey is concerned about being subjected to further harm by Defendant Officers and other law enforcement officers at future demonstrations.

*The Assault on the Large Group of Protesters Was Unreasonable and Excessive*

133.    Defendant Officers had no legitimate basis to disperse the peaceful demonstration that night with such extreme force.  At the time Defendant Officers first fired tear gas canisters, "nearly all [demonstrators] were acting peacefully."[53]

134.    Furthermore, Defendant Officers' violent response was in contravention to the requirements outlined in NOPD's Operations Manual ("the Manual").  The Manual contains detailed instructions on when the use of force is appropriate.[54]  NOPD's "Use of Force Policy Statement," as set out in the Manual, states that officers "shall use the minimum amount of force that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control, while protecting the lives of the members or others."[55] Defendant Officers did not follow this policy on June 3, 2020.

135.    The Manual further states that "NOPD officers, regardless of the type of force or weapon used, shall abide by the following requirements: (a) Officers shall use verbal advisements, warnings, and persuasion, when possible, before resorting to force."  Defendant Officers did not follow this policy on June 3, 2020.  Protesters at or near the front line, like Plaintiff Lauren Chustz, did not hear any warnings prior to the firing of tear gas or projectiles.  NOPD has since admitted that officers did not adequately warn demonstrators.  The body worn camera accounts summarized within the June 3 Bridge Tear Gas Public Integrity Bureau (PIB) Signed Final Report consistently illustrate Defendant Officers' failure to adequately warn demonstrators prior to using force.

136.    The Manual also requires officers to "intercede to prevent the use of unreasonable force if the officer has reason to know that unreasonable force is being used and there is a realistic

---

[53]   Stole, *supra* note 14.
[54]   New Orleans Police Department, *New Orleans Police Department Regulations Manual,* (Accessed Apr. 1, 2021) https://nola.gov/nola/media/NOPD/Documents/NOPD-Regulations-Manual-Reduced-Size_3.pdf.
[55]   *Id.* at 1.3(1).

opportunity to intervene to prevent harm."[56]  Defendants Lampard, Roberts, Thomas, and NOPD Bystander Officers did not follow this policy on June 3, 2020.  They failed to intervene to stop their fellow officers from attacking peaceful demonstrators with tear gas, unauthorized projectiles, and physical force.

137.    The Manual also devotes an entire chapter to responding to "Unusual Occurrences," which includes protests, demonstrations, civil disturbances, and terrorism.  Defendant Officers did not follow these policies on June 3, 2020 either.

138.    The police manuals of LSP and JPSO are not publicly available.  However, their policies must comport with the U.S. Constitution, which does not allow officers to use excessive force on peaceful demonstrators.  Nor does it permit bystander officers to fail to intervene to protect innocent protesters from excessive force executed by their fellow officers.

139.    In the days following the Incident, Superintendent Ferguson strongly denied the use of unauthorized projectiles and accused demonstrators of firing the rubber bullets from within the crowd.[57]  Shortly after videos and photographs contradicting those claims surfaced, and civil rights attorney Katie Schwartzmann sent a letter to NOPD's Public Integrity Bureau, NOPD admitted that officers not only fired these projectiles into the largely peaceful crowd *without* permission, but also failed to "immediately report" having done so.[58]

140.    According to the CCC Investigation Summary prepared by Sergeant Barnes for the NOPD Public Integrity Bureau on or around December 7, 2020, Superintendent Ferguson was initially informed on June 4, 2020 that only tear gas was used during the Incident.[59]  Later that day (June 4, 2020), investigators learned that NOPD officers also used unauthorized projectiles.  The

---

[56]   *New Orleans Police Department Regulations Manual, supra* note 54 at 1.3(22).
[57]   Ramon Antonio Vargas, *Lawyer: Physical Evidence Contradicts NOPD Claim No Projectiles Fired at Protesters*, The New Orleans Advocate, Jun. 7, 2020.
[58]   Katie Schwartzmann, *Letter Regarding Items Fired Upon Protesters*, Tulane University Law School, (Jun 7, 2020).
[59]   *CCC Protest Investigation Summary*, *supra* note 23.

summary states that ten officers had used their batons that night to strike demonstrators; it also includes a list of munitions fired by NOPD officers into the crowd of demonstrators that night: seven (7) No. 2 CS Irritant Smoke gas containers; nine (9) Direct Impact LE Extended Range CS Crushable Foam rounds; six (6) Direct Impact Marking Crushable Foam rounds; and two (2) 60 caliber rubber ball "Stinger" rounds.[60]  The supervisor of the gas deployment team authorized an officer to use "60 caliber Stinger Rubber Ball rounds launched from the 40mm launcher," intended to "specifically target[] individuals who were identified as agitators."  The problem is, such rounds fire 18 rubber bullets at a time, making them inherently imprecise and rendering these instructions impractical.  As a result, many peaceful demonstrators, including Plaintiffs Remy Williams and Bilal Ali-Bey, were shot by Defendants Joseph's and/or Pierce's indiscriminate firing of unauthorized projectiles into the retreating crowd.

141.    Investigators state that the use of these projectiles was not immediately reported to the command desk and that NOPD's Chain of Command was not notified of their use.  The investigators determined this to be the result of "a failure of communication within the gas deployment team" and "a lack of planning coupled with several tactical errors" that "*led to a peaceful protest escalating into a form of civil unrest on top of an elevated highway.*"[61]  And yet, it was also determined that "the use of the gas deployment and all impact rounds, based on the circumstances presented at the time of their use *could* be considered reasonable and objective based on the totality of the circumstances."[62]  The summary does not specify what "circumstances" supposedly justified Defendant Officers' use of violent force that night.

142.    In a December 21, 2020 press conference, Superintendent Ferguson admitted that an internal investigation revealed numerous departmental failures, including a lack of policy in

---

[60]    *CCC Protest Investigation Summary*, *supra* note 23.
[61]    *Id.* (emphasis added).
[62]    *Id.* (emphasis added).

place to guide a response to protests, a lack of planning and tactical decision-making that night, several tactical errors, and a failure to implement "an adequate 'Use of Force Policy' to govern the use and reporting of specialized weapons, such as 'Tear Gas' and 'Impact rounds.'"[63]  At the same time, however, Superintendent Ferguson concluded that the officers need not be disciplined or held to account for their unauthorized use of projectiles because protocols cannot be violated if there were no such protocols to violate in the first place.[64]  He made this statement despite the clear instructions provided in NOPD's Operations Manual.

143.     Superintendent Ferguson maintains that his tactical officers—donning full riot gear, holding batons and shields, and backed by armored police vehicles that night—had been "provoked" by what he described as a "small group" of demonstrators in the front lines.  He makes this claim, as though the action of a few agitated individuals could justify the violent use of batons or the firing of tear gas, rubber bullets, and sponge grenades into a crowd of several hundred peaceful demonstrators, largely unaware of any tensions at the front line.

***NOPD, LSP, and JPSO Have Repeatedly Shown that They Can Respond to Other Kinds of Demonstrations Without Unreasonable Use of Force***

144.     The discriminatory nature of NOPD's, JPSO's, and LSP's use of force on protesters against racial injustice and police brutality is evidenced by how these agencies have responded to protests associated with other subject matters.

145.     NOPD, JPSO, and LSP have shown their capacity to practice reasonable restraint in using force, namely, when it involves (often unpermitted) protests attended by largely White attendees and those who are not protesting racial injustice and police misconduct towards

---

[63]   Sledge, *supra* note 1.
[64]   *Id.*

communities of color.[65]  This content-based approach to restricting free speech and peaceful assembly is incongruent with the values of our democracy and is unconstitutional.

146.    By way of example, on May 1, 2017, a pro-Confederate monument protester brandished an assault rifle during demonstrations seeking to prevent the removal of the Jefferson Davis statue located near Morris Jeff Community School.  Although this protester was actually breaking state and federal laws, which prohibit guns within 1,000 feet of a school campus, NOPD chose not to intervene.  An NOPD resource officer at the school justified NOPD's decision by concluding that "the protesters are more than 1,000 feet from [the school]," despite the fact that the statue was 650 feet from the Morris Jeff Community School.[66]  NOPD's leniency towards this pro-Confederate protester— who was violating the law—is drastically different from Defendant Officers' punitive and excessive use of force against those who were lawfully exercising their First Amendment rights in protesting police brutality on June 3.

147.    There are other examples as well.  On May 7, 2017, about 700 supporters and opponents of removing New Orleans' Confederate monuments clashed at Lee Circle "in a tense and angry confrontation."[67]  Overall, the dueling demonstrations between the two groups were peaceful, but NOPD "quickly broke up a couple of fights"—demonstrating NOPD's ability to corral a few select restless individuals without indiscriminately attacking hundreds of peaceful protesters. NOPD later assured in a press release that "no one was arrested for violating prohibitions on carrying weapons and wearing masks at public demonstrations."  This was despite the fact that

---

[65]  Bryn Stole and Kayla Gagnet, *'Furious' LaToya Cantrell Says French Quarter Event was Not Permitted*, The New Orleans Advocate, Nov. 9, 2020, https://www.nola.com/news/coronavirus/article_080acff8-22ac-11eb-9a1a-cb65c76e2019.html.

[66]  Danielle Dreilinger, *Confederate Monuments: Protesters are Carrying Guns Near New Orleans Schools,* The New Orleans Advocate, May 2, 2017, https://www.nola.com/news/education/article_293fb2a2-033f-556a-8863-ffada55c5410.htm.

[67]  Beau Evans, *Confederate Monument Protesters in New Orleans Clash at Lee Circle,* The Times-Picayune, May 8, 2017, https://www.nola.com/news/politics/article_f5670063-8f27-590c-9f39-6ff958fb33b8.htm.

armed pro-Confederate protesters were standing their ground at the statue on Monday night.[68]  An

email from NOPD spokesman Beau Tidwell that day wrote that the demonstrations' large size and

relative scarcity of incident was "not an accident" because *"[t]he Chief pledged to keep the public*

*safe, and to give everyone a chance to express themselves safely and lawfully. That's exactly what*

*was accomplished."[69]*  The image below illustrates how disparate this response was to the one

exhibited on June 3.



148.     More recently, on November 7, 2020, several hundred unmasked people gathered

in the French Quarter for an unpermitted event to protest the coronavirus restrictions in place for

in-person gatherings.[70]  NOPD referred to this unauthorized event, held in violation of public health

guidelines, as a "community demonstration" and simply closed the streets off to traffic.[71]  There

were no reports of escalated use of force to disperse the unpermitted crowd that day and NOPD saw

no need to deploy tanks or other militarized equipment.  Mayor Cantrell reasoned that NOPD did

not confront the gathering and "followed protocols for handling protests and demonstrations"

---

[68]    WWL, *Protests End Peacefully After Both Sides of Monument Debate Meet at Lee Circle,* WWL TV, May 7, 2017, https://www.wwltv.com/article/news/local/orleans/protests-end-peacefully-after-both-sides-of-monument-debate-meet-at-lee-circle/289-437606216.

[69]    Evans, *supra* note 67.

[70]    Bryn Stole, *Event Featuring Lauren Daigle Draws Big Crowd in French Quarter; City Weighs Penalties,* The New Orleans Advocate, Nov. 8, 2020,  https://www.nola.com/news/article_49766a7e-222f-11eb-9138-0b7285d97c94.html.

[71]    *Id.*

because it was "*too large*" for NOPD to disperse.   The November 7, 2020 "community demonstration" was similar in size to the June 3, 2020 protest.



June 3, 2020 Crescent City Connection protest.    May 7, 2017 Lee Circle protest.

149.    NOPD's response to protesters against police brutality targeting Black people is in stark contrast to its lax response to other types of protests.  LSP and JPSO are guilty of this disparate treatment as well.

150.    On June 4, 2020, JPSO deployed tanks at a demonstration of protesters seeking justice for Modesto Reyes, who was killed by a JPSO deputy.[72]  JPSO does not appear to deploy tanks at protests involving other subject matters, such as the protest on August 5, 2020, involving hundreds of educators protesting the opening of Jefferson Parish Public Schools.[73]

151.    On May 2, 2020, 250 demonstrators gathered outside the Governor's Mansion to protest Governor John Bel Edwards's decision to extend the state's Stay-at-Home Order.  The

[72]   Max Becherer, *Photos: Protestors gathered to seek justice for Modesto 'Desto' Reyes at Jefferson Parish Sheriff's Offices,* The New Orleans Advocate, Jun. 4, 2020, https://www.nola.com/multimedia/photos/collection_e69ac09a-a695-11ea-b0f5-e7333979736a.html#20.
[73]   Chad Calder, *Jefferson Parish teachers protest return-to-school plan: 'It's not safe!,'* The New Orleans Advocate, Aug. 5, 2020, https://www.nola.com/news/coronavirus/article_89d5d794-d761-11ea-a7b9-977bb54ca85f.html.

demonstrators, violating this order, were "overwhelmingly white" and did not wear masks, gloves, or practice social distancing.[74] Approximately 25 vehicles were circling the Governor's Mansion honking in support. It was reported that "the numbers were far bigger than any previous Louisiana protest[]" and demonstrators were seen calling the Governor a "traitor." LSP did not confront these protesters with riot gear, tanks, or tear gas. In fact, LSP did not intervene at all.[75] Governor Edwards remained in the Mansion but "had no comment."[76]

152. In contrast, two days after the Incident, Governor Edwards decided to express his support of Defendant Officers' conduct on June 3, 2020, stating that he agreed with Defendant Officers' decision to use tear gas against peaceful demonstrators that night, believing it to be reasonable "in light of all the circumstances," and "done ultimately for the safety and protection for the people who needed to clear that area."[77]

153. This conclusion that the "circumstances" warranted the use of several canisters of tear gas (and unauthorized projectiles) and that it was done for the "safety and protection" of demonstrators runs contrary to Plaintiffs', among other demonstrators', first-hand experiences that night, wherein Defendant Officers excessively and indiscriminately fired several tear gas canisters and unauthorized projectiles, without warning, into the crowd of mostly peaceful demonstrators

---

[74] Mark Ballard, *Watch: Protestors rally to end Louisiana stay-at-home order in gathering outside Governor's Mansion,* The Advocate, May 2, 2020, https://www.theadvocate.com/baton_rouge/news/coronavirus/article_74ee2aee-8cbf-11ea-92b4-bbf81f80e40c.htm.

[75] *See* Mark Ballard, *Protestors gather at Governor's Mansion demand preventative measures end; 'we need to reopen,'* The Advocate, April 17, 2020, https://www.theadvocate.com/baton_rouge/news/coronavirus/article_c4c342ca-80df-11ea-9c0e-535308d17467.html; *but see* Claire Taylor, *Lafayette woman facing charges for protesting police killings with BBQ outside mayor's house,* The Acadiana Advocate, Feb. 5, 2021, https://www.theadvocate.com/acadiana/news/article_219f4cbc-67d2-11eb-bf1a-73ad9462ceca.html.

[76] Ballard, *supra* note 74.

[77] Sam Karlin, *John Bel Edwards: Police use of tear gas in New Orleans was reasonable*, The New Orleans Advocate, June 5, 2020, https://www.nola.com/news/politics/article_95b20ae0-a76b-11ea-a717-77912e338f23.html.

atop the onramp of a bridge, which predictably caused a "stampede" that put several hundred lives at risk of falling off of the bridge and other perils.

### Factual Allegations Surrounding the Patterns and Practices, Training, Supervision, and Discipline of NOPD Officers

154.    The Superintendent of NOPD at all relevant times before, during, and after this incident was Shaun Ferguson, making him the responsible decisionmaker and policymaker for NOPD.

155.    Superintendent Ferguson promulgated, adopted, and implemented policies, practices, protocols, and procedures, which have resulted in the deprivation of the constitutionally protected civil rights of Plaintiffs, Class Members, and others under color of law and in violation of federal and state law.

156.    NOPD has employed well-settled, *de facto* policies and practices that enable and thereby embolden the discriminatory and excessive use of force against communities of color, particularly the Black community and those who advocate for them.  NOPD employs such policies to suppress Plaintiffs' and the Classes' exercise of their First Amendment rights and to otherwise violate other constitutional rights.

157.    Superintendent Ferguson's decision not to reprimand the officers who, during the Incident, used excessive force on peaceful protesters against police brutality targeting Black people confirms NOPD's endorsement of this pattern, practice, and/or custom.

158.    The multitude of lawsuits filed against NOPD for excessive force against Black people also confirms as much.  In 2016 alone, the City of New Orleans paid out millions of dollars to settle lawsuits for NOPD's rampant use of excessive force against Black people.[78]  These suits include, but are not limited to, the following:

---

[78]    The proposed NOPD budgets approved by Defendant City Council annually include more than $1,000,000.00 annually for NOPD's Police Litigation Unit.  The Unit defends the police in federal litigation and civil service

a.  The $13.3 million settlement for a consolidated lawsuit regarding NOPD's use of excessive force against Black people during and after Hurricane Katrina;

b.  Undisclosed financial settlements paid to the family members of Black individuals wounded and killed by NOPD gunfire on the Danziger Bridge after Hurricane Katrina;

c.  Undisclosed financial settlements for lawsuits filed in response to the fatal police shooting and burning of Henry Glover, a Black man, by NOPD;

d.  Undisclosed financial settlements paid in response to the fatal beating of a 48-year-old Black handyman by NOPD;

e.  The $15,000 settlement of a lawsuit involving an NOPD officer's use of excessive force in striking a Black bipolar girl with metal shackles.

159.  NOPD had prior notice ten years ago that its officers engaged in a pattern of racially discriminatory use of force.  Indeed, in 2011, the U.S. Department of Justice's ("DOJ") Civil Rights Division commenced an investigation of NOPD, culminating in a 158-page investigations report (the "DOJ Report") outlining the "troubling disparities in treatment of the City's African American community" by NOPD.[79]

160.  Specifically, the DOJ Report determined that NOPD engaged in a pattern or practice of "excessive force" and "discriminatory policing."[80]  The report further found that "NOPD for years has acted with indifference to whether its officers are using force unconstitutionally" as

---

prosecution and appeals.  The funding is also reserved for potential exposure to damage awards, attorneys' fees and costs.  The adopted budget allocated $1,748,382 to "Police Litigation" in 2012, $1,548,980 in 2013, $1,041,454 in 2014, $1,073,528 in 2015, $1,132,359 in 2016, $1,193,160 in 2017, and $1,133,373 in 2018.

[79]  United States Department of Justice, Civil Rights Division, *Investigation of the New Orleans Police Department*, (March 16, 2011),
https://www.justice.gov/sites/default/files/crt/legacy/2011/03/17/nopd_report.pdf.

[80]  *See id.* at v, ix.

illustrated by its "Deficient System" for directing, training, supervising, and holding NOPD officers accountable for their unlawful conduct.[81]

161.    Based on this report, in 2012, DOJ brought an action for declaratory and injunctive relief against the City of New Orleans to "remedy a pattern or practice of conduct by law enforcement officers of the New Orleans Police Department . . . that deprives persons of rights, privileges and immunities secured and protected by the Constitution and laws of the United States."[82]   In January 2013, the City of New Orleans, NOPD, and DOJ entered into a Consent Decree to resolve DOJ's lawsuit.[83]

162.    In the Consent Decree, NOPD agreed to ensure that its officers "use non-force techniques to affect compliance" whenever feasible and to "use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians, and de-escalate the use of force at the earliest possible moment."[84]   The Consent Decree included an extensive list of principles to guide NOPD's use of force, including a direction that officers always provide warnings, when possible, before resorting to force, as that would de-escalate their use of force immediately once resistance decreases.[85]

163.    The Consent Decree also has a section dedicated to NOPD's SWAT Teams, stating that SWAT teams are only for "specialized response[s] to critical situations" such as ***hostage rescues*** and ***terrorism response***.[86]   NOPD was directed to  "prohibit SWAT tactics and equipment from being deployed or used for routine or 'proactive' patrol functions . . . unless approved in writing by a Deputy Superintendent."[87]

---

[81]   *Investigation of the New Orleans Police Department*, *supra* note 79 at 2, 94-96.
[82]   Complaint, 1, *United States of America v. The City of New Orleans*, No. 2:12-cv-01924-SM-JCW (E.D.La.), available at https://www.laed.uscourts.gov/sites/default/files/nopdconsent/12cv01924_Doc1.pdf.
[83]   Consent Decree, *United States of America v. The City of New Orleans*, No. 2:12-cv-01924-SM-JCW (E.D.La.), available at https://www.laed.uscourts.gov/sites/default/files/nopdconsent/12cv01924_Doc159-1.pdf.
[84]   *Id.* at 14.
[85]   *Id.* at 14-15.
[86]   *Id.* at 22-23.
[87]   Consent Decree *supra* note 83 at 22.

164.    NOPD further agreed in the joint Consent Decree to "develop and implement force policies, training, and review mechanisms that ensure that force by NOPD officers is used in accordance with the rights secured or protected by the Constitution and laws of the United States."[88]

165.    Based on the unconstitutional conduct of NOPD officers on June 3, 2020, however, and upon information and belief, Superintendent Ferguson has failed to properly train, supervise, and/or discipline officers, resulting in the discriminatory use of force against people of color and those who advocate for them, including the excessive use of force against the crowd gathered to mourn George Floyd's death on June 3, 2020.

166.    Upon information and belief, in willful, reckless, and callous disregard for the rights of Plaintiffs and Class Members, Superintendent Ferguson did not have an enforced use of force policy in place for NOPD upon which officers were sufficiently or adequately trained so as to know what extent of force is appropriate in specified situations.   Such is demonstrated by NOPD's admission after the Incident that it failed to train its officers.   These "departmental failures," actions, inactions, and deliberate indifference resulted in the arbitrary and punitive use of chemical agents against all CCC demonstrators, including Plaintiffs and the Class Members, who assembled lawfully and peacefully on June 3 to exercise their constitutional civil rights.

167.    Police officers acted on their own with purportedly no (enforced) policies, or under the standard policy, pattern, practice, or custom of unfettered discretion regarding use of excessive force.   In the face of protests against racial injustice and police misconduct, specifically the Incident at issue here, this translated into arbitrary, indiscriminate and punitive use of tear gas and projectiles.   Despite the obvious risk that accompanied use of these weapons, NOPD admittedly permitted untrained (or at a minimum, newly trained) officers in riot gear to regulate the deployment of chemical agents and projectiles in response to the peaceful demonstration on June 3.

---

[88]    *Id.* at 14.

168.     Superintendent Ferguson was on notice of the need to train NOPD officers not to use discriminatory excessive force.  He was well aware of:

- DOJ's 2012 lawsuit against NOPD for unlawful conduct, including discriminatory and excessive use of force against African Americans;

- NOPD's express agreement through a Consent Decree in January 2013 to implement and enforce training, supervision, and disciplinary policies intended to stop officers from violating the United States Constitution;

- The Consent Decree's renewal in October 2018; and

- The numerous lawsuits filed in recent years against NOPD for its officers' use of excessive force against people of color.

169.     Superintendent Ferguson, however, ignored these warnings and, on the day of the Incident, acted unreasonably, intentionally, and with knowing disregard for Plaintiffs' and the Class Members' constitutional rights.  NOPD's admission that it lacks proper policies to guide officers on responding to protests, such as the one on June 3—alongside NOPD's failure to plan, make tactical decisions, or anticipate such demonstrations on the heels of the large-scale protests against racial injustice and police misconduct in recent years—demonstrates an intentional disregard or indifference towards providing proper training and implementing policies to address or prevent further discriminatory and excessive use of force.

170.     The officers' conduct on the CCC was not an anomaly. Instead, it was undertaken pursuant to *de facto* policies, practices, and/or customs of NOPD.  Superintendent Ferguson is liable for the following wrongful acts, including but not limited to:

a.  Failure to properly hire, supervise, and train NOPD officers;

b.  Failure to promulgate, train, and enforce an adequate and constitutional use-of-force policy;

c.   Failure to promulgate, train, and enforce an adequate and constitutional de-escalation policy;

d.   Failure to promulgate, train, and enforce adequate and constitutional non-discriminatory law enforcement practices to protect African-American citizens of New Orleans;

e.   Failure to reprimand and discipline NOPD officers who engage in the use of excessive force;

f.   Tacit approval of NOPD officers using their power and position to interfere with the constitutional rights of those they are charged to serve and protect.

171.   Despite repeated notice, on June 3, NOPD treated Black people and those advocating for them in a manner that fails to comport with the United States Constitution.  The events of the June 3 protest reveal that NOPD's history of unconstitutionally discriminating against African Americans through the use of force continues in violation of the very Consent Decree put in place to curb unconstitutional conduct.  The policies and practices of NOPD listed above were implemented by Defendant Ferguson and Defendant Officers who, jointly and solidarily, worked in concert with one another to suppress the constitutional rights of community members peacefully protesting racial injustice and police misconduct.

172.   Without real consequences for officers who engage in discriminatory use of force against people of color and those who support them, Plaintiffs and Class Members will continue to suffer extraordinary damages, including a prolonged loss of liberty, emotional distress, trauma, and physical pain and suffering.

173.   NOPD, under the direction of Defendant Ferguson, deprived Plaintiffs and Class Members of their constitutionally protected rights by responding disproportionately, excessively,

and punitively to Plaintiffs' and Class Members' lawful, peaceful, and non-violent protesting of police misconduct.

***Factual Allegations Surrounding the Patterns and Practices, Training, Supervision, and Discipline of JPSO Officers***

174.    The Sheriff of Jefferson Parish at all relevant times before, during, and after this incident was Joseph Lopinto, making him the responsible decisionmaker and policymaker for JPSO.

175.    Defendant Lopinto promulgated, adopted, and implemented policies, practices, protocols, and procedures that, alongside the actions of NOPD, resulted in the deprivation of the constitutionally protected civil rights of Plaintiffs and Class Members on June 3.

176.    JPSO employed well-settled, *de facto* policies and practices that enabled and emboldened the discriminatory excessive use of force that occurred during the Incident.  They further employed such policies to suppress Plaintiffs and the Classes' exercise of their First Amendment and other constitutional rights on June 3.

177.    JPSO has a well-documented history of using excessive force against people of color.  Disturbingly, an NBC investigation found that at least 12 men and boys have died during an arrest or pursuit by JPSO since 2015—including three who were under the age of 18.  All were Black or Latino.

178.    Moreover, in May 2018, four JPSO deputies fatally choked a Black man in their custody in a case eerily similar to that of George Floyd.  The death was ruled a homicide within a week,[89] but the four officers were not fired, and one now works for LSP.[90]  All four of the officers

---

[89]   Michelle Hunter, *2 years after Keeven Robinson killed in struggle with JPSO deputies, DA says no criminal charges,* Nola.com, Jul. 14, 2020, https://www.nola.com/news/crime_police/article_a3924fdc-c5f0-11ea-9fc5-d36ce37c7a5d.html.

[90]   John Simerman, Michelle Hunter & Ramon Antonio Vargas, *Jefferson Parish Sheriff's Office an Outlier on Body Cams as Criticism Swirls Around Deadly Force,* The New Orleans Advocate, Jun. 27, 2020, https://metrocrime.org/2020/06/27/jefferson-parish-sheriffs-office-an-outlier-on-body-cams-as-criticism-swirls-around-deadly-force/.

involved had previously been sued for using excessive force—demonstrating Defendant Lopinto's deliberate indifference to his officers' pattern of using excessive force against people of color.[91]

179.    It does not stop there.  In March of 2019, two Black men were shot dead inside a car parked outside an IHOP by JSPO deputies who claimed they fired when the car began backing up.  They were supposedly conducting an undercover drug sting, but no drugs or weapons were found in the vehicle with the slain Black men.

180.    In March of 2020, a JPSO deputy shot an unarmed 14-year-old Black boy who was lying face-down on the ground.  Defendant Lopinto and JPSO attempted to cover up the shooting, only publicly acknowledging it three months later after the boy's family held a press conference expressing their concerns over the lack of transparency and accountability.[92]  Upon information and belief, Defendant Lopinto has not fired or disciplined the deputy who shot the child.

181.    In May of 2020—two days after George Floyd was murdered—a JPSO deputy shot Modesto Reyes, a 35-year-old Black welder, in his back twice, killing him.[93]  One deputy pulled his stun gun during the incident, apparently recognizing that using lethal force was unnecessary.  The other deputy nevertheless pulled out his gun and killed Mr. Reyes.[94]  Defendant Lopinto has refused to release video footage of that shooting publicly,[95] and upon information and belief, the deputy who killed Mr. Reyes has not been fired or disciplined.

---

[91]   Paul Dudley, *JPSO officers involved in Keeven Robinson's death were previously accused of using excessive force,* 4WWL, Mar. 2, 2020, https://www.wwltv.com/article/news/local/jefferson/four-jpso-officers-involved-in-keeven-robinsons-death-were-previously-accused-of-using-excessive-force/289-ea241955-6302-41ec-8e8f-1944744cf2f1.

[92]   John Simerman, *Family of teen shot by Jefferson Parish deputy alleges whitewash in federal suit,* The New Orleans Advocate, Mar. 20, 2021, https://www.nola.com/news/courts/article_6b1d8a14-898a-11eb-9ba3-6b0fcb3c6b83.html.

[93]   Mike McDaniel, *Independent autopsy shows Modesto Reyes was shot in the back twice*, 4WWL, June 19, 2020, https://www.wwltv.com/article/news/local/independent-autopsy-shows-modesto-reyes-was-shot-in-the-back-twice/289-a6b2013e-78f5-4bdf-b30f-40355dd3398e; Ramon Antonio Vargas, *Attorneys for family of Modesto Reyes, fatally shot by JPSO deputy, demand body cams for agency,* The New Orleans Advocate, Jun. 5, 2020, https://www.nola.com/news/crime_police/article_768f90bc-a782-11ea-aeda-b71495be9163.html.

[94]   *Id.*

[95]   Matt Sledge, *Modesto Reyes family lawyers and Jefferson Parish Sheriff Joe Lopinto battle over autopsy results,* The New Orleans Advocate, Jun. 23, 2020, https://www.nola.com/news/crime_police/article_dfc92d3a-b561-11ea-9ff8-9f21b743e934.html.

182.     The above facts demonstrate that JSPO's involvement in the attack on the CCC Bridge was not an anomaly.   Instead, it was undertaken pursuant to JPSO *de facto* policies, practices, or customs that enable officers to use excessive force on people of color and those advocating for them.

183.     Defendant Lopinto knows or should know that his officers routinely subject people of color to excessive force.   But he has refused to implement measures, such as body cameras, to prevent future instances of excessive force by his employees.   In fact, JPSO is the largest law enforcement agency in Louisiana that does not utilize body cameras.[96]

184.     Although the agency can afford a helicopter and drones of military-grade equipment, Defendant Lopinto claims that the agency cannot afford body cameras.   Yet it can afford actual military tanks, which it deployed in response to a peaceful protest in the wake of JPSO's killing of Modesto Reyes in 2020.

185.     Defendant Lopinto's refusal to implement body cameras demonstrates his deliberate indifference to JPSO's pattern and practice of using excessive force against people of color.   Upon information and belief, had Defendant Lopinto implemented the use of body cameras by JPSO before the June 3 protest, there would be even more evidence of Defendants' violent and unconstitutional excessive force against peaceful protesters.

186.     Upon information and belief, in willful, reckless, and callous disregard for the rights of Plaintiffs and Class Members, Defendant Lopinto did not have an adequate and enforceable use of force policy in place for JPSO when they were called upon to participate in the law enforcement response to the June 3 protest.

---

[96]     Simerman, Hunter, & Antonio Vargas, *supra* note 90.

187.    The above incidents show that Defendant Lopinto was on notice of the need to adequately train, supervise, and discipline his officers to not subject people of color, and those who advocate for them, to discriminatory excessive force.

188.    Defendant Lopinto is liable for the following wrongful acts, including but not limited to:

      a.   Failure to properly hire, supervise, and train JPSO officers;

      b.   Failure to promulgate, train, and enforce an adequate and constitutional use of force policy;

      c.   Failure to promulgate, train, and enforce an adequate and constitutional de-escalation policy;

      d.   Failure to promulgate, train, and enforce adequate and constitutional non-discriminatory law enforcement practices to protect people of color;

      e.   Failure to reprimand and discipline JPSO officers who engage in the use of excessive force;

      f.   Tacit approval of JSPO officers using their power and position to interfere with the constitutional rights of those they are charged to serve and protect.

189.    As a direct and proximate result of JPSO's policy, practice, or custom of subjecting people of color to excessive force, Plaintiffs and Class Members have suffered and continue to suffer extraordinary damages, including a prolonged loss of liberty, emotional distress, trauma, and physical pain and suffering.

*Factual Allegations Surrounding the Patterns and Practices, Training, Supervision, and Discipline of LSP Officers*

190.     The Superintendent of LSP at all relevant times before, during, and after this incident was Lamar Davis, making him the responsible decisionmaker and policymaker for LSP.

191.     Defendant L. Davis promulgated, adopted, and implemented policies, practices, protocols, and procedures that, alongside the actions of NOPD and JPSO, resulted in the deprivation of the constitutionally protected civil rights of Plaintiffs and Class Members on June 3.

192.     LSP employed well-settled, *de facto* policies and practices that enabled and emboldened the discriminatory excessive use of force that occurred during the Incident.  They further employed such policies to suppress Plaintiffs and the Classes' exercise of their First Amendment rights and other constitutional rights on June 3.

193.     LSP has a well-documented history of racism against Black people, which unsurprisingly leads to discriminatory use of excessive force against them.[97]  Indeed, Defendant L. Davis' predecessor, Col. Kevin Reeves, was compelled to resign amid the unearthing of a disturbing years-long trend of LSP officers openly displaying racist attitudes and behaviors.[98]  He faced significant criticism for the lack of transparency surrounding his officers' investigation of the death of Ronald Greene—a Black man who was killed when LSP officers brutally kicked, dragged, and tased him.[99]

194.     Under Defendant L. Davis' leadership, this policy, practice and custom of using excessive force against Black people has only continued.  After a use-of-force investigation, one

---

[97]  *See, e.g*., Kirsten Weir, *Policing in black & white*, American Psychological Association, Dec. 2016, https://www.apa.org/monitor/2016/12/cover-policing.html (discussing how implicit and explicit racial biases impact police officers' decisions to utilize excessive force against people of color).

[98]  Jim Mustian, "AP: Use of slurs not 'isolated' at Louisiana State Police," Oct. 30, 2020, https://apnews.com/article/race-and-ethnicity-louisiana-baton-rouge-racial-injustice-d7f77f196571892d71bd010ce4109677.

[99]  The Associated Press, "Louisiana trooper kicked, dragged Ronald Greene before he died, body camera footage show," Feb. 27, 2021, https://www.theadvocate.com/baton_rouge/news/crime_police/article_464d5146-791e-11eb-b82a-2f74f8b3343c.html.

LSP trooper was arrested for aggravated battery stemming from an incident where he struck a man with his flashlight 18 times in 24 seconds.[100]  Four more troopers were arrested for alleged excessive force and turning off their body cameras.  These four men brutally beat a Black man and then bragged over text about the "whoopin,'" stating that the man was going to "be sore tomorrow for sure" and "have nightmares for a long time."  One trooper stated that the incident—their brutal beating of a Black man who had already surrendered—"warm[ed] [his] heart."[101]

195.    Further, numerous state and federal lawsuits demonstrate this policy, practice and custom of using excessive force against Black people. The Superintendent and/or his deputies were sued:

> a.   After a man, who complied with the officer's order to exit the vehicle and put his hands behind his back during a traffic stop, was abruptly tased as he stood with his hands behind his back;[102]
>
> b.   After an officer tased a man while he was riding his bicycle down the street, causing him to fall off his bicycle.  As he laid defenseless on the ground, the officer kicked and stomped on the man's face, kneed his back, and dragged him across the pavement;[103]
>
> c.   After an officer repeatedly tased a man who was already in the back seat of a police car;[104]

---

[100]  Ashley Mott, *Louisiana trooper struck man 18 times in 24 seconds, concealed video: LSP warrant,* Monroe News-Star, Dec. 11, 2020, https://www.thenewsstar.com/story/news/crime/2020/12/11/lsp-trooper-hit-aaron-bowman-18-times-concealed-video-warrant/3896936001/.

[101]  Timothy Bella, *State troopers texted about the 'whoopin' they gave a Black man, records show: 'He's gonna have nightmares,'* The Washington Post, Mar. 13, 2021, https://www.washingtonpost.com/nation/2021/03/13/louisiana-police-black-man-text/.

[102]  *Betts v. Brennan*, No. CV 19-14680, 2021 WL 230242 (E.D. La. Jan. 22, 2021).

[103]  *Terrell v. Pichon*, 413 F. Supp. 3d 515 (E.D. La. 2019), aff'd, 795 F. App'x 935 (5th Cir. 2020).

[104]  *Thomas v. Louisiana State Police*, No. CV 18-10200, 2019 WL 2009245, at *1 (E.D. La. May 7, 2019).

> d. After a handcuffed man was thrown to the ground face-down by an officer, causing his head to hit the floor with great force, resulting in intense pain, swelling and concussion-like symptoms.[105]

196.   The above incidents show that Defendant L. Davis was on notice of the need to adequately train, supervise, and discipline his officers to not subject people of color, and those who advocate for them, to discriminatory excessive force.

197.   They also show that LSP's involvement in the attack on the CCC was not an anomaly, as it was undertaken pursuant to *de facto* LSP policies, practices, or customs that enable its officers to lawlessly use excessive force against people of color and those advocating for them.

198.   Upon information and belief, in willful, reckless, and callous disregard for the rights of Plaintiffs and Class Members, Defendant L. Davis did not have an adequate and enforceable use of force policy in place for LSP when they were called upon to participate in the law enforcement response to the June 3 protest.

199.   Defendant L. Davis is liable for the following wrongful acts, including but not limited to:

> a. Failure to properly hire, supervise, and train LSP officers;
>
> b. Failure to promulgate, train, and enforce an adequate and constitutional use of force policy;
>
> c. Failure to promulgate, train, and enforce an adequate and constitutional de-escalation policy;
>
> d. Failure to promulgate, train, and enforce adequate and constitutional non-discriminatory law enforcement practices to protect people of color;

---

[105]   *Kokesh v. Curlee*, 422 F. Supp. 3d 1124 (E.D. La. 2019).

e.  Failure to reprimand and discipline LSP officers who engage in the use of excessive force;

f.  Tacit approval of LSP officers using their power and position to interfere with the constitutional rights of those they are charged to serve and protect.

200.  As a direct and proximate result of LSP's policy, practice, and custom of subjecting people of color to excessive force, Plaintiffs and Class Members have suffered and continue to suffer extraordinary damages, including prolonged loss of liberty, emotional distress, trauma, and physical pain and suffering.

**CLASS ACTION ALLEGATIONS**

201.  Named Plaintiffs REMINGTYN A. WILLIAMS, LAUREN E. CHUSTZ, and BILAL ALI-BEY bring this action on behalf of themselves and all others similarly situated to assert the claims alleged in this Complaint on a common basis.

202.  This action is brought and may properly be maintained as a Class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, because the questions of law or fact common to proposed Class Members predominate over any questions affecting only individual members, and a Class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

*The Proposed Classes, Subclasses, and Class Period*

203.  Plaintiffs Remy Williams, Lauren Chustz, and Bilal Ali-Bey (collectively, the "Representative Plaintiffs") bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and (b)(4), as representatives of classes defined as follows:

The Injunctive Relief Class: All individuals present at or near the elevated portion of Highway 90 (Business 90 Westbound) at Crescent City Connection in New Orleans, Louisiana, or the streets adjacent to or surrounding the Crescent City Connection on June 3, 2020, at, around, or shortly after 9:00 p.m., when the events described in paragraphs 69-

132 above took place, who may attend or attempt to attend protests in New Orleans, Louisiana in the future (hereinafter, the "Injunctive Relief Class").

The Personal Injury Class: All individuals present at or near the elevated portion of Highway 90 (Business 90 Westbound) at Crescent City Connection in New Orleans, Louisiana, or the streets adjacent to or surrounding the Crescent City Connection on June 3, 2020, at, around, or shortly after 9:00 p.m., when the events described in paragraphs 69-132 above took place, who incurred any injury, illness, or other impairments as a result of Defendants' actions (hereinafter, the "Personal Injury Class").

204.     Plaintiff Chustz also brings claims on behalf of herself and as a representative of the subclasses defined as follows:

The Female Injunctive Relief Subclass: All people with female reproductive organs, including married people, present at or near the elevated portion of Highway 90 (Business 90 Westbound) at Crescent City Connection in New Orleans, Louisiana, or the streets adjacent to or surrounding the Crescent City Connection on June 3, 2020, at, around, or shortly after 9:00 p.m., when the events described in paragraphs 69-132 above took place, who wish to bear children in the future and who may attend or attempt to attend protests in New Orleans, Louisiana in the future (hereinafter, the "Female Injunctive Relief Subclass").

The Female Personal Injury Subclass: All people with female reproductive organs, including married people , present at or near the elevated portion of Highway 90 (Business 90 Westbound) at Crescent City Connection in New Orleans, Louisiana, or the streets adjacent to or surrounding the Crescent City Connection on June 3, 2020, at, around, or shortly after 9:00 p.m., when the events described in paragraphs 69-132 above took place, who wish to bear children in the future and who incurred any injury, illness, or other impairments as a result of Defendants' actions (hereinafter, the "Female Personal Injury Subclass").

205.     Collectively, the Injunctive Relief Class and the Personal Injury Class will hereinafter be referred to as the "Classes," where appropriate.

206.     Collectively, the Female Injunctive Relief Subclass and the Female Personal Injury Subclass will hereinafter be referred to as the "Subclasses," where appropriate.

207.     The following persons and entities are excluded from the proposed Classes: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; counsel and their

employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

208.     Plaintiffs and the Classes seek relief for the injuries caused to each member by and through Defendants' violations of their First, Fourth, and Fourteenth Amendment Rights; their rights under the Louisiana Constitution; and their rights under Louisiana statutory law.

### Fed. R. Civ. P. 23(a) Requirements Are Satisfied

#### A.   Numerosity—Fed. R. Civ. P. 23(a)(1)

209.     The members of the Classes are so numerous that joinder is impracticable.  Articles and photographs from journalists and photographers on the scene have captured the large crowds present for the June 3, 2020 protest.  It was reported that "over a thousand demonstrators marched until they were stopped by the New Orleans Police Department . . . near the Crescent City Connection where NOPD released 2 canisters of tear gas."[106]  Reports have further noted that "hundreds of people on the approach to the Crescent City Connection on June 3"[107] were tear-gassed by officers.  Therefore, there were at least several hundred demonstrators that night near the CCC subjected to the tear gas canisters and projectiles fired indiscriminately into the entire crowd by Defendant Officers.

#### B.   Commonality—Fed. R. Civ. P. 23(a)(2)

210.     All members of the proposed Classes have been subjected to the same unconstitutional policies, practices, customs, acts, and omissions on the part of Defendants, as described in this Complaint, and all have suffered violations of their constitutional rights and rights under Louisiana state law as a result of Defendants' actions.

---

[106]   Sophia Germer, *Photos: Tear Gas Shot by NOPD into Crowd of Protesters Near Crescent City Connection,* The New Orleans Advocate, Jun. 3, 2020, https://www.nola.com/multimedia/photos/collection_b43947d8-a619-11ea-8bf3-17be13780f96.html.

[107]   Sledge, *supra* note 1.

211. Questions of fact and law that are common to Plaintiffs and the Classes include but are not limited to:

a. Whether the Classes were entitled under the First Amendment to peacefully demonstrate at that time and location;

b. Whether Defendant Officers adequately informed demonstrators that they should disperse or leave before using violent force against them;

c. Whether and to what extent the use of force on the Classes was justified by a government interest and appropriately tailored to that interest;

d. Whether the Consent Decree put Defendant Ferguson on notice of the need to train his officers against discriminatory use of force;

e. Whether the numerous past lawsuits and instances of NOPD, JPSO, and LSP officers using excessive force against Black people put Defendant Supervisors on notice of the need to train their officers against discriminatory use of force;

f. Whether Defendant Supervisors failed to properly train, supervise, and discipline officers surrounding the use of excessive force against Black people (and those who directly and actively support them);

g. What rules of engagement were issued to the Defendant Officers and who authorized them;

h. Whether Defendants have a policy, practice, protocol, pattern, or custom of using excessive force when monitoring demonstrators exercising their constitutional civil rights to protest racial injustice and police misconduct;

i. Whether Defendants have a policy, practice, protocol, pattern, or custom of using excessive force when monitoring any and all types of protests, regardless of subject matter;

j.   Whether Defendants have an established policy, practice, protocol, pattern, or custom on when and how to use tear gas and projectiles, including when it is deemed appropriate to do so;

k.   Whether Defendants have a policy, practice, protocol, pattern, or custom to be outfitted in full riot gear when monitoring any and all known and anticipated protests;

l.   Whether Defendants have a policy, practice, protocol, pattern, or custom regarding responding to protests about racial injustice and police brutality with more punitive and excessive force than they respond to protests regarding other subject matters;

m.   Whether Defendants have implemented and held trainings relating to when the use of force is appropriate and necessary;

n.   Whether Defendant Supervisors provided orders and authorization to use tear gas canisters and projectiles on June 3, 2020;

o.   Whether Defendant Supervisors were aware of the officers' use tear gas canisters and projectiles—including but not limited to foam bullets, Stinger rounds, and sponge grenades—immediately after the Incident;

p.   Whether Defendant Supervisors provided orders and authorization to deploy the SWAT Team on June 3, 2020;

q.   Whether and to what extent the use of force to disperse the peaceful demonstration at and near the CCC on June 3, 2020 violated the First Amendment rights of the Class Members to assemble, speak, and petition the government;

r.   Whether and to what extent the use of force to disperse the peaceful demonstrations at and near the CCC on June 3, 2020 violated the Fourth Amendment right to be free from unreasonable seizures;

s.   Whether Defendants acted in reckless or callous indifference to the rights of Class Members;

t.   Whether and to what extent Defendants' actions may impair or threaten future activities protected by the First Amendment;

u.   What equitable and injunctive relief for the Injunctive Relief Class is warranted;

v.   Whether the injuries Plaintiffs and the Classes sustained from Defendants' actions and inactions could have been mitigated or avoided through more reasonable means;

w.   Whether Defendants' actions and inactions violated Louisiana's State Constitution;

x.   Whether Defendants' actions and inactions relating to the Incident were negligent;

y.   Whether Defendants' actions and inactions relating to the Incident, including but not limited to Defendant Officers' use of tear gas, batons, and projectiles were objectively unreasonable;

z.   Whether Defendants' actions and inactions towards Plaintiffs and the Classes constitute intentional or negligent infliction of emotional distress;

aa.   Whether Defendants' actions and inactions relating to the Incident, including but not limited to Defendant Officers' use of tear gas, batons, and projectiles constitute assault and/or battery;

      bb. Whether Defendant Supervisors' actions and inactions relating to the Incident

           make them vicariously liable.

212.    Defendants are expected to raise common defenses to these claims, including denying that their actions and inactions violated the law.

### C. Typicality—Fed. R. Civ. P. 23(a)(3)

213.    Representative Plaintiffs' claims are typical of those of all class members. Representative Plaintiffs' claims arise from the same policies, practices, protocols, customs, and courses of conduct that give rise to the claims of other class members. Representative Plaintiffs and the Classes were all present near the CCC on June 3, 2020 to exercise their constitutional civil rights, and were harmed by the same wrongful conduct. Representative Plaintiffs, the Injunctive Relief Class, and the Female Injunctive Relief Subclass are, additionally, subject to similar harm in the future.

### D. Adequacy—Fed. R. Civ. P. 23(b)(4)

214.    Plaintiffs are fair and adequate representatives of the Classes because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class Members, who each have the same basic legal claims. Representative Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class Members.

215.    There are no known conflicts of interests among Class Members, including members of the Subclasses, all of whom have a similar interest in vindicating their constitutional and statutory rights.

216.    Plaintiffs are represented by the American Civil Liberties Union Foundation of Louisiana and Nelson Mullins Riley & Scarborough, who are experienced and competent in the litigation of civil rights matters and have particular expertise with respect to class actions based on

civil rights violations.  Class counsel has a detailed understanding of local law and practices as they relate to federal constitutional requirements.

### E.  Rule 23(b)(2)

217.    The Injunctive Relief Classes may be certified because: (a) the prosecution of separate actions by the individual members of the Injunctive Relief Classes for prospective relief would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class Members for prospective relief would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Injunctive Relief Classes, thereby making appropriate final, injunctive, and declaratory relief with respect to the members of the Injunctive Relief Classes as a whole.

### F.  Rule 23(b)(3)

218.    Class action status is appropriate because the questions of law or fact common to Class Members predominate over any questions affecting only individual members, as Defendants have acted on grounds generally applicable to members of the Classes.

219.    Class treatment is superior to other available methods for fairly and efficiently adjudicating this controversy because, among other causes, most of the proposed class members' claims are premised on the policies, patterns, and practices of Defendants, therefore the relief requested is appropriate respecting the Classes as a whole.  Class members' interests in individually controlling separate actions against Defendants for an action that can be otherwise more efficiently litigated in a collective action is also low given that the damages at stake are too slight to repay the cost of an individual suit.  Further, no unusual difficulties are likely to be encountered in the

management of this Class action.  Even if Class Members could afford to litigate their claims individually, individualized litigation creates a potential for inconsistent or contradictory judgments and increases delay and expense to all parties and to the courts.  By contrast, the class action device as applied to the circumstances of this case presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I – *Monell* and Supervisory Liability—Violation of First and Fourteenth Amendment Rights to Speech and Assembly, 42 U.S.C. 1983
### (All Plaintiffs Against Defendant Supervisors)

220.    Plaintiffs and the Classes incorporate by reference the allegations set forth in each preceding and following paragraph herein.

221.    The First Amendment protects the free expression of protected speech and the rights to peaceably assemble and associate.

222.    Plaintiffs and the Classes engaged in constitutionally protected acts of peaceful assembly to protest.

223.    Defendants punished conduct of demonstrators protected by the First and Fourteenth Amendment, by using excessive force when policing the protest, in retaliation for, and to prevent them from, exercising those rights.

224.    These actions were not justified by a compelling—or even substantial—government interest.  Even if we assume there was a government interest in clearing the onramp, Defendant Officers' actions, including the indiscriminate firing of tear gas canisters and projectiles into a crowd of several hundred peaceful protesters *without warning* on an elevated highway onramp, were not narrowly tailored to serve that government interest in a lawful manner.

225.     These acts would cause a reasonable person to cease engagement in a constitutionally protected activity.  These acts did, in fact, cause Plaintiffs and the Classes to cease their peaceful protest, as Plaintiffs and Class Members dispersed upon the officers' use of tear gas, batons, and projectiles.

226.     Defendants, acting together and under the color of state law, reached an understanding, engaged in a course of conduct and otherwise conspired among themselves to commit those acts described herein and to deprive Plaintiffs and the Classes of their rights under the First and Fourteenth Amendment in violation of 42 U.S.C. § 1983.

227.     Defendants had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so in violation of 42 U.S.C. § 1983.

228.     Defendants have developed and maintained policies, customs, and practices exhibiting deliberate indifference to the constitutional rights of people of color, which caused the violation of Plaintiffs' and the Class Members' rights, as described herein, and the resulting damages suffered.  These policies, customs and practices include the following:

      a.  Failing to properly supervise, discipline, train, or control police officers and supervisors, including Defendant Officers;

      b.  Failing to take reasonable and necessary disciplinary action for misconduct against officers, supervisors or commanders, leading to a corresponding decay and decline in professionalism, accountability and discipline in the police department, to the detriment of the civil rights of residents and visitors to the jurisdiction;

      c.  Authorizing, permitting, ratifying and condoning policies, practices, customs, and procedures, whereby constitutionally protected activities and gatherings

involving the rights to speech and expression, particularly of African Americans and those advocating for them, have been the subject of disruption, interference, harassment and intimidation—all in an effort to deter, frustrate, intimidate and have a chilling effect upon the rights of African Americans citizens (and those who directly and actively support them) to freely and lawfully protest without fear of police interference, harassment, intimidation or abuse;

d. Condoning, approving and authorizing a culture and environment within NOPD, JPSO, and LSP in which personnel, including Defendants herein, had the reasonable belief or expectation that their actions would not be properly monitored by supervisory or command officers and that their misconduct and unlawful actions would not be thoroughly investigated or penalized, but would be approved and tolerated.

229.    Defendants have acted with deliberate indifference to the First and Fourteenth Amendment rights of Plaintiffs and the Classes.  The Defendants have acted maliciously, willfully, wantonly, and in reckless disregard for these constitutional rights.

230.    Defendants' acts and omissions have directly and proximately violated the First and Fourteenth Amendment rights of Plaintiffs and the Classes, and thus they are entitled to damages.

231.    Further, Plaintiffs and the Injunctive Relief Class are threatened with future violation of their constitutional rights due to Defendants' pattern and practice of violating the First and Fourteenth Amendment rights of people of color and those advocating for them, and thus they are entitled to prospective relief.

**COUNT II – *Monell* and Supervisory Liability – Fourth Amendment/Excessive Force,**
**42 U.S.C. 1983**
**(All Plaintiffs Against Defendant Supervisors)**

232.     Plaintiffs and the Classes repeat and re-allege the preceding and following paragraphs as if fully set forth in this Count.

233.     Plaintiffs and the Classes were seized when Defendant Officers intentionally used unreasonable force by way of chemical agents, batons, and less-lethal projectiles, or failed to intervene to stop their fellow officers from employing unreasonable force.  Plaintiffs and the Classes were on an elevated ramp when such force was deployed, leaving no meaningful or reasonable way to retreat and disperse safely.

234.     Plaintiffs and the Classes did not pose a threat to any of the Defendant Officers or any other person.  Plaintiffs and the Classes did not participate in riotous acts, looting, or the destruction of property.

235.     Defendants' officers and agents, under color of law, committed these acts without justification or warning, and as a result, these acts were objectively unreasonable and constituted unlawful seizures and excessive force.

236.     It was Defendants' custom and policy of utilizing excessive force against people of color and those advocating for them, as well as their failure to train and supervise their officers and issue corrective instructions after violations were brought to their attention, that caused the unlawful use of excessive force.

237.     Defendant Supervisors' failure to supervise and train their employees and agents with respect to the Fourth Amendment rights of Plaintiffs and the Classes, including a failure to discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and the Classes.

238.     Further, given the pattern and practice of constitutional violations documented throughout this Complaint, the need for more supervision or training in appropriate use of force and de-escalation techniques was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that Defendants demonstrated deliberate indifference to the constitutional rights of Plaintiffs and the Classes by failing to provide such training and supervision.

239.     Plaintiffs' and the Classes' Fourth Amendment rights were violated when they were deliberately and unjustifiably targeted and/or shot with rubber bullets, tear gas, batons, and sting ball grenades during the course of their lawful protest.

240.     As a foreseeable result of Defendants' actions and omissions, Plaintiffs and the Personal Injury Class suffered severe physical and emotional injuries as alleged herein.  Thus, they are entitled to damages.

241.     Further, Plaintiffs and the Injunctive Relief Class are threatened with future violation of their constitutional rights due to Defendants' pattern and practice of subjecting people of color and those advocating for them to excessive force, and thus they are entitled to prospective relief.

**COUNT III – Violation of Louisiana's Constitutional Rights of Free Expression, Assembly and Petition (Article I, §§ 7, 9)**
**(All Plaintiffs Against All Defendants)**

242.     Plaintiffs and the Classes incorporate by reference the allegations set forth in each preceding and following paragraph herein.

243.     Plaintiffs and the Classes engaged in constitutionally protected acts of peacefully assembling to protest racial injustice and police misconduct through participation in public demonstrations.

244.     Defendants' actions in punishing the conduct of peaceful demonstrators, especially by using various forms of excessive force when policing the protest, in retaliation for, and to prevent the demonstrators from further exercising those rights as described above, interfered with the exercise of their fundamental rights, including the right to expression and to assemble as guaranteed by Article I, Sections 7 and 9 of Louisiana's Constitution.

### COUNT IV – Aggravated Assault and Battery
### (Plaintiffs Williams, Chustz, and Ali-Bey, and the Personal Injury Class, Against Defendant Officers)

245.     Plaintiffs and the Personal Injury Class incorporate by reference the allegations set forth in each preceding and following paragraph herein.

246.     Plaintiffs and the Personal Injury Class assert violations of Louisiana law relative to intentional torts by Defendant Officers, who were acting within the course and scope of their employment for NOPD, JPSO, and LSP.

247.     Defendant Officers intentionally committed acts that would have put a reasonable person in reasonable apprehension of receiving a battery and which, in fact, put Plaintiffs and the Personal Injury Class in fear of receiving a battery.

248.     By violently using batons and deploying tear gas canisters, Stinger rounds, foam bullets, and sponge grenades into a crowd of largely peaceful demonstrators, Defendant Officers committed intentional offensive contact with Plaintiffs and the Personal Injury Class without applicable privilege, consent, immunity, or right.  Bystander officers failed to intervene to protect the peaceful protesters and, as a result, are liable for the unnecessary use of force as well.

249.     Defendant Officers at all times relevant hereto were acting under the color of state law.

250.     The acts or omissions of Defendant Officers, as described herein, deprived Plaintiffs and the Personal Injury Class of their constitutional rights and caused them other damages.

251.     As a direct and proximate result of the intentional acts of the Defendant Officers described herein, carried out in reckless disregard and/or deliberate indifference, Plaintiffs and the Personal Injury Class suffered physical injury and psychological distress, and continue to suffer from severe shock, distress, anguish, sorrow, and loss of enjoyment of life.

252.     Defendant Officers engaged in extreme and outrageous conduct, and acted maliciously and with specific intent to oppress and harm Plaintiffs and the Personal Injury Class. As a result, Plaintiffs and the Personal Injury Class are entitled to damages.

### COUNT V – Vicarious Liability for Aggravated Assault and Battery – LA C.C. ART 2315, *et seq.*
### (Plaintiffs Williams, Chustz, and Ali-Bey, and the Personal Injury Class, Against Defendant Supervisors)

253.     Plaintiffs and the Personal Injury Class incorporate by reference the allegations set forth in each preceding and following paragraph herein.

254.     Defendant Officers assaulted and battered Plaintiffs and the Personal Injury Class on June 3, 2020 while acting within the scope of their employment and under the direction and control of Defendant Supervisors (as the employers of the officers).  Pursuant to Louisiana Civil Code article 2320 and the doctrine of *respondeat superior,* Defendant Supervisors are therefore responsible for the wrongdoing of their officers.

255.     As a result of Defendants' tortious conduct, Plaintiffs and the Personal Injury Class suffered physical injuries and mental anguish.

### COUNT VI – Negligence – LA C.C. ART 2315, *et seq.*
### (Plaintiffs Williams, Chustz, and Ali-Bey, and the Personal Injury Class, Against All Defendants)

256.     Plaintiffs and the Personal Injury Class incorporate by reference the allegations set forth in each preceding and following paragraph herein.

257.     Defendants owed a duty of care to Plaintiffs and the Personal Injury Class to not use discriminatory and excessive force while Plaintiffs and the Personal Injury Class were

exercising constitutionally protected rights.  Bystander officers owed a duty to Plaintiffs and the Personal Injury Class to intervene to stop fellow officers from employing excessive force.

258.   Defendants breached these duties, proximately causing injury to Plaintiffs and the Personal Injury Class.

259.   Defendant Officers were acting within the course and scope of their employment when they fired tear gas and rubber bullets or failed to intervene to stop the firing of these weapons at Plaintiffs and the Personal Injury Class.  Accordingly, Defendant Supervisors are responsible for the wrongdoing of Defendant Officers under the doctrine of *respondeat superior.*

**COUNT VII– Intentional and Negligent Infliction of Emotional Distress**
**LA C.C. ART 2315, *et seq.***
**(Plaintiffs Williams, Chustz, and Ali-Bey, and the Personal Injury Class, Against All Defendants)**

260.   Plaintiffs and the Personal Injury Class incorporate by reference the allegations set forth in each preceding and following paragraph herein.

261.   During the Incident, Defendant Officers violently employed batons and indiscriminately fired several canisters of tear gas and projectiles in the crowd, even *after* Plaintiffs and the Personal Injury Class began retreating and dispersing, in reckless disregard of and deliberate indifference to the safety and rights of Plaintiffs and the Personal Injury Class.  Bystander officers failed to intervene to protect the peaceful protesters and, as a result, are liable for the unnecessary use of force as well.

262.   Defendant Officers' conduct was extreme and outrageous.  Defendant Officers knew or should have known that the emotional distress suffered by Plaintiffs and the Personal Injury Class was or would be severe, and Defendants desired to inflict this severe emotional distress, or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

263.     Defendant Supervisors are responsible for the wrongdoing of Defendant Officers under the doctrine of *respondeat superior.*  Defendant Officers were acting within the course and scope of their employment.

**COUNT VIII – Title VI of the Civil Rights of Act of 1964**
**42 U.S.C. § 2000d**
**(All Plaintiffs Against Defendant Supervisors)**

264.     Plaintiffs and the Classes incorporate by reference all allegations set forth in each preceding and following paragraph herein.

265.     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) *et seq.* prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance, including law enforcement programs and activities.  Title VI prohibits intentional discrimination on the basis of race or ethnicity.  It prohibits law enforcement officers from conducting police activities in a manner that is motivated by race or ethnicity, has a discriminatory effect on a racial or ethnic group, or which is motivated by a discriminatory purpose.

266.     NOPD, LSP, and JPSO receive federal financial assistance, including that provided for law enforcement activities.

267.     NOPD has previously been brought to court by the DOJ in 2012 for this precise issue.   LSP and JPSO also have well-documented histories of using excessive force in a discriminatory manner.

268.     As demonstrated by the excessive use of force against the crowd gathered to mourn George Floyd's death on June 3, 2020, Defendant Supervisors have continued to maintain a policy, pattern, and practice of using excessive force in a manner that is motivated by race and ethnicity, resulting in a significant disparate impact on people of color and those who advocate for them. Defendant Supervisors' policies, practices, and customs of targeting protests against police brutality

and misconduct, and the June 3, 2020 protest in particular, for aggressive, disproportionate, discriminatory enforcement was likely to result in racial profiling.

269.    This discriminatory and disproportionate policing response to protests demonstrates a policy, pattern, and/or permitted practice to act punitively towards demonstrators with a message critical of law enforcement agencies and was implemented by Defendants, working in concert to suppress the right of community members, including Plaintiffs and the Classes, protesting against racial injustice and police misconduct.

270.    As a direct and proximate result of Defendants' policies, practices, and/or customs, Plaintiffs and Personal Injury Class Members have suffered and will continue to suffer compensable harm, humiliation, emotional distress, loss of liberty, loss of property, and/or violations of their constitutional rights, and are entitled to damages, costs, and attorneys' fees.

271.    Further, Plaintiffs and the Injunctive Relief Class are threatened with future harm due to Defendants' pattern and practice of subjecting people of color and those advocating for them to excessive force.  They are thus entitled to prospective relief.

### COUNT IX – Violation of Equal Protection Under the Fourteenth Amendment
### (All Plaintiffs Against All Defendants)

272.    Plaintiffs and the Classes incorporate by reference all allegations set forth in each preceding and following paragraph herein.

273.    At all relevant times herein, Defendants acted under color of law.

274.    At all times relevant herein, Defendants maintained an unwritten and ongoing policy or custom of responding differently and affording less protection to a certain group of people—Black people and those protesting police brutality or racial injustice towards Black people—specifically, Plaintiffs and the Classes, and others similarly situated.

275.    Plaintiffs and the Classes' injuries are the result of the unconstitutional policies, customs, or practices, underscored by the Incident on June 3, 2020.

276.     Defendants acted with a discriminatory motive in pursuing this policy and course of action in controlling the demonstration on June 3, 2020.

277.     Defendants have established a policy which provides less protection to a certain group of demonstrators—namely Black people and others protesting police brutality or racial injustice towards Black people—than to other demonstrators, *i.e.*, non-Black people in demonstrations protesting issues not related to police brutality or racial injustice.

278.     This policy, practice, and course of action is guided by discrimination against Black people and those protesting police brutality or racial injustice and has had an adverse and disproportionate impact on such groups.

279.     At all relevant times herein, Defendants, with deliberate indifference, intentionally, or with reckless disregard, deprived Plaintiffs and the Classes of their rights and privileges secured by the United States Constitution.  Such actions and omissions include (but are not limited to) failing to take adequate, affirmative steps to properly train and supervise officers on non-discriminatory management of civil disturbances and other demonstrations that have been in regular occurrence, and a subsequent failure to meaningfully reprimand or discipline officers for violating the rights of people of color.

280.     This deliberate indifference or reckless disregard caused harm and increased the risk of harm to Plaintiffs and the Classes.

281.     These policies, practices, and/or courses of action—which result in disparate police responses to demonstrations based on the racial composition of the participants or the content of their speech—are not necessary to achieve any compelling government interest, were not narrowly tailored to achieve a compelling government interest, and did not use the least restrictive means to achieve a compelling government interest.

282.     Defendants violated Plaintiffs' and the Classes' civil rights by having a policy that, when enforced and as applied, caused deprivation of their constitutional rights.  Alternatively, they did so by having a widespread practice or custom that, although not authorized by written policy, was so permanent and well-settled as to constitute a custom or usage with the force of law.

283.     Plaintiffs and the Classes are entitled to compensatory damages and other non-pecuniary losses.  As a direct and proximate result of the Defendants' actions, Plaintiffs and the Classes have suffered deprivations of their constitutional rights.

### COUNT X – Violation of Substantive Due Process Under the Fourteenth Amendment (Plaintiff Chustz and the Female Personal Injury and Injunctive Relief Subclasses, Against All Defendants)

284.     Plaintiffs and the Subclasses incorporate by reference all allegations set forth in each preceding and following paragraph herein.

285.     Plaintiffs and the Subclasses have a fundamental right to privacy that encompasses "the right of the individual, married or single, to be free of unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."[108]

286.     Defendants infringed upon this fundamental right when they subjected Plaintiffs and the Subclasses to chemical weapons that adversely impact their ability to bear or beget children in the future.

287.     As demonstrated in this Complaint, there existed no legitimate government interest that would have justified Defendants' violation of this fundamental right.

288.     As a direct and proximate result of the conduct of Defendants, Plaintiffs and the Female Personal Injury Subclass suffered grave injuries, including loss of liberty, emotional distress, and potential damage to their reproductive health.

---

[108]  *Andrews v. Ballard*, 498 F.Supp.1038 (1980).

289.    Further, Plaintiffs and the Female Injunctive Relief Subclass are threatened with future harm due to Defendants' pattern and practice of subjecting people of color and those advocating for them to excessive force, including with chemical weapons that damage their reproductive health.   Plaintiffs and the Female Injunctive Relief Subclass are thus entitled to prospective relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that this Court enter judgment in their favor, and in favor of the putative Classes that they seek to represent, against Defendants and order the following relief:

(a) A preliminary injunction barring Defendants from engaging in the unconstitutional conduct alleged herein;

(b) A determination that this action may proceed as a Class action under Federal Rule of Civil Procedure 23;

(c) Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class counsel;

(d) A declaration that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments of the United States Constitution;

(e) A declaration that Defendants' conduct violated the Louisiana Constitution;

(f) A permanent injunction barring Defendants from engaging in the unconstitutional conduct alleged herein;

(g) Damages compensating Plaintiffs for their injuries, including but not limited to compensatory, pecuniary, and medical expense damages according to proof;

(h) An award of prejudgment interest;

(i) An order and judgment awarding compensatory and punitive damages to Plaintiffs and to the members of the putative Classes whom Plaintiffs seek to represent;

(j)  An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

(k)  A declaration that disciplinary action must be initiated against officers who violated— and continue to violate—Plaintiffs' and the Class Members' constitutional rights;

(l)  Equitable relief, in the alternative, according to proof; and

(m) Any other relief this Court or a jury deems just and proper.

Dated April 28, 2021

Respectfully submitted,

/s/ Stephanie Willis
Stephanie Willis
La. Bar No. 31834
swillis@laaclu.org
Nora Ahmed*
nahmed@laaclu.org
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70156
(504) 522-0628

Jahmy S. Graham*
jahmy.Graham@nelsonmullins.com
Mary C. Biscoe-Hall*
mary.biscoehall@nelsonmullins.com
Priscilla Szeto*
priscilla.szeto@nelsonmullins.com
NELSON MULLINS RILEY & SCARBOROUGH LLP
19191 S. Vermont Avenue, Suite 900
Torrance, CA 90502
(424) 221-2700 (CA Office)
100 S. Charles Street, Suite 1600
Baltimore, MD, 21201
(443) 382-9400 (MD Office)

* *Pro Hac Vice* application forthcoming

*Attorneys for Plaintiffs*