EXHIBIT C

**New Orleans Police Department**

**Use of Force Investigation**

**FTN 2020-0161**

**NOPD Item: F-03385-20**

**Re: CCC Protest – June 3rd, 2020**

# *TABLE OF CONTENTS*

Event Summary ………………………………………………………………………………………………….. p. 1

Listed Involved Officers……………………………………………………………………………………… p. 2

Subjects of Force ……………………………………………………………………………………………….. p. 4

FIT Investigation …………………………………………………………………………………………………. p. 6

       Scene Description ……………………………………………………………………………………. p. 8

       Review of Safariland Literature …………………………………………………………….. p. 9

       NOPD Equipment Accounting ………………………………………………………………. p. 12

       Media Release ……………………………………………………………………………………. p. 13

       Written Force Statements ……………………………………………………………………… p. 13

       Grenadier Team Force Statements ………………………………………………………… p. 13

       Involved Officer Force Statements ………………………………………………………… p. 20

       Witness Officer Statements …………………………………………………………………… p. 56

       Supervisor Witness Statements ……………………………………………………………… p. 65

       Command Staff  Statements …………………………………………………………………. p. 68

       Body Worn Camera Review ………………………………………………………………… p. 75

       Grenadier Team BWC Review ……………………………………………………………… p. 75

       Involved Officer BWC Review ……………………………………………………………… p. 90

       Special Operation Division After-Action Report ………………………………………… p. 132

       Recorded Administrative Interviews ……………………………………………………… p. 134

       Grenadier Team Interviews ……………………………………………………………………… p. 134

       Incident Command Interviews ……………………………………………………………… p. 156

       NOPD Training Staff Statements …………………………………………………………… p. 173

       Interviews Regarding BWC Violations ……………………………………………………… p. 191

       In-Car Camera Review ………………………………………………………………………… p. 200

       Communications Recordings ………………………………………………………………… p. 204

       Civilian and Witness Statements …………………………………………………………… p. 215

Anonymous Complaint Information …………………………………………………………………… p. 248

Social Media Video ……………………………………………………………………………………… p. 251

Other Video Footage …………………………………………………………………………………… p. 264

Credibility Assessments …………………………………………………………………………………. p. 269

NOPD Personnel …………………………………………………………………………………………. p. 270

Civilian Witnesses and Subjects of Force ………………………………………………………. p. 275

Anonymous Complainants ………………………………………………………………………… p. 282

Decision Point Analysis ……………………………………………………………………………………… p. 285

Tactical Analysis …………………………………………………………………………………………………. p. 287

Training Analysis ………………………………………………………………………………………………… p. 289

Policy Considerations …………………………………………………………………………………………. p. 289

First Amendment Assembly Considerations ……………………………………………………… p. 289

June 4 #JusticeForFloyd Protest Plan ……………………………………………………………… p. 293

Use of Force Policy Review ………………………………………………………………………………. p. 293

New First Amendment Assembly Policies ……………………………………………………… p. 297

BWC Policy Issues … ……………………………………………………………………………………… p. 300

NOPD Consent Decree Requirements Re: First Amendment Assembly ………….. p. 300

Responsibility for Policies ……………………………………………………………………………… p. 301

Summary of Investigation …………………………………………………………………………………… p. 301

Recommendations ……………………………………………………………………………………………… p. 303

# DEFINITIONS OF TERMS USED

**SOD** – Special Operations Division, the division of NOPD that houses specialized units such as SWAT, Traffic, and Canine.

**Agitator** – Individuals who purposefully engage in and/or incite unlawful civil unrest, such as: throwing objects at police, stealing/destroying property, disregarding lawful orders from officers, and physically push through police cordons

**Protesters** – Refers to the crowd collectively as well as those peaceful protesters who were not in a position to be considered agitators.)

**Launcher** – Refers to the 40mm grenade launcher used to fire less-lethal impact rounds.

**Skirmish Line** – Skirmish lines represent the front line of contact and confrontation between police officers and a crowd

**Mobile Field Force** – The group of officers ad supervisors forming the Skirmish Line. The Mobile Field Force may also include Specialized units which may respond in the event of a non-peaceful event, such as SWAT.

**Incident Commander** – The individual responsible for all incident activities and operations at the incident site, including the development of strategies and tactics and the ordering and release of resources.

**Tactical Commander** - Oversee the response of specialized units and the Mobile Field Force in the event a peaceful protest becomes a non-peaceful civil disturbance or a riot.

**Blue Team** - A small group of SOD Members assigned to perform a specific function.  In this event the Blue Team was assigned to identify and apprehend individuals from behind the Skirmish Line.

**Orange Team** - A small group of SOD members assigned to perform a specific function.  In this event the Orange Team was assigned to be the gas deployment team, also referred to as the grenadier team.

**Red Team** - A small group of SOD members assigned to perform a specific function.  In this even the Red Team was assigned to respond to any lethal threats, such as an active shooter.

**Tear Gas** – A common term used to denote several different types of gas used by law enforcement to address barricaded subjects or to disperse crowds. Only CS gas was used during this event.

**CS Gas** - A gas causing tears, salivation, and painful breathing, used in civil disturbances; ortho-chlorobenzal malononitrile.

NEW ORLEANS POLICE DEPARTMENT

USE OF FORCE INCIDENT 2020-0161

| | | | |
|---|---|---|---|
| **TO:** | Captain Sabrina Richardson | **DATE:** | 12/14/20 |
| | Public Integrity Bureau | | |
| **FROM:** | Sergeant David A. Barnes | | |
| | PIB / Force Investigation Team | | |
| **SUBJECT:** | FTN: 2020-0161 / Item # F-03385-20 | | |
| | CCC Protest Incident | | |
| | Known Officers | | |

## Event Summary

On Wednesday, June 3, 2020, at approximately 10:15 PM, members of the New Orleans Police Department (NOPD) deployed CS gas canisters and impact rounds (including foam and rubber ball impact rounds) during a mass demonstration event on the elevated portion of Highway 90 (Business 90 Westbound) at Crescent City Connection Bridge. Investigators, with community assistance, have been unable to uncover any time NOPD has ever deployed gas as a means of crowd control.

On Thursday, June 4, 2020, the NOPD Force Investigation Team (FIT) was tasked with investigating the incident after it was learned an individual had possibly been struck in the head with one of the hand-deployed CS gas canisters. That same day, the Superintendent of NOPD, Superintendent Shaun Ferguson, publicly provided information that only tear gas had been used during the incident. This information had been provided to the Superintendent erroneously, as it was later learned to be incorrect.

During the preliminary investigation on June 4, 2020, FIT investigators learned CS gas canisters, CS foam impact rounds, foam marking rounds, and Stinger .60 caliber rubber ball rounds were deployed during the incident; however, the use of the impact rounds were not immediately reported to command desk, and no notification was raised through the NOPD's Chain of Command regarding their use.

The Force Investigation Team began an investigation into the use of force incident under NOPD Force Tracking Number (FTN) 2020-0161. As a result of the incident, NOPD's Public Integrity Bureau received several citizen complaints regarding NOPD's use of CS gas and impact rounds.

The findings of that investigation, documented in this report, determined the force used by officers was reasonable. The investigation also determined the force was the culmination of a series of decisions and events occurring during the course of the NOPD's response to what was otherwise a peaceful protest. The investigation determined the NOPD did not have sufficient guidance in place regarding the Department's response to First Amendment Assemblies or using

and reporting specialized less-lethal weapons (specific to the NOPD's Special Operations Division). Investigators noted no policy regarding the Department's response to First Amendment Assemblies had been in place, and were unable to uncover a time NOPD had ever been in a situation in which crowd control munitions were deployed during such an event.

This investigation seeks to thoroughly examine, analyze, and provide recommendations regarding this unprecedented event and the NOPD's response to First Amendment Assemblies as it applies to planning, training, and use of force.

## Investigators

FIT Sergeant David A. Barnes responded to the scene with Sergeants Clinton Givens, John Helou, and Detective Michael McCleery. The investigation was initially assigned to Sergeant Clinton Givens and shortly afterwards reassigned to Sergeant David Barnes to conduct an administrative investigation. Sergeant Clinton Givens would be assigned to conduct a criminal investigation of the incident if it were determined any of the actions of the involved officers involved apparent criminal conduct.

## Involved Officers:

During the course of the investigation, Sergeant Barnes determined the following officers were involved in the incident as using force in the manner listed:

**Special Operations Division:**

1. **Officer Travis Johnson –** (reclassified as level 4) – Hand deployed gas canisters.

2. **Officer Jason Jorgenson –** (reclassified as level 4) – Hand deployed gas canisters.

3. **Officer Devin Joseph** – (reclassified as level 4) – CS and Foam Impact rounds from 40mm launcher.

4. **Officer Michael Pierce** – (reclassified as level 4) – CS impact rounds and 60 caliber stingers from 40mm launcher.

5. **Sergeant Travis Ward** – (Level 1) – Take-down without injury during final push.

6. **Officer David Desalvo** – (Level 1) – Take-down without injury during final push.

7. **Officer Wesley Humbles –** (Level 1) – Pulled agitator through police line into custody.

8. **Officer Arden Taylor, Jr.** – (Level 1) – Pulled agitator through police line into custody.

9. **Officer Frank Vitrano** – (Level 3) – Jabbed at protesters with baton.

10. **Sergeant Evan Cox** - (Level 1) – Take-down without injury during final push.

## 1st District:

**11.**     **Lieutenant Merlin Bush** – (Level 1) – Used hands to push individuals back.

**12.**     **Officer Michael Devezin** – (level 3) - Used his shield and baton to push the crowd back, was struck in the head but reported no injuries.

**13.**     **Officer Bryan Bissell** – (level 3) – Used baton to push individuals back.

**14.**     **Officer Daniel Grijalva** – (level 3) – Used baton on individuals who tried to take his shield and baton.

**15.**     **Officer Brandon Abadie** – (level 1) – Used shield to push individuals.

## 2nd District:

**16.**     **Officer Devin Johnson** – (level 1) - Used his shield to push crowd back.

**17.**     **Officer Douglas Boudreau** – (level 1) - Used hands and shield to push crowd back.

**18.**     **Officer Matthew Connoly** – (level 3) – Used baton to jab individuals.

## 3rd District:

**19.**     **Sergeant Terrence Hilliard** – (level 1) – used hands to control individuals.

**20.**     **Officer Jonathan Burnette** – (level 1) – Used shield to push crowd back.

**21.**     **Officer Justin McCubbins** – (level 3) – Used baton to jab individuals, was kicked in the throat and hit by protester with bike.

**22.**     **Officer Kenneth Kuykindall** – (level 1) – Used hands to control individuals.

**23.**     **Officer Zachary Vogel** – (level 3) – Used baton in jabbing motion to keep protester from pushing through him.

## 4th District:

**24.**     **Sergeant Lamont Walker** – (Level 1) – Attempted to stop protesters from advancing using his hands.

**25.**     **Officer Denzel Millon** – (level 1) – Used shield to push crowd back at first push.

**26.**     **Officer Raphael Rico** – (level 3) – Used Baton to push and strike protesters.

27.     **Officer Jamal Kendrick** – (level 1) – Used shield to push crowd back.

<u>**5th District:**</u>

28.     **Sergeant Daniel Hiatt –** (level 1) – Used shield to push back at subject.

29.     **Officer Jeffrey Crouch** – (level 3) – Used shield and baton to push crowd back.

<u>**6th District:**</u>

30.     **Officer John Cabral** – (level 1) – Used shield to push crowd back.

31.     **Officer Matthew Ezell** – (level 1) – Used shield to push crowd back.

<u>**7th District:**</u>

32.     **Officer James Cunningham** – (level 1) – pushed at individuals with shield.

33.     **Officer Demond Davis** – (level 1) – pushed at individuals with shield.

34.     **Officer Joshua Diaz** – (level 1) – pushed at individuals with shield.

35.     **Sergeant Stephen Nguyen** – (level 3) – Used expandable baton to jab individuals.

36.     **Officer Vinh Nguyen** – (Level 1) – pushed at individuals with shield.

<u>**8th District:**</u>

37.     **Officer Matthew McKoan –** (level 1) – Used shield to push crowd back.

<u>**Subjects of force:**</u>

Sergeant Barnes identified the following individuals as having been subject to force by NOPD officers in the listed ways:

<u>**Bilal Ali-Bey**</u> – Was exposed to gas and hit with CS impact round.

<u>**Katharine Archer**</u> – Was hit in the head with hand-deployed gas canister and exposed to gas.

<u>**Abigail Walker**</u> – Was exposed to gas and hit with hand-deployed gas canister (same canister that his Katharine Archer).

<u>**Juliet Walker**</u> – Was exposed to gas.

**Samantha Nichols** – Was exposed to gas.

**Arrested Subjects of Force**

**Ashley Jones** - (B/F █████/97) – Was taken into custody, a take-down was conducted by members of a snatch team.

**Mariel Rose Ehrich** – (W/F █████/1997) - Was taken into custody, a take-down was conducted by members of a snatch team.

**Alexander Taylor** – (W/F █████/1987) - Was taken into custody, a take-down was conducted by members of a snatch team.

**John Mouton** – (W/M █████/1990) - Was taken into custody, a take-down was conducted by members of a snatch team.

**Delany Nolan** – (█████/1988) - Was taken into custody, a take-down was conducted by members of a snatch team.

Investigators noted the arrested subjects did not appear to have been interviewed during their apprehensions, and no interviews appear to have been conducted regarding any force used against them. Investigators recognized this as a potential failure during the on-scene incident and have recommended changes to ensure the prevention of other such failures in the future, such as proper training for the command staff overseeing the incident. incident regarding their use of force due to the circumstances of the investigation and the manner in which CS gas is deployed, many individuals who were involved in protest and/or the subsequent civil unrest may have been subjected to some form of force during the incident and remain unidentified.

**Notifications**

On Thursday, June 4, 2020, at approximately 9:25 AM, Sergeant David Barnes was notified by Lieutenant Kevin Burns of a possible level four use of force which occurred on the US Highway 90 Bridge, headed towards the New Orleans Westbank and involved the use of tear gas canisters deployed by NOPD in response to civil unrest.

The following individuals were notified of the incident:

Deputy Chief Arlinda Westbrook of the NOPD Public Integrity Bureau
Captain Sabrina Richardson of the NOPD Public Integrity Bureau
Ret. Chief Chet Epperson of the Office of the Federal Consent Decree Monitor
Ret. Chief Mitch Brown of the Office of the Federal Consent Decree Monitor
Ms. Bonycle Sokunbi of the Office of the Independent Police Monitor
Ms. Susan Hutson, the New Orleans Independent Police Monitor

## FIT investigation

## Initial FIT Response

On Thursday, June 4, 2020, at 9:03 AM, Lieutenant Kevin Burns Jr. received a call from The Independent Police Monitor's Chief Monitor of Use of Force, Mrs. Bonycle Sokunbi. Mrs. Sokunbi asked if tear gas was deployed by New Orleans Police Officers during protests in downtown New Orleans. It was also alleged that a female protester was hit in the head with a gas canister and sustained a significant injury, requiring hospitalization. Lieutenant Burns advised that he would obtain any information he could and report back to Mrs. Sokunbi.

Lieutenant Burns then called Special Operations Division Assistant Commander Lieutenant Kenny Prepetit. Lieutenant Prepetit informed Lt. Burns that a group of protesters attempted to cross the Crescent City Connection Bridge on foot. A line of NOPD Officers were formed across the Westbound lanes of traffic on US-90 near the Tchoupitoulas onramp. The crowd expressed their intent to pass. Officers attempted peaceful dialog with the protesters, but ultimately denied passage through the police line across the bridge. The crowd then attempted to push through the NOPD line towards the Westbank.

Lieutenant Burns informed FIT investigators that, as with deployments of K-9 or an order to fire in a sniper situation, approval must be obtained to deploy gas under these circumstances. Lieutenant Burns stated, according to Lieutenant Prepetit, protocol was followed, and the deployment was authorized by a commanding officer.

The incident was documented under the protest item F-03385-20. Lieutenant Burns advised Lieutenant Prepetit that FIT would document the use of force, due to the possibility of hospitalization and a head injury. Lieutenant Burns also informed Lieutenant Prepetit, and FIT investigators, that, if confirmed, the incident would be upgraded to a level four (4) use of force.

At 9:25 AM, Lieutenant Burns called Deputy Independent Police Monitor Sokunbi and informed her the department deployed CS gas canisters and used the 40mm launcher. Lieutenant Burns then informed FIT investigators of the incident.

On Thursday, June 4, 2020 At Approximately 10:00AM, FIT Investigators Sergeant David Barnes, Sergeant Clinton Givens, Sergeant John Helou, and Detective Michael McCleery relocated to the Special Operations Division Office at 1899 Tchoupitoulas Street. At the location, Sergeant Barnes met with Lieutenant Kenny Prepetit, Unit 3400, and discovered the involved officers were not at the location and were instructed to report to work at 2:25 PM for coverage of another protest that evening. Sergeant David Barnes requested the identifying information for the officers who were assigned to the gas-deployment team (grenadier team) and an inventory of what munitions had been used on the bridge the previous night. Lieutenant Prepetit informed Sergeant Barnes he would gather the necessary information and provide it in a timely fashion.

The responding FIT investigators then relocated to the area of the incident near the Tchoupitoulas Street onramp and US-90 Westbound. Sergeant Barnes and Detective McCleery

canvassed the area underneath the bridge, searching for any evidence of the munitions used, while Sergeants Helou and Givens search for any evidence of the munitions used on the elevated portion of the bridge.

During the canvass, investigators discovered the following items:

Two (1) discarded No.2 CS Gas Canisters
One (1) spent, black, 40mm casing with the writing, "Direct Impact Extended Range CS"
Two (2) gas mask filters (one used and one unused)
One (1) used roman candle

The items were photographed and collected by Sergeants Helou and Givens, provided to Sergeant Barnes, photographed at the SOD compound, and returned to the Special Operations Division Office for an accounting of their inventory.

On Thursday, June 4, 2020, at 10:54 AM, while FIT investigators were searching the scene, Lieutenant Burns arrived at University Medical Center (UMC) and met with Triage Nurse Tristian Alexander. She informed Lt. Burns there were no patients there with head injuries that had come in and was unable to search the system without having a name.

On Thursday, June 4, 2020, at 11:01 AM, Lieutenant Burns called the Independent Police Monitor's Acting Chief Monitor, Ms. Bonycle Sokunbi, to determine the injured female's name. Lieutenant Burns was informed the only information available was a tweet from Twitter account holder "abidail" using the handle @sunburnt_skin wrote in a tweet that her mother was hit in the head with a canister by NOPD Officers during the protest. Her head was "cracked", and she was hospitalized. A respondent then tweeted Ms. Archer was a known protester and implied she was a teacher at Lusher Charter School. Lieutenant Burns obtained the name Katharine Archer and a photograph from the Lusher school website.

Lieutenant Burns presented the name and photograph to Nurse Alexander. She searched her database and informed Lieutenant Burns there were no patients presently or recently discharged matching the name in question.

On Thursday, June 4, 2020, at 11:15 AM, Lieutenant Burns relocated to Tulane University Hospital with the same objective. Lieutenant Burns was again informed there were no patients presently or recently there matching the name Katharine Archer.

On Thursday, June 4, 2020, at 12:15 AM, Lieutenant Burns received a call from Deputy Police Monitor Sokunbi with updated information. Mrs. Sokunbi provided Lieutenant Burns with a first and last name that matched the name located on Lusher's website. The injured woman was in fact Katharine Archer. It was reported that she was treated at Ochsner Hospital's main campus on Jefferson Highway. Her daughter was identified as Abigail Walker, the same individual that posted the Tweet. A contact number of 504-939-6135 was provided.

## Description of Scene

On Thursday, June 4, 2020, Sergeant David Barnes observed the scene of the incident on the elevated portion of the US-90 Expressway. The scene of the incident stretched on the Westbound side of the elevated expressway from roughly above S. Peter Street to above Convention Center Boulevard, where the Tchoupitoulas Street onramp merged with the highway. Sergeant Barnes noted the road appeared to be strewn with trash and debris which had been pushed to the side. On the side wall of the bridge, closest to the third lane (the left or "fast" lane), the following statement was spray-painted on to the wall, "June 3, 2020 RIGHT HERE THE COPS USED MILITARY WEAPONS ON PEACEFUL PROTESTERS." Also, in the area were two discarded No.2 CS Gas canisters that appeared to have been run over. Sergeants Helou and Givens also discovered a black 40mm casing labeled, "Direct Impact Extended Range CS." On that portion of the bridge were also two filters used for gas masks. One of the filters was inside of its' original container and appeared unused. The sides of the bridge appeared to be littered with water bottles. Another section of the bridge wall at the scene had spray painted messages saying, "FUCK 12" and "DEATH 2 POLICE" with a drawing of a pig's face. Sergeant Barnes also noted a traffic camera at the location.

Sergeant Barnes noted the Tchoupitoulas onramp, directly next to where the protest was stopped by an NOPD police line, also appeared to be have remnants from the previous night's protest, such as litter, water bottles, and a discarded roman candle.

Sergeant Barnes observed a parking and taxi area underneath the bridge was littered with protest signs, pamphlets, and water bottles. Sergeant Barnes also observed a bicycle had been discarded underneath the bridge and was bent in a way that suggested it had been thrown over the side.

## End of Scene Description

On June 10, 2020, Sergeant Barnes received an email, forwarded from Sergeant Clinton Givens, originally sent by NOPD Detective Chad Cockerham to Lieutenant Kevin Burns, identifying the primary agitator of the recent protests as Mr. Brandon Wheeler (B/M 1/29/1996). The email noted that Mr. Wheeler was in town for the protests from Miami, Florida and had also made threats to tear the city part during the protest the night before if the Mayor did not come to speak to them. The email identified Mr. Wheeler as making threats that the police would not make it home while he was negotiating with Captain Roberts on the night of the June 3rd protest.

(**Note**: Investigators must differentiate agitators from protesters for the purpose of this investigation. Agitators are those individuals who purposefully engage in and/or incite unlawful civil unrest, such as: throwing objects at police, stealing/destroying property, disregarding lawful orders from officers, and physically push through police cordons. "Protesters" refers to the crowd

collectively as well as those peaceful protesters who were not in a position to be considered agitators.)

**Review of Safariland Literature**

Sergeant Barnes met with Sergeant Todd Morrell, of the Special Operations Division, and was provided with Safariland's literature describing the technical specifications of the munitions used on the evening of the incident. Sergeant Barnes noted Safariland is the parent company responsible for the manufacture of the gas grenades and munitions used on the bridge. The literature helps provide investigators insight into the safe and/or effective use of those munitions. Sergeant Barnes reviewed the literature and learned the following information about each type of munition used:

## No. 2 CS Gas Grenades

The No.2 CS Gas Grenade, referred to as a "Riot Control Grenade Continuous Discharge" is manufactured by Defense Technology, a branch of the Safariland Group. The literature provided by the manufacturer reads:

> "The Riot Control Grenade is a high volume, continuous discharge grenade available in OC, CN and CS. Built on a smaller scale than the Spede-Heat™ version; it is similar to the military design.
>
> In the OC, CN and CS configurations, pelletized chemical agent is discharged through four (4) gas ports located on top of the canister and one (1) on the bottom.
>
> Designed specifically for outdoor use in crowd control situations, the Riot Control Grenade is a high volume continuous burn canister that expels its payload in approximately 20 - 40 seconds. It has slightly less chemical content than the Spede-Heat™ version, but differs mainly in size. The longer burn time may allow for throwback by individuals wearing burn protection such as a welder's mitt. The canisters may be protected from advancing individuals with the use of less lethal impact munitions. The device should be deployed utilizing wind advantage.
>
> It should NOT be deployed onto rooftops, in crawl spaces, or indoors due to its fire-producing capability. Hand throw or launch use only. Launching of grenades will provide deploying officers additional stand-off distances. This grenade offers coverage for large outdoor areas."

Sergeant Barnes noted the manufacturer literature specifically discussed the canister being thrown back by protesters and the use of less lethal impact munitions (such as CS gas impact rounds and Stinger rounds) to protect the canisters from being tampered with.

Sergeant Barnes also noted the following warnings on the literature:

> "WARNING: THIS PRODUCT IS TO BE USED ONLY BY AUTHORIZED AND TRAINED LAW ENFORCEMENT, CORRECTIONS, OR MILITARY PERSONNEL. THIS PRODUCT MAY CAUSE SERIOUS INJURY OR DEATH TO YOU OR

OTHERS. THIS PRODUCT MAY CAUSE SERIOUS DAMAGE TO PROPERTY. HANDLE, STORE AND USE WITH EXTREME CARE AND CAUTION. USE ONLY AS INSTRUCTED."

The warnings on the literature also explained the product can expose people to lead salts and Hexavalent Chromium, which have been found in California to cause birth defects or reproductive harm, and cancer, respectively.

## Extended CS

The Extended CS Direct Impact round, referred to as a "40MM Direct Impact Extended Range OC, CS, Inert & Marking" is manufactured by Defense Technology, a branch of the Safariland Group. The literature provided by the manufacturer reads:

"The 40mm Direct Impact® Extended Range Round has evolved from Defense Technology® design of the Direct Impact®. This lightweight, high-speed projectile consists of a plastic body and a foam (frangible) nose which is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel. The rounds utilize smokeless powder as the propellant and have velocities that are extremely consistent.

The 40mm Direct Impact® Extended Range Round consists of a plastic body and a crushable foam nose that contains a powder payload. This payload area can hold inert, marking, OC or CS powder. The crushable foam nose dissipates energy upon impact while releasing the powder payload.

The 40mm Direct Impact® Extended Range Round is a "point-of-aim, point-of-impact" direct fire round that is most commonly used by tactical teams in situations where greater accuracy and deliverable energy is desired for the incapacitation of an aggressive, non-compliant subject at longer distances.

The 40mm Direct Impact® Extended Range Round is intended for direct fire deployment. The operator should be adequately trained in the use of Less Lethal Impact Munitions and have a thorough understanding of the round and considerations for selecting shot placement such as level of threat, target distance, size and clothing. The 40mm Direct Impact® Extended Range Round will prove most successful for incapacitation when used within their optimal energy range of 10 – 70 meters. Extensive testing was done on the Direct Impact® Extended Range Round to ensure that the round is less lethal when fired within the optimal energy range and at the large muscle groups of the buttocks, thigh, and knees. These areas provide sufficient pain stimulus, while greatly reducing serious or life-threatening injuries.

The 40mm Direct Impact® Extended Range Round is intended to be used in applications that exceed the performance capability of the standard Direct Impact® Round. The Direct Impact® Extended Range Round should only be used at ranges beyond 10 meters, targeting the subject's lower torso or extremities. Impacts closer than 10 meters or targeting the subject's head, neck, or upper torso can result in serious injury or death."

Sergeant Barnes noted the recommended minimum range is 10 meters (approximately 32.8 feet) and is suggested to be fired at the lower extremities. Sergeant Barnes did note that

C14

targeting the head, neck, or upper torso could result in serious injury or death. Sergeant Barnes also noted the listed muzzle velocity of the round was approximately 355 feet per second, which is roughly the speed a small crossbow or airsoft gun fired. The literature also included the same warnings as the other provided literature.

## **Marking Rounds**

The marking rounds, referred to as a "40MM Direct Impact Round OC, CS, Inert & Marking" is manufactured by Defense Technology, a branch of the Safariland Group. The literature provided by the manufacturer reads:

> "The 40mm Direct Impact® Round has evolved from Defense Technology® design of the eXact iMpact™. This lightweight, high-speed projectile consists of a plastic body and a crushable foam nose which is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel. The rounds utilize smokeless powder as the propellant and have velocities that are extremely consistent.
>
> The 40mm Direct Impact® Round consists of a plastic body and a crushable foam nose that contains a powder payload. This payload area can hold inert, marking, OC or CS powder. The crushable foam nose dissipates energy upon impact while releasing the powder payload.
>
> The 40mm Direct Impact® Round is a "point-of-aim, point-of-impact" direct fire round that is most commonly used by tactical teams in situations where greater accuracy and deliverable energy is desired for the incapacitation of an aggressive, non-compliant subject at longer distances.
>
> The 40mm Direct Impact® Round is intended for direct fire deployment. The operator should be adequately trained in the use of Less Lethal Impact Munitions and have a thorough understanding of the round and considerations for selecting shot placement such as level of threat, target distance, size and clothing.
>
> The 40mm Direct Impact® Round will prove most successful for incapacitation when used within their optimal energy range of approximately 5 – 36 meters, although it may used in situations from 2 – 50 meters. Extensive testing was done on the Direct Impact® Round to ensure that the round is less-lethal when fired within the optimal energy range and at the large muscle groups of the buttocks, thigh, and knees. These areas provide sufficient pain stimulus, while greatly reducing serious or life-threatening injuries."

Sergeant Barnes noted the recommended minimum range is 1.5 meters (or 5 feet) and is suggested to be fired at the lower extremities. Sergeant Barnes also noted the listed muzzle velocity of the round was approximately 295 feet per second, which is roughly the speed a paintball gun. The literature also included the same warnings as the other provided literature.

## **Stinger Rounds**

The Stinger rounds, referred to as a "40MM Stinger 60-cal Rubber Ball Smokeless Powder Round" is manufactured by Defense Technology, a branch of the Safariland Group. The literature provided by the manufacturer reads:

"The Stinger® 40mm, 60-Caliber Round incorporates a 4.8-inch casing that contains approximately eighteen (18) rubber balls. It differs from its 37mm counterpart in that it utilizes smokeless powder as the propellant and therefore has velocities that are considerably more consistent and have tighter patterns.

The Stinger® 40mm, 60-Caliber Round is most widely used as a crowd management tool by Law Enforcement and Corrections. The round is generally deployed in low trajectories or skip fired in the general direction (non-target specific) of the intended targets. It is suitable for administering a means of pain compliance over a greater distance than its counterpart, the Stinger® 32 Cal. Round. Like the Stinger® 32 Cal., the Stinger® 60 Cal. Round is not well suited as a dynamic, high-energy single subject round for the purposes of incapacitation.

The Stinger® 40mm, 60-Caliber Round is intended to be skip or direct fired at the discretion of the operator, but it is necessary to keep the trajectory low so the projectile spread will not engage the subject above the breast line. When used in this manner, the operator should be adequately trained in the use of Less Lethal Impact Munitions and have a thorough understanding of the round and considerations of selecting shot placement such as level of threat, target distance, size, and clothing.

As a pain compliance round for crowd control, it is most suitable at close to moderate ranges of fire, approximately 15 to 40 feet. This round provides significantly more energy than its counterpart, the Stinger® 32 Cal. It is ideal for lower threat levels such as non-compliant crowd prior to the use of more dynamic munitions."

Sergeant Barnes noted the recommended minimum range is 4.6 meters (or 15 feet) and is suggested to be fired at the lower extremities or skipped on the ground towards the lower extremities. Sergeant Barnes also noted the listed muzzle velocity of the round was approximately 325 feet per second. The literature also included the same warnings as the other provided literature.

## <u>NOPD Equipment Accounting</u>

On Sunday, June 7, 2020, Sergeant Barnes was forwarded an email sent from Field Operations Bureau (FOB) Sergeant Nicole Powell which detailed several pieces of NOPD equipment had been taken during the incident and had not been recovered. Sergeant Barnes noted the following officers had the listed equipment lost or taken during the incident:

Sgt. Stephen Nguyen – BWC
Sgt. Justin Almeida – Riot Shield and Baton
Officer Ryan Cashmore – Riot Helmet
Officer Zachary Vogel – Riot Gloves
Officer Jonathan Burnette – Radio Shoulder Microphone
Officer Denzel Millon – Riot Helmet
Officer Vinh Nguyen – BWC
Officer Justin McCubbins – Riot Shield and Baton

Sergeant Barnes then learned on Thursday, June 4, 2020, at 6:17 PM, Sergeant Stephen Nguyen authored an electronic police report documenting the equipment was lost. The report was listed as a supplemental report under NOPD item number F-03385-20.

## Media Release Information

On Thursday, June 4, 2020, the NOPD held a press conference and answered questions concerning the incident. During that press conference, Superintendent Ferguson advised the public only tear gas had been used on the bridge. The information regarding the munitions used on the bridge was later determined to be incomplete.

On Sunday, June 7, 2020, Katie Schwartzman, with the Tulane School of Law's First Amendment Clinic, released information regarding evidence she had that NOPD used more than just tear gas at the protest. The release by Mrs. Schwartzman included video of projectiles being fired on the bridge that evening and injuries to persons on the bridge. Sergeant Barnes later determine the injuries depicted in the release were injuries to Mr. Bilal Ali-Bey.

On Monday, June 8, 2020, the NOPD held a press conference during which Superintendent Ferguson informed the public of the incomplete information he received and released regarding the types of munitions used during the incident on the bridge.

On Tuesday, June 9, 2020, the NOPD held a demonstration for the news media, during which, Sergeant Todd Morrell, of the Special Operations Division, demonstrated the use of the stinger rounds which were fired on the bridge. Sergeant Morrell also explained the operations of the other rounds and gas canisters which were used during the incident.

Sergeant Barnes prepared portions of body worn camera footage to be released to the News Media on Wednesday, June 10, 2020. The video of the incident, as captured and edited for release, was provided to the public at that time. The complete edited video files have been made a part of the permanent case file.

## Review of Force Statements

Sergeant Barnes, with assistance from Sergeant Givens and Lieutenant Kevin Burns, ensured force statements were collected from every involved and witness officer on the scene that evening. Sergeant Barnes, to ensure the accuracy of the information, quoted the involved officers force statements, as they were written. The statements provided by witness officers are summarized following the involved officers' statements.

## Grenadier Deployment Team Force Statements

## Lieutenant Kenny Prepetit

Sergeant Barnes reviewed the Force Statement provided by Lieutenant Kenny Prepetit. In that statement, Lieutenant Prepetit wrote the following:

"On Wednesday June 3rd, 2020 Lieutenant Kenny Prepetit Unit 3400 Assistant Commander of the Special Operations Division (SOD) was tasked to provide SOD/

Tactical support for Protest events occurring in the City of New Orleans specifically at Duncan Plaza located across from City Hall.  On this date an approximate number of several hundreds to thousands of protesters gathered in the Plaza. After hours of speakers and activists speaking in the plaza the large number of protesters began to march throughout the streets of New Orleans. The protesters marched form Duncan Plaza to the Uptown area of New Orleans via St. Charles Ave. to Jackson Ave. to Magazine Street to Camp Street.  The protestors continued to march along Camp Street to Calliope Street where they were able to enter the on ramp to the Crescent City Connection (US90) towards the Westbank Expressway.   Once the protesters had committed to enter the onramp instructions were given by Command members of the Police Department who had incident command over the monitoring and movement of the protesters to create a police skirmish line with the mobile field force on the Crescent City Connection Bridge just before the Tchoupitoulas Street onramp to the Westbank expressway. While monitoring the police radio channel the protest coverage was being handled on Lt. Prepetit received instructions to mobilize the SOD/ Tactical  units to provide tactical coverage and assist the officers on the bridge to prevent the protesters from crossing the Westbank expressway. At approximately 9:30pm members of the NOPD SOD Tactical were notified and predesignated tactical teams were called to the bridge. Lt. Prepetit arrived on top the bridge via the Tchoupitoulas onramp located by Henderson Street. Upon arrival Lt. Prepetit observed several uniformed officers running towards the area of where the protesters entered the expressway.  As Lt. Prepetit exited his vehicle he observed a large number of protesters face to face with members of the NOPD. Lt. Prepetit made his way to the area where the skirmish police line was formed and assessed the situation.  Lt. Prepetit observed the police line to be face to face with the protesters who were chanting and yelling at this time. Lt. Prepetit then returned to the onramp area to begin with route in instructions of the deployed tactical unit. As the initial response team arrived on the bridge Lt. Prepetit instructed Blue Team (Arrest and Snatch team) to come up to support the line and to bring the LRAD (long range acoustic device) As the support arrived along with the LRAD, Lt. Prepetit observed members of the Command Staff used the LRAD to provide instructions to the protesters. Shortly thereafter members of the protesters were given passage behind the line in attempt to open line of communications to resolve the conflict and get the protesters to exit the expressway. Lt. Prepetit observed that the communication between the protesters and command staff failed and the protesters representatives returned back to the protester side. After an unknown amount of time had passed the protesters became more and more aggressive by constantly pushing against the police line. Lt. Prepetit overheard several warnings over the LRAD for the protesters to exit the bridge. Lt. Prepetit conferred with Captain Lampard about the location of where the line was and needed to the additional officers don their mask and switch out with officers on the front line in case of gas deployment. As this adjustment was to be made and additional warnings given via LRAD, the protesters became more aggressive and began to force their way thru the line. During this time Lt. Prepetit received the order to call up the grenadier team and prepare for gas deployment. Lt. Prepetit heard the preparatory command of "Gas -Gas- Gas" come Captain Lampard, followed. Lt. Prepetit then instructed Orange Team (Grenadiers/ GAS deployment team) to move up and deploy gas. Just prior to the deployment of gas Lt. Prepetit observed the left side of the line being breached and an unknown uniformed officer grab a protester that had broken the line. The officer was able to hold the unknown subject who fell to ground. The deployment of CS gas via canisters was conducted by Orange Team (Gas deployment) members. Detective Travis Johnson hand deployed gas canisters in front of the line and 5- 10 ten feet over the line. As the gas deployment was occurring Lt. Prepetit observed the protesters on the front line become more aggressive and almost breached the right side of the line. Lt. Prepetit observed canisters of gas being thrown back

C18

from the protesters side back at the police line. Lt. Prepetit also observed canister of gas being thrown from behind the protester side over the bridge to ground level. Lt. Prepetit observed officers engaged in attempting to hold onto police shields. During the first deployment of gas Lt Prepetit observed members of the protest had gained possession of police shields and were attempting to pick up canisters of gas that were actively burning. Lt. Prepetit observed Orange Team member Grenadier Devin Joseph use 40mm to launch less lethal munitions over the police skirmish line to disperse protesters. After the deployment of gas the protesters began to disperse but a large number still held their ground. The Police skirmish line regrouped and was able to regain a line formation and was able to push the remaining of protesters back down the bridge. Once the protesters exited the bridge no other conflict between police and protesters continued."

The original force statement has been made a part of the permanent case file.

## Sergeant Damond Harris

Sergeant Barnes reviewed the force statement prepared by Sergeant Damond Harris. In that statement, Sergeant Harris wrote the following:

"FTN# 2020-0161. Location: US 90 West and Tchoupitoulas.

On Wednesday June 3, 2020 at approximately 10:00 pm, The Special Operations Division was tasked with assisting The NOPD Mobile Field Force during a protest. The protest had made its way up onto US 90 West and its exit with Tchoupitoulas Street. Sergeant Damond Harris was the Orange Team (grenadiers/ less than lethal) leader. Members of the Orange team were Officers Michael Pierce Devin Joseph, Jason Jorgenson, and Travis Johnson. Officers Pierce and Joseph were tasked with the operation and deployment of less than lethal munitions by way of the 40mm launcher (CS gas impact rounds, green marking rounds, and 60 caliber rubber ball rounds). Officers Jorgenson and Johnson were tasked with the hand deployment of CS canisters. Officer Johnson was also tasked with carrying a ruck sack (back pack), which contained additional CS gas impact rounds, CS gas canisters, green impact marking rounds, and 60 caliber rubber ball rounds).

The NOPD Mobile Field Force was comprised of district officers on the perimeter on US90 (Crescent City Connection) and Tchoupitoulas. This position became overrun by active aggressive protest participants. The order to deploy chemical agents (gas) was given by 3500 Captain Bryan Lampard. Officer Travis Johnson deployed one gas canister behind the district officers line to repel the aggressive protestors who broke through the line and who stole NOPD Equipment (batons, shields, helmets, and body worn cameras, as well as other NOPD gear). Officer Johnson then deployed a canister into the crowd by rolling it on the ground to push the aggressive crowd back so the district officers could don (put on) their gas masks, and re-establish the broken perimeter line. Sergeant Harris assisted with re-positioning district officers on the line to re-establish the perimeter just as a protestor on a motorcycle started to drive toward the broken line. Officer Jorgenson deployed two gas canisters toward the aggressive protestors.

Officer Pierce exhausted all of the 40mm CS gas impact rounds in his launcher and there weren't any more CS gas impact rounds or green impact marking rounds in the ruck sack (back pack). I loaded 5 60 caliber rubber ball stinger rounds into Officer Pierces launcher,

and immediately advised Officer Johnson to run back to the vehicle and get more CS gas impact rounds and green impact marking rounds.

Sergeant Harris identified a white male subject in the front of the line whom he had previously observed throw two of the CS canisters back into the Mobile Field Force position. The subject now had his face covered with a cloth and was in the front of the protest line.

Sergeant Harris advised Officer Pierce to watch the subject because he was one of the main aggressive agitators.

The order was given to deploy the second volley of gas and Officer Jorgenson deployed two gas canisters toward the group of protestors. At which time one I observed a CS gas canister was thrown back into the Mobile Field Force Position and one was thrown off of the bridge.

I then assisted the district officers perimeter with their forward movement, which drove the protesters down the Tchoupitoulas off ramp from the bridge.

My body worn camera was activated and functioning the entire duration of the incident."

The original force statement has been made a part of the permanent case file.

### Officer Travis Johnson

Sergeant Barnes reviewed the force statement of Officer Travis Johnson. In that statement, Officer Johnson wrote the following:

"On Wednesday, 6/3/2020, Operator Travis Johnson, manning unit 3574 of the Special Operations Division (S.O.D.) was assigned to the "grenadier" unit assigned to Sgt. Damond Harris.

On Wednesday, 6/3/2020, Operator Travis Johnson, manning unit 3574 of the Special Operations Division (S.O.D.) was assigned to the "grenadier" unit assigned to Sgt. Damond Harris.

On Wednesday, 6/3/2020, Operator Travis Johnson, manning unit 3574 of the Special Operations Division (S.O.D.) was assigned to the "grenadier" unit assigned to Sgt. Damond Harris.

As Operator Johnson began to park the 550 and exit the vehicle, the grenadier unit began to be requested via the dispatch channel that S.O.D. was working off of to approach the police line. While Operator Johnson was securing his assigned equipment and applying his gas mask the command to deploy gas was given. Operator Johnson was still a distance away that he would be unable to successfully deploy the gas cannisters. As Operator Johnson heard the command to deploy gas, he looked toward the direction where the Mobile Field Force Team was positioned and observed that the lined had been breached by agitated protesters. Operator Johnson observed several agitators that breached the Mobile Field Force Team front line and began walking towards the command staff that were positioned behind the front lines.

As Operator Johnson observed this, he began to run toward the direction of the police line that had been breached to deploy "gas" as directed. Due to immediate requested action and the surrounding circumstances of still "dressing out" during the call, Operator Johnson had a mental lapse to activate his body worn camera. As Operator Johnson began to arrive in the immediate area of the breached line he deployed a gas cannister behind the police line that was breached with the intentions of re-securing the line. After Operator Johnson deployed a gas cannister where the police line was, he deployed a second gas canister in front of the location in which the police line was to ensure of additional dispersant of gas coverage as the police line.

As the initial gas deployment occurred Operator Johnson was surrounded by both non-police personal that had breached the line and police personnel that was still attempting to hold against additional persons who were attempting to push forward. As this was occurring Operator Johnson observed both police personnel retreat to the secured portion of the bridge and non-police personnel began to retreat away from the police line as the affects of the gas deployment began to take affect. As the disbursement of gas began to settle around the police line, Operator Johnson observed a gas canister in the air traveling toward the direction of the police line and police vehicles were set on the C.C.C. bridge. Operator Johnson tracked the canister as it traveled toward the police personnel and as it landed behind the police line he obtained the canister as it was still disbursing gas and tossed it back to the other side of the police line.

After returning the gas canister back across the police line, Operator Johnson did not apply any additional force."

The original force statement has been made a part of the permanent case file.

## Officer Michael Pierce

Sergeant Barnes reviewed the force statement of Officer Michael Pierce. In that statement, Officer Pierce wrote the following:

"on 6-3-2020 Detective Michael Pierce was assigned to tile New Orleans Police Department Special Operations Division Tactical Unit On the day in question. the tactical unit responded to the George Floyd protest that was happening in New Orleans mainly at the top of the Crescent City Connection (CCC). Detective Pierce was assigned to the Grenadier team. mainly responsible for the deployment of gas munitions and impact rounds through a 40mm grenade launcher assigned to him during the state of civil unrest.

On 6-3-20 at approximately 10:20pm. the tactical unit was called to the scene at the top of the CCC (Crescent City Connection) due to the crowd becoming violent As Detective Pierce and the remaining members of the Grenadier team arrived at the top of bridge they began to gear up. at which time the crowd began to get hostile and began to breach the NOPD Mobile Field Force team. Detective Pierce began hearing the distress call ·grenadiers up grenadiers up· and was trying to hurry to get to the front line to render assistance by deploying gas as the crowd was still hostile. Several protesters were already taken into custody at which time Detective Pierce began to fire several rounds of the CS-extended gas in the direction of several agitators in attempt to disperse the crowd. Detective Pierce directed the gas munitions strategically in the area where he observed

agitators/protesters retrieving gas canisters and tossing them back at the Mobile Force Team. Once Detective Pierce ran empty of the cs- extended munitions he retreated to the rear of the marked police unit to reload. where he was then advised by Sgt. Damond Harris that we were completely out of gas munitions. It was at that time Detective Pierce's 40mm launcher was reloaded with the 60 caliber stinger rounds by Sgt. Harris. It was at that point Detective Pierce ran back to tile front line and quickly scanned for areas of aggression and hostility. Detective Pierce then observed an area where several protestors continued hurling gas cans and projectiles back toward the Mobile Field Force. Detective Pierce then deployed stinger rounds in that direction by aiming on an angle to skip the rounds off the ground in order to get them to disperse. A short time later. the crowd began to retreat and move back. No other force was utilized by Detective Pierce."

The original force statement has been made a part of the permanent case file.

## Officer Jason Jorgenson

Sergeant Barnes reviewed the force statement provided by Officer Jason Jorgenson.  In that statement, Officer Jorgenson wrote the following:

"On 06/03/2020, I, Officer Jason Jorgenson was deployed as a member of the Special Operations Division to Highway US 90 at the Tchoupitoulas Exit. I was advised by my rank, Sgt. Damon Harris, that protesters were on the US 90 Highway bridge approaching the Crescent City Connection Bridge, and NOPD had formed a line on the highway in order to stop the protesters for progressing further or the roadway.

I was assigned to the "Orange Team", with the specific responsibility of deploying gas canisters into the crowd of protesters if given the command to do so. We arrived at the location where the police had stopped the protesters on the highway at approximately 10:00 PM. As we dismounted from our vehicles we immediately received the command to move to the front line and prepare to deploy our gas canisters. As I was putting on my gas mask and placing two gas canisters ·among my duty gear we received the command to deploy gas into crowd in order to disperse the agitated protesters. I looked in the direction of the line of police officers that were blocking the protesters and observed several protesters had breached the line and were wrestling with officers. I hurried to the line while activating my Body Worn Camera. I arrived near the area where protesters had breached the line of officers, and we again received the command to deploy the gas. I deployed two canisters of gas into the crowd just beyond the line of officers. I deployed the canisters in the manner in which I was instructed to deploy them (overhead lob, five to ten feet into the crowd of protesters).

I located Officer Travis Johnson, who was in possession of a ruck sack containing spare gas cannisters. I retrieved two more gas canisters from the bag. Several minutes later we received the order to deploy gas. I deployed the gas canisters into the crowd, again in an attempt to disperse the agitated protesters, in the same manner as the previous two canisters (overhead lob, five to ten feet into the crowd of protesters). I observed individuals within the crowd of protesters pick up the canisters, which were dispersing gas, and throw one of them off the bridge and the other back in the direction of the police officers.

At that point I observed that my Body Worn Camera was not actively recording, even though I had attempted to turn it on and activate it as i hurried to the group of protesters in

order to deploy the first two canisters of gas. I immediately activated the Body Worn Camera and left it activated for the duration of the incident.

To the best of knowledge and recollection I did not deploy more than four canisters of gas, but due to the chaotic circumstances I cannot be sure of the exact amount of canisters I deployed. I did not participate in any other uses of force throughout the incident."

The original force statement has been made a part of the permanent case file.

## Officer Devin Joseph

Sergeant Barnes reviewed the force statement provided by Officer Devin Joseph. In that statement, Officer Joseph wrote the following:

"On Wednesday, June 3, 2020, Detective Devin Joseph was assigned to the George Floyd Protest Coverage. The Detective was detailed to the Grenadier Team along with Sgt. Damond Harris, Michael Pierce, Travis Johnson, and Jason Jorgenson. Sgt. Harris equipped Detective Joseph with the .40-millimeter launcher loaded with 6 extended CS gas rounds. The Detective was also aware that additional reloads for the .40-millimeter launcher were being carried by Detective Travis Johnson in a back pack designated for less lethal chemical munitions. The Detective was aware that the additional rounds were extended CS gas rounds, marking rounds and .60 caliber rubber ball rounds that were separated by category in three separate pouches.

On the above date about 10:20pm, Detective Joseph along with the above listed Grenadier Team was summoned to U.S. 90@ Tchoupitoulas on ramp. The Detective was made aware that the NOPD Mobile Field Force was face to face with rowdy protestors, who were refusing to leave the U.S. 90 elevated portion of the bridge (CCC). Upon arrival, Detectives were immediately advised to don their gas mask and report to the mobile field force formation. While Detective Joseph was attempting to don his mask, the grenadier team was given the order to deploy gas via radio and rank because the mobile field force team line was breached by protesters. When the detective don his gas mask, he activated his body worn camera as he ran to the formation area. Once in position, the detective noticed the protesters had breached the mobile field force team and the deployment of handheld CS gas canisters had already been deployed. The detective then noticed that protesters were attempting to kick the gas canisters off the bridge and some were throwing the gas canisters back at the deployment line which were landing behind the mobile field force team. The detective immediately began to fire multiple 40 mm impact marking rounds over the mobile field force team to mark the protesters throwing the gas and to prevent protesters from further picking up the projectiles and throwing them back at the Mobile Field Force team. The detective then reloaded with extended CS rounds and positioned himself on top of a police car, which allowed him to successfully fire multiple rounds further back into the ground in an attempt to disperse the rowdy protesters with CS gas. The Detective then noticed that his body worn earner was dangling around my neck. At that point, the detective double tapped his camera button to assure his camera was still recording. As the detective further observed the area, he noticed the CS gas was taking affect on the crowd and immediately deescalated and stood fast. The detective stayed at a gun ready position behind the mobile field force team. The detective observed the mobile field force team regain control and back the remaining protesters' off of the bridge. No other force was used by the Detective."

The original force statement has been made a part of the permanent case file.

## **Additional Involved Officer Force Statements**

The original force statement has been made a part of the permanent case file.

### **Sergeant Travis Ward**

Sergeant Barnes reviewed the force statement provided by Sergeant Travis Ward. In that statement, Sergeant Ward wrote the following:

> "On Wednesday, June 3, 2020 at or about 10:00pm, Sergeant Travis C. Ward, assigned to the Special Operations Division, was working in a capacity of a snatch team supervisor during a protest demonstration on the elevated portion of the Crescent City Connection bridge. Sgt. Ward overheard several loud verbal orders from an amplified public announcement speaker directing the protesters to vacate the area. The protesters ignored the repeated orders to leave and elevated their show of aggression by yelling profane obscenities which were directed at the officers. Sergeant Ward then overheard the command to deploy GAS into the crowd who had become physically combative by attempting to breakthrough the line of uniformed officers who were positioned as a barrier to prevent the protesters from advancing. Sgt. Ward did not observe which officers deployed the GAS as they were positioned behind him and his attention was on the crowd and any developing threats. Sgt. Ward observed the effects of the GAS canisters as the smoke enveloped portions of the protesters as well as several uniformed officers.
>
> After a large portion of the crowd dispersed, the command was given to advance upon the remaining protesters in an attempt to coerce them to walk freely back down the bridge by yelling "Back, Back, Back" repeatedly and banging batons against their shields. Some of the protestors complied and began to leave the area and walk back down the bridge while others stayed and attempted to push through the shields held by the front line officers. Sgt. Ward's role was as a snatch team supervisor tasked with separating the front line officers and physically grabbing a protester who has attempted to break through the barrier and place them into custody. Sgt. Ward observed an unknown male or female wearing an orange / red shirt who had pushed into the uniformed officers and refused to move back. Sgt. Ward approached the two nearest uniformed officers and alerted them that he was going to snatch the protester, The two uniformed officers parted ways as Sgt. Ward grabbed ahold of the unknown male or female about the shoulder area and attempted to bring him/her into the rear area for arrest. The unknown male or female then pulled away from Sgt. Ward, however, Sgt. Ward had a hold upon him/her and was able to pull him/her through the line. Sgt. Ward then placed the subject onto the ground for handcuffing for security reasons as the unknown male or female had already shown an unwillingness to peacefully comply with commands and leave the area. Once the unknown male or female was properly secured into handcuffs, he/she was walked towards an awaiting NOPD marked unit by an unknown LSP Trooper.
>
> Sgt. Ward was not part of any additional reportable use of force incidents and did not witness any other reportable use of force incidents."

The original force statement has been made a part of the permanent case file.

**Officer David Desalvo**

Sergeant Barnes reviewed the force statement authored by Officer David Desalvo. In that statement, Officer Desalvo wrote the following:

"On Wednesday, June 3rd, 2020 at approximately 10:17 p.m., Officer David Desalvo and other members of the Special Operations Division were tasked with assisting district personnel with crowd control on the elevated express way (U.S. 90 at Tchoupitoulas Street). Once I arrived, I observed the district personnel forming a barricade line, some with shields and riot gear, and others in NOPD class B uniform.

I parked my marked vehicle near the top of the bridge, and upon exiting my vehicle, the command was given via SOD channel "SWAT 3" by Captain Bryan Lampard, to prepare for gas. The command was for the grenadiers to make their way to the line and deploy the gas. I was still by my vehicle as I removed my departmental issued gas mask from my gas mask pouch and properly fit the mask to my face. Once my mask was properly fit, I locked and secured my vehicle and approached the front line of the protest.

Upon arrival of the area of the confrontation, I observed the grenadier's had already deployed the gas due to the white cloudy smoke remaining on the bridge. I observed one of the protestors grab one of the gas cannisters from the ground and throw it over the side of the bridge. The call was made to reform the line of officers who were injured or did not have time to properly fit their gas masks to their face before the call for gas was made. The line was reformed and the call was made to hold our position. Most of the protestors retreated and left the bridge, but there were approximately 100-200 protestors who remained and formed a line near the officers on the front line.

An announcement was later made for the remaining protestors to exit the bridge. After several warnings, the officers on the front lines were given the command to move forward. My mission was to operate as a "Snatch" team officer. Members of the "Snatch" team were instructed to remove protestors who impeded the front line's progress. After the line of officer's moved forward, I observed several protestors who interlocked their arms and began to push against the officer's on the front line.

Sergeant Chuck Ward made the call to snatch a subject who had his arms interlocked with other protestors and began to push back against the oncoming officers. Sergeant Ward and I grabbed the subject and escorted him to the ground where I placed handcuffs on the subject before escorting him back to a standing position and walked him back to officer's who were standing by to transport. After I handed the now arrested subject off to a district officer, I returned back to the front line where I remained throughout the incident. Eventually, the line of officers successfully escorted all remaining protestors from the bridge and turned over the bridge back to the district.

I activated my BWC and recorded the entire incident. I did observe officers deploy gas, however I did not observe any officers deploy marking rounds due to my focus on the crowds of people and the grenadier officers standing behind me. I did not speak to any civilian witnesses and I did not suffer any injuries during the protest/riot. It should be noted that my vehicle was parked too far away from the incident for the MVU to be useful. Sergeant Evan Cox was present during the entire incident."

The original force statement has been made a part of the permanent case file.

**Officer Wesley Humbles**

Sergeant Barnes reviewed the Force Statement authored by Officer Wesley Humbles. In that statement, Officer Humbles provided the following information:

"ON WEDNESDAY, JUNE 3, 2020, AT APPROXIMATELY 10:15PM, DETECTIVE WESLEY HUMBLES WAS ASSIGNED TO THE SPECIAL OPERATIONS DIVISION STREET GANG UNIT FOR THE PROTEST COVERAGE. MEMBERS OF THE SPECIAL OPERATION DIVISION WERE DISPATCHED TO US 90 WEST {CRESCENT CONNECTION BRIDGE) AND TCHOUPITOULAS TO ASSIST DISTRICT PERSONNEL WITH PROTESTORS FROM THE GEORGE FLOYD PROTEST.

UPON ARRIVAL TO THE LOCATION DETECTIVE HUMBLES OBSERVED SEVERAL DISTRICT OFFICERS, WHO ATTIRED IN THEIR PROTECTIVE RIOT GEAR, FORMED IN A LINE ACROSS THE LANES ON US 90. WHILE ON THE BRIDGE AWAITING ORDERS, DETECTIVE HUMBLES HEARD A COMMAND TO BEGIN DONNING GAS MASKS. IN THE PROCESS OF APPLYING HIS GAS MASK, DETECTIVE HUMBLES OBSERVED A LARGE CLOUD OF WHITE SMOKE COMING INTO AREA WHERE THE MOBILE FIELD FORCE WAS STAGED. THE DETECTIVE ALSO OBSERVED A CANISTER WITH WHITE SMOKE COMING FROM IT FALLING INTO AREA WHERE OFFICERS WERE RETREATING FROM THE CROWD.

ONCE THE INITIAL WAVE OF GAS WAS DEPLOYED, DETECTIVE HUMBLES ALONG WITH OTHER SOD PERSONEL BEGAN TO ASSIST DISTRICT OFFICERS, WHO WERE OVERCOME BY THE PROTESTORS AND AFFECTED BY THE GAS. THE OFFICERS OF SOD RE-FORMED THE LINE WHILE DISTRICT OFFICERS DONNED THEIR GAS MAKS. AS THE CLOUDS OF GAS DISSIPATED THE PROTESTORS BEGAN TO REGROUP AND ADVANCE TOWARDS THE OFFICERS. DETECTIVE HUMBLES OBSERVED A FEMALE, WHO WOULD NOT COMPLY WITH COMMANDS TO "GET BACK." THE FEMALE REFUSED TO MOVE AS SHE PUSHED AGAINST THE DISTRICT OFFICER'S SHIELD. DETECTIVE HUMBLES WAS GIVEN INSTRUCTIONS TO REMOVE ANY AGITATORS WHO DID NOT COMPLY WITH THE LOUD VERBAL COMMANDS. DETECTIVE HUMBLES WAS ABLE TO GRAB THE FEMALE'S LEFT ARM, WHERE SHE WAS TAKEN INTO CUSTODY. DETECTIVE HUMBLES RELEASED HER INTO STATE POLICE CUSTODY AND RETURN TO THE FRONT LINE.

THE LINE OF OFFICERS WERE ABLE TO SUCCESSFULLY HAVE THE PROTESTORS EXIT THE US 90 ON RAMP. DETECTIVE HUMBLES DID NOT WITNESS ANY OFFICER, IN PARTICULAR, DEPLOY MARKING ROUNDS. DETECTIVE HUMBLES WAS PRIMARILY FOCUSED ON THE PROTESTERS IN FRONT OF HIM AT THE TIME. DETECTIVE HUMBLES DID NOT SPEAK TO ANY CIVILIAN WITNESSES. THE DETECTIVE DID NOT SUFFER ANY INJURIES DURING THE PROTEST/RIOT.

THE DETECTIVE'S BODY WORN CAMERA WAS ACTIVATED DURING THE INCIDENT, AND ASSIGNED UNIT WAS NOT ON SCENE. SGT EVAN COX WAS PRESENT DURING THE INCIDENT."

The original force statement has been made a part of the permanent case file.

## Officer Arden Taylor, Jr.

Sergeant Barnes reviewed the force statement of Officer Arden Taylor, Jr. In that statement, Officer Taylor wrote the following:

"ON WEDNESDAY, JUNE 3RD, 2020, AT AROUND 10:00 PM, DETECTIVE ARDEN TAYLOR WAS ASSIGNED TO THE SPECIAL OPERATIONS DIVISION'S STREET GANG UNIT. THE DETECTIVE, ALONG WITH THE REST OF THE SGU WAS DISPATCHED TO US90 WEST AND TCHOUPITOULAS TO ASSIST DISTRICT PERSONNEL WITH THE ON-GOING GEORGE FLOYD PROTESTS. DETECTIVE TAYLOR OBSERVED SEVERAL DISTRICT PERSONNEL, ATTIRED IN THEIR RIOT GEAR, FORMING A LINE ON THE INTERSTATE. AFTER EXITING DETECTIVE DAVID DESALVO'S MARKED UNIT, DETECTIVE TAYLOR HEARD A COMMAND TO BEGIN DONNING GAS MASKS. DETECTIVE TAYLOR FOLLOWED THOSE ORDERS AND LATER OBSERVED SEVERAL CANISTERS THROWN INTO THE APPROACHING CROWD.

AFTER THE INITIAL WAVE OF GAS WAS DEPLOYED, DETECTIVE TAYLOR ALONG WITH OTHER SOD MEMBERS ASSISTED DISTRICT PERSONNEL WHO WERE NEGATIVELY AFFECTED BY THE GAS. THE DETECTIVES RE-FORMED THE LINE AND BEGAN GETTING DISTRICT PERSONNEL BACK INTO POSITION. DETECTIVE TAYLOR OBSERVED THAT THE CROWD WAS NOW RECOVERING FROM THE GAS, AND WAS AGAIN ADVANCING TOWARDS THE OFFICERS. AT ONE POINT DETECTIVE TAYLOR OBSERVED A FEMALE WHO WOULD NOT COMPLY WITH COMMANDS TO "GET BACK". THIS FEMALE REPEATEDLY PUSHED AGAINST THE DISTIRCT OFFICER'S SHIELD. DETECTIVE TAYLOR WAS GIVEN INSTRUCTIONS TO "SNATCH" ANY AGITATORS WHO DID NOT COMPLY WITH THE LOUD VERBAL COMMANDS. DETECTIVE TAYLOR GRABBED THE FEMALE'S LEFT ARM AND PULLED HER INTO THE LINE OF OFFICERS, WHERE SHE WAS HANDCUFFED BY STATE POLICE OFFICERS. DETECTIVE TAYLOR RETURNED TO THE LINE AFTER THIS APPREHENSION.

EVENTUALLY THE LINE OF OFFICERS SUCCESSFULLY ADVANCED SEVERAL HUNDRED FEET, AND WERE ABLE TO DRIVE THE PROTESTERS OFF THE INTERSTATE VIA AN ON RAMP. DETECTIVE TAYLOR DID NOT SEE ANY OFFICER, IN PARTICULAR, DEPLOY MARKING ROUNDS. THE DETECTIVE WAS FOCUSED ON THE INDIVIDUAL PROTESTERS IN FRONT OF HIM AT THE TIME.

DETECTIVE TAYLOR DID NOT SPEAK TO ANY CIVILIAN WITNESSES. THE DETECTIVE DID NOT SUFFER ANY INJURIES DURING THE PROTEST/RIOT. THE DETECTIVE'S BODY WORN CAMERA WAS ACTIVATED DURING THE

INCIDENT. THE DETECTIVE'S VEHICLE WAS TOO FAR FROM THE INCIDENT FOR THE MVU TO BE USEFUL

SGT EVAN COX WAS PRESENT DURING THE INCIDENT."

The original force statement has been made a part of the permanent case file.

## Officer Frank Vitrano

Sergeant Barnes reviewed the force statement of Officer Frank Vitrano. In that statement, Officer Vitrano wrote the following:

"On Wednesday, June 03, 2020, at Approximately 10:00 P.M. I, Detective Frank Vitrano, Badge #1519, assigned to the New Orleans Police Department Special Operations Tiger Unit, was involved in a use of force while preventing protesters from breaking through the police line established on the Crescent City Connection. On the above date and time, I was deployed as a member of the Special Operation Division to the elevated portion of the Crescent City Connection Bridge. I was advised by my supervisor Sergeant Evan Cox, Unit #3440, that protesters from the George Floyd Protest were gathered and attempting to cross over the bridge. NOPD had formed a line to prevent the protesters from progressing further.

I was assigned to the "Blue Alpha Snatch Team" with the specific responsibility of removing unruly protesters that attempted to break through the NOPD line set by the New Orleans Police Department. After my arrival, I maintained a stand-by position on the elevated portion of the bridge. At or about 10:15 p.m. the Blue Alpha Snatch Team received orders to proceed to the front line and assist the New Orleans Police Department District Officers and Supervisors after NOPD personal deployed GAS into the crowd of unruly protesters that broke through the line.

I immedially activated my Body Worn Camera which remained on for the duration of the event and dawned my GAS mask on my head and face area before proceeding. I assisted one district officer to safety after he had been exposed to GAS. Afterward, I obtained his NOPD Riot Shield and PR24 Baton. I arrived where a secondary line had formed while in possession of the Shield and Baton. I heard clear instructions that were provided by my supervisor "Do not get sucked into this", "Hold the Line". I maintained a position with fellow Officers and yelled out "cameras on" several times. Additional warnings were overheard "GAS, GAS, GAS," I observed GAS projected into the crowd of protesters and unidentified projectiles being thrown by the protesters at the Police. Some of those projectiles were identified as GAS Canisters.

I observed the protesters regroup and form a line while chanting "Hands Up, Don't Shoot" with profanities as they advanced to the Police Line. Upon arrival multiple commands were given by New Orleans Police Department personal for them to disperse. Some dispersed, however, the agitated protesters aggressively attempted to break through the line barrier and take the Officers equipment which included their Shields and Batons. In an effort to prevent their progression, I used my Shield and Baton in a fashion I was trained to do. I blocked their advancement while yelling "Get Back" multiple times. I used my Shield and Baton in a forward motion making contact with the unruly protesters in their hands, arms and mid-section. During the course of this interaction, the protesters slowly complied

eventually being guided down the Tchoupitoulas On-Ramp to the nearby streets where they eventually dispersed.

I have no reported injuries stemming from this incident; this use of force statement was documented under the use of force tracking number 2020-0161."

The original force statement has been made a part of the permanent case file.

## Sergeant Evan Cox

Sergeant Barnes reviewed the force statement authored by Sergeant Evan Cox. In that statement, Sergeant Cox wrote the following:

"On June 3, 2020 I was assigned to supervise a standby arrest team for the ongoing protests occurring in the city. At approximately 9:50 PM I was contacted by Lt. Kenny Prepetit and requested to bring my group to the top of the Crescent City Connection via the Tchoupitoulas on-ramp. When we arrived at the location, I met with Lt. Prepetit who informed me a line had been formed to prevent protestors from taking control of the bridge. Our assignment was to support the line of patrol officers and keep the line controlled. I assigned members of my team to stand behind the line of patrolman who were outfitted with, crowd control shields. At some point near the far left shoulder of the road a group of protestors began pushing the line of 'officers in an attempt to force their way through the line. I attended the area in hopes of assisting the officers by supporting hem from getting pushed back. Unfortunately, the officers were unable to maintain as the protestors continued to forcefully break the line in turn forcing us all backwards and pinning us against the front of a marked police vehicle. I was trapped between a line officer and protestors who continued to push the officers and I was forced to jump onto the hood of the Tahoe to get over the vehicle. As the protestors forcefully broke through the line I heard the call for the grenadier team to come forward and deploy CS gas in hopes of dispersing the crowd and preventing injury to officers.

After a volley of gas was deployed, I worked with officers to reform and hold a line. The agitated crowd continued to yell and push at the officer ' s shields. Later, an order was given to begin pushing the group of protestors backwards and off the elevated roadway. As I repeated called commands, I observed the line officers stepping forward with their shields and batons as trained to push back the crowd. At one point during the push, two females who were arm locked, continued to push at the shields and obstruct movement of the line. Despite verbal commands to step back, they refused multiple times, continuing to push and obstruct. I was assisted by an unknown officer to grab a hold of the two females and pull the two non-compliant individuals out of the crowd.

When we pulled the two females through, they remained arm locked and began pushing and kicking at myself and the unknown assisting officer. Because of their resistance to us pulling them forward and them being arm locked together, the two females fell. On the ground they continued to violently kick towards us. Two unknown State Troopers assisted me in getting one of the females into flex cuffs and then walked her off towards a group of marked police vehicles. I returned to the line and continued to repeat verbal commands and support line officers from being pushed past by members of the crowd.

Once the protestors were directed off the bridge my team departed the scene. The majority of officers, and all of my assigned earn were wearing gas masks, so I did not immediately recognize the officers, and given the circumstances maintaining the control of the line was more important.

My body camera was knocked from its mount, and I believe it was during the initial attempt by protestors to defeat the line. I notified Lt. Prepetit and obtained a miscellaneous incident item to report the lost equipment, however it was later recovered by members of the 8th District."

The original force statement has been made a part of the permanent case file.

## James Cunningham

Sergeant Barnes reviewed the force statement provided by Officer James Cunningham. In that statement, Officer Cunningham wrote the following:

"ON 6-3-20, AT ABOUT 9:30 PM, OFFICER CUNNINGHAM AND DEMOND DAVIS WERE DISPATCHED TO THE CRESCENT CITY CONNECTION BRIDGE AND TCHOUPITOULAS STREET EXIT, BY UNIT 100, TO ASSIST WITH PROTEST/ RIOT PATROL. WHEN THE OFFICERS ARRIVED ON SCENE THEY TOOK POST ON THE SECOND SKIRMISH LINE. THE SECOND LINE WAS APPROXIMATELY 10 YARDS BEHIND THE FRONT SKIRMISH LINE.

THE OFFICERS WERE LOCATED THERE FOR APPROXIMATELY 5 MINUTES WHEN THE PROTESTORS BECAME HOSTILE, STRIKING THE FRONT LINE IN A VIOLENT MANNER. WITHIN MOMENTS THE PROTESTORS WERE ABLE TO FORCE THEIR WAY THROUGH THE FRONT LINE. AT WHICH POINT TEAR GAS WAS DEPLOYED BY NOPD. THE FRONT LINE THEN BROKE DOWN AND PROTESTERS COMPLETELY FORCED THEIR WAY THROUGH MOVING TOWARDS THE WESTBANK. OFFICER CUNNINGHAM ASSISTED OTHER OFFICERS WITH TRYING TO ESTABLISH ANOTHER SKIRMISH LINE. OFFICER CUNNINGHAM UTILIZED HIS NOPD ISSUED SHEILD IN ATTEMPTS TO STOP PROTESTERS FROM ADVANCING FORWARD. THE OFFICERS IN THE AREA OF OFFICER CUNNINGHAM WERE PUSHED BACK INTO NOPD VEHICLES BY THE CROWD OF PROTESTORS. THE OFFICERS WERE BEING PINNED BY THE VEHICLES AND THE CROWD. OFFICER CUNNINGHAM WAS NOT ABLE TO UTILIZE HIS GAS MASK AND THE AREA WAS FILLING UP WITH TEAR GAS. OFFICER CUNNINGHAM WAS ABLE TO RETREAT BEHIND THE NOPD TAHOE VEHICLES AND DON HIS GAS MASK.

OFFICER CUNNINGHAM RELOCATED TO THE FRONT SKIRMISH LINE WHICH WAS RE ESTABLISHED AFTER CONTROL OF THE CROWD WAS GAINED. OFFICER CUNNINGHAM STAYED AT THIS POST FOR THE NEXT COUPLE HOURS UNITL THE CROWD OF PROTESTORS DISPURSED.

OFFICER CUNNINGHAM OBSERVED OFFICERS USING THEIR SHEILDS, HANDS AND BATONS TO STOP THE CROWD. SGT. S. NGUYEN FROM THE SEVENTH DISTRICT WAS ON SCENE ALONG WITH SEVENTH DISTRICT OFFICERS DAVIS, NGUYEN AND DIAZ. OFFICER CUNNINGHAM DID NOT

RECEIVE ANY CIVILLIAN WITNESS INFORMATION. OFFICER CUNNINGHAM DID NOT OBSERVE ANY INJURIES TO ANYONE. OFFICER CUNNINGHAM'S LEFT RIB CAGE AREA WAS INJURED/ SORE FROM BEING PINNED AGAINST THE NOPD TAHOE'S PUSH BAR.

OFFICER CUNNINGHAM HAD HIS BWC'S ACTIVATED DURING THE INCIDENT BUT DUE TO THE VIOLENT CROWD IT WAS KNOCKED OFF. OFFICER CUNNINGHAM CEW WAS NEVER ACTIVATED AND WAS HOLSTERED DURING THIS INCIDENT."

The original force statement has been made a part of the permanent case file.

## Officer Demond Davis

Sergeant Barnes reviewed the force statement authored by Officer Demond Davis. In this statement, Officer Davis wrote the following:

"ON WEDNESDAY, JUNE 3, 2020, AT OR ABOUT 9:30 PM, I, OFFICER DEMOND DAVIS WAS ASSIGNED TO THE SPECIAL OPERATIONS DIVISION, IN ORDER TO ASSIST WITH MAINTAINING PEACEFUL PROTEST IN THE CITY OF NEW ORLEANS, UNDER N.O.P.D. ITEM NUMBER F-03385-20.

WHILE AT THE BASE OF THE BARONNE STREET CRESCENT CITY CONNECTION BRIDGE OFF RAMP, MYSELF AND ADDITIONAL OFFICERS WERE CALLED TO THE TOP OF THE CRESCENT CITY CONNECTION BRIDGE, TO ASSIST WITH PREVENTING A LARGE CROWD OF PROTESTERS FROM CROSSING OVER TO THE OTHER SIDE OF THE BRIDGE. WHILE I FULL RIOT GEAR AND STANDING IN THE SECOND ROW OF A POLICE LINE TO PREVENT PROTESTERS FROM ADVANCING FORWARD. I WAS APPROACHED FROM BEHIND BY AN UNKNOWN OFFICER, WHO ADVISED ME TO PUT ON MY GAS MASK, BECAUSE GAS CANISTERS WERE ABOUT TO BE DEPLOYED INTO THE CROWD OF PROTESTERS.   .

AT WHICH TIME, I STEPPED BACK BEHIND THE OFFICERS WHO WERE ON THE SECOND ROW OF OFFICERS, THEN KNELT DOWN IN ORDER TO PUT ON MY GAS MASK. WHILE KNEELING AND PUTTING ON MY MASK, I LOOKED UP AND OBSERVED THE CROWD OF PROTESTERS BREAKING THROUGH THE FIRST ROW OF OFFICERS WHO WERE LINED UP IN FRONT OF THE PROTESTERS. AT THAT TIME, I OBSERVED GAS CANISTERS DROP TO THE GROUND IN FRONT OF ME. I IMMEDIATELY GRABBED MY SHIELD AND BATON, THEN GOT UP FROM THE GROUND AND BEGAN BACKING UP AS PROTESTER RUSHED TOWARD ME AND STARTED HITTING ON MY SHIELD AND TRYING TO RIP MY SHIELD FROM MY GRASP. ALSO, OTHER OFFICERS WHO WERE NOT ABLE TO PUT ON THEIR GAS MASK IN TIME, WERE BEING AFFECTED BY THE GAS AND ATTACKED BY PROTESTERS AS THEY ATTEMPTED TO TACTICALLY RETREAT AND PUT ON THEIR MASK.

FINALLY, AFTER MORE GAS CANISTERS WERE DEPLOYED, A LOT OF THE PROTESTERS RETREATED OFF THE BRIDGE BUT THERE WAS STILL A LARGE GROUP THAT STAYED ON THE BRIDGE. AS OFFICERS REFORMED THE

POLICE LINES. I HEARD POPING SOUNDS COMING FROM BEHIND THE POLICE LINES, THEN I OBSERVED GAS CANISTERS FALLING TO TH GROUND AND GAS COMING FROM THEM. ALSO, PROTESTERS WERE PICKING UP THE GAS CANISTERS AND THROWING THEM BACK AT THE OFFICERS.

I DIDN'T SEE ANY CEW DEPLOYMENTS. I DIDN'T SEE ANY FIREARMS DRAWN. MY BODY WORN CAMERA WAS RECORDING DURING THIS INCIDENT. I WAS NOT AWARE OF INJURIES TO ANY OFFICERS. I DON'T KNOW IF THERE ANY INJURIES TO PROTESTERS. I DON'T KNOW IF EMS WAS CALLED FOR ANY OFFICERS OR PROTESTERS.

SGT. STEPHEN NGUYEN WAS PRESENT ON THE BRIDGE WITH THE OFFICERS DURING THIS INCIDENT."

The original force statement has been made a part of the permanent case file.

### Officer Joshua Diaz

Sergeant Barnes reviewed the force statement authored by Officer Joshua Diaz. In that statement, Officer Diaz wrote the following:

"ON JUNE 3, 2020, AT AROUND 9:30 PM I WAS DETAILED TO THE PROTEST RESPONSE TEAM AND WAS ON STAND-BY AT CANAL AND ST. CHARLES. ONCE THE PROTEST CROWD BEGAN TO MOVE TO HWY 90 WE WERE INSTRUCTED TO BLOCK AN EXIT RAMP AT CAMP AND US 90 W TO PREVENT IT FROM BEING USED. FROM THERE A SCRIMAGE LINE WAS FORMED GOING ACROSS US 90 AT TCHOUPITOULAS. WE THEN RELOCATED TO THAT LOCATION. ONCE THERE, MY PARTNER (P/ VINH NGUYEN) AND I DAWNED OUR FULL RIOT GEAR, ACTIVATED OUT BODY WORN CAMERAS, AND TOOK OUR PLACE AT THE FAR RIGHT FLANK OF THE SCRIMAGE LINE TO RELIEVE SERGEANT LAMONT WALKER. WHILE IN THE LINE THE CROWD BEGAN TO SHOUT AT US. WHILE ON THE LINE I OBSERVED THE CROWD START TO MOVE CLOSER TO US AND I OBSERVED THAT THE CENTER OF THE LINE WAS BEING PUSHED BACK. AT THAT TIME I SAW A HEAVY SET WHITE FEMAL START TO PUSH AGAINST MY PARTNERS SHIELD. A PETITE WHITE FEMALE IN FRONT OF ME WAS FACING AWAY FROMM HOWEVER THE CROWD BEHIND HER BEGAN TO PUSH AGAINST MY SHIELD. AS PER MY ORDERS TO HOLD THE LINE I GO INTO A WIDENED STANCE AND PUT FORCE BEHIND THE SHIELD TO KEEP MYSELF FROM BEING PUSHED BACK. AFTER A FEW SECONDS MY PARTNER AND I WERE FORCEFULLY PUSHED BACK A FEW FEET HOWEVER CONTINUED TO HOLD TH LINE. WE THEN BEGAN GETTING FORCEFULLY PUSHED AGAINST THE SIDE OF THE BRIDGE. I LOOKED BACK AND OBSERVED THAT THE REST OF THE SCRIMAGE LINE WAS ABOUT 20' BEHIND US. I THEN TOLD MY PARTNER THAT WE HA TO RELOCATE TO THE LINE. MYSELF, MY PARTNER, AND TWO OTHERS BEGAN TO MOVE BACKWARDS AND WHEN THE OBSERVED A YELLOW CLOUD OF THE TEAR GAS AND WERE CAUGHT IN IT. WHEN WE GOT BACK TO THE LINE I DAWNED MY GAS MASK AND GATHERED MY SHIELD AND BATON THEN GOT INTO THE SECONDARY LINE. I THEN OBSERVED AROUND 2 OR 3 MORE GAS CANISTERS GET DEPLOYED TO THE CROWD HOWEVER MEMBERS OF THE

CROWD PICKED THEM UP AND THREW THEM BACK AT US. DURING THE TIME MEMBERS OF THE CROWD ALSO BEGAN THROWING WHAT APPEARED TO BE PLASTIC AND METAL WATER BOTTLES. I THEN HELD THE LINE UNTIL INSTRUCTED TO GET INTO FORMATION AND PUSH CROWD ONTO THE ENTRANCE RAMP TO GET THEM OFF OF THE BRIDGE. WHEN WE ADVANCED, THE CROWD MOVED BACK DOWN THE BRIDGE. THE ONLY CONTACT MADE WITH MY SHIELD WAS WHEN THE CROWD PUSHED AGAINST THE INITIAL SCRIMAGE LINE AND I DID NOT MAKE CONTACT WITH MY SHIELD WHILE PUSHING THE CROWD OFF OF THE BRIDGE. AT NO POINT DURING THE INCIDENT DID I USE MY BATON AND I DID NOT MAKE ANY CONTACT WITH ANY OTHER WEAPON. NEITHER MY FIREARM NOR MY TASER WERE DEPLOYED DURING THE INCIDENT. MY BODY WORN CAMERA WAS ACTIVE DURING THE DURATION OF THE INCIDENT AND WAS NOT KNOCKED OFF OR LOST MY IMMEDIATE SUPERVISOR, SERGEANT STEPHEN NGUYEN WAS ALSO ON THE SCENE WITH ME."

The original force statement has been made a part of the permanent case file.

## Sergeant Stephen Nguyen

Sergeant Barnes reviewed the force statement authored by Sergeant Stephen Nguyen. In that statement, Sergeant Nguyen wrote the following:

"On 06/03/2020, Sergeant Stephen Nguyen and the 7th District Contingent were assigned, under Captain Caprera, to assist with the protest. On the same day, at approximately 9:40PM, Sergeant Nguyen and the 7th District Contingent were requested to the Westbound portion of US 90 near the Tchoupitoulas Exit to strengthen the police cordon. Sgt. Nguyen's 7th District Contingent include Officers Vinh Nguyen, Joshua Diaz, James Cunningham, and Demond Davis.

Upon arrival, Sergeant Nguyen and the 7th District Contingent, along with the protest detail were meet with a large group of protestors. Sergeant Nguyen took position just behind the first line of the police cordon to supervise the line. The civilian protestors became more and more belligerent, chanting to pass through, cursing, among many other statements. Sergeant Nguyen was ensuring his sector of the police cordon had their BWC activated and their equipment ready when the orders for "Arms Up" was echoed from the "Command Post", just behind the first line of police cordon and near the second line of police cordon. The crowd was given the command to disperse, which they refused. The crowd then begin hitting the shield and was attempting to push pass the police cordon. Sergeant Nguyen was assisting with keeping the protestors on the other side of the line, giving multiple verbal commands of "get back!". Sergeant Nguyen was able to see through his peripheral vision that the center section (to the left of Sergeant Nguyen) was giving way. As the crowd was finally pushing through the right side, Sergeant Nguyen then deployed his expandable baton, holding it with both hands, parallel to the ground, and extending it forward while continuing giving the command of "get back". When Sergeant Nguyen noted that the efforts was futile, Sergeant Nguyen begin pulling officers on the right side of the line to fall back to the second police cordon line. As Sergeant Nguyen and other officers fallen back, the crowd continued to push on the officers. Sergeant Nguyen was later pinned between police units and protestors when Sergeant Nguyen recognized the odor of CS - Tear Gas. Sergeant Nguyen was not able to don his protective face mask, and thus was mildly to moderately affected by the CS - Tear Gas. When the crowd had

fallen back due to the CS - Tear Gas, Sergeant Nguyen was able to don his protective face mask and reformed with the line of Police Cordon.

When the line of Police Cordon had reformed, the crowd of protestors also reformed, albeit much smaller and was initially approximately 15 feet away from the police cordon. Again, the verbal command to disperse was given. The crowd of protestors, again, refused, continuing their tirade, moved closer up to the police cordon. A second deployment of CS - Tear Gas was dispatched from behind the police cordon onto the crowd, causing more of the crowd to disperse. When the remnant of the crowd of protestor refused to move with another command to disperse, the order was given from the "command post" behind the cordon to march in order to move the remnant of the protestors. The line of police cordon was able to continue without any further resistance to the bottom of the US 90 on ramp by Magazine/Calliope.

It should be noted that Sergeant Nguyen's BWC was active, but was subsequently lost during the initial clash. The lost item was documented in a supplemental report under F-03385-20. Chief Thomas and Captain Caprera were notified and on scene.

There was no other discharges or deployments by Sergeant Nguyen of the 7th District Contingent."

The original force statement has been made a part of the permanent case file.

**Officer Vinh Nguyen**

Sergeant Barnes reviewed the force statement authored by Officer Vinh Nguyen.  In that statement, Officer Nguyen wrote the following:

"ON JUNE 3, 2020, I WAS ASSIGNED TO UNIT 792B. I WAS PARTNERED WITH OFFICER JOSHUA DIAZ AND SUPERVISED BY SERGEANT STEPHEN NGUYEN. WE WERE ASSIGNED TO COVER THE FRENCH QUARTER IN REGARDS TO THE PROTESTS OCCURRING IN THE CITY. FOR THIS INCIDENT, OFFICER DIAZ AND I WERE ASSIGNED N.O.P.D. RIOT GEAR FROM SPECIAL OPERATIONS DIVISION, WHICH WE HAD DONNED AT THE INSTRUCTION OF UNIT 100, CAPTAIN LEJEAN ROBERTS. VIA THE POLICE RADIO, IT WAS REPORTED A LARGE CROWD WAS MARCHING THROUGHOUT VARIOUS PARTS OF THE CITY. IT WAS REPORTED THAT THE CROWD WAS MARCHING UP ON 90 BUSINESS EAST EXPRESSWAY WITH INTENTIONS OF CROSSING THE CRESCENT CITY CONNECTION BRIDGE.

MYSELF AND OFFICER DIAZ AS WELL AS SERGEANT STEPHEN NGUYEN WERE INSTRUCTED TO COVER THE OFF RAMP AT 90 BUSINESS WEST AND CAMP STREET. UPON HEARING THE INCIDENT COMMANDER, UNIT 100, CAPTAIN LEJEAN ROBERT CALL FOR ALL UNITS TO FORM A LINE ON 90 BUSINES EAST, I RELOCATED WITH MY PARTNER AND SERGEANT TO TCHOUPITOULAS AND HENDERSON WHERE WE WERE INSTRUCTED TO DRIVE ONTO 90 BUSINESS EAST AND JOIN THE REMAINING OFFICERS.

OFFICER DIAZ AND MYSELF WERE ASSIGNED TO COVER THE RIGHT WING OF THE SHIELD LINE, CLOSEST TO THE SOUTH BARRIER OF THE EXPRESSWAY. I WAS FACE TO FACE WITH THE CROWD IMMEDIATELY WHERE NO CONTACT WAS MADE WITH THE SHIELD. WHEN NEGOTIATIONS BROKE DOWN, I WAS UNAWARE OF THE CATALYST NOR THE EXACT TIME.

A PROTESTOR I CAN ONLY IDENTIFY AS A WHITE FEMALE BEGAN PUSHING ON MY SHIELD. I BRACED MY SHIELD BUT DID NOT ADVANCE. AS THE CROWD BEGAN PUSHING I HELD MY SHIELD AGAINST THE CROWD. I LOST TRACK OF WHICH OFFICERS WERE BY ME WHEN I OBSERVED A WHITE FEMALE PROTESTOR BEGIN CHARGING THE SHIELD OF THE OFFICER NEXT TO ME. WE BRACED OUR SHIELDS BUT DID NOT PUSH BACK. I REALIZED I WAS PINNED AGAINST THE HIGHWAY BARRIER AND SEPARATED FROM THE MAIN LINE. I WAS ABLE TO LOCATE OFFICER DIAZ AND WE TRIED TO MAKE OUR WAY BACK TO THE LINE. ABOUT THE SAME TIME, I REALIZED THE CROWD WAS REACTING TO TEAR GAS BEING DEPLOYED. WHEN I REACHED A MARKED UNIT WITH OFFICER DIAZ, I DEPLOYED MY GAS MASK AND REFORMED THE LINE ON COMMAND OF SERGEANT NGUYEN.

ONCE WE REFORMED THE LINE, WE MOVED FORWARD ON COMMAND WITH SPECIAL OPERATIONS. I REMAINED ON THE RIGHT WING OF THE LINE AND WAS NOT IN ANY PHYSICAL CONFRONTATION WITH THE REMAINING PROTESTORS FOR THE REMAINDER OF THE INCIDENT.

MY BODY WORN CAMERA WAS ACTIVATED HOWEVER IT WAS LOST DURING THIS INCIDENT. SERGEANTS. NGUYEN TOOK REPORT OF THE LOST CAMERA."

The original force statement has been made a part of the permanent case file.

## Officer Jonathan Burnette

Sergeant Barnes reviewed the force statement authored by Officer Jonathan Burnette. In that statement, Officer Burnette wrote the following:

"I WAS ASSIGNED TO THE CONTINGENT OF OFFICERS ON THE CCC BRIDGE DURING THE PROTEST. WE FORMED A SKIRMISH LINE AT THE CREST OF THE BRIDGE AND WAITED AS THE PROTESTORS ADVANCED. THEY WERE APPROACHING FROM THE ON RAMP AT MAGAZINE STREET, AND NUMBERED IN THE THOUSANDS. ONCE THEY REACHED US, THEY INITIALLY STOPPED. WHILE THEY WERE STOPPED, AN UNKNOWN PERSON THE CROWD DISTRIBUTED EYE PROTECTION AND SUMMONED "ALL WHITE PEOPLE UP FRONT".

ONCE THE DESIRED PERSONNEL WERE UP FRONT, THE PROTESTORS LOCKED ARMS AT THE ELBOWS, AND BEGAN PUSHING US BACKWARD. I USED MY SHIELD TO PROTECT AGAINST THE PUSHING, BUT WAS ULTIMATELY OVER POWERED AND FORCED BACKWARD. ONCE SEVERAL HUNDRED PEOPLE OVER POWERED US, I SMELLED CS GAS. I DONNED MY PROTECTIVE MASK, AS PROTESTORS RAN BACK DOWN THE BRIDGE.

ONCE MY MASK WAS ON AND CLEARED, I LINED BACK UP WITH OFFICERS TO FORM ANOTHER SKIRMISH LINE. AS WE STOOD THERE, THE CROWD RE-FORMED AND BEGAN ADVANCING AGAIN. A SECOND CANISTER OF CS WAS DEPLOYED, AND AN INDIVIDUAL IN THE CROWD PICKED IT UP AND THREW IT OFF THE BRIDGE.

AFTER THE PROTESTORS FELL BACK AND RE-FORMED, THEY BEGAN, IN SMALLER NUMBERS, TO ATTAMPT TO BREACH OUR LINE AGAIN. AFTER PHYSICALLY PUSHING AGAINST THE OFFICERS UNSUCCESSFULLY AGAIN, THEY FELL BACK FURTHER. THE COMAND OF NFORWARD MARCH WAS GIVEN, AND WE SLOWLY MOVED FORWARD, GIVING THE PROTESTORS AMPLE TIME TO LEAVE. SMALL CONTINGENTS OF PROTESTORS WOULD MASS TOGETHER AND TAKE TURNS KICKING AND PUSHING OFFICERS AS WE ADVANCED.

AFTER SEVERAL INSTANCES OF OFFICERS ADVANCING DOWN THE OFF RAMP TOWRAD PROTESTORS, AS THEY RETREATED, AND NO ADDITIONAL PHYSICAL CONFRONTATIONS,. WE FINALLY STOPPED NEAR THE BOTTOM OF THE OFF RAMP AS THE PROTESTORS DISPERSED."

The original force statement has been made a part of the permanent case file.

## Officer Michael Devezin

Sergeant Barnes reviewed the force statement of Officer Michael Devezin. In that statement, Officer Devezin wrote the following:

"On Wednesday, 06/03/2020, I was assigned to work protest coverage. At approximately 9:30 pm, I was involved in a use of force incident that occurred on US 908, near the Crescent City Connection Bridge at the Tchouptioulas Ramp. Incident Commander, Captain LeJon Roberts, advised the Officers working on the protest channel, to relocate to the top of the bridge to form a line in front of the protesters.

Once atop the bridge, myself and the other responding Officers and higher ranking personnel, donned our riot gear, including our shields and batons. Myself and the other Officers formed a line across the bridge to create a blockade to prevent the protesters from crossing the Crescent City Connection Bridge.

The ranking Officers allowed a few of the unofficial leaders through the line of Officers, and allowed them to use the N.O.P.D. loud speakers to address the protesters. Those ranking Officers, also advised the unofficial leaders of the reason we (the Officers) were preventing them from passing and the dangers of traversing the bridge and going into Jefferson Parish. After about 30-40 minutes, the crowd increasingly grew rowdy by continuing to shout obscenities and began to advance closer to the Officers line.

I observed several bright flashes of light coming from the crowd, and then I felt the weight of the crowd pushing at my shield and individuals trying to pull my shield away from me. I used my shield and baton in an attempt to keep the protesters at bay, but was unable to due to the size of the crowd and the line the Officers created being breached by the protesters. A protester struck me in the back of my head, but I did not sustain any injuries. While using my baton and shield to protect myself and my fellow Officers from the mob of protesters, tear gas was deployed by the N.O.P.D. Special Operation Division. The tear gas was successful in getting a large number of the protesters to exit the bridge. The Officers were able to reform the line and back the remaining protesters off of the bridge by using verbal commands, our shields, and our batons.

My BWC was activated during the incident.

I did not sustain any injuries, nor did I observe any Officers or protesters sustain any injuries. I did not activate, deploy, nor see any Officers use a ECW."

The original force statement has been made a part of the permanent case file.

## Officer Devin Johnson

Sergeant Barnes reviewed the force statement of Officer Devin Johnson. In that statement, Officer Johnson wrote the following:

"On Wednesday, June 03, 2020, upon arrival for work, Officer Devin Johnson Unit 215, was informed he was to be detailed to help work the protest in lieu of the recent protest that were taking place in the city of New Orleans with Sergeant Dowal Barrett Unit 230. Officer Johnson's Statement is as follows:

When Officer Johnson made it to the Crescent City Connection with Sergeant Dowal Barrett Unit 230, the protesters were already in close proximity to the line that the other officers had already formed. From what Officer Johnson observed it was only two to four inches separating the protesters from the riot shields the officers on the line were holding. in some cases when some of the protesters moved they were so close that they were bumping into some of the officer's shields. Officer Johnson was dressed in complete riot gear: both arm pads, (forearm, shoulder, and elbow protection), both leg pads, (thigh, shin, and knee protection strapped under both boots, as well as a riot helmet and riot shield. when Officer Johnson made it to the Crescent City Bridge he exited the vehicle without a riot baton, because the protesters were so closes to the officers. Due to the plastic riot gear. Officer Johnson was not able to follow departmental policy and wear his body worn camera on his chest. Due to the hard plastic and no designated area on the riot chest protection, Officer Johnson had to wear his body worn camera on the outside of his right thigh. Officer Johnson placed the magnet in his pocket and the camera it's self on the outside of his right pocket. Officer Johnson's body worn camera was activated during this time under item number, F-03385-20. The in-car camera in the unit that Officer Johnson arrived in was not activated due to the exigency of the circumstances upon arrival and how far the unit was parked away from the protesters. On arrival, Officer Johnson was put on standby, however when it was determined that Officer Johnson was needed, he was put on the left side of the line. Officer Johnson was directed to not let any protester pass the line and keep the integrity of the line strong.

Officer Johnson was placed next to the last or second to last person to the left. Before tear gas was used Officer Johnson witnessed several of the protesters verbally abuse all the officers but more specifically the black officers. Protesters stated, " you black officers mother's are bitches and your mother raised a bitch." White protesters called black officers racist and that all black officers should be embarrassed to be policemen. Protesters stated black officers are slave catchers and are a disgrace to their ancestors. Protesters continued to yell other derogatory and explicit chants and phrases will officer stood in their way to cross the Crescent City Connection. Officer Johnson observed the protesters were not going to leave the bridge and wanted to become violent because the officers were not allowing the protesters to cross the Crescent City Connection.

The longer officers stayed in the protesters way the more Officer Johnson felt the tension growing. Officer Johnson also observed the protesters drinking liquor from pint glass bottles and smoking Black N Mild cigars. It was at the point when the "leader" of the protest gave the protesters a message is when the protest changed violent. The "leader" of the protesters was giving a message to the protesters after talking with Captain Roberts, when she stated, " I'm not telling yall to be peaceful, I'm not telling y'all not to be peaceful, I just want y'all to know they said the further we march across this bridge, the more danger we are in." about a minute or so after the "Leader" said that to the protesters was when the protesters turn violent.

Right before the protesters turned violent by pushing against myself and all the officers on the line, Officer Johnson smelled the aroma of burning marijuana. Making him think that the protesters were under the influence while being as emotional as they were. When the protesters decided to break the line the officers made, the protesters rushed between the officers to get past the officers. Officer Johnson pushed his riot shield on the protesters that were rushing the officers in front of him. Officer Johnson observed another policeman dressed in a class A or B uniform, physically carry one protester that made it through the line back on the other side of the line. Other then that, Officer Johnson only witnessed officers dressed in riot gear attire use shields to keep protesters back from crossing the Crescent City Connection. Officer Johnson did not witness any officer use the riot baton or physically fight any protesters. At that point was when SOD deployed the tear gas. After the tear gas was deployed the protesters were continued to use foul language, however they kept their distance from the officers.

Officer Johnson was not used to the tear gas and retreated to catch his breathe for a few minutes. When Officer Johnson returned to the line he put on his gas mask and had armed himself with a right baton that another officer had dropped when SOD deployed the tear gas. Officer Johnson was also without his body worn camera when he returned due to how violent the protesters grew. Protesters threw water bottles filled with a yellow liquid toward the officers line, however the water bottles did not reach the officers. It was at that point the officers walked the remaining protesters of the Crescent City Connection.

Officer Johnson did not witness any injury to any officer or protester. Officer Johnson did not know the names of any of the officers that he was around when he was on the line before or after SOD deployed the tear gas. Officer Johnson only knows the name of Dowal Barrett, Unit 230, who is his immediate supervisor. Officer Johnson does not know any other name of any other supervisor that was on scene."

The original force statement has been made a part of the permanent case file.

## Officer Douglas Boudreau

Sergeant Barnes reviewed the force statement of Officer Douglas Boudreau. In that statement, Officer Boudreau wrote the following:

"On Wednesday, July 3rd, 2020, at about 9:30 pm, I was involved in the protest coverage for the protest stemming from the George Floyd protest at the crescent city connection bridge at Tchoupitoulas street.

Officer Matthew Connolly and I were deployed to the above location when the protesters began to walk up onto the crescent city connection bridge. Upon our arrival to the location we were advised by ranking personal on the bridge to put on our riot gear; which included a helmet with visor, chest and back protector, arm protectors, leg protector, a shield with police written on it, a baton, and an issued gas mask. Due to being unable to attach my body worn camera to the chest protector and being provided with no other alternative, I was forced to attach it on my left leg pants pocket right below my duty belt.

Upon putting on my gear I was forced to run from where we parked on the bridge to where other officers in riot gear where forming a line at the command of sergeants and lieutenants. during this time, I attempted to activate by body worn camera, but later discovered that I was unable to properly activate it at this time.

Upon reaching the line of other officers I filed in to the line on the left side with my baton in right hand pointed to the ground and my riot shield raised in front of me with my left hand and being used to separate myself from the crowd of protesters, who were standing about a foot or two away from where the line of officers was located. Due to the noise from the large crowed of protesters and my equipment interfering with my hearing, it became very difficult to hear commands or orders coming from the back of our line.

I began to scan the crowed in an attempt to identify any persons that may be acting in such a way as to stir the protesters up and get them to begin acting aggressively or violently toward myself and fellow officers. I also began to speak with some members of the protest in order to have a dialog with them and to simply try and keep some of the tension down. As this was going on, I noticed other nopd officers filling into the line in order to prevent any protesters from advancing pass our position.

After an un-known amount of time I began to hear one of the "leaders" of the protest speaking to the protester from behind our line. When that person finished speaking I began to notice the people I had been talking to being moved from the front of the protest's line and being replaced by individuals holding each other's arms and forming a line of their own. I also began to hear people telling others to get in front and calling for them to continue moving up the bridge, pass our line of officers.

It was not long after this that the protesters began to physically push themselves at us, colliding into my raised shield in an attempt to get passed our line. I began to struggle with multiple people who were trying to pull my shield from my hands and break through our line. I began to get physically pushed back by the number of people the were pushing into myself and the other officers in the front line. At some point I was pushed back into the front of a nopd marked vehicle that had been parked about 10 yards behind the line of officers. I continued to struggle with people trying to pull my shield from me and get pass me, forcing me to use my shield and hands to push people away from me.

While I was struggling with people, I noticed smoke begin to rise from in front of me and protesters began to run in the opposite direction, back down the bridge. I also began to breath in the smoke, realizing that it was "tear gas". Once people began to stop pushing on me and crowding around me, I began to hear the call to put on gas mask. I retreated to the back of the nopd vehicle and took the time to properly put on my issued gas mask. Once my mask was secured on my face and riot gear properly attired again, I moved back to in front of the nopd vehicles and began to form a new line with other officers who had put their gas mask on.

As a new line of officers was formed, I noticed the smoke from the "tear gas" began to dissipate and clear from the area. I also noticed the crowed of protesters began to from up again and slowly start walking towards us, with some having their hand up in the air. I further noticed that two nopd shields had been take by the protester and were being wielded by them. I observed other protesters using their bicycles as makeshift shields and/or rams, holding them in front of themselves and pushing them.

While I was observing this, I notice blue object get thrown from inside the crowed of protesters and land right in front of my, were I realized it was a cloth bag containing some hard objects such as rocks. I yelled out to other officers about the bag but was unsure if anyone could hear me through my gas mask and over the loud noises and screaming coming from the protesters.

It was right after this that I observed what appeared to be a second canister of "tear gas" being deployed toward the moving crowd of protesters, landing in front of the protesters between them and our line. I observed on protester pick up the canister and throw it back at officers located on the right side of the bridge. I believe the canister was then thrown back towards the protester by an officer before it was again picked up by a protester and thrown off the bridge.

The protesters continued to push up to right in front of our line again, about two or three feet from us before stopping. The protesters continued to yell at us and began to argue with each other about attempting to continue forward or leaving the area, with many protesters choosing to turn around and leave. Some of the protesters choose to stay, a few sitting down in front of us. The protesters continued to argue with each other while other left for a while till there was only about 50 or so protesters left that I could observe.

At this point I was able to hear officers behind me giving warning to the remaining protesters that they need to leave the bridge. After multiple warnings and waiting for some time we were advised by our ranking officers that we would began to move down the bridge in line and force the remaining protesters down the bridge and down one of the one ramps off the overpass.

At the command of a ranking officer we began to march forward, at first being confronted by the remaining protesters who refused to leave the bridge. After stopping and again giving verbal waring to the remaining protester multiple times, I observed the protesters began to finally leave the bridge. We came to a rest, allowing the protesters to exit the bridge before continuing forward and walking down the bridge and on ramp where we came to a stop.

Once all of the remaining protesters had left the area, we were advised to return to our nopd marked units parked on the bridge and meet at a location for a debriefing.

I am unsure at which point I did notice that my body worn camera was not activated and was able to then activate the camera properly. I am unsure if the in-car camera in my nopd vehicle was activated at the time.

I am unsure of any injuries that may have occurred to officers or protesters during the incident.

At the time, my immediate supervisor was Sergeant D. Barrett, unit 230b. I am unsure of all the supervisors or officers who were on scene.

My C.E.W. was never activated but I am unsure if any were."

The original force statement has been made a part of the permanent case file.

## Officer John Cabral

Sergeant Barnes reviewed the force statement authored by Officer John Cabral. In that statement, Officer Cabral stated the following:

"ON MONDAY, JUNE 8, 2020 AT OR ABOUT 9:30 P.M., WHILE TEMPORARILY ASSIGNED TO THE 8TH DISTRICT IN ORDER TO MONITOR PROTESTS, OFFICERS JOHN CABRAL AND MATTHEW EZZELL, WERE PERFORMING TRAFFIC CONTROL AT THE INTERSECTION OF BARONNE STREET AND CALLIOPE STREET TO PREVENT VEHICLES FROM POSSIBLY STRIKING PROTESTORS THAT WERE ENTERING THE BRIDGE.

OFFICER CABRAL HEARD A BROADCAST FROM OTHER OFFICERS ON THE BRIDGE, REQUESTING IMMEDIATE ASSISTANCE FROM ANY AVAILABLE OFFICERS AS THERE WAS A LARGE AMOUNT OF PROTESTORS ON THE BRIDGE ATTEMPTING TO CROSS THE CRESCENT CITY CONNECTION. OFFICERS CABRAL AND EZZELL THEN RELOCATED TO US 90 BUSINESS WEST, DIRECTLY WEST OF THE TCHOUPITOULAS ONRAMP, WHERE OFFICER CABRAL WAS MET WITH WHAT OFFICER CABRAL APPROXIMATED AS POSSIBLY BEING ONE THOUSAND PEOPLE ON THE BRIDGE.

OFFICER CABRAL WAS POSTED AT THE SECONDARY LINE OF DEFENSE ON THE BRIDGE, WHERE AFTER A MOMENTARY ATTEMPT TO SPEAK TO THE UNOFFICIAL LEADERS OF THE PROTESTORS BY N.0.P.D. LEADERSHIP, THE PROTESTORS ON THE NORTHEN SIDE OF THE PRIMARY LINE BEGAN PUSHING AGAINST OFFICERS ON THE PRIMARY LINE. OFFICER CABRAL THEN OBSERVED AS PROTESTORS ON ALL PORTIONS OF THE PRIMARY LINE BEGAN TO PUSH AGAINST OFFICERS ON THE PRIMARY LINE, WHICH FORMED BREAKS IN THE LINE. ARMED WITH A RIOT SHIELD, OFFICER CABRAL THEN ASSISTED IN ATTEMPTING TO HOLD THE PROTESTORS BACK, HOWEVER, DUE TO THE LARGE AMOUNT OF PROTESTORS PUSHING AGAINST THE SMALL AMOUNT OF OFFICERS ON THE BRIDGE, OFFICER CABRAL WAS THEN PINNED AGAINST AN UNMARKED FORD EXPLORER, LOCATED APPROXIMATELY 35 FEET BEHIND THE SECONDARY LINE OF OFFICERS. OFFICER CABRAL CONTINUED HIS ATTEMPTS TO PUSH THE PROTESTORS BACK USING HIS RIOT SHIELD, HOWEVER, PROTESTORS BEGAN TO WEIGH DOWN ON OFFICER CABRAL'S SHIELD IN AN ATTEMPT TO TAKE IT AWAY FROM HIM. OFFICER CABRAL REGAINED CONTROL OF HIS SHIELD, AND PUSHED THE PROTESTORS BACK ONCE AGAIN, AT WHICH TIME OFFICER CABRAL OBSERVED PLUMES OF SMOKE RISING FROM TEAR GAS CANISTERS DEPLOYED FROM AN UNKNOWN LOCATION. OFFICER CABRAL IMMEDIATELY BEGAN TO FEEL THE EFFECTS OF THE TEAR GAS

BEING USED, AND DUE TO NOT BEING EQUIPPED WITH A GAS MASK, OFFICER CABRAL ELECTED TO RETREAT FROM THE LINE.

AFTER OFFICER CABRAL RETREATED FROM THE LINE, HE THEN PRIMARILY TOOK A SUPPORTIVE ROLE DURING THE INCIDENT, AND, AS SUCH, DID NOT OBSERVE ANYTHING FURTHER OF WHAT OCCURRED DURING THIS INCIDENT.

OFFICER CABRAL'S BODY WORN CAMERA AND IN CAR CAMERA WERE ACTIVATED AND RECORDING DURING THIS INCIDENT."

The original force statement has been made a part of the permanent case file.

## Officer Matthew Ezzell

Sergeant Barnes reviewed the force statement of Officer Matthew Ezzell. In that statement, Officer Ezzell wrote the following:

"ON JUNE 3RD, 2020 AT APPROXIMATELY 9:30 P.M., MYSELF AND OFFICER JOHN CABRAL WERE ASSIGNED TO PROVIDE SECURITY FOR THE PROTEST, UNDER NEW ORLEANS POLICE DEPARTMENT ITEM NUMBER F-03385-20. OFFICER EZZELL AND OFFICER CABRAL RELOCATED TO THE CCC, UPON RECIEVING A REQUEST FOR ASSISTANCE FROM UNITS ALREADY POSITIONED ON THE BRIDGE, FACING THE PROTESTORS.

I TOOK A POSITION ON THE FIRST LINE, NEAR THE LEFT SIDE OF THE FORMATION. INTIALLYTHE PROTESTORS WERE PEACEFUL AND DID NOT ATTEMPT TO PUSH THE FORMATION. AFTER A FEW MINUTES, I OBSERVED WHAT APPEARED TO BE THE SECOND LINE OF PROTESTORS PUSH THE FRONT LINE FORWARD, CAUSING NUMEROUS PEOPLE TO RUN INTO THE RIOT SHIELD. I WAS PUSHED BACKWARDS INTO THE VEHICLES POSITIONED BEHIND THE LINE BY NUMEROUS PROTESTORS. I THEN FELT A BURNING SENSATION IN MY FACE AND THROAT, WHICH I BELIEVED TO BE THE EFFECTS OF GAS. I THEN EQUIPPED MY DEPARTMENT ISSUED GAS MASK. I THEN REPOSITIONED MYSELF ON THE FRONT LINE. I THEN RECIEVED THE COMMAND TO MOVE FORWARD. AS I MOVED FORWARD, I OBSERVED A WHITE MALE WEARING A RED SHIRT AND BASEBALL CAP STANDING WITH HIS ARMS CROSSED. AS I MOVED FORWARD, THE SUBJECT WEARING THE BASEBALL CAP REFUSED TO MOVE, CAUSING ME TO PUSH HIM WITH THE SHIELD. UPON RECIEVING AN ADDITIONAL COMMAND TO MOVE BACK, THE SUBJECT THEN LINKED ARMS WITH NUMEROUS OTHER PROTESTORS. I THEN MOVED FORWARD ON COMMAND, AT WHICH POINT THE SUBJECT WAS APPREHENDED BY OFFICERS POSITIONED BEHIND THE FRONT LINE.

MY BODY WORN CAMERA WAS NOT ACTIVE FOR THE FIRST CONTACT WITH THE PROTESTORS. DURING THE INITIAL STAGES OF THE INCIDENT, I WAS EQUPPED WITH A SHIELD AND BATON AND WAS UNABLE TO ACTIVATE THE CAMERA. UPON DISENGAGING FROM THE PROTESTORS, I THEN ACTIVATED THE BODY WORN CAMERA.

MYSELF, AND THE MEMBERS OF THE FRONT LINE, THEN CONTINUED WALKING ON US 90, DOWN THE TCHOUPITOULAS STREET EXIT UNTIL THE PROTESTORS DISPERSED.

I DID NOT USE OR OBSERVE ANY CEW USE DURING THIS INCIDENT."

The original force statement has been made a part of the permanent case file.

## Officer Bryan Bissell

Sergeant Barnes reviewed the force statement of Officer Bryan Bissell. In that statement, Officer Bissell wrote the following:

"On Wednesday, 6/03/20 at approximately 9:30 PM, I was involved in a use of force incident that occurred on US 90B, near the Crescent City Connection Bridge at the Tchoupitoulas Exit. I was assigned to protest coverage and was advised by the Incident Commander, Captain LeJon Roberts, via N.O.P.D radio, to relocate on top of the bridge to form a skirmish line in front of the protesters.

During the course of the incident an abundance of protesters disregarded multiple amplified verbal commands to stop their encroachment of the bridge and physically pushed through the skirmish line by shoving the officers with their arms, grabbing the officers by their bodies and I or their equipment and pulling them, and pushing the officers with their momentum and body weight. In order to negate the protesters' advance, I used my shield and baton to attempt to push the protesters back and create distance before tear gas was deployed and the protesters fell back.

The incident was recorded by my BWC and my vehicle's front facing camera.

I did not sustain injury nor observe any injuries to any Officers or any of the protesters.

I did not deploy or observe any deployment or activation of a CEW."

The original force statement has been made a part of the permanent case file.

## Lieutenant Merlin Bush

Sergeant Barnes reviewed the force statement authored by Lieutenant Merlin Bush. In that statement, Lieutenant Bush stated the following:

"On Wednesday June 3, 2020, there were protests that took place in various areas of the city for the police related death of George Floyd. At some point the large group of protestors entered the Magazine on ramp headed towards the West Bank in an attempt to go over the Crescent City Connection bridge. A skirmish line was set by NOPD officers, at the Tchoupitoulas on ramp (West Bank) in effort to stop the protestors from crossing the bridge and give them an area to exit the bridge 'safely. The line was set and the protestors walked up to the line. The protestors began to peacefully protest.
    Some of the protest leaders requested to speak with Captain Lejon Roberts. Captain Roberts allowed several of the informal leaders to pass the skirmish line and he spoke with

some them. He even allowed the protestors to use the L-Rad (loud speaker) so they could address the other protestors. The Captain allowed them to speak until he believed they were trying to incite the other protestors. The protestors then returned to the other side of the skirmish line.

A short time after the leaders crossed back over the skirmish line, I observed protestors starting to remove their jewelry. Additional! they started to call the men come to the front of the skirmish line. They advised the women go to the rear. One of the leaders, I only knew as Brandon, asked to speak with me. Brandon asked me, "Did you ever have a kid that had a temper tantrum and you gave them what they wanted?" I said, "Absolutely not". Brandon then started saying something to the crowd and I heard him saying it was time for them to take one step forward, because we were not giving them what they wanted. I then advised the skirmish line to go to the "On guard" position, believing they were about to start pushing the officers.

Brandon then advised the protestors to start moving forward, which they did. They started pushing pass the skirmish line creating breaches within the line. Officers were using their shields attempting to hold back the crowd and they were failing in some areas of the skirmish line. That is when SOD started deploying the gas. I was on the left side in the rear of the line when a white male, 30 to 40 years of age, long hair, wearing a baseball cap, black pants, and black t-shirt broke through the skirmish line. The male ran to the side of me, I pivoted and grabbed hist-shirt from the rear. I swung him back towards the skirmish line and he seemed to lose his balance falling back into the skirmish line. The subject may have fell to the ground, but he disappeared and I didn't see him any more. I immediately started trying to assist the skirmish line regain its integrity, but I started feeling the effects of the gas that SOD started deploying, because I was not wearing a gas mask. I observed tear gas being tossed and shot in to the air. I also observed protestors throw the canisters of tear gas back at the officers. The crowd went from about 400 to about 70 after the gas was deployed.

The SOD units began giving warnings at that point. After a while a small group remained on the bridge. The small group didn't leave until the skirmish line started pushing forward. The bridge was then cleared of civilians. It should be noted that Lieutenant Bush did observe numerous officers pushing protestors with their shields, and snatches that resulted in take downs but he did not see who did the take downs. There were several agencies that were assisting behind the skirmish line. The State Police and the U.S. Marshals are two that I remember. I also remember the following NOPD Supervisors on the scene: 1) Captain Lejon Roberts 2) Captain Anthony Caprera 3) Captain Brian Lampard 4) Captain Preston Bax 5) Lieutenant Kenny Prepetit 6) Sergeant Damond Harris 7) Sergeant Victor Gant 8) Sergeant Justin Almeida 9) Sergeant Terrance Hilliard. First District Officers that were on the skirmish line were Brandon Abadie, Daniel Grijalva, and Michael Devezin.

Lieutenant Bush was not wearing a body worn cameras, because the department policy does require him to."

The original force statement has been made a part of the permanent case file.

## Officer Daniel Grijalva

Sergeant Barnes reviewed the force statement authored by Officer Daniel Grijalva. In that statement, Officer Grijalva wrote the following:

"On Wednesday, June 3rd, 2020, Officer Daniel Grijalva was tasked with providing coverage for the Protests occurring throughout the city. On the above evening, Officer Grijalva was on scene near on the Crescent City Connection Bridge near Tchoupitoulas Street due to the large amount of protesters who gained access via an on-ramp. Officer Grijalva was outfitted in a Department provided "riot" protective equipment and utilized a riot shield and baton. Officer Grijalva was under the direction of Captain Lejon Roberts. Officers created a physical barrier line utilizing their Department issued Riot Shield in order to keep the multitude of protesters continuing on the CCC Bridge.

During the course of the events, an unknown large amount of subjects refused multiple verbal commands to disperse which were amplified to leave the CCC Bridge. These unknown subjects ignored multiple commands and began to use their bodies to push, shove and break through the line formed by Officers During the course of the incident, Officer Grijalva utilized his Department provided riot shield and baton to push the advancing protesters back in order to create distance and space from the advancing subjects.

Officer Grijalva observed tear gas being utilized as multiple subjects had pushed past the Officers line, Officer Grijalva suffered the effects of the tear gas prior to being able to utilize the Department provided gas mask. In addition Officer Grijalva observed subjects attempting to disarm Officers of their shields and batons. Throughout the incident, Officer Grijalva had subjects attempt to disarm him his riot shield and baton on multiple occasions by grabbing at his equipment. Officer Grijalva observed unknown Officers utilizing their riot shields and batons to push unknown subjects back who ignored commands to leave and disperse from the area.

Officer Grijalva's body worn camera was activated during the incident and video file is uploaded under F-03385-20.

Officer Grijalva does not know of any civilian witnesses. Officer Grijalva did not suffer any lasting injuries besides the effects of the tear gas deployed. Officer Grijalva is unaware of any injuries suffered by other Officers, or any subjects.
,
Officer's vehicle camera was not activated as it was parked far from the area where the incident occurred.

Officer Grijalva is unaware of any CEW applications. Officer Grijalva then handwrote, "END OF STATEMENT" and initialed the statement at the end."

The original force statement has been made a part of the permanent case file.

## Officer Justin McCubbins

Sergeant Barnes reviewed the force statement authored by Officer Justin McCubbins. In that statement, Officer McCubbins wrote the following:

"USE OF FORCE TRACKING NUMBER 2020-0161

ON WEDNESDAY JUNE 3, 2020 AT APPROXIMATELY 2030 HOURS, I OFFICER JUSTIN MCCUBBINS MANNING UNIT 329C OF THE THIRD DISTRICT C

PLATOON, WAS DETAILED TO THE PROTEST THAT ENDED NEAR US-90 AT THE TCHOUPITOULAS ON RAMP.

I WAS INSTRUCTED WITH OTHER RIOT TRAINED OFFICERS TO FORM A LINE ON THE US-90 OVERPASS, WEST BOUND AND TO NOT LET PROTESTORS MARCH ACROSS THE BRIDGE. AS PROTESTOR'S ARRIVED, A WHITE MALE, WITH DARK HAIR AND GLASSES IMMEDIATELY RAN HIS BIKE INTO MY RIOT SHIELD AND INTO MY KNEE, CAUSING IT TO BEND BACKWARDS. I USED MY SHIELD TO MOVE THE BIKE BACK AND GAVE A CONTROLLED STRIKE, WITH THE END OF MY BATON TO HIS STOMACH AREA. THIS STRIKE WAS EFFECTIVE IN DETERRING THE SUBJECT TO CONTINUE HIS BEHAVIOR.

APPROXIMATELY THIRTY TO FORTY MINUTES LATER, I SAW A LARGE NUMBER OF PROTESTOR'S BEGIN TO PUSH THE SHIELDS OF MY FELLOW OFFICERS TO MY RIGHT SIDE. THIS ACTION CREATED MORE PROTESTOR'S CONDUCTING THEMSELVES IN THE SAME MANNER. I WAS FORCED TO USE MY SHIELD AND PUSH BACK PROTESTOR'S AS THEY ATTEMPTED TO RUSH THE NOPD LINE.

I WAS OVERCOME WITH PROTESTORS AND WAS SURROUNDED BY PROTESTOR'S. AS THE PROTESTOR'S RAN PASSED ME, I RECEIVED MULTIPLE PUNCHES FROM THEM IN MY HEAD, NECK AND STOMACH AREA. SHORTLY AFTER THIS OCCURRED, I SAW CANISTERS BEING LAUNCHED ONTO THE GROUND BY S.O.D. STAFF.

I MOVED TO COVER AND ATTEMPTED TO PUT MY GAS MASK ON. AS I LAID MY SHIELD AND BATON DOWN, I BENT DOWN TO ONE KNEE TO DON MY GAS MASK. AT THIS TIME I WAS KICKED BY AN UNKNOWN SUBJECT IN THE THROAT AREA.

I WAS ABLE TO DON MY GAS MASK AND GET TO COVER BEFORE ANY FURTHER INCIDENTS OCCURRED.

MY BODY WORN CAMERA WAS ACTIVATED DURING THIS INCIDENT, BUT WAS IMMEDIATELY KNOCKED OFF MY MY BODY BY PROTESTER'S AS THEY BREACHED THE NOPD LINE. I WAS ABLE TO RECOVER MY BODY CAMERA AFTER THE INCIDENT WAS OVER. I DID NOT REMOVE MY E.C.W. OR MY ISSUED FIREARM DURING THIS INCIDENT."

The original force statement has been made a part of the permanent case file.

## Officer Kenneth Kuykindall

Sergeant Barnes reviewed the force statement authored by Officer Kenneth Kuykindall. In that statement, Officer Kuykindall wrote the following:

"(A)    ON WEDNESDAY, JUNE 03, 2020 AT AROUND 9:30 P.M. OFFICER KENNETH KUYKINDALL WAS ASSIGNED TO THE PROTEST COVERAGE THAT WAS WITHIN THE EIGTH DISTRICT. AS SUCH, PROTESTERS TOOK A POSITION ONTO THE INTERSTATE OF US90 WEST BOUND, COMPLETELY MAKING THE INTERTATE IMPASSABLE. OFFICERS SET UP A "SKIRMISH LINE" AS A BLOCKADE AS DIRECTED BY THE IMMEDIATE SUPERVISORS ON SCENE. THIS WAS DONE FOR THE SAFETY OF THE PROTESTERS, AND IN AN EFFORT TO KEEP CITIZENS FROM CROSSING THE INTERSTATE ON FOOT IN AN UNSAFE MANNER. OFFICER KUYKINDALL WAS STANDING IN ONE SPOT ALONG THE LINE WITH OTHER OFFICERS. ALL OFFICERS TOOK ONE

POSITION AND NEITHER MOVED FORWARD OR BACKWARD. OFFICERS STOOD AND HELD THEIR SHIELDS. AT SOME POINT IN TIME THE PROTESTERS WERE NO LONGER PEACEFUL AND BEGAN TO FORCIBLE PUSH AGAINST THE OFFICERS SHIELDS, AND THROW THEIR BODIES INTO THE OFFICERS SHIELDS IN AN EFFORT TO BREAK THE LINE AND MOVE PAST THE OFFICERS. AFTER JUST A FEW SECONDS THE CROWD FORCIBLY PUSHED PAST THE OFFICERS AT WHICH TIME THE OFFICERS WERE FORCED TO MOVE BACK IN AN EFFORT TO BEGAN ANOTHER STRUCTURED LINE.

(B)     THE OFFICERS WERE ON SCENE DUE TO THE NATURE OF THE PROTEST

(C)     PROTESTERS FORCIBLY PUSHED OFFICERS AS OFFICERS STOOD IN FRONT OF THEM HOLDING SHIELDS.
(D)     PROTESTERS USED FORCE TO PUSH PAST THE OFFICERS.
(E)     OFFICER USED THE SHEILD IN A FASHION OF PROTECTION AND NOT AS A WEAPON. AT ONE POINT A PROTESTER ATTEMPTED TO TAKE THE OFFICERS SHIELD AND THE OFFICER USED HIS RIGHT HAND TO PUSH THE PROTESTOR OFF OF THE SHIELD. THE OFFICER DID NOT OBSERVE OTHER USES OF FORCE BY OTHER OFFICERS BECAUSE OF THE SIZE OF THE CROWD AND NUMBER OF PEOPLE ON SCENE.

(F)     SGT T. HILLIARD WAS OFFICERS KUYKINDALL IMMEDIATE SUPERVISOR WHO WAS ALSO ON SCENE FOR THE INCIDENT.

(G)     OFFICER KUYKINDALL NOTIFIED SGT T. HILLIARD OF THE INCIDENT

(K) OFFICER KUYKINDALL WAS WEARING BODY CAMERA AT THE TIME OF THE INCIDENT, BUT THE BODY CAMERA WAS KNOCKED OFF OF THE OFFICERS PERSON DURING THE PHYSCIAL ENCOUNTER.
THE OFFICER DID NOT HAVE A VEHICLE CAMERA ACTIVATED AND THE OFFICER DID NOT ACTIVATE OR DISCHARGE HIS CEW DURING THE INCIENT."

The original force statement has been made a part of the permanent case file.

## Officer Matthew Connolly

Sergeant Barnes reviewed the force statement authored by Officer Matthew Connolly. In that statement, Officer Connolly wrote the following:

"ON WEDNESDAY JUNE 3RD 2020, AT ABOUT 9:30PM, I WAS DETAILED TO ASSIST WITH A PROTEST/ MARCH THROUGHOUT THE CITY OF NEW ORLEANS.

I WAS ASSIGNED TO ASSIST IN BLOCKING TRAFFIC ON THE EASTBOUND PORTION OF THE 90. MYSELF OFFICER BOUDREAUX, OFFICER GAINES AND OFFICER JOHNSON WERE INSTRUCTED TO BLOCK TRAFFIC AND DIVERT TRAFFIC OFF ON THE TCHOUPITOULAS EXIT.

UPON OUR UNITS BEING IN PLACE I HEARD OVER N.O.P.D. DISPATCH INO (ORLEANS5) RADIO CHANNEL THATTHE PROTESTERS WERE ATTEMPTING TO MARCH ONTO THE CRESCENT CITY CONNECTION BRIDGE AND THAT UNITS THAT WERE IN PLACE TO KEEP PROTESTERS OFF THE BRIDGE WERE BEING SWARMED AND PROTESTERS WERE GETTING PAST THEM.

IMMEDIATELY AFTER HEARING OVER THE RADIO OF THE PROTESTERS BEGINNING TO MARCH ON THE RAISED PORTION OF THE BRIDGE I HEARD UNIT 100 REQUEST OFFICERS TO RELOCATE TO THE WESTBOUND PORTION OF THE CRESCENT CITY CONNECTION. WHILE EN ROUTE I COULD HEAR UNIT 100 GIVING UPDATES ON THE LOCATION OF THE PROTESTERS MARCHING TOWARDS OFFICERS ALREADY ON THE WESTBANK PORTION OF THE BRIDGE.

UPON MY ARRIVAL I OBSERVED A LARGE GROUP OF PROTESTERS (UPWARDS OF 3,000) WITHIN 1-3 FEET OF OFFICERS ALREADY IN PLACE ON A LINE STOPPING PROTESTERS FROM CONTINUING TO WALK UP THE CRESCENT CITY CONNECTION. I WAS ATTIRED IN N.O.P.D. CLASS "B" UNIFORM WITH N.O.P.D. ISSUED RIOT GEAR (CHEST, ARM SHIN PROTECTORS, AS WELL AS A RIOT HELMET) ATOP. I IMMEDIATELY TOOK A POSITION IN AN OPENING IN THE LINE WITH OTHER OFFICERS WITH A CLEAR RIOT SHIELD FACING THE CROWD OF PROTESTERS (MIDDLE LEFT OF THE FORMATION).

WHILE IN POSITION I COULD HEAR MANY PROTESTERS USING DEROGATORY TERMS TOWARDS POLICE AS WELL AS EXTREMELY DEROGATORY TERMS TOWARD BLACK OFFICERS (EG. "RACE TRADERS", "NIGGERS" AND OTHER HATEFUL THINGS). I BELIEVED THE PROTESTERS WERE USING SUCH HATEFUL TERMINALITY IN ORDER TO GET A RISE OUT OF OFFICERS BUT WERE MET WITH NEGATIVE RESULTS WHEN OFFICERS DID NOT INTERACT WITH PROTESTERS. PROTESTERS WERE ALSO STATED MULTIPLE TIMES THAT THEY WERE NOT THERE FOR BEING PEACEFUL AND THEY CAME THERE FOR "THIS" (MEANING THEY CAME IN ORDER TO CLASH OR FIGHT WITH POLICE)

WHILE I WAS AT THE LINE AN UNIDENTIFIED BLACK FEMALE AND MALE WERE ALLOWED THROUGH THE LINE OF OFFICERS IN ORDER TO SPEAK WITH RANKING MEMBERS OF N.O.P.D. AFTER A SHORT WHILE THE FEMALE WAS ALLOWED TO USE THE N.O.P.D MEGAPHONE IN ORDER TO SPEAK TO THE CROWD OF PROTESTERS. WHILE ADDRESSINC THE CROWD THE UNIDENTIFIED BLACK FEMALE STATED THAT RANKING MEMBERS OF N.O.P.D INFORMED HER THAT NO
PROTESTERS WERE BE ALLOWED TO PASS THE POLICE LINE AND SHOULD TURN AROUND AND IF THEY ATTEMPT TO CONTINUE TO PROCEED THINGS WOULD BE DANGEROUS. THE UNIDENTIFIED BLACK FEMALE INFORMED THE CROWD THAT SHE IS NOT TELLING THE CROWD TO WALK OR BE PEACEFUL. SHORTLY AFTER THE UNIDENTIFIED BLACK FEMALE RETURNED TO THE CROWD, I COULD HEAR PROTESTERS START GROWING MORE AGITATED WITH THE FEMALE SPEAKING WITH POLICE AND SOME PROTESTERS START SAYING "FEMALESTO THE BACK AND MALES TO THE FRONT ND TO LINK ARMS."

SHORTLY AFTER THE MALE PROTESTERS LINKED ARMS I HEARD AN UNKNOWN RANKING OFFICER FROM BEHIND THE LINE YELL THE ORDER ON GUARD POSITION, AFTER RECEIVING THE ON GUARD ORDER I ROSE MY CLEAR RIOT SHIELD AND STRAIGHT BATON. ALMOST IMMEDIATELY AFTER RECEIVING THE ON GUARD ORDER THE PROTESTERS BEGAN MARCHING FORWARD AGAINST MINE AND FELLOW OFFICERS SHIELDS IN AN ATTEMPT TO BREAK THROUGH OFFICERS CORDON. WHILE PROTESTERS WERE PUSHING AGAINST OFFICERS SHIELDS MULTIPLE PROTESTERS GRABBED ON TO OFFICERS SHIELDS AND PULL OR TRY TO SEPARATE OFFICERS BY PULLING AND PUSHING ON SHIELDS, FURTHERMORE OBSERVED MULTIPLE PROTESTERS USE BICYCLES AS WEAPONS AND JAB THEM AT OFFICERS AND THEIR SHIELDS. AT THIS TIME FEARING THAT PROTESTERS WERE USEING WEAPONS AGAINST OFFICERS AS WELL AS ATTEMPTING TO TAKE OFFICERS PROTECTIVE SHIELDS AND BATONS I ELECTED TO PUSHED MULTIPLE PROTESTERS WITH MY ISSUED RIOT SHIELD AND JABBED MULTIPLE PROTESTERS WITH MY PR-24 IN ORDER TO PREVENT PROTEST FROM USING FORCE ON MYSELF OR OTHER OFFICERS ON SCENE.

AT AN UNKNOWN POINT DURING THE SKIRMISH SOME PROTESTERS WERE SUCCESSFUL IN BREAKING THROUGH THE POLICE CORDON AND BEGAN TO RUN PAST OFFICERS. SHORTLY AFTER THE PROTESTERS BEGAN TO RUN PAST OFFICERS I OBSERVED A LARGE CLOUD OF SMOKE EMULATING FROM THE FRONT LEFT OF THE CROWD. IMMEDIATELY AFTER OBSERVING THE CLOUD OF SMOKE A MAJORITY OF THE PROTESTERS BEGAN TO SEPARATE FROM OFFICERS AND RETREAT. THERE WAS STILL A GROUP OF PROTESTERS ACTIVITY USING FORCE ON OFFICERS AND IN AN ATTEMPT TO GET PAST OFFICERS WHO WERE UNSUCCESSFUL AND EVENTUALLY RETREATED.

UPON FINDING A SAFE TIME TO PLACE MY ISSUED GAS MASK ON AND GATHERED BACK ON LINE WITH FELLOW OFFICERS. AFTER BEING BACK ON LINE WITH OFFICERS I OBSERVED A SMALLER GROUP OF PROTESTERS REMAINING (100-200). WHILE ON LINE I OBSERVED A SECONDARY CLOUD OF GAS COMING FROM A CYLINDER WHICH WAS THROWN AT THE REMAINING CROWD. THAT SMOKING CYLINDER WAS PICKED UP AND THROWN BACK AT OFFICERS BY AN UNIDENTIFIED WHITE MALE PROTESTER. I FURTHER OBSERVED MULTIPLE PROTESTERS ARMED WITH POLICE EQUIPMENT TAKEN DURING THE FIRST SKIRMISH.

OFFICERS ON LINE WERE ONCE AGAIN GIVEN THE ON GUARD COMMAND AND ORDER TO MARCHED FORWARD IN ORDER TO ASSIST THE REMAINING PROTESTERS OFF THE ON RAMP. DURING THIS PORTION MULTIPLE PROTESTERS RUSHED TOWARDS OFFICERS AND REFUSED TO CONTINUE TO EXIT THE RAISED PORTION OF THE BRIDGE. DURING THIS TIME, I PUSHED MULTIPLE PROTESTERS WITH MY ISSUED CLEAR RIOT SHIELD AND JABBED PROTESTERS WITH THE ISSUED PR-24. EVENTUALLY PROTESTERS EXITED THE RAISED PORTION OF THE BRIDGE THERE WERE MULTIPLE N.O.P.D. SUPERVISORS INCLUDING RANKING COMMAND STAFF MEMBERS THAT OBSERVED AND WERE INVOLVED IN THE USE OF FORCE.

'THERE WERE MULTIPLE PROTESTERS THAT OBSERVED THE USE OF FORCE HOWEVER I DO NOT KNOW ANY NAMES OF CIVILIAN WITNESSES.

MY BODY WORN CAMERA WAS ACTIVATED AND RECORDING DURING MY PORTION OF THE USE OF FORCE, HOWEVER MY BODY CAMERA WAS PLACED ON THE RIGHT THIGH PORTION OF MY LEG DUE TO WEARING ISSUED RIOT GEAR AND NOT HAVING A PLACE TO ATTACH THE RIOT GEAR ON THE CHESTDUE TO THE PLACEMENT OF MY BODY WORN CAMERA IT WAS UNINTENTIONALLY DEACTIVATED WHEN I BENT DOWN TO PLACE MY GAS MASK ON. I IMMEDIATELY REACTIVATE MY BODY CAMERA UPON NOTICING IT WAS NOT RECORDING.

MY IN CAR CAMERA WAS NOT RECORDING AND WAS PARKED ON THE CRESCENT CITY CONNECTION FACING AWAY FROM THE USE OF FORCE.

I DID NOT ACTIVATE MY CEW

THERE WERE MANY ATTEMPTS TO DE ESCALATE THE PROTESTERS AND MULTIPLE VERBAL COMMANDS GIVEN IN ORDER TO PREVENT THE PROTESTERS FROM COMMAND STAFF RANK AS WELL AS ADVANCING ON OFFICER."

The original force statement has been made a part of the permanent case file.

## Sergeant Terrence Hilliard

Sergeant Barnes reviewed the force statement authored by Sergeant Terrence Hilliard. In that statement, Sergeant Hilliard wrote the following:

"On Wednesday, June 3, 2020, I was assigned to the "George Floyd" protest event coverage. During the event, protesters unlawfully took over the on ramp to the Pontchartrain expressway located closest to the intersection of Camp and Calliope streets. The large crowd proceeded up the on ramp and began walking towards the crescent city connection bridge. As per instructions received in roll call, I relocated to the top of the bridge via the Pontchartrain expressway Tchoupitoulas on ramp, located near the intersection of Tchoupitoulas and Henderson streets. Upon arriving to the top of the bridge, I began to instruct Officers to form a line in efforts of preventing protesters from crossing the bridge. After several minutes of being on the bridge the protesters began to become extremely irate and hostile screaming profanities and chanting in unison "move bitch, get out the way, get out the way bitch, get out the way. Move Bitch!" Seconds later, several individuals both male and female began to attempt to push thru the front line officers. I observed a group of individuals on the right flank of the line breaking thru the patrol Officers. I immediately attempted to prevent any breaches and began physically pushing individuals back into the crowd using both of my hands and arms. I distinctly remember one white female screaming "don't touch me bitch". I then observed a breach occurring on the left flank of the line and observed a white male with long hair pushing his way thru patrol officers. I grabbed the individual by the back of his hair with my left hand, then controlled his body using my right hand, pushing him back into the crowd. I noticed that the line initially formed by the patrolmen was being quickly overcome by protesters. Therefore, I began attempting to push any protesters back into the crowd with my hands. I

was met with resistance, as I was pushed back and blinded by protesters who were strategically armed with handheld strobe flash lights who intentionally activated the devices directly in my face. When I believed we had lost full control of the bridge, I began to smell the distinct odor of CS gas, as I observed SOD Tactical personnel hand deploying CS gas canisters into the crowd. I then observed protesters throwing gas canisters back towards the officers. I initially observed many Officers and protestors who were not equipped with gas masks exhibiting the effects of CS gas, and becoming unable to function. Once line Officers began to dawn there masks, the line was reformed. The large majority of protesters departed the location, while several others remained present and exhibited hostile behaviors towards us. CS gas was deployed again, at which time the protesters began throwing the canisters off of the bridge. After several minutes of giving verbal warnings to protesters to vacate the location, Officers began to tactically make movements to apprehend any protesters refusing to depart the location. I assisted in taking two individuals in custody. These apprehensions were made without incident."

The original force statement has been made a part of the permanent case file.

## Officer Brandon Abadie

Sergeant Barnes reviewed the force statement authored by Officer Brandon Abadie. In that statement, Officer Abadie wrote the following:

"ON WEDNESDAY, JUNE 3, 2020 AT APPROXIMATELY 9:30 PM, OFFICER BRANDON ABADIE ASSIGNED TO THE NEW ORLEANS POLICE DEPARTMENT'S FIRTST DISTRICT SECOND PLATOON WAS DETAILED TO ASSIST WITH GEORGE FLOYD PROTEST NEAR THE CRESCENT CITY CONNECTION BRIDGE AT TCHOPITOULAS STREET.

DURING WHICH TIME, THE OFFICERS FORMED A LINE ACROSS THE INTERSTATE WEARING "CLASS B UNIFORM" AND ISSUED RIOT GEAR (HELMET, CHEST PLATE, ARM GUARDS, SHIN GUARDS, RIOT SHIELD AND BATON) PREVENTING PROTESTORS FROM CROSSING THE BRIDGE. THE OFFICERS AND SUPERVISORS GAVE THE PROTESTORS MULTIPLE VERBAL WARNINGS VIA LOAD SPEAKER TO DISBAND, CLEAR AND RELOCATE OFF THE INTERSTATE. SHORTLY AFTER, THE PROTESTERS LINKED THEIR ARMS TOGETHER AND BEGAN TO APPROACH THE OFFICERS TO BREAK THROUGH THE FRONT LINE. AS THE PROTESTORS APPROCAHED, OFFICER ABADIE CONTINUED TO GIVE VERBAL COMMANDS TO "BACK UP" WHILE IN THE ON-GUARD POSITION. DURING WHICH TIME, OFFICER ABADIE USED IS ISSUED SHIELD TO CREATE DISTANCE WITH PROTESTORS WHO ATTEMPTED TO PENETRATE THE LINE AND CROSS THE CRESCENT CITY CONNECTION BRIDGE. SHORTLY AFTER, THE PROTESTORS BROKE THROUGH A SECTION OF THE FRONT LINE AND OFFICER ABADIE THEN FELT THE AFFECTS OF TEAR GAS DEPLOYED BY THE OFFICERS BEHIND THE OFFICERS ON THR FRONT LINE. ONCE THE OFFICERS WEDGED THEMSELVES BETWEEN THE MARKED N.O.P.D. UNITS TO REFORM THE FRONT LINE. OFFICER ABADIE THEN RELOCATED TO HIS MARKED N.O.P.D. UNIT TO RETREIVE HIS GAS MASK AND THEN RETURNED TO THE FRONT LINE. DURING WHICH TIME, OFFICER ABADIE CONTINUED TO PUSH BACK THE CROWD OF THE

PROTESTORS WITH THE SHIELD WHO WERE CONTINUING TO DISREGARD COMMANDS TO DISBAND AND RELOCATE OFF OF THE INTERSTATE.

OFFICERS ABADIE WITNESSED OFFICERS ALSO USING RIOT SHIELD AND BATON TO PREVENT PROTESTORS FROM PENETRATING THE FRONT LINE. OFFICER ABADIE ALSO WITNESSED THE.USE OF TEAR GAS. IT SHOULD BE KNOWN OFFICER. ABADIE OBSERVED MULTIPLE PROTESTORS ATTEMPTING TO TAKE OFFICERS' SHIELDS AND BATONS.

OFFICER ABADIE DID NOT SUFFER ANY INJURIES, BUT FELT THE AFFECTS (EYE IRRITATION, RUNNY NOSE, COUGHING AND DIFFICULTY BREATHING) OF THE DEPLOYED TEAR GAS.

OFFICER ABADIE'S BODY WORN CAMERA AND IN-CAR CAMERA WERE ACTIVE FOR THE DURATION OF THE INCIDENT. THE VIDEOS WERE DOCUMENTED UNDER N.0.P.D. ITEM# F-03385-20.

OFFICER ABADIE'S CEW WAS NOT ACTIVATED AND WAS NOT DISCHARGED DURING THE INCIDENT."

The original force statement has been made a part of the permanent case file.

## Officer Zachary Vogel

Sergeant Barnes reviewed the force statement authored by Officer Zachary Vogel. In that statement, Officer Vogel wrote the following:

"ON 6-3-20 AT ABOUT 2133 HOURS OFFICERS WERE STAGED IN THEIR POLICE VEHICLES NEAR CALLIOPE ST AND THE ON RAMP TO THE CRESCENT CITY CONNECTION WEST BOUND. PROTESTERS BEGAN RUNNING TO THE ON RAMP AND AT WHICH TIME OFFICER VOGEL RELOCATED TO THE BRIDGE OF THE CRESCENT CITY CONNECTION VIA PATROL UNIT AND ON RAMP. OFFICER VOGEL THEN GOT IN FORMATION WITH RESPONDING OFFICERS TO BLOCK PROTESTERS FROM FURTHER WALKING UP THE BRIDGE. PROTESTERS BEGAN APPROACHING OFFICERS AND OFFICER VOGEL. A WHITE MALE IN A WHITE SHIRT APPROACHED OFFICER VOGEL SO CLOSE THAT OFFICER VOGEL BELIEVED HE WOULD ATTEMPT TO MARCH THROUGH THE FORMATION LINE. DURING THAT TIME OFFICER VOGEL HELD HIS RIOT BATON FORWARD AND PARALLEL WITH THE GROUND STOPPING THE UNKNOWN MALE AS IT WAS POSITIONED IN FRONT OF HIS ABDOMEN.
NO INJURIES WERE REPORTED TO OFFICER VOGEL BY PROTESTERS. OFFICER VOGEL'S BWC WAS ACTIVE. SGT. T. HILLIARD WAS NOTIFIED THAT THE BATON WAS USED TO STOP THE PROTESTER."

The original force statement has been made a part of the permanent case file.

## Officer Matthew McKoan

Sergeant Barnes reviewed the force statement authored by Officer Matthew McKoan. In that statement, Officer McKoan wrote the following:

"A) ON JUNE 3, 2020, AT APPROXIMATELY 9:00 PM, MATTHEW MCKOAN WAS ASSIGNED TO THE PROTEST DETAIL UNDER NOPD ITEM F-03385-20. DURING THE PROTEST, THE DETAIL CONTINGENT WERE DISPATCHED TO US 90 (WESTBANK EXPRESSWAY) ON THE WESTBOUND LANE, BETWEEN THE TCHOUPITOLAS ONRAMP AND THE ONRAMP NEAR CALLIOPE AND MAGAZINE. THERE WAS A LARGE CROWD NUMBERED BETWEEN 1,000 AND 2,000 PROSTESTERS FORMED ON THE INTERSTATE. OFFICER MCKOAN ALONG WITH THE OTHER OFFICERS WERE ATTIRED IN THEIR N.O.P.D RIOT GEAR ALON WITH A RIOT SHILED AND BATON. OFFICER MCKOAN AND THE OTHER OFFICERS WERE INSTRUCTED TO FORM A LINE WITH THE RIOT SHIELDS TO PREVENT THE PROTESTERS FROM ADVANCING UPON THE INTERSTATE AND OVER THE BRIDGE. N.O.P.D'S SOD TEAM WAS STATIONED BEHIND THE RIOT SHIELD LINE TO ASSIST THE OFFICERS WITH RIOT SHIELDS. THE OVERWHELMINGLY LARGE CROWD OF PROTESTERS BECAME AGIATED AND BEGAN FORCING THEIR WAY THROUGH THE OFFICERS SHIELD WALL. THE PROTESTERS WERE ACTIVELY KICKING AND PUSHING AGASINT MULTIPLE OFFICERS UNTIL THEY ADVANCED THROUGH A PART OF THE SHIELD WALL. OFFICER MCKOAN HELD HIS RIOT SHIELD AND FENDED OFF PROTESTERS THAT ATTEMPTED TO RIP THE SHIELD AWAY. OFFICER MCKOAN OBSERVED GAS CANISTERS HIT THE GROUND SEVERAL FEET AWAY FROM HIS LOCATION. OFFICER MCKOAN DID NOT WITNESS THE CANISTERS BEING SHOT ONLY WITNESSED THEM HIT THE GROUND. OFFICER MCKOAN BROKE AWAY FROM THE SHIELD LINE AND SUCCESFULL Y PLACED ON HIS DEPARTMENT APPROVED GAS MASK. OFFICER MCKOAN AGAIN WALKED UP TO THE SHIELD LINE REJOINING THE OTHER OFFICERS AND BEGAN MOVING THE PROTESTERS DOWN THE EXIT RAMP.
B)      DISPATCHED TO A RIOT
C)      THE PROTESTERS BECAME IRATE AND BEGAN KICKING, PUNCHING, AND PULLING OFFICERS RIOT SHIELDS. ULTIMATLEY THE PROTESTERS PUSHED THEY WAY THROUGH THE RIOT SHIELD LINE.
D)      PROTESTERS BECAME VIOLENT AND BEGAN ENGANGING IN A PHYSICAL CONFRONTATION WITH OFFIERS
E)      OFFICER MCKOAN USED HIS HSIELD TO BLOCK PROTESTERS. OFFICER MCKOAN OBSERVED GAS CANISTERS LAND I THE MIDDLE OF THE CROWD.
F)      OFFICER MCKOAN, LARGE NUMBER OF OFFICERS FROM EACH DISTRICT ALONG WITH THE SOD TEAM.
G)      LARGE NUMBER OF SUPERVISORS ON SCENE
H)      UNKNOWN OF WITNESS NAMES
J)      NO INJURIES OBSERVED
K)      BODY WORN CAMEREA WAS ON AND ACTIVATED. THE CAMERA WAS KNOCKED OFF DURING THE RIOT AND LATER ON RECOVERED.
I) UNKNOWN IF VEHICLE CAMERAS WERE ACTIVATED, I WAS ON FOOT.
M) I DID NOT DISCHARGE A CEW. UNKNOWN IF A CEW WAS DISCHARGED."

The original force statement has been made a part of the permanent case file.

## Sergeant Lamont Walker

Sergeant Barnes reviewed the force statement authored by Sergeant Lamont Walker. In that statement, Sergeant Walker wrote the following:

"On 6/3/2020, I was assigned to augment the New Orleans Police Department protest coverage. I supervised five Officers from the 4th district on this coverage. Officer Curtis Caldwell, Russell Gary, Jamal Kendrick, Denzel Millon, and Raphael Rico. We were under the command of CPT Roberts, CPT Lubrano, and LT Palumbo. For the first few hours of the protest we monitored the radio and tried to move parallel to where the protestors were in case things got out of hand. We heard on the radio that the protestors may be attempting to enter the Crescent City Connection. My contingent of Officers, as well as the Fifth District, led by Sergeant Daniel Hiatt entered US 90 via the Tchoupitoulas Street on ramp. We were ordered to park our cars beyond the exit ramp and hurry back down the highway and form a line before the exit. Most, but not all of us were in riot gear. I was not issued riot gear prior to the assignment. Officers got into formation and formed a line across all three or so lanes of the highway. There was a large gap on the right side, that I attempted to fill, even though not being in riot gear. Our orders were to not allow the protestors beyond our position onto the Crescent City Connection. When the protestors reached our position, I put my hands out as if to not let anyone by me and lightly pushed them back, but they went by anyway. The officers with shields used them to keep protestors back, and some went back to the large group, while others approached command staff and begin a dialogue. More officers in riot gear arrived, Officers Nguyen and Diaz from the 7th District, and filled my position. The protestors were yelling at us to let them though. Some protestors were saying that if we did not let them through they would come through anyway and flip over cars and start a riot. Some protestors stated that the only way the standoff could be resolved peacefully is if we lay down our badges, guns, and shields and walk with them across the bridge. As it became increasingly clear that we were not going to let the protestors across, they got increasingly agitated and death threats and other things were yelled in our direction. The initial group of patrol Officers was able to hold the line while SOD, State Police, US Marshalls, Jefferson Parish Helicopter, and other entities arrived on scene. The informal leader of the group was speaking via megaphone and stated she was told to tell the crowd to turn back but was not going to do so. She stated to them that it would get more dangerous for them if they chose to continue and they had to understand that. Other leaders spoke and said that they had no wish to be in solidarity with the police and wanted to continue across the bridge. Soon pushing began, and I first heard SOD personnel mention the word gas. I backed up behind the line because I did not have any protective equipment. I echoed the term "Gas, Gas, Gas" in an attempt to notify the personnel on the line to be prepared for CS gas. Gas was soon deployed and several Officers left their positions due to the effects of gas. I believe I witnessed a gas cannister being fired by an officer in a turret on top of an SOD vehicle. I helped carry Officer Denzel Millon to EMS after he was affected by gas. I picked up or was handed multiple pieces of equipment and BWC's. The crowd began to thin, and were given multiple orders to disperse, but refused. I took a position immediately behind the line and we were given orders to move forward. I helped the Officers stay on line. I witnessed several people who did not move back as we advance get "snatched" and flexi-cuffed. We were eventually able to push the few remaining protestors down the on ramp. I learned that all of the Officers under my command complained of irritation due to the gas and not having mask on. Officer Jamal Kendrick complained of lower back pain as a result of probably pulling a muscle

while attempting to keep protesters from breaching the line. I completed a first report of injury. I did not see or hear of any injured protesters. My BWC documented the incident."

The original force statement has been made a part of the permanent case file.

## Officer Denzel Millon

Sergeant Barnes reviewed the force statement authored by Officer Denzel Millon. In that statement, Officer Millon wrote the following:

"On Wednesday, June 3, 2020, Officer Millon was assigned to the protest, which was held at US90 W & Tchoupitoulas Exit., on the Crescent City Connection Bridge, stemming from the killing of George Floyd that occurred in Minneapolis, Minnesota.

At approximately 9:20pm, Officer Millon along with other members of NOPD, were instructed to put on riot gear (shin guards, arm guards, chest guard, and helmet) with their shield and baton in hand also. Officers formed a squirmish line on the Crescent City Connection Bridge, due to a large amount of protestors walking on the bridge. Officer Millon along with other NOPD officers formed their line. The large group of protestors then came face to face with officers as their shields were up, screaming and shouting profanity. Moments later, the protestors began to shove the officers shields, attempting to break through the line that was formed by the officers, by pushing and shoving at their shields. Officers began to push back with their shields in an efforts to keep the line formed as one. The protestors were eventually successful at overpowering the officers and breaking through the line that was formed. Moments later Officer Millon felt his skin tingling, eyes began to burn, and hard to breathe. As Officer Millon turned around he observed a thick cloud of smoke, knowing gas had been deployed, to keep the protestors from advancing over the bridge.

Officer Millon turned back around and observed majority of the protestors running in the opposite direction, covering their faces, attempting to get away from the gas that was deployed. Officer Millon could not get his gas mask on before feeling the full effects of the gas, and was eventually taken away from the front line by members of the Special Operations Division.

Officer Millon camera did not activate. Officer Millon did not deploy his CEW.

Sgt. L. Walker, unit 430B, was on scene of this above listed incident."

The original force statement has been made a part of the permanent case file.

## Officer Raphael Rico

Sergeant Barnes reviewed the force statement authored by Officer Raphael Rico. In that statement, Officer Rico wrote the following:

"ON WEDNESDAY, JUNE 3, 2020 I WAS ASSIGNED FOR COVERAGE FOR THE GEORGE FLOYD PROTESTS. MY UNIT WAS ADVISED THAT THE PROTESTORS HAD BEGAN TO WALK ONTO US 90 HEADING WESTBOUND. WE WERE

ADVISED TO STAGED ON TOP OF US 90 INTERSTATE WESTBOUND RIGHT BEFORE THE CRESCENT CITY CONNECTION. I WAS ATTIRED IN RIOT GEAR (SUIT, HELMET, SHIELD, BATON) AND FORMED A LINE WITH THE OTHER OFFICERS. THE PROTESTORS MARCHED DIRECTLY TO OUR FORMATION LINE. I HEARD MULTIPLE VOICES FROM THE PROTESTORS SAY "BRING ALL THE WHITE PEOPLE TO THE FRONT". IT WAS AT THIS TIME MULTIPLE PROTESTORS BEGAN TO MARCH INTO MY SHIELD, PUSHING ME BACKWARDS. I FELT MY HELMENT BEING PULLED AWAY FROM MY BODY, MY SHIELD ARM BEGAN TO TWIST AND SOMEONE WRAPPED THEIR ARM AROUND MY LEFT LEG AND BEGAN PULLING UPWARDS AND TOWARDS THE CROWD. EVENTUALLY THE INTEGRITY OF THE LINE WAS BREACHED, AND SAW MULTIPLE PROTESTORS BEHIND THE LINE. I BEGAN TO FEEL MY SKIN TO BECOME IRRITATED, AND MY EYES BEGAN TO WATER WHEN THE TEAR GAS WAS DEPLOYED. I SAW ONE OF THE PROTESTORS WHO BREACHED THE LINE PUSH ANOTHER OFFICER TO THE GROUND AND RUN BACK INTO THE CROWD. I ASSISTED THE OFFICER TO HIS FEET, AT WHICH TIME I DAWNED MY GAS MASK AND REFORMED THE LINE. I HEARD MULTIPLE VERBAL COMMANDS FOR THE REMAINING PROTESTOR TO EXIT THE INTERSTATE, HOWEVER THEY REFUSED TO EXIT. AFTER GIVEN ORDERS, WE BEGAN TO MARCH TOWARDS THE REMAINING PROTESTORS. SHOUTING "BACK" AS WE MARCHED. I USED MY SHIELD AS A PUSHING DEVICE AND BATON STRIKES TO THE STOMACH/MIDSECTION AREA TO CREATE DISTANCE BETWEEN MYSELF AND THE PROTESTORS.

I AM UNAWARE OF ALL THE OFFICERS OR CIVILAIN WITNESSES WHO WERE PRESENT DURING THE INCIDENT. SERGEANT LAMONT WALKER WAS MY DIRECT SUPERVISOR AT THE TIME OF THE INCIDENT.
I SUFFERED FROM SCRAPS AND BRUISES TO MY HANDS AND LEGS.

MY BODY WORN CAMERA WAS ACTIVE DURING THE INCIDENT, HOWEVER DURING THE INCIDENT MY BODY WORN CAMERA WAS KNOCKED OFF AND WAS NOT FOUND; I ADVISED SGT. WALKER OF MY LOST BWC. I WAS ADVISED THAT SGT. NGUYEN OF THE 7TH DISTRICT WAS AUTHORING A REPORT OF ALL LOST PROPERTY DURING THE INCIDENT WHO I THEN ADVISED.

MARKED UNIT 14024 MVU CAMERA WAS NOT ACTIVE.

I DID NOT ACTIVATE MY CEW, NOR DID I DEPLOY MY CEW."

The original force statement has been made a part of the permanent case file.

## Officer Jamal Kendrick

Sergeant Barnes reviewed the force statement authored by Officer Jamal Kendrick. In that statement, Officer Kendrick wrote the following:

"On June 3, 2020 at approximately 11:00pm New Orleans Police Officer Jamal Kendrick was assigned to the Black Lives Matter protest on the Crescent City Connection, at its intersection with the Tchoupitoulas exit ramp.

Officer Kendrick was attired in full riot gear at the Tchoupitoulas exit ramp. The officers formed a line across the bridge to stop the protesters from crossing the Crescent City Connection bridge because for public safety reasons.

Officer Kendrick activated his Body Worn Camera as he observed the protesters coming on to the bridge. The ranking New Orleans Police officials use a megaphone to advise the protesters that this is as far as they can go due to safety reasons. The protesters were also advised to exit the bridge at this time. Officer Kendrick also observed the New Orleans Police ranking officers let an unknown female from the protest use the megaphone to calm the crowd of protesters and advise them that this is as far as they could go.

Officer Kendrick then observed a female calling for all the men to come to the front of the line and lock arms together. Once the males locked arms together they began pushing and pulling the officers police shield's forcing the officers (Officer Kendrick) backwards. During this time Officer Kendrick felt a pain in his lower back. Officer Kendrick then observed gas being deployed into the crowd of protesters by an unknown source.

At that time Officer Kendrick stepped behind one of the marked New Orleans police units and applied his gas mask then returned to the frontline of defense.

The New Orleans Police Officers re-established the line across the bridge at which time commands started coming from the Special Operation Division Bearcat vehicle advising protesters to leave the bridge.

Officer Kendrick did not discharge his CEW nor did he observed any other officers discharge any weapons.

Officer Kendrick Body Worn camera was activated during the incident.

Officer Kendrick was marked unit's In Car Camera was activated during the incident.

Officer Kendrick notified Lieutenant Ray Jones 1400, of his injury during the protest due to Sergeant Lamont Walker still on the bridge engaged in the protest."

The original force statement has been made a part of the permanent case file.

## Sergeant Daniel Hiatt

Sergeant Barnes reviewed the force statement authored by Sergeant Daniel Hiatt. In that statement, Sergeant Hiatt wrote the following:

"On Wednesday, June 3, 2020 at about 9:30pm, Sergeant Daniel Hiatt, unit 570, was assigned as a supervisor of 5th District officers who were assisting with protests throughout the city. At around 9:30pm, command staff gave the order to assemble on the Crescent City Connection near the Camp Street on-ramp to the roadway. It was learned the protesters were moving onto the elevated expressway at that location.

A short time later, a line formation was formed with multiple officers, prepared to confront the protesters. At the time the line formation was completed, prior to the arrival of protesters, Sergeant Hiatt activated his Body Worn Camera for the duration.

At that time, the protesters arrived at the line formation. During the time the protesters stood in front of officers, additional units arrived to reinforce the line to keep the peace at the location. It should be noted, all officers were provided with, and utilized, departmentally issued riot gear during the duration of the protest.

The situation remained calm for quite some time, approximately an hour or so. Protesters were allowed to speak with commanding officers and to address the crowd behind the line formation. Shortly after multiple people addressed the crowd, the situation began to deteriorate. The protesters became aggressive and began to-call for "white people and men" to move to the front of the ranks. The protesters began to chant in unison and walked forward towards the line formation. A commanding officer provided the order to move into the "On Guard Position." Which was the command to prepare for imminent danger. The protesters arrived at the line formation and began to push through. Initially the protesters were held back but, somewhere along the formation, protesters made it through. Officers were pushed back towards a line of cars that were tactically parked behind them in an effort to dissuade the mob of people from continuing on the bridge towards Algiers. Sergeant Hiatt was pushed back by protesters towards the line of cars and, at that point, held his ground by utilizing the vehicles as a leverage point. While wedged into that position, Sergeant Hiatt immediately smelled and felt the presence of CS gas. The protesters began to run away from the position, providing the opportunity to employ the issued gas mask. Th CS gas usage pushed the angry mob backwards, allowing the officers to re-establish the line formation.

After the line formation was reestablished, it was held steady while protesters continued to agitate the crowd, although a majority of the crowd had dissipated. After many verbal warnings to clear the area, the order was given by command staff to begin moving the protesters off the bridge. The officers were given the "On Guard" command followed by the "March" command. Officers began to move forward in an effort to remove the protesters from the area, attempting to drive them back down the Camp Street Ramp. As officers were moving forward, a person attempted to grab the shield of an officer next to Sergeant Hiatt. The shield Sergeant Hiatt was holding was used to remove the persons hand from the officer's shield. A quick forward motion was used, and the unknown agitator removed their hand. Sergeant Hiatt was unsure if the person was struck by the shield, however, there seemed to be no ill-effect to the agitator.

The protesters were ultimately removed from the bridge and Special Operations assumed command of the location at the bottom of the on-ramp. No other force was witnessed by Sergeant Hiatt."

## Officer Jeffrey Crouch

Sergeant Barnes reviewed the force statement authored by Officer Jeffrey Crouch. In that statement, Officer Crouch wrote the following:

"ON WEDNESDAY JUNE 3, 2020 AT APPROXIMATELY 9:30 PMDEPARTMENT (BADGE #1709/EMPLOYEE #26890) WAS ASSIGNED TO A MOBILE, ROVING UNIT IN REGARDS TO ON-GOING PROTESTS THROUGHOUT THE CITY OF NEW

ORLEANS. OFFICER J. CROUCH WAS THEN ADIVISED BY HIS IMMEDIATE SUPERVISOR, SGT. D. HIATT THAT A LARGE GROUP OF PROTESTING INDIVIDUALS WERE ENTERING ONTO l-90W PER TH CAMP STREET ON-RAMP IN AN ATTEMPT TO WALK ACROSS THE CRESCENT CITY BRIDGE ON FOOT. OFFICER J. CROUCH, ALONG WITH SEVERAL OTHER NEW ORELANS POLICE OFFICERS, IMMEDIATELY ASCENDED ONTO THE BRDIGE AND FORMED A STATIONARY FRONT LINE, WITH ALL OFFICERS ADORNED IN FULL RIOT GEAR WHICH HAD BEEN PROVIDED BY THE NEW ORLEANS POLICE DEPARTMENT. UPON FORMING THE LINE, A LARGE GROUP OF SEVERAL HUNDRED INDIVIDUALS APPROACHED THE OFFICERS OF THE NEW ORLEANS POLICE DEPARTMENT. THE ENCOUNTER BETWEEN THE CITIZENS EXCERCISING THEIR RIGHT TO PROTEST AND THE OFFICERS OF THE NEW ORLEANS POLICE DEPARTMENT REMAINED PEACEFUL AND CALM FOR ABOUT 45 MINUTES TO AN HOUR, WITH THE PROTESTERS ONLY SHOUTING SLURS AND CURSE WORDS AT THE OFFICERS. AFTER AN ITINIAL DIALOUGUE WAS ESTABLISHED WITH THE INFORMAL LEADERS OF THE PROTESTERS (WHICH WERE ALLOWED BEHIND THE LINE) AND MULTIPLE CAPTAINS OF THE NEW ORLEANS POLICE DEPARTMENT, IT SOON BECAME APPARENT THAT SEVERAL OF THE PRETESTERS WERE NOT SATISFIED WITH THE RESULTS AND BEGAN TO VERBALLY COMMAND ALL "WHITE MEN AND WOMEN" TO THE FRONT OF THE PROTEST LINE. UPON ESTABLISHING A FRONT LINE OF ONLY WHITE MEN AND WOMEN, THE ENTIRE PROTESTING CROWD THEN BEGAN TO FORCEFULLY PUSH THIER WAY PAST THE OFFICERS OF THE NEW ORLEANS POLICE DEPARTMENT.

AFTER THE INTEGRITY OF THE LINE HAD FAILED, OFFICER J. CROUCH USED HIS RIOT SHILED TO PUSH SEVERAL WHITE FEMALES OFF OF HIM, PUSHING ONE TO THE GROUND, THOUGH NOT HAVING ANY EFFECTS TO HER HEALTH. OFFICER J CROUCH USED HIS RIOT GEAR ISSUED BATOON TO ESTABLISH DISTANCE BETWEEN HIMSELF AND SEVERAL PROTESTERS WHO WERE TRYING TO GRAB AND TAKE HIS SHIELD. OFFICER J. CROUCH SUFFERED A LARGE CUT TO THIS RIGHT-HAND POINTER FINGER BY UNKNOWN PROTESTER (E.M.S. UNIT WAS NOT NEEDED FOR OFFICER J. CROUCH'S INJURY). UPON THE INTEGRITY OF THE N.O.P.D LINE FAILING, OFFICER J. CROUCH OBSERVED THE DEPLOYMENT OF C.S. GAS, WHICH WAS SUCCESSFUL IN PUSHING BACK THE ANGRY MOB. OFFICER JL CROUCH, AFTER RETREATING ABOUT 15 FEET TO ESCAPE THE EFFECTS OF THE TEAR GAS, PLACED HIS GAS MASK OVER HIS FACE AND THEN RE-ESTABLISHED A FORMAL LINE WITH SEVERAL OTHER OFFICERS. OVER THE COURSE OF THE NEXT HOUR OR SO, THE NEW ORLEANS POLICE DEPARTMENT SLOWLY PUSHED THE REMINING PROTESTERS DOWN THE CAMP ST EXIT AND REGAINED CONTROL OF l-90W.

OFFICER J. CROUCH DID NOT USE NOR WITNESS ANY FURTHER USES OF FORCE.

OFFICER J. CROUCH DID NOT DEPLOY HIS DERPARTMENTAL ISSUED C.E.W. (TASER) AND HIS BODY WORN CAMERA WA ACITVATED."

## Witness Officer Statements

### Officer Rodney Brown

Sergeant Barnes reviewed the witness statement authored by Officer Rodney Brown. In that statement, Officer Brown wrote that he was tasked with assisting district personnel with crowd control on the Crescent City Connection Bridge. When he arrived on the bridge he observed district officers had formed a line spanning the Westbound lanes of travel, dressed in riot gear.

Officer Brown wrote that the officers were instructed to prepare for gas deployment by donning gas masks. The grenadier team officers then deployed gas over the officers towards the protesters and the effects were felt by both protesters and the front-line officers. Members of the front line fell back, and members of SOD helped supplement the line. Officer Brown collected a shield from the ground and positioned himself on the line.

An announcement was made instructing the remaining protesters to exit the bridge. The remaining protesters refused to comply. Officer Brown remained behind the front-line officers, operating as part of the "snatch team" and was instructed to remove protesters who impeded the line's forward progress. Officer Brown assisted with placing an unknown white female in handcuffs who had been removed by other officers on the snatch team. Officer Brown continued to assist at the line after placing the female in handcuffs, with his BWC active.

The full witness statement has been made a part of the permanent case file.

### Officer Glenn Miller

Sergeant Barnes reviewed the witness statement authored by Officer Miller. In the statement, Officer Miller wrote the following, in summary:

Officer Miller was assigned to SOD when they received a request to assist on the Crescent City Connection and observed a large crowd of unknown civilians trying to cross on foot but were stopped by district officers in riot gear. Shortly after arriving on the bridge the order came for officers to don their masks and then the order for gas to be deployed. Officer Miller then observed numerous officers without masks retreating from the front line where the gas had been deployed. Officer Miller reached the front line and helped form a defensive position in the event the crowd attempted to overtake them.

Officer Miller observed a gas canister go towards the crowd from behind him and observed a member of the crowd pick up the canister and throw it at the police line. Once the line was formed, they were able to advance forward and escort the remaining civilians off the interstate.

The full witness statement has been made a part of the permanent case file.

## Officer Jehan Senanayake

Sergeant Barnes reviewed the witness statement prepared by Officer Jehan Senanayake. In the statement, Officer Senanayake wrote that he was a member of the "red team" responsible for responding to any active shooter situations and retrieving any downed officers during the event. Once he was called to the top of the bridge he observed several protesters face to face with the mobile field force, agitating the officers. There were also protesters fighting amongst themselves.

Officer Senanayake was then present as the officers advanced with the police line, and he assisted in maintaining a straight line as the officers advanced. Officer Senanayake did not write about observing any other force.

## Officer Raymond Smith

Sergeant Barnes reviewed the witness statement provided by Officer Raymond Smith. In that statement, Officer Smith wrote that he was assigned to the "red team" and was responsible for extracting officers in distress and responding to any active shooters. After relocating to the top of the bridge he observed hostile protesters standing face to face with the mobile field force team. Officer Smith stated he saw protesters attempting to push their way through the line and hear six verbal warnings to exit the bridge given to protesters. The mobile field force then advanced, pushing the line of protesters back, and the protesters then fled the bridge.

## Officer John McIver

Sergeant Barnes reviewed the witness statement provided by Officer John McIver. In that statement, Officer McIver wrote that he was assigned to the "red team" during the protest. Sometime around 10:27 PM he received the call to relocate to the top of the bridge because the crowd was unruly and attempting to break the police line. At the top of the bridge he observed several protesters face to face with the mobile field force. After a while of chanting, many of the protesters left the bridge. Several protesters remained on the bridge after being warned to exit multiple times.

Soon after the warnings, Officer McIver observed officers driving the protesters back as some of the protesters attempted to push through the officers' shields. The remaining protesters then moved down the onramp and left the bridge.

## Officer Charles Stamps

Sergeant Barnes reviewed the witness statement authored by Officer Charles Stamps. In that statement, Officer Stamps wrote that he was assigned to the transport team and stayed by the equipment trucks. Officer Stamps stated he heard a call for gas deployment but could not see what was happening. Officer Stamps stayed at the back where several arrested subjects were escorted to him until NOPD units arrived to take custody of the subjects.

## Officer William Mullaly

Sergeant Barnes reviewed the witness statement authored by Officer William Mullaly. In that statement, Officer Mullaly wrote that he was assigned to the "blue team," a snatch team led by Sergeant Travis Ward. At about 10:15 PM the decision was made to deploy gas to disperse the crowd that had become aggressive and broken through the front line of officers. Officer Mullaly was then instructed to go to the front line and assist the officers. He observed clouds of gas and several officer who had been affected by the gas. He also observed several protesters had taken police riot shields and were using them as cover while antagonizing the officers.

In Officer Mullaly's statement, he noted he did not immediately activate his BWC. He returned to the front line and assisted in re-establishing the front line and preventing the protesters form moving forward. Officer Mullaly was not directly involved in the arrest or apprehension of anyone during the incident.

## Officer Jake Engle

Sergeant Barnes reviewed the witness statement provided by Officer Jake Engle. In that statement, Officer Engle wrote that he was assigned to a snatch team to assist the mobile field force on the evening of the protest. At approximately 10:14 PM he heard over the radio that gas was deployed, and he donned his gas mask and activated his BWC.

Once he was arrived at the line, he observed clouds of gas and several district officers moving backwards, who had been affected by the gas. Officer Engle observed at the second deployment of gas, a gas canister was thrown over the police line, back at police, by protesters. During the incident several protesters drew close to the officers' shields and shouted insults at the officers.

At approximately 11:00 PM the line began to move forward and directed the remaining protesters down an onramp.

## Officer Carey Jordan

Sergeant Barnes reviewed the witness statement of Officer Carey Jordan. In the statement, Officer Jordan wrote that he was assigned to a snatch team on the evening of June 3rd for the protest. On the bridge, Officer Jordan observed approximately 1500 protesters and a line of police officers preventing them from advancing onto the Crescent City Connection.

The grenadier team was ordered to assemble and because the protesters were attempting to progress through the police line. Upon seeing the gas deployed, detective Jordan put his gas mask on and took a position behind the officers holding the line. The line of officers then moved forward towards the crowd until all of them were successfully moved off the interstate.

## Officer Timothy Jones

Sergeant Barnes reviewed the witness statement prepared by Officer Timothy Jones. In that statement, Officer Jones wrote that he was assigned to an overwatch position in the Lenco Bear armored vehicle. Detective Jones' responsibility was to observe the crowd and communicate information about the quantity of protesters, weapons observed, identify agitators and provide any other intelligence that could be useful. Detective Jones observed several protesters push through the establish police line and the command for gas was given. He donned his gas mask when the gas was deployed. Officer Jones stated, after several minutes of unrest the police line was re-established.

Detective Jones was relieved of his position by a member of the gas team and he joined a snatch team at the line. Detective Jones did not have the occasion to arrest anyone or assist in any arrests.

## Officer Dylen Pazon

Sergeant Barnes reviewed the witness statement provided by Officer Dylen Pazon. In that statement, Officer Pazon wrote he was assigned to transport a tactical team to assist the district officers in case of an emergency. While staged near the convention center, he was ordered to relocate to the top of the bridge after protesters forced their way through an established line formation.

After arriving on the bridge, he began assisting with re-establishing the line formation and was summoned by Lieutenant Prepetit for assistance. He exited the Bear-Cat and assisted the Lieutenant and the Grenadier team with equipment and approaches. He observed multiple protesters in an aggressive standoff with the front-line officers.

While the line advanced, he noted there was a communications breakdown because of the gas masks officers were wearing. He then interceded and gave commands to the mobile field force and gave verbal warnings to protesters. The mobile field force was able to direct all protesters to the Magazine Street onramp, below the interstate.

## Officer Russell Green

Sergeant Barnes reviewed the witness statement authored by Officer Russell Green. In that statement, Officer Green wrote that he was assigned to drive the Lenco Bear armored vehicle. He was initially parked 100 yards away from the protest. He heard instructions to deploy gas and for the Bear to proceed closer to the protest. He activated his BWC and proceeded to move the Bear about 30 yards from the protest. Upon arrival, he observed police equipment (helmets, shields, and batons) in the middle of the road. He was able to observe several unknown officers (both LSP and NOPD) taking protesters into custody. Officer Green stated he did not observe any force used by officers because there were cars in front of him obstructing his view.

## Officer Curtis Caldwell

Sergeant Barnes reviewed the witness statement authored by Officer Curtis Caldwell. In that statement, Officer Caldwell stated he was assigned to the protest and was stationed on the Crescent City Connection bridge near the Tchoupitoulas onramp with other officers. He was

equipped with a riot shield and positioned in a line across the westbound lanes of traffic. Officer Caldwell had been instructed to not allow protesters to cross the line. Officer Caldwell stated the protesters were advised by NOPD rank and the protesters spokesperson they would not be allowed to cross the line of officers and they were to leave peacefully via a bullhorn. The protesters ignored the order and began pushing against the line of officers, eventually making it through the line.

Officer Caldwell then saw white gas coming from the crowd and was affected by the tear gas. He did not have a gas mask. Officer Caldwell was helped by two SOD member and brought to the rear of the police units. Officer Caldwell was then advised to stay at the back because he did not have a gas mask or other riot gear.

## Officer Bronson Gettridge

Sergeant Barnes reviewed the witness statement authored by Officer Bronson Gettridge. In that statement, Officer Gettridge wrote that he was summoned to assist with the protest on the bridge by Captain Anthony Caprera. After arriving and dressing in his riot gear, Officer Gettridge was tasked with a position on the line by Sergeant Terrence Hilliard. The crowd began pushing against the line and the integrity of the line was lost. The Special Operations Division then deployed gas. Officer Gettridge did not see which officers deployed gas and did not see any other officers use force. Officer Gettridge also stated he did not see any injuries to officers or protesters.

## Officer Patrick MacFarlane

Sergeant Barnes reviewed the witness statement authored by Officer Patrick MacFarlane stated he donned his riot gear and moved into position in a second riot line approximately 30 feet away from the agitated crowd, which numbered in the thousands. Officer MacFarlane stated he activated his BWC once he observed the crowd surge because the informal leaders were rousing them to use force against the police. He stated he clearly heard NOPD Rank commanding the protesters to turn back or force would be used to disperse them.

Officer MacFarlane observed the protesters crash into the front line of officers with force at several locations, causing officers to stumble backwards. He as then alerted by NOPD Rank that gas was about to be deployed.
Officer MacFarlane stated he saw several protesters using aggressive resistance by grabbing shields and batons and physically kicking and shoving at the front line. Gas was deployed and all but 100 or 200 people left.

The order was given to push the protesters back down the bridge for their safety. The protesters continued to use aggressive resistance, but officers used minimal force to push the protesters towards the entrance ramp at Calliope Street and Camp Street.

## Officer Marylou Augustin

Sergeant Barnes reviewed the witness statement authored by Officer Marylou Augustin. In that statement she wrote that she was called to the bridge and stood about thirty yards behind the front line of officers. She observed protesters push through the police line and saw an SOD officer firing tear gas into the crowd while standing on the hood of a police vehicle. She observed tear gas being thrown back at the officers by an unknown protester, then saw an officer throw it back.

She heard an unknown officer inform protesters to exit the bridge multiple times over a loudspeaker. The protesters walked back to the police line and more tear gas was fired at protesters. Many of the protesters left, but several refused to leave.

She then stood behind the officers as they began walking down the bridge to clear it. She observed several protesters refusing to leave push through the officers' shields. She observed an officer grab and arrest a protester in a red shirt who had pushed through the line of officers. The officers continued to walk towards protesters and protesters walked backwards until they exited the bridge.

## Officer Maggie McCourt

Sergeant Barnes reviewed the witness statement authored by Officer Maggie McCourt. In that statement, Officer McCourt stated she observed an officer on the front-line experiencing difficulty breathing when the tear gas was deployed. She and Detective Nickolas Davis escorted the officer to a staging location, away from the front line, and stayed with the officer until his breathing was controlled. Detective McCourt then returned to the front-line and walked behind the front line of officers as the rest of the protesters were directed off the ramp.

## Officer Nickolas Davis

Sergeant Barnes reviewed the witness statement authored by Officer Nickolas Davis. In that statement, Officer Davis stated he was approximately 30-40 yards behind the officer and ranking officials at the police line. After a few minutes, members of LSP and the US Marshalls arrived on scene to assist as well.

Officer Davis heard a female voice, who he believed was not with the NOPD, telling protesters the NOPD said that was as far as they were allowed to go. She advised the police department would use force to not allow the protesters to cross. Officer Davis stated he heard someone in the crowd yell, "I will die for this shit." A few moments later a group of protesters pushed through the front line of NOPD officers, causing them to use their shields to protect themselves and the integrity of the line.

While the altercation was occurring, Officer Davis stated he saw gas canisters shot from the rear of where law enforcement was staged. He immediately relocated to the top of the bridge where he would not be affected by the gas. He saw several NOPD officers helped to the bridge because they were affected by the gas. The gas also caused a large group of protesters to leave, with only a small group of agitated protesters remaining.

NOPD made several statements telling the crowd to exit the bridge, which were ignored by some. The NOPD line moved forward, causing the rest of the protesters to exit the bridge.

## Officer Brett Mathes

Sergeant Barnes reviewed the witness statement authored by Officer Brett Mathes. In that statement, Officer Mathes wrote he observed a large crowd of protesters on the interstate and NOPD officers attired in riot gear and gas masks. He was then instructed by an SOD Sergeant to stay back because he did not have riot gear, or a gas mask and gas had been deployed. Officer Mathes stated about a quarter mile away from the protest and only observed officers in gas masks escort a few civilians in handcuffs back to the area he was in. He did not observe anything he believed to be in violation of NOPD use of force guidelines.

## Officer Danielle Williams

Sergeant Barnes reviewed the witness statement authored by Officer Danielle Williams. In that statement, Officer Williams stated she saw the police line, in riot gear with shields and batons, preventing the crowd from traveling across the bridge. She heard an officer using an NOPD police vehicle asking the protesters to disperse from the bridge. The officer asked numerous times for the protesters to exit the bridge. The protesters then began chanting and pushing through the line of officers. Officer Williams then heard a call about a subject with a rifle on the onramp, and she directed her attention to the onramp. Once the subject was unable to be located, she observed several citizens in the HOV lane, recording the protest. She then saw protesters pushing the officers on the left side of the line. Because of the police vehicles, she could not see the middle or right of the line.

She then heard an officer advise, over the radio, tear gas would be released. A group of officers who were not equipped with masks were affected as the gas was deployed. She observed an SOD officer standing on the roof of a marked police unit fire several tear gas canisters into the crowd. The crowd retreated backwards momentarily; a small number of protesters left the bridge.

She observed a gas canister thrown back over the line of officers and observed Officer Denzel Millon coughing and gasping for air as he was being brough to New Orleans EMS. She heard the command for gas over the radio again and saw the officer on the car fire multiple canisters into the crowd. She stated the crowd retreated again and another canister of gas was thrown back towards the police officers. The crowd was then much smaller in number.

The police line was then ordered to move forward, and she observed Officer Pazon instructing the officers to move the line. She saw an unknow black female push through the line and be arrested by Louisiana State Police. She then saw an unknown white female and an unknown white male break through the line of officers and be arrested by unknown Louisiana State Police Troopers. As the line continued to push, the rest of the protesters began walking down the onramp.

C66

Officer Williams stated she observed Officer Jeffrey Crouch received a cut to his finger during the incident.

## Officer Keith Mays

Sergeant Barnes reviewed the witness statement authored by Officer Keith Mays. In that statement, Officer Mays stated he was standing in the police line and observed protesters negotiate with NOPD leaders. The protesters then pushed through the police line and gas was deployed. Officer Mays stated he did not use any force against the protesters, and he did not observe any force used.

## Officer Alois Warren

Sergeant Barnes reviewed the witness statement authored by Officer Alois Warren. In that statement, Officer Warren advised he was a part of the police line across the bridge preventing protesters from going any further. He observed protesters shouting obscenities at officers, trying to elicit a response. The protesters linked arms and pushed their way through the police line. Officer Warren stated he saw a canister land on the ground and begin emitting CS gas. He dropped to a knee and donned his gas mask. He then helped control the crowd and reform the police line. Eventually the police line moved forward, causing the remaining protesters to exit the bridge. Officer Warren stated he did not use force during the incident.

## Officer Jenna Geiger

Sergeant Barnes reviewed the witness statement authored by Officer Jenna Geiger. In that statement, Officer Geiger advised she was part of the police line and observed the protesters being verbally abusive towards the police. The NOPD command staff gave commands for the protesters to exit the bridge and they refused. The protesters then pushed through and broke the police line. Gas was then deployed. Officer Geiger then returned to the police line and advanced with the line to push the protesters off the exit ramp. She did not use force and did not observe force used during the incident.

## Officer Jesse Roger

Sergeant Barnes reviewed the witness statement authored by Officer Jesse Roger. In that statement, Officer Roger stated he was part of the police line, attired in riot gear, on the bridge. Protesters advanced aggressively towards the line until they were less than a foot away from the police officers. Many of the protesters then started pushing at the officers' shields and shouting obscenities towards the police. While the officers were holding the line, he heard protesters call for all white people and males to come to the front of the protest. The protesters then rushed the police line together. The line broke and the protesters were rushing past Officer Roger. He he noticed a burning sensation and difficulty breathing and realized tear gas had been deployed.

Officer Roger was trying to put his gas mask on when a protester ran at him and pushed him to the ground causing a bruise to his right knee and a large brush burn to his leg. The

protesters then retreated once the tear gas was deployed. The officers reestablished their line and were able to force the remaining protesters off the exit ramp.

## Officer Russell Gary

Sergeant Barnes reviewed the witness statement authored by Officer Russell Gary. In that statement, Officer Gary stated he was part of the police line, attired in riot gear with a shield and baton. He observed NOPD command staff give protesters multiple commands to exit the bridge and refused. The protesters then pushed against the line of officers, eventually breaking through the line. Shortly after, Officer Gary noticed tear gas was deployed to disperse the crowd. The officer donned his gas mask and noticed the crowd and thinned significantly. The officers then reformed the line and were able to push the protesters back to the exit ramp after more orders to exit the bridge. Officer Gary stated he was not injured during the incident.

## Officer Stephen Roshto

Sergeant Barnes reviewed the witness statement authored by Officer Stephen Roshto. In that statement, Officer Roshto advised he was attired in riot gear providing protest coverage when a group of, "irate, belligerent protesters made the decision to lock arms together and push their way forward against the officers protective protest/riot shields in an attempt to break through the police barrier." The barrier was successfully breached the line and CS gas was deployed in an attempt to control the hostile crowd. Officer Roshto was affected by the gas and had to retreat from the line and seek medical treatment.

## Officer Damien Gaines

Sergeant Barnes reviewed the witness statement authored by Officer Damien Gaines. In that statement, Officer Gaines advised he was in the secondary line of officers with his riot gear on and his shield and baton. Officer Gaines stated the protesters were shouting derogatory and inciteful things at the officers, including using racial slurs. He observed an unknown black female protest leader was given the opportunity to speak to the crowd over the megaphone and stated, "I'm not telling y'all to be peaceful, I'm not telling y'all not to be peaceful, I just want y'all to know they said the further we march across the bridge, the more danger we are in." The crowd of protesters became angrier and the leader later joined them and informed the crowd to let males go to the front while females moved to the rear.

The protesters started moving forward, pushing their way through the officers, and the SOD officers deployed tear gas. After recovering from the effects of the tear gas, Officer Gaines repositioned himself on the front line of officers and saw several protesters leaving.

Officer Gaines stated some protesters were still angry and threw water bottles and the deployed tear gas canisters at the officers.

The officers were given the command to go to the on-guard position and walk/march the remaining protesters off the bridge. He did not observe an officers or protesters injured during the incident.

## Supervisor Witness Statements

### Sergeant Calvin Brazley

Sergeant Barnes reviewed the witness statement authored by Sergeant Calvin Brazley. In that statement, Sergeant Brazley wrote the following, as quoted:

"On Wednesday, June 3, 2020 at 10:00 pm, Sergeant Calvin Brazley, assigned to the Special Operations Division, working a protest under Item Number F-03385-20 on the elevated portion of the Crescent City Connection. Sergeant Brazley arrived on the bridge and observed several marked police units on the bridge. Sergeant Brazley could also hear several protesters as he approached the police line.

Sergeant Brazley then heard Captain Lejon Roberts, via radio, indicating the situation was getting bad. At this time Sergeant Brazley heard, via radio, they were fighting. Sergeant Brazley then observed an NOPD Officer appear to almost go over the edge of the bridge as the crowd was pushing. He also observed several officers attempt to retreat by climbing over police cars that were directly behind them. Gas was then ordered to be deployed to disperse the crowd.

Sergeant Brazley could see from where he was standing, the gas canisters being tossed back at the police. Sergeant Brazley then assisted officers who were feeling the affects of the gas deployment. Sergeant Brazley then heard several request ordering the crowd to exit the bridge.

Sergeant Brazley walked to the back of the police line and could hear the protesters yelling and cursing at officers. But could not see the protesters from where he was standing. He then heard SP0 Dylan Pazon give commands to the police line as they walked forward in an attempt to get protesters to exit the bridge. Sergeant Brazley observed officers walking forward in a line telling protesters to get back."

### Sergeant Victor Gant

Sergeant Barnes reviewed the witness statement authored by Sergeant Victor Gant. In that statement Officer Gant wrote the following, as quoted:

"On Wednesday, June 03, 2020, at or about 10:25 pm, Sergeant Victor Gant Jr, was assigned as the Red Team leader. The Red Team leader duties consisted of: stopping the threat of active shooters, extracting officers in distress from hostile groups, etc. As the Red Team stood fast at the intersection of Henderson Street and Convention center, Assistant Commander Kenny Prepetit alerted Sergeant Gant that distraction devices were needed at their location on top of the Crescent City Connection. Sergeant Gant then relocated to the top portion of the Crescent City Connection to assist. As Sgt. Gant arrived at the location, he observed hostile protesters standing face to face with the Mobile Field Force Team chanting and attempting to agitate the Mobile Field Force Team.

As time went on, I observed the protesters become very irate and began pushing their way through the line trying to push officers off of the interstate. Sergeant Gant immediately started assisting the Mobile Field Force Team by helping keep the integrity of the line by making sure officers keep the line tight. Sgt. Gant then observed a group of people push

pass the line onto the ground behind the Mobile Field Force team. I then assisted other officers by picking up the protesters and detaining them. I held the hands of one unknown female while State Police Officers placed flex cuffs on. I then walked the protester to the back by the police cars. I then handed her over to an unknown officer and returned back to the line.

After several minutes, I observed several protesters trying to get the violent protesters to leave from off the bridge in which they refused. Sgt. Gant then heard the next command to form the line and back the additional protesters off of the interstate."

## Sergeant Robert Barrere

Sergeant Barnes reviewed the witness statement authored by Sergeant Robert Barrere. In that statement, Sergeant Barrere wrote he made his way towards the front line and observed members of the department speaking with a representative from the protest group who was using a loudspeaker to relay messages to the crowd. Minutes later, the crowd began pushing their way through the front line of police officers, who were using their shields to hold the crowd back. Th crowd pushed past the front line and a warning was announced for the crowd to stop. Eventually gas canisters were deployed into the crowd which were thrown back in the area occupied by police. Sergeant Barrere noticed the crowd began to disperse but several protesters continued to attempt to work their way past the frontline officers. A few protesters were detained and those individuals were escorted to nearby police units for transport.

Sergeant Barrere wrote that he was unable to discern what officers were involved in the takedowns of subject because of the overall chaotic atmosphere of the incident and the gear worn by officers. He did not witness any excessive use of force.

## Sergeant Nigel Baddoo

Sergeant Barnes reviewed the statement authored by Sergeant Nigel Baddoo. In that statement, Sergeant Baddoo wrote that he observed a line of officers attired in riot gear with shields and batons. He also observed the crowd was pushing against the officers on the line. He stated he heard an officer using an amplifier to give several orders to disperse and leave the bridge. The crowd did not move and continued to advance towards the officers.

Sergeant Baddoo heard information over the radio that an individual was armed with an assault rifle and that gas was going to be deployed. Sergeant Baddoo then moved further away from the line to avoid inhaling the gas. Sergeant Baddoo heard the order for gas and saw an SOD officer fire several gas canisters into the crowd from a position on top of a vehicle. Several officers were affected by the gas and Sergeant Badoo and Sergeant Pruitt assisted Officer Denzel Millon so he could receive medical attention.

Sergeant Baddoo observed the protesters throwing the canisters of tear gas back at the officers. Sergeant Baddoo returned to the front line when Officer Pazon was giving commands to advance the frontline so everyone can safely exit the bridge. Sergeant Baddoo stated he heard clicking sounds as if someone was trying to clear a weapons malfunction. Sergeant Badoo stated he observed an unknown black female penetrate the front line and be arrested by Louisiana State

Troopers. He continued behind the front line until the officers had gone down the ramp and the crowd had dispersed.

### Sergeant Tyra Pruitt

Sergeant Barnes reviewed the witness statement authored by Sergeant Tyra Pruitt. In that statement, Sergeant Pruitt advised she observed Officer instruct protesters to leave the bridge, but many of the protesters refused. She observed protesters push and shove the police on the front line as the officers attempted to hold their positions and maintain the line.

Because she was not equipped for a gas deployment and she heard over the radio that tear gas would be deployed, she retreated backwards towards the Crescent City Connection Bridge. She then observed two or three canisters of tear gas fly about the crowd with a foggy mist escaping as they descended. She stated someone in the crowd returned the canisters back towards the police. The tear gas took effect on the officers. She then assisted Officer Denzel Millon with seeking EMS that was behind the vehicles on the interstate.

She then returned to assist other officers affected by the gas. Officer Pazon was telling the officers to reform a line. The officers regrouped themselves. The protesters then stood in front of the officers, bladed, as if ready to push through the line. A black female charged at the police line and plummeted through it, where she was arrested by State Troopers. Officer Pazon gave the commands to the line to move forward. Officer Pazon and the line continued forward, driving the protesters off the bridge.

A group of officers went to the bottom of the onramp to make sure it was cleared off. She observed an officer who was bleeding from his fingers and reported the injury to one of the commanding officers.

### Sergeant Justin Almeida

Sergeant Barnes reviewed the witness statement authored by Sergeant Justin Almeida. Sergeant Almeida stated he was behind the police line to provide instruction to officers when protesters pushed through the line. Officer pushed back with shields to try and create distance from the protesters. SOD officers then deployed tear gas into the crowd causing them to retreat from the bridge. The officers then reformed a skirmish line, and the protesters were escorted off the exit ramp. Sergeant Almeida did not use force, but witnessed officers pushing protesters back with their shields and batons. Sergeant Almeida was not able to activate his BWC because he did not have a location on his riot gear to wear it.

### Sergeant Dowal Barrett

Sergeant Barnes reviewed the witness statement authored by Sergeant Dowal Barrett. In that statement, Sergeant Barrett advised he was at the second row of officers when he observed Captain Roberts negotiate with protest leaders. Sergeant Barrett stated it became obvious the situation was intensifying because protesters became more aggressive in their movements and displayed an agitated demeanor.

The protesters advanced towards the front line, scream expletives, then pushed and shoved through the front line of officers. He observed a protester throw a water bottle containing an unknown substance. Sergeant Barrett was then told to don his gas mask in preparation for a gas deployment. Sergeant Barrett went to his vehicle to get his gas mask and noticed the tear gas had been deployed. He observed much of the crowd disperse as they were affected by the tear gas and a smaller group remained. Sergeant Barrett stated he then saw a tear gas canister thrown towards the police line. Sergeant Barret stated he did not observe anyone injured and did not use force during the incident.

## Command Staff Witness Statements

### Captain Lejon Roberts (On-Scene Incident Commander)

Sergeant Barnes reviewed the witness statement authored by First District Captain Lejon Roberts, the on-scene incident commander. In that statement, Captain Roberts wrote the following:

"On Wednesday, June 3, 2020 at about 10:00 pm, a large group of unruly protesters converged on top of the elevated portion of the Crescent City Connection in an effort to cross the bridge. I immediately instructed all of the officers on the elevated portion of the bridge that were donned in riot gear to form a skirmish line to prevent the unruly protesters from traveling any further. The skirmish line was ordered by me in an effort to ensure safety of all officers and civilians on top of the Crescent City Connection and below it, and prevent possible destruction of property.

Once the skirmish line was formed, the unruly protestors came face to face with the officers, and demanded that they move to let them cross the bridge. The officers remained steadfast in holding the skirmish line, and prevented the protesters from going any further. I immediately met with the informal leaders of the protest, and informed them that they would not be able to travel any further on the bridge. I also advised them to turn around and exit on the Magazine Street on ramp.

The informal leaders advised me that they would not leave, and that they were in fact going to cross the bridge. The informal protest leaders continued to advise me that they wanted all of the officers to take a knee, put their riot gear on the ground, and disarm themselves. I informed the group of individuals that I had started a line of communication with, to peacefully exit the bridge, but they refused to comply with my instructions. I continued to negotiate with the informal leaders of the group, and assured them that if they exited the bridge, that they could continue to peacefully protest on the ground.

My efforts to come to a rational consensus with the group never came to fruition. The informal leader of the group became belligerent and agitated, and demanded that the protesters start to push their way through the skirmish line formed by the officers donned in riot gear on top of the bridge, At that time I immediately tried to fortify the secondary skirmish line that had begun to form with additional officers, who were arriving on top of the bridge for support.

While the secondary line was being strengthened with additional support, Captain Lampard ordered everyone on the secondary skirmish line to don their gas masks as a result of the protesters pushing and shoving and trying to break through the initial skirmish line. After several protesters broke through the initial skirmish line, the group became more irate and agitated. Captain Lampard at that time ordered the deployment of gas. I did not have a gas mask, so I moved to the back of the secondary skirmish line and reiterated over the NOPD airwaves that gas was being deployed. I continued to relate all actions that I observed and ordered over the NOPD airwaves to command desk.

I observed gas being deployed in at least two volleys. I then observed many of the protesters leaving the bridge via the Magazine on ramp after being affected by the gas. A few protesters remained on the bridge and refused to leave. At that point, I instructed the skirmish line from a distance, due to the fact that gas was still permeating tl1e area, to reform and start to move forward in an effort to clear the bridge of protesters. I instructed the officers in the armored vehicles to give three verbal warnings on the P.A. system instructing the protesters to leave, or be arrested.

Approximately five protesters refused to adhere to the warnings and were arrested. The rest of the protesters left the bridge, and dispersed in many directions. I immediately met with Chief Thomas after the bridge was cleared, and briefed him on the situation."

## Captain Brian Lampard (Tactical Commander)

Sergeant Barnes reviewed the witness statement authored by Special Operations Division Captain Brian Lampard. In that statement, Captain Lampard wrote the following:

"On Wednesday, June 3, 2020, Captain Bryan Lampard, unit 3500, was assigned to work a protest. As the protest evolved from a stationary incident at Duncan Plaza to a mobile protest, several locations were given via NOPD radio chronicling the crowd's locations. Eventually, the crowd, believed to be approximately 2,000 protesters, made its way onto the Crescent City Connection Bridge.

The incident commander, Captain Lejon Roberts, formed a skirmish line on the bridge with district officers clad in riot gear. A second partial line of officers was behind the initial line and was held in reserve. Captain Roberts called for the assistance of SOD personnel. SOD assets responded and were positioned further behind the second group of district officers. When SOD assets are mobilized to respond to civil unrest, their mission is to reinforce the skirmish line, rescue any officers who are overwhelmed and engulfed by the crowd, remove agitators if and when necessary and to repel any breach or attempted breach of the skirmish line via chemical and impact munitions.

Upon arrival, Captain Lampard immediately observed that the protesters and officers forming the skirmish line were already face to face. Captain Roberts was speaking with several protesters who appeared to be leaders of the group. They appeared to be negotiating a peaceful resolution to the situation which was rapidly deteriorating. Captain Roberts utilized the LRAD (long range acoustic device) to address the protesters and instructed them to leave the bridge several times. Additionally, the leaders of the protest were allowed to utilize the LRAD to address the protesters.

Despite the efforts of both Captain Roberts and protest leaders the protesters became increasingly agitated they began calling for the group to break through the police skirmish line. Believing that the situation was escalating and becoming increasingly dangerous, Captain Lampard instructed Lieutenant Prepetit to have the second line of reserve officers don their gas masks. This was done in order to transition the front line officers giving them an opportunity to don their protective masks.

Unfortunately, the protesters were in such close proximity to the officers on the skirmish line that donning the protective masks while still on the line was not a safe alternative. As the reserve officers were in the process of donning their masks, the protesters began violently pushing and shoving the officers on the skirmish line and breaking through the officers' ranks. Realizing that the situation was becoming increasingly dangerous and that the police line was in danger of being overrun, Captain Lampard gave the order to deploy the grenadier team from SOD. As the grenadier team was approaching the rear of the skirmish line the protesters began breaking through, overrunning the police line. As he observed the line being breached, Captain Lampard gave the order to deploy gas by the command Gas, Gas, Gas. Captain Lampard observed several protesters that broke through the line being detained by NOPD Officers and LSP Troopers.

As the grenadiers deployed the gas, the protestors began to fall back. Captain Lampard observed several gas canisters being thrown back at the officers by protestors. After this first volley, the protestors momentarily disengaged. Shortly after the protestors regrouped and began advancing on the skirmish line once again. As the protestors again attacked the officers on the line, Captain Lampard gave the command to deploy a second volley of gas. After deploying the second volley, the protestors retreated in large part and began to exit the bridge. With a significantly smaller group of protestors remaining on the bridge, the officers on the skirmish line were able to march forward and persuade the remaining protestors to exit."

## Captain Anthony Caprera

Sergeant Barnes reviewed the witness statement authored by Eighth District Captain Anthony Caprera. In that statement, Captain Caprera wrote the following, as quoted:

"On Wednesday, June 3, 2020, Capitan Anthony Caprera was assigned as a supervisor working the planned protest at Duncan Plaza. At the conclusion of the speeches, a large crowd marched in an uptown direction from Duncan Plaza. The protesters eventually walked up the access ramps to the Crescent City Connection Bridge. Captain Lejohn Roberts, Car 100 directed responding officers to utilize the access ramp at Tchoupitoulas and Henderson, in an effort to block the protester's path.

Upon arriving at the top of the CCC Bridge, Captain Caprera observed members of SOD, as well as District Officers assigned to the protest. Captain Caprera was supervising officers from the 8th, 7th District and Mounted Unit. A large crowd of what appeared to be well in excess of 1000 people had gained control of the west bound interstate lanes and marching towards the west back of the river shouting an assortment of obscenities, anti-police and Black Lives Matters slogans.

Captain Roberts instructed the on scene officers to form a "Police Line" across the entire width of the bridge. The human line was supported by parked vehicles approximately 20

yards to the rear. The line officers were attired in Riot Gear and Riot Shields. Captains Caprera, Roberts, Lubrano and Bax were positioned behind the Police line and in front of the police vehicles.

The Tactical Commander, Captain Lampard was providing verbal commands to the line officers as the protesters marched up to the police line. Captain Roberts engaged several protesters in conversation asking they exit the roadway. Roberts allowed the protester to utilize the department PA to address the crowd in hopes they would disburse. This unsuccessful dialog lasted approximately 45 minuets. Clearly, the protesters wanted confrontation and refused additional verbal request by SOD Officers via the PA of the armored vehicle.

Members of the crowd began to shift places with more males stepping to the front of the crowd. A shout from the crowd to step forward was heard as the protesters began to engage to the police line by pushing their bodies into the shields while punching and kicking at the officers and shield as they attempt to break the line.

Due to the overwhelming size of the crowd, the police line was shoved back towards the parked vehicles. At one point protesters were observed on top of least one vehicle (B15003) Captain Caprera stepped up into line as to maintain its integrity. Captain Lampard order the deployment of tear gas, which caused the crowd to begin to retreat from the engagement.

This allowed the officers to collect themselves and reform the line. A large amount of assorted police equipment and riot gear littered the area of engagement. Several officers needed time to clear themselves from the confrontation and effects of the tear gas. At least one marked police vehicle had a smashed windshield (unkown B#)

The vast majority of the crowd retreated down the expressway away from the confrontation., while others threw objects including tear gas canisters at the officers.

At least 100 people remained and again formed up and approached the police line. Again, verbal commands were given to leave the roadway. The group refused., the Police line was ordered to advance on the crowd who again used their bodies and arms to violently shoved back against the riot shields.

At that time several of the more violent crowd members were arrested by "Snatch Teams" who stepped up from immediately to the rear of the police line.

To my knowledge, no protesters were injured although all were medically treated for the exposure to tear gas.

Eventually the remaining crowd was forced down the Magazine Access Ramp to the ground level where they eventually disburse.

Although the mounted officers were requested to assist with the police line, they arrived on scene after the protesters had been forced down the access ramp. Therefore, the Mounted Unit was NOT part of the engagement.

Without any uncertainty, clearly this group of protesters wanted to engage the officers in a physical confrontation. The crowd advanced on the officers and used violence against the police line. Our officers were severely out numbered, and yet held the line together."

## Captain Preston Bax

Sergeant Barnes reviewed the witness statement authored by Sixth District Captain Preston Bax. In that statement, Captain Bax wrote the following, as quoted:

"On Monday, June 3rd, 2020, at approximately 9:00pm, I was following behind a group of protesters at Prytania/Clio streets. I provided updates on the group movements, current locations and behavior. I assisted because of the protest movements in the Sixth District.

At approximately 9:10 pm, a transmission was relayed over the radio of any available unit to proceed to the elevated portion of the Crescent City Connection bridge to stop protesters from crossing. I immediately relocated to the top of the CCC where I meet other units who were walking on the downslope of the CCC to cut off advancing protesters.

I assisted with setting the skirmish line in preparation of the oncoming protesters from one end of the concrete pillar to the other. Once the line was set, Captain Lejon Roberts began to speak with the group leaders in an attempt to talk the protesters back down to ground level. After several minutes; Captain Roberts was unsuccessful in reaching a mutual agreement as the protesters leaders fell back into formation with the group. The group became more forceful and began to push through the skirmish line. Several members of the group began to snatch away officers shields and push officers to the ground as we were outnumbered 20:1.

SOD Commander, Captain Bryan Lampard, ordered for the deployment of Tri-Chamber gas as a deterrent to the protesters increasingly violent movements. I remained behind the skirmish line and directed officers to fill gaps in the formation. Several officers had to be removed from the skirmish line due to them being pushed down and stepped on while others were overcome by the gas deployment. After the deployment of gas, about 3/4 of the group dispersed immediately. The remaining officers were able to walk the remaining protesters back down the on-ramp from which they entered the bridge without further incident.

I did not encounter any protester where I had to physically restrain or take down during this incident. I am not assigned a BWC. I did not witness any misconduct or excessive use of force from any officer on the skirmish line or during entire incident. My vehicle is not equipped with an ICC."

## Captain Ryan Lubrano

Sergeant Barnes reviewed the witness statement of Third District Captain Ryan Lubrano. In that statement, Captain Lubrano wrote the following:

"On Wednesday, June 3, 2020, I was assigned to protest coverage in the 8th District along with Lieutenant Andrew Palumbo. Lieutenant Palumbo and I were supervising Sergeants and Officers from the Fourth, Fifth and Sixth District. The protest which started for 6pm that day quickly grew to about three thousand participants. After a couple of hours the

protesters began to march from Duncan Plaza and into the Uptown area of the Sixth District. Eventually the protesters walked towards U.S. 90 and the entrance ramp on the Pontchartrain Expressway near Camp Street. Lieutenant Palumbo and I along with the Fourth and Fifth District contingents relocated to the top of the bridge from the Tchoupitoulas Entrance along with other Officers that began to arrive. A skirmish line was set up before the Tchoupitoulas exit and the crowd of protesters approached some making it through the line. Eventually a stronger line was formed as more officers arrived and the crowd continued to chant and scream at the officers.

Captain Lejon Roberts eventually spoke with protest organizers for awhile and allowed them to talk to the protesters. One of the organizers who seemed to antagonize the crowd was eventually told to go back on the other side of the line. The crowd then began to push the Officers back and the line was broken on the right side. Gas masks were called for and then a call for gas. SOD released gas canisters into the crowd. As I stood behind the front and second line of the Officers I could see the gas plume rising and flowing slowly to the right because of the wind conditions. A short time later protesters threw a gas canister back over the line at the officers and another gas canister over the side of the expressway. At this time, I elected to move further back (behind the armored vehicle) due to not having a gas mask. I saw some officers that were exposed and they moved from the line to where EMS was staged (further up the bridge). The protesters who broke through the line were arrested by snatch teams set up behind the line.

Some protesters refused to leave and were given verbal commands over the PA system in the armored vehicle. For the remaining protesters refusing to leave the line was used to slowly direct them back down the Camp Street entrance. Once this was accomplished we cleared portions of the law enforcement traffic at the top of the bridge. This allowed us to pull the traffic that was stuck on the entrance ramp when the crowd entered and took it over."

## Lieutenant Andrew Palumbo

Sergeant Barnes reviewed the witness statement authored by Fifth District Assistant Commander, Lieutenant Andrew Palumbo. In that statement, Lieutenant Palumbo wrote the following:

"On Wednesday, June 6, 2020, Lieutenant Andrew Palumbo, unit 1500, assigned to the Fifth District Investigations Unit, was witness to a use of force at Tchoupitoulas St. and US 90 West. Lt. Palumbo reported to the scheduled Black Lives Matter protest roll call at 5:00pm on the same date in front of Gate A and the Superdome. Captain Lejon Roberts requested for Lt. Palumbo and Captain Ryan Lubrano to oversee a team of officers from the 4th, 5th and 6th Districts during the protest. Our team was assigned to the foot of Canal St. near Saks Fifth Avenue.

At approximately 6:00pm, the protestors began to meet up at Duncan Plaza and then began to march some time after. SOD Traffic officers were escorting the protestors and keeping everyone advised of their locations. The protestors reached St. Charles Ave. and Poydras St. and turned right in an uptown direction toward the 6th District. The protestors continued on St. Charles Ave. and crossed under US 90 and stopped at Erato St. Once it was determined that the protestors would not be coming to Canal St. area, Lt. Palumbo directed

the 4th and 5th District officers to Calliope St. and Camp St. and the 6th District officers to Calliope St. and Carondelet St.

The protestors eventually began to make their way to the US90 on ramp near Camp St. in an attempt to go up on the elevated expressway. At this time, Lt. Palumbo directed the 6th District officers to assist the Louisiana State Police and Motorist Assistance Patrol (MAP Units) in blocking US90 West bound. Captain Roberts instructed Captain Lubrano and Lt. Palumbo to take their team to the elevated expressway and form a line near the Tchoupitoulas St. exit to not allow the protestors to go any further than that point. Captain Lubrano and Lt. Palumbo led the 4th and 5th District officers onto elevated US90 West via the on ramp at Tchoupitoulas St. and Henderson St. Once on the expressway, Lt. Palumbo directed the officers to form a line and not allow any protestors past that point. This was done and the protestors reached our location and stopped directly face to face with the line of officers. After a few minutes other units arrived to assist, 1st and 3rd District officers joined to the skirmish line officers and Special Operations Division officers were set up behind the line to assist if needed.

There was a dialogue between representatives with the protest and NOPD command staff on the expressway. The protesters wanted to continue across the bridge and NOPD advised they could stay on the expressway for a while to protest but would have to exit the elevated expressway at the same ramp they entered. Some protestors agreed but one male subject disagreed and became inciting the crowd to push through the officers. The male called for all protestors to take one step forward, at which time Captain Bryan Lampard called the front line officers to the "On Guard" position. The protestors began pushing and shoving to get through the line. The officers were able to maintain the line but some protestors made it through where officers on the secondary line stopped them and walked the back across the line. The pushing began to escalate at which time Lt. Palumbo heard the call for officers to don their gas masks. At this time, Lt. Palumbo walked further behind the front line because he was not equipped with a gas mask. Lt. Palumbo then heard "gas, gas, gas" and saw gas canisters being deployed into the crowd followed by a plume of gas among the protestors and front line officers.

Soon after Lt. Palumbo observed a gas canister thrown back at the officers as well as a canister being thrown over the side of the elevated expressway. Lt. Palumbo's vantage of this incident was behind the front line, secondary line and SOD Officers deploying the gas. All Officers were in riot gear with gas masks, helmets, shields and batons. Lt. Palumbo began to see some officers come off of the line to clear their masks and/or get medical attention from EMS due to the effects of the gas. Lt. Palumbo assisted two officers in walking up the bridge to the awaiting EMS units.

The protestors eventually began to disperse walking down the bridge toward the Tchoupitoulas on ramp. There were still protestors at the front line trying to push forward. SOD Officers utilized the PA system on the armored vehicle to order the remaining protestors off of the expressway. This command was given numerous times however some protestors still did not follow the order and remained on the expressway. The front line officers were again called to the "On Guard" position then directed to move forward in an effort to direct the remaining protestors off of the expressway. The front line officers began to move forward giving the command "Back" repeatedly to the protestors. As the line was moving forward, Lt. Palumbo observed five subjects that continued to push through the line. These subjects were taken into custody by the SOD Snatch Teams and eventually arrested and booked into lock up. The front line officers pushed the remaining protestors

off of the elevated expressway at the on ramp near Camp St. Once all protestors were cleared, the officers removed their vehicles from the expressway and traffic was reopened."

## End of Force Statements

## Body Worn Camera Review

Sergeant Barnes and members of the Force Investigation Team reviewed the Body Worn Camera (BWC) footage captured by the involved officers. Investigators prepared the following summaries after reviewing the footage:

## BWC of Sergeant Damond Harris

Sergeant Barnes observed Sergeant Damond Harris's BWC video began at the timestamp 03:17:21, after the police skirmish line had been breached and Officer Devin Joseph was using his launcher towards protesters/rioters with barriers or obstructions between him and those individuals. Damond Harris instructed Devin Joseph to "Hit'em" and attempted to help re-establish the police skirmish line. Sergeant Harris then assisted guiding the grenadier team back to safety behind the police skirmish line. Sergeant Harris then ordered the line to back up to where there is a fence above the side walls of the bridge, presumably for safety reasons.

The following events were then observed at the listed timestamps on the video:

03:19:05 - Officer Travis Johnson is told to go get more gas canisters.

03:19:15 - Lieutenant Kenny Prepetit calls for Officer Michael Pierce with extended CS rounds (Extended CS gas impact rounds).

03:19:16 - Captain Lampard and Captain Roberts are seen observing the incident from nearby, behind the line.

03:20:07 - More gas is deployed over the police line, between the rioters and the police after the

03:20:14 - A canister of gas is thrown from a distance by protesters back to the police line, landing just behind the officers. An officer picks it up and tosses I back over the line towards protesters. Sergeant Harris and several officers are heard on the video saying, "Throw it back!"

03:20:20 - Officer Devin Joseph climbs on top of the hood of a police car to an elevated position above the police line. Captain Lampard, standing near the rear of the vehicle, says, "get up there Devin, you're good."

03:20:28 - Sergeant Harris says, "Shoot, Shoot!" to Officer Joseph. Officer Joseph can be heard firing the 40mm launcher.

03:21:00 - Sergeant Harris hands Officer Jason Jorgenson a gas canister.

03:21:20 - Sergeant Harris, looking to reload Officer Devin Joseph, asks for the CS rounds. Sergeant Harris removes the rounds from a pack carried by Officer Johnson and verifies what they are before providing them to Officer Joseph.

03:21:40 - Lieutenant Prepetit calls for "two 25's," meaning two distractionary devices commonly referred to as "flashbangs."

03:22:33 - Officer Michael Pierce comes to Sergeant Harris to reload, asking for CS gas. Sergeant Harris informs him there is no more CS and looks through the backpack. Sergeant Harris then says, "We have sting balls. You want sting balls?" Officer Pierce responds, "Alright, give me that." Sergeant Harris then loads five (5) stinger ball rounds directly into Officer Pierce's launcher. Sergeant Harris then tells Officer Pierce to position himself between the officers on the skirmish line.

03:23:09 - Lieutenant Prepetit asks Sergeant Harris to have Stinger Grenades ready. Sergeant Harris informs Lieutenant Prepetit that Michael Pierce has Stinger rounds loaded into the launcher and explains to Lieutenant Prepetit that they are the same thing as the grenades but shot from a launcher.

03:23:50 – As Sergeant Harris briefs Officers Jorgenson and Johnson on the plan for the next deployment, Lieutenant Prepetit tells Sergeant Harris to wait for his command to deploy flashbangs on either side of the bridge and when the flashbangs detonate, deploy the stinger grenades into the middle.

03:25:20 - Sergeant Harris tells Captain Lampard they still have another gas canister and Captain Lampard tells Sergeant Harris to deploy the gas if we have it saying, "Hit them again, Hit them again. Throw it in the middle of the crowd."

03:25:26 - Sergeant Harris instructs Officer Jorgenson on how to deploy the gas so it begins to disperse as it is deployed. Officer Jorgenson then deploys gas over the police skirmish line. (this is the last canister of gas deployed)

03:25:44 - the 40mm launcher can be heard firing as the deployed gas canister is seen being thrown by an unknown protester.

03:26:22 - Sergeant Harris tells Officer Pierce to watch the person in front.

03:26:28 - Sergeant Harris tells Officer Pierce, "Hit them antagonizers speed"

03:26:33 - Officer Pierce appears to fire the launcher again towards an unknown target in the crowd.

03:27:32 - The grenadier team is waiting on the flashbangs to deploy the stinger grenades.

03:32:50 - the protesters have come face to face with the skirmish line again. Protesters could be heard yelling to fall back, saying, "There's not enough of us."

03:33:40 - Officer Pierce tells Sergeant Harris he is out of gas and only has stinger rounds.

03:36:20 - Officer Joseph tells Sergeant Harris he has five (5) Extended CS and Stinger rounds

03:37:00 - A protester is heard asking where is the Captain who can make the call and asks the officers to walk with them over the bridge.

03:37:19 – Officer Travis Johnson tells Sergeant Harris he can't find any more gas besides what he gave him, and they only have stingers.

03:37:43 - An unknown protester is heard saying they want to get off peacefully with the police and asks officers to join them. The unknown protester asks, "How do we get off?"

03:39:25 – Sergeant Harris verifies Officers Pierce and Joseph have the 40mm launchers loaded.

03:41:37 – Sergeant Travis Ward informs Sergeant Harris, pointing at a specific agitator in the crowd, that if she comes closer to the line they are going to snatch her.

03:45:15 - The officers are seen in a huddle near the rear of the police vehicles. Lieutenant Prepetit and Officers Joseph, Pazon, Johnson, Jorgenson, and Pierce appear to be in the huddle.

03:46:15 - Lieutenant Prepetit discusses the plan to deploy again if they need to.

03:46:45 – Lieutenant Prepetit verifies Officer Jorgenson's BWC is not recording. It appears Lieutenant Prepetit is verifying the officers are not recording the huddle with their BWCs. Lieutenant Prepetit says, "Leave the switch on. Just don't hit, you're not recording right now." Sergeant Harris asks, "So you want me to turn it off?" Lieutenant Prepetit responded, "No, I don't want you to turn it off, we good."

03:46:57 – Captain Lampard walks towards Lieutenant Prepetit and asks, "how much more gas we got?" Lieutenant Prepetit informs him the equipment truck is coming.

03:47:05 – Officer Jorgenson and Sergeant Harris tell him they have a couple of cans and Captain Lampard says, "That'll work for the first volley, we're good." Lieutenant Prepetit then tells Captain Lampard his plan for a third volley of gas (the two flashbangs and stinger grenades).

03:47:36 - Officer Joseph tells Lieutenant Prepetit he is going to use Stinger rounds against people picking up the gas canisters and Officer Pierce is going into the turret of the armored vehicle (Bear).

03:48:10 - Sergeant Harris says the CS gas is not working.

03:49:40 - Officer Joseph tells Sergeant Harris they need to push the protesters back with the police line and snatch the agitators. Officer Joseph says that gas won't affect this. Sergeant Harris tells Officer Joseph he understands but to let the rank make that decision.

03:51:21 – Sergeant Ward asks Sergeant Harris if the district knew they were going to deploy gas, because they didn't have their masks on.


03:52:43 – Officer Joseph and Sergeant Harris are discussing deployment plan near line. Sergeant Victor Gant pulls them back and tells them to discuss the plans behind the cars because they are loud.  The officers then step back behind the vehicles to discuss the plan.

03:53:34 – Warnings to exit the bridge can be heard over the loudspeaker.  An unknown protester states, "We'll exit when you put your guns down."

03:54:10 – Captain Roberts can be heard on the radio advising they gave three warnings, they will wait a few minutes, then give three more warnings, then push.

03:55:10 - The Officers, after receiving the command to, begin to push the protesters back on the bridge, snatching the protesters that refused to move.

03:56:10 – At least one person is seen snatched through the line by Louisiana State Troopers.

03:56:37 – Protesters are seen locking arms in front of the line and refusing to move.

03:57:00 – At least one person is seen snatched through the line by NOPD officers.

03:58:50 – A final warning is heard over the loudspeaker asking protesters to please leave the bridge.  A protester responds telling officers to put their shields down and they will leave. Another protester is heard saying, "Just arrest us."

03:59:10 – It appears another individual is snatched through the line.  It's unclear if done by NOPD or LSP.

03:59:45 – Another warning to leave the bridge is heard over the loudspeaker.  Officer Pazon can be seen yelling warnings and calling the police line commands.

04:02:01 – Another warning to exit the bridge can be heard over the loudspeaker. Officer Pazon calls for NOPD officers to listen and advises they are going to march forward, just marching, not pushing forward with shields.  They continued to march forward until they protesters all begin moving down the onramp.

04:16:15 – Travis Johnson asks if they're done with the cameras.  Sergeant Harris says no and instructs them to leave the cameras on.

04:17:20 – Officer Joseph says he doesn't know where Mike was and Sergeant Harris responds, "Mike was up front.  Mike was stingin' em.  That's what I'm saying, them CS rounds wasn't working."  Officer Joseph stated, "I wanted to go to the stingers, 'cause it'll hit more people."

04:17:21 – Officer Johnson then reminds them they are still recording.

04:17:25 – Sergeant Harris then tells his officers they can turn their cameras off and turns off his own.

Sergeant Barnes reviewed the footage in its' entirety and did not observe any other pertinent information on the recording.

## BWC of Officer Michael Pierce

Sergeant Barnes reviewed the BWC footage of Officer Michael Pierce captured during the incident. Sergeant Barnes discovered Officer Pierce had four (4) videos associated with the incident. Sergeant Barnes reviewed the videos and noted the following information, at the listed times:

**Officer Pierce Video 1:**

03:19:14 – The video begins with Officer Pierce standing well behind the police skirmish line, and the line of vehicles, as the skirmish line is being reformed. Sergeant Barnes noted the camera appears to be mounted a chest height on the front of Officer Pierce but is partially obstructed by what appears to be him holding the launcher across the front of his body. The video then ends at 03:19:32, without Officer Pierce appearing to intentionally turn it off.

**Officer Pierce Video 2:**

03:19:32 – Officer Pierce's second video begins as the same timestamp the first video ended.

03:59:56 – Officer Pierce is seen removing CS extended rounds from Officer Johnson's backpack. Officer Johnson then tells Officer Pierce he needs CS gas canisters, not 40mm rounds. Officer Pierce moved himself and Officer Johnson behind the vehicles to access the backpack away from the front line of officers.

03:20:34 – Someone is heard calling for the grenadiers, screaming, "Grenadiers!" as Officer Pierce continues to search through Officer Johnson's backpack. Officer Pierce if having issues trying to open the backpack to get to the gas.

03:20:52 – Officer Jorgenson arrives at Officer Pierce's location asking for more gas canisters. Officer Jorgenson then helps open Officer Johnson's backpack.

03:21:11 – Officer Pierce moves back to the front line, where Officer Devin Joseph can be seen standing behind the officers holding his launcher.

03:21:23 – Officer Pierce fires his launcher over the police line after verifying with Officer Joseph that he would take the shot. The call for "Gas! Gas! Gas!" is heard in the background.

03:21:44 – Two gas canisters are deployed over the police line, towards the protesters.

03:21:51 – One of the canisters is see coming back through the air from the protesters to the police line.  Officer Pierce fires his launcher again.

03:22:09 – Lieutenant Prepetit tells Officer Pierce if he has to, open the line and shoot direct impact.  Officer Pierce states he doesn't have direct impact, Devin has the direct impact rounds (marking rounds).  Lieutenant Prepetit then clarifies with Officer Pierce that he has CS gas in his launcher.

03:22:30 – Officer Pierce steps between two officers on the police line and fires a round towards the advancing protesters.

03:22:46 – Officers can be heard calling out to Officer Pierce that a subject in a white jacket/lab coat who has a green laser.  An unknown officer points out the subject to Officer Pierce and says she has it in her left hand.

03:23:20 – Officer Pierce's camera is obstructed as Lieutenant Prepetit is heard over the radio requesting two (2) flashbangs (25s).  Officer Pierce's launcher is heard cycling and firing five (5) times.

03:23:55 – Officer Pierce opens his launcher and leaves away from the police line, telling Officer Johnson he is out of rounds.  Officer Pierce and Officer Johnson appear to unload the spent casings from the launcher.

03:24:14 – Officer Pierce tells Sergeant Harris to give him fie (5) extended CS rounds.  Sergeant Harris tells Officer Pierce they have no more CS.  Sergeant Harris then asks if he wants to load "Sting-balls." Officer Pierce tells him yes and Sergeant Harris loads the stinger rounds into the launcher and tells Officer Pierce to make sure he steps in between the officers.  Officer Pierce then returns to the police line and levels the launcher towards the crowd, between two officers.

03:26:50 – Someone is heard saying, "Gas fellas, Gas."  Just as a protester with a gas mask is seen walking past Officer Pierce's camera.  The call, "Gas! Gas! Gas!" is then given.

03:27:18 – A gas canister is heard being deployed and a small plume of smoke is seen on Officer Pierce's BWC, which is partially obstructed.

03:27:23 – Officer Pierce's launcher is heard being fired seconds after the gas canister is deployed as another officer is heard saying, "Watch him, watch him, watch him."

03:27:49 – Officer Pierce fires his launcher again, on the left side of the crowd, as an officer is heard saying, "who threw that?"  The crowd reacts to the shot as if a stinger round was fired (multiple people react as if the shot was spread).

03:28:03 – Sergeant Harris tells Officer Pierce to watch an individual at the front and tells him to hit the antagonizers.

3:28:08 – Officer Pierce fires again and the crowd reacts as if it was a stinger round

3:28:20 – Officer Pierce appears to fire again in the direction of a protester marching towards the line with a police shield clearly marked with marking round paint. The crowd barely reacts, and a protester can be heard angrily yelling, "what the fuck?!" at the officers.

03:30:40 – Officers point out an individual with green shorts on who appears to be holding an unknown liquid between their legs.

03:31:10 – Deputy Chief John Thomas is heard on the radio saying a subject with a rifle is on the onramp and tells the units to take cover.

For the next several minutes, officers can be heard being yelled at by protesters as the protesters arrive at the police line.

03:34:30 – A protester's voice can be heard screaming for the protesters to fall back saying, "There aren't enough of us." The protesters then start calling to regroup.

For the next several minutes Officer Pierce stands at the police line as protesters continue to yell at and verbally antagonize the officers.

03:40:55 – Sergeant Harris asks Officer Pierce if he is full, Officer Pierce responds that he is.

03:43:00 – Officer Pierce's BWC has become obstructed, but he appears to leave away from the police line (as the sound fades some) and Officer Pazon can be heard asking who hand-deployed gas. An officer responded, "Him and Jorgenson." Officer Pazon then tells the officer to call Jorgenson over. An officer asks Officer Pazon if he wants him to turn off his BWC. Officer Pazon says, "No, you're good right now, we're just going to talk this through."

03:43:35 – Officer Pazon begins discussing what the grenadier team is going to have to do before telling the officers they can turn off their cameras at 03:43:45.

The video ends at 03:43:45.

**Officer Pierce Video 3:**

The footage begins at 03:58:29 with the camera obstructed.

03:58:40 – Officer Pierce lifts his 40mm launcher and the camera footage revealed he is standing in the turret of the Lenco Bear armored vehicle, several yards behind the police line looking over the scene. A protester's strobe light can be seen shining directly at Officer Pierce.

The footage continues from this vantage point, with no interactions, until 04:00:42 when Officer Pierce calls for "Vic" (possibly Sergeant Victor Gant) and turns his camera off at 04:00:45.

**Officer Pierce Video 4:**

The fourth video of Officer Pierce begins at 04:19:55 as Officer Pierce rides inside of the armored vehicle. Officer Pierce, in the back of the armored vehicle is moving and a loud banging noise is heard when the driver of the vehicle asks him if someone's back there. Officer Pierce says, "That's me, That's me." The vehicle sits on the bridge until 04:20:58 when Officer Pierce can be heard sighing loudly and turns his BWC off.

Sergeant Barnes reviewed the entirety of the footage captured by Officer Pierce's BWC and did not observe any other information pertinent to the investigation on the recordings.

### BWC of Officer Devin Joseph

Sergeant Barnes reviewed the BWC footage of captured by Officer Devin Joseph. Sergeant Barnes observed Officer Joseph had two (2) videos associated with the incident. Sergeant Barnes reviewed the videos and observed the following information at the listed times:

**Officer Joseph Video 1:**

The first video began at 03:35:58 with Officer Josephs camera pointing at the ground from above his shoulder area above the sidearm on his right side.

03:36:18 – Someone asks Officer Joseph how many he needs. Officer Joseph responded saying he got five (5) of the extended CS and he has 60mm rubber stingers.

Throughout the video, protesters can be heard pleading with and loudly antagonizing police officers.

03:39:32 – Sergeant Harris asks Officer Joseph if he is full. Officer Joseph responds that he is good.

03:41:10 – Officer Joseph appears to walk to where the team meets with Officer Dylen Pazon, behind the vehicles.

03:41:20 – Officer Pazon asked who hand-deployed. Officer Joseph responded, "Just him and Jorgenson huh?" Officer Pazon then says, "Call Jorgenson." An officer asks Officer Pazon if he wants him to turn off his BWC. Officer Pazon says, "No, you're good right now, we're just going to talk this through." An officer says he is going to go get his helmet and Officer Pazon tells him he will go get his helmet.

03:41:48 – Officer Pazon begins to say, "Look, the next time we deploy…" Officer Joseph then says, "They ain't deploy enough." Officer Pazon responds, "I know." Officer Pazon begins talking about what they will have to do for the next deployment when an officer grunts, which may have been an indication they are still recording. Officer Pazon then tells the officers "It's fine, you can go off."

C86

Officer Joseph's camera then turns off at 03:42:07 on the timestamp.

**Officer Joseph Video 2:**

The second video begins at 03:51:36 on the timestamp. The camera is obstructed as the footage begins.

03:52:15 – Officer Joseph is telling another officer that he needs to know where they are deploying so he can cover that. Officer Joseph clarifies that he needs to know where they are deploying the gas, so he can cover them picking it up. An officer informs him how they are going to deploy it. Officer Joseph explains again that he needs to know where they are deploying the gas. The officer informs him they are deploying flashbangs (25s) on either side and then deploying gas.

While that conversation is happening, at 03:53:32 a voice can be heard over the loudspeaker in the background saying, "Protesters, this is your final warning to exit the bridge." At 03:53:45 a protester responds, "We'll exit when you put your guns down."

03:54:16 – As Captain Roberts explains over the radio that he gave three warning and will give more then start advancing at the remaining protesters, Officer Joseph is heard saying, "You need to snatch one." The officers are heard discussing and describing who the agitators are.

03:55:02 – The "on guard" position is called for the line. Then the command to move is given. Officer Joseph's BWC is still obstructed. The line stops momentarily and then continues forward as the officers can be heard moving their shields and yelling, "back!"

03:55:38 – Officer Joseph is heard saying, "Somebody snatch them!"

03:55:48 – A call to hold the line and standby is heard.

03:56:35 – "on guard" position is called again, and the line is given the command to move forward.

03:58:10 – The line calls for people to be let through, as Officer Joseph says to wait for the snatch team to snatch them. The line halts and Officer Pazon can be heard saying, "This is your final warning, please leave the bridge. Please leave the bridge." Officer Pazon then informs officer he needs a snatch. He then calls the line to "on guard" again and moves it forward.

03:59:40 – Officers are heard discussing a group of protesters that should be apprehended. Officer Pazon then asks a snatch team if they are good where they are. Someone responds yes.

04:00:35 – The line is called to halt and standby.

04:01:00 – Officer Joseph asks if they are going to go through the line and snatch people, and says he is going to go with them with the launcher.

04:02:17 – Officer Pazon calls for the line to just march, calls them to attention, and calls for a forward march.

04:05:30 – Officer Joseph tells Officer Pazon he needs to slant the line in order to guide people off of onramp.

04:05:36 – Officer Joseph's BWC falls again, filming the ground at his right side from near his shoulder.

04:06:36 – Someone calls for the line to standby and regroup.   The command to march is given again.

04:11:35 – Officer Joseph is informed the officers wanted him where he is in case they get ambushed as they move down the onramp.

04:13:30 – Officer Joseph gets onto the armored vehicle as it continues on the bridge.  An officer is heard over the PA system telling protesters to exit the bridge.

04:05:30 – Officer Joseph gets off the armored vehicle and walks on the bridge.  The officers are heard taking their gas masks off shortly after as they walk.

04:17:10 – Officer Joseph says he doesn't know where Mike was and Sergeant Harris responds, "Mike was up front.  Mike was stingin' em.  That's what I'm saying, Them CS rounds wasn't working."  Officer Joseph stated, "I wanted to go to the stingers, 'cause it'll hit more people."

Sergeant Harris then instructed everyone to turn their BWCs off at 04:17:26. Officer Joseph's camera shuts off at 04:17:32.

Sergeant Barnes reviewed the entirety of the footage captured by Officer Joseph's BWC and did not observe any other information pertinent to the investigation on the recordings.

### BWC of Officer Travis Johnson

Sergeant Barnes reviewed the BWC footage captured by Officer Travis Johnson and learned Officer Johnson's BWC had three (3) separate videos.  Sergeant Barnes reviewed those videos and observed the following information, captured at the listed timestamps:

**Officer Johnson video 1:**

The video begins at 03:20:40 with Officer Johnson standing near the front of a police vehicle, behind the skirmish line.  Sergeant Barnes noted the footage started after the initial deployment of gas, after the initial deployment of the second round of canisters, and after the police line had been reformed.

03:20:50 – A launcher can be heard cycling and firing three (3) shots in the video, just before Sergeant Harris is heard saying, "What you want?" and Officer Joseph is heard responding, "You

got CS?" Officer Johnson, at the side of the front of the vehicle stands with his back to Sergeant Harris, making his backpack available.

03:21:35 – Sergeant Travis Ward is seen speaking with Captain Lampard briefly as Captain Lampard mentions something barely audible about flashbangs. Sergeant Ward then turns towards the gas team and says, "Gimme two 25's up. I need two 25s."

03:21:40 – Captain Lampard tells Officer Joseph, "Keep moving buddy. Pepper'em"

03:21:45 to 03:22:10 – Five (5) more shots from the 40mm launcher are heard. Sergeant Harris tells Officer Joseph he's going to need more ammo. Officer Johnson then says, "That's all I got right now, waiting for Sarge." Sergeant Harris then states, "I'm giving it to him, go ahead."

Officer Pierce then walks towards Officer Johnson and opens his launcher.

03:22:21 – Officer Johnson assists Officer Pierce by taking the spent casings out of his launcher. Officer Pierce is seen loading a blue-tipped round into his launcher, consistent with an extended CS gas round.

03:22:58 – An officer approaches Officer Joseph and alerts him to a subject with a white lab coat shining a green laser. Officer Johnson then opens the door to a nearby police vehicle and discards what appears to be the spent 40mm casings inside of the vehicle.

03:23:15 – Officers Joseph and Johnson request a flashlight from the other officers to point out the subject with the laser. As Officer Johnson hands an officer the flashlight, he says, "Light her up."

03:23:40 – Sergeant Harris asks, "Where's Jason at?" Officer Johnson then calls Officer Jorgenson over to him. Sergeant Harris asks Officer Jorgenson how many more gas canisters he has. Officer Jorgenson informs him he only has the one, holding it up. Sergeant Harris then hands Officer Jorgenson a Stinger Grenade and begins instructing him on how to deploy it.

At that moment, Lieutenant Prepetit steps next to Officer Jorgenson and Sergeant Harris, holding his hand up, and says, "Time out. I'll give you the command to deploy. I'm gonna deploy to 25s to the corners, when those 25s go off, deploy the stingers…" Officer Johnson then turns his attention to Officer Joseph, who is asking where Officer Pierce is. Sergeant Harris points out Officer Pierce at the line saying, "Mike's right there with the stingers."

03:24:44 – Officer Johnson tells Sergeant Harris he doesn't have anything and asks, "What you want me to use?"

03:24:54 – Lieutenant Bush looks at Officer Joseph and someone says, "Just back them up."

03:25:10 – Lieutenant Bush is heard saying, "Gas fellas, Gas." Sergeant Harris then points to Captain Lampard and asks, "You want gas?" Captain Lampard responds, "You got gas? . . . Right in the middle of the crowd."

03:25:35 – Officer Jorgenson underhand lobs a canister of gas over the police line into the space between the officers and the protesters.

03:25:41 – The officers on the front line directly in front of Officer Johnson flinch and duck as the canister of gas is forcefully thrown towards the side of the bridge by a protester.  At the same time, the 40mm launcher is heard firing a single time.

03:26:06 – An unknown object is seen flying through the air from the protesters towards the police line as Officer Johnson yells, "Incoming!"  A 40mm launcher is heard firing a single time as the object lands at the police line and an officer is heard asking, "Who threw that?"

03:26:30 – A 40mm launcher is heard firing a single time.

03:26:41 – A 40mm launcher is heard firing a single time.

03:27:10 – Sergeant Harris approaches Officer Johnson and tells him to get some gas canisters from him.   Officer Johnson asks where they are.

03:27:26 – Officer Joseph asks Sergeant Harris, "What's up with the gas? Why they ain't throwing the stinger grenades?"  Sergeant Harris informs him they are waiting to deploy the 25s.  Officer Joseph then tells Lieutenant Prepetit the crowd is too close for the stinger grenades.

03:27:43 – Officer Johnson leaves from the front line to retrieve more munitions from the equipment truck at the request of Sergeant Harris.

03:28:38 – Officer Johnson arrives at the equipment truck and calls Officer Charles Stamps to help him unlock the back of the truck.  Officer Johnson tells Officer Stamps he is retrieving more CS gas and Officer Stamps responds in a surprised tone, "More?"

03:29:09 – Just prior to opening the storage area of the equipment truck, Officer Stamps asks Officer Johnson if he has a camera on.  Officer Johnson says he'll turn it off and turns away from the truck as he turns his camera off at 03:29:14.

**Officer Johnson video 2:**

The video begins at 03:35:59 as Officer Johnson is walking back towards the police line from the equipment truck.

03:36:15 – Officer Johnson arrives at the police line and protesters can be observed standing just feet away from Officers.  As Officer Johnson arrives, Officer Joseph can be heard telling Sergeant Harris he has five (5) extended CS rounds and a stinger left.  Officer Johnson advises them that he has gas in the "big bag."  Sergeant Harris asks what else he got, and Officer Johnson informs him he got rubber stingers.

03:36:55 – Officer Johnson, Officer Jorgenson, and Sergeant Harris step back from the line towards the vehicles as Sergeant Harris removes a gas canister from Officer Johnson's backpack. Sergeant Harris hands a gas tri-chamber gas canister to Officer Jorgenson, who is already holding a rubber ball stinger grenade. Sergeant Harris tells Officer Jorgenson the canister is another gas, in case they need gas. Sergeant Harris is seen holding a canister in his right hand as well.

03:37:10 – Officer Johnson tells Sergeant Harris he has marking rounds and stingers in the pouches, but he can't find anymore gas. Sergeant Harris responds, "Alright, it is what it is," and hands Officer Johnson a stinger grenade. Sergeant Harris then explains to Officer Johnson they are going to deploy flashbangs on either side of the bridge and then throw the stinger grenades into the crowd to push the back.

03:38:00 – Officer Jorgenson asks Sergeant Harris where the other gas canister is. Sergeant Harris informs him he has two in his gas mask pouch.

For the next few minutes, Officer Johnson and the other members of the gas team standby behind the police line.

03:41:15 – The gas deployment team is brought behind the vehicles by Officer Dylen Pazon. Officer Pazon asks who hand deployed and Officer Joseph says Officers Johnson and Officer Jorgenson, responding, "Him and Jorgenson huh?" Officer Pazon then instructs them to call Jorgenson. Officer Johnson asks, "you need me to go off?" (meaning turn off his BWC). Officer Pazon says, "No, you're good right now, we're just going to talk this through." Officer Pierce says he is going to go get his helmet and Officer Pazon tells him he will go get his helmet. The officers discuss getting their helmets before Officer Pazon instructs Officer Johnson to get Jorgenson.

03:41:46 – Officer Johnson returns to the line and calls Officer Jorgenson to join the team behind the vehicles. As Officer Johnson returns to the group, Lieutenant Prepetit is seen standing next to Officer Pazon. Officer Pazon states, "Y'all can go off, that's fine" while pointing to his chest. Officer Jorgenson then turns off his BWC at 03:42:00.

**Officer Johnson video 3:**

The video begins at 03:58:48, approximately 16 minutes and 48 seconds after the previous video ended. As the video begins, the officers on the police line are called to "on guard" position. The officers are ordered to move, and the police line begins marching forward yelling, "Back!" with each step.

03:59:04 – There is a commotion on the left side of the video at the police line. An SOD officer reaches forward, through the shields, and pulls an unknown individual through the police line. The individual falls to the ground and a Louisiana State Police Sergeant is heard saying, "We got her," and appears to bend down to handcuff the subject. The other officers remain at the line and quickly prepare to keep moving forward. The police line, still slowly moving, is clearly engaged with protesters pushing against the police shields at the location where the subject was pulled through the line.

C91

03:59:42 – Officer Pazon can be heard and seen clearly asking protesters to please exit the bridge. Officer Pazon then steps forward, pointing towards the line where officers' shields were being pushed, and asks if the snatch team is good there. Officer Pazon then says, "That group needs to be taken into custody." An officer turns around and calls for a snatch team at that location.

The line then moves forward again, and Officer Johnson stays back, slowly walking behind the line. His BWC's view of the line is blocked by other Officers and State Troopers walking in front of him, behind the line.

04:00:33 – The line is called to a stop as they engage with a group of subjects, at the location Officer Pazon pointed to earlier, pushing against the shields. Officers are heard describing the subject at issue. It does not appear anyone is pulled through the line at that time.

04:01:25 – Officer Pazon is heard saying, "They're leaving, standby."

04:01:57 – An Officer is heard giving orders for protesters to exit the bridge over the loudspeaker. Officer Pazon then gives the instruction that they are only going to march. The line is then called to attention and given the order to march forward.

04:05:28 - Officer Pazon tells the officers they are forcing everyone off the exit to the left. Officer Joseph then begins arranging the officers, sliding them to the left. The officers continue walking forward as this happens. Protesters can be seen walking backwards, facing the officers, as the officers continue walking toward them.

04:06:32 – The line is called to standby and regroup. At 04:07:00 the line continues walking forward. The line is then called to a stop again shortly after. Officer Johnson turns around and Captain Lampard and Captain Caprera can both be seen walking behind the line. The bear armored vehicle is also behind the line.

04:08:25 – Officer Pazon tells the officers to keep moving and calls the line to move forward. Cheering can be heard from the protesters as an 18-wheeler blows its horn.

04:08:57 – The line is called to a stop again.
04:09:35 – The gas team then travels along the side of the onramp, on the highway, to ensure the officers won't be ambushed as they walk down the onramp. The officers walk alongside the armored vehicle, on the highway, ensuring the highway is clear of protesters or anyone wanting to ambush the officers on the ramp.

04:13:39 – An Officer is heard over the loudspeaker telling protesters to exit the bridge as the officers locate protesters still on the onramp.

04:15:46 – The officers on the gas team begin walking back towards the location of their vehicles (near the original police line).

04:16:07 – Officer Johnson asks if they are done with the cameras. Sergeant Harris replies, instructing the officers to leave them on.

04:16:53 – Officer Johnson tells the officers if they have extra munitions they can put it in his bag.

04:17:10 – Officer Joseph says he doesn't know where mike was and Sergeant Harris responds, "Mike was up front. Mike was stingin' em. That's what I'm saying, Them CS rounds wasn't working." Officer Joseph stated, "I wanted to go to them stingers, cause it'll hit more people." Officer Johnson then stated, "We still hot." Sergeant Harris then instructs the officers to turn off their cameras.

Officer Johnson turned his camera off at 04:17:29 on the timestamp.

Sergeant Barnes reviewed the entirety of the footage captured by Officer Johnson's BWC and did not observe any other information pertinent to the investigation on the recordings.

## BWC of Officer Jason Jorgenson

Sergeant Barnes reviewed Officer Jason Jorgenson's BWC footage and discovered Officer Jorgenson's BWC was not activated until after the deployments of gas. At the time the camera was activated the timestamp showed the time as being 03:52:11 (GMT), approximately 37 minutes after the first deployment of gas. The footage showed the following:

03:53:50 – Sergeant Harris tells Officer Jorgenson what area he is going to deploy his gas canister, indicating sections of the crowd. Officer Joseph tells them he needs to know where they are going to deploy, so he can cover it.

03:55:15 – Sergeant Harris is observed telling Officer Johnson they are deploying gas canisters, not the stinger grenades. An officer can be heard telling protesters to "please exit the bridge" several times over a loudspeaker. A protester responds, "We'll exit when you put your guns down."

03:56:40 – The officers are called to the on-guard position and given the order to march forward. The officers move forward yelling "back" as they do.

03:59:55 – The officers on the line directly in front of Officer Jorgenson are instructed to let the subjects refusing to leave through. An individual can be seen pulling at one of the officer's shields and several individuals can be seen grouped together with their arms linked, directly in front of the line. Officer Jorgenson informs Officer Pazon he's on the gas team, not snatch team. Officer Jorgenson is then told to step back to let the snatch team be behind the line. Officer Jorgenson then steps back. The line then begins moving forward again and protesters can be seen facing the police line, nearly touching the police shields as they step backwards with each step forwards from the police.

The footage captured the same information already documented on the BWC of Officer Travis Johnson until approximately 04:08:15. At that time, the camera appears to malfunction, and begins capturing all of the events in a time-lapse mode, at a high speed with no discernable specific incidents captured by video or audio, capturing approximately seven minutes of video in 20 seconds. The video then ends at 04:15:28 (GMT).

Sergeant Barnes reviewed the entirety of the footage captured by Officer Jorgenson's BWC and did not observe any other information pertinent to the investigation on the recordings.

### End of Grenadier Team's BWC Review

### Other Involved Officer BWC Review

### Sergeant Terrence Hilliard

Sergeant Barnes reviewed Sergeant Terrence Hilliard's BWC footage recorded during the incident. The footage showed the following:

The footage began at 02:23:40 on the timestamp, as Sergeant Hilliard is parked in his vehicle on the ground level under an onramp listening to radio communications about the protest. Sergeant Hilliard is talking to an unknown officer about the possibilities of the protest. He tells his officers to hold tight and if they need to they will go onto the bridge at the last minute.

02:24:40 – Sergeant Hilliard radios that they protesters are breaking at Calliope to get onto the bridge. He then advises that the protesters are using bicycles to block in the police cars.

02:26:40 – Captain Roberts is heard on the radio advising units to form a line on the onramp to keep protesters from entering the lanes of traffic on the bridge.

02:27:40 – Sergeant Hilliard is making his way to an onramp to get onto the bridge as Captain Roberts advises units to let the protesters have the bridge for now and discusses trying to get in front of the protesters near the Tchoupitoulas onramp.

02:29:00 – Sergeant Hilliard makes his way to the Tchoupitoulas Street onramp from Henderson Street.

02:31:00 – Sergeant Hilliard arrives on the bridge and Captain Roberts is on the bridge instructing officers to form a skirmish line. Lieutenant Prepetit tells Captain Roberts they need to form the line at the Tchoupitoulas exit to allow protesters to exit. Lieutenant Bush tells Lieutenant Prepetit over the radio that they can let them off the entrance ramp if they need to. Lieutenant Palumbo informs Lieutenant Prepetit that the onramp they entered is beyond the Tchoupitoulas Exit ramp. There is some discussion of where the protesters will be able to exit if they place the line on the bridge. Someone on the radio says they can send them back if they need to.

02:35:00 – Sergeant Hilliard pulls his vehicle onto the bridge against traffic, forming the line of vehicles behind the skirmish line.

02:36:00 – Officers arrive to form the line as someone is heard saying there are about 2000 protesters.

02:36:40 – Protesters can be heard changing in the background as they approach, and the line is being formed.

02:37:40 – Protesters approach the line and as they reach it a few protesters step through on the right side of the line.

02:38:00 – Sergeant Hilliard politely asks an unidentified white female protester to please step on the other side of the line. The unknown female tells Sergeant Hilliard that she can go on the other side, but he has to tell the protesters to "stand down because they won't." Sergeant Hilliard tells the female they are with them and they negotiate to give and take, she says she will tell the protesters to take three steps back. The female then tells Sergeant Hilliard she is going to go get someone who is in charge. Sergeant Hilliard then helps her back through to the other side of the line.

02:39:30 – Sergeant Hilliard helps another protester back to the other side of the line, who is taking pictures with what appears to be a DSLR camera and wearing a balaclava (ski mask).

Sergeant Hilliard, throughout that time, walks along the police line making sure all the gaps are filled in.

02:41:00 – An unknown protester, using a megaphone, tells the protesters to hold the charge at the police line, saying, "Hold the charge here, hold the charge."

02:41:30 – The same unknown protester with the megaphone is calling to speak to the ranking officer.

02:42:30 – Captain Roberts allows her and a few other protesters through the police line to negotiate behind the line.

02:44:40 – A protest leader calls for a moment of silence as protesters call for officers to let them through, chanting, "Let us through."

02:48:40 – An unknown female protester addressed the crowd using a loudspeaker. The unknown female incites the crowd saying, "This is where we make our stand, right here."

02:50:50 – Brandon Wheeler is let through the police line and immediately asks, "Where's John Thomas?" The crowd begins chanting, "let us through" again.

02:51:30 – A protester on a loudspeaker tells the crowd that they are there for prison abolition, and the police are part of the problem. The protester says they need to turn in their badges.

For the next several minutes, the crowd grows increasingly agitated as protest leaders continue to negotiate with police and other protesters with loudspeakers in the crowd continue to call for prison abolition and the police officers to let them through.

02:57:00 – The crowd is chanting, "Drop the shields."

02:59:11 – A strobe flashlight is seen pointing over the police line towards officers from an unknown protester.

03:03:10 – Brianna Chatmon addresses the crowd using a loudspeaker. Before she speaks, Brandon Wheeler says, "You police officer better see that. We are together out here," speaking to the crowd being one. Ms. Chatmon begins telling the crowd about uniformity and the crowd responds angrily as someone says, "A protest is not uniformity, what the fuck?" Ms. Chatmon says she is not talking about uniformity with them and the police, and she is not talking about being peaceful. She says the further they go the more dangerous it is for them and explains that is what the police are saying. She also says she is not telling the protesters to be peaceful or not be peaceful, and says she is not telling them what to do. The crowd grows increasingly agitated as Ms. Chatmon talks, screaming obscenities and calling leaders to stop talking and continue through the police line. Ms. Chatmon tells protester the police are ready to beat them and shoot them and if they cross the line they need to be ready for that.

03:08:18 – The protest leaders are ushered back to the other side of the police line as the crowd chants, "Move bitch, get out the way."

03:09:20 – A call is heard in the crowd for white people to move to the front.

03:13:03 – The police line is called to the on-guard position.

03:13:40 – Sergeant Hilliard points and yells for officers to, "Catch that side" as protesters push at the police line on the inside portion of the bridge (right side). The officers on the line are seen struggling to brace themselves against the pushing protesters and at 03:13:49 several protesters break through the line along the inside edge of the bridge. Lieutenant Bush attempts to corral the protesters as they place their hands in the air. Sergeant Hilliard relocates to that side to assist. Sergeant Hilliard physically pushes a protester back to the other side of the police line.

03:14:14 – Sergeant Hilliard then moves back towards the center of the police line as agitators push at the police line, pushing officers at the center of the line backwards. Sergeant Hilliard attempts to physically push an agitator back as the police line begins to break. Protesters are heard yelling, "Stop, Don't shoot!" as Sergeant Hilliard attempts to push the agitator back through the police line. As Sergeant Hilliard turns around, an agitator who has pushed through the police line turns and runs directly into Sergeant Hilliard. Sergeant Hilliard grabs the agitator and pushes him back into the line of protesters trying to push through the police line.

As Sergeant Hilliard steps back, the police line has completely broken, and the protesters are walking through the police line and continuing forward as police order them to stop and get

back. Sergeant Hilliard tells and unknown female to get back as the female steps away and yells at him, "Don't fucking touch my sign!" Sergeant Hilliard continues to command the crowd to get back as a strobe light is seen held by an agitator being shined directly at Sergeant Hilliard. An unknown agitator responds to Sergeant Hilliard yelling, "You get back!"

Sergeant Hilliard steps back in front of the protesters and agitators telling them to get back. Mr. Wheeler is seen in front of the crowd as Sergeant Hilliard places his hand on his chest gently and tells him to get back, politely. Mr. Wheeler looks at Sergeant Hilliard and appears to shake his head before continuing to walk forward towards the secondary police line.

Protesters and agitators continue to move forward as Sergeant Hilliard attempts to get in front of them and stop them from moving forward. An agitator yells at Sergeant Hilliard as he places his hand on an agitator, "Don't touch him." Someone else then says, "Don't fucking touch me!" as an agitator with a strobing flashlight points it directly at Sergeant Hilliard.

03:15:13 – Sergeant Hilliard turns to his left and a small cloud of gas is seen forming as an unknown protester throws an already dispensing gas canister forcefully into the air, towards the police staging area. Sergeant Hilliard steps on the side of the police vehicles as Captain Roberts is heard saying, "They're throwing them back at us." On the radio. At 03:15:21, and unknown agitator is seen picking up another gas canister and throwing it forcefully back towards the police staging area. At 03:15:23 a canister of gas, not already dispensing, is seen falling into the sparce crowd, landing near a small group of protesters, then bouncing towards the side of the bridge as if it hit something or someone. It is unclear if anyone is hit, but another agitator wearing all black runs to the canister, picks it up, and throws it off the side of the bridge.

As protesters and police flee the gas, Sergeant Hilliard grabs another protester by the bicep and begins escorting him away from the police line yelling, "get back!" The scene grows more chaotic, with protesters, agitators, and police all affected by the gas. Sergeant Hilliard walks through several officers who are affected by the gas and climbs over the hood of a police vehicle to get to a safer area, clearly suffering the effects of the gas.

03:16:13 – An officer is being helps back by members of SOD as the gas affects him and he begins shedding his riot gear. Sergeant Hilliard tells the officer he is ok and tell him to "suck it up," speaking about the gas, saying that it burns, but it is ok.

Sergeant Hilliard then relocates back to where the police line had been to help reform the line. Members of the SOD gas deployment team can be seen beyond the line with a 40mm launcher pointed the crowd. An unknown agitator begins moving towards the gas team as if he/she were going to throw something at the officers and the 40mm launcher is heard firing. A motorcycle is also heard revving its' engine and can be seen approaching the reforming police line. Several protesters/agitators can be seen on the left side of the bridge (outer side) in a small group as other protesters are farther in the distance. Sergeant Hilliard turns around and begins instructing officers to get back on the line. Sergeant Hilliard helps an officer with adjusting his gas mask.

Sergeant Hilliard then moves forward to the SOD gas team, who is retreating, moving backwards, as they face several agitators motioning towards the police line. Sergeant Hilliard tells them, "Back it up, Y'all good." Someone in the background is heard telling the police line to back up to the fence.

Several agitators continue to move towards the police line, screaming obscenities, as the police line is reforming.

03:19:50 – The call, "Gas, Gas, Gas," is given after someone says the protesters are coming back up.

03:20:05 – An SOD Officer deploys a gas canister, tossing it overhand, in front of the police line, as Sergeant Hilliard says, "Launch it, get it out there." A second gas canister is seen in the air, lobbed over the police line, from the right side of the camera. At 03:20:13 a deployed gas canister is scene hurdling through the air back towards the police line. The 40mm launcher can be heard in the background, firing, during and after the gas is deployed.

03:22:53 – Lieutenant Bush says, "They look like they thinned out a little bit," as the remaining protesters and agitators continue to advance towards the police line.

03:25:38 – A canister of gas is lobbed underhand over the police line. Moments later it is seen flying over the left side of the bridge.

03:27:00 – Sergeant Hilliard begins polling the officers on the police line asking each one if they are ok and if they need a break.

The protesters and agitators continue to verbally antagonize police officers on the video for the next several minutes. The verbal agitation and yelling at officers continue for the remainder of the video, until the majority of the protesters leave.

03:42:40 – Sergeant Evan Cox speaks to Sergeant Hilliard about replacing an officer on the line to make sure he does not buy into the agitation from the subjects at the line.

Sergeant Hilliard continues to stand behind the line of officers, observing as certain agitators continue to verbally antagonize officers.

03:53:15 – Captain Roberts is heard on the radio discussing pushing the protesters and agitators back.

03:53:45 – Warnings can be heard over the loudspeaker being given to protesters and agitators to leave the bridge. An agitator responds, "We'll leave when you put your guns down."

03:55:05 – The on-guard position is called as another warning is given. The police line then begins pushing forward yelling, "back" as they advance towards protesters. Almost immediately an officer on the left side of the line is pushed back and his shield can be seen raising as if he is being shoved backwards. Sergeant Hilliard turns to his right and a protester can be seen standing

firm with his/her hands raised in the air as the police line moves into him/her. Sergeant Hilliard then turns back as officers are pulling the officer who was hit off of the police line. Sergeant Hilliard grabs the back of the officer and pats him, saying, "You're alright, you're alright, you're good."

The police line then continues moving forward and Captain Anthony Caprera can be seen at the back of a snatch team, with both hands on the officers, as the line moves forward. Several protesters are refusing to move as the line advances and Sergeant Hilliard says, "Snatch them." Sergeant Hilliard then steps forward and assists with pulling an unknown female through the police line. The female falls to the ground and appears to be taken into custody by Louisiana State Troopers.

03:57:00 – As the police line pauses its movement, Sergeant Hilliard calls for an additional officer to cover the left side of the line, which has a gap between the line and the wall of the bridge.

The line begins moving forward again as several protesters are seen at the police shields, refusing the leave. Sergeant Hilliard tells and officer to snatch them and then attempts to reach through the line to snatch an agitator himself but is unsuccessful. Sergeant Hilliard tells the officers that if the agitators want to come through the line then snatch them through.

03:59:35 – A protester is heard telling other protesters that they made their point, and they are going to be snatched up one by one.

04:00:45 – Sergeant Hilliard attempts to snatch another individual through the line, but is unsuccessful as the line stops, and several protesters back up from the police line.

04:01:29 – Sergeant Hilliard points out four agitators to a nearby snatch team. Another officer tells officers the protesters and agitators are leaving and to stand by. Officer Pazon is heard instructing officers to only march and calls the line to move forward.

The line continues to move forward for the next several minutes as they approach the top of the onramp entrance. Officer Pazon instructs the officers to form an echelon formation to direct the individuals to the left, down the onramp. The police line moves forward and stops at the top of the onramp as members of the gas deployment team ensure the ramp is clear for officers to advance to the bottom.

At approximately 04:12:00 the officers begin moving down the onramp to ensure the onramp is clear of protesters. As the officers walk down the onramp protesters can be heard yelling at the officers. At approximately 04:20:00 the officers are instructed to take a break until other officers arrive. The officers rest momentarily while standing on the onramp, above magazine Street.

As the officers are resting and not in contact with any protesters, Sergeant Hilliard approaches Sergeant Cox and asks him if his camera is still rolling. Sergeant Cox points to his chest and says he does not have one. Sergeant Hilliard then turns his BWC off at 04:23:29.

Sergeant Barnes noted the footage was 1:59:50 in length.  Sergeant Barnes reviewed the video in its' entirety and did not observe any other information not already documented in this report.

**<u>BWC Footage of Officer Arden Taylor, Jr.:</u>**

Sergeant Barnes reviewed the BWC footage captured by Officer Arden Taylor.  Sergeant Barnes observed the footage began at 03:14:43 with Officer Taylor approaching the police line that was falling apart.  Officer Taylor told unknown female protesters to get back as they continued past the police line.  Captain Roberts appears to be trying to reason with the agitators as Officer Taylor arrives.

03:14:54 – Officer Taylor appears to push one of the subjects backwards as one of the female agitators completely disregards what the officers are saying and begins walking past them towards the bridge.  Officer Taylor steps in front of her and uses his hands to keep her from going further.   At the same time, the order for a gas deployment is heard in the background.

03:15:07 – A gas canister on the ground ahead of Officer Taylor begins sparking and emitting white smoke in the area where the police line had been, which is now completely overrun by protesters and agitators.

03:15:11 – A second gas canister is seen falling from the air and landing amid a crowd of protesters towards the right side of the bridge. While at the same time an unknown agitator picks up and hurls the first gas canister through the air back at the police staging location.

03:15:14 – A third gas canister, not yet emitting smoke, lands on the ground directly in front of the police cars, in front of the majority of the protesters and agitators.  That canister begins emitting sparks and the smoking as another agitator picks up a different gas canister and throws it back towards the police line.

03:15:18 – Another agitator, dressed in all black, runs from the right side of the bridge and grabs the third deployed canister, hurling it back towards the police staging area as well.

03:15:22 – A fourth canister lands near protesters on the left side of the bridge and begins emitting sparks and smoke.  That canister is quickly picked up by another agitator and tossed off the side of the bridge, appearing to land on the onramp.

03:15:35 – A lout thud is heard, and someone is heard saying, "Be advised they are throwing water bottles, glass bottles…"  Officer Taylor then steps behind the line of police cars.   As he reaches the rear of the cars, a gas canister is seen, emitting smoke, rolling behind the cars.  Another officer steps forward and kicks the canister back towards where the police line had been.

03:16:05 – An officer is seen stumbling through the cloud of smoke next to the police vehicles. Officer Taylor runs forward to the cloud of smoke to assist the officer back. The officer drops his police shield and Officer Taylor runs back and retrieves the shield. Officer Taylor equips himself with the dropped shield and holds it as he begins moving forward towards the smoke cloud, where the police line had been.

03:16:35 – Officer Taylor sees an officer in the distance near the left side of the bridge, struggling with the effects of the gas. Officer Taylor runs through the gas to the officer. On the footage as the officer stumbles through the gas a protester is seen laying on the bridge, leaning up and coughing. Officer Taylor assists the officer to the staging area behind the police vehicles where another officer steps in to assist and relieves Officer Taylor.

03:17:00 – The order is heard to use extended CS launched over the crowd (Sergeant Barnes noted extended CS rounds are the blue-tipped CS gas rounds launched from the 40mm launcher). Officer Taylor runs back towards the reforming police line.

03:17:40 – Officer Taylor is standing at the front line, near the gas team which is addressing agitators using a 40mm launcher. On the footage a motorcycle can be seen approaching the officers and several agitators can be seen slowly moving towards the officers. The motorcycle turns around and an agitator, in black, is seen kneeling in front of the officers holding a police riot shield, covering himself. The officers begin moving forward to address the agitator and someone screams, "mark that shield, mark that shield!" as the agitator with the shield stands and begins moving away from officers, using the shield. Lieutenant Prepetit tells the gas deployment team to stand down and back the line to the fence as they approach two agitators holding police riot shields. The team, and Officer Taylor, begin backing up towards the police line. As the officer backup, the agitators continue to slowly move forward, closing the gap between them and the officers. Officer Taylor takes a position on the left side of the police line.

03:19:50 – The agitators and protesters continue to close the gap, moving towards the reformed police line, and the order to deploy more gas can be heard. Gas canisters can be heard deploying and seconds later an officer screams, "Incoming!" After this second deployment of gas the protesters momentarily retreat. Agitators and protesters can be heard screaming obscenities at officers in the background.

03:23:45 – An officer is heard saying, "watch for bricks" as the protesters continue to move forward while chanting, "hands up, don't shoot."

03:24:30 – Officer Taylor is relieved from the police line and provides the riot shield to another mobile field force line officer who has arrived at the location.

03:35:10 – Lieutenant Bush can be heard saying, "Gas Fellas" as another command for gas is given.

03:25:36 – A single gas canister is deployed over the center of the police line.

03:26:05 – A loud thud is heard (as if something crashed against a police shield) and an officer immediately says, "Who threw that?"

The protesters and agitators stop several feet from the police line and verbally antagonize and assault the officers. Mr. Brandon Wheeler is seen, shirtless now, at the front of the crowd, leading them. The protesters slowly inch close over the next several minutes, still shouting and verbally antagonizing the officers. By 03:35:00 the protesters are once again face to face with officers and are still verbally antagonizing officers. The verbal antagonizing includes asking if any of the officers are part of the KKK, if they or their coworkers are racist, and if they and their coworkers regularly commit adultery.

03:36:30 – An unknown white male agitator is antagonizing the police officers and appears to be intoxicated or under the influence of a foreign substance. Mr. Wheeler steps between the subject and the police and tries to calm him down. The subject then engages in an argument with an unknown female protester before the female protester leaves as protest leaders call for the crowd to fall back. The male subject continues to stand at the police line and rant, calling out a specific officer for being small and asking how they found a shield low enough for the officer. The subject continues to antagonize officers and use racial epithets until an unknown female protester, wearing a blue bike helmet, steps between him and the officers while telling him to stop. The male pushes the female aside and walks back towards the police line. The female in the bike helmet steps back in front of the subject and he pushes her using his chest. The female pushes him back and other protesters step in to calm the situation.

The protesters continue to stand in front of the officers for the next several minutes until the situation eventually starts to die down, with only a few protesters staying on the bridge in front of officers.

03:47:20 – A protester at the line who has been talking to the officers tells the officers he doesn't have a problem with them and gives several of the officers fist-bumps.

03:50:10 – The overwatch officer radios to the command post and advises he is giving up his position to a member of the gas deployment team (investigation determined this was Officer Timothy Jones leaving the Turret of the Bear to allow Officer Pierce the position as the line advanced).

03:54:00 – Warnings are heard being given over a loudspeaker instructing protesters to exit the bridge.

03:55:07 – The line is called to the on-guard position and instructed to march forward. The officers move forward saying, "Back." An unknown white female immediately starts pushing against one of the officers shields directly in front of Officer Taylor. The line stops and the

female engages in a shoving match with the officers' shield. Officer Taylor helps to pull the officer back, patting him, saying, "You're good, You're good."

03:55:25 – The line is called to march forward again. The female braces herself against another officer. She can be seen widening her stance and placing a foot back to push against the shield as the officers advance.

03:55:40 – Officer Taylor then helps pull the female through the police line as she screams and struggles. The female and another unknown protester fall to the ground. Officer Taylor and other unknown officers help the female to her feet as Officer Taylor places her hands in flex-cuffs behind her. Officer Taylor pats down the male subject who was taken into custody at the same time before he is brought to the staging area by other officers. Officer Taylor then returns to the police line.

03:58:22 – The line continues to move forward as officer Taylor's BWC turns off at 03:58:22. At the time the BWC deactivated Officer Taylor's hands did not appear to be on the camera as one is scene briefly near the camera and then is placed back onto the officer in front of Officer Taylor prior to the BWC turning off.

Sergeant Barnes reviewed the audit trail for the video and observed the footage stopped due to the camera powering down.

**BWC Summaries received from Sergeant John Helou**

On Monday, October 26, 2020, Sergeant Barnes received written summaries of BWC of some of the involved officers from Sergeant John Helou. Sergeant Barnes observed the events captured in the summaries were noted at the times listed on the timestamp of the videos.

**BWC of Officer Brandon Abadie**

Sergeant John Helou reviewed the BWC footage of Officer Brandon Abadie captured during the incident. Sergeant Helou discovered Officer Abadie had two (2) videos associated with the incident. Sergeant Helou reviewed the videos and noted the following information, at the listed times:

**Officer Abadie Video 1:**

02:26:25 – The video begins with Officer Abadie inside a police vehicle with another officer. The BWC is facing the roof of the vehicle. A protestor is observed on the vehicle's exterior. A male voice over the police radio broadcast the protestors are heading up the ramp. Officer Abadie's partner states a protestor is on top of a unit, presumably a police vehicle. The male voice over the radio announces there are over one hundred protestors heading up the on-ramp towards Jefferson Parish. Officer Abadie states he is going to reverse his police vehicle. Abadie's partner tells, presumably the driver of a police vehicle behind their own, to also back-

up. A male voice over the radio announces units are going to try to get in front of the protestors at the Tchoupitoulas Street on-ramp.

02:28:28 – Another male voice over the police radio requests a unit to block the Baronne Street on-ramp ASAP.

02:28:52 – Another male voice over the police radio informs the units that if they want to get in front of the protestors, get on at Tchoupitoulas and Henderson; the voice further advised this is where the line would be formed to prevent the protestors from going to Algiers.

02:29:02 – The police vehicle is observed moving forward and Officer Abadie appears to maneuver through traffic (emergency lights activated and airhorn is heard). A third male voice, presumably another officer, is heard inside the vehicle.

02:29:52 – The officer deactivates his BWC.

**Officer Abadie Video 2:**

03:08:52 – The video begins with Officer Abadie at the police skirmish line. Sergeant Helou noted the camera appears to be mounted somewhere below chest height on the front of Officer Abadie, who is holding a clear shield. The officer lowers the shield approximately thirty seconds into the video. A protestor attired in a white shirt and holding a bull horn is directly in front of the officer.

03:09:34 – A male protestor attired in a black shirt tells other protestors at the skirmish line "If you're not going to go up, get out the way" several times.

03:09:37 – The protestor holding the bullhorn announces for the protestors to stay peaceful, among other protest-related messages.

03:11:45 – The protestor holding the bullhorn appears to ask Officer Abadie if they could "do this one step at a time. Each of us." The protestor asks the officer to take one step back and they will take one step forward. Either Abadie or a nearby officer responds to the protestor about safety concerns with crossing the bridge.

03:12:48 – The protestor holding the bullhorn says, "let's go, one step at a time." The protestors begin moving towards the officers. Officer Abadie and the officers next to him begin pushing the protestors back with their shields as the protestors state "Let us through!"

03:14:48 – Officer Abadie and the officers around him appear to retreat as the protestors continue moving forward while holding their hands in the air and shouting, "Hands up, don't shoot!" The officers appear to reestablish the skirmish line seconds later and continue pushing the protests back using their shields.

03:15:26 – A shrieking sound, like that of a firework, is heard, followed by a male voice over the police radio saying, "Gas deployed." Officer Abadie says "Gas, Gas, Gas" as the officers

appear to abandon the skirmish line as a cloud of gas is visible in front of the line. Officer Abadie retreats past a line of police vehicles and begins coughing.

03:15:48 – Several male voice shout "Re-form the line!" Officer Abadie states he does not have a gas mask with him and retreats further back to retrieve it.

03:18:26 – The officer retrieves his gas mask from the cargo area of a marked Chevrolet Tahoe (B18065). The vehicle is facing away from the skirmish line.

03:19:43 – The officer begins his return to the area of the original skirmish line.

03:20:57 – The officer is stopped by another male officer (possibly his partner), who informs Abadie that he also needs a gas mask. Abadie gives this officer his car keys and tells him the location of his police vehicle.

03:22:11 – The officer returns to the skirmish line area. The protestors, who are still chanting "Hands Up, Don't Shoot," appear to be positioned several feet from the skirmish line.

03:25:15 – Abadie announces "Gas, Gas, Gas!' As the protestors begin walking towards the skirmish line, the gas is deployed (03:25:39).

03:25:43 – A protestor possibly throws a gas canister off the bridge. Someone instructs the officers to back up as there are "no more charges." Several sounds of something being fired are heard, which evokes a vulgar response from one or two protestors. The protestors slowly approach the skirmish line, and some appear to speak with officers.

03:45:41 – The majority of the protestors appear to begin to retreat away from the skirmish line. A female protestor advised a male protestor near Officer Abadie seconds earlier that SWAT was coming up the on-ramp to pin them in.

03:53:33 – A male voice provides three final warnings (over a loudspeaker) for the protestors to exit the bridge.

03:55:02 – Officer Abadie and other officers on the skirmish line begin walking towards the remaining protestors ordering them back. Someone over the loudspeaker again instructed the protestors to exit the bridge.

03:56:08 – Abadie appears to swing his baton at a male protestor (unsure if contact was made). The skirmish line continues pushing the protestors to exit the bridge. The protestors eventually move on their own as the skirmish line follows them. The protestors exit the bridge via the US 90 B W Tchoupitoulas St on-ramp.

04:20:00 – The officers on the skirmish line are instructed to take a break by an unknown male officer, presumably a supervisor. The officers lower their shields, wait on the same on-ramp used by the protesters and talk amongst themselves.

04:27:00 – The officers pick up their equipment and continue down the on-ramp and hold their position.

04:35:17 – The officers receive instructions from a supervisor to go home. The officers turn around and head up the onramp to their respective police vehicles.

04:50:19 – The officer deactivates his BWC.

## BWC of Officer Damond Davis

Sergeant Helou reviewed the BWC footage of Officer Damond Davis captured during the incident. Sergeant Helou discovered Officer Davis had two (2) videos associated with the incident. Sergeant Helou reviewed the videos and noted the following information, at the listed times:

## Officer Davis Video 1:

03:12:54 – The video begins with Officer Abadie at the police skirmish line. Sergeant Helou noted the BWC appears to be mounted somewhere above chest height (BWC facing the sky) on the front of Officer Davis, who is holding a clear shield and wearing a helmet.

03:13:16 – A male yells "Gas, Gas, Gas." Officer Davis says something unintelligible, to which a male voice next to him says "Go behind me." The officer appears to move and the BWC is obstructed by something.

03:13:54 – Officer Davis activated his BWC after someone instructed him to do so. Although the BWC remains obstructed, the officer appears to move forward behind the shield.

03:15:12 – A male voice repeatedly says, "I can't breathe." A short while later, the officer instructs someone to back up who is coughing.

03:15:47 – A male voice announces, "Reform the line!" several times.

03:15:57 – The officer's BWC is uncovered again – the officer has donned his gas mask and a cloud of tear gas is observed near the officer. Several other officers. Some without a gas mask, in the area are coughing. Officer Davis tells everyone around him to put their masks on. The officer falls back to an area behind the skirmish line (behind a line of police vehicles).

03:16:52 – As the officer manipulates something on his gas mask, the BWC is obscured again for a few seconds. Several males' voices yell, "Reform the line" as the officer continues manipulating his mask (possibly to clear it).

03:17:33 – The officer moves forward, returning to the skirmish line.

03:20:02 – A male yells "Gas, Gas, Gas!' What appear to be two cannisters of tear gas are visible in the sky, either launched or thrown towards the protestors. A cloud of tear gas is observed ahead of the officer.

03:20:11 – A tear gas cannister (still expelling gas) is thrown back towards the officers.

03:20:21 – A tear gas cannister (possibly the same one thrown back) is launched or thrown towards the protestors. Officer Davis states, "They're throwing canisters back." Another officer next to Davis states "They've got fucking masks, dude."

03:21:40 – A male voice announces over the radio "CP to Red Team Alpha, bring me up 25's; I need two 25's."

03:25:12 – Several officers, including Davis, yell "Gas, Gas Gas!"

03:25:35 – An object is either thrown or launched towards the protestors. Sparks are observed in front of the skirmish line and some protestors are heard screaming. A tear gas cloud is observed in front of the line. Officer Davis states "They're going to try to throw it, watch out."

03:26:10 – A male officer next to Davis announces the protestors are throwing rocks.

03:29:25 – A male voice announces over the radio that there is an African American male with an assault rifle on the on-ramp and warms the officers to take cover.

03:34:42 – An African American male appears to motion to the protestors to get off the bridge. The male informs the officers that he wants them (protestors) off the bridge and begs the officers on the line not to do anything else.

03:43:51 – Car 3 (Chief John Thomas) asks unit 100 (Captain Lejon Roberts) over the radio regarding the number of protestors (on the bridge). Captain Roberts informs Chief Thomas there are approximately two hundred protestors still on the bridge. Captain Roberts further informed the Chief that the Mounted unit was enroute and upon their arrival, they would begin pushing the protestors back. The Chief suggested they begin the pushing process now; Captain Roberts replied they would begin the push back using the skirmish line.

03:45:32 – A Caucasian female protester and an African American female protester appear to have an argument in front of the skirmish line. Another Caucasian female protester shoves the Caucasian female protestor. Another female protestor gets in between the two.

03:53:22 – Captain Roberts broadcast over the radio that they were about to begin the process of pushing the protestors back. Captain Roberts requested verbal commands be given to the protestors using the LRAD. These commands / warnings for the protestors to exit the bridge were broadcast seconds later. Following these warnings, Captain Roberts advised Chief Thomas that he was going to give the protestors a few more minutes and then give them three more warnings.

03:54:45 – Additional warnings broadcast over the LRAD to the protestors for them to exit the bridge.

03:55:04 – Skirmish line assumes the "On guard position." Officers begin approaching the line of protestors at 03:55:28, beginning the process of pushing them back.

03:58:38 – A final warning is given to the protestors to exit the bridge. The skirmish line continued the process of pushing the protestors back at 03:58:55.

03:59:43 – Someone (in person, not over LRAD) requested the protestors exit the bridge.
04:00:00 - The skirmish line continued the process of pushing the protestors back. The line ceased pushing and stood by at 04:00:58.

04:01:59 – LRAD broadcast requesting the protestors exit the bridge.

04:02:08 – A male instructed the skirmish line to only march towards the protestors as another request was made over the LRAD for the protestors to exit the bridge.

04:02:24 – Skirmish line began marching towards the protestors as some instructed the protestors to keep moving.

04:03:27 – Captain Roberts advised Chief Thomas over the radio that the skirmish line was successfully moving the protestors off the bridge. Skirmish line continued marching until 04:06:28 when they re-grouped.

04:07:02 – Skirmish line continued marching until 04:07:56.

04:08:25 – Skirmish line continued marching until 04:08:57.

04:12:30 – Skirmish line continued marching until 04:19:18.

04:19:58 – Skirmish line instructed to take a break.

04:23:18 – Officer deactivated his BWC as officers talked amongst themselves.

## Officer Davis Video 2:

04:29:23 – The video begins with Officer Abadie in formation with other officers underneath what appears to be US90W (ground level). Sergeant Helou noted the BWC appears to be mounted somewhere above chest height (BWC facing the support of the elevated interstate) on the front of Officer Davis, who is holding a clear shield and wearing a helmet. The formation is not moving, and protestors appear to be somewhere near the officers.

04:35:13 – Supervisors are instructed to gather their respective personnel and go home.

04:35:32 – The officer deactivates his BWC.

## BWC of Sergeant Daniel Hiatt

Sergeant Helou reviewed the BWC footage of Sergeant Daniel Hiatt captured during the incident. Sergeant Helou discovered Sergeant Hiatt had one (1) BWC video associated with the incident. Sergeant Helou reviewed the video and noted the following information, at the listed times:

## Sergeant Hiatt BWC Video 1:

02:37:18 – The video begins with Sergeant Hiatt at the police skirmish line. Sergeant Helou noted the BWC appears to be mounted somewhere around chest height on the front of Sergeant Hiatt, who is holding a clear shield and wearing a helmet. As the sound of approaching protestors increase (presumably approaching the skirmish line), a male voice is heard stating over the radio several times to maintain integrity of the line.

02:37:48 – Protestors approach the skirmish line. Several of the protestors appear to photograph above the line with digital cameras and cell phones.

02:39:16 – Sergeant Hiatt appears to reposition himself behind the skirmish line as other officers take his place.

02:41:01 – A female protestor asks over a pa system "Who is in charge?" several times, followed by "Let's talk."

02:42:03 – A male protestor announces to the officers over a pa system that everyone is calm and attempts to reason with the officers.

02:44:25 – The female protestor requests over the pa system that the protestors take a moment of silence. The protestors begin chanting 'Let us through," followed by "march with us!"

02:46:18 – Lieutenant Merlin Bush instructs Sergeant Hiatt to stand at what appears to be a secondary skirmish line with other officers.

02:52:45 – Sergeant Hiatt instructs additional officers to take their places at the secondary skirmish line.

02:54:03 – A female protestor (believed to be the earlier person with the pa) appeared to either be allowed through or breached the skirmish line, where she spoke with Captain Roberts. The female was heard asking to make a deal.

03:03:14 – The same female protestor addresses the crowd via the LRAD pa system.

03:14:23 – The protestors attempt to break through the primary skirmish line. Sergeant Hiatt runs to the line to assist with keeping the protestors back. The BWC is eventually obscured by something during this process.

03:16:26 – A male voice yells for officers to don their masks. Just prior to this, several people are heard coughing. Sergeant Hiatt advises the officers to don their masks, breath, get back on the line and then to reform the line.

03:19:30 – Sergeant Hiatt assists a male officer with ensuring his gas mask is properly sealed. The sergeant offers his helmet to this officer after learning the officer's helmet was broken (causing the bad seal). Gas was observed in the air during this time. The sergeant then remained with the other officers at the secondary skirmish line.

03:25:14 – A male voice announces "gas, fellas." Sergeant Hiatt repeats this warning with "Gas, gas, gas!" Gas is launched shortly after these warnings.

03:27:50 – Sergeant Hiatt informs someone inquiring about a found baton that he gave his baton to an unknown person.

03:55:32 – Sergeant Hiatt assisted with moving protestors off the bridge via the Tchoupitoulas on-ramp. The BWC is eventually obscured by something during this process.

04:20:06 – The sergeant is instructed, along with the rest of the line to take a break. The personnel talk amongst themselves.

04:24:11 – The sergeant, along with his group are instructed to "mount back up" due to another group approaching. The sergeant (and rest of group) begins marching at 04:27:56 and stop shortly thereafter at the base of the on-ramp.

04:36:10 - The sergeant walked up the onramp, deactivating his BWC at 04:38:00

The video was reviewed in its' entirety and no other pertinent information was discovered. The video has been made a part of the permanent case file.

## BWC of Officer John Cabral

Sergeant Helou reviewed the BWC footage of Officer John Cabral captured during the incident. Sergeant Helou discovered Officer Cabral had three (3) BWC videos associated with the incident. Sergeant Helou reviewed the videos and noted the following information, at the listed times:

## Officer Cabral BWC Video 1:

03:12:53 – The video begins with the officer at the secondary police skirmish line. Sergeant Helou noted the BWC appears to be mounted somewhere around chest height on the front the officer, who is holding a clear shield. Ahead of the officer is the primary skirmish line with protestors observed on the other side of this line.

03:13:50 – A male voice instructs everyone to activate their cameras. Captain Roberts is heard shortly afterwards over the radio advising the skirmish lines to assume the on-guard position.

03:14:22 – Protestors break through the primary skirmish line and approach the secondary skirmish line with their hands raised. The protestors attempt to breach the secondary line, causing the officers to push them back with their shields.

03:15:30 – An African American male protestor is observed with possible blood or vomit on his shirt. The male's head may have previously contacted the officer's shield seconds earlier. The officer begins coughing and gas is observed in the air. The officer leaves the skirmish area and walks further back on the bridge to recover from the gas exposure.

03:18:00 – The officer begins walking back towards the skirmish line but stops to rest at 3:18:48. The officer informed Sergeant Calvin Brazley that he did not have a gas mask. The officer remained in this position until 3:47:30, when he deactivated his BWC.

## Officer Cabral BWC Video 2:

03:59:53 – The video begins with the officer still on US 90. At 04:00:40, the officer took custody of a Caucasian female prisoner from Sergeant Brazley. The sergeant informed the officer the female's backpack was not searched. The officer escorted the prisoner to an area on US90 where other prisoners were located. The officer asked the prisoner to stand in this area.

04:02:00 – The officer moved the prisoner goggles from over her eyes to her forehead at her request.

04:03:10 – Officer Charles Stamps asks the prisoner if she has identification, to which she replied no. Officer Stamp conducted a brief pat down then asked if her identification was in her bag. Officer Stamps then searched the prisoner's bag after Officer Cabral informed him the bag was not searched. Officer Stamps found some form of identification inside the prisoner's cell phone case as the prisoner objected to the officer searching her belongings. Officer Stamps informed the prisoner the search was incidental to her arrest.

04:08:11 – Officer Stamps placed a different Caucasian female prisoner in the rear passenger compartment of B19074.

04:08:53 – Officer Cabral's prisoner requested Officer Stamps' name. The officer did not immediately provide this information to the prisoner.

04:09:52 – Officer Stamps requested Officer Cabral place his prisoner in the rear passenger compartment of B19074. The officer performed this action at 04:10:12. Officer Stamps then secured the female with a seatbelt.

04:11:18 – Officer Cabral placed his shield inside the rear passenger compartment of his police vehicle (B15066). The officer then relocated his vehicle onto the CCC at the request of mounted.

04:27:02 – The officer deactivated his BWC.

## Officer Cabral BWC Video 3:

04:28:50 – The footage begins with the officer still on US-90 speaking with an unknown Caucasian male State Trooper Sergeant. The officer then took custody of an African American female prisoner from another Caucasian male State Trooper nearby at 04:29:01.

05:07:06 – The officer escorted the prisoner to a marked Chevrolet Tahoe, where a Caucasian male officer conducted a search incidental to the arrest of the prisoner, including her bag. The officer then escorted her to another marked Chevrolet Tahoe, where an African American male officer took custody of the prisoner at 05:08:22, at the direction of Officer Stamps.

05:08:38 – The officer deactivated his BWC as he returned to his police vehicle.

The video was reviewed in its' entirety and no other pertinent information was discovered. The video has been made a part of the permanent case file.

**BWC of Sergeant Travis Ward**

Sergeant Helou reviewed the BWC footage of Sergeant Travis Ward captured during the incident. Sergeant Helou discovered Sergeant Ward had one (1) BWC video associated with the incident. Sergeant Helou reviewed the video and noted the following information, at the listed times:

**Sergeant Ward BWC Video 1:**

03:13:28 – The video begins upside down with Sergeant Ward on the CCC. A male voice announces over the radio for everyone to don their face masks. Sergeant Ward presumably dons his mask while saying "The shit's about to go down, fellas." at the police skirmish line. Sergeant Ward instructs everyone around him (members of SOD) to "go hot" after donning their gas masks. Officer Ward screams 'go hot' after "Gas, gas, gas" is announced.

03:15:08 – An unknown male SOD officer appears to launch a handheld gas cannister towards the protestors. The cannister appears to almost immediately be thrown back either at SOD or off the bridge. Another cannister is launched and almost immediately appears to be thrown off the bridge. Sergeant Wards instructs the officers falling back from the skirmish line to reform the line after they don their gas masks.

03:16:38 – Sergeant Ward assists an unknown male officer with donning his gas mask.

03:17:59 – Sergeant Ward joins the officers on the secondary skirmish line.

03:18:41 – Sergeant Ward informs the officers this is their stronghold and we're going to hold this as the protestors approach their skirmish line.

03:20:06 – An additional cannister of tear gas is launched towards the protestors. The cannister is almost immediately thrown back towards the officers. Sergeant Ward instructs an unknown SOD officer to throw the still smoking cannister back at the protestors.

03:20:24 – An unknown SOD officer is observed on the hood / windshield are of a marked NOPD Ford Explorer launching gas.

03:20:35 – Additional gas cannisters are launched at the protestors.

03:21:38 – Sergeant Ward requests "two 25's" out.

03:24:06 – Lieutenant Prepetit is observed giving instructions to an unknown SOD officer on how to deploy the two 25's and the stinger rounds. The lieutenant would advise when to deploy these rounds.

03:25:17 – Sergeant Ward tells everyone to stand by for gas, after someone else announced gas, gas, gas.

03:25:38 – An unknown projectile (possibly gas) is launched towards the protestors. It is almost immediately thrown over the bridge.

03:26:40 – An additional projectile is launched towards the protestors.

03:28:14 – Lieutenant Palumbo alerts Sergeant Ward that he is going to secure two BWCs that fell to the ground.

03:28:36 – Sergeant Ward informs officers on the skirmish line that additional devices were going to be deployed soon and for them to hold the line.

03:34:51 – Sergeant Ward asked an unknown officer on the skirmish line if an agitator was present – the officer stated he could not tell if one was present, but stated other protestors were policing their own.

03:41:28 – Sergeant Ward advised an officer on the skirmish line that if a Caucasian female protestor came any closer to the line, to "snatch her."

03:41:53 – Another officer, presumably a supervisor, informed Sergeant Ward there was no reason to "snatch" a protestor unless they contacted an officer – the protestors were allowed to walk and talk as much as they wanted.

03:49:48 – Sergeant Ward approached two SOD officers, one of which was possibly Devin Joseph, who were discussing removing the protestors from the area by pushing them back and snatching them. The other officer told "Devin" to let the supervisors make that decision.

03:50:33 – Sergeant Ward approached Lieutenant Prepetit regarding if there was any plan to push the protestors back. The lieutenant advised the sergeant that they were holding their positions now.

03:51:19 - Sergeant Ward asked an unknown SOD officer if the district officers knew gas would be deployed due to many of them not having their masks. The officer informed the sergeant "they said gas, gas, gas, they wasn't ready."

03:52:14 – Protestors are observed throwing fireworks in the distance.

03:54:47 – Sergeant Ward checked with officers on the skirmish line to see if they needed a break.

03:55:09 – Sergeant Ward supervised the officers on the skirmish line as they pushed the protestors back off the bridge via the on-ramp.

03:56:54 – Sergeant Ward instructed officers on the skirmish line to snatch a Caucasian male protestor who refused to move back. Sergeant Ward took this individual to the ground behind the line as another officer handcuffed the protestor.

04:02:21 – Officers on the skirmish line were instructed only to march up to the remaining protestors. The protestors exited the bridge via the Tchoupitoulas Street on-ramp.

04:20:03 – Everyone involved with removing the protestors from the bridge took a break.

04:24:12 – The officers re-grouped and continued down the on-ramp in anticipation of another group of protestors approaching their location. The group held their position prior to completely descending the ramp.

04:33:45 – Sergeant Ward informed Sergeant Hiatt that Lieutenant Palumbo was in possession of two BWCs that fell to the ground and that everyone needed to inventory their equipment.

04:35:12 – Sergeant Ward deactivated his BWC as the SOD Bearcat descended the on-ramp.

The video was reviewed in its' entirety and no other pertinent information was discovered. The video has been made a part of the permanent case file.

## BWC Summaries received from Sergeant Clinton Givens

On Thursday, October 29, 2020, Sergeant Barnes received written summaries of BWC footage from Sergeant Clinton Givens. Sergeant Barnes noted the listed events were notated according to the running time on the videos.

## BWC Footage of Officer Glen Miller, Jr.

Sergeant Clinton Givens, of the Force Investigation Team, reviewed the footage of Officer Glen Miller, Jr. and observed the following, in summary:

The footage started with this officer behind the established police line on the bridge. It captured Captain Lejon Roberts speaking with apparent protest leaders. Most of the conversations between Captain Roberts and the unidentified protest "leaders" was unintelligible.

01:50 – "Leaders" behind police line speaking with crowd using loudspeaker

03:55 – Another "leader" was allowed through police lines to speak with Captain Roberts. It was clear that the crowd was irate, chanting and such.

12:15 – Blue laser seen shining into crown from above and behind Miller.

12:37 – Laser disappeared

13:19 – Laser seen again in the same position

13:48 – Laser disappeared again

19:30 – One of the "leaders" spoke to the crowd again from behind police lines. She stated to the crowd she was simply trying to keep them informed as the crowd argued against her. This "leader" then stated, "They ready to beat us! They ready to shoot us! If y'all cross this line, that's what you gotta be ready for!"

NOTE: There was no force captured by this device.

The footage totaled 21 minutes and 34 seconds in length and was reviewed in its' entirety.

## BWC Footage of Officer Keith Mays Jr.

Sergeant Clinton Givens, of the Force Investigation Team, reviewed the footage of Officer Keith Mays, Jr. and observed the following, in summary:

The officer appeared to be at the front line, armed with a clear shield and an expandable baton. The chanting crowd was visible, facing the officer, less than 3 feet away.

3:10 – Crowd chanting "let us through," as the officer and other officers formed a line across the interstate westbound lanes.

3:30 – Crowd "leader" speaking to crowd using a loudspeaker. This subject was not visible, but from other footage, was noted to be located behind the police line. The "leader" stated, "We gon stand on this bridge till we feel like moving. This is where we make our stand. Right here."

16:15 – B/M in crowd inciting crowd to cross the police line

C115

18:18 – Another "leader" behind the police line began using a loudspeaker to communicate with the crowd, but the crowd quickly assumed she was speaking on behalf of the police and started arguing back with her.

28:50 – Crowd pushed against the police line, with 3-4 subjects successfully crossing. The subjects were escorted back behind the line by police. No reportable force used. The crowd at large continued pushing against the police line with officer struggling to hold the line by pushing back against the crowd with their shields.

30:00 – Crowd quickly retreated. The air appeared foggy. This coupled with the sounds of heaving coughing insinuated that some sort of gas had been deployed by police. The deployment was not captured.

This officer immediately retreated as it appeared he had been adversely affected by the gas. The officer eventually returned to the line. When the officer returned, it was noted that the crowd size had significantly diminished.

41:30 – Smaller crowd still present on the bridge chanting, "Hands up, don't shoot." The smaller crowd then again approached the police line where they continued to protest.

01:11:56 – The police line began moving forward with shields up. The crowd provided no physical resistance, and no force was employed by the officer. Eventually, it was noted that there were no pedestrians remaining on the bridge.

01:34:30 – The officer and his line relocated to the bottom of an on ramp (unknown which) where a crowd could be heard chanting in the background. Remaining crowd not visible.

The footage totaled 1 hour and 51 minutes in length and was reviewed in its' entirety.

## BWC Footage of Officer Devin Johnson

Sergeant Clinton Givens, of the Force Investigation Team, reviewed the footage of Officer Devin Johnson and observed the following, in summary:

The footage started off with this officer standing behind the front established police line. This officer was armed with a clear "NOPD" shield

01:10 – The officer walked up to the established "police" line and inserted himself into the formation, which spanned all the westbound lanes of US90B

27:11 – Unknown command called (from unknown ranking officer) prompting officers at the front line to attention.

28:05 – Appeared that this officer was involved in some sort of an interaction as evidenced by pushing and shoving motion occurring between the police line and protesters. The officer's

camera was not positioned high enough to capture a more detailed accounting of what was actually occurring. No specific force observed

28:41 – Subject (protester) was seen being escorted from behind to the police line back to the crowd of protesters facing the police line. The officer/supervisor escorting the subject was not able to be identified.

30:08 – BWC fell to ground as officer began coughing/choking. It appeared that the officer was affected by gas deployment.

32:25 – An unknown officer picked the cameras up of the ground and placed it atop a police unit.

34:33 – An unknown officer was observed climbing atop the same police unit as the BWC sat upon. The officer appeared to be assigned to SOD, as he was attired in all black. Just after, sounds of small projectile being fired were heard accompanied by small puffs of smoke after each sound. The sound was similar to a paint ball gun being fired.

39:15 – Lower portion of the same officer was seen standing atop the police unit with what appeared to be a rifle style firearm in his right hand. At the time of seeing this, the firearm was pointed to the ground. An unknown voice was heard in the distance stating, "Gas fellas, gas." This was followed by the same voice stating, "Throw it in the middle of the crowd."

42:00 – The officer attired in black was still standing atop the police unit. Sounds of small projectile being fired were heard at the same time, which was accompanied by what appeared to be recoil apparent in the lower half of the officer's body. The positioning of the camera did not allow it to capture the actual firing.

43:39 – The unknown officer climbed down from atop the unit.

NOTE: Based on other evidence gathered during the course of the investigation, it is believed that the unknown officer (attired in all black) was in fact Devin Joseph.

01:07:54 – An unknown officer using a loudspeaker announced, "Protester's please exit the bridge," repeatedly.

01:09:12 – "On Guard" command called followed by "Forward March!" The officer called the command was not captured, but at the command, the officers forming the police line began moving forward.

The footage totaled 1 hour and 29 minutes in length and was reviewed in its' entirety.

### BWC Footage of Sergeant Dowal Barrett

Sergeant Clinton Givens, of the Force Investigation Team, reviewed the footage of Sergeant Dowal Barrett and observed the following, in summary:

Officer behind the first line and secondary formation. No clear visual of the protest crowd initially. Protesters could be heard screaming and chanting "let us through" in the background. Does not appear to be armed with a shield.

29:16 – "On Guard" command heard, followed by the secondary formation being ordered to don gas masks.

34:50 – Officer joined the secondary formation, which became more of a secondary line. Possibly armed with a shield at that time.

36:02 – Two (2) SOD officers positioned behind the 2nd line appeared to be firing rifle style weapons at the crowd. The visual of these officers firing was accompanied by sounds similar to "paint balls" being fired from a weapon.

38:09 – Officer (likely Devin Joseph) positioned atop a police unit, firing toward the protest crowd.

41:53 – An unidentified SOD officer lobbed a gas canister toward the protesters from behind the 2nd line.

01:09:56 – Announcement, "Protesters, please exit the bridge," repeatedly.

01:11:11 – 2nd line began to move at the "on guard" command. As they did so, they were stopped by a standing group of protesters. There was no physical interaction observed.

01:13:04 – 2nd line began moving again as a subject was seen being handcuffed in a prone position by unidentified officers. The crowd slowly backed as 2nd line advanced forward.

01:17:50 – An unknown officer stated, "They leaving, stand by." The line stopped at that time.

The footage ended with the officer and the 2nd line walking down an unknown on-ramp to ground level.

There was no specific force observed while reviewing this footage.

The footage totaled 1 hour and 39 minutes and 29 seconds in length and was reviewed in its' entirety.

## **BWC Footage of Officer Michael Devezin**

Sergeant Clinton Givens, of the Force Investigation Team, reviewed the footage of Officer Michael Devezin and observed the following, in summary:

This footage started with the officer at the front line armed with a shield.

30:29 – "On guard" command given

31:30 – Crowd pushing into shields as line began to move. The officers were using their shields to hold the crowd back. There was no hands-on force observed.

32:30 – It appeared that gas had been deployed, as evidenced by smoke streaks and the officer subsequently retreating from the front line while coughing.

36:20 – Officer returned to the newly formed 2nd line

37:24 – Unknown officer announced, "Gas, Gas, Gas," which was followed by the sounds of metal cannisters hitting the ground. There were also visible smoke trails. Unknown who deployed the cannister

39:20 – Sounds of small caliber rounds being fired were heard, resembling the sound of paintballs being fired from a weapon.

42:45 – Unknown officer again announced, "Gas, Gas, Gas," which was accompanied by a visual of an airborne cannister falling toward the protest crowd. Unknown who deployed the cannister.

50:00 – Crowd approached 2nd police line and made a stand while shouting and cursing at police.

01:12:35 – "On Guard" command given followed by "forward" command. The line began moving, using shields to push a smaller crowd back. The crown then formed a human chain in resistance, refusing to move further. No hands-on force used.

01:17:43 – Camera obscured, no visual

01:36:58 – Visual returned. Officers at bottom of unknown off ramp. No crowd visible but heard chanting in the distance.

The footage totaled 1 hour and 39 minutes in length and was reviewed in its' entirety.

## BWC Footage of Officer Joshua Diaz

Sergeant Clinton Givens, of the Force Investigation Team, reviewed the footage of Officer Joshua Diaz and observed the following, in summary:

The footage started off with officers gathering equipment from rear of his police unit and then running up to the area just behind the front line, which comprised the 2nd formation.

2:39 – Officer ran up to the front line to assist with crowd trying to push through. There was no force observed. There was no visual of the crowd due to the height and angle of the camera.

32:38 – Based on camera movement and background noise, it appeared that the crowd began pushing into established police line

35:00 – Another gas deployment (smoke streak visible). The crowd began retreating followed by the officer coughing heavily. The officer retreated momentarily but returned to the 2nd formation.

38:50 – Formed 2nd line

40:07 – Another gas deployment. Unknown which officer deployed.

52:00 – Crowd moved up to 2nd line

01:14:00 – Police announcement, "Protestors, please leave the bridge." The crowd stayed in position despite this warning.

01:15:00 – 2nd police line began moving forward, with the crowd retreating in response. The officers ended up moving the crowd off the bridge to the bottom of an unknown on-ramp, without force.

The footage totaled 1 hour and 58 minutes in length and was reviewed in its' entirety.

## BWC Footage of Officer Daniel Grijalva

Sergeant Clinton Givens, of the Force Investigation Team, reviewed the footage of Officer Daniel Grijalva and observed the following, in summary:

This footage started with the officer running to the front line from the rear.

34:40 – "On Guard" command given

35:50 – Protest crowds began pushing against officers' shields. The officers maintained the line with only the use of their shields.

36:25 – Unknown officer announced, "Gas, Gas, Gas," as the crowd continued moving against the police line.

36:50 – Gas cannister deployed. Unknown which officer deployed. Sergeant Barnes noted at 03:15:08 on the timestamp a canister falls into the crowd and it appears the canister may have hit someone. It is unknown for certain if anyone was hit.

37:00 – Cannister thrown back at officers. This officer retreated, coughing heavily. The officer joined the 2nd police line shortly after.

59:00 – Protesters at 2nd line.

01:15:19 – Police announcement, "Protestors, please leave the bridge."

01:16:49 – 2nd police line began moving forward while announcing, "back, back, back." The crowd refused to comply, instead locking arms to prevent the officers from moving forward. The officers moved the crowds using shields. No hands-on force observed.

01:22:20 – unknown female on moped drove up to remaining crowd and convinced them to retreat. The crowd moved away from the police line.

01:24:08 – 2nd police line began moving forward again. The remaining members of the protest crowd continued to retreat. There was no additional contact.

01:27:50 – Officers continued forward until ending at the bottom of an unknown on-ramp.

The footage totaled 1 hour and 57 minutes in length and was reviewed in its' entirety.

## BWC Summaries Received from Sergeant Debra Pruitt

On Monday, November 2, 2020, Sergeant Barnes received the following written summaries of BWC of some of the involved officers from Sergeant Debra Pruitt.

## BWC Footage of Officer Joshua Diaz:

Sergeant Debra Pruitt reviewed BWC Footage saved under item F-03385-20, a total of 4 minutes and thirty seconds. The video began on June 3, 2020 at about 9:32PM. Officer Diaz and other unknown officers were on the ground level of the bridge. Pedestrian and bicycle traffic were observed on the opposite side of the bridge. Marked New Orleans Police Department vehicles were used to block traffic from entering the officer's side of the ramp. Radio transmissions were heard from an unknown male stating units were to come up at Tchoupitoulas and Henderson as they estimated 2,000 protestors. Officer Diaz quickly relocated back to his marked police unit and the recording ended.

## BWC Footage of Officer Russell Gary:

Sergeant Debra Pruitt reviewed BWC Footage saved under item F-03385-20, a total of 1 hour and 53 minutes. The video began on June 3, 2020 at about 9:31 PM. The officers were located on US90 and were among other officers attired in riot gear. No civilians were seen where they were standing. The officers began to relocate collectively as they began running when instructed to move, *"double time"*. Officer Gary and the other officers formed a line across the interstate as protesters were heard chanting in the distance, *"no justice, no peace!"*

The protesters walked forward with their hands in the air chanting, *"walk with us!"* and within a few feet of the lined-up officers. Some of the front-line protesters were observed instructing the other protesters to stay back away from the officers as they were face to face. The protesters were heard asking why they could not go through, and chanting *"no justice, no peace!"*, *"Let us through!"*, *"walk with us!"*, *"quit your job!"* and sang, *"all I want to say is*

*that they don't really care about us!"* The protesters maintained a short distance from the officers as most of their bodies were captured by the camera.

A woman's voice was heard over a megaphone informing the protesters of what was being said with the police as she was at the front of the line relaying to those in the back of the line. *"The further we go the more dangerous it will get for us."* As the woman relayed her message, the crowd screamed back at her. The woman on the megaphone continued, *"I'm not telling you what to do, I'm just trying to keep y'all informed!" "I'm with y'all I'm not against y'all!", "They are ready to shoot us!"* The crowd began chanting, *"move bitch, get out the way!"* The crowd got closer as the camera captured the midsections of their bodies.

At about 10:13PM a male voice was heard screaming "*Detail*…" with unknown instructions. The protesters formed a line and stood hip to hip locking arms with the person next to them. Moments later, the protesters moved forward as Officer Gary's riot shield was against the protestors ahead. There was a lot of movement as the protestors began pushing forward toward the officers. The officers used their shields to push the crowd back but were unable to maintain the line causing protesters to get through the line. Officer Gary's BWC captured the crowd moving forward surrounding the officers.

Protesters in the crowd began to scream as smoke filled the air around them. Coughing was heard as protesters and officers scrambled in the area. Officer Gary and the other officers relocated to the other side of the lined-up police vehicles on the bridge. The officers were no longer surrounded by the protesters and were amongst each other as they put on their gas masks. After the officers put on their gas masks, they were instructed to get back on the line. The officers relocated back to their positions to form back up as the protesters were in the distance. The area between the officers and the protesters was littered with signs and other debris left by the dispersed crowd.

As the officers were lined up, protesters were observed walking back demanding they be let through. Between the officers and the oncoming protesters, an object emitting smoke, known to be tear gas fell to the ground. Another appeared to come from the side with the protesters as it was launched past the protesters to the line of officers. Smoke began flowing out of the gas canister between the officers and the protesters as another gas canister emitting smoke emerged from the sky towards the protesters from the direction of the officers. The air cleared from smoke, as the protesters kept their distance as they screamed at the officers, *"hands up, don't shoot!"*

The protesters slowly began walking towards the line of officers as they continued chanting, *"hands up, don't shoot!"* From the direction of the officers, a sparking gas canister was tossed towards the protesters and landed on the ground in front of their line. The gas canister appeared to be picked up by a protester and thrown away from them. Someone on the front line in the protest was observed with a police shield. The protesters walked closer to the officers as

one man was yelling the police *"fucked up"* because there were children out there. The crowd continued to yell expletives at the officers as they stood in front of them. As the officers stood their ground as the protesters were scattered and continued screaming at the officers and the officers stood silent. The crowd of protesters steadily thinned out.

At 10:53PM, a male voice over an intercom instructed the remaining protesters off the bridge. After the announcement, the officers were told to tighten their line. The officers began moving forward appearing to swing their batons. The line stopped as they approached a group of protesters. The officers repositioned themselves and began moving forward once again. The officers stopped again as it appeared something was happening towards the middle of the line. The officers began moving again and then stopped with a final warning from a male voice from NOPD. The male instructed the protesters to exit the bridge. The officers regrouped and were instructed to move forward. A member of the protesters was heard instructing the remaining protesters to walk off the bridge. The protesters reluctantly began walking away from the officers but appeared to stop. An unknown member of NOPD instructed the protesters off the bridge and the line of officers moved forward in their direction. The officers stopped as a semi-truck was stopped on the bridge and no further protesters were observed. The officers continued forward together in line past stopped vehicles on the bridge as a driver was heard asking if the protesters were gone.

Protesters were heard yelling in the distance, *"No justice, no peace!"* as the officers were able to relax.

### **BWC Footage of Officer Zachary Vogel:**

Sergeant Debra Pruitt reviewed BWC Footage saved under item F-03385-20, a total of 1 hour and 50 minutes. The video began at 9:32PM, the officers were observed putting on their riot gear as they were on US90. Officer Vogel quickly relocated with the other officers, lined up across the interstate as the protesters were heard and observed approaching.

The protesters quickly approached as a group chanting, *"Hands up, don't shoot!"* Officer Vogel's BWC captured protesters walking into officers as they stood in a line. The protesters shouted, *"Walk with us!" "No justice, no peace!", Let us go!", "I don't see no riot here!"* The protesters were face to face with the officers as they pleaded to continue walking. The officers maintained their positions by not allowing the protesters to continue walking.

A woman came over the megaphone saying, *"What happened last night after our last peaceful protest with one of our brothers was attacked by a cop is not happening tonight."* The woman continued talking over the megaphone as the crowd continued chanting, *"Let us through!"* The crowd continued by singing, *"All I really know is that they don't really care about us"*, and chanting *"Quit your job"*, *"Drop your shield!"*, and *"You are not your uniform!"*

At 10:03PM, a woman spoke over the megaphone stating *"I want to keep everyone informed, I need y'all to know what we are talking about up here... The police are telling us the further we go the more dangerous it will get for us...I'm not telling y'all what to do....!" At 10:13PM the protesters began pushing their way through.* The officers were observed using their shields and hands to keep the crowd back, as the officers were heard saying *"Get back!"* The officers were observed removing their helmets, coughing as a cloud of smoke was observed nearby.

Instructions were heard, for the officers to put their masks back on and get back in line. The officers regrouped and formed a line as the protesters were several feet away. The roadway was littered with signs and other debris from the scattering of protesters. The protesters walked closer towards the officers as they were lined up once again. As Officer Vogel was nearest the end of the line next to the concrete barrier, smoke was observed filling the sky to the left where the protesters were. The protesters continued chanting, "*Hands up, don't shoot!*" At about 10:25PM, another cloud of smoke appeared in the sky. The crowd was heard screaming expletives and were name calling at the officers as they were angered by the gas canisters.

An unknown male voice was heard screaming, *"Off the bridge!" "You are not accomplishing anything tonight, the best thing for you to do now if you want to move safely, is to get off the bridge!"* From the little that was observed, due to the BWC mostly facing the side of the bridge, there were few protesters remaining. A male voice over an intercom from NOPD instructed the protesters to exit the bridge as it was their final warning. The officers were instructed to line up and move forward as they held the shields in front and used their batons extended forwards as they stepped forward. The police line stopped and continued forward several times forcing the protesters to exit the bridge. Once the protesters were off the bridge, efforts to open the interstate for traffic were in effect.

### BWC Footage of Officer Kenneth Kuykindall:

Sergeant Debra Pruitt reviewed BWC Footage saved under item F-03385-20, a total of 2 hours and 17 minutes. Officer Kuykindall's footage began at about 9:38PM as he was face to face with protesters as they chanted, *"No justice, no peace!"* , *"Let us through!", "Hands up!", "I don't see no riot here!"* The protesters kept a small distance from the officers. As the crowd voiced their opinions, the officers remained standing in their positions, keeping them from walking on the interstate.

A woman on an intercom announced a message to the protesters, causing the protesters to chant, "*Let us through!*" The protesters continued voicing their opinions and trying to convince the officers to let them through. At about 10:04PM, a woman on an intercom told the protesters she wanted to keep them informed saying if they continue forward it would be dangerous and they are ready to shoot.

At 10:13PM, the protesters voices grew louder as they locked arms with each other. The small empty space in front of Officer Kuykindall filled with protesters and moments later they began pushing forward. Officer Kuykindall and surrounding officers were observed using their shields to keep the protesters back as they moved forward. There was an obvious struggle with the crowd, however because the protesters were so close to the officer, it was unclear exactly what was happening besides them pushing to get through. Soon after a rush of protesters were observed walking past Officer Kuykindall and then he was surrounded by them. At 10:15PM, Officer Kuykindall's BWC fell to the ground pointed up to the sky. A cloud of smoke was observed in the air above as Officer Kuykinadall's BWC was being walked on and kicked as protesters walked around. The area cleared as a large amount of smoke filled the air and people were heard coughing. Police officers were observed walking in the area fixing the gear they were wearing as a male voice was heard instructing them to line up again.

At 10:20PM, another cloud of smoke filled the air as officers were only observed in the area where the BWC had fallen and remained. The protesters were heard nearby as continued to chant. At 10:23PM the BWC was picked up by an unknown police officer and tossed inside a marked police unit. From inside the vehicle, a male voice on an intercom was heard giving the protesters instruction to exit the bridge several separate times. The BWC remained inside the police unit until it was turned off at 11:55PM when unknown officers returned to the police unit and trying to figure out whose camera it was.

## BWC Footage of Officer Jesse Roger:

Sergeant Debra Pruitt reviewed BWC Footage saved under item F-03385-20, a total of 2 hours. The footage began at about 9:36PM as officers were being instructed to line up in formation as they were attired in riot gear. Officer Roger appeared to be nearest the middle of the line as protesters walked forward and stopped in front of the officer's line. A woman on a megaphone attempted to gain the attention of the front-line protesters. She had their attention for a few moments, but the crowd continued shouting and chanting on their own. A male over the megaphone attempted to get the police officers to kneel and walk with them. The crowd continued to chant and try convincing the officers to let them through and walk with them. A woman on a megaphone announced the police said if they continue forward it would get dangerous for them and the police are ready to shoot them. White people were called to the front of the line by the woman on the megaphone.

At 10:10PM, the protesters linked arms and continued chanting. A male officer was heard screaming, Detail on guard…. At 10:13PM, the front-line protesters were heard saying, *"they're taking a knee!"* Moments later, the crowd suddenly began moving and the officers BWC showed lots of movement from the officer as his shield was in front of him and then he moved to wear the BWC was faced another officer's leg. It appeared the officers were trying to keep the crowd back as they were moving forward most with their hands up. At about 10:15PM, smoke filled the air amongst the crowd and officers. Officers were observed removing their equipment from their

heads and replacing it with gas masks. The crowd scattered as smoke remained in the area leaving behind signs and debris on the ground from the evacuated area. The officers relocated behind the lined-up police vehicles and collected themselves before they were called back to form a line. There was a large gap between the protesters and the newly formed police line. Officer Roger was now positioned to the right side of the line as the protesters began to return near the officers. A gas canister emerged from the side of the officers as it exploded in the air before landing near the protesters. Another gas canister was airborne from the side of the protesters toward the officers as smoke emitted from it. Another gas canister near the protesters began emitting smoke as another gas canister was airborne from the side of the officers toward the protesters. A protester was observed picking up the gas canister and throwing it toward the side of the bridge.

The protesters returned closer to the officers as another gas canister was tossed from the side of the officers to the front line of the protesters. The gas canister was tossed to the side of the bridge by a protester. The protesters moved forward near the officers as they continued to express themselves to the officers. The crowd of protesters thinned out and at about 10:53PM, a male voice over an intercom instructed the protesters to exit the bridge.

At 10:55PM, the officers tightened up their line as another announcement to the protesters was made to exit the bridge. Together the officers began moving forward while instructing the protesters *"back!"* as they extended their batons. The line stopped and started several times as they moved the protesters back. At one of the stopping points, a woman in front of Officer Roger screamed at the officers for their name and badge. The officers were successful as the protesters continued moving back and was told by another protester it was not worth it and to walk. At 11:02PM, the protesters moved in the direction to exit the bridge as they were instructed over the intercom. The officers continued forward in unison as they approached stopped vehicles on the interstate. The protesters were no longer in sight as preparations for the bridge to be reopened was underway.

### BWC Footage of Officer Justin McCubbins:

Sergeant Debra Pruitt reviewed BWC Footage saved under item F-03385-20, a total of 1 hour and 14 minutes.  The footage began at 9:34PM as the officers were on US90 and instructed to quickly form up. Officer McCubbins was positioned to the far-right side of the line. The protesters quickly approached the police line. Officer McCubbins BWC was positioned on his upper torso as the protesters head and torsos were observed. The protesters chanted together and voiced their opinions about the officers stopping them from walking. Some of the protesters had a conversation with Officer McCubbins. Officer McCubbins was receptive and professional during his conversations.

10:04PM an unknown woman on the megaphone announced the police wanted them to get off the bridge and it would be dangerous for them to continue because the police were ready

to shoot them. The woman stated she was not telling the protesters what to do, she wanted to keep them informed.

At 10:13PM woman on the front line asked out loud "*What is happening?*" as she stated, *"I'm not pushing, I'm not pushing."* The protesters began pushing into the police officers. Officer McCubbins' BWC fell to the ground and nothing was observed. The crowd was loud and the BWC sounded as if it was getting kicked around. At 10:15PM, the camera was faced up as crowds of people walked around. A cloud of smoke was observed as people coughed and scattered from the area.

At 10:18PM, the BWC was picked up by an unknown police officer and only darkness was observed for the duration of the footage. At 10:47PM an unknown officer looked for McCubbins to return his BWC.

### BWC Summaries Received from Detective Shannon Jones-Brewer

On Monday, November 9, 2020, Sergeant Barnes received written summaries of BWC footage from Detective Shannon Jones-Brewer. Sergeant Barnes noted the listed events were notated according to the running time on the videos.

### BWC of Officer Jonathan Burnette

Detective Shannon Jones-Brewer provided Sergeant Barnes with the following summary of the BWC footage of Officer Jonathan Burnette:

00:17 - Someone is heard yelling something in the crown just pass the Officers on the front line.

00:18 - An Officer to the left of Officer Burnette appeared to launch something into the crowd of protesters.

00:21 - An unknown object is thrown at the Officers skirmish line, which lands about 10 feet from Officer Burnette. Several Officer rush to pick up the object which appears to have smoke coming from the object.

The video then stopped and was unable to continue playing.

### BWC of Officer David DeSalvo

Detective Brewer reviewed the BWC footage of Officer David DeSalvo uploaded under NOPD Item F-03385-20 and prepared the following summary. The uploaded video was one hour and seven minutes in length (1h 7m). The following events occurred on the footage:

00:05 - Officer holding shields and one officer to the left holding a launcher

00:08 - Someone on the speaker instructs Officer to "extend the rounds over the crowd".

00:21 - Officer DeSalvo picks up a shield that was discarded.

00:51 - Officer DeSalvo can be heard yelling to another Officer. (Inaudible)

01:30 - Officer DeSalvo moved up with the line of SWAT Officers to form a line with the patrol Officers.

02:23 - Captain Bax giving instructions to Officer to secure their gas mask.

02:55 - A flash of light is seen from the protesters

03:30 - An object is thrown at the line Officers

04:10 - Officer DeSalvo observes a female in a white lab coat with a green laser light directed at the Officers.

04:47 - Someone on the radio is requesting 2 (25's)

04:50-08:16 - Several Protesters yelling obscenities

08:16 - Someone on the speaker called for "Gas"

08:55 - Can hear metal objects being thrown at the line Officers

Constant obscenities were being yelled at the line Officers. This continues for over 20 minutes.

30:36 - Officer DeSalvo returns a BWC to a Sergeant at the scene.

31:40 - Officer DeSalvo is looking for Officer McCubbins to return his BWC to Officer McCubbins

36:42 - Someone on the loudspeaker instructs protesters to "Exit the Bridge".

36:50 - Someone on the loudspeaker instructs protesters to "Exit the Bridge".

36:56 - Someone on the loudspeaker instructs protesters to Exit the Bridge Final Warning

37:44 - Final Warning, Protesters Exit the Bridge Final Warning

39:14 - Several Officer Yelling "Hold the Line"

40:01 - Line Officers move forward "Get Back". Line Officers makes contact with Protester as protester attempted to break through the line.

40:04 - Protester falls to ground. Officer DeSalvo handcuffs the protester.

43:01 - Protester is taken to Officer, Officer walked with protester to marked unit.

43:07 - Officer DeSalvo advised the transporting Officer to search the subject.

44:00 - DeSalvo returned back to line Officers.

45:04 - Another announcement is made for Protesters to Exit the Bridge.

45:17 - Instructions are given to line Officers to move up to protesters.

49:50 - Officers with shields are instructed to move to the front.

51:53 - Crowd Cheering

The remainder of the video is Line Officers checking vehicles stopped on the bridge.

## BWC Footage of Officer Wesley Humbles

Detective Brewer reviewed BWC video uploaded by Officer Wesley Humbles and prepared the following summary. The Video is twenty-one minutes and twenty-eight seconds in length (21:28) The following events occurred on the footage:

01:01 - Officer Humbles gives the LRAD device to Captain Lejon Roberts. Captain Roberts can be heard explaining how to use the device to four (4) protesters. Captain Roberts can be heard giving instructions to the protesters on what to say to the crowd.

02:14 - The female protester is given the LRAD device by Captain Roberts. The female protester began to speak to the crown by initially getting their attention. The female then tells the Officers that "what happen last night, when one of our brothers was attacked by police, will not happen tonight".

03:20 - Female protested asked "who killed Modesto". Then hands the LRAD device to an officer.

03:46 - A male protester is allowed through the line to speak with Captain Roberts.

04:06 - Crowd chanting "let us through".

07:30 - Officer Humbles tells the line officer not to let anyone through the line.

08:40 - Someone is heard shouting on the speaker.

09:13 - The crowd is yelling and chanting (inaudible).

10:05 - The crowd is chanting "Drop the Shields".

11:20 - The crowd is chanting "Black Lives Matter".

16:34 - The female is speaking to the crowd using the police LRAD.

The remainder of the video is the female speaking to the crowd.

### BWC Footage of Officer Matthew McKoan:

Detective Brewer reviewed the BWC footage and observed the video was twenty-four minutes and five seconds (24.05). Sergeant Barnes reviewed the video and observed it began at 03:04:42 on the video timestamp.

00:01-03:30 – During the first few minutes of the video a female protester (identified by investigators as Brianna Chatmon) is speaking on LRAD to protesters. Crowd Shouting

4:10 – Someone in the crowd is calling for white people to move to the front.

8:40 – The officers on the second line begin donning their gas masks as the crowd grows louder. Someone in the background can be heard saying, "Activate your cameras."

9:00 – Officers on the line are physically engaging agitators, trying to keep the agitators from pushing through the line. The agitators can be seen pushing through the line

9:40 - A protester can be seen shoving an officer, pushing him backwards.

9:49 – The agitators pushing through the line can be seen fighting officers to get through, two female agitators are shoving at officers who have already been pushed back. The agitators yell at the officers as they push at the officers.

10:25 – It appears an officer is saying "I can't breathe, I can't breathe"

10:38 - Officer McKoan's BWC is knocked off in the melee. A tear gas canister can be heard dispersing gas as the sounds of scuffling continue.

12:00 – Someone can be heard shouting "form the line"

Sergeant Barnes noted the video remained dark and the sounds of the protests, commands to form the line, and screaming, chanting, and yelling can be heard.

16:20 – The 40mm launcher can be heard firing in the background. Protesters can be heard chanting, "hands up, don't shoot." The sound of the 40mm launcher reloading is heard and then the launcher is heard firing again.

18:51 – An unknown officer picks up the BWC and sets it on a vehicle.

20:30 – Lieutenant Bush is heard saying, "Gas fellas, Gas" and someone shouts "Gas Gas".

21:00 – A gas canister is heard deploying and the 40mm launcher is heard firing almost immediately after the deployment (at approximately 03:25:30 on the timestamp).

23:33 – Lieutenant Andrew Palumbo (unit 1500) takes the camera and others and advises Sergeant Travis Ward he is taking custody of them if anyone is looking for them.

## Second BWC Video of Officer Matthew McKoan:

Detective Brewer reviewed the BWC uploaded by Officer McKoan. There was no video, only audio. Detective Brewer noted the BWC video is twenty-nine minutes and forty-four seconds in length (29.44). The BWC video was dark with audio. There was radio communication and unknown individuals speaking. Sergeant Barnes reviewed the video and observed it began at the 04:52:26 timestamp on the video, after the incident was over.

6:00 – There is rattling noise / Sounds of driving, talking in background.

The remainder of the video is dark.

At the end of the video, Sergeant Barnes observed an unknown individual picked the camera up, which appeared to be sitting inside of a vehicle, and turned the camera off.

## BWC Summaries Received from Sergeant Samuel Davis

On Monday, November 9, 2020, Sergeant Barnes received written summaries of BWC footage from Sergeant Samuel Davis. Sergeant Barnes noted the listed events were notated according to the running time on the videos.

## BWC Footage of Officer Jeffrey Crouch:

Sergeant Davis noted the footage was 1 hour 40 minutes long, beginning at 9:34 P.M.

3:00 – a large crowd has formed and approached the police line (skirmish line) while chanting "Black Lives Matter and Hands Up."

6:00 – the large crowd has now begun to chant Let us Pass as a female subject using a megaphone continued to guide the chant.

7: 20 – female using a megaphone continued to lead the chant and has now requested to speak to the ranking officer. Shortly thereafter she was allowed to break the line and speak with ranking officers (Captain Roberts unit 100).

10:10 – female with the megaphone returned to the crowd and requested everyone observe a moment of silence

14:35 – the female leading the chant has now began to yell using her megaphone "we are not pushovers, we are one."

15:15 – using her megaphone the female has now begun to shout, "we will stay on the bridge until we feel like moving" and chanting" Let us through, let us through."

17:00 – 31:00 – Nothing of significance occurred

31:00 – The same female with the megaphone stated to the crowd "the more we walk forward, the more dangerous it will be.

32:00 – several subjects told the officers to lower their shields and let them walk thorough.

34:20 – the crowd began chanting "move, get out the way" as a black male at the front of the crowd began to yell "are you ready, make sure the person to your right is ready." This caused others on the front line to ask each other are you ready?

37:05 – an unknown black male wearing a skull cap asked to speak to the rank. He stated he was trying to keep the peace. He requested the police take one step backward and they will take one step forward, if not the people will charge, and some will be hurt.

38:45 – the command of "Detail, On Guard" was given to the police line

39:30 – the crowd began to push forward while shouting "let us through."

40:15 – Officer Crouch began to yell" Back up off of me, Back up off of me or and I will come across your face with this" as the crowd pushed forward. The police line had been broken and was in disarray.

41:07 – tear gas was deployed. Officer Crouch retreated behind the police vehicles.

46:05 – tear gas cannisters was observed being thrown back towards the police

46:10 – 1:21:20 nothing of significance occurred from Officer Crouch's view

1:21:20 – The police line advanced forward while giving commands of "Get Back." The crowd continued to attempt to push forward while pushing against the officers' shields.

**BWC Footage of Sergeant Lamont Walker:**

Upon arrival of Sergeant Walker, Lieutenant Kenny Prepetit (S.O.D.) and other ranking officers were providing instructions to all police present to shut down the Baronne Street on-ramp.

3:15 – All officers present were donning riot protective gear

4:07 – Captain Roberts (unit 100) could be heard on the radio stating they were forming a skirmish line and will force the crowd down the Tchoupitoulas Street on-ramp

4:55 – Captain Roberts instructed all police officers present to form the skirmish line

6:50 – Captain's Lubrano (unit 300), Captain Caprera (unit 800) and Captain Roberts (unit 100) are present

8:00 – All officers present formed a skirmish line ahead of the ranking officers' vehicles. the line was set about 100 feet away from the approaching crowd.

10:30 – the large crowd has now advanced to the skirmish line and was inches from the officers' shields.

10:40 – several subjects broke through the line by gaining access at the end of the line. Sergeant Walker and Officer Bryan Bissell pushed the subjects back.

12:45 – Captain Roberts gave instructions to form a secondary line.

21:25 – A female on a megaphone "we are not a push over. After a peaceful march last night and having 1 of their brothers attacked by the police, it will not happen again." She said they will stay on the bridge until they feel like moving.

22:43 – the same female said, "this is where we make our stand."

25:00 – an unknown black male spoke calmly and respectfully with Sgt. Walker and asked if the officers could put down their shields. He said he believed the shields were causing the crowd to respond in a hostile manner. Sgt. Walker informed the subject he was not in control and acknowledged the ones in the white shirts were in charge.

25:00 – 43:00 – nothing of significance occurred.

43:00 – Chief Thomas (Car 3), was heard on the radio asking Captain Roberts if they were still holding the line?

45:20 – Chief Thomas instructed Captain Roberts to provide the crowd 3 verbal warnings to step back.

46:50 – Captain Roberts informed Chief Thomas the crowd was getting rowdy, and the line had to go to an on-guard position.

47:05 – someone is heard on the radio stating secondary units have donned their gas masks. Chief Thomas again stated give them the warnings.

47:30 – Captain Roberts was heard on the radio stating there was a fight. All ranking officers then approached the line.

47:42 – Tear Gas Deployed

48:00 – S.O.D. Bearcat arrived on scene. Tear gas cannisters are also observed being thrown back at the police.

49:00 – 53:00 – Sgt. Walker escorted 2 officers away from the skirmish line after being overcome by the tear gas.

53:00 – Captain Roberts stated, "deployed another round."

**BWC Footage of Officer Bryan Bissell:**

Sergeant Davis noted the video began at 9:25 PM and lasted approximately two hours.

For the first 10 minutes of the video Officer Bissell was driving to the scene and relocated to the bridge.

10:00 – Officer Bissell arrived, quickly donned his riot gear and joined the skirmish line on the bridge.

12:15 – several subjects broke through the line by going to the end. Officer Bissell and Sgt. Walker were able to push the subjects back.

12:30 – 47:20 -  nothing of significance occurred.

49:00 – instructions were given to hold the line as the officers advanced forward while giving commands of "get back."

49:42 – Tear Gas deployed; subjects began to scatter. Several officers did not have on their gas masks and had to don them after the deployment.

51:00 – Officer Bissell was overcome by the tear gas and retreated behind the police vehicles with other officers.

54:10 – Captain Roberts gave commands to reform the line.

54:48 – another round of tear gas had been deployed. Several cannisters were observed being thrown back at the officers.

55:00 – the crowd began chanting Hands up, don't shoot."

1:03:00 – it was heard over the radio a black male wearing blue jeans was on the ramp to the bridge carrying an assault rifle.

1:04:00 – a black male wearing all black was observed yelling at the officers, "y'all fucked up, you know you fucked up. There were kids up here."

1:05:00 – a few civilians could be seen walking around wearing gas masks.

1:08:00 – 1:35:00 – nothing of significance occurred.

1:35:00 – the command of On Guard was given and the police line advance forward. The crowd had become very thin.

1:46:00 – the command of Slow March was given as the officers continued to move towards the off ramp of the bridge.

**BWC Footage of Second video of Officer Bryan Bissell:**

Sergeant Davis noted the video began at 11:27 PM and lasted approximately 8 minutes.

The officers formed a line at the bottom of the on ramp. There was no contact with the crowd who had now continued to proceed down Calliope Street.

**Officer Jamal Kendrick**:

Sergeant Davis noted the video began at 9:26 PM and lasted approximately 50 minutes and 18 seconds.

:36 – Captain Roberts is heard on the radio stating "form a line and strong hold, don't let them get into the main flow of traffic."

1:57 - Chief Thomas asked if any units were stuck in the crowd? Someone answered and sad they were on the ramp. Chief Thomas instructed the units to get out of the way of the crowd and not allow themselves to be surrounded. Captain Roberts then gave the command "let them go at the top and let them have it." Again, Chief Thomas expressed to not let the units get surrounded.

4:25 – Officer Kendrick arrived on the top of the bridge, donned his riot gear, and joined the other officers.

6:00 – Captain Roberts gave commands to form a line and stated they would force them down the Tchoupitoulas ramp.

8:24 – Captain Roberts approached the officers and told them he was going to pull up with his police vehicle and tell them where to form the line.

11:40 – Officer Kendrick and all units present began to form the skirmish line. Captain Roberts instructed all available units to double time it to assist and form the line. The crowd was about 400 feet away.

12:30 – the crowd is now face to face with the officers "chanting hands up don't shoot" and other various chants.

17:00 – 23:40 – a female using a megaphone stated after the protest last night one of their brothers was attacked by the police and this would not happen tonight. She also said they will stay on the bridge until they are ready to move.

24:00 – 45:00 - nothing of significance occurred.

45:00 – Chief Thomas asked Captain Roberts if the line was still being held.

48:15 – the crowd can be seen attempting to push the officers back. Several subjects broke through the right side of the line. The entire skirmish line appeared to shift, and officers struggled to maintain the line.

49:43 – Officer Kendricks BWC was knocked off of his chest and was kicked around on the ground until 50:18 when the camera de-activated.

It should be noted throughout the entirety of all videos at no time did any officer speak with the crowd, except for Sgt. Walker and the exchange with Officer Crouch. Throughout the entire confrontation all officers observed remained professional, except the exchange by Officer Crouch. Even as the officers were berated and belittled they remained calm and professional.

## Review of Special Operations Division After-Action Report

On Monday, July 6, at 10:46 AM, Sergeant Barnes received the Special Operations Division's After-Action Report, authored by Lieutenant Kenny Prepetit. The report outlined the actions taken that evening by police and protesters on the bridge and the events leading up to the incident.

The issued munitions pages attached to the report documented the Gas Deployment Team was issued the following:

8 – No. 2 CS Irritant Smoke gas canisters

3 – Triple Chaser Outdoor CS canisters

2 – Flameless Tri-chamber CS gas canisters

29 – Direct Impact Marking Rounds (Green)

23 – Direct Impact CS Rounds (Blue)

17 - .60 Caliber Smokeless Powder Stinger rounds

24 – Stinger Rubber Ball CS grenades

The paperwork noted the following munitions were returned to the armory after the incident:

1 – No. 2 CS Irritant Smoke gas canisters (7 used on bridge)

3 – Triple Chaser Outdoor CS Canisters (all issued returned)

0 – Flameless Tri-Chamber CS gas canisters (Sergeant Barnes noted none of these were used on the bridge)

22 – Direct Impact marking rounds (green) (7 not returned)

14 – Direct Impact CS rounds (blue) (9 not returned)

15 - .60 Caliber Smokeless Powder Stinger rounds (2 not returned)

24 – Stinger Rubber Ball CS grenades (all issued returned)

The self-reporting sheets documented Officers on the gas team believed/reported they deployed the following munitions:

6 - No. 2 CS Irritant Smoke gas canisters

SOD also deployed the following rounds were self-reported as being used in the two 40mm 6-shot launchers.

9 – Direct Impact LE Extended Range CS Crushable Foam rounds (Blue in color)

6 - Direct Impact Marking Crushable Foam rounds (Green in color)

2 - 60 caliber rubber balls "Stinger" rounds

Sergeant Barnes also noted Officer Joseph listed he was unsure how many CS rounds he had fired because the launcher was misfeeding.

Sergeant Barnes noted that later in the report a photograph of the returned munitions showed the correct number of 6 total canisters had been returned and observed the flameless tri-chamber canisters were on the table as being returned in the photograph. Based on that information it appears the number on the returned munitions list is an error. Sergeant Barnes contacted Sergeant Crawford to ensure they were not missing the two flameless tri-chamber canisters and to verify whether the returned munitions form listed none being returned in error. Sergeant Crawford confirmed the listed amount of zero on the return sheet was an error and that all of the flameless tri-chamber canisters issued had been returned.

Lieutenant Prepetit documented that after negotiations failed, the protesters became increasingly agitated as the long-range acoustic device (LRAD) was attached to a large, armored vehicle (the Lenco Bear) and was used to order protesters to exit the bridge. The protesters then began breaking through the police skirmish line and when the line failed to control the aggressive protesters, Captain Lampard ordered the deployment of gas. In the report, Lieutenant Prepetit described the officers were ordered to deploy gas at the front line of the protest and hand-toss canisters 5-10 feet into the crowd to disperse the protesters. During the first deployment of gas, several agitators picked up and threw gas canisters off the bridge and back and police. The grenadiers on the orange team (gas team) then used the 40mm launchers to address those

individuals. The first deployment was only partially successful, and many protesters reformed a line and continued to advance towards police. Lieutenant Prepetit wrote that the orange team was told to standby and prepare for a second deployment of gas. As the line of protesters reformed and advanced towards the newly formed police line, the order to deploy the second volley of gas to disperse the crowd was given. After the second volley of gas the orange team was asked to prepare for a third volley of gas if it was needed. The report documented the second volley of gas appeared to be effective in dispersing the majority of the crowd and a third volley of gas was not needed.

The report also documented which officers were assigned to which teams, members of the U.S. Marshalls and the Louisiana State Police were present to assist during the incident. The report does not appear to document if and how the Louisiana State Police were alerted or notified to assist, other than the contingent assisting is regularly assigned to the area to assist the New Orleans Police Department. The U.S. Marshalls assisting the SOD rapid response teams are reported to work with the SOD Violent Offender Warrant Squad on a daily basis and, as such, are a regular part of SOD's operations. The report also documented five individuals were placed under arrest that evening for City of New Orleans Municipal Code Ordinance 54:442 – Crossing or Traversing a Police Cordon. Those individuals are listed earlier in this report under the heading, "Subjects of Force."

The after-action report also notes changes to the assignment and operations of future gas deployment teams. The report noted a minimum of six officers are needed to make up the gas deployment team, in order for round loading and verification to be done in a timely manner. The report also noted, in future operations, all gas members must conduct an inventory of all munitions issued and used and will conduct a debriefing immediately after the incident.

Sergeant Barnes noted in the report, recertification training for all SWAT officers for munitions deployments was conducted after the incident.

Sergeant Barnes observed the attachments to the report included gas deployment forms relaying what munitions were used by the gas team, photographs of the scene prior to the gas deployment, and documentation of an injury to Sergeant Evan Cox.

### Grenadier Team Statements (Accused Officer Statements)

#### Statement of Lieutenant Kenny Prepetit

On Tuesday, July 7, 2020, at 1:16 PM, Sergeant Barnes emailed Lieutenant Prepetit and advised him of his rights as per the Louisiana Police Officer's Bill of rights. Sergeant Barnes requested Lieutenant Prepetit meet with Sergeant Barnes and provide a recorded statement regarding the incident. Lieutenant Prepetit acknowledged the email the same day. On Thursday, July 9, 2020, Lieutenant Prepetit was provided with a notice to render statement form by email.

On Tuesday, July 14, 2020, at approximately 9:47 AM, Sergeant Barnes met with Lieutenant Prepetit at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Lieutenant Prepetit, Sergeant

David Barnes, and Mr. Donovan Livaccari, attorney for Lieutenant Prepetit. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against Lieutenant Prepetit, recorded the required information as per the Louisiana Police Officer's Bill of Rights, and ensured Lieutenant Prepetit was aware of his rights. During the statement, Lieutenant Prepetit provided the following information, in summation:

Lieutenant Prepetit informed Sergeant Barnes he was working a protest regarding the George Floyd incident and monitored the protest as the protesters marched throughout the city. The protest made it onto the bridge and Captain Roberts gave the order to create a skirmish line on the Crescent City Connection (CCC). Lieutenant Prepetit then made it to the top of the CCC and stood in the rear with Captain Lampard to assess the situation for their tactical response. Lieutenant Prepetit then gave the order for his tactical teams to move up to the form up position at Tchoupitoulas and Henderson Streets.

As the protesters came face to face with the police line, Lieutenant Prepetit stated there was a lot of confrontation, and a lot of talking. Lieutenant Prepetit then called his blue team up, the arrest and snatch team, to assist the police line because there were not enough officers to handle the situation with the amount of people that were there. An opportunity was given to members of the protest to speak to police officials about leaving the bridge because they would not be allowed to cross the bridge. At some point they dialogue failed and the crowd became more and more agitated. Because of the nature of how the crowd was responding to the police and not complying with police requests to stop their protest, gas team was called to come up and stand by.

As they were discussing the possibility of having to use gas to disperse the crowd the crowd broke through the police line. At that time, Captain Lampard ordered the gas team to come up and prepare to deploy. At that time, the line was broken again in a different location on the bridge. When the police line was broken again the order to deploy gas was given. While they were preparing for the possibility of gas, a secondary line was being formed and was preparing for gas, but the first line was not prepared for the deployment of gas.

Once the order was given to deploy gas, the first actions were to deploy hand canisters 5 to 10 feet into the crowd, because the way the protesters were at the police line a traditional method of rolling the canisters would not have been effective. There was no standoff area between the crowd and the police line, so they wanted the canisters deployed towards the rear to have the saturation come back towards the front of the crowd.

Lieutenant Prepetit stated he believed the reason why the police line was formed on the bridge was to keep the protesters from traveling to the Westbank towards Jefferson Parish. Blocking the bridge causes a great deal of backup throughout the city and causes issues getting to the Westbank of the city. Lieutenant Prepetit stated the only intelligence information he received regarding the protest was from what they experienced in prior protests, specifically the night before when they had made it onto the interstate. Lieutenant Prepetit stated he received information they were going to try and do that again but was unsure where.

Lieutenant Prepetit stated the order to deploy gas was given verbally and he gave it over the radio to Sergeant Harris. The order to give gas was prompted by the agitating protesters forced their way through the police line. Sergeant Barnes asked at what point the 40mm launchers would be used when the order to deploy gas is given. Lieutenant Prepetit explained the different types of rounds launched by the 40mm launchers and stated they are used to protect the gas deployment team and the officers on the line from long range distances. They are used as a backup instrument and as a gas deployment tool. The plan is to deploy gas with the canisters and then use the 40mm launchers to stop protesters from taking direct action against the police, such as picking up canisters and throwing them back. Lieutenant Prepetit said the officers using 40mm launchers have the autonomy to take the immediate action with them when the gas canisters are deployed. The launchers are initially used while they are just observing but can take immediate action if needed. If the launchers have time to ask prior to deploying, they should, but its' on a case-by-case basis.

The launchers would have been assigned during a pre-briefing, at the Special Operations Division (SOD) office. The pre-briefing would have included an inventory of munitions and a discussion about what would have been authorized under what circumstances. Lieutenant Prepetit said a pre-briefing took place with himself and the gas team as they were loading the launchers and preparing the "gas package." The "gas package" would be an inventory conducted prior to deployment of what was distributed and packed into supply bags to give out on scene.

Lieutenant Prepetit stated Sergeant Harris was assigned as the team leader, Officers Devin Joseph and Michael Pierce were assigned 40mm launchers, and Officers Jason Jorgenson and Travis Johnson would have had supply bags and been hand deployers for gas canisters.

Sergeant Barnes then clarified that the officers would deploy the hand canisters and then the officers assigned launchers would either wait for an order to deploy the launchers or address issues they observed need immediate addressing. Lieutenant Prepetit stated the officers on the gas team were all SWAT officers and trained on deployment tactics for the munitions used. Lieutenant Prepetit also informed Sergeant Barnes that Officer Joseph is an instructor for the munitions used and was one of the officers assigned to use the 40mm launcher.

Lieutenant Prepetit stated there were two volleys of gas deployed that night. The first was the hand canisters and then deployment of the CS impact rounds from the launcher to address things such as people picking up the canisters and throwing them back at officers. Lieutenant Prepetit stated the protesters regrouped and continued to show agitation towards the police and a second volley was deployed which included hand canisters and impact rounds, which included the stinger rounds. Lieutenant Prepetit stated that usually a second authorization for the stinger rounds to be used from the launcher, but it was at the discretion of the officer using the launcher to determine which rounds would be most effective for the situation. Lieutenant Prepetit believed they had preloaded the launcher with the stinger rounds because they were preparing for a third volley that would have included them.

Lieutenant Prepetit stated no immediate authorization was given for the stinger rounds to be used. Lieutenant Prepetit stated he was not informed the stinger rounds were shot that evening,

he was aware they were loaded, but not fired. He learned they had been fired the next day. Lieutenant Prepetit stated the inventory and debriefing for the event was not done until the next day because everyone was instructed to go home and decontaminate themselves and a debrief would be done the next day, instead of contaminating the office at SOD to do a debrief.

Lieutenant Prepetit stated that night Captain Lampard asked if they had any uses of force and Lieutenant Prepetit believed there may have been some miscommunication. Lieutenant Prepetit stated he believed Captain Lampard's question could have been interpreted as hands-on force, which is what would be traditional uses of force covered by policy, but not pertaining to the gas deployment.

Lieutenant Prepetit stated SOD has never used gas canisters or impact rounds in a crowd setting to address civil unrest before this event and have only used it on SWAT deployment situations with barricaded subjects.

Lieutenant Prepetit stated the use of gas or impact rounds on a SWAT deployment is documented in the SWAT report but is not reported as a use of force and it has never been recommended it be documented as a use of force. Lieutenant Prepetit stated he was not aware of anything in policy that required the deployment of gas and munitions to be reported as a use of force.

Lieutenant Prepetit informed Sergeant Barnes that during SWAT school, all SWAT officers undergo a familiarization course with the gas and munitions, which includes classroom training and a practical exercise.

Sergeant Barnes then clarified that Sergeant Harris was the supervisor of the gas team, Lieutenant Prepetit would have been over him, and then Captain Lampard would have been the commander over both of them and Captain Roberts was the incident commander on the bridge.

Lieutenant Prepetit stated the mobile field force, that formed the skirmish line, they had received riot training that included the use of the riot gear. Sergeant Barnes then clarified the order of events regarding the gas team. Specifically, the pre-briefing would take place and the munitions would be assigned and made part of a package, and then the officers, once on the bridge, would have the discretion to use what was in the package as they saw necessary. Those officers would have to report it to Sergeant Harris, who would then report it to Lieutenant Prepetit. Sergeant Barnes clarified that gas and 40mm launchers have been used in the past but have not been reported in accordance with NOPD policy. Sergeant Barnes asked Lieutenant Prepetit was SWAT has in place to ensure there is accountability for the use of the munitions. Lieutenant Prepetit stated on a SWAT deployment it would be reported up the chain for authorization and then back down with the order to deploy and it would be documented that way. Lieutenant Prepetit also clarified that the gas team all moves together as one unit, with the launchers there to protect the hand deployment of the canisters, so when gas is deployed they could all be used in this type of setting. Lieutenant Prepetit stated this was consisted with their training.

Sergeant Barnes asked if there was a responsibility for the use of the munitions to be reported up the chain of command from the team leader. Lieutenant Prepetit stated the information should be reported up the chain, and that notification should take place on scene, but it would be documented after a debrief and a proper inventory was conducted. Lieutenant Prepetit stated that the debriefs of incidents usually happen withing 24 hours of the incident. Lieutenant Prepetit stated that normally on a SWAT deployment they will have a quick debrief on scene to address any issues or concerns. Lieutenant Prepetit stated a debrief that night was not done the way it normally would have because of the location. Lieutenant Prepetit stated he recalled Captain Lampard asking generally if they had any uses of force. Lieutenant Prepetit stated he believed a general response was given that they had no traditional uses of force. Lieutenant Prepetit stated he was aware of the gas deployment and the use of the direct impact foam rounds used that night but was only aware the stinger rounds were loaded. Lieutenant Prepetit stated he did not have any indication that the stinger rounds were fired that night, but it was brought to his attention they were loaded that night. Lieutenant Prepetit stated the stinger rounds were loaded before the second volley of gas was deployed.

Sergeant Barnes then left the room to ask if anyone observing had any questions or statements they would like clarified. Sergeant Barnes returned to the room a short time later with a few follow-up questions.

Lieutenant Prepetit stated there was no documentation of the pre-operation briefing, but the assignments and information is written on the dry-erase board in the briefing room at the SOD office. Sergeant Barnes then clarified again that once the order to deploy gas is given, the hand canisters will be deployed first, then the launchers would be used to address things at a distance and to address agitators to protect the police.

Sergeant Barnes asked if SOD trains to deal with crowd control scenarios during civil unrest. Lieutenant Prepetit stated they train based on a mobile field force model of creating a police skirmish line, identifying agitators, and trying to move and snatch them if they can. However, because of the situation that evening with the protesters and police face to face, some of the traditional methods trained for crowd control were not able to be used.

Lieutenant Prepetit stated he did not know of any groups being escorted across the bridge.

Sergeant Barnes asked if there were any notifications made to the crowd that the gas would be deployed. Lieutenant Prepetit stated he ordered the Long-Range Acoustic Device (LRAD) to the bridge and had two officers provide the LRAD to Captain Roberts to use the LRAD to communicate to protesters. Lieutenant Prepetit stated several warnings were given over the PA system in the armored vehicle to leave the bridge, but no specific warning of gas being used was given. Lieutenant Prepetit stated the actual warning of gas being imminent was not even a possibility because when the police line was broken is when the use of gas became necessary. Lieutenant Prepetit stated Captain Lampard gave the order to deploy gas, and he was unsure if Captain Roberts was part of that decision. Captain Roberts was the incident commander for the police skirmish line, and as the line was broken the tactical team took over because the line was not sufficiently manned. Lieutenant Prepetit stated the location where the line was formed put them at a disadvantage and stated the decision was made to push the line back to

where a fence was located to prevent protesters from pushing officers off the side of the bridge. Lieutenant Prepetit stated because the situation escalated so quickly they were unable to relocate the line safely and create a standoff area to properly deploy gas with the traditional method.

Lieutenant Prepetit stated he was not aware of injuries that evening from either protesters or police but saw officers had suffered from exposure to the gas. Lieutenant Prepetit stated he learned of complaints of injury from Lieutenant Kevin Burns the following day.

When asked if he would consider any of the force he saw unjustifiable physical abuse, violence, force, or intimidation Lieutenant Prepetit stated everything he saw was within policy. Lieutenant Prepetit added that he cut an item that night to document the incident and then was informed by Lieutenant Burns that FIT would document the whole incident. Lieutenant Prepetit stated that in lieu of the miscellaneous incident report being written he documented the incident in the SWAT report he previously provided to Sergeant Barnes.

Sergeant Barnes then concluded the stated at approximately 10:43 AM. The audio and video recordings of the statement have been made a permanent part of the case file.

## Statement of Sergeant Damond Harris

On Tuesday, July 7, 2020, at 1:14 PM, Sergeant Barnes emailed Sergeant Damond Harris and advised him of his rights as per the Louisiana Police Officer's Bill of rights. Sergeant Barnes requested Sergeant Harris meet with Sergeant Barnes and provide a recorded statement regarding the incident. On Thursday, July 9, 2020, Sergeant Harris was provided with a notice to render statement form by email. Sergeant Harris acknowledge receipt of the form the same day.

On Tuesday, July 14, 2020, at approximately 10:44 AM, Sergeant Barnes met with Sergeant Harris at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Sergeant Harris, Sergeant David Barnes, and Mr. Donovan Livaccari, attorney for Sergeant Harris. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against Sergeant Harris, recorded the required information as per the Louisiana Police Officer's Bill of Rights, and ensured Sergeant Harris was aware of his rights. During the statement, Sergeant Harris provide the following information, in summation:

Sergeant Harris stated he was called to assist the mobile field force on the bridge, as the supervisor of the grenadier team. As they arrived saw things being thrown and exploding on the ground, realized they were frozen water bottles. Saw the line of police officer was broken through and they were called to deploy gas. Because the line had been overrun, they deployed gas directly in front to push the protesters back, so the mobile field force could reestablish their line.

Once the gas was deployed, the rioters were backed up and the mobile field force reestablished their line. A call for a second deployment of gas was given, and another volley of

gas was deployed. At same time he also had two officers assigned to deploy extended CS rounds and marking rounds to mark gear that was stolen during the initial break of the line.

Sergeant Harris identified a subject as one of the main antagonizers after he observed him throw two canisters of gas back. Sergeant Harris learned his team was out of CS gas rounds and Officer Pierce needed to reload. Sergeant Harris then loaded Officer Pierce's launcher with the .60 caliber rubber ball "Stinger" rounds. Sergeant Harris then pointed out subject to Officer Pierce and let him know to keep his eye on him. Sergeant Harris stated he then stepped back and continued to supervise. Once the subjects were pushed back, the team returned to SOD.

Sergeant Harris stated that when they arrived, they were so far back all they could see were police cars and the mobile field force was holding the line up front. Sergeant Harris did not know who gave the order to establish the line, and stated it was already set when they got there.

Sergeant Harris explained he was the team leader for the gas deployment team (grenadier team). Sergeant Barnes asked when the order to deploy gas was given. Sergeant Harris stated when the rioters broke through the mobile field force's position, and had started throwing things, the order to deploy gas was given by Captain Lampard. Sergeant Harris said he received the order over the radio from either Captain Lampard or Lieutenant Prepetit.

Sergeant Harris explained the pre-operation briefing was so that everyone would know their role. During the briefing, they set the teams together and the gas team then met near the vehicle and prepared the launchers. The preparation included ensuring they had extended CS rounds in a launcher, marking rounds in a separate launcher, and they inspected the rounds. Inspected the bags with extra ammunition, so everyone knew what was where so it would be accessible when they needed it. At that briefing reviewed all the gear and made sure everyone knew who was using what and where it was located. The 40mm launchers were assigned to Officers Devin Joseph and Michael Pierce. Sergeant Harris stated he was aware that both Officer Joseph and Officer Pierce had used the launchers on warrants or SWAT deployments at least a dozen times each. Sergeant Harris stated the authorization for the launchers to be used came from either Captain Lampard or Lieutenant Prepetit, but was not sure which one gave the order.

Sergeant Harris then explained the use of the rounds. He stated the CS gas rounds are used to stop agitators and designed to hit individuals directly to stop individuals from taking whatever action they are doing, such as throwing something. The marking rounds are designed to mark specific equipment or agitators so that they can be identified by the snatch team or the "red team." (which would be called to address specific situations as backup). Both rounds are sponge rounds, designed to break apart when they hit a target, such as an individual or gear. The marking round leaves a mark on that target and the Extended CS round leaves a puff of gas on the subject. Sergeant Harris said both extended CS and marking rounds were used that night as well as two (2) .60 caliber stinger rounds. Sergeant Harris stated separate authorization is not needed for each round, the use of the rounds depends on the situation and the supervisor on scene. If the supervisor determines a round is ineffective because of the situation, or one of the officers using the launcher does, then they can use other rounds to address the situation, such as

a need to preserve injury to an officer. Sergeant Harris stated the decision to use another round is not covered by standard operating procedures.

Sergeant Harris stated this incident is the first time in the history of the NOPD that the gas and launchers were used in a riot situation. Sergeant Harris was unable to provide an estimate of how often gas or the launchers are used by SOD during deployments but did acknowledge gas had been used on a roll while he was a supervisor in SOD. Sergeant Harris stated the use of gas on a deployment would be documented in a SWAT report and uses of force on a deployment would be documented in a SWAT deployment and would also be reported and documented as a use of force in accordance with policy. Sergeant Harris stated the use of gas would not be documented as a use of force because it is not covered by the policy as a use of force. Sergeant Harris stated gas and impact rounds are not in the use of force policy and are not documented as a use of force because they are not in the policy.

Sergeant Barnes clarified with Sergeant Harris that he loaded the .60 caliber stinger rounds into Officer Pierce's launcher because they ran out of the extended CS gas and he wanted Officer Pierce to be loaded with the impact rounds in the event he needed to protect the officers if the rioter began throwing frozen water bottles again. Sergeant Harris stated he was not aware that Officer Pierce fired the rounds until the following day during their debriefing.

Sergeant Harris stated the debriefs usually happen after the event but that night they had to consider the fact that the officers were covered in gas and past the end of their shifts and there was no available overtime.

When asked, Sergeant Harris stated he did not authorize anyone to use any of the munitions, because they received the order to use them and the officers themselves would have the discretion to use whatever tools are in the gas package to deescalate the situation, based on what would be most effective in that situation.

Sergeant Harris stated he learned of an SOD supervisor who was injured during the incident and had only heard rumors about injured protesters. Sergeant Harris stated he was not aware of any injuries on the night of the incident.

Sergeant Harris stated he pointed out a specific agitator to Officer Pierce after Officer Pierce's launcher was loaded with stinger rounds, telling Officer Pierce to keep an eye on that subject.

Sergeant Barnes clarified with Sergeant Harris that the initial gas deployment that occurred when the line was broken was not accompanied by the 40mm launchers. After the antagonizers were pushed back with the gas canister deployment, the launchers were used to mark some of the equipment taken during the initial deployment. After the line was reformed, Officer Joseph then took a position on the hood of a vehicle. Sergeant Harris was unable to state exactly when Officer Pierce fired his launcher.

Sergeant Harris stated the officers would report what they had used at the debrief after the operation, but the debrief did not occur until the next day, after a press conference was given

about the incident. Sergeant Harris stated he became aware of the stingers at the debriefing the next morning and saw the press conference when he woke up and realized the press conference was inaccurate about what munitions were used. Sergeant Harris stated he was not sure the stingers were used until he learned about them at the debrief, which took place after the press conference he saw.

Sergeant Harris, when asked, stated he assumed the stinger rounds were fired at the agitator he pointed out to Officer Pierce after a second volley of gas was deployed by Officer Jorgenson. Sergeant Harris said he based that on the fact that the agitator picked up the canister and threw it off the bridge instead of at the police and assumed Officer Pierce had used the launcher to address the agitator when he picked up the canister.

Sergeant Harris stated the only time he was aware anyone was allowed to cross the CCC was during a peaceful march led by Reverend Jesse Jackson after Katrina. Sergeant Harris stated he believed that march took place in either 2006 or 2007 and he was unsure if the march was permitted or not.

Sergeant Harris stated that during the pre-operation briefing the assignments would have been on the board at the SOD office but did not indicate the pre-operation briefing would be documented.

Sergeant Harris added to his statement that he was the assigned team leader that night and that the actions of any of the officers under him would be his responsibility. Sergeant Barnes asked if anyone asked Officer Pierce if he fired the rounds that night or if he would have normally informed a supervisor he had fired them. Sergeant Harris stated that normally, on a SWAT deployment, they would know everything either directly after the incident or during the debrief, but in this circumstance everyone was covered in gas, so they didn't learn about the use of the stinger rounds until the debrief the next day.

Sergeant Harris, when asked, stated everyone he saw on the bridge acted professionally and implied that none of the force he observed on the bridge would be considered unjustifiable physical abuse, force, intimidation, or violence.

Sergeant Harris stated there are written standard operating procedures for SOD that would be maintained by Sergeant Michael Crawford. Sergeant Harris also stated that all of the officers in SOD would have undergone the same training in the NOPD's SWAT School.

Sergeant Barnes then concluded the interview at approximately 11:38 AM.

## Follow-up Statement of Sergeant Damond Harris

On Monday, December 14, 2020, Sergeant Barnes conducted a second interview with Sergeant Damon Harris at the PIB Office to clarify Sergeant Harris's statement on the body worn camera in which he said, "Mike was stingin' em. That's what I'm saying, them CS rounds wasn't working." Present for the interview were Sergeant Barnes and Sergeant Harris. The interview was monitored via Zoom by Sergeant Samuel Davis of the FIT, Consent Decree Monitor Chet

Epperson and the OIPM's Acting Chief Monitor Bonycle Sokunbi. The interview began at approximately 4:06 PM.

Sergeant Harris stated he was not speaking specifically about the Stinger rounds but about the rounds fired from the 40mm launcher. Sergeant Harris stated he did not know if Officer Pierce had actually fired the rounds until the following day, when he arrived at the Special Operations Division office and assisted in conducting a full accounting of the munitions.

Sergeant Harris informed Sergeant Barnes that he did not recall being asked what force was used or asked if the Stinger rounds were fired the night of the event. Sergeant Harris also stated he loaded the rounds into Officer Pierce's launcher but did not ask Officer Pierce if he had fired the rounds.

Sergeant Barnes concluded the interview at approximately 4:21 PM

The recordings of the interviews have been made a part of the permanent case file.

## Statement of Officer Michael Pierce

On Tuesday, July 7, 2020, at 1:16 PM, Sergeant Barnes emailed Officer Michael Pierce and advised him of his rights as per the Louisiana Police Officer's Bill of rights. Sergeant Barnes requested Officer Pierce meet with Sergeant Barnes and provide a recorded statement regarding the incident. On Friday, July 10, 2020, Officer Pierce was provided with a notice to render statement form by email.

On Tuesday, July 14, 2020, at approximately 2:22 PM, Sergeant Barnes met with Officer pierce at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Officer Pierce, Sergeant David Barnes, and Mr. Donovan Livaccari, attorney for Officer Pierce. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against Officer Pierce, recorded the required information as per the Louisiana Police Officer's Bill of Rights, and ensured Officer Pierce was aware of his rights. During the statement, Officer Pierce provide the following information, in summation:

Officer Pierce stated on the night of June 3, 2020, he was assigned as a grenadier on the gas team and was deployed to the top of the CCC. Once he arrived on the bridge, he was trying to get his equipment together when the crowd became unruly and he was called up to deploy gas. Officer Pierce stated the crowd was unruly and had a lot of agitators near the front. Officer Pierce was assigned to use a 40mm launcher and stated when he ran out of munitions he was told to reload, and once he attempted to reload, he was advised they were out of gas. At that point his Sergeant, Damond Harris, stated they had the .60mm stinger balls remaining, and they were loaded into his launcher.

Officer Pierce stated the protest was attempting to cross the bridge and they were called to stop the protest from crossing the bridge by Captain Lampard and Lieutenant Prepetit. Officer

Pierce stated as soon as they got up to the bridge and began to get things together, they got the call saying, "grenadiers up" and they deployed gas. Officer Pierce stated the call came from Captain Lampard and Lieutenant Prepetit.

Officer Pierce stated the grenadier team was comprised of himself and Officer Joseph, Johnson, and Jorgenson. Their supervisors were Sergeant Harris, then Lieutenant Prepetit, and then Captain Lampard. Officer Pierce stated he and Officer Joseph were assigned to use the 40mm launchers and Officer Johnson and Jorgenson were assigned to hand toss gas canisters.

Officer Pierce stated he was loaded with CS extended gas rounds but ran out of them and had to reload. He said the first time he deployed the launcher was after the gas canisters had been hand tossed. He then clarified the "grenadiers" were himself and Officer Joseph, the officers using the launchers, and the call for grenadiers came after the hand tossed canisters had already been deployed.

Officer Pierce stated prior to going to the scene there were assignments on the board in the main classroom and he learned he was assigned to the grenadier team. Officer Pierce was unsure which supervisor assigned him to the grenadier team.

The role of the grenadiers, as Officer Pierce described it, was to support the officers who were hand-tossing gas canisters. The objective of Officer Pierce was to disperse the crowd, and he would deploy the Extended CS rounds to disperse the crowd by skipping it off the ground to disperse gas. When asked if there was a separate call for the launchers, Officer Pierce stated the gas canisters, and the launchers were all in the same package, but they were specifically told to use to hand-tossed canisters first as part of the plan during the pre-operation briefing.

Officer Pierce described the plan for gas as having to deploy once the command staff feels it is needed. Officer Pierce stated he was certified once a year through Safariland to use the launchers and gas. Officer Pierce described the deployment method consistent with training as using the launchers, specifically the Extended CS, as dispersing gas at a farther distance than the hand-tossed canisters.

When asked if there was a separate order for the launchers to be used Officer Pierce informed Sergeant Barnes that once the hand-tossed canisters were deployed and the crowd was still aggressive, the grenadiers were called up to deploy the extended CS rounds. Officer Pierce stated he was using the extended CS rounds and he believed Officer Joseph was using the marking rounds.

Officer Pierce stated he had authorization to use the extended CS rounds, and he received an order to use those rounds when he was called up to deploy the rounds.

Officer Pierce stated that he was informed by Sergeant Harris they were out of gas when he attempted to reload his launcher and they then loaded the stinger rounds into his launcher. Officer Pierce stated the stinger rounds are also used to disperse crowds and would be skipped off the ground, affecting the bottom part of a person, at their legs. When asked if he had any specific targets he was aiming at, Officer Pierce stated he focused on a subject Sergeant Harris

pointed out to him that had tossed a hand canister back towards the police line. Officer Pierce stated he saw the subject reach to pick up a canister and he deployed a stinger round at that subject. Officer Pierce informed Sergeant Barnes he fired two of the stinger rounds. The first was launched at the subject picking up and tossing the canisters, and he believed he fired the second round shortly after but said he could not recall what his specific target was, but knew it was an agitator. Officer Pierce stated he did not receive direct authorization to use the stinger rounds at that time but that they were part of the gas package. When asked if he had been told he had the discretion to use whatever rounds were part of the package, Officer Pierce stated he had not been, but that they were out of the extended CS rounds and those were what was available in the gas package.

Officer Pierce informed Sergeant Barnes he did not notify anyone that he had used the stinger rounds until they came back for a briefing the following day. Officer Pierce stated they were contaminated with gas and did not want anyone sitting in the classroom, so they did not debrief until the next day. Sergeant Barnes asked Officer Pierce if anyone asked him if he used force and she stated that he was not asked what was used until the next day.

Officer Pierce informed Sergeant Barnes he has been assigned to SOD for approximately 18 years and this is the first time he has ever used the impact rounds or gas in a crowd control setting. Officer Pierce stated he may have used gas or impact rounds on a SWAT deployment a long time ago, and he recalled gas being used on a deployment, but not impact rounds. Officer Pierce stated he has been on SWAT deployments when gas has been used within the past two years. When asked if he knew how it was documented, Officer Pierce stated, from his understanding, gas was not part of the use of force policy, and he was unsure if impact rounds were. Officer Pierce also stated he did not believe gas had been reported as a use of force on other SWAT deployments.

Sergeant Barnes then clarified with Officer Pierce that the first time a supervisor was notified the stinger rounds were used was the following day at the debriefing.

When asked, Officer Pierce stated he did not observe any use of force on the bridge that he would consider unjustifiable physical abuse, force, or intimidation.

Officer Pierce stated he was not sure how many volleys of gas there were total during the event, but he fired six (6) extended CS rounds and two (2) stinger rounds.

Officer Pierce stated he was not aware of any injuries to protesters or police officers.

Sergeant Barnes asked what made the protesters unruly. Officer Pierce stated they were being overly aggressive by breaking through the mobile field force line, tossing objects, and tossing gas canisters back. Officer Pierce stated they protesters were pushing officers to the side as they came through the mobile field force, pushing officers to the edge, and they successfully broke through the line. Officer Pierce described the scene as "mass chaos." Officer Pierce stated that he assumed once the protesters broke through the mobile field force he believed the call for gas was given. Sergeant Barnes then clarified that when Officer Pierce arrived at the police line, the hand-tossed canisters had already been deployed.

Officer Pierce stated he was positioned between two officers' shields at the line and, from where he was, he could not recall if he could see the exit where the protesters were expected to exit.

Sergeant Barnes asked what Officer Pierce's primary focus with the launcher was when he was on the line, the protesters, or the agitators. Officer Pierce stated he was focused on the agitators because they were throwing frozen water bottles and gas canisters. The peaceful protesters were further back from the police line.

Sergeant Barnes then left the room to consult with those observing the interview and determine if any questions needed to be addressed in more detail. Sergeant Barnes then returned to the room to ask a few follow-up questions.

Sergeant Barnes discussed Officer Pierce reloading with the stinger rounds and asked who authorized him to use the stinger rounds at that point. Officer Pierce stated he was speaking with Sergeant Harris, who advised him all they had was stinger rounds and asked him if he wanted them. Officer Pierce stated he did, and Sergeant Harris loaded his launcher with stinger rounds.

Officer Pierce stated he assumed an inventory of the rounds was conducted prior to the equipment loadout, because there normally was, but was unsure if one had been done. Officer Pierce stated he did not load the equipment bags for the incident. When asked who was near him when he reloaded his launcher, Officer Pierce stated himself, Sergeant Harris, and Travis Johnson were present.

When asked what the effective range on the extended CS rounds were, Officer Pierce stated he believed it was 20 to 50 feet, and he believed the range was the same on the stinger rounds.

Sergeant Barnes then concluded the interview with Officer Pierce at approximately 3:01 PM. The recordings of the interview have been made a permanent part of the case file.

### Statement of Officer Travis Johnson

On Tuesday, July 7, 2020, at 1:17 PM, Sergeant Barnes emailed Officer Travis Johnson and advised him of his rights as per the Louisiana Police Officer's Bill of rights. Sergeant Barnes requested Officer Johnson meet with Sergeant Barnes and provide a recorded statement regarding the incident. On Friday, July 10, 2020, Officer Johnson was provided with a notice to render statement form by email.

On Tuesday, July 14, 2020, at approximately 3:09 PM, Sergeant Barnes met with Officer Johnson at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Officer Johnson, Sergeant David Barnes, and Mr. Donovan Livaccari, attorney for Officer Johnson. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of

the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against Officer Johnson, recorded the required information as per the Louisiana Police Officer's Bill of Rights, and ensured Officer Johnson was aware of his rights. During the statement, Officer Johnson provide the following information, in summation:

Officer Johnson stated he was assigned to the Special Operations Division grenadier unit to hand deploy gas during the protest. He was standing by at the SOD office when he was informed of an incident on the bridge and they were called to relocate to the location. When asked, Officer Johnson stated the information he received was that there was a skirmish line on the bridge, and they were attempting to have people disperse.

Officer Johnson stated when they got to the bridge, there were more people than they could count, the police skirmish line, and then the officers' vehicles behind the skirmish line. Officer Johnson stated he was driving an equipment truck for the grenadier team (which he referred to as the "550" and later described as an equipment truck with an armored passenger cab) and as the team began to dismount from the vehicle to move towards the location they received the command for "grenadiers up." While they were still gearing up to go, the order to deploy gas was given. Officer Johnson was aware that it was his job to conduct the hand deployment of gas, so he ran towards the skirmish line. When he was arriving at the line he noticed people coming through the skirmish line, between the vehicles that were already there. Officer Johnson then hand deployed a canister where the line was to try and maintain the integrity of the police line that had already been broken.

Officer Johnson informed Sergeant Barnes he undergoes a yearly recertification through the SOD training staff, Sergeant Crawford and Officer Pazon. Officer Johnson also stated during SWAT school he was exposed to the gas as part of the training.

Officer Johnson stated his understanding of the commands they received was that "Grenadier's up" was the call for the gas team to get to the line and be ready to deploy gas. The command "Gas, Gas, Gas," was the communication they used to order the actual deployment of gas, and also served as a warning to officers on the line that gas was being deployed. Officer Johnson stated those orders were given by Captain Lampard.

Officer Johnson informed Sergeant Barnes the gas deployment team consisted of Sergeant Harris as the supervisor, himself and Officer Jorgenson were assigned to hand-deploy gas, and Officer Joseph and Pierce were assigned as grenadiers using the launchers. Sergeant Barnes noted Officer Johnson referred to the launcher as a 50mm launcher and seemed unsure of the exact nomenclature of the weapon.

When asked, Officer Johnson informed Sergeant Barnes he did not remember a separate command being given for the launchers to be used. Officer Johnson stated that another command would not necessarily be given, depending upon the circumstances. Officer Johnson explained that, in a situation of civil unrest, an officer still must use their training regarding using force, and specifically discussed it depended on the totality of circumstances. Officer Johnson stated that a supervisor could not necessarily order someone to use force on specific individuals. It was

the training of the grenadiers that they would use the launchers based on their own observation and the situation.

When asked about a plan to deploy gas, Officer Johnson stated they usually determine what types of munitions they would use, but the situation would dictate what type of munition would be used. Officer Johnson stated in a perfect scenario everything would be peaceful and they would not have to deploy anything.

When asked if he heard any warnings, Officer Johnson informed Sergeant Barnes he was approximately half a football field (50 yards) away from the skirmish line, so he didn't know what was actually going on until he was called up and was not in a position to hear any warnings.

Officer Johnson stated if the hand-deployment was not effective, being assigned to the gas deployment team, he would wait for an additional command to deploy another volley of gas. Officer Johnson stated if the first deployment of gas was not effective the situation would dictate whether or not a second deployment would be called for. When asked, Officer Johnson informed Sergeant Barnes a deployment of gas does not automatically mean the launchers would be used, but they can be. Sergeant Barnes asked what would case the launchers to be used. Officer Johnson stated they would be used to attempt to deescalate the situation or stop force from being used against officers. Officer Johnson stated, in this incident, some individuals were retrieving the gas canisters and throwing them back to the police line. Some of the officers did not have gas masks on and couldn't stand at the line and dropped shields and batons. Officer Johnson stated that from his perspective, anyone he saw being aggressive, such as throwing canisters back or attacking officers, would be the reason he would deploy a 40mm launcher at that time. Officer Johnson stated he saw people pushing through the line when he got close, and when he was standing behind the line someone in the crowd through a glass bottle at them and someone through a hand-deployed gas canister at them. Officer Johnson stated he picked up the canister and threw it back towards the crowd. Officer Johnson explained that canister was thrown back during the second volley of gas. Officer Johnson stated there was space between the officers and the crowd at that time, and he threw the canister towards the crowd.

Officer Johnson informed Sergeant Barnes that evening he deployed two canisters of gas, three if he included the one the threw back. Officer Johnson explained how a canister is deployed and explained that the canister he threw back was still putting out gas when he had to find it and throw it back towards the crowd. Officer Johnson stated the first canister he deployed was dropped underhand at the line to try and secure the skirmish line, and the second canister he deployed was tossed overhand towards the crowd after the line had been reestablished. Officer Johnson stated he deployed one canister during the first call for gas, and the second canister at the time of the second call for gas.

When asked what other crowd control options were available on the bridge, Officer Johnson stated they had the option of using a "25" (flashbang) and stated he would not do that, or they could use stinger grenades. Officer Johnson struggled with the answer and offered that he was not quite sure what other options they would have had at the time.

Officer Johnson stated he had almost two years of experience in SOD. Officer Johnson also informed Sergeant Barnes he was not asked if he used force. Officer Johnson also stated he was not aware of what munitions were fired from the launchers. Officer Johnson stated there was another bag of munitions inside of the equipment truck and after the first volley of gas he was sent back to the truck to get more equipment to bring to the line. Officer Johnson clarified he was also tasked with carrying a bag of munitions on his back which had stinger grenades, gas canisters, and other munitions. Officer Johnson stated after the first volley of gas they were looking for more gas in his bag and did not find any, so he went back to the equipment truck to gather more munitions from the other bag, which he placed into his bag. Officer Johnson informed Sergeant Barnes he filled the bag with additional stinger grenades and canisters of CS gas. Officer Johnson stated munitions for the 40mm launcher were already in the bag he was carrying.

Officer Johnson, when asked if he assisted anyone with reloading, he stated he assisted Officer Pierce with removing spend 40mm casings from his launcher but did not load the launcher with anything. Officer Johnson stated someone else would reach into the bag on his back and load the launchers, but he was not able to see what munitions were being loaded.

Officer Johnson stated he did not have an inventory of what munitions where in the bags, and he did not load the bags. Officer Johnson stated Officer Pazon or Sergeant Crawford would have to answer the question of who loaded the bags.

When asked Officer Johnson said he told Sergeant Harris he did not have any gas left and that Officer Jorgenson had requested additional gas canisters. Officer Johnson stated he did not recall anyone being out of gas munitions for the 40mm launchers. Officer Johnson stated he went to Officers Joseph and Pierce individually and asked if they needed any additional munitions and was informed by both that they did not.

Officer Johnson informed Sergeant Barnes the only injuries he was aware of was officers of protesters who had suffered from the effects of the gas.

Sergeant Barnes conclude the statement at approximately 3:37 PM. The recordings of the interview have been made a permanent part of the case file.

## Statement of Officer Devin Joseph

On Tuesday, July 7, 2020, at 1:20 PM, Sergeant Barnes emailed Officer Devin Joseph and advised him of his rights as per the Louisiana Police Officer's Bill of rights. Sergeant Barnes requested Officer Joseph meet with Sergeant Barnes and provide a recorded statement regarding the incident. On Sunday, July 12, 2020, Officer Joseph was provided with a notice to render statement form by email. The interview was subsequently rescheduled due to a conflict with Officer Joseph's representation, Mr. Keith Sanchez, and Officer Joseph was sent another notice to render statement form on Monday, July 20, 2020.

On Tuesday, July 21, 2020, at approximately 2:23 PM, Sergeant Barnes met with Officer Joseph at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video

recorded statement. Present for the statement were Officer Joseph, Sergeant David Barnes, and Mr. Keith Sanchez, attorney for Officer Joseph. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against Officer Joseph, recorded the required information as per the Louisiana Police Officer's Bill of Rights, and ensured Officer Joseph was aware of his rights. During the statement, Officer Joseph provide the following information, in summation:

Officer Joseph informed Sergeant Barnes that he was assigned to the grenadier team that evening and was equipped with a 40mm launcher. At some point during the evening, the grenadier team was called to the bridge. Officer Joseph stated as soon as they arrived, he understood the skirmish line was face-to-face with protesters who were attempting to cross the line. Officer Joseph was told to don his gas mask and get the gas package ready in case it was needed. As soon as he was able to don his gas mask, by his understanding, the line was broken, and the grenadier team was asked to deploy gas.

Officer Joseph was running to the skirmish line and donning his gas mask as the gas was being deployed. Joseph stated his launcher was loaded with marking rounds and once he observed individuals throwing canisters of gas back at the officers he began to launch 40mm markers to mark the individuals who were throwing the canisters so they could later arrest them.

After the first gas deployment, Officer Joseph stated he reloaded his launcher with 40mm extended CS rounds. After a second deployment of gas was called for, Officer Joseph stated he launched an unknown number of extended CS rounds into the ground near where subjects were throwing canisters back at the police. Officer Joseph stated after he launched those rounds, he stood fast and did not take any other action.

Officer Joseph described the grenadier team as being led by Sergeant Damond Harris, with himself and Officer Pierce assigned 40mm launchers, and Officers Johnson and Jorgenson assigned to hand-deploy gas canisters.

From Officer Joseph's understanding, the police had formed a skirmish line on the bridge and protesters had advanced towards the skirmish line and were attempting to get past the skirmish line. The grenadier team was then called up to the bridge to be on standby in case they were needed on the bridge. Officer Joseph stated he did not know what the protesters were doing to try and get past the skirmish line. He was several yards away from then, and when he arrived at the skirmish line he saw some protesters had already passed beyond the skirmish line, behind the officers, officers attempting to arrest those protesters, and gas being thrown back by the protesters. Officer Joseph said when he got there, it was not a peaceful protest.

Officer Joseph clarified that when he arrived at the skirmish line, gas canisters had already been deployed by Officer Johnson. Officer Joseph stated he was not sure if Officer Jorgenson had deployed any at that time, but he was running behind Officer Johnson and had seen Officer Johnson deploy the canisters.

The order to deploy gas was ordered over the radio, but Officer Joseph stated he did not hear that order over the radio, he learned it from Sergeant Harris who physically alerted him of the order, in person. Officer Joseph stated that 40mm launcher was not explicitly authorized by command staff, he used the launcher to address the canisters being thrown back at officers. Officer Joseph informed Sergeant Barnes that he is a Safariland instructor regarding the use of the launchers and gas deployment. Officer Joseph stated he and Officer Dylen Pazon are the certified instructors for the gas munitions. He further stated the launcher is used to prevent harm to the officers by preventing canisters from being thrown back at them, or things of that nature.

Officer Joseph stated in his career he has never used gas or the 40mm launchers in a crowd control setting, but has used them on SWAT deployments, such as barricaded subjects.

When asked, Officer Joseph said he was not familiar with any standard operating procedure in writing that governed NOPD's use of the gas canisters or 40mm munitions. Officer Joseph said they follow the Safariland training as guidance on when to use the gas or 40mm munitions. The launchers are generally used to protect officers during a crowd control setting, but the use depends on the munition being used. Officer Joseph provided the example of using the marking rounds he initially used to target individuals, equipment, or location (such as a door) to mark that target. Officer Joseph then explained the use of the extended CS rounds he had also used that night, saying the rounds were used to deploy gas at a further range, where a handheld gas canister may not reach.

Officer Joseph said, during Safariland training, other instructors from other jurisdictions would share their experiences with the use of the munitions and what each munition is used for around the country. Officer Joseph informed Sergeant Barnes that he renews his instructor certification every three years, and acts as an instructor to renew SOD's certifications every year.

Officer Joseph stated the armory staff conducts an inventory prior to each deployment and provides a select amount of each rounds to the grenadier team. Those munitions are stored in two rucksacks, which were assigned to officers Travis Johnson and Jason Jorgenson. Officer Joseph stated he was assigned to Officer Travis Johnson to reload from that rucksack and assumed Officer Pierce would have been assigned to Officer Jorgenson.

Officer Joseph stated prior to the deployment, the grenadier team would meet with the armory staff and go over the munitions, which were laid out on a table. Each grenadier would be assigned a launcher with a specific munition for their launcher, to start with. On the night of the incident, Officer Joseph was assigned marking rounds while Officer Pierce was assigned extended CS rounds. Officer Joseph stated he reloaded his launcher one time that evening. When asked, Officer Joseph told Sergeant Barnes the launchers hold six (6) rounds, and he fired six (6) of the marking rounds, then reloaded with extended CS rounds and was unsure how many extended CS rounds he fired. Officer Joseph did not use any other type of round that evening.

Officer Joseph answered questions as to his knowledge of the effective range of the different types of munitions, saying he believed the marking rounds had an effective range of 5 to 50 feet and the extended CS rounds had an effective range that he was unsure of, and would have to refer to the manual. Officer Joseph then clarified that the effective range applies to the

direct impact of a round, as if it were aimed directly at a target. Officer Joseph stated he was familiar with the .60 caliber stinger rounds and that they are used to disperse a crowd, address agitators in the crowd, or address the crowd if the crowd is acting as an agitator. Officer Joseph stated the stinger rounds were authorized to use if force was being used upon them, but he did not know if there was any express permission given to use the rounds. Officer Joseph clarified that the rounds are authorized for them to use at their discretion, in accordance with use of force guidelines. Officer Joseph stated that, based on the situation, if he had been loaded with the rounds he would have been authorized to use them.

Sergeant Barnes asked Officer Joseph was his focus was when he was firing the launcher. Officer Joseph stated when he shot the marker rounds he aimed for the munitions on the ground, to keep people from picking up the munition by moving it, or directly at an that individual's legs to mark that individual. Officer Joseph stated he used the extended CS rounds to shoot at the ground to disperse CS gas. Officer Joseph explained when a CS round is shot and hits a solid object, the plastic round is crushed, and CS gas is dispersed into the air.

Officer Joseph informed Sergeant Barnes that his supervisor was aware of the rounds he fired that night, and he informed them through conversation of what he fired, knowing they would not have the opportunity to debrief that night because of the gas contamination. Officer Joseph stated they would usually have an informal debrief that evening and then a formal debrief the following day. The debrief would not have been done that night because of the gas contamination.

Officer Joseph did not know of any injuries that evening and did not know if anyone checked for injuries that evening.

According to Officer Joseph, SOD has been called to be on standby for crowd control in the past but has never been called out from being on standby until the evening of this incident. Sergeant Barnes asked Officer Joseph about the use of gas on SWAT deployments. Officer Joseph stated he believed it was used on approximately 80% of SWAT deployments, and the 40mm launcher has been used, but not that often. Sergeant Barnes asked how the use of gas or launchers on a SWAT deployment is documented. Officer Joseph informed Sergeant Barnes that the use of both would be documented in the SWAT report, but neither have ever been documented as a use of force, to his knowledge. Officer Joseph also stated he could not recall the 40mm launchers ever being used against a person, specifically.

Sergeant Barnes then left the room to consult with those observing the interview and determine if any questions needed to be addressed in more detail. Sergeant Barnes then returned to the room to ask a few follow-up questions.

Officer Joseph informed Sergeant Barnes that he told Lieutenant Prepetit that he used all of the marker rounds he had and used some of his CS gas rounds. Officer Joseph stated only he and Lieutenant Prepetit were present for that conversation. Officer Joseph informed Sergeant Barnes that Sergeant Harris was present for the pre-briefing in which the rounds were loaded and/or distributed, but Officer Joseph did not inform him of what rounds he had fired on the bridge.

When asked if the marking rounds were dangerous to people, Officer Joseph stated, "Not at all, it's just chalk." Sergeant Barnes asked Officer Joseph what the possibility of them causing injury to someone is. Officer Joseph stated the rounds can cause a bruise, but the round is meant to be shot at a minimum distance of five (5) feet, and all of the rounds he shot were from a distance of at least 15 feet. Officer Joseph stated, in his training, he had never learned of anyone being injured by marker rounds. Officer Joseph stated there are other rounds that people have been injured by, such as foam baton rounds, but they were not used or available that evening. Officer Joseph stated that, of the munitions in the supply bag, the .60 caliber rounds can cause injury if they are used incorrectly. Officer Joseph stated that they train to skip them off the ground, not fire them directly at people, in order to lessen the velocity of the round.

Officer Joseph was told Sergeant Barnes that if someone were hit in the head with rubber ball rounds or marking rounds at 15 feet or beyond, the round would probably barely leave a bruise. Officer Joseph stated that if the extended CS round was to directly impact someone within 30 feet, it can cause a bruise. Officer Joseph clarified it would cause skin discoloration but implied it would not cause serious injury.

Officer Joseph stated that, with his years of experience and his instructor certification with Safariland, there was nothing he could have done differently. Officer Joseph stated a third volley of gas was asked for and he advised his supervisors that he did not believe a third volley was needed.

Officer Joseph stated he would not consider any of the force he observed on the bridge that evening to be unjustifiable physical abuse, violence, force, or intimidation.

Sergeant Barnes then concluded the statement at approximately 3:06 PM. The recordings have been made a part of the permanent case file.

## Statement of Officer Jason Jorgenson

On Tuesday, July 7, 2020, at 1:15 PM, Sergeant Barnes emailed Officer Jason Jorgenson and advised him of his rights as per the Louisiana Police Officer's Bill of rights. Sergeant Barnes requested Officer Jorgenson meet with Sergeant Barnes and provide a recorded statement regarding the incident. Officer Jorgenson was later provided with a formal notice to render statement form.

On Tuesday, July 21, 2020, at approximately 3:11 PM, Sergeant Barnes met with Officer Jorgenson at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Officer Jorgenson and Sergeant David Barnes. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against Officer Jorgenson, recorded the required information as per the Louisiana Police Officer's Bill of Rights, and ensured Officer Jorgenson was aware of his rights. During the statement, Officer Jorgenson provided the following information, in summation:

Officer Jorgenson stated he was assigned to the grenadier team to hand-deploy gas canisters during the protest coverage if they were needed. Officer Jorgenson received notice approximately 45 minutes before the incident that the protesters had made their way onto the bridge and were heading towards the Westbank. At that time, they began to mobilize and move towards the bridge.

When his team arrived on the bridge, they observed police officers had formed a skirmish line. As they were getting out of their vehicle, he heard the command to deploy gas. Officer Jorgenson stated at that point the officers must have lost control of the skirmish line. Officer Jorgenson stated they scrambled to get their gear together and make it to the skirmish line. Officer Jorgenson said while he was doing that, he heard at least one other time the command to deploy gas was given. Officer Jorgenson stated the command came very fast and kept coming to deploy gas. Officer Jorgenson retrieved two gas canisters and deployed them into the crowd, in the method he was instructed. That method was an overhand toss, 10-15 feet into the crowd.

Officer Jorgenson stated the gas took effect on the protesters and the situation where the line had been broken was resolved. The protesters then regrouped and began approaching the skirmish line again. Officer Jorgenson stated he believe the protesters may have confronted the officers at the skirmish line again and they were given another command to deploy gas. Officer Jorgenson then retrieved two more gas canisters from the backpack carried by Officer Johnson and deployed them in the same method he had the first time. After that, many of the protesters had left and there was a small group that had remained. The skirmish line then moved forward until the remaining protesters left on the exit ramp. The officers were told they were finished and to return to the SOD office to receive further orders or a debrief.

Officer Jorgenson stated the SOD rank determined who would be on the grenadier team but was unsure who exactly. Officer Jorgenson then described the pre-operation briefing which took place in the large classroom at the Special Operations Division Office. The teams were assigned and written on the whiteboard. At that time, they were informed of what was going on with the protests at the time and what was expected. The officers were informed to standby and await further information or instructions. The grenadier team then had a second briefing in the warehouse where the munitions were assigned out and loaded into backpacks. Officer Jorgenson said the grenadier team consisted of himself and Officer Johnson to hand-deploy canisters, Officers Joseph and Pierce were assigned to use the 40mm launchers. Sergeant Harris was the supervisor over the team. Officer Jorgenson clarified with Sergeant Barnes the launchers were not firearms and referred to them as a less-than-lethal device.

When asked what training he had received to deploy gas, Officer Jorgenson said he had classroom briefings on the effects of the gas and how to deploy them; however, Officer Jorgenson stated he had never physically trained on deploying a gas canister. Sergeant Barnes clarified that Officer Jorgenson had never deployed a gas canister until the event.

Officer Jorgenson stated he did not have a backpack, but Travis Johnson was carrying the backpack and all of the munitions were retrieved from that pack. Officer Jorgenson was unsure of exactly which type of gas they used to deploy that night, and informed Sergeant Barnes

he would recognize the canister but could not recall the actual name of the type of canister he deployed and didn't want to give the wrong name.

Officer Jorgenson stated he believed the initial command to deploy gas was from Captain Lampard, but he was unsure who gave the command the second time, but believed it was Captain Lampard as well.

Officer Jorgenson stated the training for the deployment of gas is conducted by Officer Pazon and Sergeant Crawford. Officer Jorgenson stated he was trained on the gas in SWAT school in 2017 and received a recertification class taught by Officer Pazon. Officer Jorgenson clarified he had only been through the single recertification class and has been assigned to SOD since February of 2019. Officer Jorgenson has been with the New Orleans Police Department as an officer for approximately five (5) years and had spent seven (7) years with the US Border Patrol prior to that. Officer Jorgenson stated in that time he has had riot control training, but it did not include specific training on deploying gas.

Sergeant Barnes asked Officer Jorgenson to explain what he meant when he said the situation at the skirmish line resolved itself after the initial deployment of gas. Officer Jorgenson stated when he was arriving at the skirmish line after the command to deploy gas, he could see protesters on both sides of the skirmish line. Officer Jorgenson stated it was clear the protesters had broken through the skirmish line. Officer Jorgenson stated he and Officer Johnson deployed the first four canisters of gas. Officer Jorgenson described it as a "messy situation" with protesters and officers who were both affected by the gas. Officer Jorgenson was not sure if the officers didn't have their masks on, or didn't have them on correctly, or if they were unaware that gas was going to be deployed.

Sergeant Barnes clarified with Officer Jorgenson that the instruction he received on how to deploy the canisters came in the pre-operation briefing by his supervisors, specifically Sergeant Harris and Lieutenant Prepetit, and he was unsure if that was consistent with the classroom instruction. The supervisors instructed him on how to deploy the gas canisters over the police line, throwing them overhand 10-15 feet into the crowd.

Officer Jorgenson informed Sergeant Barnes that the reason for deploying gas was if the situation got out of control and they wanted to disperse the crowd. Officer Jorgenson clarified that was the reasoning applied to the hand-deployed canisters. Officer Jorgenson offered that the reason for using launchers would be to address any violent protesters or individuals who were throwing canisters back at the police.

Officer Jorgenson stated he believed the initial command for gas came from Captain Lampard, but the others were relayed and was not 100 percent sure that the call came from Lampard. Officer Jorgenson stated he did not recall hearing any separate call for the launchers to be used. Officer Jorgenson stated the launchers would be used in coordination with the gas deployment to address problems after the canister deployment.

Officer Jorgenson stated he was informed an inventory was conducted prior to the deployment that night, but he did not take part in it. Officer Jorgenson stated he believed

Sergeant Crawford took the pre-deployment inventory and the post-deployment inventory would have been conducted by Officer Pazon but was overseen by Sergeant Crawford.

Officer Jorgenson stated the backpacks were loaded up by the grenadier team, he believed, but he personally did not load the backpacks. Officer Jorgenson stated he believed Officer Johnson received the backpack after it had been packed, but that he did observe Officers Joseph and Pierce reviewing the backpacks to verify what was in the package.

Officer Jorgenson stated he heard reports that there were injuries to protesters after the incident but did not learn of any injuries that evening. Officer Jorgenson stated he was unaware if anyone checked for injuries.

Officer Jorgenson stated in his time in SOD he has never deployed gas before, himself. Officer Jorgenson did say he has been on a SWAT deployment where gas was deployed inside of a house. Officer Jorgenson stated that he was unsure if the deployment of gas was reported as a use of force. Officer Jorgenson stated he is not sure what the use of force policy stated about using gas or the 40mm launchers.

When asked if it were possible that any of the canisters thrown by him could have hit a protester, Officer Jorgenson stated it was definitely possible. Officer Jorgenson stated the method of deployment made it possible, overhand, 10-15 feet into the crowd. Officer Jorgenson then demonstrated, using a chalk board eraser, how he deployed the canisters. Officer Jorgenson demonstrated he raised his arm overhead in a lobbing motion, releasing the canister when it was directly over his head, so the canister would ark over the line in the air. Officer Jorgenson also demonstrated he lobbed at least one canister in the same arcing fashion, but underhand, releasing the canister into the air so it would arc and come down. Officer Jorgenson stated the force he used to lob the eraser is the same amount of force he used that evening to deploy the canisters.

Officer Jorgenson stated he did not witness any force on the bridge that evening that he would consider unjustifiable physical abuse, violence, force, or intimidation.

Sergeant Barnes then concluded the statement of Officer Jorgenson at approximately 3:43 PM. The recordings have been made a part of the permanent case file.

## Incident Command Statements

## Statement of Captain Lejon Roberts (On-Scene Incident Commander)

On Friday, July 24, 2020, at approximately 10:05 AM, Sergeant Barnes met with Captain Lejon Roberts at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Captain Roberts and Sergeant David Barnes. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against the accused officers and ensured Captain Roberts understood he was being interviewed

as a witness in the investigation. During the statement, Captain Roberts provided the following information, in summation:

Captain Roberts stated he and several captains were monitoring a protest as it went throughout the city from downtown to uptown. After the protest became mobile, it attracted more protesters and eventually converged onto the Magazine Street onramp to US90 Business onramp to the Crescent City Connection. Captain Roberts then called for officers to form a skirmish line on the bridge to prevent the protesters from continuing on the bridge to prevent destruction and harm to themselves or anyone else.

Captain Roberts stated he observed the line was well formed and none of the officers had gas masks on at that time. The protesters were coming towards the officers rather quickly. Captain Roberts relayed over the radio the distance of the protesters as they advanced towards the officers.

Once the protesters and officers were "nose to nose" some of the informal leaders were allowed through the police line to speak to Captain Roberts. Captain Roberts stated the main informal leader was an individual named "Brandon" and two other males and two other females were allowed behind the police line. Captain Roberts explained to them they would not be allowed to cross the bridge, for their safety. The leaders became upset, belligerent, and agitated. One of the females told Captain Roberts they were going over the bridge and the police could not stop them. Captain Roberts explained to her that would not happen, and they needed to turn around and continue their protesting on the ground, peacefully. The woman and "Brandon" wanted the officers instructed to put down their batons and shields, and at one point said they wanted the officers instructed to put down their weapons (meaning firearms). Captain Roberts explained that would not happen. Captain Roberts explained to the informal leaders that they may have been peaceful, but the rest of the crowd was turning unruly and getting agitated. Captain Roberts stated the crowd tried to call the leaders back saying, "Stop all that talking, we don't want to talk, we need to do what we gotta do." Captain Roberts stated that threats were made towards the officers concerning if they were not allowed to cross the bridge no one would go home and other threats to do harm to the police officers.

Captain Roberts stated the dialogue with the leaders was not working and the crowd was growing agitated and starting to hit. Several other officers were arriving on the bridge at the time. Captain Lampard instructed a secondary skirmish line to form don their gas masks. The secondary line was supposed to start replacing the officers on the first line, so they could don their gas masks. The crowd at that time was becoming very irate, beating on the police shields, and testing the officers by trying to incite them, agitate them to try and get them to do something stupid. Before the officers on the secondary line could finish donning their gas masks the informal leaders were called back to the protest side of the skirmish line. Someone in the crowd then said, "Women to the back, men up front." At that time, the protesters started hitting shields, pulling on shields, and trying to push through. Lieutenant Bush had called the line to an on-guard position because the situation was growing more contentious. Once Lieutenant Bush called the on-guard position, several people broke through the line and they attempted to corral them and get them back on the other side. More people started breaking through the line when Captain Lampard gave the order to deploy gas. Captain Roberts stated he repeated the order

over the radio. Once gas was deployed, Captain Roberts stepped back with other Captains on scene because he did not have a gas mask.

Captain Roberts stated he did see at least two volleys of gas deployed and once the gas was in the air it was very strong. Captain Roberts stated once the gas was deployed the crowd started to disperse and several protesters were exiting the bridge. Captain Roberts called for the skirmish line to reform. Once the line was reformed, Captain Roberts made sure instructions to exit the bridge were given to the protesters three times before they started advancing the line. Captain Roberts stated once the line moved forward, five (5) people refused to exit the bridge and were taken into custody. The remaining protesters exited the bridge.

Captain Roberts stated he contacted Deputy Chief Thomas and briefed him of the incident.

Captain Roberts stated they had intelligence information earlier that day that the protesters may be trying to take the bridge. Captain Roberts stated they had placed cars some of the ramps, but the protesters went right around the cars and stormed the bridge. Captain Roberts then instructed officers to enter the Tchoupitoulas exit and form a skirmish line to prevent the protesters from going over the bridge. Captain Roberts stated he had already positioned some officers on top of the bridge because they were forming plans throughout the night as the protest went mobile just in case they decided to go up on the bridge.

When asked, Captain Roberts stated they informal leaders of the protest refused to listen to anything he said. The night before he had a good conversation and had built a rapport with the subject, and the night of this incident they were not reasoning with officers. They seemed irate, and one of the leaders tried to calm the others down. One of the females leading the protest demanded officers put their weapons down. Captain Roberts stated one of the informal leaders of the protest stated a friend of his was robbed by the police the night before. When asked to speak to the subject and if it was reported the leader told Captain Roberts that he was not going to bring the subject to him and he didn't file a report because he is scared of the police. The leader demanded that Chief Thomas come to the bridge and that the Officer who robbed him, identified only as Officer White, be arrested that evening. Captain Roberts stated the leader told him if Officer White weren't arrested Captain Roberts would "see what happens." The leader went on to threaten that all he had to do was tell the protesters and they would not be very happy.

One of the female leaders began taking off her earrings and started becoming more hostile. Captain Roberts explained they needed to leave the bridge and go down and continue to protest on the ground for safety reasons. Captain Roberts explained to the leaders that the crowd was growing hostile and throwing things, and they cannot just throw things off the bridge. Captain Roberts stated there was another leader in the crowd who yelled, "Fuck all that talking, that's too much talking. We don't need to talk no more." That is when the rest of the leaders went back into the crowd.

Captain Roberts stated he heard the crowd getting agitated and irate, beating on the shields, and screaming at officers. Captain Lampard began to prepare the officers to don their gas masks. Before anyone could get in place or don their gas masks, the protesters started

breaking through the line, fighting, and pushing at officers. Captain Lampard ordered gas deployed and Captain Roberts and the other captains moved back.

Captain Roberts informed Sergeant Barnes he was relaying all the information he had to Chief Thomas and had been the one to hold roll call, request additional personnel, and was coordinating the traffic unit. Captain Roberts stated he the supervisor in charge of the protest.

Captain Roberts stated there were police motorcycles leading the protest, and he did not want them blocking the onramps so they would not get hurt. Captain Roberts stated he recalled telling officers to park their cars at the foot of the onramps to deter the protesters from going up the bridge, but they cars were overrun to there was nothing they could do.

Captain Roberts then made the decision to establish the skirmish line on the bridge. When asked why not let them cross the bridge, Captain Roberts stated it was a safety issue, because they had not shut traffic down, and the crowd was hostile and irate. Captain Roberts did not want them to throw anything off the bridge that could cause harm to anyone else. Captain Roberts also stated he did not want to allow the protest to leave into another jurisdiction. Mostly, there was a safety issue, protesters were climbing on rails, it became a safety issue for officers if the protest became violent. It was a bad safety issue to have a mobile, hostile, group on an elevated bridge.

Sergeant Barnes asked when the crowd became hostile. Captain Roberts stated the crowd became hostile when the skirmish line was formed. Captain Roberts allowed the informal leaders through to talk to them and provided them the Ling-Range Acoustic Device (LRAD) to talk to the crowd. The leader told the crowd the opposite of what Captain Roberts was telling the leaders. Captain Roberts stated they cut the LRAD off and had to take it from them because the female leader stated the police were going to shoot them and beat them and hurt them. Captain Roberts stated that was not what they were communicated to the leaders. Captain Roberts stated both a male and a female were allowed to talk to the crowd on the LRAD and the female stated something to the effect of, "We're gonna do what we gotta do." Captain Roberts stated it appeared the female was trying to incite the crowd. That is when things started heating up and Captain Roberts stated he remember a glass bottle being thrown by protesters behind the police line while they were trying to negotiate with protest leaders.

When asked if a warning that gas would be deployed was given, Captain Roberts stated they did not have time. The last thing anyone wanted was to deploy gas or use force. When the pushing and shoving started as the officers were preparing to deploy gas but, prior to the officers being prepared, the protesters started breaking through the line and fighting, so there was no time to give a warning. Captain Roberts stated the protesters had it on their mind once they said, "men to the front, women to the back." The officers began to get ready just in case it escalated further. The officers on the front line were not ready and were affected by the gas.

Captain Roberts explained gas would be deployed in that situation because the officers were greatly outnumbered by the protesters, who were breaking through the line. The protesters had also taken officers' equipment, such as shields, batons, and helmets. Captain Roberts stated in situations like this, where the officers become vulnerable, the Special Operations Division

uses less lethal munitions to try and hold back the crowd. If they had not, the crowd would have run all over the police, in a chaotic form, so the less lethal munitions were used to regain control of the crowd.

Captain Roberts, when asked, stated he told the informal leaders to tell the protesters to exit the bridge and when the LRAD was provided to the informal leaders they did not tell the protest that but instead stated the police would shoot them and hurt them and advised they were not being allowed to cross the bridge. Captain Roberts also believes a member of SOD was on a bullhorn asking people to please exit the bridge, prior to the gas deployment.

Sergeant Barnes asked Captain Roberts what his experience with the NOPD was. Captain Roberts explained he has 22 years with the NOPD, nearly 15 of those years were spend in SOD as a patrolman and then as a sergeant. Captain Roberts has been the commander of the First District since January of 2019. In that time, Captain Roberts has had training through SOD in deploying gas and training in riot control. Captain Roberts stated he was familiar with all of the equipment used, including the gas. Captain Roberts stated he has never deployed gas in a crowd control setting and did not remember any specific time gas or 40mm launchers were used for crowd control. Captain Roberts stated he has deployed gas many times before on SWAT deployments.

Captain Roberts stated he did not believe there was any operations plan in writing at the time of the incident, it was an informal plan, but it was not written. Captain Roberts stated after the gas was deployed during the protest an operations plan was put together.

When asked if there was any intelligence information received prior to the event, Captain Roberts stated they knew there were going to be protests from a group, possibly Black Lives Matter, that met every day at 6:30 PM at Duncan Plaza. They were unsure if the protests would move from that location each night. Captain Roberts requested assistance from other districts through Chief Thomas. Captain Roberts stated they did not request any assistance from other jurisdictions, but Louisiana State Police were assisting on the bridge. Captain Roberts had communicated with LSP Captain Dean Behrens, who was on the bridge that evening. Captain Behrens had asked if they needed LSP's mobile field force and Captain Roberts stated they did not that evening.

Captain Roberts stated he observed an officer exposed to the gas being pulled out from the incident, and he believed someone hurt their back. Captain Roberts stated several of the protesters from the bridge went to area hospitals complaining that they were exposed to gas and clarified that he had heard that information that evening through the radio and from Chief Bouyealous of the Tulane Police Department. Captain Roberts stated the 5th District sent several officers to the hospital with the individuals who were taken into custody to get a medical clearance before being booked at the Orleans Parish Sheriff's Office. Captain Roberts did not recall if EMS was summoned to the bridge and did not recall seeing EMS on the bridge.

Sergeant Barnes then followed up with Captain Roberts about what happened with the complaint made by the informal leader, known as Brandon, regarding the allegation his friend was robbed by a police officer. Captain Roberts stated they never found a complainant, Brandon

kept saying they knew who the officer was and that it was Officer White. Captain Roberts explained he did not have an Officer White in the Frist District and it could have been a neighboring district or someone impersonating the police. Brandon said his friend was scared and insisted that if they did not bring Officer White to the bridge and show that he was in custody "you know what would happen." Brandon refused to bring the victim forward and stated he just wanted to see Officer White in jail. Brandon would not describe the officer and stated it was an NOPD officer near the food stamp office. Captain Roberts stated Brandon was very irate because he said his friend was robbed by the police. Captain Roberts stated they had nothing to verify the information and no victim came forward. Brandon told Captain Roberts that he spoke to Chief Thomas and Chief Thomas knew Officer White had to be in jail. Captain Roberts stated Brandon refused to bring the alleged victim to speak to police, stating, "That's like bringing a rapist around a woman."

Captain Roberts stated Chief Ferguson arrived on scene at the bridge after the incident was over and everyone was off the bridge. Captain Roberts stated he discussed the particulars of what happened with Chief Ferguson about the protesters coming on the bridge. Captain Roberts stated he provided the same information to Sergeant Barnes that he provided to Chief Ferguson. Chief Ferguson asked Captain Roberts if they had used rubber bullets, Captain Robertson stated he knew they deployed gas but was not sure what else they deployed and they would have to ask Captain Lampard. Captain Roberts stated he spoke to Captain Lampard that evening and was informed they only deployed gas.

Captain Roberts observed the gas canisters and saw them firing the launchers but believed it was all gas. Captain Roberts stated he was under the impression they were firing gas through the 40mm launchers because when they deployed the gas canisters the protesters were throwing them back. Captain Roberts then clarified for Sergeant Barnes that in his experience they would use the 40mm launchers to deploy gas, in an encapsulated pellet, to prevent protesters from picking up the canisters and throwing them. Captain Roberts stated he could see the gas in the air and all he knew they were deploying was gas.

Captain Roberts stated he also spoke with Chief Westbrook the following day and was asked what was deployed from the 40mm launchers. Captain Roberts called Captain Lampard and was informed they only deployed gas and the 40mm launchers were used to deploy CS gas rounds.

When asked if any of the force he observed on the bridge that evening could be considered unjustifiable physical abuse, violence, force, or intimidation, Captain Roberts stated he did not, and the deployment of gas helped them maintain control.

Sergeant Barnes then exited the room to discuss with the other members of FIT, the OIPM, and the OCDM if there were any additional questions or clarifications they wanted. Sergeant Barnes then entered the room after a short period with some follow up questions.

Sergeant Barnes asked if the use of force policies that are in effect now were in effect at the time he was in the Special Operations Division. Captain Roberts stated they were. When asked, Captain Roberts stated when SOD deployed gas on a SWAT deployment they would

document the use of gas or the launchers on the SWAT after action report, and he believed it was documented in a use of force report as well. Captain Roberts stated he was not sure if the Blue Team report was in place at the time, but it should have been documented on a resisting arrest report. Captain Roberts again referred to the SWAT after action report as the documentation.

Sergeant Barnes then asked if the protesters had indicated they would or had become violent at all prior to the police line being formed and prior to the informal leaders meeting with NOPD. Captain Roberts stated they were just chanting and marching in the streets. Captain Roberts stated at one point someone was beating on the windows of business uptown, but someone in the crowd stopped them.

Sergeant Barnes asked if it was possible that establishing a skirmish line escalated the situation that evening. Captain Roberts stated no. He believed the protesters had it on their mind they were going to cross the bridge and they wanted to do whatever they wanted to do that night and wanted a fight with the police and got one by getting the NOPD to deploy gas. Captain Roberts stated they wanted to have a fight with the police and have destruction and vandalism and they were not getting that from the NOPD, and they wanted to escalate it to create a situation with the police. Captain Roberts stated that no matter what they tried to say to them, approximately 75% of the crowd on the bridge wanted to get into a confrontation with the police. Sergeant Barnes asked if Captain Roberts believed it was the goal of the protest leaders to cause a confrontation and Captain Roberts said yes.

Sergeant Barnes then asked Captain Roberts if there were any other steps, he could have taken prior to forming the skirmish line that may have been successful in deescalating the situation. Captain Roberts stated, "Shy of us just letting them just go across the bridge? No." Captain Roberts then stated the risks of preventing first responders to get to the Westbank and the impact it could have on the citizens on the Westbank. Captain Roberts stated the crowd had started out peacefully and they went throughout the city and started getting more unruly as they went throughout the city. Captain Roberts stated the crowd had bicycles traveling around the protest and would block cars in using bicycles, at the front and the back, as if they were trying to block the cars in to keep them in the path of the crowd. Captain Roberts stated it was clear the leaders wanted a confrontation. Captain Roberts stated he even radioed to the units to not get close enough to allow the bikes to block them in.

Sergeant Barnes then concluded the statement at approximately 11:15 AM. The audio and video recordings have been made a part of the permanent case file.

## Statement of Captain Brian Lampard (Tactical Commander)

On Friday, July 31, 2020, at approximately 10:32 AM, Sergeant Barnes met with Captain Brian Lampard in his office at the Special Operations Division at 1899 Tchoupitoulas Street and obtained an audio and video recorded statement. It should be noted that because of a communication error on the part of Sergeant Barnes, the interview was delayed and the physical location changed to Captain Lampard's office. Present for the statement were Captain Lampard and Sergeant David Barnes. The statement was monitored via a zoom call by several members

of the Office of the Independent Police Monitor, including Ms. Susan Hutson, members of the Office of the Consent Decree Monitor, and other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against the accused officers and ensured Captain Lampard understood he was being interviewed as a witness in the investigation. During the statement, Captain Lampard provided the following information, in summation:

Captain Lampard stated the Special Operations Division was placed on standby, because the event was an "all hands on-deck" incident, with both the tactical and traffic teams involved. The traffic division was used a scout teams while the tactical teams were broken down into snatch teams, a gas team, and a rapid response team.

The tactical teams waited on standby at SOD in case they were needed, and Sergeant Todd Morrell was monitoring the crowds that evening. Captain Lampard stated he was receiving updates from dispatch and from Sergeant Morrell.

The protest went uptown and made its way back towards the Crescent City Connection, where they got on the ramp and got onto the bridge. The incident commander, Captain Roberts, then formed a skirmish line on the bridge near the entrance to the Crescent City Connection. Captain Lampard clarified that he was the tactical commander and Captain Roberts was the incident commander. His instruction, as the tactical commander, was to respond to any calls from the incident commander. Captain Lampard then clarified that he would not be calls unless the protest turned into civil unrest and started to become a riot. Captain Lampard stated he was not sure what happened prior to his arrival but knew that the incident sounded tense because of Captain Roberts' voice on the radio when he asked for assistance. Captain Lampard stated when he arrived on the bridge the skirmish line was already formed, and the protesters and police were already face-to-face. There was absolutely no space between the officers and the protesters.

Captain Lampard clarified that SOD's job is not to form a skirmish line but is to support the units forming the skirmish line. No one was SOD was in the initial skirmish line.

Captain Lampard stated he arrived on the bridge and a second skirmish line, not as big as the first line, was formed. When he arrived, Captain Roberts was already in negotiations with the informal leaders of the protest. Captain Lampard stated he was not privy to what was being said in the negotiations. Captain Lampard was positioned behind the second line, approximately 15 yards back, between the line and the armored vehicles.

When asked, Captain Lampard stated the purpose of the second line was the have a reserve of officers. The intention was to have the second line of officers don their masks and relieve the front line so they could don their masks as the situation escalated.

Captain Roberts appeared to be in negotiations with the leaders of the protest and SOD brought the LRAD to him and allowed the protest organizers to use it to talk to the crowd. The intent was to try and calm the crowd down, to try and keep it peaceful. At the time, things were escalating, and the crowd was calling for overrunning the police line. Captain Lampard stated he was nervous and was not sure if they were going to deploy gas but determined it was certainly a possibility, so he made the call for the officers to don gas masks.

Captain Lampard stated he was not involved in the decision to not let the protest cross the bridge. Captain Lampard reiterated that SOD's mission was to reinforce the skirmish line, rescue officers, repel agitators, and address a breach or attempted breach of the police line with munitions.

Captain Lampard stated he made the decision to deploy gas after the line started breaking down. The protesters were pushing and shoving. While the officers were in the process of donning their gas masks, the protesters broke through the line. Captain Lampard stated he was in fear for the safety of both officers and protesters and determined he needed to deploy gas to disperse the crowd before someone got hurt.

When asked to weight the benefits and the risks, Captain Lampard replied that there were approximately 2000 protesters and less than 100 officers. The protesters were throwing things at officer and were not content with merely passing by. They were pushing, shoving, and stealing things from officers.

Captain Lampard stated he was just behind the skirmish line when he gave the command to deploy gas. That command was then echoed to Lieutenant Prepetit, then to the gas team. Captain Lampard then described how the gas canisters worked. Captain Lampard went on to discuss that the canisters are deployed by an underhand toss, or by rolling on the ground, but are not thrown. Captain Lampard stated tossing the canisters is consistent with the training for deployment. When asked if it should be tossed into the crowd, Captain Lampard responded that generally the canisters should be tossed in front of the crowd. He went on to state that the crowd was moving, and the canisters would have been tossed to get deeper penetration into the crowd. Captain Lampard then clarified that the canisters would have been tossed, and not thrown, so as not to cause any injuries.

Captain Lampard stated there was more than one volley of gas and clarified that hand tossing gas canisters is only one method of deployment. Another method of deployment is using a 40mm launcher, firing a soft foam projectile that contains CS gas. The purpose of the launcher is that it can get more distance to disperse the crowd. When asked why they would use both the canister and the launcher, Captain Lampard stated the canisters are a method of dispersing gas more broadly. Launching rounds would allow officers to direct gas to more specific targets.

When asked what warning were given prior to the deployment of gas, Captain Lampard stated warnings were given for approximately 45 minutes. Captain Lampard stated warnings were given by Captain Roberts and over the LRAD in the Lenco Bear armored vehicle. Captain Lampard stated he believed Officer Pazon was giving warnings in addition to the warnings Captain Roberts and the protest organizers had given. Captain Lampard believes the protesters were told numerous times to exit the bridge or they would be subject to gas.

Sergeant Barnes asked Captain Lampard what other crowd control options were available at the time of the incident. Captain Lampard stated impact munitions could have been used, but he believes that would have been excessive. Captain Lampard stated the gas is an irritant and

impact weapons were farther up on the force continuum than he was willing to go at the point they deployed.

When asked if there were other options that could have prevented the conflict, Captain Lampard stated he was not called until the protest had already become civil unrest, and Sergeant Barnes would have to ask Captain Roberts.

Captain Lampard stated in the past NOPD has used tactics, such as negotiating with the leaders, to prevent civil unrest. Captain Lampard stated those methods usually work, but the leaders, "weren't having any part of it in this." Captain Lampard stated there was a progression of animosity towards the officers, civil unrest, and the protesters seemed to think this was acceptable behavior.

When asked, Captain Lampard stated he was aware of what munitions were loaded up to bring to the bridge that evening and was in the area when they were loading them. He stated that all of the munitions are part of the gas package. Captain Lampard stated calling it a "gas package" is misleading, because it's not only gas. The package also consists of marking rounds, gas canisters, stinger rounds, and launched impact CS foam rounds.

Sergeant Barnes asked what the stinger rounds are used for. Captain Lampard stated the stinger rounds are used when they aren't getting compliance with the handheld canisters or launched CS rounds. Mainly towards subjects that are particularly agitating and potentially causing a danger to others. Captain Lampard said that evening, the rounds were used because there were rioters that picked up gas canisters and threw them back at the police and off the bridge. His understanding was that the stinger rounds were used to address those agitators.

Captain Lampard stated that night, after the bridge was cleared, Chief Thomas asked if anything other than gas shot at protesters. Captain Lampard stated he turned to Lieutenant Prepetit, who was there with Officer Joseph, Sergeant Harris, and several other officers and asked that question. Captain Lampard was told no, all they used was gas. He then relayed that information to Chief Thomas.

Captain Lampard was then told the next day at the briefing that a grenadier had used stinger rounds. Captain Lampard stated he was informed that Officer Pierce told Sergeant Harris, who told Lieutenant Prepetit, who then told him. Captain Lampard could not recall if Officer Pierce was around when he asked if anything other than gas was used. Captain Lampard then stated that he was asked to give a response to something that should have waited until they did an inventory, but he was confident he was given the proper response and did not wait.

Captain Lampard stated he had no other communication with Chief Thomas that evening, but may have spoken briefly, in passing, before the incident occurred and was told to have his men on standby. Captain Lampard stated he had no other discussions with Chief Thomas about anything to do with the crowd or the incident.

Captain Lampard informed Sergeant Barnes that the decision to have the Special Operations Division on standby came from the operations bureau and was not unusual.

Sergeant Barnes asked if he knew of any injuries that evening. Captain Lampard responded that he didn't know of any that night. He was aware that officer had been affected by gas, but, as far as he knew, no protesters were hurt. Captain Lampard stated supervisors checked for officers who were injured, but the protesters were gone. Captain Lampard also stated that EMS was on scene and no protesters sought help from EMS or were treated. Captain Lampard later clarified that he believed EMS was at the base of the bridge and may have been on the bridge as well.

Captain Lampard stated it was not until the next day, or later, that he learned of any injuries. He was asked about the deployment of canisters because a female said she had been struck in the head and received stitches. Captain Lampard stated he did not see any children on the bridge when asked if there was anyone on the bridge who was high risk when they deployed the gas. Captain Lampard also stated he received no reports of protesters going to hospitals.

Sergeant Barnes asked if the officers on the skirmish line had received training in riot control. Captain Lampard stated he did not assign them, so he did not know. He stated SOD conducts riot training several times a year and gives requests to the district commanders to send officer. He would assume those officers being sent have received the training but does not know because he did not assign them to be on the line.

Sergeant Barnes asked Captain Lampard why snatch teams wouldn't just detain the agitators that evening. Captain Lampard stated the agitators were too numerous. That evening they had two snatch teams and about 50 agitators on just the front line. The crowd was full of agitators six (6) or seven (7) rows back and there was no way they could have accomplished that. Snatching the agitators works when there are one or two agitators. Captain Lampard offered, in his opinion, if they had tried to snatch people it would have escalated the situation. The plan was to let the situation calm down and it became obvious the agitations of the crowd were not going to let it calm down.

Captain Lampard stated, in the 26 years he has being doing policework, he is never seen a protest that combative. He stated they would have sat there all night with them, but that was not the atmosphere. The crowd was extremely combative, agitative, and was looking for a fight. The crowd was calling to break through the police line, throwing objects at the police, stealing batons, shields, and helmets, pushing, and shoving at the line, and breaking through the line, attempting to engulf the officers.

Sergeant Barnes learned Captain Lampard has approximately 26 years of experience and has spent between 18 and 20 years in the special operations division. For the last five (5) years he has been assigned at the Captain/Commander of SOD and has spent eight (8) years prior to that as the second in command of SOD. Captain Lampard stated this is the first-time gas has been deployed for crowd control, and the first time a protest has been that combative.

Captain Lampard stated they have deployed gas on SWAT deployments and high-risk warrants and have used 40mm launchers to break windows and deploy gas inside of houses. In those incidents the use of the gas or the launcher have always been documented in the SWAT

After Action Report. Captain Lampard stated it has never been documented as a use of force. Captain Lampard informed Sergeant Barnes the use of gas and the launchers is not covered in the policy, has never been documented as a use of force, and has never been an issue prior to this incident. Captain Lampard stated the use of the gas has been at the discretion of the commander of SOD and has always been documented, it is just not covered under policy.

When asked if he would consider the use of gas a use of force, Captain Lampard stated he would not. Captain Lampard clarified that he would not because it was not like using a gun or conducting a take-down. The gas is an irritant. Captain Lampard informed Sergeant Barnes he believes that OC spray, previously used by the NOPD, was an effective tool. When asked if OC was ever not a use of force, Captain Lampard stated he did not recall OC spray ever *not* being a reportable use of force. Sergeant Barnes asked if the same standard should apply to CS gas. Captain Lampard stated it was not up to him to decide. He reiterated the use of gas is not covered by the policy and it's never been reported as a use of force in the past. Captain Lampard stated, "Making this a unique situation is not something I was looking to do." Sergeant Barnes asked if he thought gas should be covered by the policy. Captain Lampard stated no, but it was not up to him. Captain Lampard then stated he does not write the policy; he just follows it.

Captain Lampard stated a written operations plan was written by Sergeant Blackman. Captain Lampard also stated he believed the written plan by Blackman was distributed prior to the incident on June 3, 2020. Captain Lampard also stated that in addition to the operations plan, during the pre-incident briefing, the team assignments and responsibilities are all written out on a white board in the briefing room, with each group given a color designation for clarity.

Captain Lampard stated they had received information from intelligence that the protest that evening had a possibility of escalating, and that's why SOD was placed on standby.

Captain Lampard informed Sergeant Barnes he did not notify any other jurisdictions but saw Louisiana State Police was on the bridge.

When asked, Captain Lampard stated he did not see or speak to Chief Ferguson either that evening or the following day. Any information he had about what munitions were used during the incident was provided to Chief Thomas and no one else. Captain Lampard clarified that Chief Thomas was the only person who asked. Captain Lampard stated that, at the time he provided the information to Chief Thomas, he believed it was true. The following day, at the briefing, he learned the two stinger rounds had been fired and immediately reported it to Chief Thomas.

Captain Lampard informed Sergeant Barnes that any tactical decisions made prior to the deployment of gas would have been made by Captain Roberts. Captain Lampard clarified that the Incident Commander, Captain Roberts, oversaw everything until the protest turned to civil unrest. When the line was breached the civil unrest, incident fell under the command of Captain Lampard.

Captain Lampard stated he was unsure if any drones were used that night, but also stated it was irrelevant, because by the time they got there it was easy to see what was going on. Any

drones used by the NOPD would have been piloted by Detectives Nick Morrell or Sean Ogden. Captain Lampard stated a drone may have been used that evening, but it was not an NOPD drone and no drone was noted in the after-action report.

Sergeant Barnes asked how the munitions were used that evening and if they were used together, meaning the canisters and the 40mm launchers. Captain Lampard stated they were and clarified that if the canisters are effective then they do not need to use the launchers. The launchers are used to enhance the canisters. Captain Lampard stated the first volley of gas had some effect and the crowd dropped back. This gave officers the opportunity to don their masks. After approximately five (5) minutes the protesters regrouped and advanced towards the police line again. Captain Lampard stated the protesters advanced towards the line and when they reached it they were pushing and shoving, trying to break the line again, and another round of gas was deployed.

Sergeant Barnes asked when the stinger rounds were deployed. Captain Lampard stated his understanding is the stinger rounds were deployed after the second volley of gas, when rioters were picking up canisters of gas and throwing them back at the officers and over the bridge. When asked, Captain Lampard stated the stinger rounds could be specifically authorized, but the authorization to use them is implicit when the CS impact rounds and gas canisters are being deployed, if there is a threat that the gas is not driving away. Captain Lampard stated the officers were certainly authorized to use the stinger rounds, and he did not give specific authorization, but it was within the purview of the officer to use it. Captain Lampard clarified that the use of the rounds is not left to the discretion of the officer initially, the gas is to be used initially. However, if someone is causing a threat in the deployment of gas that needs to be addressed with stinger rounds, then the officers can use them. Captain Lampard stated he did not give permission to use them at the beginning of the incident because it would have been excessive without at least giving the protesters the opportunity to exit on their own after the deployment of tear gas. Captain Lampard then added that he absolutely thinks the officer was justified in using the stinger rounds. Captain Lampard believes Officer Pierce was only using the stinger rounds to try and drive rioters away from picking up gas canisters and throwing them at the police or off the bridge.

Captain Lampard informed Sergeant Barnes he should have been notified of the use of the stingers rounds that night and he was not. Captain Lampard said the officer should have notified his sergeant, who should have notified his lieutenant, who should have notified him. Captain Lampard stated he believes the breakdown in communication came between the officer and the sergeant.

Sergeant Barnes asked if there is usually a debrief after an event like this. Captain Lampard stated generally it's the night of, but that evening they had a long shift, and the department was very conscious of curtailing overtime. They had also used gas, so the officers had to decontaminate their equipment prior to bringing it into the building to avoid contaminating the building. Captain Lampard stated he and Lieutenant Prepetit made the decision to debrief the following day because they were coming in for a protest then as well. That is when they discovered the stinger rounds were used.

Captain Lampard stated he would not consider any of the force observed to be unjustifiable physical abuse, force, violence, or intimidation.

Captain Lampard stated all of the information he received about the actions of the rioters was from what he personally saw and heard from his officers. He personally saw bottles and objects, which he believed were rocks, being thrown at the police officers, prior to the initial breach of the line. After the initial breach he saw gas canisters being thrown and didn't recall any other objects, besides gas canisters, but stated objects were flying all over the place. The canisters stood out because they leave a big plume of gas.

Captain Lampard then clarified he does not consider the use of gas a use of force because it is not in the policy, if the policy changes they will adhere to the policy, but the gas did not need to be documented in any way other than the after-action report because it is not in the policy. Captain Lampard stated if the policy changes, they will adhere to the policy.

Sergeant Barnes then concluded the statement at 11:15 AM. The recordings of the statement have been made a part of the permanent case file.

## Statement of Deputy Superintendent John Thomas

On Monday, August 24, 2020, at approximately 10:41 AM, Sergeant Barnes met with Deputy Superintendent John Thomas at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Sergeant Barnes and Deputy Superintendent Thomas. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against the accused officers and ensured Deputy Superintendent Thomas understood he was being interviewed as a witness in the investigation. During the statement, Deputy Superintendent Thomas provided the following information, in summation:

Deputy Superintendent (Chief) Thomas stated he was monitoring the protests on the night of June 3rd and because there were protests that had split and gone in different directions, he determined he couldn't monitor all of the directions on the ground. Chief Thomas stationed himself at the Real Time Crime Center (RTCC) with a few others to monitor all the different locations at once. Chief Thomas stated he realized on June 2 he was only able to monitor the one location at a time without being in the RTCC.

Chief Thomas informed Sergeant Barnes he was the incident commander on the night of June 3rd and was responsible for overseeing the protests as the overall commander. Sergeant Barnes asked if there were other individuals assigned to each of the locations where protests were going on. Chief Thomas stated Captain Lejon Roberts was the operations commander and on-scene commander and when the Special Operations Division was activated Captain Lampard was the commander of SOD and Lieutenant Prepetit was his assistant commander.

Chief Thomas stated he made the decision to have SOD on standby because of the magnitude of the protests. Chief Thomas stated at the operations command they put together a

package that included the Louisiana State Police patrolling the Lower French Quarter and they had different units on standby to assist. They also pulled from other districts, had the motors (traffic division) available and mounted available if they needed them.

Sergeant Barnes asked Chief Thomas to talk about what happened with the protest that went onto the bridge. Chief Thomas stated the protesters they decided to go onto the bridge. Captain Roberts, as the operations commander, made the decision to form a line on the bridge that would allow the protesters to exit the bridge so they would not put anyone in danger or cut off traffic on the bridge. Chief Thomas stated Captain Roberts made the decision to put the line at that point on the bridge so people could have the option to go back the way they came or exit the bridge by the convention center. Chief Roberts stated he was made aware that a line was being formed on the bridge.

When asked why not just let the protesters cross the bridge. Chief Thomas stated allowing people on the bridge presented a safety issue that there was traffic still flowing and if they had an emergency across the river the resources would have been cut off.

Chief Thomas stated he did not have an opportunity that evening to negotiate with any of the protesters or see the protest first-hand. Chief Thomas said he was not privy to what was discussed during any of the negotiations and he was not aware that the command to deploy gas was given that evening. Chief Thomas stated he was not aware that gas was part of the munitions package that evening until after the fact.

Sergeant Barnes asked if Chief Thomas was aware that when SOD was on standby and asked to respond, if gas and impact rounds were part of a package SOD would have on hand when they respond. Chief Thomas stated SOD carries those munitions as part of a SWAT patrol, but they have never used it on a protest. Chief Thomas stated in his seven (7) years working in SOD and his 29 years with NOPD they have never used gas on a protest, only on other SWAT deployments.

Chief Thomas stated his approval to deploy gas was never requested that evening. Sergeant Barnes asked if it was a situation in which it would have been required that the on-scene commander seek Chief Thomas's approval prior to deploying gas. Chief Thomas stated they had never had a situation like that, and the on-scene commander had more intelligence than him because he was on scene. Because the situation was rapidly evolving there was never an opportunity to request his approval through the chain of command. Chief Thomas stated he was informed the gas was deployed because the crowd was coming towards the officers in an aggressive manner. Chief Thomas also stated that he was unable to see what was happening on the bridge from the RTCC, but he could hear it on the radio.

Sergeant Barnes asked if there were other options available for crowd control that evening. Chief Thomas stated he was not aware of any other available tactics and he was not on the bridge that evening. Chief Thomas continued that he was not sure what tactics could have been used because they were clearly outnumbered on the bridge, but without having been there he is not sure. Chief Thomas also stated he was not sure what warning were given prior to the deployment of gas.

Sergeant Barnes asked if there was anything that occurred differently between the protests on June 2nd and the protests on June 3rd, clarifying that both times protesters went onto the highway, but the night of June 2nd ended peacefully. Chief Thomas stated the first night he was able to develop a rapport with some of the leaders of the crowd and was able to negotiate with them. Chief Thomas stated that the crowd then said they wanted the mayor to come out the next night. Chief Thomas stated he spoke to Captain Roberts the next night and learned the protest leaders had made unrealistic demands. They wanted the officers to put their gun belts down, which was an unrealistic demand. Chief Thomas said from speaking to the leaders the night before, it was communicated they were going to be more aggressive and escalate things the night of June 3rd if they did not get what they wanted.

Sergeant Barnes asked if Chief Thomas was aware stinger ball rounds were fired on the bridge that evening. Chief Thomas said he learned about the stinger rounds when there was an inventory done the next day. Chief Thomas stated it was reported to him that SOD deployed canisters of gas when what SOD had reported was two volleys of gas. Chief Thomas stated someone mistook volleys for canisters and he received information that SOD deployed two canisters of gas, when they actually deployed two volleys of gas. Chief Thomas was informed that gas was launched with the 40mm launchers and that evening he did not get any information about SOD launching anything other than gas.

Chief Thomas, when asked, stated he learned about an injury to a woman who was hit in the head with a gas canister but was not sure if it was that evening or the next day. He was unsure if anyone checked for injuries. Chief Thomas stated he did not recall seeing any children on the bridge. Chief Thomas also clarified that he did not go to the bridge until after the incident. By the time he arrived on the bridge the bridge was almost cleared out. Chief Thomas stated he went onto the bridge when it was almost clear and met the Superintendent there.

Chief Thomas informed Sergeant Barnes he met with the Superintendent of Police, Shaun Ferguson, on the bridge after the incident was over. Chief Thomas stated they discussed what was deployed and what happened. Chief Thomas believes he spoke with Captain Roberts and Lieutenant Prepetit to give the Superintendent a gist of what occurred on the bridge.

Chief Thomas informed Sergeant Barnes that the intelligence he had received prior to the incident was from the night before, that the protest leaders had threatened to cause "drama" (in Chief Thomas's words) if they did not get their way.

Sergeant Barnes asked what the role of LSP Troop N during the incident. Chief Thomas stated they had Troop N patrolling the French Quarter while NOPD tailed the protest. Chief Thomas stated he did not notify or request assistance from any other jurisdictions or agencies.

Sergeant Barnes asked if there was an operational plan for the event. Chief Thomas stated they had a basic plan they used from SOD that discussed how they would do regular protests. Chief Thomas did not remember if there was a written operational plan that was put out before that evening. Chief Thomas stated he did receive the basic plan for their response from either Lieutenant Prepetit or Sergeant Richard Blackmon.

The following evening and that evening, Chief Thomas and the Superintendent did not ask about anything other than gas being fired. Chief Thomas stated they received a briefing of the incident and were not told about the rubber balls being fired.

Chief Thomas, when asked, stated the current use of force policy does not address the gas canisters and takes away OC spray and only approves the use of gas for the Special Operations Division. Chief Thomas stated the 40mm launchers were treated the same way by the policy, they are only authorized to be used by SOD because they require special training. Sergeant Barnes asked how the use of gas or the use of the 40mm impact munitions are documented. Chief Thomas stated that it should be documented as a use of force when they use the gas or 40mm impact rounds. Chief Thomas was unsure how SOD documents the use of gas or the use of the 40mm launchers now because it was different when he was in SOD. Chief Thomas did inform Sergeant Barnes the use of force policy does not cover the use of gas or the use of the 40mm launchers.

Sergeant Barnes asked if there was a policy that governs NOPD's response to protests. Chief Thomas stated a policy called "civil disturbance" is currently under review by the Office of the Consent Decree Monitor and the Department of Justice.

Chief Thomas informed Sergeant Barnes that he has seen some Facebook videos with the protesters pushing against shields but has not watch any other videos because the incident is under investigation. Chief Thomas stated that was the only force he saw on the bridge.

Chief Thomas stated he was unable to see anything on the bridge from the RTCC cameras. Chief Thomas said there are cameras placed strategically through the city and he was able to watch the protests as they moved throughout the city but could not see what happened on the bridge.

Chief Thomas stated that if someone was hit when a gas canister was deployed, he would consider it a use of force. He stated the policy may cover it from the basis of throwing an object, not specifically a gas canister, but the act of throwing any object into a person's head should be covered under the policy.

At the request of the Independent Police Monitor, Sergeant Barnes asked Chief Thomas if there was any racial tension on the bridge. Chief Thomas stated he did not know of any racial tension or epithets on the bridge.

Sergeant Barnes clarified that the decision to use gas was made by the on-scene commander. Sergeant Barnes asked if the on-scene commander was required to reach out to Chief Thomas to get authorization before deploying any part of the gas package. Chief Thomas reiterated they had never dealt with that situation before but now they have rewritten the SOPs so it will be a part of the new SOP. Sergeant Barnes asked, once the incident devolved into that situation and Captain Lampard took over as the commander of SOD, does he have the authority to determine what munitions are brought to the scene. Chief Thomas stated that SOD brings all of their munitions, an entire package, based on the situation, they know what tools they have

available to use and will make the determination on what to use based on their resources and what they are confronted with. Chief Thomas stated that is a decision the commander would make because he has the expertise to know how the tools are utilized and what situation they should be utilized in.

When asked if there is anything that would assist the department in these situations, Chief Thomas referred to the SOP being worked on and stated this is an area that NOPD and other departments around the country are struggling with right now.

Chief Thomas stated he was not part of the tactical decision making regarding whether or not to allow the protesters on the bridge. Chief Thomas stated it was not a matter of deciding to allow them on the protesters on the bridge, because 100 officers could not stop 2000 protesters. Chief Thomas stated that it was really a matter of determining at what point you want to fight that battle, because if the protesters decide they want to go on the bridge they are going to go on the bridge. Chief Thomas stated he was not a part of the tactical decision but understood what Captain Roberts was trying to accomplish.

Sergeant Barnes concluded the interview at approximately 11:14 AM. The recordings of the interview have been made a part of the permanent case file.

## **Training Staff Statements**

## **Statement of Sergeant Todd Morrell**

On Monday, August 3, 2020, at approximately 12:05 PM, Sergeant Barnes met with Sergeant Todd Morrell at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Sergeant Morrell and Sergeant David Barnes. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against the accused officers and ensured Sergeant Morrell understood he was being interviewed as a witness in the investigation. During the statement, Sergeant Morrell provided the following information, in summation:

Sergeant Morrell stated his duties during the protest involve walking in the crowd, wearing plain clothes, and reporting information back to SOD Command Staff in the event a tactical response is needed.

That evening, once they reached the onramp, the bicycles assisting the protest stayed on the ground and there were police cars parked, blocking the entrance to the onramp. Several of the protesters began jumping the wall to the onramp, going around the police cars to get on the onramp. Sergeant Morrell stated he did not get on the onramp, and approximately 300 or 400 other protesters did not get on the onramp either. Sergeant Morrell referred to the individuals who went on the on ramp as being mostly agitators. Sergeant Morrell explained that he refers to them as agitators because it was many of the same people who had broken car windows and shown they were willing to commit acts of civil unrest during other protests.

Sergeant Morrell stated he stayed around the ground level, under the bridge, until he started seeing canisters of gas being tossed off the side of the bridge. Sergeant Morrell stated he then left to avoid exposure to the gas.

Sergeant Morrell said he positioned himself near the middle of the protest and was relaying information about the protest. Sergeant Morrell stated that the bicyclists with the protest would go ahead of the protest and sometimes forcefully block traffic. Sergeant Morrell stated the protesters in the rear of the protest was mostly peaceful and were regular protesters. Towards the front of the protest there were several agitators who would bang on the hoods of cars and appeared to have a different agenda than the back of the protest. Sergeant Morrell stated the front half of the protest appeared to have no doubt in their mind that they were going on the bridge. The back half of the protest appeared confused and a large portion of the protesters then stayed on the ground.

Sergeant Morrell stated the bicyclists had earpieces in and were communicating at the time of the protest. Sergeant Morrell noted they also had access to NOPD's communications and would communicate via Twitter what NOPD's responses were going to be. Sergeant Morrell stated he later learned a firefighter from a neighboring jurisdiction had used his radio to listen to and relay the communications between responding officers.

Sergeant Morrell stated he did not go onto the bridge because he knew it was dangerous and there was no reason for him to go there because the bridge only allows the protesters one way in and one way out.

Sergeant Morrell stated, from a training standpoint, there are multiple reasons to establish a skirmish line. Sergeant Morrell stated forming a skirmish line generally would be to stop the protest, then they would find out who the formal or informal leaders were and negotiate with them. Sergeant Morrell stated that until this incident they have always been able to come to an agreement with the formal or informal leaders. Sergeant Morrell stated that a line could be established to keep a crowd from going across a certain point for other reasons, such as safety or security of infrastructure. Another reason the skirmish line would be established where it was is because there is no way for reinforcements to get to the officers, so the officers would be in the middle of the Mississippi bridge without the availability of backup. If a line were to be formed in the middle of the bridge there could be fighting that would lead officers and protesters to being thrown off the side of the bridge. The protesters would then have the advantage because they would realize the police did not have a way to reinforce themselves.

Sergeant Barnes asked why they would not just let the protesters cross the bridge. Sergeant Morrell stated there are several reasons. The protesters would still be blocking traffic, which would cause issues. Sergeant Morrell stated that if the protesters decided to block the bridge in the middle then they would not be able to get reinforcements or emergency services to the other side of the bridge. Sergeant Morrell said another reason to stop them is because we do not know their intentions.

Sergeant Morrell stated his main role in SOD right now, besides being the bomb squad commander, he is the first one to respond to unusual occurrences, such a plane crashes and train derailments, since he has the protective equipment and can assess the situation.

Sergeant Morrell stated that during the protest, he would communicate to SOD things that were going on during the protest, if anyone was breaking windows, or that there were a lot of bicycles. Sergeant Morrell stated that as soon as he would tell SOD the protest was doing one thing, they would change what they did, and he later found out it was because they had the police radio channels. Sergeant Morrell stated that prior to going on the bridge it was a regular first amendment protest and was a lower profile protest than they have had in most other cities, until they went on the bridge.

Sergeant Morrell stated he tried to call his supervisors to alert them when the protesters went on the bridge and no one answered, so he stayed on the ground level until he saw the canisters of gas. At that point he returned to the SOD office. He stated while walking under the bridge he had probably gotten to the area near Annunciation Street, as he was walking back towards the office.

Sergeant Morrell stated there was no organization with the people on the ground after the front of the protest went on the bridge. The crowd on the ground stood around looking for direction.

Sergeant Morrell, when asked, stated he did not hear any warnings prior to the gas deployment from below the bridge.

Sergeant Morrell informed Sergeant Barnes that he previously conducted riot training for the department and has since taken on other responsibilities. He stated he now leaves the training to the armory staff and the primary people responsible for training are Sergeant Crawford and Officer Pazon.

Sergeant Morrell stated that particular skirmish line group of officers had a crash course in riot training earlier that day. Sergeant Morrell stated that previously they would conduct riot control and crowd control training with the task forces. The task forces were disbanded, so that day they sent some officers from the districts to receive a crash course in formations. Sergeant Morrell said he was not sure if they got around to training about donning gas masks. Sergeant Morrell said the training encompasses a lot of information that cannot be adequately taught in a few hours. He said it took initial training and then sustained training with task forces to get them comfortable with the skirmish line and donning gas masks. Not everyone knows how to use a gas mask, or a shield, and it's not taught in the academy. The training does not work out for everyone. Sergeant Morrell stated not every police officer is comfortable with using a gas mask. Some officers may be good in a district, but not in a riot situation. In a shortened crash course, instructors cannot identify who those people are.

Sergeant Barnes asked what other options there are for crowd control. Sergeant Morrell said there are different stages for crowd control. He clarified that Sergeant Barnes is asking about protest crowd control, not Mardi Gras crowd control. Sergeant Morrell stated that first

you have to understand what the protesters are protesting and acknowledge they have a first amendment right to protest. In the past NOPD has dealt with the informal leaders and learned what they want to do and assist them in doing it. In the days before the June 3rd protest they went on the interstate and everyone made an agreement. The NOPD kept their end of the deal and the protesters kept their end of the deal and it worked out. Sergeant Morrell said once we know what they want to do, we can make arrangements from there. Sergeant Morrell used an example of when NOPD handled abortion protests. Sergeant Morrell said there were as many people who were protesting to be for them as there were against them. The NOPD setup barricaded sections for both with policeman in the middle. That way they can yell all they want, and if they do not throw anything then they were fine.

Sergeant Morrell stated New Orleans has been lucky when it comes to protests because we have a good relationship with most of our local protesters. They can explain what they want, and we come to a happy medium. Sergeant Morrell stated a lot of the protesters are not front New Orleans and they do not have the relationship with the NOPD that a lot of local protesters do. Judging by the people on the bridge and the people on the ground, Sergeant Morrell said there were a lot of local protesters on the ground, and he knows their faces from seeing them. However, on the bridge, they were not easily recognized as local protesters and the NOPD does not have the same relationship with them.

Sergeant Morrell stated there are a few different ways to deal with the protest but there must be trust on both sides. Once there is no trust the only option is to establish a skirmish line and say you can protest but you cannot come past this line. The point of establishing a skirmish line is less of a first amendment issue and more of a public safety issue.

Sergeant Barnes asked what other options there are for riot control, besides gas. Sergeant Morrell stated that, assuming a skirmish line is established, the only other thing is distraction devices like flashbangs. He stated, in extreme cases, you can use stinger balls, batons, or go hands on. Sergeant Morrell stated that one option could be using the mounted unit, but it would not have been safe to use horses on the bridge. Sergeant Morrell stated that police are limited on what they can do safely at that point. Sergeant Morrell also stated the police are limited on what they can do legally. In his opinion, Sergeant Morrell stated using gas is a better option than using batons. The use of gas allows people to retreat and maintained a reactionary distance. Using a baton, people are close and there is no reactionary distance.

Sergeant Morrell drew a distinction between a peaceful protester and someone with their hands in the air saying, "Hands up, don't shoot," who is running at the officers. Sergeant Morrell stated if someone with their hands in the air runs into an officer with a shield it can still hurt the officer. However, it is a technique used by protesters because it looks good on TV, but it is really just a technique, he stated. Sergeant Morrell stated the Long-Range Acoustic Device (LRAD) is an option, but it is only effective 20 percent of the time. He stated if the crowd is too loud, wearing earplugs, or if it is not placed at the right angle then it won't be effective.

Sergeant Morrell stated the most effective option is the one that was used. He reiterated that that police want a reactionary gap between themselves and the protesters. Sergeant Morrell then stated if gas has to be deployed then they are no longer protesters and are now rioters.

Sergeant Morrell stated, if he were in command, he would have used gas to make sure they had the reactionary gap between protesters and police. To make sure they can have room to get on the LRAD and tell protesters to disperse. It also prevents everyone from being intermingled and having no organization. Sergeant Morrell stated the use of the 40mm launchers would depend on the circumstances. First, he would start with the hand rolled canisters and if that works then there is no need to escalate to anything else. If there is the reactionary gap and the protest stops moving forward then there is no need to use anything else, it becomes a waiting game.

Sergeant Barnes asked how police would maintain the gap if rioters continued to advance into that gap. Sergeant Morrell said that, ideally, you hand toss canisters. If protesters still start coming towards the officers and there is a way for officers to back up, then they should backup. If the line can be maintained. Sergeant Morrell stated there is nothing wrong with backing up if you can back up, but you have to be able to back up and still protect what you need to protect behind you. Sergeant Morrell said if that is not working then he would use stinger balls or 40mm balls fired at a distance to make people stop coming towards the line. Sergeant Morrell stated as long as the stingers are used at a distance, they are not lethal. He stated the stingers are a crowd control device to let them know there is something being thrown at them. Sergeant Morrell stated on June 3rd he believes they fired the stingers at a distance past the manufacturer's recommended distance. Sergeant Morrell stated, at the range they fired stinger, they have no velocity and may not sting. Sergeant Morrell noted the rioters on June 3rd had also taken police equipment and had shields, radios, and helmets. Sergeant Morrell said, with the riot gear, the protesters ability to come closer is much greater. If a hand-tossed canister is deployed they can use the shield to throw it back at the police or over the side of the bridge.

Sergeant Morrell stated he did not hear a command for gas from where he was. He heard a lot of commotion but could not discern what was what.

Sergeant Morrell informed Sergeant Barnes he did not stay at the office for the entirety of the briefing. He moved with the crowd ahead of SOD being deployed, so he left before the briefing ended. The crowd had started forming up, so he left to join them. When asked, Sergeant Morrell stated Sergeant Crawford would conduct an inventory and he knew Sergeant Crawford to usually be on top of things like that.

Sergeant Morrell stated he is no longer a trainer for gas deployment but can speak to what he trained on. He stated the preferred method of deploying gas canisters is rolling them or throwing them underhand into a void area, forcing the crowd to go where you want them to.

Sergeant Morrell said rolling or tossing depends on the reactionary gap between the protesters and the officers. He said if the protesters are right on the shields, then there is no way to roll canisters, they would get kicked or when you open the shields the protesters would just come through. In that situation they would have to hand-toss canisters into an area they can see

is somewhat unoccupied. When deploying the canisters, they do not want to hit anyone, they want it to hit the ground. It is ideal to hand toss it so it puffs gas while still in the air so people can see it and have an opportunity to move. Sergeant Morrell stated if you do not have area to work with, then toss the canister either as far right or left as possible to have the gas come over the deployment area. On the bridge it depends where the crowd is, if there is a heavy population then maybe they would have to throw it right in the middle.

Sergeant Morrell stated if there is a no man's land, they can roll or toss it and fire the 40mm launcher into no man's land. Sergeant Morrell stated there is still the issue of people throwing the gas back at officers. He said they can use the 40mm stingers to try and stop them from throwing the canisters back.

Sergeant Morrell stated if he deployed a gas canister and someone tried to pick it up and throw it back, he would use the 40mm stinger rounds to drive them back, but it depends on the distance. He stated after 30 feet it would have less effect on someone.

Sergeant Morrell stated he did not see any children while he was marching with the protest and if he had he would have passed that information on. Sergeant Morrell made clear that if there are children present it changes a lot of what SOD will do. Sergeant Morrell stated SOD officers do things very different when children are present.

Sergeant Barnes asked why the snatch teams wouldn't just grab the agitators. Sergeant Morrell stated that if you can get a particular agitator and bring him through the line, handcuff him and sit him down that is how it should work. However, it depends on how many agitators there are. If there are 50-60 police officers and 70 agitators then it won't work because they cannot be realistically detained. The agitators also have to be grabbed one at a time.

Sergeant Morrell stated he didn't know if there was an operations plan for the event and he did not notify or request assistance from any other jurisdictions. He stated he did see Louisiana State Police in the crowd working with NOPD intelligence officers but was unsure if any additional help was requested.

Sergeant Morrell stated he has been in SOD for approximately 22 years and has never used gas or the launcher in a crowd control setting. He stated that gas is used in about 20 percent of SWAT deployments, including on empty houses. When gas is used it is documented in the SWAT after action report and has never been documented as a use of force. Sergeant Morrell stated, to his knowledge, gas is not covered by the policy.

Sergeant Morrell informed Sergeant Barnes that, in his opinion, gas should be covered by a viable SOP. It has never been an issue because NOPD has never had to use it in a crowd control setting. He stated crowd control has always been the forte of the NOPD and they have always talked to protest leaders and everyone has been happy when they leave.

Sergeant Morrell stated the NOPD needs to establish a viable SOP to provide guidance to everyone. Sergeant Morrell stated he does not believe there is currently a policy that covers the types of crowd control measured they used on the bridge because they have never had to deal

with it before. Sergeant Morrell stated that there were preliminary SOPs for SOD that were being worked on, but it was put on hold and got lost in the shuffle as the NOPD policies went from chapters to policies then back to chapters. Sergeant Morrell stated there is no reason to not have an SOP.

Sergeant Morrell then elaborated that even though an SOP should be established. He does not believe there is a particular that can cover everything and any SOP in place must be flexible enough to allow the commander to deal with what is actually transpiring on the ground. Sergeant Morrell posed scenarios regarding civil unrest turning into a hostage situation, or a bomb threat, there would be three different SOPs and they all may have guidance specific to that SOP, but the SOPs will not be able to control the situation, the situation will transpire that way.

Sergeant Morrell, when asked, stated it is important for the investigation to know that there is a distinction between a peaceful protest and a riot. Sergeant Morrell added that he does not believe anyone in the police department disagrees with what is being protested for.

Sergeant Barnes concluded the statement at approximately 1:21 PM. The recordings of the statement have been made a part of the permanent case file.

## Statement of Sergeant Michael Crawford

On Monday, August 3, 2020, at approximately 1:26 PM, Sergeant Barnes met with Sergeant Michael Crawford at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Sergeant Crawford and Sergeant David Barnes. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against the accused officers and ensured Sergeant Crawford understood he was being interviewed as a witness in the investigation. During the statement, Sergeant Crawford provided the following information, in summation:

Sergeant Crawford informed Sergeant Barnes he has approximately 22 years of experience with the Special Operations Division and is currently in charge of the armory, which includes vehicles, training, and equipment.

Sergeant Crawford stated he was initially at 1899 Tchoupitoulas Street in case they needed something from the armory at the protest site and he would bring it to them. Sergeant Crawford received a call from Officer Pazon requesting the equipment truck to the bridge. On his way to the bridge, Sergeant Crawford received another call from Officer Pazon asking him to bring 25s (flashbangs). Sergeant Crawford went back to 1899 Tchoupitoulas to retrieve the flashbangs and was instructed to enter the bridge, going against traffic, using the HOV lane to cross the river before coming against traffic.

Sergeant Crawford, when asked, said he did not know how flashbangs would be used in a riot control setting and has never been part of the riot control training. Sergeant Crawford

stated they do not conduct any training that includes the use of flashbangs in a crowd control setting.

Sergeant Crawford stated when he got to the bridge, he was unable to bring the equipment truck close to the officers and was advised to standby at the rear of the vehicles on the bridge. Sergeant Crawford stated by the time he got onto the bridge; the incident had already occurred. Sergeant Crawford stated he was parked over the water on the bridge, 75 to 100 yards away from the police line, and did not see any of the gas deployed. Sergeant Crawford stated he could only see vehicles from where he was and could not see any of the officers near the line.

Sergeant Crawford informed Sergeant Barnes that, from a training standpoint, police would establish a skirmish line to prevent protesters from going any further, to keep them at a certain spot. The line could also be used to move the protesters back, left, or right, depending on where they would want to be staged. The line on the bridge would be established to prevent the protesters from going any further from where they were.

Sergeant Barnes asked what reasons there could be to prevent protesters from continuing further on the bridge. Sergeant Crawford stated if there were information that protesters were going to a certain location to conduct things that were against the law. Sergeant Crawford stated other than that reason, he would assume they did not want the protesters traveling to the other side of the bridge for fear of what damage they might do or to keep them from going into another Parish.

Sergeant Crawford stated the Special Operations Division conducts riot training for the mobile filed force. When asked if they conducted training for the mobile field force that was on the bridge the night of June 3, Sergeant Crawford stated they did but was not sure if it was that day or the day before. Sergeant Crawford stated they had done two or three short trainings, only an hour or two long, each day before the mobile field force was deployed. Sergeant Crawford could not remember exactly which days the training was conducted but knew it had been around the day of June 3.

Sergeant Barnes asked what options exist for controlling a crowd that has ceased to be peaceful. Sergeant Crawford stated when the NOPD has protests there is usually an intel unit with the protest. Officers assist the protest with blocking traffic and helping ensure the safety of the protest. Sergeant Crawford stated that if there is an issue and they need the protesters to get out of traffic or something like that, they will usually try speaking to them first. The officers will then assist them with going where they want to go or doing what they want to do. Sergeant Crawford stated they have had protesters that have asked to be arrested, so they would arrest them, and protesters that wanted to sit in the street for 10 to 15 minutes so they would just let them sit in the street. Sergeant Crawford clarified for Sergeant Barnes that they had a protest one time that hold told the NOPD intelligence unit they wanted to be arrested. Those protesters then sat in the street as officers stood and read the laws to them and gave them warnings, and then arrested them. Sergeant Crawford stated the protesters communicated beforehand and organized with NOPD to be arrested.

Sergeant Barnes asked if negotiations would have work on the night of June 3rd. Sergeant Crawford stated that he was not there, but it had worked the previous night.

Sergeant Crawford informed Sergeant Barnes he was aware some negotiations had taken place on June 3rd because they had placed the LRAD on one of the armored vehicles (the Bear) and believes it was used to speak to the protesters but wasn't sure if any true negotiations had taken place.

Sergeant Crawford stated that once the civil unrest starts, they can use a snatch team to isolate an individual who may be starting the civil unrest. Sometimes extracting that person from the crowd will calm the crowd down. If that person is throwing objects, they would mark that person with one of the impact rounds.

Sergeant Crawford clarified that the options are all in planning, that night on the bridge was the first time they ever had an encounter of that magnitude with protesters. Sergeant Crawford said during his approximately 22 years in SOD he has never had to use gas on protesters during a civil unrest type of situation.

When asked why isolating individuals that may be starting civil unrest did not happen that night, Sergeant Crawford stated he did not now. He clarified that if it is one person that is the issue, and you can identify them and extract them. If it were everyone, they wouldn't be able to do that. If there were 20 agitators up front the line would have to hold and the snatch teams would have to snatch them one at a time. Sergeant Crawford stated if there was a gap between the protesters and the police line, they would not be able to snatch people, because they would not send a snatch team away from the line. If an agitator were on the other side of the gap throwing bottles, then they would address it with an impact round from the 40mm launcher.

Sergeant Crawford stated other options for crowd control would include deploying gas, stinger balls with gas, which are pain compliance with gas. Sergeant Crawford stated the stinger balls could cause the line to back up and the gas could cause them to disperse. Sergeant Crawford, when asked, stated he would have had to be there to see what was happening and how rowdy it was to determine what the best method of control would have been. If there was something overwhelming to the manpower, they have it would cause them to use munitions.

Sergeant Crawford assumed the command to deploy gas came from Captain Lampard. Sergeant Crawford stated when the command to deploy gas is given, there were two people who were assigned to hand-deploy gas into the crowd, Officer Jorgenson and Johnson. Deciding who is going to deploy is done at the SOD office, they have the sergeants get together and pick what manpower is going to be on their team. Sergeant Crawford initially stated there were two gas teams but then corrected himself and stated one of the teams was off that night. Sergeant Crawford described the gas team as Sergeant Harris and Officers Jorgenson, Johnson, Pierce, and Joseph.

Sergeant Crawford stated that prior to leaving SOD there is a briefing with the Sergeants and Lieutenants. The Sergeant would then brief the officers on who on the team would be assigned to what position. Sergeant Crawford stated that the Sergeant over the gas team would

get with his team and go over the steps they would take and what they would do if they were called to deploy munitions. When asked if a briefing like that took place, Sergeant Crawford stated he did not see one, but believed it occurred either before or after he issued the munitions. Sergeant Crawford stated he would meet with the team and issue out whatever munitions they need. Sergeant Crawford stated normally there is no count of the munitions when they are issued out but he did conduct a count of what was issued that evening. Sergeant Crawford stated Sergeant Victor Gant, Officer Pazon, Officer Johnson, and Lieutenant Prepetit were present when he issued the munitions and he stated there may have been other SOD personnel around.

Sergeant Crawford explained that they determine what is issued by what the assignment is. That evening they used gas canisters specifically designed to be used outdoors. The 40mm launcher munitions that night included green marking rounds, blue CS gas rounds that include an impact round with CS gas, stinger balls that do not have CS gas but can be used for multiple subjects, and they also had CS stinger balls that have the rubber balls and the CS gas. Sergeant Crawford stated the launchers are loaded at that time with marking rounds and CS gas rounds. The rest of the rounds will go into the bag, including the canisters. Sergeant Crawford stated Travis Johnson would have loaded his rucksack and described he was in charge of holding the rucksack and hand-deploying canisters. Sergeant Crawford stated there were two rucksacks loaded that night and they were both placed inside of the 550 (equipment truck). Sergeant Crawford stated he was unsure if Officer Johnson located the second rucksack in the equipment truck. Sergeant Crawford stated they ran out of certain munitions but there were more in the other rucksack.

Sergeant Crawford informed Sergeant Barnes the munitions loaded were loaded because those are the munitions they would use in a riot control situation.

Sergeant Barnes asked how the launchers would be used when gas is deployed. Sergeant Crawford stated the only gas the launchers shoot is the CS impact rounds. Sergeant Crawford stated there is a launcher for the gas canisters, but they do not use it.

Sergeant Barnes clarified the stinger balls are used for pain compliance and asked how they are used. Sergeant Crawford stated the rounds are direct impact for multiple people, but it can be shot at one individual. Sergeant Crawford stated it would be used if someone was throwing rocks or doing anything that could cause harm to the line or the officers behind the line. Sergeant Crawford stated he heard the protesters were throwing water bottles and they would use stinger rounds to address that. Sergeant Crawford also stated if you see someone who is going to do something, like pick up a bottle, it could be used to prevent that from happening. Sergeant Barnes asked where Sergeant Crawford heard the crowd was throwing water bottles. Sergeant Crawford stated he heard it at SOD but could not remember anyone specific saying it.

Sergeant Crawford informed Sergeant Barnes the task forces would normally train for three days initially and then do a one-day recertification every year. Since the task forces were disbanded, some officers were sent to be trained the day of the incident. Sergeant Crawford stated no one in the mobile field force was trained to use gas, but all of SOD was trained to use gas.

Sergeant Crawford stated to certify someone on riot control they conduct a three-day training class and informed Sergeant Barnes that they had not conducted the three-day training class in the past two years but had conducted one-day classes the past two years. Sergeant Crawford, when asked, stated a one-day training is adequate enough when the same people who have already been trained come every year. Sergeant Crawford stated the one day of training for someone who has never had the training is not adequate enough. Sergeant Crawford stated the officers in SOD would usually train the day before the district mobile field force officers come into train, so SOD officers would get two days of training and the district officers would get one day. Sergeant Crawford also stated SOD officers requalify with the use of gas once a year, but they do not deploy gas at that training. Sergeant Crawford stated he believes the training for the gas deployment is adequate. Sergeant Crawford stated they have never launched gas from the 40mm in training. Sergeant Crawford informed Sergeant Barnes reasons for not deploying it would be because there is not a suitable location to deploy gas outside and they have a limited number of supplies. Sergeant Crawford clarified that everyone who goes through SWAT school and is certified on gas deployment is exposed to CS gas during SWAT training.

Sergeant Crawford informed Sergeant Barnes the hand-deployed canisters could be deployed through the legs of the officers to the front of the crowd to get the crowd to back up, or into the middle of the crowd to get the crowd to disperse. Sergeant Crawford stated it could be shot from a launcher, but they do not have a launcher for canisters. Sergeant Barnes clarified the deployment methods would be tossed into the crowd or rolled in front. Sergeant Crawford stated the officers should make sure there are no children at the front when they deploy the canisters, and the canisters should be deployed into a location to make sure it achieves the goal they are trying to accomplish.

Sergeant Crawford stated an officer should consider that if the crowd was thick a reason to deploy past the front line would be because you want the deeper portions of the crowd to back up as well.

Sergeant Crawford stated there were no specific instructions to officers on how to deploy gas that evening. Sergeant Crawford, when asked, stated he heard about officers being struck by protesters that night. Sergeant Crawford stated the equipment taken that evening was equipment that was supplied by him through the armory at SOD. Sergeant Crawford stated he recalled helmets, shields, batons, and gloves were taken that night by protesters. Sergeant Crawford also stated there were body worn cameras that were knocked off.

Sergeant Crawford stated he did not know if EMS was summoned to the bridge that evening. He did not recall seeing an operational plan for the event, and he did not know if any other jurisdictions were called for assistance.

Sergeant Crawford confirmed he conducted an inventory that night of what was loaded and taken to the bridge. Sergeant Crawford confirmed he also conducted an inventory after the event, the following day. Sergeant Crawford stated they did not go back to the SOD office that night because everyone had been gassed and they did not want to put everyone in the same room getting gas activated again. Sergeant Crawford stated he asked if there was going to be a briefing when he drove the equipment truck back and was told no. Sergeant Crawford stated there was

a briefing conducted and there were a lot of issues because of the level the protesters went to that night, they had never dealt with protesters at that level.

Sergeant Crawford stated he conducted an inventory directly after, or possibly before, the briefing the following day. Sergeant Crawford stated he would have known what munitions were used when everything was returned to him. Sergeant Crawford stated he received everything back the following day. Sergeant Crawford stated he informed Lieutenant Prepetit of what was used when he conducted the inventory.

Sergeant Crawford informed Sergeant Barnes that prior to that day, there was no documentation of what munitions were being issued out. Sergeant Crawford stated he took it upon himself to document what went out and what came in, to make sure that if anything was used, they would know what was used. Sergeant Crawford stated he only had tally issues on a sheet of paper to keep track of what was issued out. Sergeant Crawford stated, after that, they created a form that has the numbers of what was issued out, who was assigned to what position on the gas team, and what munitions were returned after the event. Sergeant Crawford stated he created the form as a result of this incident.

Sergeant Crawford stated he received the call to determine what was used on the bridge, so he went to work to see what was returned so he could tally what was actually used.

Sergeant Crawford stated tri-chamber gas is used on SWAT deployments on approximately less than 50 percent of the time. Sergeant Crawford stated the use of gas is documented in a SWAT report and not as a use of force. When asked why, Sergeant Crawford stated the use of gas has never been required to be documented as a use of force. Normally the officers who make entry will point their weapons and that is reported. Sergeant Crawford stated the use of the gas and the launchers have never been reported as a use of force on a SWAT deployment. Sergeant Crawford stated the launchers rarely ever come out and are usually used to put out lights to give them an advantage.

Sergeant Crawford stated he did not observe any of the force used that evening on the bridge.

Sergeant Barnes then exited the room, leaving all recording devices running, as he consulted with members of the OIPM, OCDM, and FIT who were observing the interview.

Sergeant Barnes returned to the room and asked Sergeant Crawford if there was anything the investigators should be aware of. Sergeant Crawford stated he would like to have seen the mobile field force have been trained better before the event. Sergeant Crawford stated they just finished a four-day riot control training with the mobile field force and explained they are trying to make a permanent mobile field force, so they don't have the turnover.

Sergeant Crawford stated, as far as equipment, they need hand-held bullhorns and new LRADs. Sergeant Crawford stated that is something he will take care of.

Sergeant Barnes then concluded the statement at approximately 2:23 PM. The recordings of the statement have been made a part of the permanent case file.

## Statement of Officer Dylen Pazon

On Monday, August 3, 2020, at approximately 2:28 PM, Sergeant Barnes met with Officer Dylen Pazon at the PIB Office at 1340 Poydras Street, Suite 1900 and obtained an audio and video recorded statement. Present for the statement were Officer Pazon and Sergeant David Barnes. The statement was monitored via a zoom call by members of the Office of the Independent Police Monitor and members of the Office of the Consent Decree Monitor, as well as other members of FIT. Sergeant Barnes reviewed the information regarding the allegations against the accused officers and ensured Officer Pazon understood he was being interviewed as a witness in the investigation. During the statement, Officer Pazon provided the following information, in summation:

Officer Pazon informed Sergeant Barnes he has just over ten (10) years of experience in the Special Operations Division and is currently the lead trainer for SOD. As the lead trainer he trains officers on tactics and ensures their certifications and training is up to date. Officer Pazon informed Sergeant Barnes they train every Monday, unless there is a special assignment. Officer Pazon stated the Monday training sessions consist of various topics, including chemical munitions, active shooters, tactical entries, and protests. The topics vary throughout the year.

The night of the protest, on June 3rd, Officer Pazon was charged with providing the equipment and tools needed for the protest and he was the driver of the "Bear Cat," a Lenco armored vehicle. Officer Pazon stated that evening he was driving the red team, Sergeant Gant's team, and they had a staging location near the convention center until a certain point they were ordered to drive to the CCC. From there the red team exited the vehicle and began to receive their instructions.

Officer Pazon stated when he first arrived at the bridge, his job was to stay with the vehicle and could not see much until later, when he was ordered to come to Lieutenant Prepetit to provide information. Officer Pazon was parked facing against traffic on the bridge far enough back that he could not really see the front line from where he was, but there were police lines and other jurisdictions on the bridge. Officer Pazon stated he could not remember about how far back he was from the line. Officer Pazon also had trouble recalling what he was hearing over the radio. Officer Pazon stated he heard the protesters pushing and the call the prepare for gas over the radio and could not remember exactly what order the calls came in. Officer Pazon stated he was unsure if he was called to the bridge before or after gas was deployed and said he did not recall seeing any gas deployed when he got to the bridge.

Officer Pazon stated he initially found out gas had been deployed when he was ordered out of the vehicle to meet with Lieutenant Prepetit and Captain Lampard. Officer Pazon stated he did not think the gas was 100 percent effective based on the information he received, that protesters were throwing the gas off of the bridge. Officer Pazon stated they were seeking his opinion on what steps they should take next. Lieutenant Prepetit also requested Sergeant Crawford relocate to the bridge with additional equipment.

Officer Pazon said his advice was to deploy the gas close to the front line of officers so it would blow into the crowd, and they would not have access to get the canisters. Officer Pazon stated he could not recall what equipment Lieutenant Prepetit wanted from Sergeant Crawford. Officer Pazon clarified that the deployment of gas close to the line was never conducted and no other gas was deployed after he was called to meet with Lieutenant Prepetit.

Officer Pazon explained to Sergeant Barnes that a skirmish line would be established to prevent a crowd from entering a certain space. Officer Pazon stated he did not know the reasons command staff chose to establish a skirmish line on the bridge that evening. Officer Pazon stated in his experience and training a reason to not allow protesters to cross the bridge is to ensure crowds do not affect the interstate system for safety, and infrastructure reasons.

Officer Pazon, when asked, stated he is familiar with and conducts the training for the mobile field force. Officer Pazon stated he conducts riot training yearly and teach the officers how to establish line formations and how to don and clear gas masks and work with the Special Operations Divisions. Sergeant Barnes asked what training the mobile field force on the bridge had. Officer Pazon stated he did not know who was on the bridge, so he could not speak to their training.

Officer Pazon stated they conducted a refresher training course on riot training with some officers either that week or the week before but was unsure if the officers in the training course were the officers on the bridge that evening. Officer Pazon stated he was unsure if the officers on the bridge had been part of the training at all. Officer Pazon stated the training they had for the refresher course was about four hours, as opposed to the full mobile field force training is done over a period of four days. Officer Pazon stated that if an officer had not had the full training and the first time getting the training was the four-hour refresher course, the training would not be sufficient. Officer Pazon stated the training records for the training is housed in SOD.

Sergeant Barnes asked what other options exist within the NOPD to use for crowd control. Officer Pazon stated that if an event happens in a specific area the first thing they would do is give verbal warnings from a distance. Officer Pazon stated after you establish communication with the crowd, hopefully things move in a positive direction. If they do not move in a positive direction, one of the tools they have is gas. Officer Pazon stated once the commands are disregarded and blunt objects are tossed, or whatever type of resistance is offered, he would deploy gas from a safe distance and then go from there.

Officer Pazon stated he has been on the SWAT team for over ten years and has never deployed gas in a crowd control setting. Officer Pazon also clarified that once things turn into a situation of civil unrest; gas would be his first option to deter the crowd. Other options that may be effective are less lethal impact munitions for dealing with agitators.

Officer Pazon, when asked what forms of crowd control have been used before with success by NOPD. Officer Pazon stated the night before, the front line had a very good distance from the protesters and the crowd continued to approach the officers. Deputy Superintendent

Thomas used the LRAD to communicate with the heads of the organization and a very good dialogue occurred. The crowd embraced their message, and the leads of the organizations had the opportunity to speak. Officer Pazon stated the negotiations were successful that evening and the protest was peacefully relocated to the ground from the interstate.

Officer Pazon stated he did not know where Chief Thomas was the night of the protest on June 3rd. Officer Pazon also stated that he wasn't sure if the same type of negotiations would have worked on the night of June 3rd, because he was not there to see it.

Officer Pazon stated he did not hear the command to deploy gas but heard the command to prepare for it. Officer Pazon also stated they train to give warnings prior to deploying gas or using any munitions. He was unsure if any warnings were given that night prior to the gas deployment. Officer Pazon stated he did give some warnings later that evening after the skirmish line began to push the rest of the protesters back. Officer Pazon stated Captain Lampard gave commands to the line and Officer Pazon relieved Captain Lampard and took over giving commands to the line of officers. Officer Pazon also stated he gave warnings to the crowd, shouting them vocally, and had the driver of the bearcat, Officer Russel Green, give warnings over the LRAD system, attached to the bear. Those warnings were given after the deployment of gas.

Officer Pazon stated he was present when the munitions for the gas team were issued. Officer Pazon said he and Sergeant Crawford issue out all of the munitions. Officer Pazon stated he did not recall if he was present for the briefing took place regarding the munitions, but he was present when the munitions were issued, but he was not sure if he issued them or if Sergeant Crawford issued them that night.

Officer Pazon stated there are two large bags which he and Sergeant Crawford would pack a counted amount of munitions into to issue them out. After the bags return, Officer Pazon and Sergeant Crawford then conduct a count with the officers on the team to inventory what was used.

Sergeant Barnes asked what munitions are packed in the bag. Officer Pazon stated that for outdoor use they have No.2 CS gas and Triple Chaser gas. They also have stinger ball grenades that have rubber balls and CS gas inside of them. Officer Pazon stated there are also 40mm launcher CS impact, marking rounds, and Stinger rubber ball rounds. Officer Pazon stated the direct impact rounds are all used for pain compliance and are designed to cause blunt trauma. The 40mm stinger rounds are also used for pain compliance, but the balls can be skipped. The phone rounds are not so easily skipped. The CS canisters are used to deploy gas to affect a large crowd.

Officer Pazon stated the call the deploy gas comes from a superior officer. The launchers can be used without an order if an officer perceives the use of an object that could cause serious bodily injury then it would call for the use of the launchers. Officer Pazon was asked to give an example of what kind of situation would call for the launchers in a crowd control setting. Officer Pazon stated if the crowd were throwing things, such as large rocks or frozen water bottles, it would call for the 40mm launchers to be used.

Officer Pazon stated the gas canisters are supposed to be deployed by an underhand toss of 6 to 25 feet. Officer Pazon stated that if a canister is tossed into the crowd, there is a high probability that it will be tossed back by the crowd. Officer Pazon stated that is why his opinion was to deploy the gas near the line, allowing the wind to blow the gas into the protesters, which depends on the wind at the time. Officer Pazon stated the cans are light and would compare them to the weight of a 16oz bottled beverage. Sergeant Barnes asked if a canister were to hit someone if it would cause a serious injury. Officer Pazon stated he was not sure if he would consider it to cause a serious injury. Sergeant Barnes then asked if the canister was thrown at the distance of 25 feet and his someone in the head, would it cause an injury. Officer Pazon stated if it were deployed at that range it could cause some pretty serious damage.

Sergeant Barnes asked what the targeting considerations are when they deploy gas canisters. Officer Pazon stated it depends on the things like the wind and he said distance is "always your friend." Officer Pazon said on the bridge the protesters were extremely close, and the police line was being broken, there was a lot of commotion. Officer Pazon stated that is why it is very important they maintain that distance from the crowd, it can be used to the advantage of the police. If there is distance between the police and the crowd then gas does not have to be deployed into the crowd.

Sergeant Barnes then retrieved a charging cable for his phone, which was being used to join the Zoom call for the other agencies monitoring the interview.

Officer Pazon stated he did not see any officers or protesters injured on the bridge that evening and was not sure if anyone checked for injuries. Officer Pazon also did not see any children on the bridge that evening. Officer Pazon was also not aware if EMS was summoned to the bridge that evening. Officer Pazon stated they work with tactical medics often, and he wasn't sure if they were on the bridge that night.

Officer Pazon stated he recalled Louisiana State Police being on the bridge that evening and was unsure if anyone had notified or requested any other agencies to be on the bridge.

Sergeant Barnes then asked about the crowd control techniques they train and use. Sergeant Barnes clarified the mobile field force is actually everyone, including SOD. The skirmish line is manned by district officers. The other teams involved with the mobile field force will be the skirmish line and their supervisors, then snatch teams with their supervisors, the gas team with their supervisor, then the mounted unit, if they are there, and then a lethal force team and snipers with their supervisors. All the teams together make up the mobile field force.

Officer Pazon then described the purpose of each team. The skirmish line is to prevent a group from entering a certain space. If the snatch team, behind the skirmish line, is responsible for taking any problematic rioters into custody. The grenadier team is responsible for deploying gas and less lethal munitions, if needed. The lethal force team and snipers are there in the event there is a lethal force encounter.

Sergeant Barnes asked why a snatch team would not go beyond the line and apprehend agitators to keep the situation from escalating. Officer Pazon stated that usually the team would move forward, and the small group of agitators would be taken by the snatch team, from the safety of the line. Moving a small team beyond the line, into a crowd in which they are outnumbered, is not a good idea. The better idea is to use things like the LRAD to communicate with protest organizers to try and prevent the incident from escalating. The snatch teams are trained to be able to push beyond the line to apprehend someone in the crowd, but they prefer to use that as a last resort.

Officer Pazon informed Sergeant Barnes he never saw an operation plan for the event.

Sergeant Barnes brought Officer Pazon's attention to the huddle on the bridge, during which he met with the members of the gas team and Lieutenant Prepetit. At approximately 55:20 into the interview, Sergeant Barnes asked Officer Pazon if he instructed anyone to turn off their body worn cameras. Officer Pazon stated, "Not that I recall." When asked why they would have turned off their cameras, Officer Pazon stated they would usually turn them off to discuss tactics "off-line." Officer Pazon explained this was because the Special Operations Division is limited in available tools and never want to let out everything they do in order to gain a tactical advantage. Officer Pazon stated if they formed a huddle it would have probably been to discuss a point of action and move forward with it.

Sergeant Barnes asked who was in the huddle for the discussion. Officer Pazon stated he did not recall exactly who was there, but believed Lieutenant Prepetit, and Officers Devin Joseph, Travis Johnson, Jason Jorgenson, and Michael Pierce.

Officer Pazon informed Sergeant Barnes that he is assigned a BWC but did not have it equipped that evening because he was assigned to be the driver and stay inside of the vehicle. However, because of his administrative role as the SOD Training Officer, Lieutenant Prepetit ordered him out of the vehicle to seek advice on the munition's deployment plans. When asked if it was reasonable that the driver of the armored vehicle not be equipped with a BWC, Officer Pazon stated he believed it was, because the driver's responsibility is to stay inside of the armored vehicle and not take action with the community. Officer Pazon clarified for Sergeant Barnes that the vehicle is not a typical departmental vehicle, the windows cannot be rolled down. Officer Pazon implied the driver does not usually have any interaction with the public.

Sergeant Barnes asked if it is a regular thing to turn off a BWC in a situation where they are planning or conducting information gathering or dissemination. Officer Pazon stated that during a briefing, if he is not mistaken, it is a regular occurrence within SOD.

Sergeant Barnes asked if the policy allowed for it. Officer Pazon stated he believed that an officer would have to be ordered by a supervisor to turn off their BWC. Sergeant Barnes asked if supervisors in SOD have given prior approval to turn off cameras during on-scene briefings. Officer Pazon informed Sergeant Barnes he has been in an administrative role for two (2) years and is not sure what the protocol is today.

Officer Pazon stated the situation on the bridge was the first of its' kind in NOPD and he is only sure about what the department says at the time and clarified that the situation was evolving, and decisions were made as the situation evolved.

Sergeant Barnes asked who tactics would be revealed to if they were captured on body worn camera. Officer Pazon stated he believed the footage was public record and that anyone with an evidence.com user ID and password would have access to the footage. Officer Pazon informed Sergeant Barnes there is no issue with the community knowing what tools SOD uses, but they are very aware that the information can get into the wrong hands. Officer Pazon stated it is very important, especially with riots, because particular groups prepare to get a tactical advantage on officers and if they know what the officers are going to do, then those actions are ineffective. Officer Pazon stated it is important that they plan accordingly and release information when it is feasible. Officer Pazon then stated he believes it is important the community and public know what tools SOD uses and believes it would control some of the outrage and some of the issues they face. Officer Pazon added that it is important the police be transparent.

When asked if it was proper that officers turn off their BWC in that situation, Officer Pazon stated he doesn't see a problem with police officers turning off their cameras to step away from the line and attempt to come up with a plan. At that point, the officers are not interacting with the public and not taking action. Officer Pazon also added that if the conversation had taken place at the police line it would be an issue if the officers turned off their cameras. This is because the officers are in close proximity to the agitators and are not removed from the environment. Officer Pazon reiterated that distance is their friend. He stated that we don't know what would happen in that moment, but it might be important and isn't captured on camera, so he would not agree with turning cameras off near the police line.

Sergeant Barnes asked Officer Pazon what was discussed in the huddle. Officer Pazon stated he asked what steps they took to deploy gas and he was told the protesters were tossing the gas back, so it was ineffective. Officer Pazon discussed deploying it near the front line where they could control the gas. Officer Pazon stated none of the tactics discussed in the huddle were implemented.

Sergeant Barnes asked who was conducted the inventory of munitions for the incident. Officer Pazon stated he was not sure, and he would have to refer to the form, because they sign the bottom of it. Sergeant Barnes asked what information Officer Pazon received that night about what was deployed. Officer Pazon stated he did not recall he was aware they used gas and impact rounds but was not sure which rounds exactly. Officer Pazon did not recall if he was aware that evening if the stinger rounds were deployed, or if anyone else was aware. Officer Pazon stated he thought he remembered getting information that evening, before they left, that stinger rounds were used. Officer Pazon stated if he had the information, he would have probably passed it to Sergeant Crawford. Officer Pazon stated no one asked him what was used that evening and he was not sure if anyone asked Sergeant Crawford.

Officer Pazon stated SOD deploys gas on SWAT deployments several times a year and in recent years they have used gas quite a bit but did not use the launchers often. Officer Pazon

stated the use of the gas and launchers is documented in the SWAT report, but gas is not reported as a use of force. Officer Pazon stated he believed the impact rounds would be reported as a use of force, but he cannot remember since they haven't had any use of it recently. Officer Pazon stated he does not believe the policy has anything about the use of less lethal impact munitions.

Officer Pazon stated he oversaw the line moving forward to get the protesters and agitators to exit the bridge on the magazine onramp. During that time, he remembered Officer Russel Green giving warnings before the line pushed forward. Officer Pazon stated the supervisors on the line are supposed to provide instructions for the line, but that night it was not happening. He recalled, at one point, Captain Lampard was yelling to give instructions and the gas masks appeared to interrupt communications. Officer Pazon stated he decided to assist, because as the lead trainer he was familiar with how to effectively control the front line. So, he took over control of the front line from Captain Lampard, at the authorization of Captain Lampard.

Officer Pazon began to give the orders to move forward, after the crowd had been broken up but there were agitators who refused to leave. Officer Pazon stated some of the agitators were snatched and some finally complied and exited the bridge. Officer Pazon stated the line moved forward until they had reached the bottom of the onramp at Magazine Street and Calliope Street.

Officer Pazon stated the warnings basically were NOPD asking the protesters to exit the bridge and could not recall the exact verbiage used. Officer Pazon stated he did not recall any warnings about what the protesters were in violation of or what the consequences would be if they refused to leave.

When asked, Officer Pazon stated he would not consider any of the force he observed on the bridge to be unjustifiable physical abuse, violence, force, or intimidation. Officer Pazon stated he did not see any force used by the protesters other than when the police were pushing forward, they were pushing back.

During the statement, Officer Pazon stated he believed it is important for the NOPD Command Staff to understand the training of the mobile field force, and the Command Staff should undergo similar training by a table-top exercise so they can understand how to properly manage incidents under their command. Officer Pazon stated they also did not have enough riot gear for the officers at that time without riot gear, it is a very unsafe approach for officers. Officer Pazon would also like to see increased training for the mobile field force.

Sergeant Barnes then concluded the interview at approximately 3:54 PM. The audio and video recordings of the incident have been made a permanent part of the case file.

### Follow-up Interviews Regarding Potential BWC Violations

Sergeant Barnes decided to conduct a second interview with some of the accused officers regarding the failure to activate their BWCs in a timely manner. The officers who were asked to come in for follow-up interviews were Officer Devin Joseph, Travis Johnson, Michael Pierce, and Lieutenant Kenneth Prepetit. Officer Jorgenson failed to turn on his BWC until after the

discussion, and Sergeant Harris did not participate in that discussion, nor did he turn off his BWC once it was activated.

## **Follow-up Interview of Officer Travis Johnson**

On Friday, August 21, 2020, at approximately 10:29 AM, Sergeant Barnes conducted a second audio and video recorded interview with Officer Travis Johnson at the PIB office at 1340 Poydras Street. Present during the statement were Officer Travis Johnson and Mr. Donovan Livaccari. The statement was monitored via Zoom call by members of the OIPM and OCDM, as well as other members of FIT. Officer Johnson provided the following information, in summation:

Officer Johnson stated he is assigned a BWC and the camera was activated while he was on scene. Officer Johnson stated the camera was activated after the first gas deployment. Officer Johnson had a chance to review his BWC footage a day or two after the incident on the bridge but has not reviewed it since because it is restricted.

Officer Johnson stated that when they arrived on the bridge he received the call to deploy gas almost immediately and as he was getting everything together he forgot to turn on his BWC.

Officer Johnson informed Sergeant Barnes he was unsure as to when the policy would require him to activate the camera for an incident like the protest because it is not a regular call for service. Officer Johnson stated that he should have activated his camera when they first called for the gas deployment. Officer Johnson stated he arrived on the bridge and the call for the gas team to prepare was given, while they were preparing the call to deploy gas was given. Officer Johnson stated he was still getting his equipment together when the call to deploy was given and in the midst of the incident he forgot to activate his BWC.

Officer Johnson stated he deactivated his camera twice while he was on the bridge, once when he was discussing with the officers about how they were going to deploy the third volley of gas, and once when he was at the equipment truck.

Officer Johnson stated he deactivated his camera at the equipment truck to ensure the security of what is in it and how the equipment truck is loaded. Officer Johnson stated he felt it necessary to not record that information to ensure it was not released so that the information would not be released, and their equipment and tactics become ineffective. Officer Johnson informed Sergeant Barnes the equipment truck has compartments that are roll up panels and kept under lock and key. Officer Johnson stated the equipment truck could be broken into, but it is kept locked.

The second time he turned off the camera, Officer Johnson informed Sergeant Barnes it was to secure the integrity of the tactics, because they were discussing the options they would use to deploy the next volley of gas. Officer Johnson stated that he did not want anyone to have the information because if people knew what they were going to do then the tactic becomes ineffective.

Sergeant Barnes asked Officer Johnson if there was anything in policy that allowed the officers to turn off their cameras. Officer Johnson stated he believes in this situation it would require rank approval. Officer Johnson stated he could not remember if rank was there or not. Sergeant Barnes played that portion of his BWC video for him to review and refresh his memory. After viewing the video Officer Johnson informed Sergeant Barnes he remembered himself, Officers Dylen Pazon, Devin Joseph, Michael Pierce, and Lieutenant Prepetit were present for the discussion. Officer Johnson stated he did not recall Lieutenant Prepetit telling him to turn his camera off, but he did not tell them to turn them on either. Officer Johnson stated that SOD normally turns off their cameras when they are conducting a briefing about tactics. Officer Johnson stated the cameras would not be turned off when they are in the midst of conducting any actions, but they regularly turn them off once everything is safe and they conduct an on-scene briefing of what happened.

Sergeant Barnes clarified with Officer Johnson that once the incident is over and the members of SOD conduct a debriefing it is standard practice to turn their cameras off during that debrief. Officer Johnson also clarified that it is standard practice during debriefs, while the incident is ongoing, for the officers to step away to where the scene is safe and turn off their cameras while briefing about tactics. Officer Johnson clarified that the rank authorizes them to turn the cameras off during those briefings. Officer Johnson stated that the rank doesn't necessarily tell them to turn their cameras off during those briefings, but they have regularly done it because they are not exactly involved in the incident at that point.

Officer Johnson stated he has no idea who reviews the videos. Sergeant Barnes asked if he believed if there was anyone viewing the footage that they would have to keep the information hidden from. Officer Johnson stated that as public servants the footage is public record, so they turn the cameras off to keep the integrity of their tactics.

Officer Johnson stated the deactivation of the cameras on the bridge was not intentionally done to hide misconduct. Officer Johnson also stated his camera was reactivated. Officer Johnson also stated he is assigned to the U.S. Marshall's fugitive task force, and as part of the task force they do not wear BWCs, other than that he has not been authorized to not have a BWC.

Sergeant Barnes then left the room to consult with the individuals who were monitoring the interview. A few minutes later, Sergeant Barnes returned to the room and asked a few follow up questions. Including clarifying the timeframe from when he arrived at the bridge to when the call for gas was given. Officer Johnson stated the call for the grenadiers came as they were pulling up to the bridge.

When asked if there was any equipment or changes he would like to see that would have helped in the incident, Officer Johnson was not sure. Mr. Livaccari offered that he would like to see a policy written that applies to this type of circumstance.

Mr. Livaccari also added that Louisiana Revised Statute Title 44, Section 3 of the public records law makes the types of discussions about tactics exempt from public records laws. To record them would require the officers to rely on someone else to redact the videos prior to release. Mr. Livaccari added that he is not sure if that is a risk worth taking.

Sergeant Barnes then concluded the interview at approximately 10:58 AM. The audio and video records of the interview have been made a part of the permanent case file.

## Follow-up Interview of Officer Devin Joseph

On Monday, August 24, 2020, at approximately 12:11 PM, Sergeant Barnes conducted a second audio and video recorded interview with Officer Devin Joseph at the PIB office at 1340 Poydras Street. Present during the statement were Officer Devin Joseph and Sergeant David Barnes. The statement was monitored via Zoom call by members of the OIPM and OCDM, as well as other members of FIT. Officer Joseph provided the following information, in summation:

Officer Joseph informed Sergeant Barnes that he is assigned a BWC and the BWC was equipped when he was on the bridge. Officer Joseph stated he reviewed his BWC the day after the incident and had not since.

Officer Joseph stated he did activate his BWC on the bridge but did not have it activated for the entirety of the incident. Officer Joseph stated he wasn't certain when he activated it, but at some point he noticed his camera was dangling from his collar and he reattached it to his collar and then looked down and noticed it was not activated.

Officer Joseph informed Sergeant Barnes that the BWC he has is not a standard BWC camera, it has a separate camera that can mount to his collar or his helmet. That evening it was magnetically attached to his collar and he noticed at some point the camera was dangling and not activated.

Officer Joseph stated he thought he turned his camera on when he first arrived on scene. As soon as he arrived on scene, he was called to deploy gas, and he was still trying to put his gear on as he moved to the line to join the gas team. Officer Joseph stated after his camera was activated initially, he deactivated it to discuss a tactical plan for another deployment. Officer Joseph stated the entire grenadier team was riding to the location in the back of the "Bear" armored vehicle.

Officer Joseph stated he turned his camera off to discuss the tactics regarding the gas deployment. Officer Joseph stated that he would turn the camera off at that point to discuss what needs to be done, then activate the cameras after the discussion is over and they are going to do what they planned to do. Officer Joseph stated the officers do that so that the tactics they have do not get released to protesters who would defeat their tactics in the future. Officer Joseph stated that was done on the bridge and has been done in every tactical deployment he's been involved in. Officer Joseph stated any plans regarding their tactics that they don't want to be defeated in the future they turn their cameras off and do not record the planning.

Sergeant Barnes asked Officer Joseph why he didn't activate his camera when he arrived on the bridge. Officer Joseph stated when they arrive on the bridge, they go to a point they call the Final Assault Position (FAP) and they generally will sit at that location until they are needed. Once they are called to move into position, they activate their cameras and then move in. That

evening within seconds of arriving they were called to deploy gas because the mobile field force line was being defeated. Officer Joseph stated he did not have all of his equipment when he ran to help the mobile field force line and had even forgotten his helmet. Officer Joseph stated once the line got containment, he realized his camera was not on and he actually activated his camera and also went back to get his helmet. Officer Joseph stated his camera was turned off for the briefing, then reactivated after the briefing and remained on for the remainder of the event.

Officer Joseph stated that at other protests they have been called to FAP before and they will sit there and not be needed, so they never activate their cameras. Officer Joseph recalled a protest that took place in Jackson Square and they were called to the FAP behind St. Louis Cathedral. Officer Joseph stated if they get directed to move in from FAP they activate their cameras and them move in to take action. At that protest they were never called in to take action and remained at FAP waiting, so their cameras were never turned on.

Officer Joseph stated that he has been instructed by supervisors on scene before to turn off their cameras during briefings on scene. Officer Joseph also stated there was nothing in writing that directed them too. When asked if a supervisor directed him to turn off his camera on the bridge the night of the incident, Officer Joseph stated the supervisor did not ask him to turn off his camera, but Officer Pazon asked him to. Officer Joseph stated that Officer Pazon and Lieutenant Prepetit were discussing another gas plan, and when they called the gas team over he believed it was to discuss the plan and with the Lieutenant present he assumed he was aware they were turning the cameras off.

Sergeant Barnes then left the room to briefly consult with the individuals who were monitoring the interview. Sergeant Barnes re-entered the room after a brief period to ask a few follow up questions.

Sergeant Barnes asked why it was important to turn off the cameras to discuss tactics. Officer Joseph stated that when they discuss tactics, they discuss several different possibilities and choose the best plan. Officer Joseph stated if they put all the plans on camera and they get out then they can be used against them. Officer Joseph stated there was no reason management could not review the plans and that management could come to their briefings, but they do not record the plans, so they do not get released. Officer Joseph stated that a supervisor is present for every briefing. Officer Joseph stated that turning the BWCs off is never done to hide misconduct or hide anything from anyone in the department who would be reviewing cameras. Officer Joseph stated the cameras are only turned off to ensure the security of the tactics.

Sergeant Barnes then concluded the statement at approximately 12:33 PM. The recordings have been made a part of the permanent case file.

## Follow-up Interview of Officer Michael Pierce

On Monday, August 24, 2020, at approximately 11:45 AM, Sergeant Barnes conducted a second audio and video recorded interview with Officer Michael Pierce at the PIB office at 1340 Poydras Street. Present during the statement were Officer Pierce, Mr. Donovan Livaccari and Sergeant David Barnes. The statement was monitored via Zoom call by members of the

OIPM and OCDM, as well as other members of FIT.  Sergeant Barnes informed Officer Pierce of his rights regarding the administrative investigation and ensured he understood his rights.  Officer Pierce provided the following information, in summation:

Officer Pierce informed Sergeant Barnes he is assigned a body worn camera and it was activated on the bridge.   Sergeant Barnes was informed that Officer Pierce reviewed his BWC footage approximately a day or two after the incident occurred and has not seen it since.

Officer Pierce informed Sergeant Barnes the BWC was not activated for the entirety of the incident because everything happened so fast, once the grenadier team reached the bridge they were called to deploy gas immediately.   Officer Pierce stated he did not turn his camera on immediately but turned it on sometime after the first deployment of gas.

Officer Pierce explained the mobile field force was being broken through when they were on the onramp headed to their final approach position (FAP) on the bridge and as soon as they got onto the bridge they were called to act.

Sergeant Barnes asked if they had been called from being on standby during a protest before.  Officer Pierce informed Sergeant Barnes that they were called to stage at the FAP during a protest near St. Louis Cathedral, but were never called to take action.  Officer Pierce explained that event was after the event on June 3rd.

Officer Pierce then explained the process SOD members go through when heading to a scene where they are going to take action, such as a high-risk warrant.   They start at the SOD office and proceed to the FAP, which is usually a block from the location.  At FAP they will make sure they are ready to act and turn on their cameras, then move in.

Officer Pierce explained the designated FAP for the incident on June 3rd was on top of the bridge.  He stated once they got onto the bridge the grenadier team was being called to deploy so they did not get a chance to get set and make sure they were ready.  Officer Pierce stated he even forgot his helmet when they went to deploy.

Officer Pierce told Sergeant Barnes he was not sure when he turned his BWC on, but it was after he got settled, after the initial deployment of gas.

Sergeant Barnes then played a clip of Officer Pierce's BWC from the first time the BWC was activated.  Officer Pierce stated he assumed the camera came on when they were about to deploy but he's not sure.  Officer Pierce also stated he was not sure why the camera turned off and believed he was still trying to get his equipment together.  Sergeant Barnes noted the second video began within one (1) second of the first video ending.

Sergeant Barnes asked if Officer Pierce turned his camera off intentionally at any point during the incident.   Officer Pierce informed Sergeant Barnes he had because they were conducting a briefing after they deployed the first volley of gas.  At that point they had gotten everything under control and were called back to plan in case they needed another deployment.  Officer Pierce stated they were told to cut the cameras off so they could discuss what they were

going to do. When asked who told them to cut the cameras off, Officer Pierce stated Officer Pazon had told them to. Officer Pierce stated Officer Pazon was not operating in a supervisory capacity, but he was controlling the mobile field force at the time. Officer Pierce stated Lieutenant Prepetit was present at the time the instruction was given.

Sergeant Barnes asked why Officer Pierce would turn the camera off during the briefing. Officer Pierce stated that the camera recordings are public record and they do not want to expose their tactics to the public because it could cause them to have a disadvantage in the future because people may learn their tactics. If people learn their tactics, they may be prepared to know what they are going to do during the next protest. Officer Pierce stated the deactivation of the camera was not done to hide any misconduct.

Officer Pierce stated he could not recall exactly what was discussed during the briefing, but he believed they were discussing if they had enough gas and what they were going to do next if they had to deploy.

Officer Pierce, when asked, stated he was not sure if the policy allowed them to turn off their cameras while they discuss tactics, but was sure they are allowed to not expose their tactics to the public. Officer Pierce stated he has been authorized before to turn his camera off while discussing tactics. Officer Pierce stated the discussions on how they are going to execute a warrant is not recorded so they do not disclose their tactics.

Officer Pierce stated after the discussion he probably turned his camera back on but was not sure. Officer Pierce stated after that briefing, he believes he got into the Lenco Bear armored vehicle to provide an overwatch from the turret of the armored vehicle. Officer Pierce informed Sergeant Barnes that he did not recall using any other force after that briefing and he believed the protesters started retreating. Officer Pierce stated he thinks he recalled using the launcher from the turret of the Bear at the beginning of the event, during the first deployment.

Sergeant Barnes asked Officer Pierce why he didn't activate his camera on his way to the bridge. Officer Pierce stated they do not usually activate their cameras until the reach the FAP. Officer Pierce stated there is no interaction with citizens at FAP and that is where they usually make sure they are ready to act. Officer Pierce stated he has been authorized to not wear a body worn camera when he is acting as a Task Force Officer with the U.S. Marshalls.

Sergeant Barnes asked if there is a pattern and practice to turn off their cameras to have discussions in SOD. Officer Pierce stated they do turn off their cameras when they are discussing tactics. Officer Pierce informed Sergeant Barnes they do not turn off their cameras and discuss anything other than tactics or their planning.

Sergeant Barnes then exited the room briefly to consult the members of the OCDM, OIPM, and FIT who were monitoring the interview. Sergeant Barnes and the other members did not have any additional questions to ask.

Sergeant Barnes then concluded the statement at approximately 12:09 PM. The recordings of the interview have been made a part of the permanent case file.

## Follow-up Interview of Lieutenant Kenneth Prepetit

On Monday, August 31, 2020, at approximately 10:01 AM, Sergeant Barnes conducted a second audio and video recorded interview with Lieutenant Kenny Prepetit at the PIB office at 1340 Poydras Street. Present during the statement were Lieutenant Prepetit, Mr. Donovan Livaccari and Sergeant David Barnes. The statement was monitored via Zoom call by members of the OIPM and OCDM, as well as other members of FIT. Lieutenant Prepetit provided the following information, in summation:

Lieutenant Prepetit informed Sergeant Barnes that he is not assigned a body worn camera because in the position he is in, as a lieutenant, he is not required to have one. Lieutenant Prepetit also informed Sergeant Barnes he was unable to review any of the body worn camera footage from the bridge.

Lieutenant Prepetit stated he recalled the discussion which took place on the bridge, after the initial deployments of gas. Lieutenant Prepetit stated during the meeting they were discussing a secondary tactical plan in case they needed to deploy a second volley. The decision was made to use distractionary devices which were being brought to the bridge and to determine if they needed to deploy more gas.

Sergeant Barnes asked why Officer Pazon told the officer it was ok to turn off their cameras. Lieutenant Prepetit stated the officers were called to a tactical huddle. Lieutenant Prepetit stated they turn off their cameras during all SWAT operations, they do not discuss their tactical operations on camera because it is public record and could be used against them in future operations.

Sergeant Barnes asked if Lieutenant Prepetit authorized Officer Pazon to tell the officers to turn off their cameras. Lieutenant Prepetit stated Officer Pazon looked at him and asked if they could and Lieutenant Prepetit couldn't remember if he verbally said they could or just nodded, but he knew he was present and his presence in that moment they all understood it was authorized for them to turn off their cameras. Lieutenant Prepetit said he may not have expressed it verbally, but he would have authorized the officers to cut off their cameras, and he knew that his presence in front of them and their acknowledgement was his authorization to do it.

Lieutenant Prepetit stated turning off the cameras is not done to intentionally hide any misconduct. He stated in their tactical planning they always discuss their plans off camera because they have that option so their tactics cannot be used against them. Lieutenant Prepetit stated that they discuss several options and choose one, and they do not want them released.

Lieutenant Prepetit can see that the image of being in the field under these circumstances, which is the first time ever in the department, may look like they are attempting to hide something, but it is their standard method when discussing tactics or tactical planning.

Lieutenant Prepetit stated, on a typical SWAT deployment, they will step away from the incident itself, to a location such as behind a vehicle, they will turn the cameras off to discuss planning.

Sergeant Barnes asked why they would shut the cameras off instead of relying on the department to redact that portion of the video before releasing it. Lieutenant Prepetit stated, in the past, when a public records request comes in the videos have been released straight out and SOD does not get a seat at the table to review the footage and make sure it has been redacted before it goes out. Lieutenant Prepetit stated he does not know if the department is redacting videos before they are released.

Lieutenant Prepetit stated that he does not know if anyone at a command staff level is aware of the cameras being turned off to discuss tactical planning. Lieutenant Prepetit did state that his captain, Captain Brian Lampard, is aware of the officers turning off their cameras to discuss tactics and planning.

Lieutenant Prepetit stated he reviewed the policy and there is nothing specifically in policy that says SOD can cease recording during these incidents. Lieutenant Prepetit stated that, since he has been in SOD, they do not record their tactical planning or debriefings.

Lieutenant Prepetit stated he believes that the policy should be modified to allow SOD officers to protect their tactics rather than record the briefings and subject them to public record. Lieutenant Prepetit explained that the actions are going to be recorded but the explanation of why they use those tactics is not, because that is where the safety issue is. Lieutenant Prepetit stated the tactics can be used against them if they are released and implied if the general public understands how to combat and use their own tactics against them it would make their tactics ineffective.

Sergeant Barnes then exited the room briefly to consult the members of the OCDM, OIPM, and FIT who were monitoring the interview.

Sergeant Barnes returned to the room and asked if there was any equipment or anything Lieutenant Prepetit would like to see implemented that be beneficial to the department because of this incident. Lieutenant Prepetit stated they have already started training additional officers in the mobile field force training. Lieutenant Prepetit also stated he would like to see updated riot gear because the riot gear they have is outdated and they could not attach body worn cameras to it. Lieutenant Prepetit said they have recently contacted Axon about trying to develop a way to attach the body worn cameras to the riot gear and are currently outfitting their gear with Velcro to attach the cameras.

Sergeant Barnes asked what it was like on the bridge when the grenadier team first responded. Lieutenant Prepetit said he was observing the front line when it was broken, and Captain Lampard gave the order because the scene was very chaotic, and the line had been broken. Lieutenant Prepetit stated the gas team was called up rapidly because it was exigent they get on site. Lieutenant Prepetit stated he remembered officers were donning their masks as they were headed to the line and he even reminded one or two of them to get their helmets because they were in such a rush under an exigent circumstance they didn't get a chance to stage or get setup. Lieutenant Prepetit stated that the grenadier team had to come up from the Westbank side because the onramp was shut down at that point.

Sergeant Barnes then concluded the statement at approximately 10:23 AM. The recordings of the statement have been made a part of the permanent case file.

## In-Car Camera Review

### ICC of Officer Bryan Bissell

On August 5, 2020, Sergeant Barnes reviewed the in-car camera footage recorded by Officer Bryan Bissell, from NOPD vehicle number B18047. The video began at approximately 02:24:59 on the timestamp and captured the following events:

02:24:59 – The video begins with the vehicle facing with traffic at the bottom of the onramp, surrounded by protesters. A bicyclist can be seen blocking the vehicle from moving, positioning himself directly in front of the bumper of the vehicle. Another protester almost steps in front of the vehicle, inches from the bumper, and directs protesters around the vehicle. Another protester then steps in front of the vehicle, facing the vehicle directly in front of the driver, nearly leaning against the vehicle with his hands in the air.

02:27:00 – Several of the protesters are stopped directly in front of the vehicle as much of the crowd stops to observe, take pictures, and video the people standing in front of the vehicle. To the left of the vehicle a woman can be observed wearing a bright green hat, watching the events unfold. The woman is holding a notepad and appears to be an NLG observer.

02:27:13 – Unit 130 is heard advising that himself and another unit are stuck on the onramp.

02:27:34 – The police vehicle begins backing up, away from the crowd. As it does, the bicyclist stays directly in front of the vehicle backing the vehicle up. Several other protesters walk in front of the vehicle, motioning for it to back up. One protester, a black male wearing a dark beanie hat and a camouflage shirt with a backpack, is flicking the police officers off and mouthing the words, "fuck you" as he walks the vehicle backwards. The protesters continue to march the vehicle backwards until it is completely off of the onramp. At which point the protester in the camouflage begins directing protesters to turn and go up the ramp. The vehicle then turns and drives up Calliope Street back to St. Charles Avenue.

02:32:42 – The vehicle enters the Tchoupitoulas onramp. As it enters it passes two (2) LSP vehicles and two (2) NOPD motorcycles at the base of the onramp.

Sergeant Barnes noted the vehicle initially parked facing the Westbank, in the right lane of travel, until it was later moved to join other vehicles facing against traffic, just behind the police line.

02:35:00 – Officer Bissell pulled the vehicle against traffic and parked it on the inside portion of the bridge, straddling the line of the second and third lanes.

02:36:00 – The skirmish line was quickly formed as protesters approached. At the same time, Captain Anthony Caprera is seen exiting his vehicle, which is parked next to Officer Bissell's.

2:38:00 - The protesters reach police line and start trying to push through on the right side of the video. Shortly after several officers begin forming a second line, gathering several feet behind the first line.

02:59:00 – A strobe light can be seen shining directly at officers from the side of the protesters.

03:04:30 – Brianna Chatmon can be heard addressing the crowd through a loudspeaker.

03:13:17 – The command "gas, gas, gas" is heard and officers on the second line are seen beginning to don their gas masks.

03:13:27 – Officers can be seen struggling to hold the protesters back as they are being pushed near the side of the bridge on the right side of the screen.

3:14:20 – The police line breaks as protesters push their way through.

3:14:40 – The police line is completely overrun at this point, the police officers on the line are surrounded by protesters as the protesters push forward. Officer can be seen pushed and pinned against the police cars.

3:15:06 – a canister of gas appears to go through the air on the left side of the screen. Seconds later, another canister of gas is seen falling from the sky as another canister of gas is thrown from the protesters back towards the police. Sparks appear on the left side of the screen, consistent with another canister of gas being deployed. Almost immediately after, another canister of gas is thrown back towards police from the protesters. Then a third canister of gas is seen being thrown back towards the police from the protesters.

While this is happening, the protesters and police continue to push against each other in a chaotic scene, with police officers and protesters climbing over the police cars on the line.

03:15:30 – As the melee continues, another object (possibly a water bottle) is thrown directly over Officer Bissell's vehicle.

03:15:40 – The scene starts calming down as protesters begin retreating. The officers on the line are also seen retreating behind the vehicles.

03:16:43 – A protester is seen picking up a police shield in the middle of the roadway before retreating back again.

3:17:00 – The police line is starting to be reformed near the same area as the original line.

3:18:00 – The police line is backed up to the fence line on the bridge. As the police line moves, protesters can be seen walking back towards the police line again.

03:19:51 – The command "Gas, gas, gas" is called again.

03:20:03 – The command "Gas, gas, gas" is called again and gas is deployed again. The deployment appears to be two canisters.

3:20:12 – One of the canisters is thrown back to the police line, just over the heads of the officers.

3:20:22 – An officer retrieves the canister and throws it back towards the protesters at the same time Officer Devin Joseph is seen climbing to the hood of a police vehicle and firing the launcher over the police line.

3:20:45 – On the video it appears Devin Joseph's 40mm launcher is not cycling properly. As Devin Joseph fires two rounds from the launcher DJ fires two launcher rounds, Sergeant Harris is at the back of Officer Johnson, looking through the backpack. Sergeant Harris then hands Officer Joseph more ammunition for the launcher.

3:21:42 – Lieutenant Prepetit can be heard on the radio calling for two 25's"

3:21:50 – Officer Joseph fires the launcher five times and then reloads.

3:22:40 – Officer Pierce arrives to reload his launcher as the protesters appear to be getting closer and can be heard chanting in the video.

3:25:38 – A single gas canister is deployed over the middle of the line.

3:25:45 – A gas canister is seen thrown off the side of the bridge by protesters. Officer Joseph fires the launcher once at that time.

03:29:30 – Officer Joseph leaves his position on the hood of the vehicle.

03:37:43 – Sergeant is seen removing a gas canister from the backpack of Officer Travis Johnson and handing it to Officer Jorgenson.

03:55:05 – Warnings are heard over the loudspeaker for protesters to exit the bridge. Officers then life their shields and prepare to advance forward.

03:55:28 – The command to move is heard and the officers begin advancing towards the remaining protesters.

For the remainder of the video, the officers continue to advance towards the protesters. At 03:57:05 it appears a protester is snatched through the line on the right side of the line as it advances. The flashlight from one of the protesters is seen over the line as the line continues to advance.

At 03:59:14 another protester is snatched through the left side of the line as the line continues to advance.

The line continued to move away from the vehicles, towards the protesters, until 04:00:45 when it appeared another protester was snatched through the line.

At 04:01:25 the Lenco Bear armored vehicle was brought in front of the line of cars to the rear of the line.

The police line continues to move forward until it is barely in view of the camera.

At 04:08:00 Deputy Superintendent John Thomas appears on the screen, walking forward towards the police line.

Sergeant Barnes watched the video in its' entirety and did not observe any other information pertinent to the investigation.

## ICC of Sergeant Daniel Hiatt

Sergeant Helou reviewed the ICC footage of Sergeant Daniel Hiatt's vehicle captured during the incident. Sergeant Helou discovered Sergeant Hiatt had three (3) ICC videos associated with the incident. Sergeant Helou reviewed the videos and noted the following information, at the listed times:

**Sergeant Hiatt ICC video 1 (front camera):**

02:25:44 – The video begins with the vehicle driving up the Tchoupitoulas CCC on-ramp behind a Chevrolet Tahoe (unmarked) police vehicle. Upon reaching the top of the on-ramp, the vehicles turn right and travel against traffic on US90B, stopping briefly in the emergency lane before turning back with traffic and stopping just past the Tchoupitoulas on-ramp in the right lane of traffic.

02:29:20 – The vehicle's occupants exit, leaving the vehicle's camera recording as it faced the bridge. Other marked NOPD vehicles park in front of the Tahoe as officers are observed donning their emergency gear.

04:53:17 – The occupants returned to the vehicle and drove against traffic on US90B West, exiting at possibly the Magazine Street on-ramp.

05:01:50 – ICC is deactivated

**Sergeant Hiatt ICC video 2 (rear camera):**

Documented no new information.

**Sergeant Hiatt ICC video 3 (rear camera):**

Documented no new information.

## **Communications Recordings**

Sergeant Barnes reviewed the OPCD recordings for item number F-03385-20 on the radio channel used for the protest coverage on June 3, 2020.  Sergeant Barnes discovered the following information on the recordings:

As the recording begins, unit 3860 is heard informing unit 3400 (Lieutenant Kenny Prepetit) that about 30-40 people were in the park at Duncan Plaza.  At 28 seconds into the incident, Captain Lejon Roberts informed the dispatcher to make sure the channel was being monitored.  Shortly after that, Captain Roberts advised there were about 100 people heading towards the protest at Duncan Plaza.

Unit 1100, Lieutenant Merlin Bush, advised that if the protesters went mobile from Duncan Plaza they would just flank them.

Sergeant Barnes continued to review the recording and documented the following information, at the listed times, on the recording:

3:28 - unit 3860 advised unit 100 (Captain Roberts) that several protesters were walking into Duncan Plaza with gallons of milk, presumably to combat tear gas, and stated they look like professional protesters.

At 6:23 – Captain Roberts tells unit 320 (Sergeant Terrence Hilliard) to take a car with him to the Westbank in case they decide to take the GNO.  That way he will be able to get on the bridge and divert traffic off Tchoupitoulas.  Captain Roberts instructed Sergeant Hilliard to take three (3) units with him.

6:53 – Dispatch was advised the protesters were about to start moving.  Unit 3860 then prepared "motors" (traffic control units) for movement.

7:25 – Unit 3860 advised the protesters were on Loyola going towards Perdido (with traffic).

7:45 – Units were advised to lock down all intersections towards Poydras.

10:00 – Dispatch was informed the protesters were crossing O'keefe on Poydras.  A unit advised the protest was moving "pretty good" and informed units near Harrah's Casino and Canal Street to be ready for the protesters.

10:40 – Unit 1500 (Lieutenant Andrew Palumbo) instructs officers from Districts 4, 5, and 6 to relocate to Canal and S. Peters.

11:15 – Captain Roberts advised the protesters were using both sides of Poydras Street.

11:40 – A unit advised officers to have riot gear and shields with them but said they do not need them at the time.

C208

12:00 – Dispatch was advised the protesters turned on St. Charles towards the bridge.

12:15 – The radio communications indicated the officers were not set up to control the bridge and were trying to get in place.

12:40 – Lieutenant Bush (1100) instructed Sergeant Dowal Barret to head to the Westbank.

13:00 – Lieutenant Palumbo instructed the 4th, 5th, and 6th District officers to relocate to Lee Circle.

13:13 - Dispatch was advised the protesters stopped at Lafayette Square.

14:00 – Dispatch was advised the protest was continuing past Girod Street.  Lieutenant Palumbo advised units to not drive through the protest but go around.

14:20 – A unit advised if the protesters try to go to the Westbank, Districts 1, 2, and 3 will have to cover and units should divert traffic off the Tchoupitoulas exit.

14:50 – Units were advised if protesters get up on the westbound side of the expressway they should start diverting traffic at Camp Street and Tchoupitoulas Street.

15:15 – Officer were advised to stand by at the onramp, and to make the onramp a "choke point."

15:46 – Units advise where onramps and exit ramps are leading to the bridge as they attempt to cover the possible ramps protesters could use to get on the bridge.  A unit is heard advising they will "play it by ear."

16:15 – Lieutenant Palumbo instructs the 4th district officers to stage at camp and calliope and 5th district and 6th district to stage at Carondelet and Calliope.

16:40 – Lieutenant Bush stated there is a horseshoe at camp to get on to the expressway towards the Westbank and says it is a good location to stop them from getting up onto the expressway.

17:15 – Dispatch is advised the protesters are already at Lee Circle, and a few have been caught climbing up the monument.

17:40 – Dispatch is advised the protesters are moving on Howard towards WDSU.

17:55 – A unit asks if there is someone on the bridge to stop the traffic from coming down the Camp exit.

18:20 – A unit replies if they are discussing the Westbound side, they already shut it down there.

18:30 – Dispatch is advised they need to move the street cars out of Lee Circle.

19:00 – Deputy Chief John Thomas advised he is on the interstate by Camp Street.

19:10 – Sergeant Daniel Hiatt is asked to send a car to the interstate to relieve Deputy Chief John Thomas.

19:35 – Deputy Chief Thomas instructs the units to shut off traffic at Tchoupitoulas and says when they start coming up the ramp he's going to need to leave quickly so he doesn't get caught in the protest.

20:00 – Unit 1800 (Lieutenant Bradley Rhodes) advises units an officer embedded with the protest has informed him the plan is to go on the bridge.

20:30 – A unit asks if the U-turn to get on going towards the Westbank can be made a chokepoint to keep the protest from going up onto the bridge.

21:05 – Captain Roberts advised the protest is going under the overpass, heading uptown, and not turning.

21:25 – Captain Roberts stated the protesters are headed into the 6th District, uptown, and have passed up the bridge.

21:45 – Dispatch is advised to notify the 6th district, have them lock up the station and shut the gates and put all the vehicles inside.

22:20 – Lieutenant Palumbo advised Captain Roberts he is going to have the officer from the 4th, 5th, and 6th Districts hold their locations on Calliope Street until it is determined where the protesters are going.

23:20 – A unit advised to have a traffic unit move ahead and warn businesses the protesters are coming.

23:50 – Captain Roberts advised the protest is at a standstill in the Wendy's parking lot on St. Charles.

24:00 – Deputy Chief Thomas asked who is available to block traffic heading to the Westbank.

24:40 – A unit advised Louisiana State Police and IMAP units are securing traffic at I-10 and Highway 90.

25:12 – Lieutenant Palumbo advised he was sending Sixth District units to block off ramps.

25:50 – Captain Roberts advised the protesters are still at Wendy's.

27:00 – The instruction is given to block traffic for the protest.

27:15 – Captain Roberts advised if the protesters go on the interstate they want to contain the protest from both ends. Captain Roberts stated they don't want to prevent them from going up to the interstate because it could cause trouble. Captain Roberts further advised that if the protest does go up there they want to try and contain them on both ends.

27;40 – Deputy Chief Thomas advised units to be sure when they park cars on the bridge to face them towards the Westbank, so they don't get stuck in the protest.

28:00 – Captain Roberts reiterated that if the protest does go on the bridge they want to contain them and prevent them from going any further towards either side.

28:58 – Lieutenant Bush advised Captain Roberts the crowd was peaceful, and they were just chanting in front of the Wendy's.

29:30 – Dispatch is advised the protest is moving again from the Wendy's parking lot.

29:40 – Lieutenant Bush advised Lieutenant Palumbo that his officers from the 4th, 5th, and 6th Districts would be the first line to shut down the Tchoupitoulas ramp.

30:10 – A unit advised there was an onramp near Magazine Street. Lieutenant Bush advised they will not be able to block every onramp and stated the key thing was to keep them from going past the Tchoupitoulas exit.

It was advised the Tchoupitoulas exit is the last exit before you can get on the bridge so the Tchoupitoulas exit needs to be the last line so protesters can get off there.

31:00 – Lieutenant Palumbo instructs Sergeant Hiatt to use the ramp by the D-day museum (at magazine) to go and set up. Lieutenant Palumbo informed units to not allow them to go past the Tchoupitoulas exit.

A unit then asked if they were stopping the protesters from getting onto the bridge.

The unit is advised they want officers on the bridge, going towards the Westbank, and instructed the officers to not let protesters past the Tchoupitoulas exit. Lieutenant Palumbo stated, "That's where we are going to stop them, but we aren't going to stop them from getting on the bridge."

31:37 – Deputy Chief Thomas says "Kevin" is live feeding the protest and they are trying to break windows on St. Charles Avenue, but the crowd is stopping the agitators.

31:57 – Captain Roberts advised all units they are not preventing the protesters from getting on the bridge. Captain Roberts stated if the protesters decide to get on the bridge they want to contain them, they don't want them to move freely. Captain Roberts then stated they will not use the motorcycles to block traffic for safety reasons, they will use car.

32:24 – The protest begins moving again and Deputy Chief Thomas advises there are some allies in the crowd, and they seemed to help stop agitators from breaking windows.

32:50 – Captain Roberts advised the crowd is moving towards Drew Brees's house.

33:10 – Dispatch is advised the protesters are not getting on the bridge yet, they are staying on the ground level.

34:28 – Lieutenant Bush tells the IMAP units to open the interstate and just standby.

34:50 – Deputy Chief Thomas advised if they did try to get on the interstate they need to block the on-ramp by Home Depot.

36:50 – Traffic units are called towards Prytania and Washington to cut off the major intersections.

37:57 – Deputy Chief Thomas advised units to open highway 90 headed towards the Westbank and to standby to shut it down again if they need to.

38:50 – Dispatch is advised the protest is headed down Jackson towards Prytania.

39:40 – A unit advised there is discussion in the crowd about going to Magazine to get on the onramp by the D-day museum.

40:30 – Captain Roberts advised there are protesters on the bikes acting as spotters and to stay ahead of them because they will try and block units in.  A unit advised he was listening to the protesters on bikes talk and advised they are going to go to Magazine Street.

41:32 – Captain Roberts advised the lead of the protest is on Jackson near Magazine.

41:45 – Lieutenant Palumbo tells Lieutenant Bush that officers from the 4th and 5th Districts are standing by at the onramp by Magazine and Camp.  Lieutenant Palumbo says if they look like they're going to get on the bridge there they will go ahead and set up a line by the Tchoupitoulas exit to prevent them from crossing the river.

42:50 – Captain Roberts advised the protesters were speaking near Trinity School on Jackson.

42:20 – Lieutenants Palumbo and Bush discuss how to get units to the bridge to form a line. Lieutenant Palumbo stated the Camp exit will be the last line of defense.    Clarified that based on what the protesters do, unit will have to go to either side of the bridge.

45:25 – Deputy Chief Thomas tells Captain Roberts not to forget they have SOD available to hold the bridge until they can respond.

46:10 – Captain Roberts advised the protest is turning on Magazine towards Downtown (the bridge).

46:30 – A unit asked what they are doing with the expressway and Captain Roberts said wait to see what the protesters do because they may not go that far. Captain Roberts stated they will be able to react quick enough.

46:51 – Lieutenant Palumbo relocated the 4th and 5th districts to Tchoupitoulas and Henderson so they can get on the bridge from Tchoupitoulas if they need to.

47:40 – Dispatch is advised there are about 30-50 protesters back on St. Charles headed towards Lee Circle, that have broken away from the main protest.

47:50 – A unit advised the crowd is peaceful and looks tired. The unit stated they may be heading back to the starting point.

49:10 – A part of the protest breaks away, turning on St. Andrew towards Prytania.

49:30 – Dispatch is advised a large crowd is on Camp Street passing the school, headed in the direction of the bridge.

49:50 – The protest appeared to have broken into three separate groups, one on St. Charles Street, one going to St. Charles from Camp Street, and one on Camp Street moving towards the bridge.

51:40 – Captain Roberts stated they may be disbanding and going in separate directions.

51:50 – A unit stated it looked like bicyclists are trying to make a decision.

52:35 – Captain Roberts advised police units to turn away from the crowd, so they don't get blocked in by the bikes.

53:15 – Captain Roberts stated the information from Louisiana State Police is that the protesters are trying to get on the interstate and go to Jefferson Parish.

53:33 – Captain Roberts repeated the intel from LSP that they are going to the CCC to go to Jefferson Parish on the Westbank.

54:00 – Captain Roberts said the protesters may try and get on at the Camp Street onramp and asked to have officers ready there. Captain Caprera says he will have officers flex that way.

54:20 – Lieutenant Bush told Sergeant Barrett to shut down the traffic towards the Westbank, make them get off the Tchoupitoulas exit.

54:55 – Lieutenant Palumbo makes the call to close the expressway headed to the Westbank and asked the 6th district and LSP to close the expressway headed towards the Westbank.

55:15 – Lieutenant Palumbo asked traffic to block the onramp near Henderson and Tchoupitoulas.

56:02 – Captain Roberts stated some of the group is going past Calliope, and it may indicate they are going straight back to the 8th District.

56:09 – Lieutenant Prepetit advised Captain Roberts if they protesters were crossing Calliope they can turn around to get on the onramp to the Westbank from Magazine.

56:50 – Lieutenant Bush called for officers to get on the expressway and start setting the skirmish line.

57:50 – Captain Roberts said it looked like they are going straight past Calliope.

58:30 – A unit advised some protesters are breaking away to get on the CCC at Camp the onramp.

58:42 – Sergeant Wade Bowser advised he is at the onramp and the protesters took over the onramp and they're going up the Camp onramp to the expressway.

58:50 – A unit advised protesters on bikes are blocking the police cars, so they'll have to stay behind.

59:05 – A unit advised they are surrounded on the onramp and can't back out.

59:35 – A unit asked to make sure there were not cars stuck in the crowd this night.

59:38 – Captain Roberts advised units as soon as they get up on the bridge to form a line and keep the protesters on the onramp, not to let them into the main flow of traffic.

1:00:24 – Unit 130 advised they have people on top of his unit on the onramp. Captain Roberts relays there are 1500 or more protesters going up the onramp.

1:00:37 – Unit 130 advised he and another unit are stuck on the onramp.

1:01:15 – There is discussion about what onramp to use to get in front of the crowd.

01:02:00 – Lieutenant Palumbo says anyone trying to get on the bridge should go to Tchoupitoulas and Henderson and that's where we are going to form the line to keep protesters from going to Algiers.

01:03:00 – Lieutenant Palumbo called for the expressway to be completely shut down at Baronne and Loyola.

01:03:58 – Captain Roberts advised he is on the bridge and going to form a skirmish line right before Tchoupitoulas and try to force them back town at the Tchoupitoulas exit. Lieutenant Palumbo says to form the line further forward in case they need to get resources up that ramp.

1:04:40 – Lieutenant Prepetit says to Captain Roberts to come down to the exit so they can force the protesters down that way. Someone responded saying they can still make them go down another way if they have to.

1:05:00 – Lieutenant Palumbo advised where the protesters got on is already past the Tchoupitoulas exit.

1:05:35 – There is discussion about getting the crowd stopped before they lose their position and where they can usher the crowd off the bridge.

1:06:50 – A unit advised they have to form the line where they are and may come down further to the fence line.

1:07:20 – A unit calls for cars to be brought up to help establish the line.

1:07:45 – Someone advised there are approximately 2000 protesters.

1:08:00 - All available units are asked to come to Tchoupitoulas and Henderson, the line is set, they need it fortified, about 400 feet from the protesters. Captain Roberts calls to bring up SOD with the munitions team. Captain Roberts calls to maintain the integrity of the line and advises when the protesters are face to face with officers.

1:09:25 – Captain Roberts calls for help, "ASAP."

1:09:35 – Captain Roberts is heard advising the protesters are trying to breach the line and hitting shields. He calls for units to help quickly saying, "C'mon guys, double time it."

1:09:41 – Someone asked is SOD was in route. Captain Roberts advises the protesters are calming down and the officers are nose-to-nose with them.

1:09:55 – Someone asked again where SOD was and was advised they are on their way. A unit asked if State Police is coming and Captain Roberts advised, "It's just us." Captain Roberts then informs dispatch they are forming a secondary line and calls for more units.

1:10:50 – 1800 (Rhodes) says they have about 40 of them walking up camp to canal. 800 advises the canal contingent to stay there, keep them on canal street.

1:11:30 – Car 32 advised Captain Roberts a contingent from ISB is on their way to assist as well.

1:13:08 – Captain Roberts advised the LRAD is being used and the female leading the protest understands they can't go any further. Captain Roberts says she is going to speak to the protesters, explain it, and get them off the bridge.

1:14:35 – Captain Roberts advised all units to be prepared because the protesters are not cooperating with anything they say.

1:14:57 – Deputy Chief Thomas asked Captain Roberts if they were still holding the line. Captain Roberts advised they were, but the protesters want them to put down their shields and their guns. Captain Roberts says the crowd is too hostile. Deputy Chief Thomas says, "Absolutely not. All that's off, we're not going there." Captain Roberts advised the incident could erupt at any time and they have a front line and secondary line, with the tactical unit ready to deploy.

1:15:50 - Captain Roberts says to deputy Chief Thomas that if the crowd starts pushing and shoving he and Captain Lampard have a plan in place.

1:16:03 – Deputy Chief Thomas says to give them three warnings if there is time. He says tell them to step back and give them three warnings with about a minute between each warning. Captain Roberts replied, "We are gonna exhaust every means possible Chief."

1:16:22 – Captain Roberts advised the crowd was rowdy and they had to call an on-guard position at the line. The secondary units have donned their gas masks and the protesters and front line are in a shoving match. Deputy Chief Thomas acknowledges Captain Roberts and says, "10-4, just give them the warnings."

1:16:39 – Captain Roberts advised they are fighting the protesters. Deputy Chief Thomas responded, OK, Y'all got gas?" Captain Roberts is head saying, "It's a fight! Maintain that line! Maintain that line! Deploy gas! Deploy gas! Deploy gas!"

1:16:58 – Captain Roberts advised they were deploying gas and the protesters are throwing the canisters back at them. He then calls to reform the line.

 1:17:12 – Captain Roberts advised they had to deploy gas and they should be moving out, and they have to redeploy.

1:17:40 – Captain Roberts advised they formed the line again and the protesters are about 100 feet away.

1:17:55 – The line is backed up to the fence.

1:18:10 – Captain Roberts advised Chief Thomas they have reformed the line and Chief Thomas advised he is sending additional 8th and 6th District units.

1:18:30 – Captain Roberts advised there are more protesters coming back to the line.

1:18:36 – Car 32 advised she is watching live from nola.com and it appeared a protester is coming back to the line with a police shield. Captain Roberts stated they may have taken the shield during the fight and advised the protesters are throwing something. Captain Roberts then stated they are deploying another round (meaning gas).

1:19:04 – Deputy Chief Thomas acknowledged another round was deployed.

1:20:15 – Captain Roberts advised Deputy Chief of the subject who started the incident.

1:20:40 – A call about an armed subject is provided over the radio, stating if the subject has a backpack he has a firearm in it.

1:21:07 – Captain Roberts advised the subject who caused everything left and is not in the crowd. Deputy Chief Thomas asked for a description to be placed out and Captain Roberts relayed the information.

1:21:30 – Captain Roberts advised they still had about 250 protesters on the bridge. Deputy Chief Thomas stated the Superintendent is going to be coming up behind them on the bridge.

1:21:43 – A unit advised they were at Henderson and Convention Center and a gas container was thrown off the bridge.

1:21:50 – Deputy Chief Thomas relayed there is a subject in blue jeans that has an assault rifle on the ramp and advised the units to take cover. Deputy Chief Thomas stated he was watching it live.

1:22:45 – A unit advised someone to move because they are throwing stuff.

1:23:15 – A call advised intelligence had information a subject with a gun is on the ramp.

1:23:31 – Captain Roberts says we have a team from SOD that's ready to snatch him and asks for his location.

1:24:20 – Captain Caprera advised Lieutenant Rhodes there was a crowd coming his way from the bridge and that tear gas had already been deployed so they may be looking to break something.

1:24:30 – Captain Lampard calls for Deputy Chief Thomas and is not answered.

1:24:50 – Captain Caprera calls for mounted units to come to the bridge.

1:25:50 – Units 627 and 623 advised they drove the ramp and didn't see anyone with a rifle.

1:26:10 – An unknown unit advised the subject with the rifle has it in a backpack and describes it as a Kel-tech breakdown with a 100-round drum. The responding units reiterated they saw no one at all on the exit ramp.

1:26:50 – Sergeant Brazely advised the US Marshalls had arrived and asked if they want them to look for the armed subject or if they need them on top of the bridge.

1:27:35 – Captain Roberts advised there are probably 200 people still on the bridge and advised they are going to push them back off the bridge when mounted arrived.

1:28:00 – Deputy Chief Thomas asked if they have the big PA horn that can "mess their ears up." Captain Roberts responded that they have the LRAD.

1:28:18 – Deputy Chief Thomas asked if any officers suffered injuries they need to deal with. Captain Roberts advised he did not know of any injuries to officers or protesters.

1:29:25 – Captain Roberts advised Deputy Chief Thomas the main four agitators were nowhere to be seen.

1:32:20 – Captain Roberts relays that they have seen mounted units yet, but they have enough people, so they are going to give commands from the LRAD and start pushing the protesters back.

1:32:45 – Deputy Chief Thomas asked Captain Roberts if he requested Jefferson Parish.

1:32:57 – A unit advised protesters have roman candles.

1:33:40 – Deputy Chief Thomas tells Captain Roberts that if they encounter any resistance to wait for mounted.

1:34:37 – Captain Roberts advised they are moving the protesters back and have three in custody.

1:34:47 – Captain Roberts advised they have five people in custody and requests a wagon for transport. Captain Roberts advised they are successfully moving down the bridge with the police line.

1:36:05 – Captain Roberts advised Deputy Chief Thomas they don't need mounted.

1:38:04 – The units discuss preparing for traffic on the bridge for the next few minutes.

1:47:10 – Captain Lampard tells Lieutenant Bush they are all clear and clear on the ground as well. Unit 3860 instructs units to open up all the traffic on the ground.

1:48:00 – EMS Command asks if they can secure or if there are other protests.

1:53:45 – Captain Roberts advised he is on his way to meet by Harrah's Casino with Deputy Chief Thomas to address everyone before they head out for the evening. says he's on his way down with Chief Thomas, wants to address everyone before they head out. (meeting by Harrah's)

2:01:00 – car 32 secures channel, marks up protest item NAT 5 arrests.

The recording stops at 2:02:04. The recording has been made a part of the permanent case file.

## Civilian and Witness Statements

### Ms. Juliette Walker (subject of force)

On Thursday, June 4, 2020, at approximately 2:46 PM, Sergeant Clinton Givens relocated to a known location to speak with Ms. Juliet Walker (A white female with a DOB of ███/1999). During that statement, Ms. Juliet Walker provided the following information:

Ms. Walker advised Sergeant Givens they were on the ramp approaching the Crescent City Connection bridge and were at a standstill with police officers at the line. Ms. Walker was with her mother, Mrs. Katharine Archer, and her sister, Ms. Abigail Walker, when they decided to push forward. Ms. Walker stated they were not pushing against the police but were pushing themselves to protect other protesters there. Ms. Walker stated they were approximately three (3) or four (4) people away from the police line. Ms. Walker stated they had their hands up and were chanting "Hands Up, Don't Shoot."

Ms. Walker stated from what she could tell, and clarified she could see over the heads of people, she saw police backing up as protesters were stepping forward and saw large plastic barricades open as if the protesters were being allowed to pass. Ms. Walker stated she saw some protesters go through the open barricade.

Ms. Walker said as soon as the barricade opened, she heard something and saw a shot, Ms. Walker assumed it was the canister. Ms. Walker stated something hit her mom in the head and she did not see what it was but saw her mother fall to the ground. Ms. Walker immediately helped her mother and saw tear gas start "fizzing" from the canister. Ms. Walker stated the canister kind of exploded when she went to help her mom and she breathed smoke in, and it got into her lungs. Ms. Walker stated she saw that happen to her and her sister but could not see her mother. Ms. Walker stated she did not know the canister had hit her mother, but she had seen her fall. Ms. Walker stated she then grabbed her mother and began to run away.

After a few feet of running, she looked back at her mom and saw her hand was on her head and she was bleeding profusely from her head. Ms. Walker stated she then began "freaking out" and screamed for a medic. Several of the protesters then helped them. Ms. Walker stated she brought her mother to Ochsner's main campus on Jefferson Highway.

Sergeant Givens asked where the barricade and police were, on the interstate, or the onramp? Ms. Walker responded they were on the interstate, but the protest was so big that people were on the interstate and the onramp. The barricade was there to stop them from walking across the bridge and the police were ahead of them as well.

Sergeant Givens asked where the canister came from. Ms. Walker stated she did not see where it came from, she heard a loud "bang" and saw her mom on the ground. Ms. Walker then saw the cannister on the ground by her.

Sergeant Givens asked her what injuries she sustained during the incident. Ms. Walker stated she fell on her knees to help her mother up and her skin and eyes and lungs were burning because of the teargas. Ms. Walker stated she also lost her shoe.

Sergeant Givens asked if anyone else was hurt in the area. Ms. Walker responded that she did not see anyone else down. When she went to get her mother, she was the only person on the ground that she could see through the teargas.

Ms. Walker informed Sergeant Givens that she dropped her mother off at Ochsner and her and her sister were not allowed to go in with her (because of Covid restrictions). Ms. Walker stated she was focused on her mother's injuries and did not focus on her own or her sister's.

Ms. Walker stated her mother had two gashes on her head that she believed needed 13 stitches, a welt on her back, and a bruised coccyx. Ms. Walker stated the injuries made it so her mother could not sit and had to lie on her side.

When asked if there were any other visible injuries, Ms. Walker said no. Ms. Walker identified her mother as Mrs. Katharine Archer, with a date of birth of ▇▇▇▇ 1962.

Sergeant Givens asked Ms. Walker if there was anything else she could offer that was pertinent to the investigation. Ms. Walker stated she saw a press conference earlier in the day with the Superintendent talking about tear gas canisters, one being rolled, and one being launched. Ms. Walker said her mother getting hit with the canister wasn't from someone who had picked it up, it was launched into her because there wasn't enough time from the moment the gas was released for someone to have picked it up.

Ms. Walker clarified her perception of it was based on the timing; she heard the shot, her mom was on the ground, and then the gas released. There was no time for anyone to grab the canister and when they picked up her mother there was no one around her.

Sergeant Givens then concluded the statement at 2:56 PM. Moments later, at Sergeant Givens called Ms. Walker back for a follow up question.

Sergeant Givens asked Ms. Walker if there were any warnings given at the time the canisters were launched. Ms. Walker said no. Sergeant Givens then asked if anything was said at all. Ms. Walker stated she was about three (3) people away from the police line, is 21 years old with great hearing, and didn't hear anything. Ms. Walker said she did not hear a first, second, or a final warning.

Sergeant Givens then concluded the interview at approximately 2:57 PM. The interview was audio recorded and has been made a part of the permanent case file.

**Interview of Ms. Abigail Walker (subject of force)**

On Friday, June 5, 2020, at 8:02 PM, Sergeant Clinton Givens interviewed Ms. Abigail Walker (Date of Birth ████/1997) under Force Tracking Number 2020-0161 regarding the incident.

Ms. Abigail Walker stated she was in the protest that evening and her mother was hit with a tear gas canister. She informed Sergeant Givens she was hit with the canister as it ricocheted off her mom. Herself, her mother, and her sister (Juliet Walker) were then subjected to the tear gas from the canister.

Ms. Abigail Walker stated she did not know where she was on the ramp or on the bridge but that all the protesters were there. Ms. Abigail Walker did not know how long they had been standing there, stated she could see the police barricade and could not see anyone pushing. She stated she heard the leader saying we are one and everyone was chanting "we are one," and put their hands up saying, "Hands up. Don't shoot."

Ms. Abigail Walker said her, and her mother, and sister were three or four people back from the front line and did not see anyone pushing, but the police appeared to be backing up. She stated it seemed like the police were opening, like a gate, and the protesters started cheering. Ms. Abigail Walker informed Sergeant Givens she thought the police and protesters had come to terms and they were going to be allowed to cross the bridge.

Ms. Abigail Walker said she was not sure where on the bridge she was because she doesn't drive often and said she's only been to the Westbank "like once." Ms. Abigail Walker stated she thought the plan was the cross the bridge and didn't have any direction but just followed the front of the protest.

Ms. Abigail Walker continued her story, saying the police line opened up and the protesters were thankful, then suddenly her and her were hit. The protesters then went from cheering to everyone screaming in a split second. Ms. Abigail Walker stated when she got hit, she wasn't sure what happened she just knew that if things were coming from the sky it was time to leave. She turned to run and realized her mother was not next to her. She turned to find her mother on the ground holding her head. Next to her mother was a tear gas tube that was spinning and sparking. Ms. Abigail Walker stated she did not know how tear gas worked and leaned in to get her mom. The canister started spinning and spewing smoke, which immediately got into her eyes. She stated they had masks on, and the smoke easily went through the masks. They started holding on to each other and running and trying to get her mother to anyone who could help.

Ms. Abigail Walker said a minute or two after the initial gas, her eyes started to clear. She turned and saw her holding her head and bleeding profusely. Ms. Walker then started screaming for a medic, crying, and sobbing, until eventually a medic was found while they were still on the ramp heading down towards the ground. She stated the medic pulled her mother to the side and wrapped her head in gauze. Ms. Abigail Walker said she talked to her mother to ensure she was still conscious and lucid. Ms. Abigail Walker said she heard screaming from where the front was and heard they were moving police cars towards them. Ms. Walker said

they had to move out of the way of cars trying to come up the ramp. Then moved a block or two away from where the incident was to get picked up by a friend. They then brought her mother to the emergency room at Ochsner Hospital on Jefferson Highway.

Sergeant Givens asked Ms. Abigail Walker to tell him about the injuries she, her mother, and her sister sustained. She stated that her and her sister's injuries were minor compared to her mother's. Ms. Abigail Walker informed Sergeant Givens her sister was trampled a little as she was running and ended up losing a shoe and her knee was a little bruised. They did not recover the shoe. She then stated her mother had two cuts on her forehead, between her eyebrow and hairline, which needed 12 stitches and left her with a concussion. She stated the canister must have hit her mother's head and bounced into her because it hit her jaw and fell to the ground.

Ms. Abigail Walker described the canister that hit her mother and her as being the size of two hands together, metal, can shaped, with sparks and smoke coming from both sides. She did not see writing on it but stated it was gray or silver(ish) in color.

Ms. Abigail Walker reiterated she may have only been on the bridge one time before and wasn't sure where they were on the bridge during the incident but were still far away from the metal that covers the bridge, so they weren't on the actual bridge itself.

Ms. Abigail Walker informed Sergeant Givens she didn't see anyone throw the can and stated they weren't at the front; they were a few people away from the police line and the can came out of the sky. Ms. Walker stated she believed the canister was launched at them.

Sergeant Givens asked if she heard anything before the canister hit them. Ms. Walker stated she did not hear anything from the police and did not hear any warnings. Ms. Walker stated she knew none of them heard warnings because no one alerted each other to it, and they were close to the front. Ms. Walker stated the only thing they heard was one of the protest leaders chanting "We are one" into a megaphone.

Ms. Abigail Walker stated she was wearing a black turtleneck top, black jeans, and gray running shoes. Her mother was wearing a green shirt, a pair of sweatpants, and a pair of running shoes. She also described her sister (Juliet) as wearing white Nike shoes, and believed she was wearing black leggings with either a black or white top.

When asked if there was anything she could think of that was relevant to the investigation, Ms. Abigail Walker stated, the protest was genuinely peaceful. She said she has protested with the organizations before and they are good at letting the people who wanted to break stuff say their piece and then clarified that is not what they were about. She stated it was clear they are peaceful protesters and they wanted to keep the peaceful protests going. Ms. Walker stated none of the family wanted anything to be violent and just wanted a peaceful protest and to raise awareness and help the causes.

Sergeant Givens asked about speaking to her mother, Ms. Katharine Archer. Ms. Abigail Walker stated she spoke to her doctor on Friday, June 5, and was going to take her in for head scans and was not sure when she would be able to talk.

During the interview, Ms. Walker stated she understood tear gas is used to disperse big crowds, but along with it being incredibly dangerous to be launched into a crowd (she stated because of course it is going to hit someone) it was dangerous on the ramps because if someone was blinded by the gas they could have fallen off and died. The stampede of people in response to the gas was very dangerous as well, she stated.

Ms. Abigail Walker stated she did not see any other force used by the police, then added that the moment they were hit and blinded by the tear gas they just ran and didn't stay around.

Sergeant Givens the concluded the interview at approximately 8:24 PM. The recording has been made a part of the permanent case file.

## Mr. Bilal Ali-Bey (subject of force)

On Thursday, August 6, 2020, at approximately 1:20 PM, Sergeant Barnes conducted a recorded phone interview with Mr. Bilal Ali-Bey. During the interview, Mr. Ali-Bey informed Sergeant Barnes he was on the bridge the night before, when NOPD took a knee with protesters. Mr. Ali-Bey informed Sergeant Barnes he was the one who called to leave the bridge the night before, during the protest on June 2.

Mr. Ali-Bey told Sergeant Barnes he was looking to have the same results the night of June 3rd and was looking to have a peaceful march to the Jefferson Parish line.

Mr. Ali-Bey informed Sergeant Barnes there were actions taken by the police that were uncalled for. Mr. Ali-Bey said once he got onto the bridge, there were lines of the officers and lines of the people. There were conversations that were had between the people and the police and there were altercations that were happening. Mr. Ali-Bey stated the officers were taking aggressive actions towards the protesters when the protesters pushed back because the police were aggressive.

Mr. Ali-Bey stated the people pushed through the police line because they wanted to peacefully protest through. Immediately after the people pushed through the police line, gas canisters were thrown directly into the crowd of people. Mr. Ali-Bey was unsure if anyone was hit with gas canisters and informed Sergeant Barnes, he did not witness anyone hit with a gas canister.

Once the canisters were thrown, the people went back to the other side of where the police line was and regrouped, where they would not be where the officers were. Everyone stayed together for accountability reasons. The people then started to march back towards the police. Mr. Ali-Bey stated they were not coming at the officers in a threatening manner, but they were definitely coming in an angry manner.

Mr. Ali-Bey stated he saw the officer who had the launcher. Mr. Ali-Bey stated the launcher is a gun and it shoots "really hard," inflicts a lot of damage, and it hurt. He saw the officer aiming down the barrel of the launcher and stated he was not expecting anything. Mr.

Ali-Bey stated he saw a girl at the protest near him who was shot in the face. Mr. Ali-Bey stated he heard the shot, then heard the unknown girl get shot in the head. He then heard another shot, which he described as sounding like "boomp," as if the launcher was a CO2 gun. Mr. Ali-Bey stated he looked back up after that shot and seemed to communicate that he was not sure if he was hit. Mr. Ali-Bey described his reaction as looking at the officer and asking, "did you just shoot me?" Mr. Ali-Bey stated he was thinking maybe they had thrown tear gas, but he looked at the officer as it happened, then looked down and picked up the projectile that had hit him through his shorts, striking both of his legs.

Mr. Ali-Bey stated he only recalled there being two shots, and he was not sure if there were any other shots after he was shot. He stated he was hit with one of the rubber balls and did not remember exactly what happened after he was hit. He believed there may have been more gas after he was shot but could not be sure.

Mr. Ali-Bey recalled another gas canister was thrown, picked up by protesters, and thrown back at the officers. Mr. Ali-Bey stated after the crowd regrouped and went back towards the police line. He said it was not heated but the police were trying to clear everyone off the bridge. Mr. Ali-Bey recalled police were saying if people did not leave, they were going to detain people.

Mr. Ali-Bey stated the incident was a battle that people were not looking for and no one was prepared for. No one expected the turn of events. Mr. Ali-Bey described the crowd as a provoked group that was not ready for the provoked action. He stated no one had gas masks, and no one was prepared. He added that people thought it could occur, but no one expected it.

Sergeant Barnes asked Mr. Ali-Bey to describe the projectile he was hit with. Mr. Ali-Bey described the projectile he was hit with as having a rounded blue head and was larger than a quarter. Mr. Ali-Bey described the woman he saw shot in the face as a younger lady, not small, who was in her mid-twenties or early thirties.

Mr. Ali-Bey stated he had wounds on both his legs, one had broken skin and was an open wound, the other was just a large bruise. He confirmed for Sergeant Barnes the pictures of the wounds were the ones published in the Nola.Com article on June 7, 2020.

When asked what outcome he would like to see from the investigation, Mr. Ali-Bey responded that it is yet to be determined. He then stated that the kind of force, and any kind of projectiles, should not be used against civilians, even if a protest does turn into people pushing back. Mr. Ali-Bey reiterated that police using those types of weapons on people should never occur.

Mr. Ali-Bey stated that everyone who was harmed, and the amount of mental trauma people suffer because of the incident is an issue. He stated he was attacked by a force that he already feels is against him, and that causes a lot of trauma. Mr. Ali-Bey stated everyone who was there for the incident should be compensated for that, if not monetarily, at least in the form of providing trauma therapy.

Sergeant Barnes then concluded the interview at approximately 1:50 PM. The recording of the conversation has been made a part of the permanent case file.

## Vincenzo Pasquantonio – Witness provided by the OIPM (subject of force)

On Thursday, August 6, 2020, at approximately 1:45 PM, Sergeant Barnes was provided the contact information for a witness to the incident by Mrs. Bonycle Sokunbi, of the Officer of the Independent Police Monitor.

On Wednesday, August 12, 2020, at approximately 2:30 PM, Sergeant Barnes contacted Mr. Pasquantonio in a conference call with Mrs. Bonycle Sokunbi. During that call, Mr. Pasquantonio provided the following information, in summary:

On June 3rd, Mr. Pasquantonio was at the protest and broadcast the protest over Facebook live. He was towards the front of the crowd, so he could see most of what was happening. He stated he was close enough to see the shields but was unable to see what agency was forming the police line.

Mr. Pasquantonio stated the demonstration was peaceful from what he saw and observed some individuals being "sassy with comments." He did not see a situation where the crowd was not under control. He saw the police form the line and, in act of civil disobedience, the crowd decided to advance. At that point he terminated his Facebook live video and joined in the disobedience. He then saw confusion amongst the crowd as the tear gas landed.

Mr. Pasquantonio stated he did not witness any individual actions between officers and people, but the crowd was controlled and the chaos that ensued made the situation dangerous. Mr. Pasquantonio stated he took his friends and tried to make sure they did not go over the side of the bridge.

After the gas was deployed, the crowd was backed up and complied with police and started leaving. Mr. Pasquantonio stated he saw 90 percent of the crowd comply with orders. He stated he heard some stragglers were still on the bridge but did not see. About four (4) or five (5) minutes after leaving, as he was leaving, he heard lots of screaming, yelling, and running. He witnessed what looked like a stampede. Mr. Pasquantonio stated he made an effort to calm everyone down, because it was disorienting. He informed Sergeant Barnes he did not witness projectiles being fired, but believed the stampede was when the projectiles were fired. Mr. Pasquantonio stated he believed the impact rounds were unnecessary. The use of the rounds made the situation extremely dangerous for everyone.

Mr. Pasquantonio stated the act of civil disobedience was not the crowd being violent. The crowd was orderly, stepping forward (towards the police line). He stated he did not see individuals breaking the law and the crowd engaged in a very intentional act of civil disobedience to cross the line.

Mr. Pasquantonio stated he has worked with NOPD in the past and was shocked to learn NOPD deployed gas because he has seen them deescalate well.

Mr. Pasquantonio stated at some point he turned around to shield himself and was unsure why he turned around. Mr. Pasquantonio also said he did not see anyone injured.

Mr. Pasquantonio stated he saw young children on the bridge and a few elderly people. Mr. Pasquantonio stated he will never forget the young children. He saw them there but did not see the impact of the tear gas on the children when the incident took place. If the stampede was a result of the projectile rounds, it is unacceptable and made the situation dangerous. Mr. Pasquantonio stated if the crowd was showing signs of aggression, the projectile rounds would be ill advised because they make the whole situation dangerous.

Mr. Pasquantonio emphasized difference between violence and act of civil disobedience.

He stated he heard the discussion between lead organizers. Mr. Pasquantonio stated the lead organizer was trying to calm the situation but was speaking in a way that would "speak to their language." Mr. Pasquantonio stated there was a particular moment where there was a hardening of the police line, and an intentional decision by protesters to slowly advance at the police line. He did not hear officers say anything to the crowd. He does not recall any statements from protest leaders. Mr. Pasquantonio also did not recall police officers issuing warnings on any loudspeaker device or with any amplification. He stated he did not recall words that were exchanged between police and protesters, and believed he heard the organizers speak, but was unsure.

Mr. Pasquantonio stated there was an understanding with the protesters completely throughout the incident. The actions of a crowd, as a whole, from beginning to end were completely peaceful and he saw a crowd committing an act of civil disobedience, not violence, as they decided to slowly cross the police line. Mr. Pasquantonio stated the crowd he saw maintained their composure throughout the incident. Mr. Pasquantonio clarified he was not talking about what the crowd said. Mr. Pasquantonio reiterated that the crowd was not out of control to the point it had to be dispersed.

Sergeant Barnes then concluded the interview. The audio recording of the interview has been made a part of the permanent case file.

## Beata Deselle – PIB CTN 2020-0260-P

On Friday, August 7, 2020, at approximately 2:47 PM, Sergeant Barnes contact Ms. Beata Deselle, the complainant under NOPD control number (CTN) 2020-0260-P. During the interview, Ms. Deselle provided the following information, in summation:

Thousands of protesters had marched onto the bridge, tightly packed together, and tried to cross the bridge peacefully. Ms. Deselle stated there was a line of officers with shields preventing the protesters from crossing the bridge. Ms. Deselle stated the crowd stood for a while asking to be allowed across, but the officers did not allow it. Ms. Deselle stated the crowd then just walked past the officers because they were able to just walk between them. Ms. Deselle stated police deployed gas and rubber bullets then. Ms. Deselle stated a woman from her friend's

high school was hit in the head with a gas bomb and was bleeding.  Ms. Deselle identified the woman hit by the canister was Mrs. Katharine Archer.

Ms. Deselle stated the police deployment of gas was irresponsible because of how tightly packed people were on the bridge and that people ran back when the gas was deployed, so someone could have been hurt.

When asked if any of the protesters or the police had taken any actions that could be considered agitating, she responded that protesters were yelling and chanting.  Ms. Deselle stated the chanting was not provocative and no one was throwing anything at the police.  Ms. Deselle stated she was at the front of the protest, saying there may have been four people in front of her.

When asked, Ms. Deselle stated she did not see Mrs. Archer get hit with the gas canister.

Ms. Deselle informed Sergeant Barnes, after the initial deployment of gas, she and her friends ran off the bridge and did not see what happened after that point.  Ms. Deselle stated as she was leaving the bridge, she heard people saying more gas was being thrown, but she did not see it happen.

Sergeant Barnes then concluded the interview at approximately 2:55 PM. The recording of the conversation has been made a part of the permanent case file.

## Danielle Goodwin – PIB CTN 2020-0260-P (listed witness)

On Monday, August 10, 2020, at approximately 1:50 PM, Sergeant Barnes attempted to contact Ms. Danielle Goodwin, the witness to the event listed in the complaint filed by Ms. Beata Deselle under NOPD CTN 2020-0260-P.  Sergeant Barnes left a voicemail informing Ms. Goodwin what the call was concerning and provided his contact information.  At approximately 3:03 PM on the same day, Ms. Goodwin called Sergeant Barnes and provided the following information, in summation:

Ms. Goodwin stated she and other protesters were standing on the bridge for approximately 40 minutes, asking officers to let them through.  Eventually, people began pushing forward through the police line after a long time of asking peacefully to go through.  At that time, tear gas was deployed.  Ms. Goodwin stated one of the gas canisters hit her former swim coach in the head, causing her head to be cracked open in two places.  Ms. Goodwin stated the coach was with her daughters.  Sergeant Barnes later verified with Ms. Goodwin that the former swim coach was Mrs. Archer.

Ms. Goodwin stated when the gas was deployed, she could not see anything and almost fell off the bridge.  Everyone was wearing masks (for Covid protection) up until the gas was deployed, then people took them off because they could not breath or see.  Ms. Goodwin stated she luckily tested negative for Covid, but she believes the use of tear gas probably cause a spike in Covid cases.

Ms. Goodwin stated she does not think the incident was handled very well and that using tear gas against protesters should be illegal.

Ms. Goodwin stated she was right at the front of the protest because all white people were called to go to the front of the protest, and she went to the front as an ally to protect the black people behind her.

Ms. Goodwin informed Sergeant Barnes she did not hear any of the discussion between protest leaders and the police. She stated someone tweeted that if the protesters did not back off the police were going to throw tear gas; however, Ms. Goodwin said that never happened and she never heard any warnings from the NOPD. Ms. Goodwin stated she did not hear any NOPD leaders talk over megaphones. The megaphones were used by only the protesters. When asked if she heard the protest leaders say anything on the megaphones, Ms. Goodwin said the leaders of the protest asked NOPD to please let them through and said, "We're peacefully protesting, we don't understand, they let us on I-10 the day before, why is this an issue?"

Ms. Goodwin stated that when the protesters walked through the police line, as soon as they crossed the line, someone said, "they're throwing tear gas." Ms. Goodwin said she could not see after that. She then said an officer fell next to her and his baton fell and almost hit her. When asked if the officers were allowing people to go past the line, Ms. Goodwin stated the crowd pushed through because the officers would not allow them to. The leaders of the protest asked if they could go through and the police said no, so people eventually started pushing through.

Ms. Goodwin stated there was no information about turning around or pushing through. There were no warnings. Ms. Goodwin informed Sergeant Barnes she was one person away from the officers, in the second row of protesters.

After the initial tear gas was deployed, Ms. Goodwin could not see and almost fell. She felt her way to someone, and they helped each other. After approximately six (6) minutes of running around aimlessly, she was asked if she needed water for her eyes and someone poured water in her eyes. Ms. Goodwin stated her eyes were still burning badly but she was able to open them enough to see where she was going. Someone then yelled, "They have rubber bullets." They then started running down (meaning off the bridge) the same way they had gotten onto the bridge.

Sergeant Barnes asked if she was there for a second deployment of gas. Ms. Goodwin stated she believed she was, but she did not know, and she did not know how long she was there, because it was all a shock. When asked, Ms. Goodwin stated she heard people say the police fired rubber bullets, but no one she was with saw them or were hit with them. Ms. Goodwin did not see police fire any rubber bullets.

Sergeant Barnes then concluded the interview at approximately 3:13 PM. The recording of the conversation has been made a part of the permanent case file.

**Jon Klein – PIB CTN 2020-0281-P – NOPD Web Complaint #921**

On Monday, July 6, 2020, Sergeant Barnes reviewed the PIB intake packet for the complaint lodged by Mr. Jon Klein under PIB control number 2020-0281-P, authored by Investigator Barbara Sharp. In the complaint lodged through the internet Mr. Klein wrote the following when asked to describe the incident:

> "All of my friends were there. I was not there because my mom is immunocompromised and I had to look out for her safety, but I heard many accounts and saw several videos of people peacefully protesting on the bridge, only to be met with tear gas in FULL FORCE by the NOPD. Shaun Ferguson as well as journalists have defended the fabrication of said incident but my own two eyes don't deceive me. It is unconstitutional, criminal, and above all else a LIE to the same citizens he swears to protect. I will be in contact with city council members and others who look out for the safety of the people in New Orleans, as it has been made abundantly clear that your staff doesn't give a shit about them."

Mr. Klein went on to say, "Every officer on the CCC should be held accountable for their actions and PC Ferguson should resign as the people of New Orleans will no longer respect or trust him after lying to the city's face."

In the section for additional witnesses Mr. Klein wrote:

> "I will not give out names of the people I know. However, twitter live streams and videos have allowed everyone in the city to bare witness to what actually went on last night and it is sad to conclude that your department doesn't aim to be on the right side of history. We peacefully protest all week with minimal disturbance and this is the thanks we get? Fuck you."

Sergeant Barnes emailed Mr. Klein on Monday, July 13, 2020, at approximately 6:33 PM, introducing himself and providing his contact information. Mr. Klein did not respond to the email or provide Sergeant Barnes with any updated contact information.

On Monday, August 10, 2020, at approximately 1:58 PM, Sergeant Barnes attempted to contact Mr. Jon Klein, the complainant under NOPD CTN 2020-0281-P. After several attempts to reach Mr. Klein at the phone number provided when he filed his complaint, Sergeant Barnes was unsuccessful. Sergeant Barnes noted the provided phone number did not ring when dialed and the number appeared to have been disconnected.

**Ms. Elise Butler – PIB CTN 2020-0282-P – IPM CC 2020-0047**

On Wednesday July 1, 2020, Sergeant Barnes reviewed the OIPM complaint number CC2020-0047, which was sent to PIB personnel on Friday, June 5, 2020, at approximately 6:26 PM, by Ms. Stella Cziment, the Deputy Independent Police Monitor. In that complaint, Ms. Elise Butler wrote the following:

> "During a peaceful protest, marchers walked onto the entrance ramp to the Crescent City Connection. At the top of the ramp, a line of police in full riot gear, with

guns and shields up completely blocked protesters from moving forward. As the marchers in the back walked forward, the crowd became more and more tightly packed. Organizers at the front talked with police but the rest of the crowd could hear none of the exchange. The stand off lasted about 30 minutes. Finally, an organizer at the front of the protesters shared that the police had said "the further you come, the more dangerous it will be for you." This message was said only to a few people in the front row of protesters and passed back through the crowd as best as we could. I was about 4 rows back from the front and heard nothing directly from NOPD. At no point did they use loudspeakers to address any direction to the crowd as a whole. The crowd could not move forward or back safely. After approximately 30 minutes of police holding the line, and no direct communication or directions to the marchers, I saw the police fold back their line into an L shape, which allowed some protesters to pass through on one side. I was toward the front and was able to pass through parallel to the line. As I passed, I heard officers say "go ahead" and I was under the impression that protesters were being allowed to pass and being protected by police. About 5 seconds later, tear gas was released and Hit, I ran with the crowd, unable to see. Many people linked together to lead each other away safety, even as they were choking and blinded. Others sprayed a baking soda and water solution on our eyes to relieve pain. The police quickly reformed their straight line. Protesters reformed and moved forward and were tear gassed at least two more times that I saw: At some point between 11pm and 12am, the organizers encouraged protesters to fall back, and I walked back with one group. A much smaller group stayed facing police, At no point did I see any violence from any protester, except yelling and an empty water bottle thrown (landed about 10 ft away from the line of police) after the crowd was gassed. When I walked back down the ramp, a line of cars was attempting to enter the bridge. Before I got to the bottom, cars began backing up off the ramp, all of this without any police protection or presence directing traffic."

Sergeant Barnes reviewed the intake packet authored by PIB Intake Investigator Barbara Sharp. Sergeant Barnes observed on June 12, 2020, Investigator Sharp took and audio recorded interview of Ms. Butler. Investigator Sharp noted her initial interview tracked her web complaint closely. She did add that an empty water bottle may have been thrown at the police. When asked if rather than the police allowing the protesters through the police line was it possible that the police line was broken by the protester and that they did not step aside. She said it was entirely possible.

When asked what she interpreted the police instruction of "If you continue forward it could get more dangerous," Ms. Butler said she was not sure what the police meant. She said it was a "vague threat" and thought it was a pretty "weird thing to say." She also stated, she had no idea that force was going to be used by the police and they put many, many people in danger. She continued by saying, "if anybody had a respiratory disease the tear gas exacerbated that." She thought the police should have used a vehicle loud-speaker and all weapons should be banned against protesters.

Ms. Butler also said that while exiting the bridge she did see someone in the crowd that appeared to have been shot with what she thought was a rubber bullet.

Ms. Butler also said that she would send her a video that her husband recorded. Neither Investigator Sharp, nor Sergeant Barnes have received this video from Ms. Butler.

Sergeant Barnes emailed Ms. Butler on Monday, July 13, 2020, at approximately 6:35 PM, introducing himself and providing his contact information. Ms. Butler did not respond to the email or provide Sergeant Barnes with any updated contact information.

Sergeant Barnes also sent Ms. Butler a certified letter with the same information provided in his email.

On Monday, August 10, 2020, at approximately 2:01 PM, Sergeant Barnes contacted Ms. Elise Butler, the complainant under PIB control number 2020-0282-P and OIPM complaint CC2020-0047.

During the interview, Ms. Butler stated the incident occurred more than a month ago, so her memory may not be exact. Ms. Butler said she was with a group of protesters that were on the bridge, close to the front, maybe in the 4th or 5th row back from the front. Ms. Butler stated when they got onto the bridge, they saw riot police had formed a line.

During the incident, she did not hear any exchanges between the police and protest leaders. Ms. Butler stated she was unable to hear anything, even with the megaphone, from as close as three (3) or four (4) rows back. She was able to see that officer were trying to say things to the crowd, but could not hear what they were saying, and there was no message passed back through the crowd. Ms. Butler stated there was no device loud enough to transmit what was being said.

After standing together for a few minutes they became closely packed together because people kept coming. Ms. Butler then stated she received a message back from the front that relayed, "If you go forward, it'll be trouble for you." Ms. Butler was unsure how far into the that message was relayed.

She then saw a surge forward in the crowd and was under the impression the crowd was being allowed to go through. Ms. Butler stated she heard an officer say, "Yeah. Go ahead." She moved with the crowd, passed the police line, and within 30 seconds she said she was tear gassed.

Ms. Butler stated she saw elderly people, children, and church leaders in the crowd.

Ms. Butler said, after the initial deployment of gas, the protesters reformed again about 30 or 40 feet back. Ms. Butler said there was a conversation, yelling back and forth, but she never saw any actions from the protesters that were aggressive. Ms. Butler stated she only saw an empty plastic bottle thrown towards the police, but it landed about 20 feet away from the officers.

Ms. Butler told Sergeant Barnes she thought about how dangerous the incident was because it was at the height of the pandemic and everyone had to take off their masks.

Ms. Butler said after the third time of being tear gassed, the protest organizers got everyone to leave by going to the back of the crowd and getting people to leave. She said the police did not help people leave the location at all. Because the police had blocked the front of the crowd and the back of the crowd was still coming forward, she was trapped and scared. Ms. Butler stated because of the police line they could not even move forward to the Tchoupitoulas exit.

Sergeant Barnes asked Ms. Butler about when the crowd surged forward through the police line. Ms. Butler stated there was a chant, "One step forward," and the protesters took one step forward. She was under the impression the line had opened for the protesters to leave on the Tchoupitoulas exit.

Ms. Butler told Sergeant Barnes she never saw any act of aggression by the protesters, and that the deployment of tear gas by NOPD was an act of aggression. She informed Sergeant Barnes there were no warnings at all about the tear gas deployment.

Ms. Butler stated she was further back on the bridge the second time tear gas was deployed and tried to go to the side of the bridge, which she described as scary. Ms. Butler said she wasn't directly hit with the tear gas the second time, but saw people getting trampled. Ms. Butler stated she saw someone with an injury and heard people yelling something about rubber bullets but did not see any rubber bullets. Ms. Butler stated the injury she saw was someone bleeding from her back, saying she had been shot, and was with medics at the time. Ms. Butler stated the medics with the injured individual were field medics for the protesters, that had been marching with the protesters since the beginning. There were no police or EMS at the bottom of the bridge.

Ms. Butler stated there was no one to help get the protesters off the bridge in an orderly fashion and there were no police officers around until they got on the bridge. She believed JPSO and NOPD were there. Ms. Butler said she was just "going with the flow" and the crowd seemed to be escorted, so she assumed the protest was being escorted by police. Ms. Butler said NOPD seemed supportive of all the other protests and was shocked that this protest turned into the incident it did.

Sergeant Barnes noted Ms. Butler's husband was in the background, offering information to Ms. Butler during the interview, but declined to provide his information.

Sergeant Barnes then concluded the interview. The audio recordings of the interviews have been made a part of the permanent case file.

## Robert Morton – Listed Witness to PIB CTN 2020-0282-P

On Monday, August 10, 2020, at approximately 2:23 PM, Sergeant Barnes attempted to contact Mr. Robert Morton, the witness listed by Ms. Butler under PIB control number 2020-0282-P. Sergeant Barnes did not receive an answer at the provided contact number and left a voicemail. Sergeant Barnes did not receive a return call and was not contacted by Mr. Morton in any way.

**Athena Turek – CTN 2020-0284-P - IPM CC 2020-0038**

On Wednesday July 1, 2020, Sergeant Barnes reviewed the OIPM complaint number CC 2020-0038, which was sent to PIB personnel on Friday, June 5, 2020, at approximately 3:39 PM, by Ms. Stella Cziment, the Deputy Independent Police Monitor. In that complaint, Ms. Athena Turek wrote the following:

> "Black lives matter protesters were tear gassed by police after about an hour of protests. I saw people affected by the gas. Also, heard talk of rubber bullets, but didn't see them myself. The protesters had been calm and peaceful on the bridge; singing, chanting, playing music."

Sergeant Barnes received the intake packet prepared by PIB intake investigator Ernest Crayton. Sergeant Barnes noted that on the complaint form, Ms. Turek wrote the following:

> "On the night of June 4th, 2020, I participated in the peaceful protests that ended on the I-10 bridge. There was a police barricade that prevented us from crossing the bridge, so we decided to wait. I was in the middle of the crowd. We were sitting, milling about, singing songs, and chanting. We were unable to see what was happening near the front of the crowd. After about 45 minutes of waiting, there was a sudden commotion at the front and the crowd starting to run after officer set off tear gas and began shooting rubber bullets. The crowd very nearly turned into a stampede on top of a bridge and people could have been seriously hurt, were it not for the levelheadedness of some of the protest leaders that shouted for people to not run or push. I can't imagine the injury and loss of life that may have occurred were it not for them. The NOPD annually exercises crowd control during Mardi Gras season, they should be better trained than a violent reaction on a bridge. It was shear luck that no one died. It is especially upsetting learning after the fact that the NOPD lied about the tactics employed against protesters until video evidence made it undeniable."

Sergeant Barnes emailed Ms. Turek on Monday, July 13, 2020, at approximately 6:37 PM, introducing himself and providing his contact information. Ms. Turek responded to the email and informed Sergeant Barnes she would be moving to a new address soon and provided the information for the updated address.

Sergeant Barnes also sent Ms. Turek a certified letter with the same information provided in his email.

Sergeant Barnes reviewed the statement Ms. Turek provided to Investigator Crayton. In that statement, Ms. Turek provided the following information, in summation:

Ms. Turek stated her primary complaint was the safety of everyone on the bridge was jeopardized by the police action that night. She stated she was milling about on the bridge, near the middle of the crowd, when rubber bullets were shot, and tear gas was thrown. People started running, and because they were on a bridge it almost caused a stampede. People at the front of the crowd shouted for people to not run, which prevented a stampede.

Ms. Turek stated she then filed a complaint after someone she knows provided her the paperwork to file a complaint.

Ms. Turek stated that night, in the crowd, she could not see what happened at the front. Suddenly, people started running and pushing. Ms. Turek heard someone yell to stop running, then looked back and saw the tear gas. There were people rushing through the crowd because they were affected by the tear gas.

Ms. Turek spoke to a number of individuals who were complaining about injuries from the rubber bullets, but she was not injured. She then walked off the bridge and went home.

Investigator Crayton asked what outcome she would expect from the investigation. Ms. Turek stated she would like to see an investigation, because she heard on the news the incident was not authorized and it wasn't immediately reported. She stated she knew a City Councilman had legislation to not allow tear gas, which she believes is the best outcome, but understood that it was probably beyond Investigator Crayton's control.

Investigator Crayton then explained the investigative process to her and then ended the conversation.

On Monday, August 17, 2020, at approximately 1:15 PM, Sergeant Barnes contacted Ms. Athena Turek, the complainant under PIB control number 2020-0284-P and OIPM complaint CC220-0038. Sergeant Barnes received Ms. Turek's voicemail and left a message.

On the same day, at approximately 8:55 PM, Sergeant Barnes received a phone call from Ms. Turek. During the phone conversation, Ms. Turek informed Sergeant Barnes the statement she provided to Investigator Crayton during the intake process covered what she had witnessed during the incident.

Sergeant Barnes asked if she had seen anyone injured during the incident. Ms. Turek stated as she was coming off of the bridge, she saw people affected by the gas. Ms. Turek stated he was not injured herself and that she was somewhere in the middle of the crowd, but far back enough that she could not see what was happening at the police line. Sergeant Barnes learned Ms. Turek did not see any of the impact rounds launched but heard about them later. Ms. Turek stated she left the bridge once the gas was deployed and the majority of the crowd was leaving.

Ms. Turek asked Sergeant Barnes when the case would be closed. Sergeant Barnes explained he hopes to finish the investigation within the next month and explained the magnitude of the investigation.

Sergeant Barnes then ended the interview. The recorded conversations have been made a part of the permanent case file.

**Peter Schamp –CTN 2020-0285-P – IPM CC 2020-0051**

On Wednesday, July 1, 2020, Sergeant Barnes reviewed the OIPM complaint paperwork, which was emailed to PIB Intake personnel on Wednesday, June 10, 2020, at 11:04 AM by Ms. Stella Cziment, the Deputy Independent Police Monitor. In that complaint, Mr. Peter Schamp wrote the following:

"To Whom It May Concern:

While the NOPD has mostly served as an exemplar for police forces across the country as protestors have taken to the streets regarding radicalized police brutality, the use of riot control tactics on the evening of June 3 as demonstrators attempted to cross the Crescent City Connection was an unfortunate exception. It is difficult to understand how the need or desire to prevent the marchers from crossing outweighed the need to prevent escalation, panic, or serious injury.

The use of tear gas was dangerous – causing protesters, some of them unable to see properly due to the effects of the gas, to flee within a confined space on an elevated roadway – but the alleged use of less lethal projectiles (apparently rubber bullets) is also very concerning. Statements from the NOPD and Chief Shaun Ferguson initially denied the use of these weapons, but video and bystander accounts seem to clearly contradict these denials.

If Chief Ferguson was unaware of the use of the projectiles, their use was likely unauthorized; if he was aware, then it raises serious questions about why he would deny they were deployed. **Either way, the situation – including the use of tear gas – demands an immediate and thorough investigation, the results of which should be communicated to the public.**

I personally witnessed the use of tear gas and would like to formally lodge request such an investigation.

Thank you,
Peter Schamp
70130"

Sergeant Barnes reviewed the PIB intake packet prepared by PIB Intake Investigator Ernest Crayton under NOPD PIB control number 2020-0285-P. Investigator Crayton was unable to contact Mr. Schamp, therefore the only information in the packet regarding his complaint was the information contained in the complaint sent by Ms. Cziment.

Sergeant Barnes emailed Mr. Schamp on Monday, July 13, 2020, at approximately 6:38 PM, introducing himself and providing his contact information. Mr. Schamp did not respond to the email or provide Sergeant Barnes with any updated contact information.

On Wednesday, August 12, 2020, at approximately 12:05 PM, Sergeant Barnes emailed Mr. Schamp, informing him he wished to speak to him regarding the complaint and provided his contact information. Mr. Schamp replied that same day, at 12:55 PM, and wrote the following:

"Hi Sgt. Barnes - thanks for reaching out, and I appreciate that this is being taken seriously and investigated properly. I'd be happy to talk over the phone, although I don't want to waste anyone's time; I'm not sure I can describe anything that I witnessed that isn't already basically public record. From a distance of about 50 yards, I saw two gas canisters fired into the crowd on the bridge. Beyond that, I don't know if anything I know or saw could be of help.

Let me know if you'd still like to speak to me.

Thanks again,

Peter"

Sergeant Barnes then responded with the following at 1:04 PM:

"Thank you for responding so quickly. I don't think a phone call will be necessary. I do have a few quick questions though:

Did you see anyone injured?

Did you see any rubber balls rounds or impact rounds fired?

Did you see any aggressive actions by the police (besides tear gas) or by any protesters? (such as throwing things or pushing/shoving)

Is there anything you think could help the investigation or is important for investigators to know?"

At 1:14 PM, Mr. Schamp responded:

"I did not see anyone injured by anything other than the tear gas, that is to say suffering from the effects it is designed to cause (trouble breathing, irritation of the eyes/throat, *etc.*). I did not personally witness the use of rubber rounds or other aggressive actions by the police.

Sorry I can't be of more help, and thanks again!"

Sergeant Barnes then thanked Mr. Schamp and let him to know to reach out if he has any questions or comes across any more information. Mr. Schamp then replied asking if he would be able to put Sergeant Barnes in touch with someone who might have been in a better position to provide more information. Sergeant Barnes replied, "Absolutely." Since that time, Sergeant Barnes has not heard any further information or has been provided with any other person's contact information by Mr. Schamp.

The emails have been made a part of the permanent case file.

## Michael Spinola – PIB CTN 2020-0286-P – NOPD Web Complaint #920

On Monday, July 6, 2020, Sergeant Barnes received and reviewed the PIB intake paperwork for control number 2020-0286-P, authored by Investigator Mariza Duplessis. The complaint was received through an NOPD web complaint, which was attached to the intake packet. Sergeant Barnes discovered the complaint relayed that Mr. Spinola stated that on Wednesday, June 3, at approximately midnight, NOPD officers released tear gas on a crowd of peaceful protesters in the midst of a respiratory pandemic. Mr. Spinola also stated it is an American right to peacefully protest. Mr. Spinola stated the NOPD is breaking the law it swore to uphold. In the complaint section for additional witnesses Mr. Spinola wrote, "The entire United States of America is watching you."

Sergeant Barnes emailed Mr. Spinola on Monday, July 13, 2020, at approximately 6:40 PM, introducing himself and providing his contact information. Mr. Spinola did not respond to the email or provide Sergeant Barnes with any updated contact information.

On Monday, August 17, 2020, at approximately 1:00 PM, Sergeant Barnes contacted Mr. Spinola, the complainant under PIB control number 2020-0286-P. During the conversation Mr. Spinola relayed the following information to Sergeant Barnes:

Mr. Spinola stated he was in a part of the crowd near the middle and did not see anything at the front. He stated he was hearing things, such as screaming, yelling, and "get back." Mr. Spinola stated he mostly heard the protest leaders saying fall back and retreat.

During the incident, friends of his suffered from the effects of the gas. Mr. Spinola stated the leadership of the protest was asking people to fall back, on their end it was peaceful. Mr. Spinola stated it would be nice if the leadership on both sides were able to make sure they were on the same page to be peaceful. He then clarified if the peacefulness were reciprocated by the police.

Sergeant Barnes then concluded the conversation. The audio recording has been made a part of the permanent case file.

## Aaron Avidon – CTN 2020-0287-P – NOPD Web Complaint #922

On Monday, July 6, 2020, Sergeant Barnes received and reviewed the PIB intake packet for PIB control number 2020-0287-P, prepared by Investigator Audrey Boskent. The intake packet documented the NOPD web complaint number 922 of Mr. Aaron Avidon. In that complaint, Mr. Avidon wrote, "NOPD threw tear gas at peaceful protesters marching on the highway, effectively trapping and torturing them." In the additional witness information section of the complaint form, Mr. Avidon wrote, "The protesters were peaceful, singing, when the police unleashed tear gas on them. This was done without incitement by the protesters."

Sergeant Barnes noted Investigator Boskent attempted to contact Mr. Avidon by email and by phone but was unable to reach the complainant.

Sergeant Barnes emailed Mr. Avidon on Monday, July 13, 2020, at approximately 6:41 PM, introducing himself and providing his contact information. Mr. Avidon did not respond to the email or provide Sergeant Barnes with any updated contact information.

On the afternoon of Monday, August 10, 2020, Sergeant Barnes attempted to call Mr. Avidon at the phone number provided in the complaint but received a message that the phone number could not be completed as dialed. At the time of this report, Sergeant Barnes has not been able to contact Mr. Avidon.

## Jenna Losh – CTN 2020-0288-P - IPM CC 2020-0044

On Wednesday July 1, 2020, Sergeant Barnes reviewed the OIPM complaint number CC 2020-0044, which was sent to PIB personnel on Friday, June 5, 2020, at approximately 6:13 PM, by Ms. Stella Cziment, the Deputy Independent Police Monitor. In that complaint, Ms. Jenna Losh wrote:

> "NOPD not only tear gassed peaceful protestors - they knowingly instigated a stampede. They could have easily, easily killed people, and I can't imagine people whose "career" is "crowd control" would not know that. There were possibly thousands of people, all crammed shoulder to shoulder between the sides of the bridge. It was only the shred of consciousness holding the crowd together that kept the stampede from causing people to be crushed or stomped underfoot. Still, some people were injured in the stampede. This was an evil tactic intended to harm and dominate. NOPD is just like every other police force in the nation -- rotten at the roots. The rot of racism at the ROOTS of NOPD is why this happened. They believe they have a right to kill people to protect property."

Sergeant Barnes reviewed the intake packet for PIB control number 2020-0288-P, prepared by Investigator Paloma Miller. Sergeant Barnes noted Investigator Miller attempted to contact Ms. Losh on June 10, 2020 but discovered the provided number did not appear to be valid. Sergeant Barnes reviewed the intake packet for the complaint, forwarded by the office of the Independent Police Monitor, and learned there was no email or municipal address provided in the complaint.

On Monday, August 17, 2020, at approximately 1:25 PM, Sergeant Barnes attempted to contact Ms. Jenna Losh at the phone number provided in her complaint. After several attempts, Sergeant Barnes's calls were sent straight to voicemail and Sergeant Barnes received notice that the mailbox belonging to the phone number was full. Sergeant Barnes has been unable to contact Ms. Losh.

## Samantha King – CTN 2020-0289-P – IPM CC 2020-0045

On Wednesday July 1, 2020, Sergeant Barnes reviewed the OIPM complaint number CC 2020-0045, which was sent to PIB personnel on Friday, June 5, 2020, at approximately 6:18 PM, by Ms. Stella Cziment, the Deputy Independent Police Monitor. In that complaint, Ms. King wrote, "NOPD fired tear gas into a peaceful protest with elders and children. I did not hear any warning to disperse before the tear gas was fired."

Sergeant Barnes, On July 6, 2020, received an intake packet for PIB control number 2020-0289-P, prepared by Investigator Trinell Mitchell. Sergeant Barnes reviewed the packet and discovered Investigator Mitchell emailed an NOPD complaint form to Ms. King on June 10, 2020. Sergeant Barnes also discovered Investigator Mitchell spoke with Ms. King on the phone on Friday, June 19, 2020 and was informed of the following in an audio-recorded statement:

Ms. King stated she was at the protest but was unable to see the police line. Ms. King stated she could not see what happened at the front line, but could hear, and did not hear the officers give a warning about dispersing gas. Ms. King saw the gas going into the crowd about 30-45 minutes into the protest but was not close enough to be affected. Ms. King then became emotional as she mentioned there were elderly people and a 10-year-old child near the front of the protest. Ms. King stated the officers created an unsafe environment for the protesters and should have the proper equipment to speak to a large crowd so everyone can hear. Ms. King said it is inappropriate for the NOPD to use gas against the public, and the NOPD should do away with having it.

Investigator Mitchell then concluded the interview.

Sergeant Barnes emailed Ms. King on Monday, July 13, 2020, at approximately 6:43 PM, introducing himself and providing his contact information. Ms. King did not respond to the email or provide Sergeant Barnes with any updated contact information.

Sergeant Barnes also sent a letter through certified mail to Ms. King with the same information contained in his email.

On Monday, August 17, 2020, after 1:00 PM, Sergeant Barnes contacted Ms. Samantha King, the complainant under PIB control number 2020-0289-P and OIPM complaint CC 2020-0045. In an audio recorded phone conversation, Ms. King provided the following information:

Ms. King stated she could not see much due to the number of people in the protest. She did see a number of drones flying overhead, police in riot gear, and high-tech equipment on the NOPD side of the police line. Ms. King did not hear any order to disperse or any warnings from police that they would use tear gas.

When asked, Ms. King estimated she was 100 yards away from the police line. She stated the tear gas went into the crowd where there were elders and children. She then saw a woman being carried away with a bloodied face and head, and several people choking and coughing as they ran from the tear gas.

Sergeant Barnes asked Ms. King to describe the injured woman. Ms. King stated the injured woman was middle aged, may have been there with her kids, and she later head the injured woman was a teacher. Ms. King stated the woman was being escorted out by volunteer medics for the protest.

Ms. King stated she did not see any acts of aggression by protesters, or any acts of aggression towards the front line. She stated everyone was just standing around.

Ms. King informed Sergeant Barnes she was not injured during the incident.

Ms. King informed Sergeant Barnes that NOPD appearing in riot gear with drones overhead escalated the situation. Ms. King also stated NOPD firing tear gas at civilians escalated the situation.

When asked what she would like to see as the outcome of the investigation, Ms. King stated she would like to see NOPD no longer using tear gas on citizens and to have better training on de-escalation. She stated she sees no reason for NOPD to launch tear gas or other non-lethal weapons.

When asked, Ms. King stated she was not aware of the impact rounds until after the fact. She stated her understanding was that the impact rounds and the gas-deployment happened at the same time. She also stated it created a dangerous situation because when the tear gas was fired, people moved away from the line of police.

Ms. King said when the gas was deployed, she observed protesters helping each other to get out of the situation safely. She left after the first deployment of gas but saw another canister after people moved away. She said she saw people moving away and then another canister was fired as people were moving away.

Ms. King then asked Sergeant Barnes about the investigative process and Sergeant Barnes explained the process. Ms. King stated she wanted to make sure if any other witnesses came forward, their statements would not be used against them in court. Sergeant Barnes explained the investigation he was conducting was administrative in nature but informed her all of the statements and information associated with the investigation could be subject to subpoena or a public records request.

Sergeant Barnes then concluded the interview. The audio recordings have been made a part of the permanent case file.

## Kerem Ozkan – CTN 2020-0290-P - IPM CC 2020-0046

On Wednesday July 1, 2020, Sergeant Barnes reviewed the OIPM complaint number CC 2020-0046, which was sent to PIB personnel on Friday, June 5, 2020, at approximately 6:21 PM, by Ms. Stella Cziment, the Deputy Independent Police Monitor. In that complaint, Mr. Ozkan wrote the following:

> "As many social media posts have shown, NOPD unnecessarily and unconstitutionally teargassed peaceful protesters exercising their right to peaceful assembly. No matter how NOPD has attempted to spin it, protesters attempting to walk past a police line does not constitute a use of force. Tear gas and rubber bullets is force."

On Monday, July 6, 2020, Sergeant Barnes reviewed the PIB intake packet for PIB control number 2020-0290-P, prepared by Investigator Mariza Duplessis. Sergeant Barnes discovered Investigator Duplessis made several attempts to contact Mr. Ozkan by phone and by

email. Investigator Duplessis noted it remained unclear if Mr. Ozkan participated in the protest that evening or filed his complaint after having learned about the incident.

Sergeant Barnes emailed Mr. Ozkan on Monday, July 13, 2020, at 6:44 PM, introducing himself and providing his contact information. Mr. Ozkan did not respond to the email or provide Sergeant Barnes with any updated contact information.

On Wednesday, August 19, 2020, at approximately 1:02 PM, Sergeant Barnes attempted to contact Mr. Kerem Ozkan. Sergeant Barnes did not receive an answer at the number provided and was unable to leave a voicemail due to Mr. Ozkan's voicemail box being full.

At the time of this report, Sergeant Barnes has been unable to contact Mr. Ozkan.

### Rory "Bob" Payne - CTN 2020-0291-P - IPM CC 2020-0049

On Wednesday July 1, 2020, Sergeant Barnes reviewed the OIPM complaint number CC 2020-0049, which was sent to PIB personnel on Friday, June 5, 2020, at approximately 6:32 PM, by Ms. Stella Cziment, the Deputy Independent Police Monitor. In that complaint, Mr. Payne wrote the following:

> "I was part of the peaceful protest in honor of black lives matter. The police allowed the organizers to go up the bridge and allowed the on for a certain portion. Approximately 5-800 of us seemed to be up there. But at approximately 10:15pm, they released tear gas on protestors without any particular cause/reason. There was no audible warning from where I stood (probably about 3/4 of the way back) and I saw firsthand at least 3 people who had tear gas damage. I was in the far back of the crowd; people began panicking and running/walking fast from the front. the clouds spread over the first rows of people. Someone very easily could have been killed by falling off the bridge. The NOPD did this action without any violent action by the peaceful protestors."

On Monday, July 6, 2020, Sergeant Barnes received and reviewed the PIB intake packet for PIB control number 2020-0291-P, authored by Investigator Audrey Boskent. Sergeant Barnes discovered Investigator Boskent was able to contact Mr. Payne and obtain an audio recorded statement from him. In that statement, Mr. Payne provide the following information:

Mr. Payne stated he was that he was part of a peaceful march that went onto the US-90 Crescent city connection and informed Investigator Boskent he had three parts to his complaint.

Mr. Payne stated the first part of his complaint was that police used tear gas and rubber bullets on protesters. He stated he was near the back and was not impacted by it and that he could see the tear gas but could not see the rubber bullets.

The second part of his complaint was that people started running and there were a few points where people bumped into each other and it created a dangerous situation because someone could have fallen off the bridge.

The third part of his complaint was that NOPD had closed off the onramp when protesters were marching up the onramp but after the tear gas was deployed there were cars all over the ramp, which had clearly been let onto the onramp. Mr. Payne stated the most dangerous thing was that a woman, approximately 20 years old, was sitting on a railing trying to recover before someone brought her down.

Mr. Payne stated he did not have any video footage he wished to provide to investigators, and he could not identify any specific officers.

Mr. Payne stated the outcome he would like to see from the complaint was disciplinary action for the officers who used tear gas and the rubber bullets. Mr. Payne also stated he would like the NOPD to revisit how they deal with protests. Mr. Payne stated NOPD escalated the situation by allowing protesters onto the bridge and then stopping them.

Mr. Payne also reiterated that the NOPD allowed vehicles to travel onto the bridge as the protesters were trying to leave and that the officers who allowed the traffic onto the bridge should be disciplined as well.

Ms. Boskent then concluded the interview. The audio recording of the interview has been made a permanent part of the case file.

Sergeant Barnes emailed Mr. Payne on Monday, July 13, 2020, at approximately 6:46 PM, introducing himself and providing his contact information. Mr. Payne did not respond to the email or provide Sergeant Barnes with any updated contact information.

## Morgan Landry – CTN 2020-0292-P - IPM CC 2020-0054

On Wednesday July 1, 2020, Sergeant Barnes reviewed the OIPM complaint number CC2020-0054, which was sent to PIB personnel on Wednesday, June 17, 2020, at approximately 12:06 PM, by Ms. Stella Cziment, the Deputy Independent Police Monitor. In that complaint, Ms. Morgan Landry wrote the following:

> "A peaceful demonstration was met with unnecessary violence. Rubber bullets and tear gas were used against protesters. Police were the instigators. A stampede-effect almost happened. My friends and I had to act as a wall as best we could to protect women who had been knocked to the ground in front of us from getting trampled. All while we were being actively tear-gassed. I'm glad and surprised no one fell over the barrier in a panic while trying to regain sight/respiratory abilities."

On Monday, July 6, 2020, Sergeant Barnes received and reviewed the PIB intake packet for PIB control number 2020-0292-P, authored by Investigator Mariza Duplessis. Sergeant Barnes discovered Investigator Duplessis made several attempts to contact Ms. Landry by phone and email but was unsuccessful.

Sergeant Barnes emailed Ms. Landry on Monday, July 13, 2020, at approximately 6:47 PM, introducing himself and providing his contact information. Ms. Landry did not respond to the email or provide Sergeant Barnes with any updated contact information.

Sergeant Barnes also sent Ms. Landry a letter through certified mail, providing the same information he provided in his email.

On Wednesday, August 19, 2020, at approximately 1:17 PM, Sergeant Barnes contacted Ms. Landry, the complainant under PIB control number 2020-0292-P and OIPM complaint CC 220-0054. During an audio recorded phone conversation, Ms. Landry provided Sergeant Barnes with the following information:

Ms. Landry stated she was on the bridge for a protest, it was a peaceful march and she had marched with the crowd from Duncan plaza to the bridge. She was at the back of the demonstration and was not sure who blocked off the bridge, but noted the bridge was blocked off when she got there.

Ms. Landry stated when they got on bridge and it was blocked off, everything seemed peaceful and fine. The crowd stood around for a while and believed the organizers were trying to speak to NOPD leadership. She then tried to make her way to the front lines, and at that point, tear gas was deployed into the crowd. When the tear gas was deployed everyone panicked and started stampede a little. Ms. Landry thought, "Oh my God, someone is about to fall off the bridge."

Ms. Landry stated she formed a line with some of her friends to protect other people from the stampede. She stated she did not know of anyone around her that was hurt. Ms. Landry then left the bridge.

Ms. Landry informed Sergeant Barnes she was probably 20 feet away from the front of the protest when the tear gas was deployed, and from what she saw, police were behind cars and shields when the gas was deployed.

Ms. Landry stated she saw no violence from the protesters.

Sergeant Barnes asked her about the line she formed to protect others. Ms. Landry stated she formed a line because some smaller women were behind her and her friends and they had fallen. She and her friends formed a line to protect them because they were scared, they were going to get trampled in the stampede.

When asked if she saw any injuries, Ms. Landry stated she scraped her knee. Ms. Landry stated other had scrapes and bruises from falling and suffered the effects of the tear gas.

Ms. Landry informed Sergeant Barnes she stayed on the bridge after the initial deployment or gas helping people who were alone to get home and rinsing peoples' eyes. Ms. Landry estimated she stayed on the bridge for about 30 to 40 minutes after the initial deployment of gas.

C243

Ms. Landry stated she did not see rubber bullets, but hear about them, anecdotally.  Ms. Landry stated she had a friend who was hit with a rubber bullet.  When asked, Ms. Landry stated she could not remember any other rounds of gas being deployed that evening.

Sergeant Barnes asked if her friend who was hit with the rubber bullet would be willing to talk to him.  Ms. Landry stated she could not say if her friend would talk to Sergeant Barnes.

Ms. Landry seemed unsure of what happened and informed Sergeant Barnes that the night before there was a similar march and there was a line of officers and the officers knelt, then everyone left the bridge peacefully.

Sergeant Barnes then finished the conversation.  The interview was audio recorded and has been made a part of the permanent case file.

## Kylie Shortell – CTN 2020-0293-P – IPM CC 2020-0055

On Wednesday July 1, 2020, Sergeant Barnes reviewed the OIPM complaint number CC 2020-0055, which was sent to PIB personnel on Thursday, June 18, 2020, at approximately 1:19 PM, by Ms. Stella Cziment, the Deputy Independent Police Monitor.  In that complaint, Ms. Shortell wrote the following:

> "The cops blocked us in a dangerous spot, not on the ground, not up on the bridge proper where there's sides and more space, but on the on ramp, where the sides are low. Social distancing became impossible bc of the police block. We were peaceful and then the cops tear gassed and then shot at us. I saw the gun. At the NOPD's show and tell june 9th to explain what they did they did not show the gun I saw firing at us. It looked completely different. Tear gas is excruciating. I was in severe pain. I feared the cops would put a rubber bullet in my head and kill or maim me. My hands were over my head. We were saying hands up don't shoot. Officer Ferguson lied several times after about what happened. The actions all the way from the decision to block us, the location, the gassing, the shooting, and then the lying are indefensible. Irresponsible. We demand recourse for those who made decisions. We want the budget flipped. NOPD did not earn OUR tax dollars with their dangerous policing of the peaceful community."

On Monday, July 6, 2020, Sergeant Barnes received and reviewed the PIB intake packet for PIB control number 2020-0293-P, authored by Investigator Paloma Ramos-Tapia.  In the intake packet, Sergeant Barnes noted Investigator Ramos-Tapia attempted to contact Ms. Shortell on June 20, 2020 but was unable to reach her on the phone.  Investigator Ramos-Tapia emailed Ms. Shortell as well but was ultimately unable to contact Ms. Shortell.

Sergeant Barnes emailed Ms. Shortell on Monday, July 13, 2020, at approximately 6:49 PM, introducing himself and providing his contact information.  Ms. Shortell did not respond to the email or provide Sergeant Barnes with any updated contact information.

Sergeant Barnes also sent Ms. Shortell a letter through certified mail providing the same information contained in his email.

On Wednesday, August 19, 2020, at approximately 1:47 PM, Sergeant Barnes contacted Ms. Kylie Shortell, the complainant under PIB control number 2020-0293-P and OIPM complaint CC220-0055. Sergeant Barnes then interviewed Ms. Shortell in an audio recorded phone conversation. During that interview, Ms. Shortell provided the following information:

Ms. Shortell informed Sergeant Barnes she was certain her complaint was more accurate but agree to speak to what she remembered.

Ms. Shortell stated the crowd was marching and had been on the highway the day before, so they went onto the highway again. When they got onto the highway there was a line of officers on the onramp, not at the base of the onramp, but on top of the onramp. Ms. Shortell thought that was a weird spot to place the line of officers, because they were stuck on the bridge. Ms. Shortell stated she was in the middle of the crowd and was sandwiched in once people got onto the onramp. Ms. Shortell stated they could not move, so as people arrived, they got bunched up.

Ms. Shortell stated they stood there for at least an hour, in the heat. Ms. Shortell compared it to a packed dance floor, with people sweating on each other.

Ms. Shortell stated she could kind of hear people on megaphones but could not hear what was going on. She then tried to get closer to the front and got close enough to see officers' helmets but couldn't hear what was going on. Ms. Shortell stated the crowd then started moving forward and she moved forward with the crowd. Suddenly there was tear gas.

Ms. Shortell said she was able to keep things calm, shouting out "Walk, don't run." Ms. Shortell stated after that the crowd walked back up to the police line to just stand there. Ms. Shortell said she forgot how much time had passed or what was going on at that point, but recalled people were still reforming positions and wanting to walk across the bridge. Ms. Shortell stated she was now at the front and could see everything clearly.

Mr. Shortell stated she saw the small barrel of a gun pointed over the front, middle, officer on the police line. Ms. Shortell recalled she had seen people in other cities get their skulls shattered and be blinded by rubber bullets. Ms. Shortell stated the officer with the gun started shooting at them, but not directly at anyone's heads. She stated it was terrifying and compared being there to being on a battlefield.

Ms. Shortell stated she then learned about NOPD's demonstration of the munitions and thought they would be able to go, but learned it was only open to the media. Ms. Shortell stated she watched the live stream of the demonstration and saw it showed a canister gun that shoots big rubber balls. Ms. Shortell stated she saw a girl's injury and saw a gun with a skinny, narrow, bullet. Ms. Shortell stated the gun used on the bridge that night was a different gun than the one used at the demonstration. Ms. Shortell then stated she recalled seeing a video of people in the back getting projectiles shot at them.

Ms. Shortell informed Sergeant Barnes she filed a complaint because she believed where NOPD formed the line was a poor decision for the safety of the people. She said it caused there to be a lack of social distancing, a danger of falling off the bridge, and tear gassing could have

caused more problems in that enclosed space. Ms. Shortell stated again the location of the line was a dangerous spot and NOPD leadership should be held accountable for their decisions.

Sergeant Barnes asked Ms. Shortell to describe the gun she saw on the bridge that night. Ms. Shortell stated the gun was black, and there was an officer crouching, then an officer standing behind him with a little gun. She stated it was very subtle. She was at the very front and was like, "What's that little thing?" then realized it was a gun. Ms. Shortell stated the gun was fired towards peoples' legs and into the ground to bounce into people. She also stated when the gun was fired it sounded like a soft $CO_2$ gun and made a soft "whooshing" noise. When pressed about the description of the gun, Ms. Shortell stated she could only see the barrel.

When asked, Ms. Shortell stated protesters were not throwing things. She said some people were yelling at police from a few feet away. Ms. Shortell stated she was proud of the protesters because she didn't want to get tear gassed again and was happy protesters didn't do anything to have it happen again.

Ms. Shortell stated after the gas deployment and the crowd walking back to the police line, a lot of people were starting to leave because they were not making any progress. The organizers said they were not doing anything, so they said to leave. Ms. Shortell stated she left the bridge when there were still some people there, before the police officers advanced, pushing them off the bridge. Ms. Shortell stated she checked with those people who stayed to make sure they really wanted to stay on the bridge before she left.

Sergeant Barnes then concluded the interview with Ms. Shortell. The audio recording of the interview has been made a part of the permanent case file.

### Anna Donnell – CIT 2020-0313-P - IPM CC 2020-0059

On Friday, July 10, 2020, Sergeant Barnes received and reviewed the PIB intake packet for control number 2020-0313-P, authored by Investigator Ernest Crayton. Sergeant Barnes observed it was associated with a complaint filed with the Officer of the Independent Police Monitor under IPM complaint number CC 2020-0059 on June 13, 2020 and was received by PIB from the OIPM on June 26, 2020. Sergeant Barnes noted in the initial complaint with the OIPM, Ms. Donnell wrote the following:

> "I was part of the peaceful protest which occurred that evening on the ramp of the Crescent City Connection. I was probably 10 feet or so from the police line in riot gear, behind several rows of fellow protesters. There were hundreds more standing behind us, and we were packed very tightly. Our leaders and police discussed for maybe 30 minutes to an hour our plan to continue marching peacefully as we had all evening, but even at my close distance, there was little I could hear. Throughout the entire time standing, the crowd was not moving violently or acting violently, we were standing in solidarity peacefully. There were several children present who I observed. I did hear requests for the police to continue the march with us and to join us. The police had a megaphone which I could hear better than voices alone. At NO point on the police megaphone was it announced that tear gas or rubber projectiles would be employed. Then, we heard the pops. My friend told me she saw the tear gas canister fall about 8 feet away from where we were standing. Immediately, I experienced extreme pain in my eyes and I was unable to breathe. We tried to make our

way out of the smoke without causing a stampede. The suffocation and blindness was making my legs buckle and I was absolutely terrified that I was going to pass out and be trampled. I thought I was going to die. My friend lifted and pulled me out, a fellow protester washed our eyes, and we turned back around to the police line to try to help others and support our leaders. The use of tear gas and rubber projectiles should not be allowed, and in that scenario, hundreds of feet in the air on a packed bridge it was an extremely dangerous action. It is clear based on the revealed lies surrounding the use of rubber projectiles and the escalation of a peaceful march on the part of people standing up against police brutality that extreme mistakes were made on the part of the NOPD. If the response of police dressed in riot gear to unarmed New Orleanians saying "we are going to keep walking peacefully" is a chemical weapon and dangerous rubber projectiles then the police force has failed at de-escalation."

Sergeant Barnes noted Investigator Crayton attempted to contact Ms. Donnell by email and received no response.

Sergeant Barnes emailed Ms. Donnell on Monday, July 13, 2020, at approximately 6:50 PM, introducing himself and providing his contact information. Ms. Donnell did not respond to the email or provide Sergeant Barnes with any updated contact information.

On Thursday, August 20, 2020, at approximately 1:51 PM, Sergeant Barnes contacted Ms. Donnell by phone to interview her. During the conversation, Ms. Donnell provided the following information, in summation:

Ms. Donnell stated she was peacefully protesting with the crowd around the neighborhoods for a time before reaching the bridge. Ms. Donnell stated she was in a large crowd that was densely packed and had people with kids. Ms. Donnell stated she was unarmed and had a sign and a backpack.

Ms. Donnell stated that the crowd was so tightly packed in on the bridge, indicating it was troublesome and that she has serious claustrophobia. She stated she was close to the police line and did not hear any announcements or warnings that tear gas or rubber bullets would be used. Ms. Donnell informed Sergeant Barnes there was a slight shift in the crowd, and she ended up moving closer to the front line. She stated she felt a slight pushback but could not see what was happening at the line.

Ms. Donnell stated a tear gas canister was then deployed and landed about sic (6) feet from her. In seconds she could not breathe or see. The crowd started to panic because no one could breathe or see. Ms. Donnell stated she thought she was going to die. Ms. Donnell said she tripped, and luckily someone in the crowd picked her up so she was not trampled. Ms. Donnell also stated it was lucky no one was pushed over the side.

Ms. Donnell said, prior to the deployment of gas, there were several drones and flashing lights. Ms. Donnell stated she could not hear any kind of announcement or warning about gas or bullets within approximately 20 feet of the line. She said there were people for hundreds of feet behind her.

Sergeant Barnes was informed by Ms. Donnell that it is misleading when statements are made that there was an announcement. It was an incredibly dangerous scenario. Everyone was taking Covid precautions as best as they could with the knowledge, they were exercising their constitutional right to protest. However, when the tear gas was deployed, peoples' masks came off, everyone was crying, there was mucus coming out. Ms. Donnell stated as soon as someone sprayed baking soda in her eyes she went back to help other who were worse off.

Ms. Donnell stated she was packed in for at least 30 minutes or more prior to the gas deployment. She said she was approximately 30 feet away from the police prior to the gas deployment and about 15 feet away when gas was deployed. She estimated she was five (5) rows of people back when the gas was deployed. The canister landed 6 feet to her left and she had turned to face away from the line. She described the canister as being a little closer to the police line than to her.

When asked if she saw any injuries besides people affected by the gas, she said she saw people on the ground who had fallen, people crying and trying to breath, and saw people hobbling out.

Ms. Donnell stated, prior to the protest, she definitely heard calls for the protesters to stay where they were and calls trying to keep everyone quiet. There was something said along the lines of, "Something bad might happen." She said it was not a clear statement. Ms. Donnell said she is a little hard of hearing and has difficulty hearing things from far away. She was on the left side of the bridge, facing the police. Ms. Donnell said the leader's voices sounded like they came from the right side.

When asked, Ms. Donnell said she could not see any aggressive acts by either the police or the protesters. She stated that with a large crowd there is going to be a little bit of pushing by everyone. Ms. Donnell claimed she could see the same amount of pushing at the front as there was next to her. She stated there was no aggression until the gas was deployed.

Ms. Donnell informed Sergeant Barnes she did not see rubber bullets fired but heard several explosive popping sounds all at the same time. She stated she probably turned around then and was talking to someone behind her. When they heard the pops, they tried to shield their bodies a little. She then saw the canister on the ground when people were moving.

Sergeant Barnes asked when she left the bridge. Ms. Donnell stated she left about 20 minutes after the tear gas was deployed because she was making sure everyone else was ok. Ms. Donnell stated that, as a white protester, she stayed behind to make sure the black and brown protesters were ok.

She stated it was a slow process to get from the front to out of the gas cloud. Ms. Donnell stated she couldn't see anything at that time except the person in front of her. She did not notice a second deployment of gas and stated it may have happened while she was getting out of the cloud. Once she was able to see again, she did not observe a second volley of gas.

Ms. Donnell stated the only thing she would like to add to the statement is that she lives in New Orleans because she loves this community. Ms. Donnell stated she never though in her life she'd be in her own city, sticking up for people, and a chemical weapon would be used on her. Ms. Donnell stated it is important we recognize what happened. Ms. Donnell described herself as a "120-pound white girl" and said this type of thing should not happen.

Sergeant Barnes was then asked to explain the process and the goals of the investigation. Sergeant Barnes answered Ms. Donnell's questions and then concluded the interview. The audio recording has been made a part of the permanent case file.

## Samantha Nichols – CTN 2020-0330-P - IPM CC 2020-0064

On Thursday July 9, 2020, Sergeant Barnes received and reviewed the OIPM complaint for complaint number CC 2020-0064, which was files with the OIPM on Monday, July 6, 2020. In that complaint, Ms. Samantha Nichols wrote, "Peaceful protest Cops in riot gear Tear gassing unarmed citizens Shooting us with rubber bullets Lying about it on the news."

Sergeant Barnes later received and reviewed the intake packet prepared by Investigator Ernest Crayton for PIB control number 2020-0330-P. Sergeant Barnes noted Investigator Crayton attempted to contact Ms. Nichols by phone and received no response.

Sergeant Barnes emailed Ms. Nichols on Monday, July 13, 2020, at approximately 6:51 PM, introducing himself and providing his contact information. Ms. Nichols did not respond to the email or provide Sergeant Barnes with any updated contact information.

Sergeant Barnes attempted to contact Ms. Nichols by phone on Thursday, August 20, 2020, at approximately 2:25 PM and received no answer. Sergeant Barnes left a voicemail informing Ms. Nichols he was investigating her complaint and would like to speak to her about what she witnessed. Ms. Nichols returned Sergeant Barnes's call at approximately 4:20 PM on Thursday, August 20, 2020 and provided the following information in an audio recorded phone call:

Ms. Nichols stated she was on a bike, pulling a trolley with snacks and water and things to dilute any sort of gas because they had heard across the country cops were using gas. Ms. Nichols rode up the bridge along with hundreds of people and was in the middle to the back of the crowd. She could not hear much of what the police were saying because the police did not have anything that was projecting loud enough to everyone to hear. Ms. Nichols stated that was a big issue because if there were hundreds of people and they were only talking to ten (10) in the front then no one could follow their directions

Ms. Nichols stated everyone was standing around and was chanting and being peaceful, no one was throwing anything or yelling. She stated all of a sudden she heard "Get back. Get back." She was trying to turn around to leave or get out of the way and just saw smoke coming. She stated she was tear-gassed badly, and her nervous system was breaking down. She stated her entire body went numb. Ms. Nichols stated she has been tear gassed twice before and she's

never been affected like that before. Ms. Nichols stated tear gas should not be used on citizens at all, people don't even use it against each other in war.

Ms. Nichols stated one of her friends got hit with a rubber bullet and was bleeding. She stated she saw another girl got hit in the face with a rubber bullet and she was crying as people were walking her out. Ms. Nichols stated people were running away from the tear gas and almost got pushed over the bridge. Ms. Nichols stated it made the situation more dangerous and that cops are supposed to "protect everyone or whatever." Ms. Nichols then stated she did not believe that because the origination of the profession is from slave catching. Ms. Nichols stated most cops do not know that. She then stated it depends on who is training them, because someone could be from an older mindset and they train the new people to keep that same mind set. Ms. Nichols then stated she wants the abolishment of police and to redirect money elsewhere, because everything that cops touch is made worse.

Ms. Nichols stated another friend of hers was triggered after he was hit with the rubber bullet because he has had friends die from bullets. Then she said they wanted them to get off the ramp, but they were still letting cars up. Ms. Nichols stated again that the situation was dangerous.

Sergeant Barnes then asked Ms. Nichols what tools she had to deal with the gas. Ms. Nichols stated she had vinegar, baking soda with water, and a leaf blower. Ms. Nichols stated she pulled her trolley to the side and called for people to come to her and was washing their eyes out.

Ms. Nichols stated she has been tear-gassed and thrown in jail and been concussed previously just from being at protests for black people. She stated she was targeted with an assault rifle by police in Baton Rouge when protesting the murder of Alton Sterling. Ms. Nichols stated she was tear gassed inside of the jail when she was arrested for protesting in Baton Rouge.

Ms. Nichols stated her friend was shot in the leg with a rubber bullet and had a massive bruise. Ms. Nichols stated she did not see any other injuries with her own eyes but saw several other injuries on posted on Facebook. Ms. Nichols stated she was not injured during the incident on June 3rd.

Ms. Nichols informed Sergeant Barnes that she had never been exposed to tear gas before in New Orleans and that New Orleans is pretty good a de-escalation. Ms. Nichols stated she believes the situation was from an ego problem because people do not want to be on the wrong side of their moral standing and do not want to lose their jobs by abolishing the police.

Ms. Nichols told Sergeant Barnes about the police killing his cousin who was undergoing a mental crisis, and someone called the police. Ms. Nichols stated the police are not trained to de-escalate things and help people in a mental crisis, they are trained for war.

Ms. Nichols stated she did not see anything on the bridge that called for the deployment of gas. She stated people were mad and yelling in the cops' faces but no one was touching or throwing things. Ms. Nichols stated people had the right to be mad.

When asked if there was anything that stood out to her on the bridge that evening, Ms. Nichols stated the failure to have equipment that was loud enough for everyone to hear. Ms. Nichols stated it seems like it was either lazy or on purpose. Ms. Nichols also stated that throwing tear gas on the bridge caused more danger to everyone and she stated it seemed like it was on purpose to do something so dangerous. Ms. Nichols stated it seemed like another way to put small people down using power. Ms. Nichols stated that the use of rubber bullets triggers people because many people have had friends and family killed by bullets. Ms. Nichols stated the tactical choices were not for protecting people, they were for protecting police and city property.

Sergeant Barnes concluded the interview at approximately 4:43 PM. The audio recording of the call has been made a part of the permanent case file.

## Hope Byrd – 2020-0390-P - IPM CC2020-0071

On Monday, August 10, 2020, Sergeant Barnes received a complaint filed through the Office of the Independent Police Monitor under IPM CC 2020-0071. The complaint was assigned PIB Control number 2020-0390-P. Sergeant Barnes noted the complaint was lodged against unknown officers by a Ms. Hope Byrd. In the complaint, Ms. Byrd wrote the following:

> "NOPD deployed tear gas and fired projectiles at peaceful protesters on the night of June 3rd between 9:32pm and 11:00pm on the Crescent City Connection. I was reporting on the event at the cordon line. I saw the officers in front of me receive instruction to advance on protesters -- that were peaceful up to the altercation. It was then, at 10:14pm, when I was physically thrown, once initially onto the ground, and again against the cement wall where I sustained a concussion, a torn rotator cuff with facial abrasions. I still can't move my left arm fully. I can identify the specific officer responsible both from my visual evidence and photos from NOLA.com. Video and supporting photographs available but not attached because your online form has a broken file upload link. See your email for files. X Rays also not attached but on file."

While reviewing the PIB intake packet, Sergeant Barnes noted Investigator Crayton was unable to contact Ms. Byrd.

On Wednesday, August 12, at 11:57AM, Sergeant Barnes emailed Mrs. Bonycle Sokunbi to inquire about receiving any of the pictures or videos Ms. Byrd alleged to have documented in her complaint. Mrs. Sokunbi informed Sergeant Barnes that she had not received any attachments except a link to a YouTube video that showed the protest at the time of the gas deployment. Sergeant Barnes reviewed the video, which is documented under the social media videos and posts section of this report. Sergeant Barnes did not observe anyone on the video being physically thrown onto the ground or against the cement wall by police. Sergeant Barnes noted 10:14 PM was approximately the time the protesters broke through the police line and the initial volley of gas was deployed.

On Wednesday, August 26, 2020, at 12:00 PM, Sergeant Barnes attempted to contact Ms. Hope Byrd and reached her voicemail. Sergeant Barnes left a message informing Ms. Byrd

who he was, that he was investigating the incident, and provided a number for her to reach him at.

On Thursday, September 10, 2020, at 1:16 PM, Sergeant Barnes emails Ms. Byrd a letter introducing himself as the investigator and providing his contact information. Ms. Byrd did not respond to the email or provide Sergeant Barnes with any updated contact information. At 2:20 PM, Sergeant Barnes sent an email to the email address provided by Ms. Byrd in her complaint, asking Ms. Byrd to contact him regarding her complaint concerning the protest on June 3, 2020. Ms. Bird did not respond to the email or contact Sergeant Barnes by phone.

## Mrs. Katharine Archer – (subject of force)

On Friday, September 18, 2020, at approximately 12:05 PM, Sergeant Barnes contacted Mrs. Katharine Archer. During the brief conversation, Mrs. Archer informed Sergeant Barnes she was ready to speak to investigators and would contact Sergeant Barnes later that evening, or on Monday, September 21, 2020 to arrange a time to speak to him.

On Monday, September 21, 2020, Sergeant Barnes received a text message from Ms. Archer which stated:

"Sargent Barnes, my case is in the hands of the MacArthur Justice Center. Any contact with me should go through them please. I thought your unit had been informed of this. Thank you."

Sergeant Barnes acknowledged his receipt of the text message saying, "I had not been informed. Thank you."

Sergeant Barnes made no other attempts to contact Ms. Archer. The text message has been saved and made a permanent part of the case file.

## Anonymous Complaint Information

### IPM AC – 2020-0039

Sergeant Barnes reviewed the complaint form from the IPM's office, which was filed with the IPM's office on Thursday, June 4, 2020. The complaint form listed an anonymous complaint with unknown accused officers. The details of the complainant's account were written in the complainant's own words. They were:

"Officers fired tear gas canisters and rubber bullets into a crowd of unarmed civilians, proceeding to beat protesters with batons while they were blinded. I saw protesters collapsed and bleeding."

### IPM AC – 2020-0040

Sergeant Barnes reviewed the complaint form from the IPM's office, which was filed with the IPM's office on Thursday, June 4, 2020. The complaint form listed an anonymous

complaint with unknown accused officers. The details of the complainant's account were written in the complainant's own words.   They were:

"We were protesting last night. peaceful protest. around 9:30-9:40, trying to go up ramp (on New Orleans side), but we couldn't go past…on to the bridge because there were cop cars already blocking where we were trying to go. On the ramp…camp street westbound…the cop cars were already blocking. we were chanting let us pass, let us pass. the last thing I remember is a cop getting on the mic saying ok, come on…about three minutes later…they released gas. I saw three fucking shits launched in the crowd. I heard the rubber bullets going off. It sounds like an amplified paintball gun. People were screaming. it was pandemonium. WE never got a warning to get off the bridge. We just got gassed. We were encouraged to advance then we got gassed. I don't know if it was the same people on the loudspeaker that threw the gas. I saw they were in fucking riot gear. They had the fucking shields. Much different than what we had been experiencing before. Before the protest, I hadn't seen a cop like that. IT was like they knew already. It feels like they planned to gas us. Can't remember if saw an officer in a white shirt. There was a lady with blood coming out of her head. A little girl got a face full of tear gas. She had to be no older than 7 years old. In that moment it didn't appear that the police were providing any type of assistance. I dipped just based on what happened around the country. There was medical staff after. They didn't tell us to get off the bridge until after they launched the gas."

## IPM AC – 2020-0041

Sergeant Barnes reviewed the complaint form from the IPM's office, which was filed with the IPM's office on Thursday, June 4, 2020. The complaint form listed an anonymous complaint with unknown accused officers. The details of the complainant's account were written in the complainant's own words.   They were:

"During a peaceful protest, with children and the elderly in attendance, police in riot gear confronted the crowd. They gave no commands but pretended to be open to negotiation. Without warning or command, tear gas was fired into the crowd repeatedly and we were advanced upon, causing confusion and panic on a high bridge whose sides don't even come to waist height. It's a miracle nobody fell. Tear gas was deployed in rapid succession, into the middle of the crowd, continuing the chaos and not allowing anybody to protect themselves or withdraw. The police endangered the lives of peaceful citizens with no warning, no prior force, nothing. This is not the behavior of a free country."

## IPM AC – 2020-0048

Sergeant Barnes reviewed the complaint form from the IPM's office, which was filed with the IPM's office on Thursday, June 4, 2020. The complaint form listed an anonymous complaint with unknown accused officers. The details of the complainant's account were written in the complainant's own words.   They were:

"Cops used tear gas against a crowd of peaceful protesters. This was an extremely dangerous choice not only because tear gas is a chemical weapon banned in war, but that it was done to incite chaos on a bridge. Unbelievably irresponsible."

**IPM AC – 2020-0056**

Sergeant Barnes reviewed the complaint form from the IPM's office, which was filed with the IPM's office on Thursday, June 11, 2020. The complaint form listed an anonymous complaint with unknown accused officers. The details of the complainant's account were written in the complainant's own words.   They were:

"Part of the protesters that were tear gassed and had rubber bullet shot at them. Nopd claims to have warn us to leave but there was at least 1000 protesters and I was toward back. No one heard these requests other than the front of the line. Didnt even know what was happening until they released the tear gas. It triggered my friend to have a asthma attack they could have died. People ran everywhere, luckily no one fell off the side of the bridge. Tear gas is outlawed in war. There is no way nopd should use it on citizens ever. They escalated violence against us because we didn't get off the bridge fast enough. The protest was peaceful. I watched an officer shoot rubber bullets at someones back who was running away. They are dangerous to citizens of new orleans."

**Email Complaint # 918**

Sergeant Barnes reviewed NOPD Email complaint form number 918, which was submitted on Wednesday, June 3, 2020, at 11:26 PM.  Sergeant Barnes noted the form was submitted approximately nine (9) minutes after the listed date and time of the incident.   The complainant identified themself only by the name "MK" on the form and provided no contact information.

In the complainant's own words, they described the incident by writing the following:

"Unlawful use of weapons against peaceful protesting citizens, excercising their constitutional right - tear gas used at night, on a bridge against peaceful protestors using their voices for the fifth night in a row to stand in solidarity with Minneapolis for the murder of George Floyd, killed by four police officers that have all been arrested."

The section for a description of the officers was left blank and in the additional witness section was written:

"Protestors were not antagonizing or instigating offense against officers or property. Attacks with tear gas was completely unforeseen, unnecessary, and illegal."

**Email Complaint # 919**

Sergeant Barnes reviewed NOPD Email complaint form number 919, which was submitted on Wednesday, June 3, 2020, at 11:26 PM.  Sergeant Barnes noted the form was submitted approximately 12 minutes after the listed date and time of the incident.  The complainant identified themself only by the name "Jonathan" on the form and provided no contact information.

In the complainant's own words, they described the incident by writing the following:

"Peaceful protesters were marching for the 5th night in a row to stand in solidarity for a man who was murder by 4 members of the Minneapolis police department. New Orleans police and military looking members with tactical vehicles used tear gas on protestors (United States citizens) exercising their constitutional right. The event caused bodily harm to defenseless citizens that were posing no threat to the wellbeing of any people or property."

The section for a description of the officers was left blank and in the additional witness section was written:

"It is not clear who deployed the tear gas so I will assume that every NOPD member that was stationed on the bridge will be thouroughly investigated for their actions, including but not limited to who ordered the unlawful use of military type force against citizens in their own country and who were the ones to follow these orders and attack."

## Email Complaint # 923

Sergeant Barnes reviewed NOPD Email complaint form number 923, which was submitted on Wednesday, Thursday, June 4, 2020, at 12:22 PM. The complainant identified themself only by the name "Rocky Bender" on the form and provided no contact information.

In the complainant's own words, they described the incident by writing the following:

"I was peacefully protesting when I was shot with tear gas. Police claim we were given a chance to back off but that is entirely false."

In the section for a description of the officers was written, "Pigs" and in the additional witness section was written, "Defund the police department."

## Social Media Video

## Facebook Live Video of Ms. Brianna Chatmon (Brianna Elaine on Facebook)

Sergeant Barnes reviewed the Facebook live video posted publicly to the Facebook page of Ms. Brianna Chatmon (Brianna Elaine on Facebook). Sergeant Barnes observed the video began as Ms. Chatmon was behind the police skirmish line with other protest leaders to speak with Captain Roberts. Sergeant Barnes noted the following on the video, at the listed times:

0:40 – One of the unknown female protesters behind the line with Ms. Chatmon says, "We can't be scared to push through this line." The crowd can be heard chanting, "Let us through" in the background.

0:55 – A protester with a megaphone shouted that they were there for prison abolition and said if the officers did not turn in their badge they would not surrender.

Early in the video, the protest leader identified by FBI intelligence units as Brandon Wheeler was seen negotiating with Captain Roberts and making several demands. Sergeant

Barnes noted Mr. Wheeler was the protester captured on Officer Bissel's in-car camera shooting the bird at the officers and mouthing "fuck you" as he marched them backwards down the onramp.

02:20 – Mr. Wheeler tells Captain Roberts most of the people there are only being peaceful because they said so and they have only been peaceful this long because there is some type of organization. Brandon tells Captain Roberts that going into tomorrow if there are still officers robbing people and he "does not have those officers' names," Ms. Chatmon begins speaking to her Facebook live audience explaining where they are and says all they are trying to do is get off at the same exit they just entered on and the police aren't letting them move. Ms. Chatmon stated that the police have already told them that the further they go the more dangerous it gets for them.

03:30 – A unknown female protest leader is attempting to make a deal with Captain Roberts, asking him to have the officers put their batons down. Mr. Wheeler is heard in the background saying, "Why are they clutching them batons like that?!" Ms. Chatmon stated, "Y'all think the batons are the problem? They got guns too. Put y'all's batons down, put y'all's guns down."

04:30 – Mr. Wheeler stated if the officers take all of their weapons off and put them down then everyone will leave. In the background a female protest leader can be heard on the megaphone telling the officers to turn in their badges.

Sergeant Barnes noticed Mr. Wheeler consistently interrupted or talked over Captain Roberts and another unknown protest leader tells Mr. Wheeler he has to listen.

8:05 – Someone is heard saying that someone threw a bottle of water across the line.

9:28 - During negotiations, an unknown male tries to make an agreement and tells the other leaders that everyone should take two steps back and everyone will take a knee together for five (5) minutes. Brianna responds, "No, we're not taking no more knees." The other female protest leader also says no, they have taken too many knees.

10:50 – Mr. Wheeler says if the crowd decides to break through, they cannot do anything. He says the vehicles are getting turned over and a few people might get shot, "but I promise you, none of you are going home."

11:35 – Ms. Chatmon asks again to address the crowd and the other female protest leader asks her what she is going to say. The two appear to engage in a brief argument over what she is going to say with Ms. Chatmon telling the other leader she does not need to be policed and that the other leaders are pissing them off. Captain Roberts then provides Ms. Chatmon with the LRAD and tells her that she cannot make any statement that would incite violence.

12:40 – Ms. Chatmon begins to address the crowd using the LRAD. A protester argues against Ms. Chatmon as she speaks over the LRAD. Ms. Chatmon says she is not talking about being peaceful and is not talking about doing nothing but is trying to tell them what the police are saying to them at that time. Ms. Chatmon says she has been told not to incite violence and is not

inciting anything.  Ms. Chatmon says over the LRAD that the police said the further they go, the more dangerous it gets for them.  She says, "I'm not telling y'all what to do, I'm not telling y'all what not to do." She also states, "I'm not telling y'all to be peaceful and I'm not telling y'all not to be peaceful."

The protesters grow increasingly agitated as she continues to address the crowd.  A Protesters wants to cross the bridge.  Another protester tells Ms. Chatmon to tell the officers they want to go to the middle of the bridge and stand there.

Ms. Chatmon continues to address the crowd and says, "There are people telling me to tell y'all to turn around and I'm not doing it."  The protesters continue to cry to continue forward.  Ms. Chatmon then says, "They're ready to beat us, they're ready to shoot us.  I just need y'all to know if we cross this line that's what y'all gotta be ready for."  As Ms. Chatmon says that, the other female protest leader removes her earrings for her at 17:00 into the video.

17:34 – The protest leaders are allowed back to the other side of the police line at the instruction of Captain Roberts.  As they cross someone says they want to hear what the cops have to say.  Ms. Chatmon responds, "It's not about what the cops got to say, it's letting you know what we are fixing to walk into, that's it."  Ms. Chatmon tells the crowd as she's walking into it that the cops did not threaten arrest, they threatened to shoot them and beat them.  She then screams, "Y'all gotta be ready to get shot, Y'all gotta be ready to get beat, because that's what's about to happen."  She again tells everyone that they need to be ready to be shot, to have their ass beat, and to be maced.

18:20 – Ms. Chatmon makes sure her earrings are out and says she is taking her contacts out in case they gas them.

18:45 – There is a call for white men to come to the front.  Then there is a call for all men to come up front.

20:50 – Ms. Chatmon announces to the crowd to take their contacts out and to take their earrings out.  She then says if anyone has milk or baking soda and water, have it ready.

22:20 – Ms. Chatmon then tells the crowd to wet their masks.  Another protester is heard telling Ms. Chatmon the gas is a powder and explains how to attempt to avoid and treat exposure to it.

23:20 – Another protester states, "We're moving Bri"

23:35 – The chant, "Hands up, don't shoot" can be heard.

24:15 – The first gas canister is deployed into the crowd near Ms. Chatmon.  The video becomes extremely chaotic as Ms. Chatmon appears to flee with many other protesters.  Protesters are heard yelling for people not to panic and to not run.

28:18 – Ms. Chatmon tells her Facebook live audience that the police threw tear gas at them and says, "We were ready for it though."

29:19 – Someone with Ms. Chatmon said they let cars on the onramp and stated, "They're trying to trap us."

29:50 – Ms. Chatmon says, "They're trying to trap us but it's fine."
31:30 – Someone in the crowd says it was Jefferson Parish that deployed gas. Ms. Chatmon says she believed it was NOPD and that Gretna PD may have been there as well. Someone with Ms. Chatmon says NOPD was acting like cowards and would not let them go across the bridge.

32:39 – Ms. Chatmon says, "I want to make it clear to everybody that's watching, we kept it peaceful the entire time. All we did was, they tried to keep us from peacefully protesting, all we were doing was trying to exit the interstate, and when we tried to exit, they tear gassed us." Someone in the background says, "This is true." She continued, "So, we didn't incite any violence, we were not trying to riot or anything like that, they simply went tear gassed us because we tried to exit a way they didn't want us to."

34:47 – Ms. Chatmon screams to people walking on the onramp that JPSO has activated SWAT. She says to let everyone know. Ms. Chatmon continues to walk on the onramp announcing that JPSO is activating SWAT. After she repeats it several times, it becomes a chant in parts of the crowd to send the message, "JPSO is activating SWAT." Ms. Chatmon says someone on Facebook heard it on the police scanner.

38:45 – Ms. Chatmon reaches the top of the bridge again, announcing to people that JPSO is activating SWAT. A comment is made that JP killed someone in Orleans Parish, so they do not follow the laws anyway.

40:40 – Ms. Chatmon says there is no reason they are activating SWAT because they didn't do anything. Ms. Chatmon continues walking back towards the police line.

41:25 – Ms. Chatmon tells her audience that they were tear gassed for no reason, all they did was try to walk forward. She stated all they were trying to do was exit the bridge and they let the police know for 30 minutes that they were trying to exit the bridge.

Ms. Chatmon continues to walk back towards the police line letting everyone know JPSO has activated SWAT and asks them to stay together so no one gets arrested or hurt.

45:50 – Someone tells Ms. Chatmon that the police told them to turn back. Ms. Chatmon said if they turn back, they need to tall turn back together because if the group gets any smaller it becomes dangerous for them. Ms. Chatmon says if the police outnumber them it would be a problem.

47:00 – Ms. Chatmon attempts to organize the protesters who are remaining on the bridge, standing not far from the police line. Ms. Chatmon says they need to get everyone off the bridge. Protesters can be heard yelling to fall back in the background. An unknown male voice is saying it's time to leave tonight and they will come right back tomorrow.

50:00 – Ms. Chatmon pleads with people to leave, telling them it is dangerous for them if they stay.

Ms. Chatmon begins walking back towards the onramp with other protesters.

52:00 – Brandon Wheeler is heard in the background saying, "You need to understand something right now. This is not anything you've ever seen before. My dad is a lieutenant fucking colonel, so I know something about war. If you want to see lives saved you need to come back with a fucking strategy tomorrow." Mr. Wheeler is heard in the background telling people to shut up because they don't know anything about war. Mr. Wheeler says that the people that don't come are all going to die and there's nothing he can do about that and they need to leave.

53:15 – Ms. Chatmon says, "The people that are not cooperating are actually all white." She then chuckles to herself and says, "Not that that is important, but I just don't understand. I think that they think because they are all white the police will not kill them, but at this point they need to get off this bridge."

56:50 – Ms. Chatmon says she has to keep her live video rolling until everyone gets in their cars because they have police under the bridge with guns behind cars with their lights off.

Ms. Chatmon and several protesters continue to move towards the bottom of the onramp. Ms. Chatmon begins telling people that people are telling her there are unmarked police cars under the bridge with the lights off and their guns out.

1:03:00 – Ms. Chatmon tells a commenter on her video that they are saying the police are bad because they tear gassed them for walking and they shot them for just walking. Then she clarifies that they shot at someone with rubber bullets.

1:04:29 – Ms. Chatmon stops to talk with others who are trying to find the mark on a woman saying she was shot in the back with a rubber bullet. Ms. Chatmon then says she was shot in the back while she was running away to grab her friend.

1:06:15 – Ms. Chatmon says the injury to the woman who got shot was not extensive it was just a red dot on her back because she got shot with a rubber bullet, but she was shot while she was running away.

1:10:00 – Mr. Wheeler gives directions to the crowd and organizes them, giving them instructions to listen to him the following day.

Ms. Chatmon and other protesters walk back to where their cars are parked near Duncan Plaza. At 1:44:57 Ms. Chatmon gets into her vehicle.

1:52:43 into the video, Brianna Chatmon says "They tear gassed us because we asked if we could just exit off the bridge." Ms. Chatmon stated they police wanted them to turn around and they did not want to turn around, they wanted to move forward. She states, "They did warn us that if

we went forward it was going to get worse for us, but we were trying to talk to them about why they had to use force against us when we were just trying to be peaceful.

1:54:20 – Brianna says they know they had agitators in their crowd walking with them.  She then stated they are not planning on burning the city down.  She then said it took so many stops for them to control the agitators.


1:55:15 – Ms. Chatmon recapped the night for her Facebook live audience.  She stated they made the decision to go on the Mississippi river bridge and go across, down the next exit on the bridge. People became agitated thinking they were making no moves.  The police refused to escort the forward.  Ms. Chatmon stated she was tired of negotiating with the police.  She addressed the crowd and let them know the police said if they moved forward, peaceful or not, they were going to use force against them.  She stated that they got passed the police and they tear gassed them and shot them with rubber bullets.

Ms. Chatmon said people are on her video saying they pushed passed the police and she is lying.  Ms. Chatmon said when they went past the police line they were chanting "hands up don't shoot," and it was not violent at all, and they expected what happened.   Ms. Chatmon's friend, only identified as Dawn, stated they asked the police to let them pass peacefully and let them make a stand in the middle of the bridge and the police said no.

1:59:04 – Ms. Chatmon stated, "We went in there knowing we were gonna get tear gassed" and that they were willing to take that risk because they wanted people to know what was going on.

Ms. Chatmon continued to air her Facebook live video until she arrived at her residence.

## **WWLTV YouTube Video from @REW_Vision**

Sergeant Barnes was able to locate a YouTube video posted to WWLTV's YouTube channel that depicted the moments just prior to the deployment of gas, from the side of the protesters, at the police skirmish line.  Sergeant Barnes noted the video had been edited to only be one minute and seven seconds long (1:07).

The video begins as protesters are chanting "Let us through" and pushing together against the police line.  Sergeant Barnes observed the front several lines of protesters were pushing, without their hands up, against the shields of the officers until the Officers could no longer contain the force of the protesters and the police line was broken near the middle.  After the police line broke, several protesters continued to push through the police line as a protester was heard yelling, "Keep pushing them back! Keep pushing them back!"  The crowd then raised their hands as they continued to march towards police officers as they chanted, "Hands up, don't shoot."  Just as an officer holding what appears to be a gas canister is scene on the right side of the screen, the edited clip ended.

## Daniel Joey Oakley Twitter Video

On Monday, August 3, 2020, at approximately 9:15 PM, Sergeant Barnes received an email from Deputy IPM Bonycle Sokunbi. The email contained a link to a video posted on Twitter by Mr. Daniel Joey Oakley from the Twitter handle @dojodanjo. The video was posted with the hashtags #NewOrleansProtest #BlackLivesMatter and #takeemdownnola. The comment on the video is labeled "on the Twin Span bridge." Sergeant Barnes also noted there was comment correcting the information that the event was on the Crescent City Connection and not the Twin Span.

The video depicted the following pertinent events:

Video begins in the middle of the crowd, away from the police line. The crowd is chanting "let us through."

At approximately 10 minutes into the video the crowd begins chanting, "Drop your shields."

16:30 – Brianna Chatmon begins addressing the crowd and her voice can be heard from well into the crowd, approximately 50 yards from the police line, where the video is being taken from. This may be because her Facebook live video is being broadcast near the rear of the crowd.

18:40 – Chatmon says she is not trying to negotiate or tell the crowd what to do, she is just trying to keep the crowd informed.

20:20 – Ms. Chatmon's message and Facebook live video is being broadcast over a speaker for the crowd to hear in the rear. Ms. Chatmon says the police are ready to beat them and are ready to shoot them. The message is directed through the crowd. The crowd starts chanting, "Move bitch, get out the way." The crowd also begins moving closer to the police line, crowding in on each other.

23:00 – The crowd begins chanting, "Hands up, don't shoot," as they place their hands in the air.

24:10 – Someone in the crowd relays Chatmon's message for men to go to the front. The crowd begins mobilizing as men move to the front of the protest.

27:10 – The crowd is moving forward as tear gas can be seen deploying near the police line in the distance. One canister is seen flying through the with a large plume of smoke. The crowd reacts and immediately starts retreating.

29:30 – protesters are regrouping and caring for themselves away from the police line. In the background the police line is non-existent. It slowly begins reforming. One of the protesters is heard calling out that he has eye wash. Several individuals are seen

32:55 – Mr. Oakley says they are getting tear gassed and pushed back with shields. He tells the video to, "Start Blasting this."

32:00 - The protesters approach the line with a riot shield as a glass bottle is heard breaking and the 40mm launcher is heard firing once.

32:20 – Two more gas canisters are deployed over the line. One is immediately thrown back to the police line and eventually tossed back towards protesters before it appears to be kicked back again by a protester. The 40mm launcher can be heard in the background.

34:00 – Several individuals approach the police line on the right side of the video and bridge as the 40mm launcher can be heard deploying. And individual with a mask, a hard hat, a welding glove, and a police riot shield can be seen at the front of the crowd holding the riot shield up. And individual with a gas mask, wearing all black with gloves is standing next to them.

36:18 – An individual throws something at the police line and another protester pushes him and yells at him, "Don't fucking throw shit at them."

37:00 – Protesters are heard apparently yelling at other protesters, "What are you doing?!" Officer Joseph can be seen standing on the hood of the police car with the launcher.

37:50 – Gas canister is deployed and an individual runs to the canister next to Mr. Oakley saying, "I got a glove."

38:12 – An individual directly in front of Mr. Oakley is seen throwing something forcefully towards the police line. The 40mm launcher is heard firing and several people directly in front of and around that subject react, no one appears injured.

38:25 – Someone in the crowd screams "We're gonna throw you off the bridge pigs!"

    The protesters then continue to move towards the police line. As they advance, the 40mm launcher can be heard firing again at 38:37. The crowd stops momentarily and then continues advancing. The 40 mm launcher is heard firing again as the crowd advances. Once they are approximately 15 to 20 feet away from the line they stop and continue chanting and yelling obscenities at the police.

41:00 – Brandon Wheeler, now shirtless, stands in front of the crowd at the police line to address them.

44:00 – At least three protesters are standing in front of the protesters, facing the protesters, as if they are shielding the police from the protesters. At that point, several people can be heard screaming for the protesters to fall back. Someone says, "Listen to your leaders, fall back!"

    Many of the protesters continue to stand a few feet from the police line, on their phones, as many others call for the protesters to fall back.

47:00 – Mr. Oakley holds his phone up at the police line and films over the police line.

For the next several minutes the crowd loiters on the bridge at the police line, disregarding calls from other protesters to fall back.

54:00 – Mr. Oakley begins backing away from the police line as the crowd begins dissipating at the line.

55:30 – Brandon Wheeler is telling people in the crowd he would have lit the city up today but there was no plan.

57:30 – Mr. Oakley says, "Your black leaders want you back this way." In response an unknown female begins attacking Mr. Oakley saying, "What the fuck did you just say to me?!"

58:30 – A unknown female corners Mr. Oakley and wants to know what happened. He attempts to explain what happened as she says, "You're with us or you're against us, it's that simple, what we say goes, now follow us or go home." Mr. Oakley continues apologizing and continues walking with the crowd off the bridge.

59:20 – The same female, with two other females, begin attacking Mr. Oakley again, striking him and verbally attacking him until an unknown male is heard pulling her away and telling her to stop hitting him.

In the background protesters can be seen fighting with each other.

1:01:00 – An unknown female begins attacking Mr. Oakley again saying, "You got something to say?" She hits him and says, "Say it. I wish you would."

1:02:10 – An unknown white female starts accosting Mr. Oakley again saying, "You like saying racist shit?" She follows him for the few minutes asking him what the fuck is wrong with him and asking if he is "half retarded" at 1:03:30 she hits him. She continues to accost him verbally and physically about what he said, refusing to say what he said wrong.

Mr. Oakley continues to leave the bridge with the crowd until they reach the ground area of the onramp. Mr. Oakley continues walking away from the onramp area in a downtown direction on Camp Street. The video ends at 1:12:46.

Sergeant Barnes screen captured the video and made that recording a part of the permanent case file.

### Facebook Live Videos of Mr. Pasquantonio

Sergeant Barnes obtained the Facebook live videos from Mr. Pasquantonio's Facebook page. Sergeant Barnes reviewed two videos that captured Mr. Pasquantonio's time on the bridge. The following pertinent facts were observed in the videos:

**Pasquantonio video 1 – Before the gas deployment**

Sergeant Barnes noted the first video begins as Mr. Pasquantonio is marching with protesters onto the bridge in the middle of the crowd.

0:55 – Mr. Pasquantonio says they are on the CCC doing what could not be done during Katrina, crossing the bridge.

3:00 – Leaders of the protest are heard saying, "White allies to the front. White people do your job."

4:00 – A child can be seen on the shoulders of a man in the crowd, as the crowd starts chanting, "Fuck 12"

The crowd is heard making antagonizing statements before chanting, "Let us through," at 6:00 minutes into the video.

8:40 – A helicopter flies over the crowd and several protesters hold up their middle fingers and say they are not scared.

13:20 – The crowd starts cheering and begins to chant, "One step forward," then "We pay your bills." Someone in the crowd says they pay for the tear gas they throw on everyone.

The crowd stands still, waiting, chanting, and chatting for several minutes.

18:35 – The crowd starts chanting, "Drop the shields." The crowd then continues to wait, chant, and chat.

21:50 – Mr. Pasquantonio states he does not know if it's NOPD or JPSO blocking the bridge. Mr. Pasquantonio discusses a green laser in the crowd.

27:30 – Mr. Pasquantonio said that during the demonstrations the police are being very peaceful, and everything is respectful. Then after the demonstrations are over people are being confronted by police and being arrested. They believe are targeting people who are peacefully protesting. Mr. Pasquantonio states that is the conversation that is being had.

29:15 – The crowd calls to move forward and the crowd begins chanting, "Move bitch, get out the way. Get out the way bitch, get out the way."

29:45 – Mr. Pasquantonio says they are going to move forward. There is a call for allies to go to the front. Another protester says, "If y'all ain't got the stomach for it step out now, ain't no shame."

30:30 – Mr. Pasquantonio says that NOPD is at the line and JPSO is behind them. He then says they are going to push past the line because every part of the city belongs to its' people. He states they are going to show up for the people in Jefferson Parish who have been suffering.

31:35 – Mr. Pasquantonio states, "We're peaceful as hell right now." The crowd appears to be trying to move forward as they chant, "hands up, don't shoot."

33:10: Mr. Pasquantonio says they are asking white folks to go to the front, so they can put their bodies between the black folks and the cops.

33:45 – Mr. Pasquantonio says he wants "y'all to know how peaceful this is."

33:50 – An Officer can be heard over a loudspeaker in the background saying, "This is your final warning." The rest of the warning is drowned out by the noise in the crowd.

34:50 – Mr. Pasquantonio steps forward and a protester with him says they are pushing back with the shield. Mr. Pasquantonio tells the camera the police are pushing back against them with the shield. The camera does not show what is happening in front of Mr. Pasquantonio as he is filming himself and what is behind him. Mr. Pasquantonio then says they (the protesters) are being completely peaceful, and he is going to cut off the camera. The video ends at 35:28.

**Pasquantonio Video 2 – After the gas deployment**

Sergeant Barnes reviewed the video and noted the video began as Mr. Pasquantonio walking away from the police line saying, "We were tear gassed, we were completely peaceful."

Mr. Pasquantonio makes several statements that they were being very deliberate and non-violent, and they were tear gassed.

2:20 – Mr. Pasquantonio says they were being non-violent, and they do not know who it was and that JPSO was being NOPD. He states this is what is supposed to happen.

4:30 – People start running and Mr. Pasquantonio states, "People are running, I don't know why." He then starts telling people to calm down.

6:15 – Mr. Pasquantonio passes on a message that they are coming back tomorrow with goggles and gloves. He then states that they are blocking them at the back as well.

7:30 – Mr. Pasquantonio states that maybe they aren't blocking them and maybe it's a truck that is stuck with them.

8:45 – Mr. Pasquantonio states they were completely calm, and the police started shooting tear gas at them. He was unable to see if it was JPSO or NOPD.

9:20 – Mr. Paquantonio says JPSO is activating SWAT.

10:45 – Mr. Pasquantonio says they were completely peaceful, and they were just trying to cross the bridge and they were stopped. Mr. Pasquantonio stated that he knows NOPD has always tried to deescalate the situation and now they have been met with tear gas.

17:00 – Mr. Pasquantonio stated that they were blocked from crossing the bridge by police officers, both NOPD and JPSO, all he knows is, all of a sudden, the police were pushing at them, beating them, and shooting tear gas. He believes it was JPSO.

Mr. Pasquantonio says they are there, as white people, to put themselves between the black people and the police to keep them safe and not escalate things.

21:00 – Mr. Pasquantonio is walking through the central business district when he says again that they were calm and peaceful, and they were stopped on the bridge when they tried to cross. He also stated that JPSO deployed SWAT and there is no need for it.

Mr. Pasquantonio then ends the video at 23:08.

## YouTube Video Provided by Ms. Hope Byrd

Sergeant Barnes reviewed the video provided to the OIPM by Ms. Hope Byrd. Sergeant Barnes noted the video opens while protesters are stopped at the police line. The person videoing appears to be approximately 25 yards away from the police line. Ten seconds into the video, a call is echoed through the protest for protesters to wet their masks because they are going to be tear gassing. Sergeant Barnes noted this is before the initial round of gas was deployed.

Just past a minute into the video, the crowd can be seen surging forward and several protesters area heard saying "Keep pushing" and discussing pushing as the crowd continues to move forward. At 1:24 the crowd begins the chant of "hands up, don't shoot" as they continue to move forward.

At 1:56 the crowd reacts to something by surging back, appearing panicked. Tear gas can be seen in the distance, far ahead of the were the video is being filmed. A plume of gas is seen trailing behind a canister, as it appears to be thrown away from the protesters, high into the air. A second plume is seen high in the air as a canister is thrown away from the protesters off the bridge. As the crowd retreats there are calls for the protesters to stop running because they are trampling people. An unknown object is hurled from the protesters, behind the camera, directly at the line of officers, which is seen broken in the background, through the smoke. Sergeant Barnes noted the police officers and smoke did not appear any closer than 25 yards from the camera at any point in the video. Another canister is thrown off the bridge on the right side of the screen by a protester at 2:17 on the video, as the crowd is retreating.

The camera then turns from facing the police line and looks to the crowd as people shuffle away from the police line. The videographer tells an unknown person, who he calls babe, they are leaving out. He then says, "I'm not moving forward, we're not doing this. Fuck these assholes, mother fucker."

At 3:45 on the video, a motorcycle is seen moving through the crowd, towards the police line. It appears the subject is just trying to get through traffic.

At 4:45 the videographer tells people there is not option because they are cornered, they have to go back because there is no exit. He then says, "We walked up into a… into a… we cornered ourselves. T-B-H. So uh, it was probably a bad move to try to go over to JP anyway, because fuck JP." The videographer says everyone was being peaceful except for the police.

The video ends at 5:31. A copy of the video has been made a permanent part of the case file.

## WWLTV Report from June 4, 2020

Sergeant Barnes discovered a WWLTV news story the day after the incident. In that report, Sergeant Barnes observed video footage of a man with two children inside of a wagon on the bridge, at the very back of the crowd. Sergeant Barnes was unable to determine if that footage was from before or after the initial round of gas; however, it appeared the footage was from before.

Sergeant Barnes observed at 1:07 into the video, one of the protesters was interviewed. The protester stated the NOPD they had seen that night was not the NOPD they were used to. The protester stated one moment the NOPD was standing with them and then the NOPD stated, "If we went any further it would get worse." The protester stated, "They told us that they would tear gas us and then it would get worse." These statements lead Sergeant Barnes to believe warning were given, as the protester echoed the statements of Ms. Chatmon. It is still unclear if a warning about the tear gas was given clearly.

## NOLA.COM slow motion video of projectile

Sergeant Barnes obtained a four second video that had been published on Nola.com's website. The video showed a projectile (believed to be a CS gas impact round) traveling past the camera. The projectile goes past as an agitator stands in front of the crowd in all black with gloves on. When the projectile passes the video points to the ground and ends.

## WWLTV video from Tchoupitoulas Onramp

Sergeant Barnes obtained a video from the Tchoupitoulas Street onramp, posted to WWLTV's YouTube page. The video begins as protesters are marching towards the police line, after the first two volleys of gas. The narrator states he is live at a protest on the Crescent City Connection as protesters have attempted to take the bridge and NOPD has responded by deploying tear gas against the protesters.

On the video, over 100 protesters can be seen marching towards the police line. The video gives a side view of the event, filmed from the onramp adjacent to the roadway where the police and protesters are. In the video, as the narrator states, one person in the back of the police line can be seen holding a weapon of some sort, possibly used to launch gas (the investigation revealed that person is Officer Devin Joseph standing on the hood of a police vehicle).

38 seconds into the video, a gas canister is lobbed over the police line, landing on the roadway directly in front of the protesters. The protesters immediately begin to retreat as an unknown protester, attired in all black, picks up the canister and throws it off the side of the bridge. The canister flies through the air and hits the wall of the onramp, feet from where the WWLTV video is being filmed. The narrator states, "Oop, that was getting close to me."

The video then ends at approximately 48 seconds.

All of the footage reviewed in this section has been made a permanent part of the case file.

**End of Social Media Footage**

## Other Video Footage

### Real Time Crime Center

On Monday, August 3, 2020, Sergeant Barnes contacted New Orleans Homeland Security Public Safety Operations Chief Matthew Patin in search of any footage the Real Time Crime Center (RTCC). Chief Patin informed Sergeant Barnes they did not have any cameras on the Crescent City Connection but believed Louisiana State Police had a drone in the air that may have been recording and the New Orleans Traffic Management Center may have a camera on the bridge. Chief Patin Provided Sergeant Barnes with the contact information for Mr. Leland "Corky" Dwight with the Louisiana State Police's Small Unmanned Aircraft section and the contact information for the New Orleans Traffic Management Center.

### New Orleans Traffic Management Center

On Wednesday, August 5, 2020, Sergeant Barnes contacted the New Orleans Traffic Management Center at 504-484-0232 and spoke to an individual who identified herself as Mrs. Susan. Sergeant Barnes was informed the traffic management cameras located on the Crescent City Connection Bridge do not record.

### Louisiana State Police Footage

Sergeant Barnes contacted Mr. Dwight and requested copies of any of the footage they had. Mr. Dwight informed Sergeant Barnes they had footage of the protest incident but not the deployment of gas. Sergeant Barnes was later informed he would need to submit a formal request on departmental letterhead to LSP Captain Hodges for them to release any of the video. Sergeant Barnes prepared the request and submitted it to the Louisiana State Police on August 20, 2020. On August 21, 2020, Sergeant Barnes received a letter from Ms. Adrienne Aucoin, an attorney supervisor for LSP, informing him that the Louisiana State Police does not maintain records responsive to his request.

On August 21, 2020, Sergeant Barnes contacted Ms. Aucoin and informed her of the information he had received through the RTCC and Mr. Dwight and that he was seeking the footage that he was informed existed. Ms. Aucoin informed him that her client, which she referred to as the Sergeant and Lieutenant in the LSP Criminal Investigative Unit, stated the footage did not exist, and she would look into it. Sergeant Barnes contacted Ms. Aucoin two additional times in the month of September to follow up on the status of his request.

On Monday, September 28, 2020, at approximately 1:50 PM, Sergeant Barnes a phone call from LSP Sergeant Jonathan Kemp who arranged to meet with Sergeant Barnes on Tuesday, September 29, 2020 to provide him with a copy of the video. Sergeant Barnes was informed he would need to sign an evidentiary custody receipt for the video, acknowledging the video is law enforcement sensitive and should not be released to anyone outside of law enforcement.

Sergeant Barnes met with LSP Sergeant Kemp at 4600 Paris Avenue on Tuesday, September 29, at approximately 8:55 PM. Sergeant Barnes was provided a blue "Verbatim" flash drive that contained several photographs and videos recorded during the protest on the evening of June 3, 2020. Sergeant Barnes noted each video varied in length and was labeled by a specific number. Sergeant Barnes reviewed the videos, as listed by file name, and noted the following:

## DJI_0765.mp4

The drone footage was approximately three (3) seconds long and depicted protesters walking on Loyola Avenue towards Poydras Street.

## DJI_0766 – DJI_0767

The files are still images of protesters at the intersection of Perdido Street and Loyola Avenue.

## DJI_0768.mp4

The drone footage was also three (3) seconds long and depicted protesters walking past Orleans Civil District Court on Loyola Avenue.

## DJI_0769

The file is a still image that shows an aerial view of the front of Orleans Civil District Court.

## DJI_0770.mp4

The footage was a single second of video from the dashboard of an unknown vehicle, facing City Hall.

## DJI_0771.mp4

The footage was approximately 1:35 minutes long and was shot from the dashboard of an unknown vehicle. The vehicle moved to a better vantage point during the video. At 44 seconds in the video, the camera zooms in to show a peaceful anti-eviction protest on the stops of Orleans Civil District Court.

### DJI_0772 – DJI_0774

The files are still images that show protesters at the front of Orleans Civil District Court.

### DJI_0775.mp4

The footage is approximately nine (9) seconds long and shows news media in front of New Orleans City Hall on Perdido Street.

### DJI_0776 – DJI_0777

The files are still images that show media in front of City Hall on Perdido Street.

### DJI_0778.mp4

The footage is approximately 19 seconds long and shows news media in front of New Orleans City Hall on Perdido Street.

### DJI_0779 – DJI_0781

The files are still images that show Perdido Street at the front of City Hall.

### DJI_0782.mp4

The footage is approximately 2:50 minutes long and shows news media packing their equipment in front of New Orleans City Hall on Perdido Street.

At 2:10 the video pans left to show a large crowd has gathered in Duncan Plaza.

### DJI_0783.mp4

The footage is approximately seven (7) seconds long and shows the crowd in Duncan Plaza, which appears to be growing when compared to the video labeled DJI_0782.mp4.

### DJI_0784.mp4

The footage is approximately one second long and shows the same crowd in Duncan Plaza.

### DJI_0785.mp4

C270

The footage is approximately 1:37 minutes long and shows the growing crowd in Duncan Plaza. The crowd appears to be listening to a speaker, as the crowd occasionally claps in response to something.

### DJI_0786.mp4

The drone footage is one (1) second long and appears to show people marching on St. Charles Avenue.

### DJI_0787 – DJI_0798

The files are still images that show protesters in the same area on St. Charles Avenue.

### DJI_0799.jpg

The file shows a tightly packed, large, group of protesters on the onramp about Annunciation Street.

### DJI_800 – DJI_802

The files are still images of a large group of protesters walking on the onramp and onto the elevated highway about Tchoupitoulas Street.

### DJI_803.jpg

The file is a still image showing protesters approaching an establish police line on the elevated highway near the Convention Center.

### DJI_804.mp4

The footage is approximately 10:17 minutes and depicts the following events:

As the footage starts, protesters walk directly into the police line, with a few protesters walking directly through the line. Several officers walk over to the protesters who have walked through the line and corral them back to the other side of the line. The protesters marching on the highway continue to advance towards the police line and the crowd becomes tightly packed against the police line.

1:00 – Officers are seen running to the line in what appears to be riot gear and being reinforcing the front line of officers. The video shows the line of officers with several members of command staff or other officers behind the front line and a line of police vehicles behind them.

1:30 – The crowd continues to grow and become more densely packed as the protesters push themselves together at the police line. The drone camera appears to zoom in closer and Captain Roberts can be seen talking on the radio behind the police line.

C271

The video continues to show the crowd become denser and packed in more tightly against the police line.

4:00 – The drone camera zooms out and flies higher, briefly showing the crowd, before turning towards the Eastbound lanes of traffic, then re-centering over the protest at 4:40. A group of individuals appear to be meeting behind the police line (this appears to be Captain Roberts and the protest leaders).

6:40 – The camera zooms out again, showing the growing protest with a large crowd on the elevated highway. Many individuals in the back are gathered sparsely and more are joining as a large crowd has gathered, packed densely together, near the police line. Sergeant Barnes estimated the densely packed portion of the crowd appeared to be at least 30 people wide against the police line and 30 rows of people deep. Beyond the first 30 rows of people it appeared the crowd became more sparsely populated. Based on this estimate, the crowd appears to consist of at least 900 people.

8:00 – The camera zooms out again and shows the entirety of the crowd. The crowd appeared to span as far back from the police line as Tchoupitoulas Street, growing more sparsely populated the farther from the police line it was.

8:20 – The camera zooms back to the police line and a secondary line can be seen forming behind the first line. Captain Roberts and the protest leaders are meeting in the space between the two lines.

The video ends at 10:17.

### DJI_0805 – DJI_0811

The files are aerial still images of the crowd and the police line. The images appear to be before the deployment of gas and DJI_0811.jpg has a time stamp of 21:49:02.

### DJI_0812 – DJI_0815

The files are aerial still images of the crowd as they appear to be leaving towards the onramp they came on. Sergeant Barnes noted DJI_0815.jpg had a timestamp of 22:52:11, over an hour later than the previous set of photographs.

### DJI_0816

The file is an aerial still image of the police line **at** 22:59:15, approximately seven (7) minutes later than the photo before it.

### DJI_0817.mp4

C272

The footage begins at the timestamp of 22:59:21 and depicts the police line, with several officer behind the line and a small group of protesters directly in front of the line standing together. Several other protesters can be seen sparsely located on the elevated highway, further away from the line. At least two individuals are seen on bicycles and one individual appears to be on a motorized scooter.

At 40 seconds into the video, the police line begins moving forward as protesters refuse to move back. The police line drives the protesters back as members of the snatch team attempt to grab individuals who are refusing to leave. The scooter moves between the police line and the protesters, appearing to act as a barrier.

At the two-minute mark, the protesters begin to walk away from the police line, it appears to be at the direction of the person on the scooter. For the next several minutes, the police line continues to move forward, as the protesters walk away from the police line, keeping their distance. The person on the scooter stays in a position behind the retreating protesters, but ahead of the police line.

The protesters continue walking away from the officers as the police line approaches with an armored vehicle following behind it. The drone continues to fly over the protesters, filming them walking towards Camp Street, around vehicles that are stopped on the onramp.

At 14:06 in the video, the drone turns and begins heading back towards the parking garage where it had parked before. The video ends at 14:19, with a timestamp of 23:13:43.

### DJI_0818.mp4

The footage is 1:13 minutes long and shows the drone landing on the roof of a nearby parking garage.

### DJI_0819.mp4

The footage is 12 seconds long and shows police officers in riot gear standing on the onramp above what appears to be the camp Street Entrance.

### DJI_0820 – DJI_0833

The files are aerial images depicting the police formation on the onramp, with no protesters in view and various shots of the elevated highway littered with remnants of the protest, and several shots of the New Orleans City Skyline.

**Credibility Assessments**

Investigators with the New Orleans Police Department use credibility assessments to assist in the judgement of whether a witness, involved officer, or subject of force is reliable. A witness

may be considered unreliable if there is any serious inconsistency with the undisputed or indisputable facts, or if a witness contradicts himself/herself on important points.

Sergeant Barnes noted many of the officers and witnesses were interviewed almost three months after the incident and several other protests and operations plans had been released since that time. Based on that information, Investigators note the witnesses may have varying abilities to recollect pertinent information regarding the specifics of the incident on June 3, 2020. Investigators also acknowledge that witnesses and officers have not been sequestered regarding the incident and would have had the opportunity to speak about the incident with others who were involved. Therefore, the recollection of events may be based partly on their perception and recall, and partly on information provided through other sources, such as media or other witnesses.

Investigators noted that because an individual is found not to be credible, does not necessarily indicate that individual is being dishonest.

### NOPD Personnel

Sergeant Barnes reviewed the evidence discovered during the investigation and the statements provided by the interviewed NOPD Personnel to determine their credibility. Sergeant Barnes made the following determinations:

### Lieutenant Kenny Prepetit

Sergeant Barnes found Lieutenant Prepetit's statement to be credible. Lieutenant Prepetit's statement was able to be corroborated by the evidence uncovered during the investigation. During his statements, Lieutenant Prepetit admitted there was a failure to properly debrief the gas deployment team on the evening of the event, during which they should have discovered the stinger rounds were fired. Overall, the investigation discovered nothing that determined Lieutenant Prepetit's statements were not credible.

During his follow-up statement, Lieutenant Prepetit also admitted to allowing the officers to deactivate their body worn cameras while discussing tactical plans. When asked, lieutenant Prepetit admitted, after reviewing the policy, the ceasing to record the briefings are not allowed by policy. This further adds to the credibility of Lieutenant Prepetit.

### Sergeant Damond Harris

Sergeant Damond Harris appeared to be credible in part and not credible in part. Sergeant Harris's BWC was turned on just after the initial deployment of gas and was not turned off until the end of the event. However, at the end of Sergeant Harris's BWC, he alluded to Officer Pierce "stinging" people with his launcher, just prior to ceasing recording. This could leave a reasonable person to believe Officer Harris knew or assumed, Officer Pierce fired the stinger rounds on the night of the incident and did not confirm or report it. Officer Harris also stated he did not learn the stinger rounds were fired until the debriefing later that day. Sergeant Barnes determined the

information that Sergeant Harris was unaware the rounds were fired on the night of the incident, may not be credible. On Monday, December 14, 2020, Sergeant Harris was interviewed regarding these statements. During that interview, Sergeant Harris clarified that he did not know if Officer Pierce fired the rounds until the following day. Based on the investigation, Sergeant Barnes determined Sergeant Harris assumed Officer Pierce fired the stinger rounds on the night of the incident, did not ask Officer Pierce if he had that evening, and was not asked to confirm it that evening. Sergeant Harris did not confirm the rounds were fired until the following day. Investigators determined this inconsistency was not a materially false statement with an intent to deceive investigators, and it would not have affected the course or outcome of the investigation.

Sergeant Harris did add to his credibility by informing investigators that he was ultimately responsible for the use of the munitions and any failures to inform command staff of their use.

## Officer Michael Pierce

Sergeant Barnes determined Officer Pierce's statements were credible. This determination was made because the information obtained from other witnesses, body worn camera footage, supported Officer Pierce's statements. Officer Pierce's recollection of the method and timing of when he deployed the stinger rounds was also corroborated by civilian witnesses. During his statement, Officer Pierce admitted he did not notify any supervisors that he had discharged the stinger rounds until the following day, which adds to his credibility. Officer Pierce also admitted to failing to activate his body worn camera at the outset of the event, and to terminating it prematurely when discussing tactical plans.

During his statement, Officer Pierce could not recall what his exact target was when he fired the second stinger round; however, his written force statement regarding the use of the stinger rounds is verified by body worn camera footage. Other than that single issue of memory recall, Sergeant Barnes found no issues as to the credibility of Officer Pierce.

## Officer Travis Johnson

Sergeant Barnes determined the statements of Officer Johnson to be credible. The statements made by Officer Johnson were supported by the evidence and verified through body worn camera. Officer Johnson admitted to terminating his body worn camera video and admitted to failing to activate his camera at the outset of the event. Based on the information uncovered during the investigation, Sergeant Barnes found no issues with the credibility of Officer Johnson.

## Officer Devin Joseph

Sergeant Barnes determined, based on the investigation, the statements of Officer Devin Joseph are credible.

During his statements, Officer Joseph admitted to failing to activate his body worn camera at the outset of the event and to terminating it during the briefing with Lieutenant Prepetit. Officer

Joseph also advised at some point during the incident, prior to the briefing with Officer Pazon and Lieutenant Prepetit, he advised the gas was not working and the NOPD needed to alter their response to the civil unrest. This was verified by body worn camera footage of the event. Officer Joseph's statements were supported by the evidence obtained during the investigation and through video footage of the event. Based on the information uncovered during the investigation, Sergeant Barnes found no issues with the credibility of Officer Joseph.

## Officer Jason Jorgenson

Officer Jorgenson's statements were determined to be credible. During his statements, Officer Jorgenson admitted to his body worn camera violations. Officer Jorgenson also admitted this was the first time he deployed gas canisters and he deployed them in the manner he was instructed, just prior to the incident. Officer Jorgenson demonstrated the method in which he deployed canister, admitting he threw them into the crowd. This information and the method which he deployed the gas canisters was corroborated by video evidence obtained from body worn cameras during the incident. Based on the investigation, Sergeant Barnes found no reason to doubt the credibility of Officer Jorgenson.

## Captain Lejon Roberts

Sergeant Barnes determined Captain Roberts' statement, based on the investigation, is credible. During his statement, Captain Roberts recounted the details of the incident and his role. Captain Roberts recounted his instructions to the officers, admitted to establishing a skirmish line on the bridge, and offered reasonable explanations for his actions. Captain Roberts recalled items being thrown towards and over the police line, which was verified on camera.

Captain Roberts was able recall specifics of the incident, including that an operations plan had not been distributed regarding NOPD's response to the protests until after the event. Captain Roberts also recalled the 40mm launchers being used but was unsure what rounds were being fired from them at the time.

The statements provided by Captain Roberts were easily verifiable and were supported by the evidence uncovered during the investigation. The information provided by Captain Roberts was verified through body worn camera footage, social media videos, and by communications over the radio to Chief Thomas. For these reasons, Sergeant Barnes found no reason to doubt the credibility of Captain Roberts' statements.

## Captain Brian Lampard

Sergeant Barnes found the statements of Captain Lampard to be credible in part and not credible in part. During his statements, Captain Lampard was able to recall events of the evening and even admitted to feeling nervous because of the situation. Captain Lampard stated he began preparing the officers for a gas deployment before the line broke down because he was unsure if

they would need to deploy gas, but stated he felt it was a possibility. Captain Lampard also stated he felt this way because the protesters grew more agitated and were throwing things towards the police line. It was not until the line was broken that he gave the command to deploy gas. Captain Lampard also stated he did not give any authorization to use the stinger rubber ball rounds and should have been notified of their use. Captain Lampard stated he did not notify Chief Thomas of their use because he was not informed of it.

Captain Lampard did appear to have a recollection of some of the events that did not appear to be corroborated by the investigation. Captain Lampard stated the second deployment of gas was due to the protesters pushing at the police line a second time. The investigation determined the protesters were advancing and throwing things at the police line but had not reached the police line at the time the second volley of gas was deployed. Sergeant Barnes determined that statement by Captain Lampard was not credible. Investigators determined this inconsistency was not a materially false statement with an intent to deceive investigators, as it would not have affected the course or outcome of the investigation. The statement is based on a perception and recollection of the event, under circumstances in which officers and civilians both have varying recollections and perceptions of the incident.

Captain Lampard also stated he believed there was some form of an operations plan released prior to the incident (Sergeant Barnes was later informed by Sergeant Blackmon that he had not released any operations plan prior to the event). Investigators determined this inconsistency was not a materially false statement with an intent to deceive investigators, as it would not have affected the course or outcome of the investigation.

The majority of the statements of Captain Lampard were able to be verified through body worn camera footage, and the statements of other witnesses during the investigation.

**Deputy Superintendent John Thomas**

Sergeant Barnes found the Statement of Deputy Chief John Thomas to be credible. However, Chief Thomas was unable to provide investigators with much information regarding the events occurring on the bridge on the evening of June 3, 2020.

Sergeant Barnes was informed by Chief Thomas that he was unable to recall if an operations plan had been released prior to the incident on June 3rd. Chief Thomas did say that a basic plan had been provided to him. Sergeant Barnes was unable to verify that any plan or draft of a plan had been provided at that time. Chief Thomas also stated that the protesters presented a danger because traffic on the expressway had not been stopped; however, at the time the protesters entered the bridge traffic had been stopped on the elevated portion and officers were in place to ensure traffic control leading to that area. Investigators determined this inconsistency was not a materially false statement with an intent to deceive investigators, as it would not have affected the course or outcome of the investigation.

Sergeant Barnes noted some areas of Chief Thomas's statement that could give rise to more questions, such as: Why was John Thomas at the RTCC when arguably the most important group of protesters, known agitators, were unable to be monitored from the RTCC? Sergeant Barnes recognizes this is a command decision made during a rapidly evolving incident on an evening where multiple protests took place and investigators have the ability and the responsibility to scrutinize the events of the evening with the benefit of 20/20 hindsight. Further, as the Incident Commander, Chief Thomas should have been in a position to monitor the events of the evening from a centralized location, where he could make informed decisions and review information away from the front lines.

Because Chief Thomas was unable to view what was happening on the bridge Investigators are unable to rely on Chief Thomas's statement for information of what occurred on the bridge but find the statement to be credible.

## Sergeant Todd Morrell

Based on the investigation, Sergeant Morrell's statement was found to be credible. During his statement, Sergeant Morrell discussed several issues faced by the officers regarding tactical deployments on the bridge. Officer Morrell also discussed the reasons for the use of 40mm launchers in conjunction with gas, without having observed how the launchers were used on the bridge. He stated while he was below the bridge, he did not hear any warnings provided prior to the deployment of gas but was also unable to hear much of what was happening on the bridge from his position below.

Sergeant Morrell did not hesitate to offer his opinion on the events of the evening and his opinion that gas should have been covered by a policy but was not. Sergeant Morrell also was able to shed light on his opinion that the protesters that went onto the bridge were mostly agitators and had been exhibiting agitative behavior at previous protests. His statement that the main agitators did not appear to be the regular protesters NOPD often encounters were able to be partially corroborated by intelligence information obtained during the investigation.

Based on this information, Sergeant Barnes found no reason to doubt the credibility of Sergeant Morrell.

## Sergeant Michael Crawford

During his statements, Sergeant Crawford appeared credible in part and not credible in part. Investigators noted only minor discrepancies regarding documentation of munitions. Sergeant Crawford was not in a position to be able to observe much of the force used on the bridge, having arrived after the gas deployments had occurred.

During his interview, Sergeant Crawford admitted that prior to the evening of June 3rd, proper inventories of the issues gas munitions were not conducted and documentation of the use

of the weapons relied on self-reporting by those officers who had been issued the munitions. Sergeant Crawford was able to conduct an inventory of the munitions on the night of June 3rd, but it appeared by the investigation that this inventory may have been in response to the event instead of prior to the event. After the event, Sergeant Crawford developed the paperwork and documentation to conduct a proper inventory of the munitions, which was admittedly being documented through tallying the munitions on a notepad. Sergeant Crawford also stated he was unable to remember exactly when the refresher course for the mobile filed force was conducted, but believed it was in the days prior to the event. This recollection issue could be accounted for because of the amount of time that had passed and the amount of protests that have been attended since the incident.

Other than those issues, Sergeant Barnes found no other issues that could cause the statement of Sergeant Crawford to not be credible.

**Officer Dylen Pazon**

Sergeant Barnes was unable to find Officer Pazon's statement credible in part and not credible in part. During his statement, Officer Pazon did not recall details of the evening, such as who conducted the inventory of the munitions, what he told the officers regarding turning off their body worn cameras, or what was specifically discussed during briefings. Officer Pazon also was unable to recall the exact date of the refresher training conducted with members of the mobile field force. Officer Pazon did say that he believed the training conducted was insufficient training for someone who had never received riot training previously. Because of these recall issues, Sergeant Barnes is unable to place credibility into those portions of Officer Pazon's statement.

Officer Pazon's statements regarding the training, and his assumed role of commanding the mobile field force line near the end of the event were found credible.

<u>**Civilian Witnesses and Subjects of Force**</u>

Sergeant Barnes reviewed the evidence discovered during the investigation and the statements provided by the civilian witnesses and subjects of force to determine their credibility. Sergeant Barnes made the following determinations:

**Juliet Walker**

The investigation revealed Juliet Walker did not appear credible in her statement. Ms. Juliet Walker stated she was only three or four people from the police line and could see what was happening. She stated there were large plastic barricades that opened and allowed the protesters through. She then heard a shot and a gas canister hit her mother in the head and fell to the ground next to her. Ms. Juliet Walker also stated the canister landed on the ground, after hitting her mother, and *then* began emitting smoke. Ms. Juliette Walker informed investigators that she did not hear any warnings given. Sergeant Barnes determined this could be true, as there is no

indication warnings were given by police prior to the first deployment of gas. However, the information regarding not being allowed to move forward and pushing through the line was provided by protest leaders. Specifically, warnings about police acting if they protesters continued forward were given by protest leaders, using amplification, at the front line. If Ms. Walker were only three or four people away from the police line it does not appear credible that she would not have heard that.

Ms. Juliet Walker's statement is inconsistent with the accounts of other witnesses who were at the front line, and inconsistent with social media footage and body worn camera footage from that area at the time gas was deployed. Ms. Walker's statement omits any of the actions of the protesters and declares the protesters were peaceful at the time the gas was deployed. The evidence in the investigation revealed Ms. Juliet Walker's account of the incident, leading up to and at the time of the gas deployment, is not credible.

### Abigail Walker

Sergeant Barnes found Ms. Abigail Walker did not appear credible in her statement. During her interview, Ms. Abigail Walker stated she saw was with her sister and mother only three or four people back from the police line and could see what was happening at the line. She stated she saw the police barricade and saw that no one was pushing. Ms. Abigail Walker stated she believed the police were opening the barricades and had come to terms with protest leaders. Ms. Abigail Walker also stated she did not hear any warnings, but heard protest leaders saying, "We are one" over a megaphone.

These statements by Ms. Walker were determined to not be credible. The evidence presented in the investigation, video evidence, and statements from other witnesses, demonstrated that Ms. Abigail Walker, had she been in the position she claimed to have been in, would have heard the protest leaders warn the protesters about moving forward, and heard their calls to push forward. Ms. Abigail Walker would also have been able to see protesters pushing against the police line and clearly not being peaceful just prior to the deployment of gas.

Therefore, the evidence in the investigation revealed Ms. Abigail Walker's account of the incident, leading up to and at the time of the gas deployment, is not credible.

### Bilal Ali-Bey

Sergeant Barnes found Mr. Bilal Ali-Bey's statements to be credible. Mr. Ali-Bey, in his statement, shared his opinions on whether or not the use of less lethal weapons was appropriate; however, Mr. Ali-Bey's opinions appear to be based on his perception of the event and not of how others perceive actions.

Mr. Ali-Bey stated the crowd was looking to have a peaceful march to the Jefferson Parish Line and the protesters pushed back at the officers after the officers took aggressive actions

towards the protesters. The investigation shows that this is not the case. However, at the initial contact between the police line and the protesters, several protesters attempted to walk past the police line and were stopped and ordered back. These actions of protesters walking past, not pushing through, the police line and officers sending them back in an authoritative manner could be perceived as an aggressive action, despite the police line clearly being an established cordon at the time. However, the main push through the police line was clearly not initiated by aggressive actions on the part of the police department, which is supported by video evidence from both sides of the line.

Mr. Ali-Bey also stated after the initial gas deployment, the protesters regrouped and marched towards the police line. Mr. Ali-Bey described the protesters as not being aggressive but marching in an "angry manner." The statement appears to be credible, while downplaying the actions of the protesters, attempting to differentiate between "aggressive" and "angry manner."

Mr. Ali-Bey was able to confirm with Sergeant Barnes the type of round that he was hit with and described a young female he could not identify but was also hit with the same type of round. Sergeant Barnes was able to identify the round Mr. Ali-Bey was hit with as a CS-extended gas round, not a rubber bullet or a stinger rubber ball round. Mr. Ali-Bey stated he was also able to hear warnings to exit the bridge after the initial deployment of gas.

For these reasons, Sergeant Barnes believes the statements of Mr. Ali-Bey are credible but are interjected with opinions that seek to minimize the perception of the protesters as aggressive.

### Vincenzo Pasquantonio

Sergeant Barnes determined the statement of Mr. Pasquantonio was not credible. During his statement, Mr. Pasquantonio attempted to equate the act of pushing through the police line as a peaceful act of civil disobedience. He made statements that the protesters were peaceful from the beginning to the end of the incident and stated he did not see anyone break the law or be aggressive.

Mr. Pasquantonio's own Facebook live videos illustrate the crowd was agitating, and acting aggressively towards the police line, diminishing the credibility of his own statement.

Mr. Pasquantonio stated he did not see any actions on the part of the crowd that indicated they needed to be dispersed. For these reasons, Sergeant Barnes could not find the statement of Mr. Pasquantonio credible.

### Beata Deselle

Sergeant Barnes found Ms. Beata Deselle's statement credible in part. In her statement, Ms. Deselle stated she was approximately four people away from the front line and could see what was happening. She stated, after waiting and asking for approximately 40 minutes, police would not allow the protesters to continue past the police line. According to Ms. Deselle after waiting,

the crowd simply walked past the officers because they were able to walk in between officers on the line. The police responded by using gas and rubber bullets. This statement is not credible.

Ms. Deselle stated protesters were yelling and chanting, but nothing being yelled was provocative and no one was throwing anything at the police.

The investigation revealed the account of the incident by Ms. Deselle was not accurate. Video evidence showed protesters pushing through the police line, trying to antagonize Officers with their words, and throwing things at the police line. Sergeant Barnes took into account that Ms. Deselle may not have heard any inflammatory words and may not have seen anything thrown at the police, but from her statement she should have clearly been able to tell protesters pushed through the police line and did not peacefully walk between the officers. Ms. Deselle's listed witness, Ms. Danielle Goodwin, who was with Ms. Deselle at the time of the incident stated protesters pushed through the police line, which directly contradicts Ms. Deselle's statement.

Based on this information, Sergeant Barnes was unable to find the statement of Ms. Deselle credible.

## Danielle Goodwin

Sergeant Barnes found the statement of Ms. Goodwin to be credible in part, with one exception. Ms. Goodwin's statement was corroborated by much of the evidence uncovered during the investigation. Ms. Goodwin stated the protesters asked to continue forward and waited for approximately 40 minutes before pushing through the police line. After protesters pushed through the police line, the gas was deployed.

Ms. Goodwin made several statements which were corroborated by both witness accounts and videos on social media. She stated she was near the front of the protest because all of the white people were called to go to the front. Ms. Goodwin also stated that she believed someone had tweeted a warning that if protesters did not back off the bridge, the police would throw tear gas.

The only portion of Ms. Goodwin's statement that did not appear credible was her statement on what protest leaders stated over megaphones. Ms. Goodwin claimed protest leaders appeared to be pleading with police, asking to be let through the line. Video evidence showed that was not entirely true. While protest leaders did ask to be let through, they also made inciteful comments, provided strongly worded warnings that the police would beat protesters if they went through, and relayed the message that police asked the protesters to turn around.

Overall, despite the statements of what was said, Ms. Goodwin recalled the actions of the protesters and the police as they were captured on video and discovered during the investigation. Based on this information, Sergeant Barnes finds the statement of Ms. Goodwin to be credible in large part, and not credible as to what protest leaders communicated to the crowd.

## Jon Klein

Sergeant Barnes was unable to determine the credibility of Mr. Klein, as he did not provide any statements during the investigation other than in his initial complaint. However, Sergeant Barnes did discover Mr. Klein had no first-hand knowledge of what occurred on the bridge and appeared to be hostile towards the police and towards journalists reporting information provided by Superintendent Ferguson. Sergeant Barnes noted Mr. Klein ended the statement in his complaint with the words, "Fuck you." Based on this information, Sergeant Barnes was unable to lend any credibility to the writings in Mr. Klein's initial complaint.

## Elise Butler

Sergeant Barnes determined Ms. Butler was not credible in her statements. Ms. Butler alleged that she was approximately four rows back from the front line and heard protest leaders relay a message from the police that the further they went the more dangerous it would be. However, in a later statement Ms. Butler stated there was no way for her to be able to hear anything four rows back, even if there was a megaphone used.

Being only four rows back from the front, Ms. Butler would have been in near the front where protesters consciously chose to push through the police line. Ms. Butler, in her statements, said the police line opened and they were allowed to go through, even saying she heard the police say, "go ahead." The investigation revealed that when the police line was broken, it was clear as the protesters walked through that the situation was not peaceful. Ms. Butler also stated she saw no aggressive actions on the part of the protesters except for an empty water bottle being thrown, that she first said landed 10 feet away from the police line, and later said landed 20 feet away from the police line.

Based on this information, Sergeant Barnes was not able to lend credibility to the statement of Ms. Butler.

## Athena Turek-Hankins

Sergeant Barnes found the statement of Ms. Turek to be credible. Ms. Turek stated she was near the middle of the crowd and was unable to see what happened at the front line. She stated she saw some commotion and then saw tear gas deployed. Ms. Turek stated she did not see any other force.

## Peter Schamp

Sergeant Barnes found the statements of Mr. Peter Schamp to be credible. Mr. Schamp was far back from the from line and was unable to see what had happened. From his vantage point, he was unable to see any force except the tear gas being deployed in the distance.

### Michael Spinola

Sergeant Barnes found the statement of Mr. Spinola to be credible. Mr. Spinola was unable to see any of what was going on from his vantage point. He stated he heard screaming and yelling, mostly of the protest leaders telling people to fall back. Mr. Spinola assumed the protest leaders were being peaceful because they were yelling to fall back. Nothing in the statement, other than Mr. Spinola making assumptions, made Sergeant Barnes doubt his credibility.

### Aaron Avidon

Sergeant Barnes was unable to contact Mr. Avidon to conduct a follow up interview. Therefore, Sergeant Barnes only has his initial complaint to base his credibility on. In his initial complaint Mr. Avidon stated the protesters were peaceful and NOPD effectively trapped and tortured them. Sergeant Barnes recognized this as not credible.

### Jenna Losh

Sergeant Barnes was unable to contact Ms. Losh to conduct a follow up interview. Therefore, Sergeant Barnes only has her initial complaint to base her credibility on. In the initial complaint, Ms. Losh was not credible. Ms. Losh wrote that NOPD gassed peaceful protesters and purposefully caused a stampede. Ms. Losh stated NOPD's tactic was evil and intended to harm and dominate the protesters. She stated NOPD believes they have the right to kill people to protect property. The statement appeared to be opinion without a factual basis. Therefore, Sergeant Barnes was unable to find her statement credible.

### Samantha King

Sergeant Barnes found the statement of Ms. King to be credible in part. During her statement, Ms. King stated she was not in a position to see any acts of aggression on the part of the protesters and could not see the front line. She did, however, stated that she observed police deploy a canister of gas at people as they were walking away. This statement was determined to not be credible.

Overall, the other portions of the event Ms. King recalled were all verified by Sergeant Barnes during the investigation. For that reason, Sergeant Barnes believes Ms. King is mostly credible.

### Kerem Ozkan

C284

Sergeant Barnes was unable to contact Mr. Ozkan to verify his statement. However, Sergeant Barnes was able to determine the statement made during his initial complaint was not credible. In that statement, Mr. Ozkan stated the protesters were peaceful, as see in social media posts, and that attempting to walk past a police line does not constitute force. Sergeant Barnes was unable to verify that Mr. Ozkan witnessed the event. Therefore, Sergeant Barnes was unable to find Mr. Ozkan credible.

## Rory "Bob" Payne

Sergeant Barnes could not find the statements of Mr. Payne to be credible. During his statements, Mr. Payne wrote that NOPD deployed tear gas on peaceful protesters without any cause or reason. The investigation determined this was not correct. Mr. Payne also advised that he was not in a position to see what occurred, and never saw rubber bullets fired. The most dangerous thing he saw, according to his statement, was a woman who was sitting on the railing of the onramp after the gas was deployed. Sergeant Barnes determined Mr. Payne's statements were opinions with no factual basis. Therefore, Mr. Payne was not found to be credible.

## Morgan Landry

Sergeant Barnes found the statements of Ms. Landry to be credible in part. During her initial statement, Ms. Landry said that police met a peaceful demonstration with unnecessary force and that police were the instigators. This statement was determined to not necessarily be true. The police did instigate stopping the protest on the bridge but did not instigate the physical conflict.

In her later recorded statement, Ms. Landry stated she was at the back of the protest and did not know who blocked the bridge. She stated she tried to make her way to the front and was about 20 feet away when the tear gas was deployed. After the initial deployment she stayed on the bridge for approximately 30 minutes and was unsure if any other gas was deployed.

Based on the investigation, Sergeants determined Ms. Landry's statement was credible in part.

## Kylie Shortell

Sergeant Barnes determined the statement of Ms. Shortell appeared credible. Ms. Shortell stated she was waiting in the crowd and made her way towards the front line. After the initial deployment of tear gas, she stayed with the crowd on the bridge.

Ms. Shortell's statement began to lose some credibility when she stated she saw the gun used to fire the rubber balls and stated it was not the gun she saw on the news at an NOPD press conference. The investigation revealed Ms. Shortell's information was incorrect. However, Sergeant Barnes recognizes that this is an issue or perception during the incident and cannot discredit her statement.

## Anna Donnell

Sergeant Barnes found the statement of Ms. Donnell to be credible. Ms. Donnell stated she could not see what was happening at the front and tried to make her way there. As she did, she felt a slight pushback in the crowd and then the tear gas was deployed. Ms. Donnell was unable to see anything that Sergeant Barnes was not able to verify through the investigation. For this reason, Sergeant Barnes found Ms. Donnell to be credible.

## Samantha Nichols

Sergeant Barnes found the statement of Ms. Nichols to be credible. Ms. Nichols was unable to see what was occurring at the front line and cannot account for the reasons force was used. During her statement, Ms. Nichols interjected her opinions that did not appear to be rooted in the facts of the incident.

Sergeant Barnes also questioned the credibility of Ms. Nichols statements that the protest was peaceful and intended to be peaceful. Ms. Nichols admitted she has a history of being involved in protests during which police use gas and has also been arrested during protests previously in other cities. Ms. Nichols claimed the protesters were intent on being peaceful but brought mixtures of baking soda and water to treat people who were gassed and brought a leaf blower to combat the deployment of gas. Sergeant Barnes noted most peaceful protesters do not prepare for the police, especially in New Orleans, to deploy tear gas. This portion of Ms. Nichols statement did not appear to be credible.

For these reasons, Sergeant Barnes was unable to lend much credibility to the statement of Ms. Nichols.

## Hope Byrd

Sergeant Barnes was unable to verify the statement provided by Ms. Byrd in her original complaint. Sergeant Barnes was also unable to contact Ms. Byrd to obtain a mor thorough interview or obtain any footage verifying her initial statement.

Based on the investigation, Sergeant Barnes is unable to find Ms. Byrd's initial statement credible. Without further corroborating evidence, and with the evidence Sergeant Barnes discovered during the investigation, the complaint made by Ms. Byrd has been determined to not be credible.

## Anonymous Complainants Credibility

## IPM AC – 2020-0039

The complainant under IPM AC-2020-0039 proved to not be credible. Without any clarification of the initial complaint, the written statement alleged officers proceeded to beat

protesters with batons while they were blinded. Video footage showed this was not true. Therefore, Sergeant Barnes could not lend credibility to the complaint.

**IPM AC – 2020-0040**

The complainant under IPM AC-2020-0040 proved to not be credible. The complainant wrote that police, using a microphone, told the protesters to come through a barricade of police cars, and then tear gassed them. The investigation proved that did not occur. The complainant says they were never told to exit the bridge. If the complainant were able to hear the officer on the microphone, they would have been in a position to hear the warnings from protest leaders and police to exit the bridge. For these reasons, the complainant is not credible.

**IPM AC – 2020-0041**

The complainant under IPM AC-2020-0041 proved to not be credible. The complainant stated they were advanced upon when tear gas was fired into the crowd. This is not what happened. Sergeant Barnes noted the complainant, without being able to clarify or obtain additional information, may not have been in a position to witness what occurred. Therefore, the complainant may be basing the allegations on opinions not supported by facts.

**IPM AC – 2020-0048**

The complainant under IPM AC-2020-0048 was not credible. The two-sentence complaint alleged that tear gas was used to incite chaos on the bridge. The investigation determined this is not true.

**IPM AC – 2020-0056**

The complainant under IPM AC 2020-0056 is only partially credible. The complainant alleged that only the individuals at the front heard warnings and they were at the back of the protest. This is likely true. The complainant also wrote that NOPD escalated the violent because they did not get off the bridge fast enough, and they watched an officer shoot rubber bullets at someone back while they were running away. The investigation was able to determine no officer shot rubber balls at a subject's back as they ran away, and the NOPD did not use force because the protesters did not leave the bridge fast enough. Therefore, the complainant cannot be found credible, but for their statements regarding their positioning in the protest and that they were unable to hear warnings where they were.

**Email Complaint # 918**

The complainant under NOPD Email Complaint number 918 was not credible. The investigation revealed the protesters were antagonizing and instigated violence by pushing through officers. The complainant alleged that did not happen, which is disputed by the evidence.

**Email Complaint # 919**

The complainant in NOPD Email Complaint number 919 could be found credible in part. The only non-credible portion of the complaint alleged that citizens were posing no threat to the wellbeing of any people or property. This is only partially true, as several protesters were peaceful, while several others at the front were not. Sergeant Barnes cannot determine the statement is not credible by that statement alone. For those reasons, the anonymous complainant would likely increase their credibility if they were properly interviewed.

**Email Complaint # 923**

The complainant in NOPD Email Complaint number 923 is not credible. The complainant alleged he was shot with tear gas and was not given a chance to back off. The investigation revealed the protesters were given ample opportunity to leave the location before several protesters forced their way through the police line, and then given ample warning and opportunity to leave after the initial tear gas was deployed.

The complainant further diminished their credibility by describing the accused officers as, "Pigs" and listing, "Defund the police department" as additional witnesses. Therefore, no credibility could be afforded to the complainant.

**Additional Credibility Issue**

Sergeant Barnes noted a slight discrepancy with many of the statements regarding both the officers and the witness's recollections of events. and other officers, appeared to include the last gas canister deployed, and the use of the launchers at that time, as part of the second volley of gas, not a separate, third, volley. Even though this deployment occurred several minutes after the initiation of the second deployment. However, whether or not the final deployments of munitions were part of the second or third volley, did not appear to make any of the officers, or witness's, statements more, or less, credible.

## Decision Point Analysis

The investigation determined the decision to deploy gas and use the 40mm launchers was precipitated by a series of events that included a lack of planning regarding the NOPD's response to the protest and a lack of manpower. In the interest of allowing protesters to exercise their first

amendment rights to the fullest extent possible, the New Orleans Police Department failed to properly prevent protesters from entering any of the onramps leading to the US-90 Expressway and the Crescent City Connection. As a result of having to shift officers to provide coverage for a protest with an uncertain direction, no officers or preparation was in place to prevent protesters from reaching the bridge. As a result, the decision was made to allow the protest to enter an onramp to the bridge and confront those protesters on the bridge, rather than on the ground or not at all.

The decision to allow the protesters to enter the onramp increased the danger for protesters and police, as the location chosen to confront protesters was now on an elevated highway.

NOPD leaders initially planned to block protesters from crossing the bridge at a point where they would be redirected off of the last available exit from the roadway prior to the bridge, the Westbound Tchoupitoulas Street exit (as noted in the radio communications at 31 minutes). However, the onramp chosen by protesters entered the highway beyond the Tchoupitoulas Street exit, or any viable exit ramps. Sergeant Barnes found no evidence that this plan was made farther in advance than the moment the protesters indicated they would likely enter the onramp. A cursory review of the onramps and exit ramps to the highway revealed the protesters would have had to enter the highway using an onramp no closer to the river than the Baronne Street onramp (approximately 4 blocks lake-bound of Camp Street) in order to be directed off at the Tchoupitoulas Street exit.

The allowing the protest to enter the highway, and confronting them there, impeded the flow of traffic and the availability of emergency services to the Westbank of New Orleans, it also ensured the only entrance or exit left for police or protesters (without turning around) was behind the established police line, at the Tchoupitoulas Street onramp, above the convention center. It can only be attributed to a lack of planning and/or preparation for the possibility of the protest going onto the interstate. The failure to prevent protesters from entering the bridge at an onramp beyond the Baronne Street onramp and the establishment of a police line prevented protesters from being able to exit without having to turn around a crowd estimated to be well over one-thousand people. The decision to allow the protest onto the elevated highway, the perception of the crowd (as noted by radio communications and interviews that many agitators were prepared and looking for confrontation), and the decision to stop them at that location, proved to be the major catalyst in escalating a tense situation towards the use of crowd control munitions (including CS gas and 40mm impact rounds).

Once the protest reached the location of the police line, the decision had to be made to either allow protesters to exit the Tchoupitoulas Street onramp, allow them to continue across the bridge, or have them turn around. It appears the decision to allow protesters to cross the bridge, given the possibility the leaders wanted a confrontation, may have led to a detrimental outcome, greatly impeding the ability of citizens, officials, and emergency services to reach the Westbank. There is no certainty that protesters would have peacefully crossed the bridge or that no one would be hurt doing so. Just as there is no certainty the protesters would not have crossed the bridge peacefully.

The decision to allow protesters to exit the bridge from the Tchoupitoulas onramp would have cut off the responding officers' ability to quickly receive reinforcements or equipment, such as medical services or more manpower, if the situation demanded it.

A third option, having the protesters turn around, was possibly the least practical, most inconvenient for the protesters, but the only situation in which the NOPD would be likely to maintain control and determine the outcome.

Once the decision was made to have protesters turn around, negotiations began with protest leaders to have the protesters exit the bridge the way they came. The negotiations quickly failed, with one of the protest leaders providing inflammatory and incorrect information to the protesters. Sergeant Barnes found no evidence anyone from NOPD addressed the crowd to correct the information or inform protesters directly of their requests and offers. Once negotiations failed, the NOPD held the police line while waiting for protesters to leave. At the same time, the protest leaders prepared the protesters and agitators to push through the police line in a show of force. This push by protesters and the subsequent situation caused by the police line being broken, culminated in a chaotic melee in which protesters and police, in large numbers, engaged in a physical fight for territory on the bridge. The decision to deploy gas to regain control of the situation was made at that time, based on the escalating physical force being used by both police and protesters. NOPD then continued the deployment of a minimal amount of crowd control munitions until the majority of the crowd had exited the bridge. Once the remaining agitators were small enough in number that the physical threat of violence was controllable by other means, the decision was made to advance the police line to figuratively "push" the remaining agitators back to the Camp Street onramp they entered from. Any protesters who refused to leave the bridge during that time were arrested by the advancing officers. All police action towards any agitators, protesters, or demonstrators, ceased once the remaining individuals exited the bridge.

Sergeant Barnes created the following illustrations to better demonstrate the locations of events on the bridge.

Figure 1 shows the locations and time of events as they occurred on the bridge.



*Figure 1*

Figure 2 shows the locations of the onramps at Camp Street and Baronne Street and the location of the last exit ramp from the bridge (Tchoupitoulas Street exit).



*Figure 2*

## **Tactical Analysis**

Analysis of the tactics revealed the decision to place police vehicles at the base of an onramp to deter protesters from entering the onramp, without establishing a police line, did nothing

to prevent protesters from entering the onramp. Further, the police vehicles were placed in a vulnerable position, surrounded by protesters, and forced out of the area.

Another tactical disadvantage for Officers, that increased the likelihood of protesters entering the highway, was the NOPD's decision to detour traffic on the highway, leaving an open pedestrian mall-like atmosphere for protesters which kept officers on traffic control points instead of assisting with preventing the protest from entering the onramp. This action signaled to protesters that NOPD was allowing them to enter the highway and that NOPD would be escorting and providing for their safety on the bridge. Had traffic not been cut on the bridge, the protesters would have had a clear indication they were not supposed to be in the area. However, not cutting traffic on the bridge presented an unnecessary risk to protesters and civilian drivers in the area. Once the protesters had entered the bridge at the chosen onramp, the decision to allow them on the bridge had been made apparent to the protesters. Establishing a police line on the bridge with no easy exit, at an elevated position, where most protesters were not able to see the police line as they approached, was a tactical decision that escalated the confrontation.

As discussed in the decision point analysis, the chosen location to confront protesters placed police officers at a tactical disadvantage and created a more dangerous situation for everyone. A better option would have been to place a blockade near the bottom of the exit ramp, preventing protesters from reaching the elevated highway. Another alternative would have been to allow protesters to cross the bridge and create a skirmish line near the General De Gaulle Drive exit, which is at the ground level and provided a clear and easy exit point, as well as a way for police to ensure reinforcements were available through the HOV lane. This option may have led protesters into a neighboring jurisdiction, which may have presented other issues for protesters and the City of New Orleans. This option, while less likely to cause confrontation, could not guarantee the security of the city infrastructure.

Sergeant Barnes noted that the radio communications also discussed the possibility of creating a "choke point" on the onramp, blocking protesters in from both sides. Investigators noted this was not done. Investigators realized this technique is often referred to as "Kettling." Kettling is explained as a crowd control technique in which police officers place large cordons in specific areas to contain and trap crowds. The technique is described in a Wikipedia article as a method in which protesters are allowed to leave through a controlled exit or contained, prevented from leaving, and arrested. The technique has been criticized as an indiscriminate tactic that leads to the detention of law-abiding citizens and can cause confrontation with protesters to escalate.

The investigation also noted that the decision to stop protesters on the elevated highway and deploy gas on the highway was accompanied by the serious risk of a stampede occurring as protesters attempted to retreat from the gas. The risk of a stampede on the elevated highway increases the danger and possibility of injury to both protesters and police.

## Training Analysis

During the investigation, Sergeant Barnes learned many supervisors on the bridge were unsure of what training responding officers had regarding riot control. Sergeant Barnes learned many of the officers used to create the mobile field force had received a refresher course on riot

control training earlier that day. Some of those officers may have been exposed to riot control training for the first time during that refresher course, with no practical application. Those asked during the interview agreed the single refresher course was inadequate training for first-time members of the mobile field force. Investigators noted this is an issue of safety for all involved in the incident, officers and civilians alike, due to the failure to have adequately trained and prepared officers responding.

Since the incident, the Municipal Training Academy, in cooperation with the Special Operations Division, has completed updated riot training for six (6) supervisors and 71 officers. The training was conducted over a four-day period and consisted of both classroom and practical exercises. The training included exposing each supervisor and officer to CS gas. These officers and supervisors now make up a part of the NOPD's established mobile field force. The training also included the use of specific, scripted, warnings which must be given to protesters through the use of a sound amplification device.

Shortly after the incident, the Special Operations Division also ensured all of the officers assigned to SOD received a refresher course on the deployment of gas and less lethal munitions, and their certifications are current.

## Policy Considerations

### NOPD Policies Regarding First Amendment Assemblies

Sergeant Barnes reviewed the NOPD policies and chapters and discovered no policy existed to provide specific guidance on NOPD's response to First Amendment Assemblies or Mass Demonstrations. More specifically, there was no policy, chapter, or standard operating procedure (SOP) that provided guidance or governance of the NOPD's response to civil unrest.

Sergeant Barnes discovered NOPD Chapter 41.1.1: Unusual Occurrences, provides some guidance, definitions, and evaluations of threat levels for the department's responses to crowds and large gatherings.

Sergeant Barnes noted the following definitions in the policy:

"**Civil Protest/Demonstration**—A person or persons who overtly take a public action to physically demonstrate their/his/her views concerning the support, contradiction or other statement or issue involving politics, government, law enforcement, etc.

**Civil Disturbance**—Any incident which disrupts a community where law enforcement intervention is required to maintain public safety. Civil disturbances may consist of riots, demonstrations, strikes, sit-ins, or mass acts of criminal damage or violence.

**Terrorism**—The unlawful use of force or violence against persons or property to intimidate or coerce a government, the civilian population, or any segment thereof in furtherance of political or social objectives."

The policy also provides the following rubrics regarding the department's evaluation of crowds or gatherings:

> "**THREAT LEVELS**
>
> 3. The following threat levels provide a relative guide to facilitate clear communication between members when evaluating and assessing the hazards associated with and possible resource needs of incidents relating to crowds, events and gatherings.
>
>     (a) LOW LEVEL:
>         i. The threat is vague and indirect.
>         ii. Information within the threat is inconsistent, implausible or lacks detail.
>         iii. Threat lacks realism; and
>         iv. Content suggests group / person is unlikely to carry it out.
>     (b) MEDIUM LEVEL:
>         i. Threat is more direct and more concrete than a LOW LEVEL threat.
>         ii. Wording suggests threatening group / person has given some thought to how the act will be carried out.
>         iii. General indication of a possible place and time (but not a detailed plan). and
>         iv. Strong indication the threatening group / person has taken preparatory steps, although there may be some veiled reference or ambiguous or inconclusive evidence pointing to that possibility.
>     (c) HIGH LEVEL:
>         i. The threat is direct, specific and plausible.
>         ii. Threat suggests concrete steps have been taken toward carrying it out.
>
> **THREAT TYPES**
>
> 4. The following threat types provide a relative guide to facilitate clear communication between members when classifying the hazards associated with and possible resource needs of incidents relating to crowds, events and gatherings.
>     (a) DIRECT THREAT – Identifies a specific act against a specific target and is delivered in a straightforward, clean and explicit manner.
>     (b) INDIRECT THREAT – Has a tendency to be vague, unclear, or ambiguous.
>     (c) VEILED THREAT – Strongly implies but does not explicitly threaten violence.
>     (d) CONDITIONAL THREAT – Warns that a violent act will happen unless certain
>     demands or terms are met."

Based on the investigation and review of the policy, Sergeant Barnes determined the agitators on the bridge, specifically the informal leaders of the protest, made conditional and veiled threats on the bridge during negotiations. The conditional threats were also based on demands which were unreasonable and impossible to perform, such as: officers laying down their firearms or an officer being arrested and brought to the bridge. Sergeant Barnes noted the threats coupled with the indications of agitators on the bridge that evening, the incident presented a high threat level, in that the conditional threats were specific and plausible.

C294

Sergeant Barnes discovered the chapter also provides some guidance for the department's response to unplanned crowds, events, and gatherings. The section of the policy that provides this information reads:

"UNPLANNED CROWDS, EVENTS AND GATHERINGS

10.    District patrol officers may encounter gatherings of people, including but not limited to:
    (a)    Civil protest / demonstrations,
    (b)    Civil disturbances, and
    (c)    Un-permitted parades (those not granted permit by City thru Special Events Section of FOB).

11.    District patrol officers should monitor such events as time permits in an effort to keep the peace and protect the safety and rights of those present.

12.    A District patrol supervisor shall be notified of the event once discovered and when it becomes reasonably foreseeable that such an event may require increasing monitoring, contact or intervention.

13.    District patrol officers responding to an event or gathering that warrants law enforcement involvement or intervention shall:
    (a)    Notify his/her supervisor.
    (b)    Carefully balance the speech and association rights of those present with applicable public safety concerns before deciding to take enforcement action.
    (c)    Seek review and approval of enforcement action from his/her supervisor (if not on-scene) before taking action.
    (d)    Officers are encouraged to contact organizers or responsible persons to seek voluntary compliance that may address relevant public safety/order concerns.

14.    District patrol officers should consider enforcement of applicable state and local laws when the activity blocks the entrance or egress of a facility or location and when requests for voluntary compliance with the law is not achieved.

15.    Absent exigent circumstances, District patrol officers shall request the presence of a supervisor on scene, brief the supervisor of conversations and actions already taken and obtain supervisory approval before taking enforcement action"

Sergeant Barnes noted the portion of the policy on unplanned events provided little guidance regarding a response to an event such as the protest that occurred the evening of June 3rd.

Sergeant Barnes then looked at the section of the policy addressing NOPD's response to planned events. That section reads:

"RESPONSE TO PLANNED CIVIL DISTURBANCES

16.     ISB - Specialized Investigations Division - Intelligence Section members will conduct an analysis of all known / planned protest events in advance and will provide a written "Threat Assessment."

17.     The Threat Assessment will be distributed to the:

>           (a) Commander of the ISB - Specialized Investigations Division,
>           (b) Deputy Chief of the Investigations and Support Bureau (ISB),
>           (c) Deputy Chief of the Field Operations Bureau,
>           (d) Affected District Commander(s), and
>           (e) The Special Operations Division Commander."

Sergeant Barnes noted the portion of the policy covering a response to planned events did not provide any guidance on an actual response to the event but required the intelligence section to provide threat assessments concerning the event in advance. Sergeant Barnes verified with Detective Steven Phillips, of the NOPD intelligence unit, that these threat assessment emails have been sent regarding each protest they were aware of.

Sergeant Barnes noted the chapter's section on planned civil disturbances offered no guidance on the department's response to the protest, other than to provide a threat assessment.

Sergeant Barnes attempted to locate any policy the department has had in the past regarding the NOPD's response to first amendment assemblies or mass demonstrations and was unable to find one. During his research, Sergeant Barnes was informed by Captain James Scott, of the NOPD's Special Investigations Division, that most responses by SOD will not be written into policy because the response is dictated by the circumstances. Captain Scott stated the most important thing on SOD responses is that the SWAT Commander is in charge and has the discretion to respond to the event based on the circumstances.

Sergeant Barnes received the Special Operations Division's written standard operating procedures (SOPs) from Sergeant Todd Morrell on July 15, 2020. Sergeant Barnes reviewed the SOPs he was provided and discovered two SOPs which addressed protests and riot control. SOP 12 is titled "Protest" and SOP 16 is titled "Riots and Riot Training." The SOPs were listed in the table of contents provided in the Field Operations Bureau SOD Tactical Division SOP Manual. Sergeant Barnes was advised by Sergeant Morrell that the manual had not been completed and several SOPs had not yet been written. Among the SOPs that had not been written were TSOP 9: KSA Process, TSOP 10: SWAT Training and Physical Fitness Training, TSOP 12: Protest, TSOP 15: Hostage Negotiations/Barricaded Subjects, TSOP 16: Riots and Riot Training, and TSOP 17: TIGER Unit. No written SOP governing SOD's response to protests or riots was in existence at the time of the incident.

Sergeant Barnes also reviewed the NOPD's Emergency Operations Plan Policy, Chapter 46.2. The policy provides that the NOPD will follow the principles of Incident Command and the structures and guidelines of the National Incident Management System (NIMS). Sergeant Barnes determined the guidelines were loosely followed but without planning or preparation for the event.

C296

In paragraph 11 of the policy, civil disturbances (defined as "riot, large scale demonstration, etc.") is considered an extraordinary circumstance which officers could be called back to work for, if the NOPD's Emergency Operations Plan was activated. The investigation revealed no Emergency Operations Plan was activated for the protests on the night of June 3rd.

## #JusticeForFloyd/#BlackLivesMatter Protest plan (released June 4)

During the investigation, On August 17, 2020, Sergeant Barnes learned from Sergeant Richard Blackman, that no operations plans had been released prior to the #JusticeForFloyd/#BlackLivesMatter Protest plan, released on June 4, 2020, the day after the incident.

Sergeant Barnes noted the plan provided the following personnel were assigned clear roles beginning with the protests on June 5. Sergeant Barnes also found that page 12 of the plan provided a script officers should use to provide three warnings to protesters before making any arrests. The plan determined there were two phases for arrests, the first phase consisted of warning all protesters of the laws they were in violation of and the consequences (arrest or expulsion from the area) if they did not comply with the laws. The second phase is to remove individuals who do not leave on their own. The plan then stated, "**THIS WILL BE DONE IN A NON-CONFRONTATIONAL MANNER.**"

The only portions of the plan pertaining to the use of gas or munitions deployment advised the use of gas or munitions was restricted to the Tactical Platoon and the Armory, at the direction of the Tactical Commander or his designee.

The plan also required an after-action report for the covered events be submitted to the Incident Commander and Planning Section Chief by Wednesday, June 10, 2020. Sergeant Barnes reached out to both the Field Operations Bureau Office and the Special Events Section Office several times, the latest being Friday, December 11, 2020, and discovered no after-action reports had been submitted (except for the SOD report).

## Use of Force Policy Review

Sergeant Barnes also reviewed the Department's use of force policy, Chapter 1.3. In that chapter, Sergeant Barnes noted the definition of use of force is, "Physical effort to compel compliance by an unwilling subject above unresisted handcuffing, including pointing a firearm at a person." Sergeant Barnes also noted force is classified into four separate levels for reporting purposes, in the following manner:

"Use of Force Levels—For reporting and investigative purposes, the New Orleans Police Department categorizes use of force by its members into four (4) primary force levels:

LEVEL 1
Level-1 uses of force include pointing a firearm at a person and hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip) applied as pressure point compliance techniques that are not reasonably expected to cause injury;

takedowns that do not result in actual injury or complaint of injury; and use of an impact weapon for non-striking purposes (e.g., prying limbs, moving or controlling a person) that does not result in actual injury or complaint of injury. It does not include escorting, touching, or handcuffing a person with minimal or no resistance.

LEVEL 2
Level-2 uses of force include use of a CEW (including where a CEW is fired at a person but misses); and force that causes or could reasonably be expected to cause an injury greater than transitory pain but does not rise to a Level 3 use of force.

LEVEL 3
Level-3 uses of force include any strike to the head (except for a strike with an impact weapon); use of impact weapons when contact is made (except to the head), regardless of injury; or the destruction of an animal.

LEVEL 4
Level-4 uses of force include all 'serious uses of force' as listed below:
(a) All uses of lethal force by an NOPD officer.
(b) All critical firearm discharges by an NOPD officer.
(c) All uses of force by an NOPD officer resulting in serious physical injury or requiring hospitalization.
(d) All neck holds.
(e) All uses of force by an NOPD officer resulting in a loss of consciousness.
(f) All canine bites.
(g) More than two applications of a CEW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or CEW application for 15 seconds or longer, whether continuous or consecutive;
(h) Any strike, blow, kick, CEW application, or similar use of force against a handcuffed subject; and
(i) Any vehicle pursuit resulting in death, serious physical injury or injuries requiring hospitalization."

Sergeant Barnes discovered the policy does not reference the use of CS gas or the 40mm launcher impact rounds. Sergeant Barnes noted the 40mm launcher impact rounds could be considered an impact weapon. Chapter 1.3 defines an impact weapon as:

"Any solid or semi-solid object used by an officer as a method of gaining control of a subject. Absent exigent circumstances, officers shall not use non-traditional weapons/hard objects, such as firearms or radios, as impact weapons."

Based on the definition, nearly anything could be considered an impact weapon. Sergeant Barnes then sought clarification on the spirit of the policy regarding its intent to classify the use of gas canisters and the 40mm launcher. On August 31, 2020, Sergeant Barnes received an email from Captain Michael Pfeiffer (Ret.), the Innovation Manager for the NOPD's Performance Standards & Accountability Bureau (PSAB), informing him the current use of force policy does not account for the use of gas or the launcher, because they are restricted to SOD.

Sergeant Barnes's investigation revealed, the deployment of gas or use of the 40mm launcher have not been documented as a use of force but have always been left to SOD to document in their after-action reports. The Force Investigation Team and NOPD administration have known SOD uses gas on certain SWAT deployments and there has never been a standard requiring the use of the weapons to be reported as a use of force. Based on this pattern and practice, and the information from Captain Pfeiffer, Sergeant Barnes concluded the use of force involving the gas canisters and the 40mm launcher are not currently covered by the NOPD's use of force policies.

Investigators noted that no specific exception has been explicitly expressed regarding SOD's use of gas or 40-millimeter launchers, or any other specialized tools specific to SOD. The policy regarding the levels of force and reporting requirements appears to have left specialized tools used by SOD out of the required reporting format for reportable use of force by omission, unintentionally. The investigation also determined the use of these tools are considered a use of force by the Department's own definition and are considered less-lethal weapons by the definition in Chapter 1.3 – Use of Force. The investigation noted the use of the weapons was and has been reported and documented through a scheduled debrief and in the SOD After Action Report.

NOPD Chapter 1.3, paragraph 4 provides:

"Any evaluation of reasonableness must allow for the fact that officers must sometimes make split-second decisions about the amount of force that is necessary in a particular situation with limited information and in circumstances that are tense, uncertain, and rapidly evolving."

This standard for evaluation of reasonableness is taken directly from *Graham* v. *Connor*, the current binding United States Supreme Court case used to evaluate reasonableness of force.

Sergeant Barnes also reviewed a non-exhaustive list of factors regarding the facts and circumstances known by officers, or should be reasonably known by officers, provided in paragraph 16 of Chapter 1.3, which should be considered when determining the reasonableness of force. Sergeant Barnes's investigation revealed the following factors were present and should be considered:

- At the time of the gas deployment, agitators and protesters were disregarding commands to exit a public highway on which they were protesting without a permit, possibly in violation of Louisiana Revised Statutes, Title 14:97 (possibly 14:96) and 14:326. Regarding obstruction of a highway of commerce and permitting requirements for processions, marches, parades, or demonstrations.

- The crowd, at the time of the gas deployment, physically pushed through a line of police officers, shoving, and hitting at officers as they did, at a level of aggressive resistance (as defined in Chapter 1.3). These actions posed a threat to the officers, as well as a threat to peaceful civilians on the bridge who were enveloped in the mob-like crowd near the fighting.

- The conduct of the individuals, by the officers' perception, was described by a member of NOPD Command Staff in the following way, "Without any uncertainty, clearly this group of protesters wanted to engage the officers in a physical confrontation. The crowd advanced on the officers and used violence against the police line."

- The crowd of protesters greatly outnumbered the police officers on the highway.

- At the time of the gas deployment none of the protesters had been restrained.

- At the time gas was deployed, the officers on the highway had no other methods to regain control of or disperse the crowd that would have been as effective, such as using batons, CEWs (Tasers), or weaponless defensive techniques (hands, fists, feet).

- The officers on the highway, once the protesters began resorting to aggressive resistance, did not have the time or ability to step back, regroup, and develop an alternative approach to address the situation.

- At the time the 40mm launchers were fired, the munitions were directed towards agitators who were throwing projectiles (including gas canisters) at the police and/or exhibiting resistance by advancing towards officers with stolen right shields.

- During the subsequent deployments of gas, several agitators remained on the bridge, refusing the leave, and were advancing towards police in an angry manner (by the admission of one of the protesters, Bilal Ali-Bey).

- The subsequent deployments of gas were deployed into an area between the protesters and police, maintaining a separation between them.

- Agitators, on the subsequent gas deployments, kicked and threw the deployed canisters back towards police, or off of the bridge. The 40mm launchers were used to address those groups of agitators.

Investigators reviewed policy guidance regarding the Oakland Police Department's policy regarding crowd control and crowd management. That policy acknowledges several aspects of crowd control incidents that must be acknowledged. This investigation recognizes the three following things:

First, it is essential to recognize that all members of a crowd of demonstrators are not the same and even when some members of a crowd engage in violence or destruction of property, other members of the crowd are not participating in those acts.

Second, once some members of a crowd become violent, the situation often turns chaotic, and many individuals in the crowd who do not want to participate in the violent or

destructive acts may be blocked from leaving the scene because the crowd is so large or because they are afraid they will move into a position of heightened danger.

Third, this understanding does not mean Law Enforcement Officers cannot take enforcement action against the crowd as permitted by legal standards, training, and policy, but NOPD should seek to minimize the risk that force and arrests may be directed at innocent persons

Investigators recommend ensuring these aspects of crowd control are recognized in policy by the NOPD.

Based on the listed factors and the information obtained through the investigation, Sergeant Barnes believes the involved officers' use of force was reasonable based on the facts and circumstances of the incident at the time force was used.

## New Policies Regarding First Amendment Assemblies

Sergeant Barnes learned that sometime in July of 2020, a draft policy regarding the department's response to First Amendment Assemblies was submitted for review by PSAB, at the direction of Deputy Superintendent John Thomas. Sergeant Barnes requested to review the draft policy so that this investigation may document the steps the New Orleans Police Department has taken to establish guidance and regulate the department's response to First Amendment Assemblies and demonstrations. Sergeant Barnes was never provided a copy of the draft policy.

On Thursday, October 15, 2020, at approximately 1:40 PM, Professional Standards and Accountability Bureau Sergeant Kevin Suzeneau sent a department-wide email introducing NOPD Chapter 46.02.1 – Civil Disturbances, announcing the policy would be effective on Sunday, October 18, 2020.

Sergeant Barnes reviewed the new chapter and discovered some of the definitions in the chapter do not align with the same or similar definitions found in the Unusual Occurrences policy, chapter 41.1.1. Chapter 41.1.1 provides the following definitions:

> **"Civil Disturbance**—Any incident which disrupts a community where law enforcement intervention is required to maintain public safety. Civil disturbances may consist of riots, demonstrations, strikes, sit-ins, or mass acts of criminal damage or violence.

> **Civil Protest/Demonstration**—A person or persons who overtly take a public action to physically demonstrate their/his/her views concerning the support, contradiction or other statement or issue involving politics, government, law enforcement, etc."

While Chapter 46.02.1 provides:

> **"Civil Disturbance** – A generic term for all forms of civil disobedience, demonstration, protest, march or riot.

**Demonstration** - A public meeting or march in which people show opposition to, or support for or against something or expressing views on a political issue."

Chapter 46.02.1 also provides new definitions for the following:

"**Civil Disobedience** - The refusal to obey civil laws in an effort to affect change in government.

**Civil Disorder** - Group acts of violence and disorder prejudicial to public law and order.

**Event** – A happening that was planned or anticipated in advance.

**Incident** – An occurrence natural or human-caused that requires an emergency response to protect life, property, or both."

Sergeant Barnes noted the definition of civil disobedience addressed the disobedience to civil law, but not criminal law, if it was meant to be interpreted in such a way. The definitions of "Event" and "Incident" also appear to be new verbiage for the same use of the terms "Planned Civil Disturbances" and "Unplanned Crowds, Events and Gatherings" found in Chapter 41.1.1.

Sergeant Barnes also observed the Incident Action Plan definition in the new chapter allowed for the plan to be oral or written and may include identification of resources and assignments, contingency plans, and attachments that provide direction or information for managing the incident. The chapter then defined the roles of the Incident Commander, Operations Section Chief, and Planning Section Chief; however, it did not define the roles of the other assignments listed in the protest operations plan. The following NOPD roles were undefined by the policy:

City Park Commander
French Quarter/Jackson Square Commander
Rapid Response Team Commander
Intelligence Section Chief
Tactical Operations Section Chief
Tactical Task Force Leader
Traffic Section Chief
EOD Task Force Leader
Armory and Equipment
Logistic Section Chief

The policy outlined several sections which overlapped with other policies, without references. The general rules of engagement encompassed many approaches, such as de-escalation and creating distance, which are addressed in NOPD Chapter 1.3: Use of Force. The policy also provides responsibilities of responding units and Supervisor responsibilities which appear to emulate or briefly expound upon the same requirements provided in the NOPD unusual occurrences policy, Chapter 41.1.1.

Sergeant Barnes review of the policy determined it did not appear to address any of the issues raised by the incident on June 3, 2020. The policy was silent as to many important aspects of NOPD's response to protests; including planning, use of force. And reporting use of force. Sergeant Barnes noted several portions of the policy were unnecessarily confusing, without using clear and concise language, which would not be open to multiple interpretations, such as paragraph 20, sections c, d, f, i, k, l, and m. Sergeant Barnes noted the term "Kettling" is used in paragraph 20, section i, but is not defined or explained in the policy.

Sergeant Barnes discovered paragraphs 6, 7, 10, and 32 of the chapter reference the "Special Operations Plan for Civil Disturbances." On Friday, October 16, 2020, Sergeant Barnes spoke with Sergeant Nicole Powell in the Field Operations Bureau Office. Sergeant Powell informed Sergeant Barnes that it was her understanding the policy did not call for a written SOP but that if there was an event that required planning it would be written by the special events office in the form of an operations plan. If there was a plan that would require the Special Operations Division, they would provide a plan regarding their involvement.

On Wednesday, October 21, 2020, Sergeant Barnes contacted Captain Sandra Contreras and Captain Michael Pfeiffer, asking about the Special Operations Plan for Civil Disturbances, if it existed and where it is housed. On Friday, October 23, 2020, Captain Michael Pfeiffer (Ret.) allowed Sergeant Barnes to view a draft of the Special Operations Division Standard Operation Procedure for handling first amendment assemblies and mass demonstrations.

Sergeant Barnes noted the draft addressed two separate levels of assemblies with Level I being peaceful civil disturbances and Level II being non-peaceful civil disturbances and riots. The section for Level I addressed peaceful civil disturbances and spoke to several portions of de-escalation and use of force that are covered in the use of force policies, it also refers to a use of force continuum which has been eliminated from NOPD policy. The policy included a section regarding Ethical Policing Is Courageous (EPIC), which is an important reminder and should be reiterated in a public policy, not an SOD standard operating procedure.

The second level addressed non-peaceful civil disturbances and riots. The policy specifically states, "Once the peaceful protest become contentious and a portion of the crowd become unruly the below protocol goes into effect." The policy advises that warnings shall be given prior to taking action and provides a script for the warnings. The section then provides direction for several less lethal weapons included in the Special Operations Division Armory and provides who is to use them and they are only to be used after a command level decision, and only as a last resort when life is in danger. Sergeant Barnes noted this is within the guidelines set by the New Orleans City Council Ordinance restricting the use of tear gas on Thursday, September 17, 2020. Sergeant Barnes noted the policy stated the Incident Commander should be located where they are able to receive intelligence and information, away from the protest location where they can make informed decisions.

Sergeant Barnes discovered nothing in the policy that should be considered classified information preventing it from being in a public NOPD Chapter, such as Chapter 46.02.1.

**Body Worn Camera Policy Issues**

Sergeant Barnes noted during his investigation that all of the members of the gas team failed to activate their cameras at the outset of the event. Sergeant Barnes also learned that, when the team arrived, they were almost immediately instructed to deploy gas, and several members ran straight to the line to deploy gas, leaving some of their own equipment behind.

Sergeant Barnes reviewed NOPD Chapter 41.3.10, which provides guidance on body worn cameras. Sergeant Barnes discovered paragraphs 10 and 11 of the policy provide requirements for when the cameras must be activated by personnel. Sergeant Barnes noted paragraph 11, section s, requires that the cameras should be activated during any legitimate law enforcement contact where the officer believes that a recording of an incident would be appropriate. Sergeant Barnes noted several other sections that may also have required the officers to activate their cameras.

During the officers' statements, each officer self-reported that they turned their cameras on during the event, as soon as they realized their error. Sergeant Barnes determined the failures to activate the BWCs could fall under the guidance of NOPD Chapter 41.3.2, regarding the inadvertent misuse of BWCs. Sergeant Barnes reviewed Chapter 41.3.2 and discovered the failure to activate a BWC under these circumstances would be considered an inadvertence misuse of the policy by NOPD policy. The inadvertent misuse of a body worn camera could ordinarily be addressed through non-disciplinary means. However, paragraph 3 of Chapter 41.3.2 specifically states:

> ". . . An alleged BWC violation is not eligible for non-disciplinary counseling if it is associated with:
> (a) Any alleged use of force (see **Chapter 1.3 – Use of Force**).
> (b) Any alleged criminal act on the part of the officer.
> (c) Any other alleged violation of NOPD rules, regulations, or policies; or
> (d) Any public complaint (see **Chapter 52.1.1 – Misconduct Complaint Intake and Investigation**)"

Sergeant Barnes determined because the alleged violations of the BWC policy is associated with a public complaint, they are not eligible for non-disciplinary counseling. Because of this, the misuse was addressed as an additional sustained violation under Formal Disciplinary Investigation number (CTN) 2020-0330-P.

**NOPD Consent Decree Requirements Regarding First Amendment Assemblies**

Investigators reviewed the Consent Decree regarding the New Orleans Police Department and did not locate any requirements specifically regarding First Amendment Assemblies, other than blanket requirements to adhere to constitutional policing. Investigators discovered paragraphs 155-161 specifically address individual First Amendment Rights to record police activity but are not specific to First Amendment Assemblies.

## Responsibility for Policies

On Wednesday, November 18, 2020, Sergeant Barnes requested and received the NOPD Performance Standards and Accountability Bureau's (PSAB) Manual of Standard Operating Procedures. Sergeant Barnes noted the document, on December 29, 2017, adopted regulations governing the implementation and maintenance of the reforms mandated by the Federal Consent Decree. These regulations are attached to the document as Appendix A. A review of the regulations revealed Section IV, paragraph A (found on page 26 of the document), states, "NOPD shall adopt a Use of Force Policy covering uses of force by NOPD officers." The regulation says the policy shall require officers who use force to notify their supervisor of the use of force, identify different force levels, define use of force, and require officers to submit a written force statement describing the use of force.

Review of the Consent Decree Regarding the New Orleans Police Department revealed that paragraph 28 states, in part:

> "The comprehensive use of force policy shall include all force techniques, technologies, and weapons, both lethal and less-lethal, that are available to NOPD officers, including standard-issue weapons that are made available to all officers, and weapons that are made available only to specialized units. The comprehensive use of force policy shall clearly define and describe each force option and the circumstances under which use of such force is appropriate."

Based on the investigation, it appeared the use of force policy adopted by NOPD, after approval by the U.S. Department of Justice, did not cover all uses of force by NOPD officers, failing to include weapons available only to specialized units, such as tear gas and impact rounds.

Sergeant Barnes learned during his investigation, the PSAB Manual is in the process of being revised, along with the applicable NOPD Use of Force policies.

After learning there were no policies in place specifically addressing the NOPD's response to First Amendment Assemblies, Investigators reviewed the policies and did not discover anything in policy specifically requiring the drafting of policies, or who would be responsible for ensuring the policies were drafted.

Investigators did discover NOPD Chapter 11: Organizational Command Responsibility, Paragraph 3, states, "The Superintendent is the highest authority within the New Orleans Police Department. The Superintendent has responsibility for all administration, organization, supervision and discipline-related functions of the Department." However, nothing in the policies specifically addressed a requirement as to which policies would be drafted governing NOPD responses to specific incidents.

## Summary of Investigation (findings)

During the investigation Sergeant Barnes discovered NOPD officers were monitoring a peaceful protest, under the supervision of Captain Lejon Roberts, at the direction of Deputy

Superintendent John Thomas. Sergeant Barnes learned, at the time of the incident, no operations plan had been provided regarding NOPD's response to the protest. Sergeant Barnes also learned the NOPD, at the time of the incident, had not established a policy specifically governing or providing guidance regarding the department's response to first amendment assemblies or mass demonstrations. The department's policy on Use of Force also did not address the use of gas or the 40mm launchers, omitting it from the levels of reportable force, despite the fact that less lethal munitions appear to fall under the department's adopted definition of reportable force. Because of this lack of a requirement to report force, the officers could not be reasonably held to a standard of failing to report force in a timely manner that was not required by policy to be reported.

An analysis of the incident from a use of force perspective (a list of factors can be found under the Use of Force policy analysis section) determined the use of the munitions was within the standards provided through training guidelines. The investigation determined the protesters who were on the elevated highway consciously chose to throw objects, demean, intimidate, and physically push through the line of officers, kicking, shoving, hitting, and taking equipment as they did. These actions by the protesters were taken after they had been informed and a police skirmish line clearly indicated the protesters would not be allowed to continue marching any further on the bridge. The response of the officers, after physically trying to prevent the protesters from advancing, included pushing back, shoving with shields, jabbing with batons, and ultimately deploying CS gas and 40mm impact rounds to control and disperse the protesters, which were actively engaged in civil unrest, with agitators demonstrating aggressive (and in a limited number of cases aggravated) resistance. Sergeant Barnes found no reasonable officer, on scene at the time of the use of force, that considered the use of the gas or any of the 40mm launcher rounds to be unjustifiable physical abuse, force, violence, or intimidation. Sergeant Barnes also found the officers did not use intimidation as a tactic during the incident, other than being attired in riot gear. Sergeant Barnes determined the donning of riot gear to establish a clear barrier for protesters did not rise to the level of being unjustifiable intimidation.

Therefore, the use of force did not appear to meet the NOPD's standard of unauthorized force.

The investigation determined that even though the use of force appears justifiable, based on the totality of circumstances, the decisions made prior to the use of force created a more dangerous environment for police and protesters alike. The positioning of the police skirmish line escalated the situation while on an elevated highway. Further, the lack of pre-planning for the event, with available intelligence on what the protesters may attempt, ensured police were unprepared for a confrontation, and unprepared to determine the location of that confrontation. Placing the police line near the base of the onramp or on a ground level would have allowed for a safer environment in the event of a gas deployment and would have allowed police to communicate with a greater number of protesters.

The investigation further revealed that the New Orleans Police Department did not have the proper guidance in place regarding the Department's response to First Amendment Assemblies

or the use and reporting of specialized less lethal munitions, such as CS gas and 40mm impact rounds.

Nothing in the investigation found a confrontation with the protesters could have been prevented entirely unless the police took no action to corral, guide, or prevent agitators from causing civil unrest.

### Recommendations

Based on the findings of the investigation, Sergeant Barnes suggests the following recommendations:

**Recommendation 1:**

The NOPD should create policy that establishes clear guidelines and expectations for officers and command staff regarding the department's response to first amendment assemblies and civil disturbances. The policy should provide guidance on the department's response to planned and unplanned events, including a command staff hierarchy, reporting procedures, rules of engagement, and the department's response to force. The policy should include sections addressing the following topics:

Policy intent

Planned First Amendment Assemblies

Unplanned events

Violent Civil Disturbances (Riots)

Organization of the Mobile Field Force

Mobilization of personnel in support of events

> Including assessing crowds and providing medical assistance

Command assignments and responsibilities

and

Operational Procedures for Civil Disturbances

Investigators also recommend the policy include as attachments the necessary forms for providing warnings to protesters and documenting the event.

Investigators also recommend the NOPD recognize the following things in any policy regarding First Amendment Assemblies, Crowd Control, or Civil Unrest:

First, it is essential to recognize that all members of a crowd of demonstrators are not the same and even when some members of a crowd engage in violence or destruction of property, other members of the crowd are not participating in those acts.

Second, once some members of a crowd become violent, the situation often turns chaotic, and many individuals in the crowd who do not want to participate in the violent or destructive acts may be blocked from leaving the scene because the crowd is so large or because they are afraid they will move into a position of heightened danger.

Third, this understanding does not mean Law Enforcement Officers cannot take enforcement action against the crowd as permitted by legal standards, training, and policy, but NOPD should seek to minimize the risk that force and arrests may be directed at innocent persons.

Sergeant Barnes verified with members of the NOPD's Professional Standards and Accountability Bureau that a policy is currently being drafted and reviewed to address these areas of concern.

## Recommendation 2:

The NOPD should update current use of force chapters to reflect the proper levels of force and requirements regarding CS/OC/CN gas, the 40mm launcher (including all impact rounds), and any other specialized weapons used by the NOPD. The policy should consider the less-lethal munitions available to SOD, to be covered by policy, and clearly articulate those weapons are specific to the NOPD Special Operations Division to ensure clear guidance and expectations are outlined. Sergeant Barnes recommended the use of any impact munitions or gas during a first amendment assembly or for crowd control should be considered a level 4 use of force and investigated by the Public Integrity Bureau's Force Investigation Team.

Sergeant Barnes has been informed by members of the Professional Standards and Accountability Bureau that updates to the current policies are under review at the time of this writing.

These requirements would include the mandatory reporting of the use of less-lethal weapons as soon as practicable. The recommendation seeks to address any issues in communication and reporting between those officers using force and supervisory staff tasked with documenting and reporting that force to the proper channels. This would include debriefing all officers on scene regarding what force was used to ensure accurate information is promptly provided.

These changes should be reflected in SOD SOP and should include a requirement to conduct a more thorough initial debriefing immediately following any SOD deployment.

**Recommendation 3:**

The department should establish a dedicated Mobile Field Force made from officers who have undergone the updated Crowd Control / Riot Training. These officers should be the first officers called back to assist the department in support of planned events and unplanned events, if they rise to the level of requiring additional personnel being called in. Each District should have a list of these certified officers in the event a response of the Mobile Field Force is needed.

Sergeant Barnes recommends the Mobile Field Force undergo yearly training regarding crowd control. Members of the mobile field force should also undergo training regarding EPIC, de-escalation, and communication training for crowd environments.

Sergeant Barnes recognizes the training should be specific to de-escalation, EPIC, and communications in crowd environments, which may require additional specialized training be created specific to those areas.

The training should also include a module specific to command staff. This training can be completed as a scenario-based table-top exercise, allowing command staff a practical exercise in responding to and organizing the mobile field force in response to civil disturbances.

Respectfully Submitted,

**Sergeant David A. Barnes**
**Force Investigation Team**
**Public Integrity Bureau**

CONCUR / ~~DOES NOT CONCUR~~

Date: 12/03/2020

**Captain Sabrina Richardson**
**Public Integrity Bureau**