# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 6, 2023

Lyle W. Cayce
Clerk

No. 22-30181

REMINGTYN A. WILLIAMS, ON BEHALF OF THEMSELVES AND ALL OTHER PERSONS SIMILARLY SITUATED; LAUREN E. CHUSTZ, ON BEHALF OF THEMSELVES AND ALL OTHER PERSONS SIMILARLY SITUATED; BILAL ALI-BEY, ON BEHALF OF THEMSELVES AND ALL OTHER PERSONS SIMILARLY SITUATED,

*Plaintiffs—Appellees*,

*versus*

LAMAR A. DAVIS, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE LOUISIANA STATE POLICE,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-cv-852

Before HIGGINBOTHAM, DUNCAN, and ENGELHARDT, *Circuit Judges*.
PER CURIAM:*

While marching across a bridge, protestors were met with non-lethal force exercised by police officers. On behalf of a putative class, three of those

---

* This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 22-30181

protestors now seek to maintain a suit against the superintendent of the Louisiana State Police ("LSP"), whose troopers were allegedly "bystanders" at the event. As we find that these plaintiffs are unable to maintain this suit, we REVERSE and RENDER JUDGMENT in favor of the LSP's superintendent.

## Factual Background and Procedural History

In June of 2020, several hundred protestors gathered to cross the Crescent City Connection bridge ("CCC") as part of protests in the wake of George Floyd's death. Among those protestors were the three named plaintiffs in this case: Remingtyn Williams, Lauren Chustz, and Bilal Ali-Bey ("Plaintiffs"). These protestors approached a police barricade primarily consisting of New Orleans Police Department ("NOPD") officers with support from Jefferson Parish Sheriff's Office deputies and equipment. Louisiana State Police troopers were allegedly "bystanders" at the event. Protestors requested permission to pass through the barricade but were denied. At some point, "a small group of agitated demonstrators passed through an opening in the police line." NOPD officers fired tear gas and other non-lethal munitions into the crowd and the crowd dispersed.

The Plaintiffs asserted various claims relating to alleged violations of their constitutional and statutory rights against individual officers and law enforcement agencies. Relevant to this appeal are the claims against Colonel Lamar Davis ("Davis"), Superintendent of the LSP. In summary, the Plaintiffs sued Davis alleging *Monell* and supervisory liability under 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 685 (1978), violations of various Louisiana constitutional and statutory provisions, and violations of Title VI of the Civil Rights Act of 1964. Davis filed a motion to dismiss for failure to state a claim, stating in part that he was protected by Eleventh Amendment

No. 22-30181

sovereign immunity and that the Plaintiffs lack standing to proceed against him.

The district court granted the motion as to the *Monell* claims and the Title VI claim but denied it as to the § 1983 claims and the state law claims. The court did not address the state law claims in detail as it found it unnecessary to do so given its findings on the federal claims. Evaluation of the § 1983 claims began with an inquiry into standing, which concluded: "[T]he Plaintiffs allege their constitutional rights have been violated, such violations are ongoing or may occur again at a later protest, and this Court can remedy those risks with prospective relief, namely injunctions curtailing LSP's policies. Therefore, at this time, the Plaintiffs have standing to bring this suit." The court also concluded that the Plaintiffs adequately pleaded § 1983 claims to fit within the relevant exception to Eleventh Amendment immunity as they "sued Col. Davis in his official capacity, 'allege[] ongoing violations of federal law by LSP,' and seek prospective relief." Davis promptly filed a notice of interlocutory appeal seeking review of the denial of Eleventh Amendment sovereign immunity.

## Standard of Review

"This court reviews denials of Eleventh Amendment immunity *de novo*." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citing *Cozzo v. Tangipahoa Par. Council—President Gov't*, 279 F.3d 273, 280 (5th Cir. 2002)). We likewise review questions concerning standing *de novo*. *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022).

## Discussion

### I. Jurisdiction

"This court has a continuing obligation to assure itself of its own jurisdiction, *sua sponte* if necessary." *United States v. Pedroza-Rocha*, 933 F.3d

No. 22-30181

490, 493 (5th Cir. 2019) (citing *Bass v. Denney*, 171 F.3d 1016, 1021 (5th Cir. 1999)). Orders denying Eleventh Amendment sovereign immunity are reviewable under the "collateral order doctrine." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993).

Less clear, however, is whether we have jurisdiction to review the district court's finding of standing. The Supreme Court has held that reviewable issues under the collateral order doctrine are those which "'[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment.'" *P.R. Aqueduct*, 506 U.S. at 144 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)). The Eleventh Circuit has explicitly considered whether standing is one such issue: "In contrast to the question of Eleventh Amendment immunity, however, we have held that a district court's denial of a motion to dismiss on justiciability grounds is *not* immediately appealable under the collateral order doctrine." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999) (citation omitted) (emphasis in original). Under Eleventh Circuit precedent, then, the "*only*" way the court can review a district court's finding of standing on interlocutory appeal is via the "pendent appellate jurisdiction doctrine." *Summit Med. Assocs.*, 180 F.3d at 1335 (emphasis in original).

This comports nicely with the nature of the collateral order doctrine. Eleventh Amendment immunity cannot effectively be reviewed "on appeal from a final judgment," *P.R. Aqueduct*, 506 U.S. at 144 (quoting *Coopers & Lybrand*, 437 U.S. at 468), because as immunity is "an immunity from suit rather than a mere defense to liability … it is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (ellipses in original, internal quotation marks omitted) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985)). Standing, however, can and

No. 22-30181

often is reviewed on appeal without such loss, in part because the question of standing is often "intertwined" with that of the merits. *See Barrett Comput. Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 219 (5th Cir. 1989). This makes questions of standing inappropriate for collateral review. If we are to address standing on the merits, therefore, it must be by the exercise of pendent appellate jurisdiction.

## II. Whether to Exercise Pendent Appellate Jurisdiction

Pendent appellate jurisdiction may only be exercised in one of two "carefully circumscribed" circumstances: "(1) If the pendent decision is 'inextricably intertwined' with the decision over which the appellate court otherwise has jurisdiction, pendent appellate jurisdiction may lie, or (2) if 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" *Escobar v. Montee*, 895 F.3d 387, 391 (5th Cir. 2018) (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 51 (1995)).

This court has previously exercised pendent appellate jurisdiction to address justiciability issues such as standing. In *Hospitality House, Inc. v. Gilbert*, it was held: "where … we have interlocutory appellate jurisdiction to review a district court's denial of Eleventh Amendment immunity, we may first determine whether there is federal subject matter jurisdiction over the underlying case." 298 F.3d 424, 429 (5th Cir. 2002). As standing indisputably goes to whether or not a court has subject matter jurisdiction, *see, e.g., Abraugh v. Altimus*, 26 F.4th 298, 301 (5th Cir. 2022), this panel can exercise pendent appellate jurisdiction to address standing issues. In fact, while reviewing a denial of Eleventh Amendment immunity, the panel in *Whole Woman's Health v. Jackson* determined that through the exercise of pendent appellate jurisdiction it had jurisdiction over justiciability issues such as standing. 13 F.4th 434, 446 (5th Cir. 2021).

No. 22-30181

Exercise of pendent appellate jurisdiction is not mandatory – as appellees point out, the Supreme Court carefully noted that "no one contest[ed] th[e] decision" to review standing on appeal in *Whole Woman's Health. Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537 (2021). Though that is not the case here, this court's jurisprudence nonetheless permits this panel to exercise pendent appellate jurisdiction. For one, "our Article III standing analysis and *Ex parte Young* analysis 'significant[ly] overlap.'" *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (quoting *Air Evac EMS, Inc. v. Tex.*, 851 F.3d 507, 520 (5th Cir. 2017)). In fact, "our caselaw shows that a finding of standing tends toward a finding that the *Young* exception applies to the state official(s) in question." *Id.* Additionally, "[w]e … address standing … when there exists a significant question about it." *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010). The *K.P.* court even addressed standing before proceeding to an *Ex parte Young* analysis even though "neither party … raised the issue of standing." *Id.*

Appellees recommend against exercising pendent appellate jurisdiction in this case for two main reasons. First, they note that as not all defendants are participating in this appeal, ruling on standing will "prematurely instruct the district court on how to decide this case for all of the defendants who are not participating in this appeal." But while the Plaintiffs stress this point, they submit no caselaw or other reasoning for why this would be problematic in itself. More persuasive are Plaintiffs' cites to *Swint* for the proposition that "a rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay … collateral orders into multi-issue interlocutory appeal tickets." *Swint*, 514 U.S. at 49–50. We are conscious of the risk of encouraging parties with potential Eleventh Amendment immunity claims (or other claims which are appealable on an interlocutory basis) to file "meritless immunity appeals just so they could seek premature interlocutory review of standing, allowing them to short-

circuit the normal appeals process when other defendants do not enjoy that same privilege." *See Abney v. United States*, 431 U.S. 651, 663 (1977) ("Any other rule would encourage criminal defendants to seek review of, or assert, frivolous double jeopardy claims in order to bring more serious, but otherwise nonappealable questions to the attention of the courts of appeals prior to conviction and sentence."). However, this immunity appeal is not meritless; further, we find that review of the *Ex parte Young* factors in this particular case is inextricably bound up with the issue of standing.

In sum, an exercise of pendent appellate jurisdiction "'is only proper in rare and unique circumstances.'" *Byrum v. Landreth*, 566 F.3d 442, 449 (5th Cir. 2009) (quoting *Thornton v. Gen. Motors Corp.*, 136 F.3d 450, 453 (5th Cir. 1998)). But our jurisprudence suggests that review of standing challenges in evaluating Eleventh Amendment immunity claims is often relevant as the issues may be both "'inextricably intertwined'" and "'necessary to ensure meaningful review.'" *Escobar*, 895 F.3d at 391 (quoting *Swint*, 514 U.S. at 51). While panels should review each case to determine whether or not it is an appropriate case for such an exercise, Fifth Circuit precedent suggests that cases such as this are "rare circumstances" in which pendent appellate jurisdiction may be exercised to review standing. As "our Article III standing analysis and *Ex parte Young* analysis 'significant[ly] overlap,'" *City of Austin*, 943 F.3d at 1002 (citation omitted), this case presents an appropriate opportunity to exercise pendent appellate jurisdiction to review standing, and we thus do so.

### III. Standing on the Merits

"[T]he irreducible constitutional minimum of standing contains three elements:" (1) "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, … and (b) 'actual or imminent,' not conjectural or hypothetical;" (2) "a causal connection between the injury

No. 22-30181

and the conduct complained of;" and (3) "it must be likely … that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). Davis contends that the Plaintiffs have no standing because their alleged future injuries are speculative.

The parties suggest that the standing debate largely turns on whether this case is more akin to *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) or *Hernandez v. Cremer*, 913 F.2d 230 (5th Cir. 1990). In *Lyons*, a plaintiff sued the City of Los Angeles and several of its police officers after he was placed in a chokehold. *Lyons*, 461 U.S. at 97. The Supreme Court found that while he had standing to pursue his claim of being subjected to a chokehold, he was without standing to seek injunctive relief to enjoin the Los Angeles police force from the use of chokeholds because he had demonstrated neither that he was likely to have another encounter with the police nor "(1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 106 (emphasis in original). *Hernandez* involved an American citizen born in Puerto Rico who presented a birth certificate indicating his place of birth while attempting to re-enter the United States from Mexico. *Hernandez*, 913 F.2d at 232. He was initially denied entry by an INS official who doubted the authenticity of the birth certificate; after several attempts, Hernandez was granted entry by another INS official. *Id.* at 232-33. Both Lyons and Hernandez sought to change an allegedly unconstitutional government policy. The *Hernandez* panel distinguished the case from *Lyons* by noting that "Hernandez (unlike Lyons) was engaged in an activity protected by the Constitution." *Id.* at 234.

The Plaintiffs here submit that they were engaged in activity protected by the First Amendment, that they would engage in such activity again in the future if not for the officers' actions, and that the LSP "employs policies,

practices, and customs that violate the plaintiffs' First, Fourth, and Fourteenth Amendment rights." They contrast the behavior of police officials at the CCC protest to police behavior at "protests attended by largely White attendees," noting that pro-confederate protests and anti-Covid-restriction protests were not met with tear gas or the like despite violations of state law. The Plaintiffs state that the LSP's actions have had "a chilling effect upon the rights of African American citizens (and those who directly and actively support them) to freely and lawfully protest without fear of police interference, harassment, intimidation or abuse." They contend, therefore, that they have adequately pleaded both that the policies in question are authorized by the superintendent and that the policies have chilled their speech. *See Laird v. Tatum*, 408 U.S. 1, 11, (1972) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.").

Unlike the plaintiff in *Hernandez*, these Plaintiffs were not engaged in constitutionally protected activity. Certainly, the right to peacefully protest is protected by the First Amendment. But "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). One such reasonable restriction is a restriction on protesting on public highways, as the Louisiana Supreme Court has recognized. *See Doe v. McKesson*, 2021-00929 (La. 3/25/22), 339 So. 3d 524, 533. In their briefing, the Plaintiffs retort that they had been protesting in the same way the five days preceding the events on the CCC and that they had even protested on another "elevated roadway" the night before. It is unclear why prior misconduct should justify further misconduct. More compellingly, the Plaintiffs suggest that they would "'lawfully' protest racial injustice and police misconduct in the future but for the discriminatory policies, practices,

No. 22-30181

and customs of the [LSP.]" Had the Plaintiffs been "lawfully" protesting at the time of their confrontation with law enforcement, perhaps there would have been a different outcome. The allegation that they were undisturbed in the five days prior to the CCC encounter only further suggests that a lawful protest may have been addressed differently.

In fact, the only other evidence of the LSP's attitude towards protesting comes in a discussion about how the LSP "did not intervene at all" while monitoring an anti-Covid-restrictions protest outside the Governor's mansion. It is alleged that the LSP officers likewise declined to intervene during the protest on the CCC. Both protests were allegedly unlawful and the LSP responded passively to both. This comparison, far from bolstering Plaintiffs' case, helps demonstrate why their injury is at best speculative. Their own complaint seems to allege that the LSP responds more or less identically to unlawful protests involving "overwhelmingly white" attendees as it did to this protest on the CCC. Plaintiffs attempt to place this incident in the context of the LSP's allegedly "well-documented history of racism against Black people" and "discriminatory use of excessive force against [Black people]" by pointing to various instances involving LSP officers' use of excessive force against minorities. The LSP is not here, however, on excessive use of force grounds, and none of these Plaintiffs were subjected to any discriminatory conduct by the LSP. None of the incidents the Plaintiffs bring to the court's attention which are alleged to show unconstitutional conduct by the LSP demonstrate an "actual or imminent" risk of "concrete and particularized" harm to these Plaintiffs by the LSP. *Lujan*, 504 U.S. at 560 (cleaned up).

The *Hernandez* panel comfortably distinguished *Lyons* by noting that "[t]he injury alleged to have been inflicted did not result from an individual's disobedience of official instructions and Hernandez was not engaged in any form of misconduct; on the contrary, he was exercising a fundamental

No. 22-30181

Constitutional right." *Hernandez*, 913 F.2d at 234–35 (footnote omitted). Here, neither of those factors is present. Some individuals did indeed disobey official instruction and attempted to pass through the barricade and the Plaintiffs were certainly engaged in misconduct by protesting atop the CCC at all. A section of *Lyons* is particularly illustrative:

> Although Count V alleged that the City authorized the use of the control holds in situations where deadly force was not threatened, it did not indicate why Lyons might be realistically threatened by police officers who acted within the strictures of the City's policy. If, for example, chokeholds were authorized to be used only to counter resistance to an arrest by a suspect, or to thwart an effort to escape, any future threat to Lyons from the City's policy or from the conduct of police officers would be no more real than the possibility that he would again have an encounter with the police and that either he would illegally resist arrest or detention or the officers would disobey their instructions and again render him unconscious without any provocation.

*Lyons*, 461 U.S. at 106. Likewise, though the complaint alleges that the LSP authorizes unlawful passivity in the face of unlawful usage of force by other police officers, the future threat from the LSP for the Plaintiffs is "no more real than the possibility that [they] would again have an encounter with the police and that either [they] would illegally [protest] … or the officers would disobey their instructions." *Id.* This conclusion is especially strong given that the LSP officers are not alleged to have used excessive force themselves.

"[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Id.* at 103. Plaintiffs may or may not have a stronger case against the officers and offices who were responsible for direct action, but against the LSP the Plaintiffs have not demonstrated more than a speculative future injury with little to no basis in past practice.

No. 22-30181

## IV. Eleventh Amendment Immunity

Eleventh Amendment sovereign immunity generally "bars private suits against nonconsenting states in federal court." *City of Austin*, 943 F.3d at 997 (citing *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011)). Although this suit was brought against Davis rather than the state, "a suit against a state official in his or her official capacity … is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted). In order to maintain a suit against a state, a litigant must generally take advantage of a state waiver or a Congressionally created exception to state sovereign immunity. *See Va. Off. for Prot. & Advoc.*, 563 U.S. at 253–54. It is undisputed here that Louisiana has not waived sovereign immunity in this case and that no Congressional loophole applies.

The Supreme Court has provided one alternative means by which litigants may sue a non-consenting state: the *Ex parte Young* exception, so named for the seminal Supreme Court case which codified it. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908). "[I]n order to fall within the *Ex parte Young* exception, a suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law." *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 424 (5th Cir. 2020) (citing *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394–95 (5th Cir. 2015)). It is through this exception that the Plaintiffs seek to maintain this suit.

The suit is brought against Davis in his official capacity, so the first *Young* prong is satisfied. Although Davis contends that he cannot be sued under § 1983 because he is not a "person" under § 1983, the very case he cites for that proposition rejects that contention: "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief

No. 22-30181

are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

As is made clear in our analysis of standing, however, the Plaintiffs have not demonstrated that they "seek prospective relief to redress ongoing conduct." *Freedom from Religion Found*, 955 F.3d at 424 (citation omitted). The Plaintiffs have not pleaded any "ongoing conduct" on behalf of the LSP that can be redressed prospectively. At oral argument, counsel made clear that the theory of standing underlying Plaintiffs' claims is that of chilled speech – namely, that the LSP's failure to act to restrain or otherwise inhibit the NOPD's use of force on the CCC that night is part of "decades-long policies and patterns of conduct" wherein LSP officers fail to intervene to aid (or prevent harm from coming to) protestors who are either minorities or speaking out in favor of minorities. As we have already mentioned, this claim is unsupported by the complaint and is far too vague to support a continuation of the action under the *Ex parte Young* standard. The LSP allegedly failed to intervene at this protest. Plaintiffs do not and cannot adequately demonstrate the relation between this failure to act in a case in which were engaged in misconduct and the chilling of their lawful First Amendment rights. As there is no "ongoing conduct" in the pleadings in this case, they have failed to satisfy the *Ex parte Young* standard and these claims are barred by sovereign immunity.

Several of the Plaintiffs' claims independently fail the third prong as they assert violations of state law rather than federal law. The district court indisputably erred in not dismissing the state law claims asserted against Davis. "[S]ince state law claims do not implicate federal rights or federal supremacy concerns, the *Young* exception does not apply to *state* law claims brought against the state." *McKinley v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011) (emphasis in original) (citation omitted). Appellees do not contest that

No. 22-30181

this was error. To the extent that the Plaintiffs' claims are for violations of state law they are barred by the Eleventh Amendment.

## <u>Conclusion</u>

The Plaintiffs have failed to demonstrate that they have standing to bring this suit and have relatedly not met their burden to proceed with their federal law claims under the *Ex parte Young* standard. Accordingly, we REVERSE the district court's order and reasons and RENDER JUDGMENT in favor of Davis.